ANDREW L. PACKARD (State Bar No. 168690)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
E-mail: andrew@packardlawoffices.com

[Additional counsel listed on p. 2]

Attorneys for Plaintiff
CALIFORNIA OPEN LANDS

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA OPEN LANDS,<br><br>        Plaintiff,<br><br>    v.<br><br>BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS, ERIC MILLER, AND DENNIS SCHMIDT,<br><br>        Defendants. | Case No: 2:20-cv-00123-DJC-DMC<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>(FRCP 56; Eastern District Civil L.R. 260)<br><br>Hearing Date: February 29, 2024<br>Hearing Time: 1:30 p.m.<br>Courtroom: 10, Hon. Daniel J. Calabretta<br>Trial Date: June 24, 2024 |

Brian D. Acree (State Bar No. 202505)
Law Office of Brian Acree
95 3rd Street, Second Floor
San Francisco, CA 94103-3103
Tel: (510) 517-5196
E-mail: brian@brianacree.com

William N. Carlon (State Bar No. 305739)
Law Office of William Carlon
437 Post Street
Napa, CA 94559
Tel: (530) 514-4115
E-mail: william@carlonlaw.com

Attorneys for Plaintiff
CALIFORNIA OPEN LANDS

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS:

PLEASE TAKE NOTICE THAT ON February 29, 2024, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 10 of the United States District Court, Eastern District of California, 501 I Street, Sacramento, California, Plaintiff California Open Lands shall move for partial summary judgment as to liability on its First Claim for Relief (Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan), Third Claim for Relief (Failure to Develop and Implement an Adequate Monitoring Implementation Plan), and Fourth Claim for Relief (Discharge of Contaminated Storm Water from the Facility).

This Motion is made pursuant to Federal Rule of Civil Procedure 56.  This Motion is based on the accompanying  Memorandum of Points and Authorities, Statement of Undisputed Facts, Appendix of Exhibits, Declarations of Holly Nielsen, Stephen Jackson, and William Carlon, and Plaintiff's Request for Judicial Notice.

Pursuant to Standing Order I.C, on August 16, 2023, the undersigned emailed counsel for Defendants to meet and confer regarding the substance of this motion. Counsel exchanged emails between then and August 25, 2023 and were unable to reach any agreement, thus exhausting meet and confer efforts.

**RELIEF REQUESTED**

By this motion for partial summary judgment, Plaintiff seeks injunctive relief, civil penalties, and declaratory relief for Defendants' violations of the Clean Water Act, section 301(a), 33 U.S.C. § 1311(a).  Defendants violated the Clean Water Act because Defendants discharged pollutants from the Neal Road Recycling and Waste Facility ("Facility") into an unnamed tributary to Hamlin Slough, a water of the United States, without complying with a permit issued pursuant to Clean Water Act section 402, 33 U.S.C. § 1342.  The County also failed to comply with all substantive and procedural

requirements of the General Permit[1] and the Clean Water Act, in violation of Clean Water Act section 402, 33 U.S.C. § 1342.

Dated: January 18, 2024                    LAW OFFICE OF WILLIAM CARLON


By: /s/ William Carlon
WILLIAM CARLON
Attorney for Plaintiff
CALIFORNIA OPEN LANDS

---

[1] Plaintiff's Request for Judicial Notice, Exhibit 1, attaches a true and correct copy of National Pollutant Discharge Elimination System General Permit No. CAS000001, State Water Resources Control Board Water Quality Order 2014-0057-DWQ as amended by Order 2015-0122-DWQ and Order 2018-0028-DWQ ("General Permit").

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ......................................................................... 3

RELIEF REQUESTED ............................................................................................. 3

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 8

I..................................................................................................INTRODUCTION
.................................................................................................................................. 8

II.....................................................STATEMENT OF ISSUES TO BE DECIDED
.................................................................................................................................. 9

III. .....................................................................FACTUAL BACKGROUND
.................................................................................................................................. 9

    A.  Plaintiff California Open Lands ................................................................. 9

    B.  Defendants' Landfill Facility .................................................................... 10

    C.  Leachate Discharges................................................................................ 11

    D.  The Facility's Storm Water Pollution Prevention Plans ...................... 11

IV. ..................................................................LEGAL BACKGROUND
................................................................................................................................ 12

V. ...............................................................................STANDARD OF REVIEW
................................................................................................................................ 15

VI. .................................................................................................... ARGUMENT
................................................................................................................................ 15

    A.  There Is No Genuine Dispute that Defendants Discharged Landfill Leachate
       into Waters of the United States, and that Those Discharges Were Not
       Authorized by Any Permit .......................................................................... 15

        1. There Is No Dispute that the Discharges Occurred....................................... 16

        2. Landfill Leachate Is a Pollutant Under the Clean Water Act......................... 17

        3. The Surface Waters into Which Defendants Discharged Landfill Leachate Are
           Waters of the United States ........................................................................ 17

        4. Defendants Discharged Pollutants from a Point Source ............................... 18

        5. There Is No Dispute that Defendants Do Not Have a Permit to Discharge
           Leachate from the Facility .......................................................................... 19

    B.............THERE IS NO GENUINE DISPUTE THAT DEFENDANTS HAVE FAILED TO
    DEVELOP AND IMPLEMENT AN ADEQUATE SWPPP FOR THE ENTIRE
    RELEVANT PERIOD. .................................................................................... 19

        1. Each SWPPP Failed to Include Adequate Site Maps.................................... 19

           a. Each Site Map Fails to Identify the Preserve ....................................... 20

           b. Each Site Map Fails to Identify the Locations of Industrial Activity and
              Material Subject to the General Permit .................................................. 20

           c. The 2019 and 2021 SWPPPs and Site Maps Fail to Identify All
              Impervious Areas .................................................................................. 22

           d. The 2021 SWPPP and Site Maps Fail to Identify the Advanced BMPs
              Implemented as a Result of the Parties' State Court Settlement
              Agreement ............................................................................................. 23

        2. Each SWPPP Fails to Accurately Describe the Locations of All Industrial
           Materials.................................................................................................... 24

3.  Defendants Have Failed to Revise the SWPPP when Necessary ................ 25

**C.  There Is No Genuine Dispute that Defendants Have Failed to Develop and Implement an Adequate Monitoring Implementation Plan for the Facility .. 26**

**D.  There Is No Genuine Dispute that COL Has Standing to Bring this Action. 28**

**VII. ......................................................................................................CONCLUSION ................................................................................................................................. 31**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ass'n to Protect Hammersly v. Taylor Res.*, 299 F.3d 1007 (9th Cir. 2002) .................. 12

*Baykeeper v. Kramer Metals, Inc.,* 619 F. Supp. 2d 914 (C.D. Cal. 2009) .................... 15

*Borden Ranch P'ship v. United States Army Corps of Eng'rs,*
    261 F.3d 810 (9th Cir. 2001) .................................................................. 19, 27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................. 15

*Clinton v. City of N.Y.*, 524 U.S. 417 (1998) .................................................. 30

*Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000) ........ 19, 26

*Envt'l Prot. Agency v. Cal.*, 426 U.S. 200 (1976) .............................................. 13

*Grano v. Rappahannock Electric Cooperative,*
    552 F. Supp. 3d 563  (W.D. Va. 2021) .................................................. 29, 30

*Hawaii's Thousand Friends v. Honolulu*, 821 F. Supp. 1368 (D. Haw. 1993) ............... 15

*Historic Green Springs, Inc. v. Louisa County Water Authority,*
    833 F. Supp. 2d 562  (W.D. Va. 2011) .................................................. 29, 30

*Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 826 (9th Cir. 2021)............. 30

*Lucas v. South Carolina Coastal Council,* 505 U.S. 1003 (1992) ................................. 29

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, (1992) ......................................... 28

*Massachusetts v. E.P.A.* 549 U.S. 497  (2007) ................................................. 29

*N. Cal. River Watch v. Redwood Landfill Inc.,*
    2007 U.S. Dist. LEXIS 95504 (N.D. Cal. 21 Dec. 2007) ................................. 18

*Northwest Envt'l Advocates v. City of Portland*, 56 F.3d 979 (9th Cir. 1995)............... 12

*O'Leary v. Moyer's Landfill, Inc.*, 523 F. Supp. 642 (E.D. Penn. June 9, 1981)............. 17

*Santa Monica Baykeeper v. Int'l Metals Ecko, Ltd.,*
    619 F. Supp. 2d 936 (C.D. Cal. 2009) .................................................... 15

*Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 45 (5th Cir. 1980) ............................ 18

*Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517 (9th Cir. 1987) .......................... 12

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ............................................................ 30

*Sierra Club v. Union Oil Co.*, 813 F.2d 1480 (9th Cir. 1987) ........................................ 12

*Sierra Club v. Union Oil Co.*, 853 F.2d 667 (9th Cir. 1988) ......................................... 12

*Union Oil Co. v. Sierra Club*, 485 U.S. 931 (1988) ................................................... 12

*United States v. Earth Scis., Inc.*, 599 F.2d 368 (10th Cir. 1979) ................................. 18

*Wash. Wilderness Coal. v. Hecla Mining Co.*, 870 F. Supp. 983 (E.D. Wash. 1994) .... 18

**Statutes**

28 U.S.C. § 2462 ........................................................................................ 12

33 U.S.C. § 1251 ..................................................................................... 9, 12

33 U.S.C. § 1251(a) ..................................................................................... 12

33 U.S.C. § 1311(b) ..................................................................................... 13

33 U.S.C. § 1342(k) ..................................................................................... 15

33 U.S.C. § 1342(p) ..................................................................................... 13

33 U.S.C. § 1362 (Act Feb. 4, 1987, P.L. 100-4, Title V, § 507, 101 Stat. 78) .............. 18

33 U.S.C. § 1362(12) ................................................................................... 16

33 U.S.C. § 1362(14) ................................................................................... 18

33 U.S.C. § 1362(16) ................................................................................... 16

33 U.S.C. § 1365(a) ..................................................................................... 12

33 U.S.C. § 1365(a)(1) .............................................................................. 19, 26

33 U.S.C. § 1365(f) ................................................................................... 12, 19

Cal. Civ. Code §§ 815-815.7 ........................................................................... 28

**Rules**

Federal Rule of Civil Procedure 56.................................................................... 3

Federal Rule of Civil Procedure 56(c) ................................................................ 15

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3      California Open Lands ("COL") brings this citizen enforcement action to compel

4  Defendants to comply with their obligations under the Clean Water Act to reduce or

5  eliminate their discharges of pollutants in storm water flowing from their waste disposal

6  and recycling operation.  The General Permit requires storm water dischargers to

7  develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") that

8  comprehensively describes the operations of the facility, critically assesses pollutant

9  sources based on activities conducted and material used and identifies the best

10  pollution control measures to be implemented to address those pollutant sources.  The

11  General Permit also requires dischargers to develop and implement a Monitoring

12  Implementation Plan setting forth a regimen for visual observations, discharge sampling

13  and analysis for industry- and site-specific pollutants, and annual reports submitted to

14  the Regional Water Quality Control Board.  Under this permitting scheme, monitoring

15  results provide feedback on the efficacy of pollution control measures, and, where

16  pollutant concentrations exceed specified levels, trigger the implementation of more

17  advanced pollution control measures.  Moreover, this permitting scheme establishes an

18  even playing field by creating minimum standards that all dischargers must meet.

19  Failure to comply with the planning requirements of the General Permit can result in

20  real-world pollution – as happened in this case.

21      Defendants have failed to comply with critical sections of the planning

22  requirements of the General Permit, such as not identifying wetlands that receive the

23  Facility's industrial storm water; failing to accurately identify and describe the primary

24  industrial activities and materials at the Facility, including locations and amounts; and

25  failing to develop and implement a monitoring plan that addresses a major source of

26  pollutants, leachate.  Considering these planning failures, it can be no surprise then,

27  that the Facility experienced catastrophic failures of its leachate management and

28  control system that resulted in millions of gallons of contaminated storm water

discharges from the Facility.  Untreated leachate, so noxious that it must be separately stored, handled, and disposed of from regular storm water, was discharged into Defendants' storm water system, generating massive volumes of contaminated storm water.  Defendants pumped this contaminated storm water into Plaintiff's wetland preserve, from where it ultimately discharged from the Facility into downstream surface waters.

## II.  STATEMENT OF ISSUES TO BE DECIDED

The issues to be decided are whether Defendants have violated and are continuing to violate the Clean Water Act (33 U.S.C. §§ 1251 *et seq*.) by discharging storm water in violation of the General Permit.  More specifically, the Court is asked to decide whether, during the applicable period beginning November 15, 2014:

I. Defendants violated section III of the General Permit by discharging leachate generated from Defendants' landfill facility to downstream surface waters;

II. Defendants violated section X of the General Permit by failing to develop and implement an adequate Storm Water Pollution Prevention Plan; and,

III. Defendants violated sections X.I and XI of the General Permit by failing to develop and implement an adequate Monitoring Implementation Plan.

## III. FACTUAL BACKGROUND

### A. Plaintiff California Open Lands

Plaintiff COL is a California non-profit land trust corporation organized under the laws of California, with its main office in Chico, California.  Declaration of Holly Nielsen in Support of Plaintiff's Motion for Partial Summary Judgment ("Nielsen Decl."), ¶ 1. COL is dedicated to the preservation and management of open space, the exchange of scientific information, public education, and responsible conservation of the natural resources of the Sacramento River Watershed, including the waters into which Defendants discharge polluted storm water.  *Id*.  In 2007, Defendant Butte County recorded a perpetual conservation easement grant ("Easement") in COL's favor that

created a wetland preserve on a portion of the Facility as mitigation for the fill of waters of the United States.  *Id.* at ¶ 2.  COL maintains the wetland preserve pursuant to the terms of the Easement.  *Id.* at ¶ 3.  Among COL's rights, as set forth in the Easement, is the right to preserve and protect the water quality in the preserve.  *Id.* at ¶ 4.

**B.  Defendants' Landfill Facility**

The Neal Road Recycling and Waste Facility ("Facility" or "Landfill"), located at 1023 Neal Road in Paradise, CA, is a solid waste facility.  SUF 13.  The Facility is approximately 229 acres, and consists of five Class III waste management units, also known as modules.  *Id.*

Defendants' primary industrial activity is the receiving, handling, and disposal of municipal solid waste.  SUF 14.  Defendants also manage and store landfill leachate collected from the waste modules via a leachate collection and removal system, a lined surface impoundment, and trucks that transport leachate from and around the Facility. *Id.*  Defendants handle a variety of other industrial materials at the Facility including, inert construction and demolition materials, green waste, recyclable materials, waste tires, stockpiled cover soil, diesel, used oil, motor oil and lubricants, hydraulic oil, and cleaners.  SUF 15.

The Facility has been developed in a northeast-to-southwest trending canyon eroded into a gently sloping plateau.  SUF 16.  The canyon containing the Facility outlets to Nance Canyon to the southwest with elevations at the site dropping approximately 200 feet from the northeast to the southwest.  *Id.*  Storm water is collected at the Facility in a series of conveyances and basins.  *Id.*  In general storm water generated at the Facility flows southwest and into the wetland Preserve before discharging off-site.  SUF 17.  Storm water runoff from the Facility drains in a southwesterly direction toward an unnamed intermittent stream that joins the intermittent stream in Nance Canyon approximately one mile southwest of the Facility property boundary, and approximately one-half mile southwest of Neal Road.  SUF 18. The combined flow from these two streams discharges into Hamlin Slough, which is

tributary to Butte Creek, and ultimately the Sacramento River.  *Id.*

### C.  Leachate Discharges

On February 14, 2019, Defendants became aware of landfill leachate[2] seeping out of the southern face of Module 4 and into Sediment Basin 4, a storm water basin located downstream of Module 4.  SUF 1, 2.  Leachate commingled with storm water collected in Sediment Basin 4 and was pumped up into a ditch that flowed to the wetland preserve.  SUF 3.  From the wetland preserve, the leachate-contaminated storm water flowed over a concrete weir along the west side of the preserve basin, across a gravel road, and off the Facility into an unnamed creek.  SUF 4.  The unnamed creek flows to Hamlin Slough, which is a tributary to Butte Creek, which is in turn a tributary to the Sacramento River and the Sacramento-San Joaquin Delta.  SUF 17. The Delta and its tributaries are waters of the United States within the meaning of the Clean Water Act.  SUF 10.

On February 26, 2019, leachate seeps from Module 4 flowed into Sediment Basin 4 where they commingled with storm water collected there.  SUF 5, 6.  Once again, Defendants pumped leachate-contaminated storm water to the ditch that drained to the wetland preserve.  SUF 7.  By the following day, February 27, 2019, enough liquid had accumulated in the preserve basin that it once again began to flow over the concrete weir and into the surface waters downstream.  SUF 8.  The Facility continued to discharge from this point for the next five days, through March 4, 2019, and again on March 6, 2019, through March 8, 2019.  *Id.*

### D.  The Facility's Storm Water Pollution Prevention Plans

During the relevant period, from when the statute of limitations began on November 15, 2014 through to the present ("Relevant Period"), there has been a succession of four SWPPPs in effect at the Facility.  The operative SWPPP for each

---

[2] Leachate means a liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste.  40 C.F.R. § 258.2.

time period is identified in the chart below:

| Operative SWPPP | Date of SWPPP | Dates Implemented | Appendix Ex. |
|---|---|---|---|
| "2014 SWPPP" | August 6, 2014 | August 6, 2014 – June 23, 2015 | Ex. 12 |
| "2015 SWPPP" | June 24, 2015 | June 24, 2015 – September 29, 2019 | Ex. 11 |
| "2019 SWPPP" | September 30, 2019 | September 30, 2019 – February 3, 2021 | Ex. 4 |
| "2021 SWPPP" | February 4, 2021 | February 4, 2021 – present | Ex. 5 |

## IV.  LEGAL BACKGROUND

"The [Clean Water Act] explicitly allows private citizens to bring enforcement actions against any person alleged to be in violation of federal pollution control requirements," including conditions of an NPDES permit.  *Ass'n to Protect Hammersly v. Taylor Res.*, 299 F.3d 1007, 1012 (9th Cir. 2002); 33 U.S.C. §§ 1365(a), (f).  The citizen suit provision authorizes enforcement of *all* NPDES permit conditions.  *Northwest Envt'l Advocates v. City of Portland*, 56 F.3d 979, 986-90 (9th Cir. 1995).  The Clean Water Act imposes strict liability for NPDES Permit violations and does not excuse "de minimis" or "rare" violations.  *Sierra Club v. Union Oil Co.*, 813 F.2d 1480, 1490-91 (9th Cir. 1987), *vacated*, 485 U.S. 931 (1988), *reinstated*, 853 F.2d 667 (9th Cir. 1988).  The Ninth Circuit treats citizen enforcement actions "liberally, because they perform an important public function … [C]itizens should be unconstrained to bring these actions and the courts should not hesitate to consider them."  *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1525 (9th Cir. 1987).  Violations of the Clean Water Act are subject to a five-year statute of limitations period.  28 U.S.C. § 2462.

### A.     The Clean Water Act

The "objective of [the Clean Water] Act (33 U.S.C. §§ 1251 *et seq.*) is to restore and maintain the chemical, physical, and biological integrity of [the] Nation's waters."  33 U.S.C. § 1251(a).  To achieve this objective, the Clean Water Act prohibits "the discharge of any pollutant by any person" unless in compliance with a permit issued under the National Pollution Discharge Elimination System.  33 U.S.C. §§ 1311(a),

1342.  NPDES permits "serve[] to transform generally applicable effluent limits and other standards . . . into the obligations of an individual discharger." *Envt'l Prot. Agency v. Cal.*, 426 U.S. 200, 205 (1976).  Non-compliance with a permit constitutes a violation of the Clean Water Act.  40 C.F.R. § 122.41.

Pursuant to 33 U.S.C. § 1311(b), the EPA has delegated authority to California to issue NPDES permits.  In 1991, pursuant to 33 U.S.C. § 1342(p), the California State Water Resources Control Board ("State Board") issued a single, statewide general NPDES permit applicable to all industrial storm water dischargers, the "General Permit."  Since 1991, the General Permit has been renewed several times:  the original permit, Water Quality Order No. 97-03-DWQ, was amended by the 2015 General Permit, Water Quality Order No. 2014-0057-DWQ.  The 2015 General Permit was in effect from July 1, 2015 to November 5, 2018.  The General Permit was amended again on November 6, 2018, by Water Quality Order No. 2018-0028-DWQ, and went into effect on July 1, 2020.[3]  In order to discharge storm water lawfully in California, industrial operations subject to the General Permit must comply with its terms.  33 U.S.C. § 1311(a).

**B.    California's General Industrial Storm Water Permit**

The General Permit sets out two core requirements.  First, it mandates that permittees develop and implement a Storm Water Pollution Prevention Plan.  Under the General Permit, the SWPPP is filed online with the State Board via the Stormwater Multiple Application and Tracking System ("SMARTS") and is available online to both private and public enforcers.  The SWPPP is a facility-specific plan to develop, disclose, and execute state-of-the-art practices designed to prevent or reduce pollution from industrial storm water discharges.  If properly designed, the SWPPP articulates all structural and non-structural Best Management Practices ("BMPs") implemented at the facility, and therefore meets the certain technology standards (Best Available

_____

[3]  The portions of the 2015 and 2018 General Permits at issue in this motion are substantively identical, and for the purposes of clarity, only citations to the effective order, the 2018 General Permit found at Exhibit 1 to Plaintiff's Request for Judicial Notice filed concurrently, will be made throughout this brief.

Technology Economically Achievable/Best Conventional Pollutant Control Technology ("BAT/BCT")).  General Permit, Section X.  The General Permit places the burden on the permittee to develop, implement, and evaluate the effectiveness of its BMPs through continuous monitoring.  *Id*.  The SWPPP must include: 1) a description and assessment of potential pollutant sources; 2) a site map; 3) a description and assessment of BMPs implemented; and, 4) a Monitoring Implementation Plan.  *Id*.  Permittees must evaluate and upgrade, whenever necessary, the SWPPP and Monitoring Implementation Plan with any additional BMPs necessary to achieve compliance with the General Permit.  *Id.* at Section VI.H.

Second, the General Permit requires that dischargers implement their Monitoring Implementation Plan.  *Id.* at Section XI.  Self-monitoring and reporting of discharges are critical feedback loops in the compliance scheme embodied in the General Permit.  Monitoring allows the discharger (as well as public and private enforcers) to determine whether the discharger's BMPs are effective enough to constitute best practices under the BAT/BCT standards.  As part of the Monitoring Implementation Plan, a permittee must collect storm water samples at all discharge points in all drainage areas during specified times; analyze these samples for specific contaminants that are likely to be present at the facility and compare them to levels set forth in the General Permit; conduct monthly visual observations of sources of storm water pollution throughout the entire wet season; and maintain records of these visual observations.  *Id.* at Sections VI.A, B.

Indeed, this process of continuously monitoring and assessing the effectiveness of the controls implemented, and then upgrading those controls when the monitoring shows the necessity, is itself a mandated BMP.  *See e.g.,* General Permit, Fact Sheet, Section II.J.1, at 157-158.  Finally, the discharger must file Annual Reports with the Regional Board summarizing the visual observations, results of sampling analyses, and General Permit compliance.  *Id.*  Pursuant to the General Permit, these Annual Reports, together with all sample analysis data, are posted online and are available to both public

1  and private enforcers.

2  **V.  STANDARD OF REVIEW**

3    Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be

4  rendered if "there is no genuine issue as to any material fact and . . . the moving party is

5  entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Because the Clean

6  Water Act is a strict liability statute, Clean Water Act cases are particularly appropriate

7  for summary judgment or adjudication.  To establish a violation of the Act, a plaintiff

8  need only prove that the permittee violated the terms and conditions of its permit.  *See*

9  33 U.S.C. §§ 1311(a), 1342(k); *see also Baykeeper v. Kramer Metals, Inc.*, 619 F.

10  Supp. 2d 914, 918 (C.D. Cal. 2009) ;  *Santa Monica Baykeeper v. Int'l Metals Ecko,*

11  *Ltd.*, 619 F. Supp. 2d 936, 939 (C.D. Cal. 2009); *Celotex Corp. v. Catrett*, 477 U.S. 317,

12  327 (1986); *Hawaii's Thousand Friends v. Honolulu*, 821 F. Supp. 1368, 1392 (D. Haw.

13  1993) .

14  **VI.  ARGUMENT**

15    Defendants have operated the Facility in violation of the planning and reporting

16  requirements of the General Permit during the entire Relevant Period.  These failures to

17  comply with the procedural requirements of the General Permit culminated in the

18  discharge of landfill leachate from the Facility on at least ten separate days.

19
20    **A.  There Is No Genuine Dispute that Defendants Discharged Landfill Leachate into Waters of the United States, and that Those Discharges Were Not Authorized by Any Permit**

21    The Clean Water Act prohibits the discharge of pollutants by any person without

22  a permit to navigable waters.  33 U.S.C. §§ 1311(a); 1342.  The General Permit

23  prohibits the discharge of storm water to waters of the United States except as

24  specifically authorized by the General Permit or another NPDES permit.  General

25  Permit, Section III.A.  No section of the General Permit specifically authorizes the

26  discharge of storm water contaminated with landfill leachate to waters of the United

27  States.

28

On at least ten days between February 14, 2019 and March 8, 2019,[4] Defendants discharged contaminated storm water[5] from the Facility via a concrete weir into an unnamed creek, which is a tributary to Hamlin Slough, which in turn is a tributary to Butte Creek.  There is no dispute that these discharges occurred and that Defendants did not have a permit authorizing these discharges.  Each of the ten discharges discussed below is a separate violation of the Clean Water Act.  33 U.S.C. §§ 1311(a), 1342.

### 1.  There Is No Dispute that the Discharges Occurred

A "discharge" is defined under the Clean Water Act to mean the "discharge of a pollutant," 33 U.S.C. § 1362(16), which, in turn, is defined to mean "any [1] addition of any [2] pollutant or combination of pollutants to [3] waters of the United States from any [4] point source."  33 U.S.C. § 1362(12).

Landfill leachate left the confines of Waste Module 4 ("Module 4") beginning sometime between February 13, 2019, when the storm began, and February 14, 2019 at around 7:44 a.m., when the leachate seeps were first observed by landfill staff.  SUF 1.  Leachate flowed down the southern face of Module 4 and into Sediment Basin #4 – a storm water collection basin – at an estimated rate of 475 gallons per hour.  SUF. 2  Defendants pumped contaminated storm water in Sediment Basin #4 up and out to a roadside ditch which flowed to the Preserve until this pump was turned off at approximately 1:40 p.m. on February 14, 2019.  SUF 3.  Contaminated storm water discharged from the Preserve via a concrete weir and flowed off the Facility to the west into an unnamed creek which flows to Hamlin Slough, which in turn is a tributary to Butte Creek.  SUF 4.

---

[4] February 14, 2019, February 27, 2019, February 28, 2019, March 1, 2019, March 2, 2019, March 3, 2019, March 4, 2019, March 6, 2019, March 7, 2019, and March 8, 2019.

[5] 'Contaminated storm water' means storm water which comes in direct contact with landfill wastes, the waste handling and treatment areas, or landfill wastewater.  40 C.F.R. § 445.2(b).  'Landfill wastewater' includes, among other things, leachate.  40 C.F.R. § 445.2(f).

Landfill leachate was again observed seeping out of Module 4 on February 26, 2019 at approximately 8:00 a.m.  SUF 5.  Again, the leachate flowed down the southern face of Module 4 and into Sediment Basin #4.  SUF 6.  Just as before, the contaminated storm water in Sediment Basin #4 was pumped up and out into the roadside ditch that flowed into the Preserve until the pump was turned off at approximately 7:41 a.m. on February 27, 2019.  SUF 7.  The Preserve discharged contaminated storm water via the concrete weir again on February 27, 2019, and continued discharging every day, except for March 5, 2019, up to and including March 8, 2019.  SUF 8.

### 2.  Landfill Leachate Is a Pollutant Under the Clean Water Act

Landfill leachate is a pollutant under the Clean Water Act.  40 C.F.R. § 445.2(f); *see, e.g., O'Leary v. Moyer's Landfill, Inc.*, 523 F. Supp. 642 (E.D. Penn. June 9, 1981).  There is no dispute that Defendants discharged landfill leachate from the Facility.  SUF 9.

### 3.  The Surface Waters into Which Defendants Discharged Landfill Leachate Are Waters of the United States

Waters of the United States include "waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide," and tributaries of such waters "that are relatively permanent, standing or continuously flowing bodies of water."  40 C.F.R. §§ 120.2(a)(1) and (3).  It is undisputed that the Sacramento-San Joaquin Delta and its tributaries, including Hamlin Slough and Butte Creek, are waters of the United States within the meaning of the Clean Water Act.  SUF 10.  It is also undisputed that Defendants' discharges of landfill leachate reached these waters.  SUF 11.  On February 14, 2019 and February 27, 2019, substantial flows left via the concrete weir, passing over the access road along the western boundary of the Facility, and flowing in a southwesterly direction via the intermittent stream.  SUF 18.  There is no genuine dispute that the leachate-contaminated storm water that discharged from the Preserve in February and March of 2019 reached waters of the United States.

### 4. Defendants Discharged Pollutants from a Point Source

"The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).  A landfill leachate collection system is considered a point source under the Act.  33 U.S.C. § 1362 (Act Feb. 4, 1987, P.L. 100-4, Title V, § 507, 101 Stat. 78); 40 C.F.R. § 122.2.  Ponds and settling basins are point sources as well.  *See, e.g., Wash. Wilderness Coal. v. Hecla Mining Co.*, 870 F. Supp. 983, 988-89 (E.D. Wash. 1994) (determining that ponds holding mining wastewater are point sources, "because the pond or pile acts to collect and channel contaminated water"); *N. Cal. River Watch v. Redwood Landfill Inc.*, 2007 U.S. Dist. LEXIS 95504, *11-12, n.3 (N.D. Cal. 21 Dec. 2007) (determining that a landfill is point source); *Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 45 (5th Cir. 1980) (determining that leachate from eroded "spoil piles," and overflows from sediment basins, were discharges from a "point source"); *United States v. Earth Scis., Inc.*, 599 F.2d 368, 374 (10th Cir. 1979) (concluding that overflows or leaks from "sump pit" were from a point source).

There is no dispute that Defendants discharged from a point source.  The leachate collection system within Module 4 is, by definition, a point source under the Act.  33 U.S.C. § 1362 (Act Feb. 4, 1987, P.L. 100-4, Title V, § 507, 101 Stat. 78); 40 C.F.R. § 122.2.  Storm Water Basin #4, because it is a "pond or settling basin," is also a point source under the Act.  The pump that caused the leachate-contaminated storm water to leave Storm Water Basin #4 is a point source because it is a discrete conveyance.  The ditch via which the leachate-contaminated storm water flowed from the outlet of the pump to the Preserve is a point source because it is a ditch.  The Preserve is a point source because it is a "pond or settling basin."  The concrete weir from which the leachate-contaminated storm water left the Preserve is a point source because it is a discrete conveyance.

### 5. There Is No Dispute that Defendants Do Not Have a Permit to Discharge Leachate from the Facility

The Facility is subject to several different permits, none of which authorize the discharge of landfill leachate to surface waters.  SUF 19.

### B. There Is No Genuine Dispute that Defendants Have Failed to Develop and Implement an Adequate SWPPP for the Entire Relevant Period.

Defendants have never had a SWPPP that complies with all the requirements of the General Permit.  Each of the four relevant SWPPPs failed to include a site map with all the information required by section X.E of the General Permit.  Each SWPPP failed to accurately describe an accurate list of industrial materials handled at the Facility as required by section X.F of the General Permit.  Each SWPPP failed to accurately describe all sources of potential pollutants as required by section X.G of the General Permit.  Each SWPPP failed to identify each BMP being implemented at the Facility per section X.H.4 of the General Permit.

Failure to comply with the SWPPP requirements of the General Permit is a violation of the Clean Water Act.  33 U.S.C. §§ 1311(a), 1365(a)(1) , 1365(f); *see Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000) ("the Clean Water Act allows citizen suits based on violations of any conditions of an NPDES permit, even those which are purely procedural").  As discussed below, each of Defendants' SWPPPs has violated the General Permit, Sections X.E, X.F, X.H, and therefore the Clean Water Act, since the beginning of the Relevant Period, a period of 3,351 days.  Each day that Defendants failed to comply with the SWPPP requirements of the General Permit is a separate violation of the Clean Water Act.  *Borden Ranch P'ship v. United States Army Corps of Eng'rs*, 261 F.3d 810, 817 (9th Cir. 2001).  Thus, Defendants have violated the Act 3,351 times for failing to comply with the SWPPP requirements of the General Permit.

### 1. Each SWPPP Failed to Include Adequate Site Maps

The General Permit requires the SWPPP to contain a site map that meets certain criteria.  General Permit, Section X.E.  These criteria include, among other things, that

the site map include information such as the "location(s) of nearby water bodies (such as rivers, lakes, wetlands, etc.)," *id.* at Section X.E.3.a; "[a]reas of industrial activity subject to [the] General Permit, *id.* at Section X.E.3.f; and "[i]dentification of all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures," *id.* at Section X.E.3.d.

### a.  Each Site Map Fails to Identify the Preserve

The General Permit requires the site map to identify the "location(s) of nearby water bodies (such as river, lakes, wetlands, etc.)."  General Permit, Section X.E.3.f.

Wetlands have existed in the Preserve since at least 2011.  SUF 20.  None of the Facility's SWPPP site maps identify the Preserve and none identify the presence of wetlands at the Preserve.  SUF 21.  Defendants' rebuttal expert acknowledges this "shortcoming" in his Rebuttal Report, and in his deposition testimony he confirms that the wetland Preserve is the type of water body that should be included in a SWPPP's site map.  *Id*.  There is no dispute that the Preserve contains wetlands and there is no dispute that the Preserve should be identified on the SWPPP site map.  SUF 22, 23. Defendant Butte County admits that the 2021, 2019, and 2015 SWPPPs do not identify or describe wetlands in the Preserve.  SUF 21.  The 2014 SWPPP also fails to identify the wetlands in the Preserve.  SUF 24.

### b.  Each Site Map Fails to Identify the Locations of Industrial Activity and Material Subject to the General Permit

The General Permit requires the site map to identify all "areas of industrial activity subject to the General Permit."  Section X.E.3.f.  The General Permit also requires the SWPPP to identify the locations where each industrial "material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency."  *Id.* at Section X.F.  The primary industrial activity at the Facility is the disposal of municipal solid waste in the active waste module units.  SUF 25.  A waste module unit is made up of several phases, one or two of which may be active at any given time.  SUF 26.  The active phase is determined by the development plan of any

given module, based on engineering and permitting constraints.  *Id.*  Waste is placed at the working face of the active module.  SUF 27.  The working face moves daily and is closed at the end of each day with material known as daily cover.  SUF 28.

The Facility has changed the active phase where municipal solid waste has been disposed at least eight times during the Relevant Period.  SUF 29.  During the Relevant Period, the active Module has changed at least once, in the second quarter of 2018 when waste began being placed in Module 5, in addition to Module 4.  SUF 30.  None of the site maps reflect the changes to the Module or the active phases.  SUF 31.  None of the SWPPPs were revised or amended to reflect the changes to the locations of where the main industrial activities were conducted at the Facility.  SUF 32.

The 2014 SWPPP identifies Waste Module Unit 4 as the active module.  SUF 33. However, the 2014 SWPPP does not identify which phase within WMU 4 is active.  *Id.* According to quarterly monitoring reports, the active phase at the beginning of the relevant period, November 15, 2014, was Module 4, Phase D.  SUF 34.  In the second quarter of 2015, the Facility began placing waste into Phase E of Module 4 as well. SUF 35.  The 2014 SWPPP was never revised or amended to reflect this change.  The 2014 SWPPP site map was never revised or amended to reflect this change.

The 2015 SWPPP was implemented between June 24, 2015 and September 29, 2019.  SUF 36.  During that period, the Facility changed the active phase at least three times.  SUF 37.  The first change occurred in the first quarter of 2016, when the Facility stopped placing waste in Phase E of Module 4, and only used Phase D.  SUF 38.  In the third quarter of 2016, Phase E was used once again, in addition to Phase D.  SUF 39. In the second quarter of 2018, the Facility opened Module 5, and began placing waste in Phase A of Module 5, as well as continuing to place waste in Phases D and E of Module 4.  SUF 40.  The 2015 SWPPP was never revised or amended to reflect these changes.  SUF 41.  The 2015 SWPPP site map was never revised or amended to reflect these changes.  SUF 42.

The 2019 SWPPP was implemented between September 30, 2019, and

February 3, 2021.  SUF 43.  During that period, the Facility changed the active phases at least twice.  SUF 44.  In the second quarter of 2020, the Facility added Phase B of Module 5, and on January 14, 2021, the Facility added Phase C of Module 5.  SUF 45.  The 2019 SWPPP was never revised or amended to reflect these changes.  SUF 46.  The 2019 SWPPP site map was never revised or amended to reflect these changes.  SUF 47.

The 2021 SWPPP is the current SWPPP being implemented at the Facility, since February 4, 2021.  SUF 48.  So far, the Facility has changed the active phases at least twice during this period.  SUF 49.  In the second quarter of 2021, the Facility only placed waste in Module 5, Phase C.  SUF 50.  In the third quarter of 2021, the Facility added back Phase B of Module 5.  SUF 51.  The 2021 SWPPP has not been revised or amended to reflect these changes.  SUF 52.  The 2021 SWPPP site map has not been revised or amended to reflect these changes.  SUF 53.

### c.  The 2019 and 2021 SWPPPs and Site Maps Fail to Identify All Impervious Areas

The General Permit requires site maps to identify all impervious areas of the Facility.  General Permit, Section X.E.3.d.

There is no dispute that areas at the Facility where Posi-Shell®[6] has been applied are impervious.  SUF 54.  There is also no dispute that areas where Posi-Shell® has been applied at the Facility should be identified as impervious surfaces on the SWPPP's site maps, but were not.  SUF 55.  Posi-Shell® was applied to Module 4, Phases D and F in the fourth quarter of 2019.  SUF 56.  The 2019 SWPPP was not revised or amended to reflect the application of Posi-Shell.  SUF 57.  The 2021 SWPPP fails to identify any areas with Posi-Shell.  SUF 58.

---

[6] Posi-Shell® is a spray-on product that dries in the form of a thin durable stucco.

### d. The 2021 SWPPP and Site Maps Fail to Identify the Advanced BMPs Implemented as a Result of the Parties' State Court Settlement Agreement

The General Permit requires the SWPPP to "identify and describe the minimum BMPs (Section X.H.1) and any advanced BMPs (Section X.H.2) implemented to reduce or prevent pollutants in industrial storm water discharges and authorized [non storm water discharges]."  General Permit, Section X.C.1.b.  The General Permit also requires site maps to include the "[l]ocations and descriptions of structural control measures[7] that affect industrial storm water discharges, authorized [non-storm water discharges], and/or run-on."  *Id.* at X.E.3.c.  Advanced BMPs include, among other things, storm water containment and discharge reduction BMPs "that divert, infiltrate, reuse, contain, retain, or reduce the volume of storm water runoff."

In April of 2022, the parties to this action resolved a conservation easement enforcement action brought by California Open Lands in Butte County Superior Court. SUF 59.  As part of that settlement, Defendant Butte County Department of Public Works agreed to install certain advanced BMPs at the Facility.  SUF 60.  The advanced BMPs included installing a series of manually-operated flow control weir boxes to direct the flow of storm water, and installing a secondary containment system to contain leachate spill from trucks when they are filled.  SUF 61.  The County confirmed on July 13, 2022 that the flow control weirs were successfully installed.  SUF 62.  The secondary containment system was confirmed to have been installed on June 16, 2023. SUF 63.  The weirs' primary function is to divert storm water, and thus they are advanced BMPs.  The secondary containment system is considered a structural control measure, General Permit, Section X.E.3.c, fn. 13, and structural control measures are advanced BMPs, General Permit, Fact Sheet 128-129.  The 2021 SWPPP, and its site map, was not revised or amended to identify either the flow control weir boxes or the

---

[7] Examples of structural control measures are catch basins, berms, detention ponds, secondary containment, oil/water separators, diversion barriers, etc.  General Permit, Section X.E.3.c, fn. 13.

secondary containment system.  SUF 65.

### 2. Each SWPPP Fails to Accurately Describe the Locations of All Industrial Materials

As discussed above, each SWPPP's site map fails to identify the location of the active phase or module, where the main industrial activity at the Facility occurs.  The General Permit requires not just the site maps to identify where industrial materials are location, but a SWPPP is also required to include "a list of industrial materials handled at the facility, and the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency."  Section X.F.  Each of the operative SWPPPs failed to provide this critical information.

In addition to failing to identify where the specific locations of solid waste are located at the Facility, Defendants also fail to accurately identify the locations of other industrial materials handled at the Facility, including where construction and demolition debris and green waste are located.  Each of these industrial materials are stored in separate locations at the Facility, yet the 2021 SWPPP lumps them all together and describes their locations as "Varies and See Drawing 1."  SUF 66.  Defendants admit that these are different materials that should be identified separately in the SWPPP.  SUF 67.  Defendants also admit that these materials are not identified on the 2021 SWPPP site map.  SUF 68.

Leachate is an industrial material handled at the Facility, and is a significant source of pollutants, yet it is not accurately identified in the SWPPP.  The 2021 SWPPP identifies leachate as an industrial material, but only describes its location as the "Class II Surface Impoundment – See Drawing 2."  SUF 69.  The General Permit requires the "locations where each material is stored, received, shipped, and handled."  Section X.F.  The leachate collection and removal system is the primary mechanism by which leachate is transported from the waste modules to the leachate impoundments, yet it is not identified as being a location where leachate is "stored, received, shipped, and handled" in the 2021 SWPPP.  SUF 70.

### 3.  Defendants Have Failed to Revise the SWPPP when Necessary

The General Permit requires discharges to "[r]evise their on-site SWPPP whenever necessary," and to "[c]ertify and submit via SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revisions."  General Permit, Sections X.B.1 and 2.  The SWPPP must "[i]dentify and describe conditions or circumstances which may require future revisions to be made to the SWPPP."  *Id.* at X.C.2.

In addition to the circumstances discussed above, Defendants have failed to revise their SWPPPs to reflect changes to the Facility that have a significant impact on storm water management.  For example, a March 17, 2022 Technical Memorandum describes a significant change to the Facility – the installation and repair of approximately five acres of rain fly over Module 4.  SUF 71.  This project was fully implemented by March 22, 2022, but the 2021 SWPPP was never revised to reflect the new conditions at Module 4.  SUF 72.

The 2021 SWPPP identifies a feature, the covered aerated static pile ("CASP"), that never came to be.  SUF 73.  The proposed CASP project was wholly abandoned, with no prospect of it being implemented at the Facility, due to financial limitations.  SUF 74.  Yet the 2021 SWPPP and site map, which reflect the Facility's proposal to install the CASP, were never revised to reflect this change, and Defendants concede that the site map is therefore inaccurate insofar as it depicts a proposed industrial activity that does not exist, and will never exist, at the Facility.  SUF 75.  Remarkably, since making that admission in May 2023, Defendants have still not updated their SWPPP to reflect this change.

In 2017, Defendants uploaded to SMARTS a document entitled "SWPPP Amendment No. 1."  SUF 76.  The document identifies a series of amendments that were purportedly made to the SWPPP, including (1) revising the title page to identify the correct legally responsible person; (2) updating the legally responsible person's information in the certification of the SWPPP; (3) updating the amendment log; (4) updating the members of the pollution prevention team; (5) adding information about the

hydrologic setting of the Facility; (6) updating the pollutant source assessment; and, (7) updating sampling procedures. SUF 77. However, Defendants admit that the SWPPP was never revised to incorporate these amendments, and no new SWPPP was certified and submitted via SMARTS that reflected these amendments. SUF 78. While some, if not all, of these amendments appear to be significant and would warrant certification and submission of a revised SWPPP via SMARTS within 30 days, General Permit, Section X.B.2, the General Permit requires dischargers to submit revisions to the SWPPP even if they are not significant on a quarterly basis. *See* General Permit, Section X.B.3; Fact Sheet at 126.

### C. There Is No Genuine Dispute that Defendants Have Failed to Develop and Implement an Adequate Monitoring Implementation Plan for the Facility

The General Permit requires dischargers to develop a Monitoring Implementation Plan as part of the SWPPP, but also to implement that plan. General Permit, Sections X.I and XI. One of the key monitoring requirements is to collect representative samples of storm water discharge and to have those samples analyzed for various pollutants. *Id.* at XI.B.6. The pollutants that the samples should be analyzed for include total suspended solids, oil and grease, and pH for all facilities. *Id.* at XI.B.6.a-b. In addition, facilities are required to conduct analyses for pollutants that are typically associated with the type of industry that they are characterized as; pollutants identified on a site-specific basis that are likely to be present in its discharges; pollutants associated with downstream impairments; additional parameters required by the Regional Board; and, parameters required under Subchapter N.[8] *Id.* at XI.B.6.c-g. Failure to comply with the monitoring requirements of the General Permit is a violation of the Clean Water Act. 33 U.S.C. §§ 1311(a), 1365(a)(1), 1365(f); *see Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000) ("the Clean Water Act allows citizen suits

---

[8] Subchapter N refers to 40 C.F.R. §§ 401-471, which identifies effluent guidelines and standards for existing sources, standards of performance for new sources and pretreatment standards for new and existing sources.

based on violations of any conditions of an NPDES permit, even those which are purely procedural").  As discussed below, Defendants' Monitoring Implementation Plans do not, and have never, complied with the General Permit, Sections X.I and XI. Defendants have failed to comply with the monitoring requirements every day since the beginning of the Relevant Period, a period of 3,351 days.  Each day that Defendants failed to comply with the monitoring requirements of the General Permit is a separate violation of the Clean Water Act.  *Borden Ranch P'ship v. United States Army Corps of Eng'rs*, 261 F.3d 810, 817 (9th Cir. 2001).  Thus, Defendants have violated the Act 3,351 times for failing to comply with the monitoring requirements of the General Permit.

Leachate is a potential source of pollutants at the Facility.  SUF 79.  Yet none of the parameters identified in the Monitoring Implementation Plans in the SWPPP require the analysis of parameters that are indicators of leachate.  SUF 80.  That is, when Defendants collect storm water samples, they are not having those samples analyzed for parameters that would indicate whether the storm water discharge is polluted with leachate.

Point source discharges of pollutants identified in Subchapter N, 40 C.F.R. §§ 401-471, are required to comply with the regulations set forth in Subchapter N. Specifically, 40 C.F.R. § 445 identifies effluent limitations for discharges of wastewater from landfill units.  Landfill wastewater includes leachate and contaminated storm water. 40 C.F.R. § 445.2(f).  For non-hazardous waste landfills, such as the Facility, Subpart B of section 445 applies.  40 C.F.R. § 445.20.  Subpart B sets forth effluent limitations which any existing point source must achieve for specific regulated parameters ("Regulated Parameters").  40 C.F.R. § 445.21.  The Regulated Parameters set forth in that section include biochemical oxygen demand, total suspended solids, ammonia (as nitrogen), α-Terpineol, benzoic acid, *p*-Cresol, phenol, zinc, and pH.  *Id.*  Non-hazardous landfills that discharge wastewater must not only analyze samples for the Regulated Parameters set forth above, but must also meet the maximum daily and maximum monthly average concentrations set forth in the regulation.  General Permit,

Section XI.B.6.g ("For discharges subject to Subchapter N, additional parameters specifically required by Subchapter N").  Discharges of contaminated storm water are discharges that are subject to Subchapter N.  40 C.F.R. §§ 445.20; 445.2(f).

The Facility is a Class III Municipal Solid Waste Landfill. [9]  SUF 81.  There is no dispute that the Facility has discharged landfill wastewater in the form of contaminated storm water.  SUF 82.  Moreover, there is no dispute that Defendants' Monitoring Implementation Plan does not require analysis of the Regulated Parameters.  SUF 83.  When Defendants discharged contaminated storm water in February of 2019, and collected samples on February 14, 2019 and February 26, 2019, they did not have those samples analyzed for all of the Regulated Parameters.  SUF 84.  Specifically, they did not analyze the samples of contaminated storm water for biochemical oxygen demand, ammonia (as nitrogen), α-Terpineol, benzoic acid, or *p*-Cresol.  SUF 85.  To the extent that the Facility discharges contaminated storm water in the future, the Monitoring Implementation Plan would not provide for the analysis of the required Regulated Parameters.  SUF 86.

**D.  There Is No Genuine Dispute that COL Has Standing to Bring this Action**

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), the U.S. Supreme Court set forth a three-part test for standing in cases such as this: (i) an actual or threatened injury, (ii) caused by defendant's conduct, (iii) redressable by the court.

Among Plaintiff's rights and duties set forth in the Easement are the rights to preserve and protect the water quality in the Preserve, and to prevent any activity on or use of the Preserve that harms the Preserve.  SUF 87.  The Easement is a Conservation Easement created by state law, which also confers on easement holders the right and obligation to seek redress from the courts to enforce the terms of the Easement.  Cal. Civ. Code §§ 815-815.7.  Plaintiff has an affirmative duty to require the restoration of any areas or features of the Preserve that may be damaged by any

[9] Class III Municipal Solid Waste Landfills, pursuant to Cal. Code Regs. Tit. 27, § 20260, are landfills for non-hazardous wastes.

impermissible or harmful activity or use.  SUF 88.  The discharge of leachate-contaminated water into the Preserve harms and threatens to harm the water quality, wildlife, and other conservation values of the Preserve.  SUF 89.  In addition, the failure to allow adequate flow volumes to the Preserve threatens the integrity of the entire wetland itself, including the plants within it, that provide habitat for wildlife in the Preserve.  *Id.*  Plaintiff has been directly harmed, and continues to be under the threat of future direct harms, by Defendants' discharges in violation of the Clean Water Act, which harm the water quality, wildlife, and other conservation values of the Preserve. SUF 90.  Plaintiff thus suffered an injury to its statutory and contractual property rights and obligations due to Defendant's violation of the CWA.  *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1013 (1992) (injury to property rights sufficient to confer Article III standing); *Massachusetts v. E.P.A.* 549 U.S. 497, 521-526, (2007) (standing recognized due to State's "particularized injury in its capacity as a landowner"); *Historic Green Springs, Inc. v. Louisa County Water Authority*, 833 F. Supp. 2d 562, 569-571 (W.D. Va. 2011) (organization holding conservation easement had standing to bring CWA action over discharges that affected conservation easement area; *Grano v. Rappahannock Electric Cooperative*, 552 F. Supp. 3d 563, 571-572, (W.D. Va. 2021) (impairment of rights and obligations under easement sufficient to confer Article III standing).

Plaintiff has been directly harmed, and continues to be under the threat of future direct harms, by Defendants' failure to maintain an adequate Storm Water Pollution Prevention Plan and failure to otherwise follow the reporting requirements of the CWA. SUF 91.  This information would assist the Regional Water Quality Control Board in monitoring the County's compliance with the CWA and the General Industrial Permit. *Id.*  More importantly, it would greatly assist Plaintiff in managing its obligations to protect the Preserve.  *Id.*  The County's failure to follow these reporting requirements has harmed Plaintiff by preventing it from better understanding threats to the Preserve and hampering its obligations under the Easement.  *Id.*; *Inland Empire Waterkeeper v.*

1  *Corona Clay Co.*, 17 F.4th 826, 832-33 (9th Cir. 2021) ("failure to report creates a

2  genuine threat of undetected past or future polluted discharges").

3      Since Plaintiff has a duty to protect the conservation values of the Preserve,

4  Plaintiff has been harmed by the actual and threatened discharges of contaminated

5  water into the Preserve, and by Defendants' failure to comply with the reporting

6  requirements of the CWA.  SUF 92.  Plaintiff has been required to spend in excess of

7  $50,000 and over 800 hours of staff time seeking to remedy these violations of the CWA

8  and the harm caused by them in the course of the past four and half years.  *Id.*  These

9  costs include experts in hydrology and wetlands, retained to study the wetland in the

10  Preserve, including damage caused by the County's leachate-contaminated discharges;

11  lab sampling and analysis; and investigative fees and costs.  *Id.*  Staff time involved

12  extensive communications with the County, State and Regional water boards, and the

13  Army Corps of Engineers, together with California Public Records Act requests, and

14  Freedom of Information Act request to obtain information from these agencies.  *Id.*

15  Plaintiff's economic injuries to investigate and remediate Defendants' contamination are

16  sufficient basis for standing.  *Clinton v. City of N.Y.*, 524 U.S. 417, 433-34 (1998); *see*

17  *also Sierra Club v. Morton*, 405 U.S. 727, 733 (1972) ("economic injuries have long

18  been recognized as sufficient to lay the basis for standing"); *Historic Green Springs, Inc.*

19  *v. Louisa County Water Authority*, 833 F. Supp. 2d 562, 569-571 (W.D. Va. 2011)

20  (organization holding conservation easement had standing to bring CWA action over

21  discharges that affected conservation easement area; *Grano v. Rappahannock Electric*

22  *Cooperative*, 552 F. Supp. 3d 563, 571-572, (W.D. Va. 2021) (impairment of rights and

23  obligations under easement sufficient to confer Article III standing).

24      These injuries are fairly traceable to the conduct of Defendants because

25  Defendants caused the discharges of contaminated storm water, and Defendants failure

26  to comply with the General Permit makes it more likely that more contaminated storm

27  water will be discharged through the Preserve.

28

The injuries will likely be redressed by a favorable decision because Defendants will be enjoined from further discharges of contaminated storm water, and will be required to comply with the General Permit. Moreover, the assessment of a civil penalty will act as a deterrent to prevent future noncompliance with the General Permit and the Act.

Because Plaintiff suffers an injury-in-fact from the pollutants that the County discharges from its Facility, and because the outcome of this case could provide redress for at least part of its injuries, COL has standing to bring this enforcement action.

## VII.   CONCLUSION

Defendants have violated the Clean Water Act each and every day for their failures to comply with the SWPPP and monitoring requirements of the General Permit. Each of these violations is counted a separate daily violation, totaling 3,351 violations of General Permit, Section X, and 3,351 violations of General Permit, Section XI, or a total of 6,702 Clean Water Act violations. Defendants' procedural violations led to more substantive violations in the spring of 2019, when Defendants discharged contaminated storm water from point sources at the Facility, and without a permit, to waters of the United States. There were at least ten days of discharges, constituting ten more Clean Water Act violations. For the reasons stated above, Plaintiff respectfully requests that this Court find Defendants liable for 6,712 violations of the Clean Water Act.


Respectfully submitted,

Dated:  January 18, 2023             LAW OFFICE OF WILLIAM CARLON


                          By:   /s/ William Carlon _____
                                William Carlon
                                Attorney for Plaintiff
                                CALIFORNIA OPEN LANDS