Diane G. Kindermann (SBN 144426)
dkindermann@aklandlaw.com
Glen C. Hansen (SBN 166923)
ghansen@aklandlaw.com
ABBOTT & KINDERMANN, INC.
2100 21st Street
Sacramento, California 95818
Telephone:   (916) 456-9595
Facsimile:    (916) 456-9599

Attorneys for Defendants
BUTTE COUNTY DEPARTMENT OF
PUBLIC WORKS, DENNIS SCHMIDT,
ERIC MILLER

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA OPEN LANDS, a non-profit land trust organization,<br><br>Plaintiff,<br><br>v.<br><br>BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS, a political subdivision of the State of California, DENNIS SCHMIDT, an individual, and ERIC MILLER, an individual,<br><br>Defendants. | No.  2:20-CV-00123-KJM-DMC<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>(FRCP 56; Eastern District Civil L.R. 260)<br><br>Hearing:    February 29, 2024<br>Time:       1:30 p.m.<br>Location:   Courtroom: 10<br>Judge:      Hon. Daniel J. Calabretta<br><br>Trial Date:  June 24, 2024 |

1

**TABLE OF CONTENTS**

2

3

I.      INTRODUCTION ........................................................................................ 5

4

II.     THE KEY ISSUES IN THIS CASE AROSE AS A RESULT OF THE 2018 CAMP
5      FIRE DISASTER AND THE EXTRAORDINARY AMOUNTS OF RAINFALL
       THAT IMMEDIATELY FOLLOWED.  COL'S MOTION IGNORES THAT. ............... 6

6

III.    THIS COURT MUST DENY COL'S MOTION WHERE THERE ARE GENUINE
7      DISPUTES OF MATERIAL FACTS ................................................................... 8

8

IV.     COL'S MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE
       DENIED BECAUSE THERE ARE DISPUTED ISSUES OF MATERIAL FACT
9      AS TO EACH OF THE THREE "ISSUES." ....................................................... 9

10

       A.      Genuine Issues Of Material Fact Warrant Denial Of COL's Motion
11             As To "Issue No. 1." ....................................................................... 9

12

               1.      Genuine disputes of material fact exist as to whether
13                     or not storm water contaminated with leachate flowed
                       off the Facility. ................................................................ 10

14

               2.      Genuine disputes of material fact exist as to whether
15                     or not there was "discharge of landfill leachate from
                       the Facility on every one of the 10 days listed in the
16                     Motion................................................................................ 12

17

               3.      Genuine disputes of material fact exist as to whether
18                     the County's permit allows the discharges alleged by
                       COL. .................................................................................. 13

19

       B.      Genuine Issues Of Material Fact Warrant Denial Of COL's Motion
20             As To "Issue No. 2," Which Is Comprised Of Nine Separate Parts. ........... 14

21

               1.      Genuine issues of material fact exist as to whether
22                     each site map in the SWPPs fails to identify the
                       Preserve. ........................................................................... 15

23

               2.      Genuine issues of material fact exist as to whether
24                     each site map in the SWPPPs fails to identify the
                       locations of industrial activity and material subject to
25                     the General Permit. ........................................................... 16

26

               3.      Genuine issues of material fact exist as to whether
27                     the 2019 and 2021 SWPPPs and site maps fail to
                       identify all impervious areas. ........................................... 17

28

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

4.   COL sneaks into this Motion the previously un-alleged and un-disclosed claim that the 2011 SWPPP purportedly fails to identify the BMPs implemented under a State Court settlement .......................................................18

5.   Genuine issues of material fact exist as to whether each SWPPP fails to accurately describe the locations of all industrial materials. .................................................19

6.   Genuine issues of material fact exist as to whether Defendants have failed to revise the SWPPP when necessary. .......................................................................................21

C.   Genuine Issues Of Material Fact Warrant Denial Of COL's Motion As To "Issue No. 3." .........................................................................22

D.   COL Failed To Meet And Confer As To The Standing Issue, In Violation Of The Standing Order .......................................................24

V.   CONCLUSION ............................................................................................ 26

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1

## TABLE OF CONTENTS

2

### CASES

3

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ......................................5, 8, 12

4

*Buckhalter v. Torres*, No. 2:17-cv- ...............................................................................5

5

*Cal. Sportfishing Prot. Alliance v. Cal. Ammonia Co.*, NO. CIV. S-05-0952
   WBS JMF, 2007 U.S. Dist. LEXIS 8845 at *28 (E.D.Ca. 2007).................................17

6

7

*Feezor v. Patterson*, 896 F. Supp. 2d 895, 903 (E.D. Cal. 2012).....................................19

8

*Mt. Club Owner's Ass'n v. Graybar Elec. Co.*, CIV. NO. 2:13-1835 WBS
   KJN, 2016 U.S. Dist. LEXIS 10383 at *4, 2016 WL 323805 (E.D.Ca.
   2016) ........................................................................................................................5, 12

9

*Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir.
   2008) .........................................................................................................................19

10

*Pensmore Reinforcement Techs., LLC v. Cornerstone Mfg.*, ___ F.Supp.3d
   ___, 2023 U.S. Dist. LEXIS 115364 at *32 (C.D.Ca, May 23, 2023) ......................17

11

12

*Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006).......................19

13

*Sierra Club v. El Paso Gold Mines*, 421 F.3d 1133, 1150 (10th Cir. 2005) ...................17

14

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) .................................................19

15

*T.W. Elec. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-532 (9th
   Cir. 1987) ...................................................................................................................9

16

*United States v. Asarco Inc.*, 392 F. Supp. 2d 1197, 1201-1202 (D. Idaho
   2005) .........................................................................................................................12

17

18

*Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir.
   2006) .........................................................................................................................5

19

*Waterkeepers N.Cal. v. AG Indus. Mfg.*, No. CIV-S-00-1967 MCE/PAN,
   2005 U.S. Dist. LEXIS 43006 at *19, 2005 WL 2001037 (E.D.Ca. 2005)..........passim

20

21

22

### STATUTES

23

33 U.S.C. §1365(b) .........................................................................................................passim

24

Fed. R. Civ. P. 56(a) ........................................................................................................8

25

Fed. R. Civ. P. 56(c) ........................................................................................................8

26

27

28

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1

**I.     INTRODUCTION**

2         Chief United States District Judge Kimberly J. Mueller's aptly observed: "The

3   Supreme Court has taken care to note that district courts should act 'with caution in

4   granting summary judgment,' and have authority to 'deny summary judgment in a case

5   where there is reason to believe the better course would be to proceed to a full trial.'

6   *Buckhalter v. Torres*, No. 2:17-cv-02072-KJM-AC, 2019 U.S. Dist. LEXIS 132901 at *16,

7   2019 WL 3714576 (E.D.Ca. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

8   255 (1986)).  Chief Judge Mueller adds:  "A trial may be necessary 'if the judge has doubt

9   as to the wisdom of terminating the case before trial.' This may be the case 'even in the

10  absence of a factual dispute.'"  *Ibid.* (citations omitted). Those considerations apply here.

11        There are genuine disputes of material facts (based on expert witness opinions)

12  as to "Issue No. 1," "Issue No. 2," and "Issue No. 3" in the "Statement Of Issues To Be

13  Decided" on page 9 of the Motion For Partial Summary Judgment ("Motion").  Plaintiff

14  California Open Lands ("COL") ignores the rule that "'[c]redibility determinations, the

15  weighing of the evidence, and the drawing of legitimate inferences from the facts are

16  jury functions, not those of a judge' ruling on a motion for summary judgment." *Mt. Club

17  Owner's Ass'n v. Graybar Elec. Co.*, CIV. NO. 2:13-1835 WBS KJN, 2016 U.S. Dist.

18  LEXIS 10383 at *4, 2016 WL 323805 (E.D.Ca. 2016), citing *Anderson v. Liberty Lobby,

19  Inc.*, *supra*, 477 U.S. at 255.

20        Even though "summary judgment is not a procedural second chance to flesh out

21  inadequate pleadings," *Wasco Prods., Inc. v. Southwall Techs., Inc.,* 435 F.3d 989, 992

22  (9th Cir. 2006), COL raises numerous substantive claims in Issue No. 1 and Issue

23  No. 3 that:  (a) were never included in a required 60-Day Notice given to Defendants, in

24  violation of 33 U.S.C. §1365(b); (b) were not raised in its Complaint; and (c) therefore

25  may not be considered here.  And Issue No. 4 in its Motion ("standing") was never

26  raised in the pre-filing "meet and confer" process, in violation of this Court's Standing

27  Order, so it cannot be considered.

28        In short, this Court should deny the Motion in its entirety.

**II.   THE KEY ISSUES IN THIS CASE AROSE AS A RESULT OF THE 2018 CAMP FIRE DISASTER AND THE EXTRAORDINARY AMOUNTS OF RAINFALL THAT IMMEDIATELY FOLLOWED.  COL'S MOTION IGNORES THAT.**

In its Motion, COL omits any discussion of the factual events at the Neal Road Recycling and Waste Facility ("NRRWF" or "Facility") that led up to the alleged discharges in this case.  Those events are relevant to the determination of the Motion.

In November 2018, the Camp Fire caused devastating impacts on the Facility.  In COL's own words:

> On or about November 8, 2018, the Camp Fire destroyed several miles of storm drainage pipes, improvements and conveyance systems, at least thirty-five landfill gas extraction wells, several miles of landfill gas collection system infrastructure, portions of the landfill's base liner system, thousands of lineal feet of the site's leachate collection and removal system, and other critical landfill infrastructure, including downed power and phone lines and interne infrastructure, that affected the performance of pumps, instrumentation, and communications.  [Defendants' Statement Of Additional Undisputed Facts In Opposition To Plaintiff's Motion For Partial Summary Judgment ("County's SAUF") 94.]

Eric Miller, the County's Person Most Qualified and its experts, describes the impacts of the catastrophic rainfall events that immediately followed the Camp Fire as follows:

> In my opinion, prior to the Camp Fire, which initiated November 8, 2018 and burned the Facility as evidenced in photographic documentation and by personal observation, the NRRWF fully complied with the BMPs and with the requirements and regulations for storm water management in the CWA, the IGP and the WDRs. Prior to the Camp Fire and during my tenure dating back to 2016, there were no storm water discharges of any kind at the NRRWF either onto or off the site. [County's SAUF 95.]

> Leachate discharges from the southwest toe of Waste Module Unit 4 of NRRWF (WMU-4 to Storm Water Basin 4 (SWB-4) and the Primary Sedimentation Basin (PSB), also known as the Conservation Easement, occurred at the NRRWF on February 14, 2019, February 26, 2019, and March 6, 2019.  In my opinion, the leachate discharges were the direct result of a series of natural disasters which can be classified as ACTS OF GOD. A series of manmade and natural events beginning November 8, 2018, with the onset of the Camp Fire caused severe damage to the Facility. The Camp Fire destroyed the infrastructure required to operate the Facility under state and federal regulatory requirements, including the CWA, the IGP and the WDRs.  Storm water Best Management Practices (BMPs) associated with WMUs 1, 2, 3 and 4, WMUs poly covers, soil grass covers, and other infrastructure required to meet local, state, and federal regulations were destroyed. [County's SAUF 96.]

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

The infrastructure destroyed by the Camp Fire was being repaired by NRRWF personnel, under my direction in support of NRRWF management at the time, when a series of severe local storm events caused by atmospheric rivers impacted the NRRWF beginning in late November 2018 which produced over three inches of rain in three days in a pattern of high intensity storms.  From October 2018 through December 2018 the Facility received nearly eight inches of precipitation.  The site received more than five inches of rain in January 2019 with wetter weather continuing into early  February 2019. NRRWF received nearly thirteen inches of rain in February 2019.  BMPs that had been in place to mitigate the potential impacts of storm water sheet flows were partially repaired by NRRWF personnel, or were in the process of repair, when these series of atmospheric rivers and subsequent rainfall overwhelmed the damaged BMPs resulting in leachate seep events. Prior to the leachate seep events, the NRRWF BMPs, even though damaged and partially repaired, had effectively controlled the discharge of leachate from all the WMUs. The intense precipitation associated with these severe local storm events overwhelmed NRRWF site infrastructure. Leachate discharged from the southwest toe of WMU-4 and entered storm water contained in SWB-4. [County's SAUF 97, 98.]

On February 14, 2019, an intense storm water event produced 2.75 inches of precipitation caused numerous seeps along the toe and mid-slope of the southern side of Module 4.  Liquid was observed flowing into the temporary storm water basin #4 at an estimated rate of 475 gallons per hour.  The storm water and leachate in SWB-4 was discharged by a pump that had either inadvertently been turned on or left in automatic mode, resulting with a discharge into a drainage ditch that feeds the PSB.  The seep areas on the Module 4 slope were managed as best as possible by landfill staff.  Pumps were manually shut off. [County's SAUF 99.]

Another atmospheric storm event occurred on February 26, 2019, and additional seeps were observed from the toe of Module 4 which flowed into storm water basin #4.  The storm water and leachate in SWB-4 was discharged by a pump that was inadvertently turned on or left in automatic mode, into the drainage ditch that feeds the PSB. Pumps were manually shut off.  NRRWF personnel attempted to mitigate the discharge of leachate to storm water but were unable to complete this work as saturated surface soil conditions from the severe storm events prevented the use of heavy equipment, and the use of electrically powered equipment to install pipes necessary to discharge the leachate to a suitable impoundment. [County's SAUF 100.]

Travis Peterson, the County's Qualified Industrial Stormwater Practitioner

("QISP") expert witness similarly testified:

"The acts of god, specifically the Camp Fire and the rain events, led to the saturation of the soils in the area, led to the saturation and introduction of leachate into that waste module, and simply reducing then the amount of leachate would not have prevented the seeps from occurring.· The seeps would have occurred due to the acts of god that introduced excess amounts of precipitation into that module."  [County's SAUF 101.]

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Mr. Peterson also noted:  "[T]he volume of precipitation introduced to the system, to the facility, to Module 4 was not in the control of the facility itself.· It was too much for the design of the system.· Cumulatively, the system received much more precipitation than any 100-year designed storm event and therefore the seeps occurred."  County's SAUF 104.

On February 28, 2019, the County of Butte declared a local emergency due to "conditions of extreme peril to the safety of persons and property" from the 2019 February storms.  County's SAUF 106.

These facts were ignored by COL in its Motion.  But they highlight why genuine disputes as to material facts in this case, often based on expert witness testimony, preclude summary judgment here.

## III.   THIS COURT MUST DENY COL'S MOTION WHERE THERE ARE GENUINE DISPUTES OF MATERIAL FACTS.

"The Federal Rules of Civil Procedure provide for summary judgment when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Waterkeepers N.Cal. v. AG Indus. Mfg.*, No. CIV-S-00-1967 MCE/PAN, 2005 U.S. Dist. LEXIS 43006 at *19, 2005 WL 2001037 (E.D.Ca. 2005) ("*Waterkeepers*") (quoting Fed. R. Civ. P. 56(c)). "Rule 56 also allows a court to grant summary adjudication on part of a claim or defense."  *Id.* at *19-*20.  The standard that applies to a motion for summary adjudication (or partial summary judgment) is "the same as that which applies to a motion for summary judgment."  *Id.* at *20 (citing Fed. R. Civ. P. 56(a), 56(c)).  "Once the moving party meets the requirements of Rule 56 by showing that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at *20-*21 (quoting *Anderson, supra,* 477 U.S. at 256).

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

The Ninth Circuit explained when disputed issues of material facts warrant the

denial of a motion for summary judgment:

> "The issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." [Citation.]  Thus, at this stage of the litigation, the judge does not weigh conflicting evidence with respect to a disputed material fact. [Citation.]  Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions. [Citation.]  These determinations are within the province of the factfinder at trial. Therefore, at summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party:  if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. Put another way, if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied. [Citation.] [¶]  Inferences must also be drawn in the light most favorable to the nonmoving party. … [¶] Thus, the court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence. [Citation.]  If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party. The nonmoving party's evidence must be taken as true. [*T.W. Elec. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-532 (9th Cir. 1987) (citations omitted).]

Application of those evidentiary rules precludes summary judgment in this case.

## IV.   COL'S MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE ARE DISPUTED ISSUES OF MATERIAL FACT AS TO EACH OF THE THREE "ISSUES."

### A.   Genuine Issues Of Material Fact Warrant Denial Of COL's Motion As To "Issue No. 1."

COL' seeks partial summary judgment on whether "Defendants violated section III

of the General Permit by discharging leachate generated from Defendants' landfill facility

to downstream surface waters."  Motion 9:12-14, 15:19-19:3.  But, there are genuine

disputes of material facts that warrant denial of the Motion as to "Issue No. 1."

In *Waterkeepers*, *supra*, U.S. District Judge Morrison C. England denied a

plaintiff's motion for summary adjudication (as well as a defendant's cross-motion for

1   summary adjudication) on a similar claim involving the alleged discharge of

2   contaminated storm water under the CWA.  Judge England explained:

> We must next address the merits of WaterKeepers' claim that AIM is
> violating the CWA through its storm water discharge. Analyzing that
> question necessarily entails an assessment of the various types of
> pollutants allegedly discharged by AIM. In order to rule in favor of either
> party as a matter of law, the Court must decide whether WaterKeepers
> has *conclusively established* that certain pollutants are being discharged,
> or alternatively whether AIM can establish that WaterKeepers has come
> forward with no evidence to show that any violation occurred, hence
> militating in favor of summary judgment on AIM's behalf. [Waterkeepers,
> 2005 U.S. Dist. LEXIS 43006 at *25.]

9   In *Waterkeepers*, the court found that there was a "factual assessment not amendable to

10  determination on summary judgment" as to whether or not storm water coming into

11  contact with industrial areas of the AIM facility was mixed with areas that would not be

12  subject to the purview of the applicable State order.  *Id.* at *28-*29.  The issue of whether

13  or not the County discharged leachate generated from landfill facility to downstream

14  surface waters on any of the ten days listed in the Motion is a "factual assessment not

15  amendable to determination on summary judgment" for the following three reasons.

**1.      Genuine disputes of material fact exist as to whether or not storm water contaminated with leachate flowed off the Facility.**

18  Under "Issue No. 1" in the Motion, COL alleges that on February 14, 2019, "[f]rom

19  the wetland preserve, the *leachate-contaminated* storm water flowed over a concrete weir

20  along the west side of the preserve basin, across a gravel road, and off the Facility into an

21  unnamed creek"; and "[t]he Preserve discharged *contaminated* storm water via the

22  concrete weir again on February 27, 2019, and continued discharging every day, except

23  for March 5, 2019, up to and including March 8, 2019." Motion 11:7-21, 16:20-23, 17:6-8.

24  However, this Court cannot grant the Motion as to "ISSUE No. 1" because there are

25  genuine disputes of material facts as to whether the storm water that flowed off the

26  Facility was *contaminated with leachate* on any of the days alleged by COL, or at all.

27  The parties agree that leachate-contaminated storm water was pumped from

28  Storm Water Basin #4 into the ditch to the west of Module 4.  County's Response to

-10-

1    SUF 3.  The parties also agree that such leachate-contaminated storm water then flowed

2    from that ditch into that portion of the east side of the Preserve that is the Primary

3    Sedimentation Basin ("PSB").  County's Response to SUF 3; SCS Engineers Module 4

4    Seep Notification dated March 13, 2019, ex. 1 at 7 (BUTTE01694);

5           The PSB was designed to serve as both a storm water sedimentation basin and a

6    Preserve Area as part of an environmental mitigation program.  County's SAUF 109. Due

7    to the extraordinary amounts of rainfall in February 2019, storm water overflowed from the

8    sedimentation basin portion on the east side of the Preserve over an earthen

9    embankment into the wetlands portion of the Preserve on the west side of the Preserve.

10   Storm water flowed from the wetlands portion of the Preserve over the concrete weir on

11   the west side of the Preserve and off the Facility to the west due to the extraordinary

12   amounts of rainfall in February 2019.  County's Response to SUF 4, 8, 9, 11, 82, 84.

13   However, there is a genuine dispute as to whether the storm water that flowed off site of

14   the Facility was contaminated with leachate on any of the days listed in the moving

15   papers, or at all.  County's Responses to SUF 4, 8, 9, 11, 82, 84.

16          COL's argument that "Defendants discharged landfill leachate from the Facility,"

17   Motion 17:12, is directly contradicted by the County's experts who made the following

18   conclusions in the Investigative Final Report, prepared by Compliance SFO, Inc. &

19   Formation Environmental, LLC, dated December 14, 2022 ("IFR")

20              As detailed in this IFR, t*he storm water data indicates that there
                *were* no *leachate discharges that flowed off-site or into the tributary*
21              *to Hamlin Slough* and no [Chemicals of Potential Concern
                ("COPCs")] were detected at concentrations in soils from the
22              conservation easement (PSB) that exceeded conservative risk
                based screening levels or background soil concentrations for
23              ecological or human receptors. No species of concern, threatened
                or endangered species or their habitats were found within the
24              conservation easement. Further, there was no impact to or reduction
                in wetland vegetative species. Some inorganic COPCs in storm
25              water were found at concentrations exceeding ecological screening
                levels (ESLs) and human health screening levels (SLs); however,
26              COPCs in the storm water sample from SW-1A are not the result of
                the leachate discharge but originate from the soil stockpile and the
27              haul road. [County's Responses to SUF 4, 8, 9, 11, 82, 84
                (emphasis added); Investigative Final Report, prepared by
28

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Compliance SFO, Inc. & Formation Environmental, LLC, dated
December 14, 2022, p. vii, County's Appendix, Exhibit F, at 245.]

That conclusion was based on the expert opinions of Sean Covington that "[t]here were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the unnamed tributary to Hamlin Slough in 2019 that exceeded ESLs or background concentrations"; and "[t]here were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the tributary to Hamlin Slough that exceeded human health SLs or background concentrations."  County's Responses to SUF 4, 8, 9, 11, 82, 84; Deposition of Sean Covington, County's Appendix Exhibit G (19:11-25, 20:17-21:14, 31:14-33:6, 68:25-69:4, Ex. 3 at pp. 7, 11-14).

Thus, the record evidence and reasonable inferences from the evidence demonstrate there are genuine disputes as to the key issue underlying COL's "Issue No. 1," namely, whether *leachate-contaminated* storm water was discharged "from Defendants' landfill facility to downstream surface waters" between February 14 and March 8, 2019.  Motion 9:12-14; 17:25-27.  This Court should view such evidence "in the light most favorable to the non-moving party and draw all justifiable inferences in its favor."  *Mt. Club Owner's Ass'n v. Graybar Elec. Co.*, *supra*, U.S. Dist. LEXIS 10383 at *4 (citing *Anderson v. Liberty Lobby, Inc.*, *supra*, 477 U.S. at 255).  In short, there are genuine factual disputes preclude partial summary judgment as to "Issue No. 1."  *See e.g., United States v. Asarco Inc.*, 392 F. Supp. 2d 1197, 1201-1202 (D. Idaho 2005).

**2.     Genuine disputes of material fact exist as to whether or not there was "discharge of landfill leachate from the Facility on every one of the 10 days listed in the Motion.**

Assuming *arguendo* that *any* storm water actually contaminated with  leachate flowed out of the Preserve during the time frame outline in the Motion, the Motion should still be denied as to "Issue No. 1."  That is because COL seeks a ruling by this Court, that as a matter of law, the storm water that flowed off the Facility on *every one* of the ten days contained leachate, and that ten separate violations of the Clean Water Act therefore occurred here.  Motion, 15:18, 16:1-7, 20-21, 17:6-8, 31:18-19.  This Court

-12-

should not make such a ruling on summary judgment. While the evidence is undisputed that leachate-contaminated storm water flowed into the Primary Sedimentation Basin on the east side of the Preserve on two days, County's Response to SUF 3, 4, 7, 8, there are disputed issues of material fact (actually, there is no evidence in the moving papers) that the storm water that flowed out of the wetlands portion on the west side of the Preserve and off of the Facility contained leachate on every one of the ten days mentioned in the Motion. County's Responses to SUF 4, 8, 9, 11, 82, 84. Thus, the Motion should be denied as to "Issue No. 1."

### 3. Genuine disputes of material fact exist as to whether the County's permit allows the discharges alleged by COL.

As a key part of its "Issue No. 1," COL also seeks a determination from this Court that, as a matter of law, the Facility "is subject to several different permits" and that "none" of those permits "authorize the discharge of landfill leachate to surface waters" that COL's alleges occurred in this case. Motion 19:1-3; SUF 19. This Court should not make such a determination. There are genuine disputes of material fact – based on expert testimony – as to whether or not the relevant permits for the Facility *do* allow for the discharge(s) that are alleged in COL's claims in this case. The document cited by COL in SUF 19 (2021 SWPPP, ex/. 5 at 174 (COL009311)) refers to relevant permits as the "Waste Discharge Requirements, Order Nol R5-2011-049; the Solid Waste Facility Permit; and the Joint Technical Document Format, Revised November, 2020." Each of the permits cite Title 27 design storm standards that require facilities to be constructed to accommodate storm water runoff from 24-hour precipitation events with a return period of 100 years. County's SAUF 102. The permits and Title 27 do not specify what happens to atmospheric river storm water that cannot be controlled by this design standard, nor do they provide that discharges due to conditions that overwhelm these standards are violations. County's SAUF 102. Other NPDES permits, including the USEPA Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity that informed California's Industrial General Permit, include "bypass"

and "upset" provisions that deal with the intentional or unintentional diversion of a waste stream around pollution controls resulting in discharge. County's SAUF 103.  "Bypass" includes the intentional diversion of waste when it is unavoidable to prevent loss of life, personal injury, or severe property damage, or when there are no feasible alternatives to bypass. County's SAUF 103.  "Upset" includes an exceptional incident in which there is unintentional and temporary noncompliance with permit effluent limitations because of factors beyond reasonable control as occurred at the Facility with the atmospheric rivers. County's SAUF 103.

These widely used provisions are relevant in this case and would allow for the discharges that occurred in this case because of the extreme fire damage and unexpected and repeated atmospheric river rainfall events here.  At this procedural stage of the litigation, this Court cannot determine that Mr. Peterson is wrong, as matter of law, as to whether the permits for the Facility allow for the alleged discharges in light of the extreme circumstances that occurred in this case due to the Camp Fire and the subsequent atmospheric rivers through March 2019. County's SAUF 105.  Yet that is what COL seeks here.  The Motion should be denied as to "Issue No. 1" because of such disputed issues of material facts.

**B.  Genuine Issues Of Material Fact Warrant Denial Of COL's Motion As To "Issue No. 2," Which Is Comprised Of Nine Separate Parts.**

In *Waterkeepers*, *supra*, Judge England denied a plaintiff's motion for summary adjudication (as well as a defendant's cross-motion for summary adjudication) on a similar claim involving whether or not the defendant failed to develop and implement an adequate SWPPP.  Plaintiff alleged that defendant "has not identified all 'significant materials' and potential pollution sources," that "the presence of metals in defendant's industrial activities "has not been properly disclosed," that certain activities "have not been detailed," and that the SWPPP "does not identify BMPs for certain types of pollutants," that the site map in the SWPPP fails to adequately identify "drainage areas within its facility boundaries" "storm water discharge and sampling points" and "areas if

-14-

soil erosion."  *Waterkeepers*, *supra,* 2005 U.S. Dist. LEXIS 43006 at *32.  As to each of these SWPPP related claims, Judge England denied summary adjudication because plaintiff's "criticisms of AIM's SWPPP also raise factual issues not amenable to determination through summary judgment."  *Waterkeepers*, *supra,* 2005 U.S. Dist. LEXIS 43006 at *33 - *34.  Judge England explained:

> Whether or not AIM's use of an aggressive sweeping program to deal with tracking issues, for example, cannot be decided as a matter of law. Similarly, the technical inadequacies of AIM's site map in terms of drainage flow and erosion potential is also not an appropriate candidate for resolution through summary judgment, whether in favor of either AIM or WaterKeepers.  [*Id.* at *34.]

The same analysis and conclusion applies to COL's SWPPP claims in "Issue No. 2" here.

COL' seeks partial summary judgment on whether "Defendants violated section X of the General Permit by failing to develop and implement an adequate Storm Water Pollution Prevention Plan" ("SWPPP").  Motion 9:15-16, 19:4-26:9; SUF pg. 10, lines 5-6. The purported "Issue No. 2" is actually comprised of six separate and distinct sub-parts, and some of those sub-parts are comprised of numerous sub-sub-parts.  The *eleven* different sub-sub-parts that actually make up "Issue No. 2" are based on separate facts, different legal requirements, and genuine disputes as to material facts that preclude summary adjudication. The instant Motion illustrates observation of District Judge William B. Shubb's in *Cal. Sportfishing* that that motions for summary adjudication of issues "request that the court resolve issues that dispose of neither a party nor a claim, and seldom accomplish anything."  2007 U.S. Dist. LEXIS 8845 at *9 & fn. 2.

**1.    Genuine issues of material fact exist as to whether each site map in the SWPPs fails to identify the Preserve.**

As a sub-part of "Issue No. 2," COL alleges that "each site map fails to identify the Preserve." Motion 20:6-18.  Specifically, COL argues that "[n]one of the Facility's SWPPP site maps identify the Preserve and none identify the presence of wetlands at the Preserve."  Motion, 20:9-11.  However, to the extent that claim involves the 2021 SWPPP, that claim was never included in the 60-Day Notice that COL provided to the

County on November 15, 2019, County's SAUF 107, was never made a part of any subsequent 60-Day Notice, in violation of the Clean Water Act (33 U.S.C. §1365(b)), County's SAUF 108, and therefore cannot be considered in this Motion or even allowed in this lawsuit.

Also, there are disputed issues of material fact as to whether the SWPPP maps sufficiently identify the Preserve.  County's Response to SUF 21, 24; County's SAUF 109, 110.

> **2.      Genuine issues of material fact exist as to whether each site map in the SWPPPs fails to identify the locations of industrial activity and material subject to the General Permit.**

As a sub-part of "Issue No. 2," COL alleges that "each site map fails to identify the locations of industrial activity and material subject to the General Permit." Motion 20:19-22:13.  But to the extent that claim involves site maps prepared after November 15, 2019, that claim was never included in the 60-Day Notice that COL provided to the County on that date, County's SAUF 111, was never made a part of any subsequent 60-Day Notice, in violation of the Clean Water Act (33 U.S.C. §1365(b)), County's SAUF 112, and therefore cannot be considered in this Motion or even allowed in this lawsuit.

Also, COL is wrong on the substance of its claim.  The County's expert explained:

> The SWPPP is designed to cover all operational modes for the facility and includes the operation of any of the modules that may be currently active. It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase.  Because the location where waste is dumped each day (The 'working face') moves daily, and is not specific to any region, it would not be practical, nor is it required to amend the SWPPP each time this location changes. [County's Response to SUF 31, 32, 41, 42, 46, 47, 52, 53, Rebuttal Expert Report Of Travis Peterson, pp. 6, 7, 8, 9, attached as Exhibit 3 to Peterson Depo., County's Appendix Exhibit E at 216, 217, 218, 219.]

"[T]he requirement of [the] general permit is to identify all areas of industrial activity and that is sufficiently identified" in the SWPPPs at issue here.  County's Responses to SUF 31, 32, 33, 41, 42, 46, 47, 52, 53, Peterson Depo., 105:24-106:2, County's Appendix, Exhibit E at 199:24-199a:2.  Identifying the areas of industrial activity on a SWPPP must

not be "so specific that it becomes outdated and inaccurate immediately."  County's

Responses to SUF 31, 32, 33, 41, 42, 46, 47, 52, 53, Peterson Depo., 100:7-17,

County's Appendix, Exhibit E at 198:7-17  Therefore, a change in the module at the

Facility "would not necessitate an update to the SWPPP," County's Response to SUF

31, 32, 33, 41, 42, 46, 47, 52, 53, Peterson Depo., 105:12-23, County's Appendix,

Exhibit E at 199:12-23 contrary to COL's position in this lawsuit.

Thus, the Motion should be denied as to "Issue No. 2."  "[C]onflicting expert

testimony raises a genuine issue of material fact" that warrants denial of a plaintiff's

motion for partial summary judgment. (*Cal. Sportfishing Prot. Alliance v. Cal. Ammonia

Co.*, NO. CIV. S-05-0952 WBS JMF, 2007 U.S. Dist. LEXIS 8845 at *28 (E.D.Ca. 2007)

(citing *Sierra Club v. El Paso Gold Mines*, 421 F.3d 1133, 1150 (10th Cir. 2005)).  *See

e.g., Pensmore Reinforcement Techs., LLC v. Cornerstone Mfg.*, ___ F.Supp.3d ___,

2023 U.S. Dist. LEXIS 115364 at *32 (C.D.Ca, May 23, 2023) ["the dispute boils down to

a classic battle of the experts that cannot be resolved on summary judgment"].

> **3.**   **Genuine issues of material fact exist as to whether the 2019
> and 2021 SWPPPs and site maps fail to identify all impervious
> areas.**

As a sub-part of "Issue No. 2," COL also seeks a court determination on the very

minor sub-issue of whether "the 2019 and 2021 SWPPPs and site maps fail to identify all

impervious areas." Motion 22:14-24.  However, to the extent that claim involves the 2021

SWPPP, that claim was never included in the 60-Day Notice that COL provided to the

County on November 15, 2019, County's SAUF 112, 113, was never made a part of any

subsequent 60-Day Notice, in violation of the Clean Water Act (33 U.S.C. §1365(b)),

County's SAUF 114, and therefore cannot be considered in this Motion or even allowed

in this lawsuit.  COL argues that the 2019 SWPPP was not revised or amended to reflect

the application of Posi-Shell®, and the 2021 SWPPP fails to identify any areas with Posi-

Shell.  Motion, 22:22-24. However, Posi-Shell is only "semi-permanent" and "temporary."

County's Response to SUF 55; County's SAUF 115.  It "may be appropriate to include

that as an area of imperviousness" in the SWPPP, if intended to be permanent, but here it was only temporary.   County's SAUF 115.  Thus, partial summary judgment is unwarranted as to that claim in "Issue No. 2."

### 4.   COL sneaks into this Motion the previously un-alleged and un-disclosed claim that the 2011 SWPPP purportedly fails to identify the BMPs implemented under a State Court settlement.

As a sub-part of "Issue No. 2," COL also seeks a court determination of whether or not "the 2021 SWPPP and site maps fail to identify the advanced BMPs implemented as a result of the parties' State Court settlement agreement." Motion 23:1-24:1. Specifically, COL alleges that "[t]he 2021 SWPPP and site map, was not revised or amended to identify either the flow control weir boxes or the secondary containment system" that the parties agreed to as a part of the parties' state court settlement agreement in April 2022.   Motion, 23:1-24:1.  However, that claim should be denied on summary judgment – indeed, it should be dismissed from this entire litigation – for the following four reasons.

First, the claim that the County failed to revise or amend the 2021 SWPPP in light of the state court settlement agreement postdates and could not have been included in the 60-Day Notice that COL provided to the County on November 15, 2019. County's SAUF 123.  And that claim was never made a part of any subsequent 60-Day Notice, in violation of the Clean Water Act (33 U.S.C. §1365(b)). County's SAUF 124.

Second, the claim that the County allegedly failed to revise or amend the 2021 SWPPP in light of the state court settlement agreement was never listed by COL in its discovery responses.  County's SAUF 126.

Third, the claim that the County allegedly failed to revise or amend the 2021 SWPPP in light of the state court settlement agreement could not have accrued until June 13-16, 2023, when the flow control weir boxes or the secondary containment system were installed. SUF 62, 63. Therefore, COL is inappropriately asking this Court to make a partial summary judgment ruling on a claim that arose *after* the applicable non-expert discovery cutoff in this case (Docket nos. 68, 76).  County's SAUF 127.  Nor

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

was that claim included in COL's expert witness report.  County's SAUF 127.  Thus, the County did not even learn about this claim until this Motion was filed and was prevented by COL from being able to conduct any discovery or expert report on this claim. County's SAUF 127.  Raising new claims in such a fashion should not be allowed.

Fourth, the claim that the County failed to revise or amend the 2021 SWPPP in light of the state court settlement agreement was never included as a claim in the Complaint. County's SAUF 125.  "Federal Rule of Civil Procedure 8(a)(2) requires that the allegations in the complaint 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)).  Consistent with this requirement, "raising such claim in a summary judgment motion is insufficient to present the claim to the district court." *Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (*en banc*). As this Court has declared:  "It is axiomatic that violations not pled in the complaint cannot be considered by this court at the summary judgment stage." *Feezor v. Patterson*, 896 F. Supp. 2d 895, 903 (E.D. Cal. 2012) [because "[t]hese violations do not appear in the operative complaint," plaintiff's motion for summary judgment is denied "and these alleged violations are disregarded."]

Therefore, this Court should not consider the sub-issue of whether the County allegedly failed to revise or amend the 2021 SWPPP in light of the state court settlement agreement.  COL should be barred from even raising that claim in this case.

**5. Genuine issues of material fact exist as to whether each SWPPP fails to accurately describe the locations of all industrial materials.**

As a sub-part of "Issue No. 2," COL seeks a court determination of whether or not "each SWPPP fails to accurately describe the locations of all industrial materials." Motion 24:2-28.  That sub-part is itself comprised of three different sub-sub-parts.  This Court should deny partial summary judgment as to this sub-part, and as to each of the sub-sub-parts of Issue No. 2, for the following four reasons.

First, to the extent that claim involves the 2021 SWPPP, that claim was never included in the 60-Day Notice that COL provided to the County on November 15, 2019, County's SAUF 116, was never made a part of any subsequent 60-Day Notice, in violation of the Clean Water Act (33 U.S.C. §1365(b)), County's SAUF 117, and therefore cannot be considered in this Motion or allowed in this lawsuit.

Second, contrary to COL's argument on one of the sub-sub-parts of Issue No. 2, Motion 24:4-12, the SWPPP's site maps *do* properly identify the location of where the main industrial activity at the Facility occurs and the locations of solid waste at the Facility, as Mr. Peterson testified. *See infra*, pages 16-17.

Third, genuine disputes of material facts exist as to the sub-sub-part of Issue No. 2 regarding whether or not construction and demolition debris and green waste were wrongly identified in the SWPPP. Contrary to COL's assertion, Defendants did *not* admit that "construction and demolition debris and green waste" were wrongly identified in the SWPPP." Motion 24:12-18; SUF 66-67. The evidence presented by COL from the Deposition of Eric Miller is that it merely would be "more appropriate" or "helpful" to separate out the different materials, which is not an admission that they "should" be identified separately in the SWPPP or that the County is legally required to do so. Indeed, that is an expert opinion, which objection was properly raised in the Miller Deposition. County's Response to SUF 67, Miller Depo., Ex. 2 at 103a:10-103b:3 (95:10-96:3), Thus, whether or not "construction and demolition debris and green waste" must separately be "identified" on the SWPPP site map, Motion 24:18-19, raises numerous factual issues that preclude summary judgment, just like the similar claim in *Waterkeepers*.

Fourth, another sub-sub-part of Issue No. 2, COL claims that the description in the 2021 SWPPP of the location of leachate as the "Class II Surface Impoundment – See Drawing 2" is legally insufficient. Motion 24:20-28. But that claim was never included in the 60-Day Notice COL provided to the County on November 15, 2019, County's SAUF 118, was never made a part of any subsequent 60-Day Notice, in

1  violation of the Clean Water Act (33 U.S.C. §1365(b), County's SAUF 119, and therefore

2  cannot be considered in this Motion or even allowed in this lawsuit.  Also, that claim

3  raises numerous disputed material issues that preclude summary judgment.  For

4  example, the 2021 SWPPP describes the location of leachate as "Class II Surface

5  Impoundment – See Drawing 2" however, the location of leachate is labeled and

6  identified in Drawing 3, which is sufficient.  County's Response to SUF 69; County's

7  SAUF 120.

8
9
   **6.      Genuine issues of material fact exist as to whether Defendants
            have failed to revise the SWPPP when necessary.**

10  As a sub-part of "Issue No. 2," COL seeks a court determination of whether or not

11  "Defendants have failed to revise the SWPPP when necessary."  Motion 25:1-26:9. That

12  sub-part is itself comprised of multiple sub-sub-parts.  This Court should deny partial

13  summary judgment as to this sub-part, and as to each of the sub-sub-parts, for the

14  following four reasons.

15  First, to the extent that claim involves the 2021 SWPPP or any alleged failure

16  after November 15, 2019, that claim postdates and therefore was never included in the

17  60-Day Notice that COL provided to the County on November 15, 2019, County's SAUF

18  121, was never made a part of any subsequent 60-Day Notice, in violation of the Clean

19  Water Act (33 U.S.C. §1365(b)), County's SAUF 122, and therefore cannot be

20  considered in this Motion or even allowed in this lawsuit.

21  Second, as one of the sub-sub-parts of Issue No. 2, COL argues that Defendants

22  failed to revise the SWPPP when necessary, under the "circumstances discussed

23  above."  Motion 25:7. But COL never listed any "circumstances discussed above," and

24  never describes what are those "circumstances discussed above."

25  Third, as another sub-sub-part of Issue No. 2, COL argues that the 2021 SWPPP

26  was allegedly not revised to reflect the "installation and repair of approximately five acres

27  of rain fly over Module 4" by March 22, 2022. Motion 25:7-13.  But again, that claim

28  postdates and was never included in the 60-Day Notice that COL provided to the County

on November 15, 2019.  County's SAUF 128.  And that claim was never made a part of any subsequent 60-Day Notice, in violation of the Clean Water Act (33 U.S.C. §1365(b).  County's SAUF 129.  Therefore, that claim may not be raised in this Motion or even in this litigation.

Fourth, as another sub-sub-part of Issue No. 2, COL argues that the 2021 SWPPP was allegedly not revised to reflect the fact that the proposed covered aerated static pile ("CASP") project was abandoned. Motion 25:14-22.  But again, that claim postdates and was never included in the 60-Day Notice that COL provided to the County on November 15, 2019.  County's SAUF 130.  And that postdated claim was never made a part of any subsequent 60-Day Notice, in violation of the Clean Water Act (33 U.S.C. §1365(b).  County's SAUF 131.  Therefore, that claim may not be raised in this Motion or even in this litigation.

For all of the foregoing reasons, partial summary judgment should be denied as to "Issue No. 2," and as to every one of the sub-parts and sub-sub-parts that comprise "Issue No. 2," just like the court did in *Waterkeepers*.

### C.   Genuine Issues Of Material Fact Warrant Denial Of COL's Motion As To "Issue No. 3."

In *Waterkeepers*, *supra*, Judge England denied a plaintiff's motion for summary adjudication (as well as a defendant's cross-motion for summary adjudication) on a similar claim involving whether or not the defendant failed to develop an adequate monitoring program.  Plaintiff alleged that defendant "failed to perform the required monthly visual inspections," that defendant "failed to sample storm water from the first storm of the 2000-01 rainy season," and that defendants' "first annual report was submitted a week late."  *Waterkeepers*, *supra,* 2005 U.S. Dist. LEXIS 43006 at *35.  As to each of these claims, Judge England denied summary adjudication of claims, because "[r]esolution of these issues, like the claimed inadequacies of the SWPPP itself as identified by Waterkeepers, all are inappropriate on summary judgment."  *Waterkeepers*, *supra,* 2005 U.S. Dist. LEXIS 43006 at *35-*36.

1   Similarly in *Cal. Sportfishing*, the court denied plaintiff's motion for partial

2   summary judgment on a "third cause of action" that alleged that defendant failed to

3   develop and implement an effective monitoring program.  2007 U.S. Dist. LEXIS 8845 at

4   *26-28.  Recognizing that conflicting expert testimony raises a genuine issue of material

5   fact the precludes a court from granting a motion for partial summary judgment, the court

6   explained:

7       Defendant also presents evidence that (1) defendant's monitoring of
        some, but not all, of its drains satisfies the representativeness requirement
8       of the permit in that the drains tested adequately covered the land from
        which pollutants could originate, and (2) defendant tested for the
9       constituents enumerated in its MRP, rendering summary judgment
        inappropriate on the third cause of action. [*Id.* at *28.]
10

11      The same analysis and conclusions in *Waterkeepers* and *Cal. Sportfishing* apply

12  to COL's claim in "Issue No. 3" as to whether or not "Defendants have failed to develop

13  and implement an adequate monitoring implementation plan for the facility."  Motion,

14  26:10-28:15.  Disputed issues of material fact, based on conflicting expert testimony,

15  exist in this case as to whether or not, when Defendants collect storm water samples,

16  Defendants are required to have those samples "analyzed for parameters that would

17  indicate whether the storm water discharge is polluted with leachate."  Motion, 27:10-15.

18  While COL contends that Defendants failed to analyze its storm water samples for

19  "biochemical oxygen demand, ammonia (as nitrogen), a-Terpineol, benzoic acid, or p-

20  Cresol."  Motion, 28:4-12.  COL is wrong.  As Travis Peterson explained:

21      Sample parameters required by the Facility primary and secondary
        Standard Industrial Code5 (SIC) numbers 4953, Landfills and Land
22      Application Facilities, and 5093, Scrap and Waste Materials, which take
        into account relevant industry considerations based on the operation of
23      such facilities, including the presence of leachate, are:
        •       pH
24      •       TSS
        •       0 G
25      •       COD
        •       Fe (Total)
26      •       Al (Total)
        •       Pb (Total)
27      •       Zn (Total)
        Subchapter N contains requirements for landfills (Part 445). However, the
28      NRRWF is not subject to Subchapter N requirements as demonstrated in
        the Facility SWPPP. Therefore:

-23-

1

*The monitoring implementation plan for the FACILITY does not require
storm water collected at the Facility to be analyzed for biological oxygen*

2

*demand, and the GENERAL PERMIT does not require storm water
collected at the Facility to be analyzed for biological oxygen demand,*

3

*ammonia (as nitrogen), a-Terpineol, Benzoic acid, p-Cresol, or Phenol.*
[County's SAUF 132, 133; Rebuttal Expert Report, dated August 15, 2023,

4

p. 10 (attached as Ex. 3 to Deposition of Travis Peterson); Peterson
Depo., 18:19-19:4, 119:7-120:17, County's Appendix, Exhibit E, 188:19-

5

189:4; 203:7-204:17, 220, 222.]

6

Just like the plaintiffs' summary judgment motions in *Waterkeepers* and *Cal.*

7

*Sportfishing*, COL's motion for partial summary judgment here should be denied as to

8

COL's claim in "Issue No. 3" regarding Defendants' development and implementation of

9

an adequate monitoring implementation plan.  That is because of disputed issues of

10

material facts involving conflicting expert opinion on that issue.

11

    **D.**    **COL Failed To Meet And Confer As To The Standing Issue, In
Violation Of The Standing Order.**

12

13

The issue of COL's "standing" is omitted from the Notice of Motion, the

14

"Statement Of Issues To Be Decided" and the "Conclusion." Motion 3:1-4:2, 9:7-18,

15

31:10-20.  But the Separate Statement of Undisputed Facts presents the standing issue

16

as "Issue No. 4" and it is discussed at pages 28-31 of the Motion.  So, the Motion is

17

ambiguous as to whether COL seeks partially summary judgment on that issue or not.

18

Nevertheless, partial summary adjudication should be denied as to the issue of COL's

19

standing because of COL's failure to follow the Standing Order's meet and confer

20

requirements regarding that issue.

21

In its Notice of Motion, COL states that "[p]ursuant to Standing Coder I.C., on

22

August 16, 2023, the undersigned emailed counsel for Defendants to meet and confer

23

regarding the substance of this motion.  Counsel exchanged emails between then and

24

[sic] August 25, 2023 and were unable to reach any agreement, thus exhausting meet

25

and confer efforts."  Motion 3:15-18.  However, at no time in that meet and confer

26

process did COL's counsel ever disclose that COL would raise the issue of its standing

27

as a part of its motion for summary judgment.  County's SAUF 134. COL's failure to raise

28

the standing issue in the meet and confer process prevented the parties from resolving

1   "minor procedural or other non-substantive matters during the meet and confer process,"

2   as this Court intended in the Standing Order. COL's omission of the standing issue in

3   that meet and confer process meant that the parties did not "discuss *thoroughly* the

4   substance of the contemplated motion and any potential resolution," as the Standing

5   Order requires.  Accordingly, this Court should summarily deny the partial summary

6   judgment as to the issue of COL's standing.  The Standing Order states that failure to

7   comply with the meet and confer requirement "will result in the motion being summarily

8   denied without prejudice."

9        The discussion of COL's standing in the Motion is also puzzling.  That is because

10  COL uses that discussion as an opportunity to rehash state court claims against the

11  County that are barred by the doctrine of res judicata and collateral estoppel.

12  Throughout its discussion in section VI.D of the Motion (pages 28-31), COL extensively

13  discusses its "rights and duties set forth in the Easement" that is "a Conservation

14  Easement created by state law," its "right and obligation to seek redress from the courts

15  to enforce the terms of the Easement," the alleged "discharge of leachate-contaminated

16  water into the Preserve" covered by that Conservation Easement, the alleged injury to

17  COL's "contractual property rights," and even the County's alleged "failure to allow

18  adequate flow volumes to the Preserve."  All of these are claims that COL brought

19  against the County in the state court litigation that is referred to in the moving papers.

20  County's SAUF 135, 136.  But the state court litigation was settled, as COL admits.

21  Thus, nearly all of the discussion about COL's "standing" in the Motion merely repeats

22  the state court claims that have already been resolved.  Is COL reasserting claims in this

23  case that are now barred by the doctrines of res judicata and/or collateral estoppel?  The

24  Motion is not clear.

25        Ultimately, the "standing" discussion is unavailing here because this Court should

26  deny partial summary adjudication as to the issue of COL's standing.  COL failed to raise

27  that issue in the meet and confer process, in violation of the Standing Order.

28

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**V.      CONCLUSION**

COL may not even raise many of the claims in its Motion because it failed to raise them in any 60-day Notice in violation of 33 U.S.C. §1365(b), or in the mandatory "meet and confer" procedure prior to filing the Motion.  And genuine disputes of material fact preclude summary judgment as to every other claim in Issue No. 1, Issue No. 2, and Issue No. 3.  The Motion should be denied in its entirety.


Dated:  February 1, 2024                    ABBOTT & KINDERMANN, INC.


                                            By:   /s/ Glen C. Hansen
                                               GLEN C. HANSEN
                                               DIANE G. KINDERMANN
                                               Attorneys for Defendants
                                               BUTTE COUNTY DEPARTMENT OF
                                               PUBLIC WORKS, DENNIS SCHMIDT,
                                               ERIC MILLER

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**