Diane G. Kindermann (SBN 144426)
dkindermann@aklandlaw.com
Glen C. Hansen (SBN 166923)
ghansen@aklandlaw.com
ABBOTT & KINDERMANN, INC.
2100 21st Street
Sacramento, California 95818
Telephone:    (916) 456-9595
Facsimile:    (916) 456-9599

Attorneys for Defendants
BUTTE COUNTY DEPARTMENT OF
PUBLIC WORKS, DENNIS SCHMIDT,
ERIC MILLER

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA OPEN LANDS, a non-profit land trust organization,<br><br>Plaintiff,<br><br>v.<br><br>BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS, a political subdivision of the State of California, DENNIS SCHMIDT, an individual, and ERIC MILLER, an individual,<br><br>Defendants. | No.  2:20-CV-00123-KJM-DMC<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>(FRCP 56; Eastern District Civil L.R. 260)<br><br>Hearing:    February 29, 2024<br>Time:        1:30 p.m.<br>Location:    Courtroom: 10<br>Judge:      Hon. Daniel J. Calabretta<br><br>Trial Date: June 24, 2024 |

-1-

1   Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 260(a), Defendants

2   BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS, DENNIS SCHMIDT, and ERIC

3   MILLER hereby submit the following opposition to Plaintiff's Statement of Undisputed Facts in

4   support of its Motion for Partial Summary Judgment.

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| **ISSUE NO. 1: Defendants violated section III of the General Permit by discharging leachate generated from Defendants' landfill facility to waters of the United States.** | |
| 1.   Landfill leachate left the confines of Waste Module 4 ("Module 4") beginning sometime between February 13, 2019, when the storm began, and February 14, 2019 at around 7:44 a.m., when the leachate seeps were first observed by landfill staff. SOS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 7-14 (BUTTE01693-1700). | **Admit.** |
| 2.   Leachate flowed down the southern face of Module 4 and into Sediment Basin #4 — a storm water collection basin — at an estimated rate of 475 gallons per hour. SOS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 7, 11 (BUTTE01693, 1697). | **Admit.** |
| 3.   Defendants pumped contaminated storm water in Sediment Basin #4 up and out to a roadside ditch which flowed to the Preserve until this pump was turned off at approximately 1:40 p.m. on February 14, | **Disputed** as to the term "pumped." **Admit** that the storm water and leachate in Sediment Basin #4 ("SWB-4") was discharged by a pump that had either inadvertently been turned on or left in |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 2019. SCS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 8, 11 (BUTTE01694, 1697). | automatic mode, resulting with a discharge into a drainage ditch that feeds the Primary Sedimentation Basin ("PSB"). Expert Report of Eric Miller, attached as Exhibit 3 to Miller Depo., Defendants' Appendix Of Exhibits In Opposition To Motion For Partial Summary Judgment, Exhibit C at 157. |
| 4.     Contaminated storm water discharged from the Preserve via a concrete weir and flowed off the Facility to the west into an unnamed creek which flows to Hamlin Slough, which in turn is a tributary to Butte Creek. SCS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 7-14 (BUTTE01693-1700). | **Disputed.** The evidence cited by COL does not state that the storm water that flowed off the Facility was actually "contaminated" with landfill leachate.  SCS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 7-14 (BUTTE01693-1700). Contrary to COL's statement, the Investigative Final Report, prepared by Compliance SFO, Inc. & Formation Environmental, LLC, dated December 14, 2022, p. vii, County's Appendix, Exhibit F, 245, states: "[T]he storm water data indicates that there were **no** leachate discharges that flowed off-site or into the tributary to Hamlin Slough."  (Bold added.) That expert conclusion is support by the expert opinions that   "[t]here were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the unnamed tributary to Hamlin Slough in 2019 that exceeded ESLs or background concentrations," and "[t]here were no leachate discharge |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | concentrations of COPCs in storm water that flowed off-site or into the tributary to Hamlin Slough that exceeded human health SLs or background concentrations." Deposition of Sean Covington, County's Appendix, Exhibit G at 316:11-22, 317:7-20, 318:16-22, 319:25-320:4, 334, 338, 340, 341 (19:11-22, 20:7-20, 31-16-22, 68:25-69:4; Ex. 3, pp. 7n 11, 13, 14). Also, there is a genuine issue of material fact as to whether the handwriting and colored markings on the SOS Engineers Module 4 Seep Notification dated March 13, 2019 (Exhibit 1 at 10 (BUTTE01696) was on the original document, or was added after the fact by an unknown person. |
| 5.      Landfill leachate was again observed seeping out of Module 4 on February 26, 2019 at approximately 8:00 a.m. SCS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 8, 11 (BUTTE01694, 1697). | **Disputed** as to "approximately 8:00 a.m." SCS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 8, 11 (BUTTE01694, 1697). |
| 6.      Again, the leachate flowed down the southern face of Module 4 and into Sediment Basin #4. SCS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 8, 11 (BUTTE01694, 1697). | **Admit.** |
| 7.      Just as before, the contaminated storm water in Sediment Basin #4 was | **Disputed** as to "[j]ust as before." The storm water and leachate in SWB-4 was |

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| pumped up and out into the roadside ditch that flowed into the Preserve until the pump was turned off at approximately 7:41 a.m. on February 27 2019. SOS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 8, 11 (BUTTE01694, 1697). | discharged by a pump that was inadvertently turned on or left in automatic mode, into the drainage ditch that feeds the PSB.  Expert Report of Eric Miller, attached as Exhibit 3 to Miller Depo., Defendants' Appendix Of Exhibits In Opposition To Motion For Partial Summary Judgment, Exhibit C at 157. |
| 8.      The Preserve discharged contaminated storm water via the concrete weir again on February 27, 2019, and continued discharging every day, except for March 5, 2019, up to an including March 8, 2019. SCS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 8, 11 (BUTTE01694, 1697).; Excerpts of the Deposition of Eric Miller, May 25, 2023 ("Miller Depo."), ex. 2 at 108:4-109:12 (165:4-166:12). | **Disputed.** The evidence cited by COL does not state that the storm water that flowed from the Preserve was actually "contaminated" with landfill leachate on any of the days stated by COL.  SCS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 8, 11 (BUTTE01694-1697); Miller Depo., ex. 2 at 108:4-109:12 (165:4-166:12). Contrary to COL's statement, the Investigative Final Report, prepared by Compliance SFO, Inc. & Formation Environmental, LLC, dated December 14, 2022, p. vii, County's Appendix, Exhibit F, 245, states: "[T]he storm water data indicates that there were **no** leachate discharges that flowed off-site or into the tributary to Hamlin Slough."  (Bold added.) That expert conclusion is support by the expert opinions that   "[t]here were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the unnamed tributary to Hamlin Slough in 2019 that exceeded ESLs or |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | background concentrations," and "[t]here were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the tributary to Hamlin Slough that exceeded human health SLs or background concentrations."  Deposition of Sean Covington, County's Appendix, Exhibit G at 316:11-22, 317:7-20, 318:16-22, 319:25-320:4, 334, 338, 340, 341 (19:11-22, 20:7-20, 31-16-22, 68:25-69:4; Ex. 3, pp. 7n 11, 13, 14). |
| 9.      There is no dispute that Defendants discharged landfill leachate from the Facility. SOS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 7-14 (BUTTE01693- 1700); Miller Depo., ex. 2 at 105:12-106:5 (140:12-141:5), 107:9-25 (142:9-25). | **Disputed.** The evidence cited by COL does not state that the storm water that flowed from the Facility was actually "contaminated" with landfill leachate.  SOS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 7-14 (BUTTE01693- 1700); Miller Depo., ex. 2 at 105:12-106:5 (140:12-141:5), 107:9-25 (142:9-25).  Contrary to COL's statement, the Investigative Final Report, prepared by Compliance SFO, Inc. & Formation Environmental, LLC, dated December 14, 2022, p. vii, County's Appendix, Exhibit F, 245, states: "[T]he storm water data indicates that there were **no** leachate discharges that flowed off-site or into the tributary to Hamlin Slough." (Bold added.)  That expert conclusion is support by the expert opinions that "[t]here were no leachate discharge |

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | concentrations of COPCs in storm water that flowed off-site or into the unnamed tributary to Hamlin Slough in 2019 that exceeded ESLs or background concentrations," and "[t]here were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the tributary to Hamlin Slough that exceeded human health SLs or background concentrations."  Deposition of Sean Covington, County's Appendix, Exhibit G at 316:11-22, 317:7-20, 318:16-22, 319:25-320:4, 334, 338, 340, 341 (19:11-22, 20:7-20, 31-16-22, 68:25-69:4; Ex. 3, pp. 7n 11, 13, 14). Also, there is a genuine issue of material fact as to whether the handwriting and colored markings on the SOS Engineers Module 4 Seep Notification dated March 13, 2019 (Exhibit 1`at 10 (BUTTE01696) was on the original document, or was added after the fact by an unknown person. |
| 10.     It is undisputed that the Sacramento-San Joaquin Delta and its tributaries, including Hamlin Slough and Butte Creek, are waters of the United States within the meaning of the Clean Water Act. Defendants' Amended Answer, ECF No. 48, 2:20-25. | **Admit.** |
| 11.     It is also undisputed that Defendants' discharges of landfill leachate | **Disputed.** The evidence cited by COL does not state |

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| reached these waters. Excerpt of Defendants' Responses to Requests for Admission, Set Two, No. 65, ex. 3; Storm Water Pollution Prevention Plan, September 30, 2019 ("2019 SWPPP"), ex. 4 at 126-127 (BUTTE02952-2953); Storm Water Pollution Prevention Plan, February 21, 2021 ("2021 SWPPP"), ex. 5 at 173 (C0L009310); Excerpts of the Deposition of Sean Covington ("Covington Depo."), ex. 6 at 239:11-13, 240:18-22 (33:11-13, 47:18-22). | that the storm water that flowed off the Facility actually contained landfill leachate.  Excerpt of Defendants' Responses to Requests for Admission, Set Two, No. 65, ex. 3; Storm Water Pollution Prevention Plan, September 30, 2019 ("2019 SWPPP"), ex. 4 at 126-127 (BUTTE02952-2953); Storm Water Pollution Prevention Plan, February 21, 2021 ("2021 SWPPP"), ex. 5 at 173 (C0L009310); Excerpts of the Deposition of Sean Covington ("Covington Depo."), ex. 6 at 239:11-13, 240:18-22 (33:11-13, 47:18-22).  Contrary to COL's statement, the Investigative Final Report, prepared by Compliance SFO, Inc. & Formation Environmental, LLC, dated December 14, 2022, p. vii, County's Appendix, Exhibit F, 245, states: "[T]he storm water data indicates that there were **no** leachate discharges that flowed off-site or into the tributary to Hamlin Slough."  (Bold added.) That expert conclusion is support by the expert opinions that  "[t]here were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the unnamed tributary to Hamlin Slough in 2019 that exceeded ESLs or background concentrations," and "[t]here were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the tributary to |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Hamlin Slough that exceeded human health SLs or background concentrations."  Deposition of Sean Covington, County's Appendix, Exhibit G at 316:11-22, 317:7-20, 318:16-22, 319:25-320:4, 334, 338, 340, 341 (19:11-22, 20:7-20, 31-16-22, 68:25-69:4; Ex. 3, pp. 7n 11, 13, 14). |
| 12.    The Neal Road Recycling and Waste Facility ("Facility" or "Landfill"), located at 1023 Neal Road in Paradise, CA, is a solid waste facility. The Facility is approximately 229 acres, and consists of five Class III waste management units, also known as modules. 2021 SWPPP, ex. 5 at 172 (C0L009309). | **Admit.** |
| 13.    Defendants' primary industrial activity is the receiving, handling, and disposal of municipal solid waste. Defendants also manage and store landfill leachate collected from the waste modules via a leachate collection and removal system, a lined surface impoundment, and trucks that transport leachate from and around the Facility. 2021 SWPPP ex 5 at 179 (C0L009316). | **Admit.** |
| 14.    Defendants also handle a variety of other industrial materials at the Facility including, inert construction and demolition materials, green waste, recyclable materials, waste tires, stockpiled cover soil, diesel, used oil, | **Admit.** |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| motor oil and lubricants, hydraulic oil, and cleaners. 2021 SWPPP, ex. 5 at 180 (C0L009317). | |
| 15.    The Facility has been developed in a northeast-to-southwest trending canyon eroded into a gently sloping plateau. The canyon containing the Facility outlets to Nance Canyon to the southwest with elevations at the site dropping approximately 200 feet from the northeast to the southwest. Storm water is collected at the Facility in a series of conveyances and basins. 2021 SWPPP, ex. 5 at 172 (C0L009309). | **Admit.** |
| 16.    In general storm water generated at the Facility flows southwest and into the wetland Preserve before discharging off-site. 2021 SWPPP, ex. 5 at 175 (COL009312). | **Disputed.** **Admit** that "[i]n general, all storm water runoff at the Facility flows to the southwest. Before flowing off-site, storm water flows into the primary sedimentation basin. Any off-site flow that occurs flows through the spillway for the primary sedimentation basin. This spillway is the only storm water sampling location at the Facility and is designated as SW-1. The previous SWPPP for the Facility described 6 drainage areas at the Facility. However, since all industrial storm water flows offsite at one location, SW-1, this SWPPP considers the Facility to consist of one drainage area with one discharge/sampling location. As shown on Drawing 1, SW-1 is the spillway for the |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | primary sedimentation basin. In addition, there are no municipal storm drain systems in the vicinity of the Facility." 2021 SWPPP, ex. 5 at 175 (COL009312). |
| 17.     Storm water runoff from the Facility drains in a southwesterly direction toward an unnamed intermittent stream that joins the intermittent stream in Nance Canyon approximately one mile southwest of the Facility property boundary, and approximately one-half mile southwest of Neal Road. The combined flow from these two streams discharges into Hamlin Slough, which is tributary to Butte Creek, and ultimately the Sacramento River. 2021 SWPPP, ex. 5 at 173 (C0L009310). | Admit. |
| 18.     On February 14, 2019 and February 27, 2019, substantial flows left via the concrete weir, passing over the access road along the western boundary of the Facility, and flowing in a southwesterly direction via the intermittent stream. Declaration of Steve Jackson in Support of Plaintiff's Motion for Partial Summary Judgment, ¶¶ 6-20. | **Objection.**  The term "substantial" is vague and ambiguous. **Disputed.**  The evidence cited does not show that the flows were "via the intermittent stream."  Declaration of Steve Jackson in Support of Plaintiff's Motion for Partial Summary Judgment, ¶¶ 6-20. |
| 19.     The Facility is subject to several different permits — none of which authorize the discharge of landfill leachate to surface waters. 2021 SWPPP, ex. 5 at 174 (C0L009311). | **Disputed.** Each of the permits, for the Neal Road Recycling and Waste Facility ("NRRWF" or "Facility") cite Title 27 design storm standards that require facilities to be constructed to accommodate storm water runoff from 24-hour precipitation events with a return period of 100 |

-11-

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | years.  The permits and Title 27 do not specify what happens to atmospheric river storm water that cannot be controlled by this design standard, nor does it provide that discharges due to conditions which overwhelm these standards are violations. Other NPDES permits, including the USEPA Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity that informed California's Industrial General Permit, include "bypass" and "upset" provisions that deal with the intentional or unintentional diversion of a waste stream around pollution controls resulting in discharge. "Bypass" includes the intentional diversion of waste when it is unavoidable to prevent loss of life, personal injury, or severe property damage, or when there are no feasible alternatives to bypass. "Upset" includes an exceptional incident in which there is unintentional and temporary noncompliance with permit effluent limitations because of factors beyond reasonable control as occurred at the Facility with the atmospheric rivers in February 2019.  Those provisions that apply to the Facility's permits allow for the discharges that occurred in this case because of the extreme fire damage and the unexpected and repeated atmospheric river rainfall events that occurred here. Declaration of Travis Peterson, ¶3; Deposition of Eric Miller ("Miller Depo.") County's Appendix, Exhibit C at 148:2-8 (36:2-8); Expert Report of |

-12-

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Eric Miller, County's Appendix, Exhibit C at 156-157; Butte County Board of Supervisors Resolution No. 19-029, adopted March 5, 2019, County's Appendix, Exhibit A; Deposition of Travis Peterson ("Peterson Depo."), County's Appendix, Exhibit E at 190:25-192:3, 195:20-196:1, 196:13-197:15 (24:25-26:3, 75:20-76:1, 76:13-77:15). |

**ISSUE NO. 2: Defendants have failed to comply with the SWPPP requirements of the General Permit, section X.**

| | |
|---|---|
| 20.     Wetlands have existed in the Preserve since at least 2011. Army Corps of Engineer Compliance Inspection Report, June 28, 2011, ex. 7 at 243-244; and Perpetual Conservation Easement Grant No. 2007-0051757, November 2, 2007, ex. 8 at 246-304. | **Admit.** |
| 21.     None of the Facility's SWPPP site maps identify the Preserve and none identify the presence of wetlands at the Preserve. Excerpts of the Deposition of Travis Peterson ("Peterson Depo."), ex. 9 at 309:4-19 (96:4-19), 310:18-22 (97:18-22); 2021 SWPPP, ex. 5 at 208 (C0L009345), 210 (C0L009347), 212 (C0L009349), Miller Depo., ex. 2 at 92:13-16 (38:13-16), 93:19-24 (55:19- 24), 95:16-20 (60:16-20); 2019 SWPPP, ex 4 at 158-160 (BUTTE02984-2986); Excerpts of the Deposition of Craig Cissell | **Disputed.** The 2015 SWPPP includes the following: <br>• Map that explicitly shows and labels the Primary Sedimentation Basin. Ex. 11 at 408. <br>• Table 4.3 identifies the Primary Sedimentation Basin as the "Constructed wetland" BMP used at the Site. <br>• Attachment 8: Other Regulatory Documents, includes the Perpetual Conservation Easement Grant that includes Exhibit A Legal |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| ("Cissell Depo"), ex. 10 at 319:20-24 (29:20-24), 327:16-21(112:16-21), 328:1-3, 7-9 (113:1-3, 7-9), 330:15-17, 20-21 (115:15-17, 20-21), Storm Water Pollution Prevention Plan, June 24, 2015 ("2015 SWPPP"), ex. 11 at 407-408 (BUTTE03287-3288), Miller Depo 1, ex. 2 at 112:17-21 (174:17-21), 113:5-11 (175:5-11), Storm Water Pollution Prevention Plan, August 6, 2014 ("2014 SWPPP"), ex. 12 at 684 (BUTTE04635). | Description, Exhibit B Map of Preserve, and Exhibit C the Neal Road Landfill Open Space Preserve Management Plan for "Preserve."  County's Appendix, Exhibit K at 618-667.  Peterson Decl., ¶4.  (**COL omitted this document that is a part of the 2015 SWPPP from its Exhibit 11**.) The 2019 SWPPP: <br>• Map explicitly shows and labels the Primary Sedimentation Basin ("PSB") in Drawing 2.  2019 SWPPP, Exhibit 4 at 158-160 (BUTTE02984-2986). <br>• The text of the 2019 SWPPP states: "The primary sedimentation basin was designed to serve as both a storm water sedimentation basin and a Preserve Area (the Neal Road Preserve mentioned above) as part of an environmental mitigation program."  2019 SWPPP, Exhibit 4 at 126.  That same language is in the 2021 SWPPP, Exhibit 5 at 173 (C0L009310). <br>COL admits that the PSB is identified in the SWPPPs, and the PSB is the Preserve. COL's Responses to Interrogatories, Set Two, Response to Special Interrogatory No. 29, County's |

-14-

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
|  | Appendix, Exhibit D at 178:27-179:1 (34:27-35:1). COL also admits that the 2021 SWPPP identifies the Preserve as "part of an environmental mitigation program." COL's Responses to Interrogatories, Set Two, Response to Special Interrogatory No. 27, County's Appendix, Exhibit D at 168:12-13 (19:12-13). |
| 22. There is no dispute that the Preserve contains wetlands Miller Depo., ex. 2 at 90:23-91:21 (33:23-34:21). | **Admit.** |
| 23. There is no dispute that the Preserve should be identified on the SWPPP site map. Peterson Depo., ex. 9 at 310:14-22 (97:14-22). | **Admit.** |
| 24. The 2014 SWPPP also fails to identify the wetlands in the Preserve. 2014 SWPPP, ex. 12 at 684 (BUTTE04635). | **Objection.** The map presented by COL, ex. 12 at 684 (BUTTE04635), cannot have been a part of the 2014 SWPPP, because it has dates on it from 2015. 2014 SWPPP, ex. 12 at 684 (BUTTE04635). |
| 25. The primary industrial activity at the Facility is the disposal of municipal solid waste in the active waste module units. 2014 SWPPP, ex. 12 at 587 (BUTTE04538); 2015 SWPPP, ex. 11 at 345 (BUTTE03225); 2019 SWPPP, ex. 4 at 132 (BUTTE02958); 2021 SWPPP, ex. 5 at 179 (C0L009316). | **Admit.** |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 26.     A waste module unit is made up of several phases, one or two of which may be active at any given time. The active phase is determined by the development plan of any given module, based on engineering and permitting constraints. Miller Depo., ex. 2 at 101:18-102:10 (80:18-81:10). | **Disputed.**  The evidence presented only shows that "within each phase, you have a cell or a working face that moves around as needed on a daily basis in order to conform with that engineering design with the phase," and "[t]he working face and cell going together.  The working face is the actual surface where the bulldozers and machinery is compressing garbage." Miller Depo., ex. 2 at 101:18-102:10 (80:18-81:10). |
| 27.     Waste is placed at the working face of the active module. Miller Depo., ex. 2 at 103:21-24 (82:21-24). | **Disputed**.  The evidence presented only shows that "So a cell is the area that you're going to put solid waste for that particular day," the "active disposal area." Miller Depo., ex. 2 at 103:21-24 (82:21-24). |
| 28.     The working face moves daily and is closed at the end of each day with material known as daily cover. Miller Depo., ex. 2 at 103:15-20 (82:15-20). | **Disputed.**  The evidence states:  Q.      But maybe the paint is worn on the parking lot and so -- I'm trying -- maybe we're getting far afield here.  A.      The size of the cell depends on how many customers come in, what they're bringing, the type of material.  Q.      Is a cell a daily thing? Like is it each day a cell is closed and you -- and then you start a new –  A.      Yes, each day a cell is closed. Miller Depo., ex. 2 at 103:15-20 (82:15-20). |
| 29.     The Facility has changed the active | **Objection.**  The term "Relevant Period" is |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| phase where municipal solid waste has been disposed at least eight times during the Relevant Period. Excerpt of Second Quarter 2015 Monitoring Report, ex. 13 at 686; Excerpt of First Quarter 2016 Monitoring Report, ex. 14 at 690; Excerpt of Third Quarter 2016 Monitoring Report, ex. 15 at 693; Excerpt of Second Quarter 2018 Monitoring Report, ex. 16 at 696; Excerpt of Second Quarter 2020 Monitoring Report, ex. 17 at 699; Excerpt of First Quarter 2021 Monitoring Report, ex. 18 at 702; Excerpt of Second Quarter 2021 Monitoring Report, ex. 19 at 705; Excerpt of Third Quarter 2021 Monitoring Report, ex. 20 at 708. | vague, ambiguous and undefined, and therefore Defendants are not able to admit or dispute the statement. **Disputed** as to the terms "eight times." Excerpt of Second Quarter 2015 Monitoring Report, ex. 13 at 686; Excerpt of First Quarter 2016 Monitoring Report, ex. 14 at 690; Excerpt of Third Quarter 2016 Monitoring Report, ex. 15 at 693; Excerpt of Second Quarter 2018 Monitoring Report, ex. 16 at 696; Excerpt of Second Quarter 2020 Monitoring Report, ex. 17 at 699; Excerpt of First Quarter 2021 Monitoring Report, ex. 18 at 702; Excerpt of Second Quarter 2021 Monitoring Report, ex. 19 at 705; Excerpt of Third Quarter 2021 Monitoring Report, ex. 20 at 708. |
| 30.     During the Relevant Period, the active Module has changed at least once, in the second quarter of 2018 when waste began being placed in Module 5, in addition to Module 4. Excerpt of Second Quarter 2018 Monitoring Report, ex. 16 at 696. | **Objection.** The term "Relevant Period" is vague, ambiguous and undefined, and therefore Defendants are not able to admit or dispute the statement. |
| 31.     None of the site maps reflect the changes to the Module or the active phases. 2021 SWPPP, ex. 5 at 208-212 (C0L009345-009349); 2019 SWPPP, ex. 4 at 158-160 (BUTTE02984-2986), 2015 SWPPP, ex. 11 at 408 (BUTTE03288), 2014 SWPPP, ex. 12 at 684 | **Disputed.** All areas of industrial activity is sufficiently identified in the SWPPPs.  2021 SWPPP, ex. 5 at 208-212 (C0L009345-009349); 2019 SWPPP, ex. 4 at 158-160 (BUTTE02984-2986), 2015 SWPPP, ex. 11 at 408 (BUTTE03288), 2014 SWPPP, |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| (BUTTE04635). | ex. 12 at 684 (BUTTE04635). "The SWPPP is designed to cover all operational modes for the facility and includes the operation of any of the modules that may be currently active.  It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase. Because the location where waste is dumped each day (The 'working face') moves daily, and is not specific to any region, it would not be practical, nor is it required to amend the SWPPP each time this location changes. Rebuttal Expert Report Of Travis Peterson, pp. 6, 7, 8, 9, attached as Exhibit 3 to Peterson Depo., County's Appendix, Exhibit E at 216, 217, 218, 219. "[T]he requirement of [the] general permit is to identify all areas of industrial activity and that is sufficiently identified" in the SWPPPs at issue here. Peterson Depo., County's Appendix, Exhibit E at 199:24-199a:2 (105:24-106:2).  Identifying the areas of industrial activity on a SWPPP must not be so specific that it becomes outdated and inaccurate immediately.  Peterson Depo., County's Appendix, Exhibit E at 198:7-17 (100:7-17.)  Therefore, a change in the module at the Facility would not necessitate an update to the SWPPP. Peterson Depo., County's Appendix, |

-18-

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Exhibit E at 199:12-23 (105:12-23). |
| 32.    None of the SWPPPs were revised or amended to reflect the changes to the locations of where the main industrial activities were conducted at the Facility. 2021 SWPPP, ex. 5 at 181 (C0L009318), 2019 SWPPP, ex. 4 at 132 (BUTTE02958), 2015 SWPPP, ex. 11 at 356-357 (BUTTE03236-3237), 2014 SWPPP, ex. 12 at 593 (BUTTE04544). | **Disputed.** All areas of industrial activity conducted at the Facility are sufficiently identified in the SWPPPs.  2021 SWPPP, ex. 5 at 181 (C0L009318), 2019 SWPPP, ex. 4 at 132 (BUTTE02958), 2015 SWPPP, ex. 11 at 356-357 (BUTTE03236-3237), 2014 SWPPP, ex. 12 at 593 (BUTTE04544). "The SWPPP is designed to cover all operational modes for the facility and includes the operation of any of the modules that may be currently active.  It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase. Because the location where waste is dumped each day (The 'working face') moves daily, and is not specific to any region, it would not be practical, nor is it required to amend the SWPPP each time this location changes. Rebuttal Expert Report Of Travis Peterson, pp. 6, 7, 8, 9, attached as Exhibit 3 to Peterson Depo., County's Appendix, Exhibit E at 216, 217, 218, 219. "[T]he requirement of [the] general permit is to identify all areas of industrial activity and that is sufficiently identified" in the SWPPPs at issue here. Peterson Depo., County's Appendix, Exhibit E at 199:24-199a:2 (105:24-106:2).  Identifying the areas of industrial |

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | activity on a SWPPP must not be so specific that it becomes outdated and inaccurate immediately.  Peterson Depo., County's Appendix, Exhibit E at 198:7-17 (100:7-17.)  Therefore, a change in the module at the Facility would not necessitate an update to the SWPPP. Peterson Depo., County's Appendix, Exhibit E at 199:12-23 (105:12-23). |
| 33.    The 2014 SWPPP identifies Waste Module Unit 4 as the active module. However, the 2014 SWPPP does not identify which phase within WMU 4 is active. 2014 SWPPP, ex. 12 at 588 (BUTTE04539). | **Admit** that the 2014 SWPPP identifies Waste Module Unit 4 as the active module. **Disputed** that the 2014 SWPPP must identify which phase within WMU 4 is active.  "The SWPPP is designed to cover all operational modes for the facility and includes the operation of any of the modules that may be currently active.  It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase. Because the location where waste is dumped each day (The 'working face') moves daily, and is not specific to any region, it would not be practical, nor is it required to amend the SWPPP each time this location changes. Rebuttal Expert Report Of Travis Peterson, pp. 6, 7, 8, 9, attached as Exhibit 3 to Peterson Depo., County's Appendix, Exhibit E at 216, 217, 218, 219. "[T]he requirement of [the] general permit is to identify all areas of |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | industrial activity and that is sufficiently identified" in the SWPPPs at issue here. Peterson Depo., County's Appendix, Exhibit E at 199:24-199a:2 (105:24-106:2).  Identifying the areas of industrial activity on a SWPPP must not be so specific that it becomes outdated and inaccurate immediately.  Peterson Depo., County's Appendix, Exhibit E at 198:7-17 (100:7-17.)  Therefore, a change in the module at the Facility would not necessitate an update to the SWPPP. Peterson Depo., County's Appendix, Exhibit E at 199:12-23 (105:12-23). |
| 34.     According to quarterly monitoring reports, the active phase at the beginning of the relevant period, November 15, 2014, was Module 4, Phase D. Excerpt of Fourth Quarter and Annual 2014 Monitoring Report, ex. 21 at 711. | **Objection.**  The term "relevant period" is vague, ambiguous and undefined, and so Defendants can neither admit or dispute the statement. <br> **Disputed**.  The evidence does not support all of that statement.  Excerpt of Fourth Quarter and Annual 2014 Monitoring Report, ex. 21 at 711. |
| 35.     In the second quarter of 2015, the Facility began placing waste into Phase E of Module 4 as well. Excerpt of Second Quarter 2015 Monitoring Report, ex. 13 at 687. | **Disputed.** The evidence does not support all of that statement.  Excerpt of Second Quarter 2015 Monitoring Report, ex. 13 at 687. |
| 36.     The 2015 SWPPP was implemented between June 24, 2015 and September 29, 2019. 2015 SWPPP, ex. 11 at 328 (BUTTE03208); 2019 SWPPP, ex. 4 at 121 (BUTTE02947). | **Disputed.**  The evidence does not support all of that statement. 2015 SWPPP, ex. 11 at 328 (BUTTE03208); 2019 SWPPP, ex. 4 at 121 (BUTTE02947). |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 37.     During that period, the Facility changed the active phase at least three times. Excerpt of First Quarter 2016 Monitoring Report, ex. 14 at 690; Excerpt of Third Quarter 2016 Monitoring Report, ex. 15 at 693; Excerpt of Second Quarter 2018 Monitoring Report, ex. 16 at 696. | **Disputed.**  The evidence does not support all of that statement.  Excerpt of First Quarter 2016 Monitoring Report, ex. 14 at 690; Excerpt of Third Quarter 2016 Monitoring Report, ex. 15 at 693; Excerpt of Second Quarter 2018 Monitoring Report, ex. 16 at 696. |
| 38.     The first change occurred in the first quarter of 2016, when the Facility stopped placing waste in Phase E of Module 4, and only used Phase D. Excerpt of First Quarter 2016 Monitoring Report, ex. 14 at 690. | **Disputed.**  The evidence does not support all of that statement.  Excerpt of First Quarter 2016 Monitoring Report, ex. 14 at 690 |
| 39.     In the third quarter of 2016, Phase E was used once again, in addition to Phase D. Excerpt of Third Quarter 2016 Monitoring Report, ex. 15 at 693. | **Disputed.**  The evidence does not support all of that statement.  Excerpt of Third Quarter 2016 Monitoring Report, ex. 15 at 693. |
| 40.     In the second quarter of 2018, the Facility opened Module 5, and began placing waste in Phase A of Module 5, as well as continuing to place waste in Phases D and E of Module 4. Excerpt of Second Quarter 2018 Monitoring Report, ex. 16 at 696. | **Admit.** |
| 41.     The 2015 SWPPP was never revised or amended to reflect these changes. Miller Depo., ex. 2 at 111:7-13 (172:7-13). | **Objection.**  The term "these changes" is vague and ambiguous. **Disputed.** All areas of industrial activity is sufficiently identified in the 2015 SWPPP,  "The SWPPP is designed to cover all operational modes for the facility and |

-22-

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | includes the operation of any of the modules that may be currently active.  It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase. Because the location where waste is dumped each day (The 'working face') moves daily, and is not specific to any region, it would not be practical, nor is it required to amend the SWPPP each time this location changes. Rebuttal Expert Report Of Travis Peterson, pp. 6, 7, 8, 9, attached as Exhibit 3 to Peterson Depo., County's Appendix, Exhibit E at 216, 217, 218, 219. "[T]he requirement of [the] general permit is to identify all areas of industrial activity and that is sufficiently identified" in the SWPPPs at issue here. Peterson Depo., County's Appendix, Exhibit E at 199:24-199a:2 (105:24-106:2).  Identifying the areas of industrial activity on a SWPPP must not be so specific that it becomes outdated and inaccurate immediately.  Peterson Depo., County's Appendix, Exhibit E at 198:7-17 (100:7-17.)  Therefore, a change in the |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | module at the Facility would not necessitate an update to the SWPPP. Peterson Depo., County's Appendix, Exhibit E at 199:12-23 (105:12-23). |
| 42.     The 2015 SWPPP site map was never revised or amended to reflect these changes. Miller Depo., ex. 2 at 111:7-13 (172:7-13). | **Objection.**  The term "these changes" is vague and ambiguous. **Disputed.** All areas of industrial activity is sufficiently identified in the 2015 SWPPP site map. "The SWPPP is designed to cover all operational modes for the facility and includes the operation of any of the modules that may be currently active.  It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase. Because the location where waste is dumped each day (The 'working face') moves daily, and is not specific to any region, it would not be practical, nor is it required to amend the SWPPP each time this location changes. Rebuttal Expert Report Of Travis Peterson, pp. 6, 7, 8, 9, attached as Exhibit 3 to Peterson Depo., County's Appendix, Exhibit E at 216, 217, 218, 219. "[T]he requirement of [the] general permit is to identify all areas of |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | industrial activity and that is sufficiently identified" in the SWPPPs at issue here. Peterson Depo., County's Appendix, Exhibit E at 199:24-199a:2 (105:24-106:2). Identifying the areas of industrial activity on a SWPPP must not be so specific that it becomes outdated and inaccurate immediately. Peterson Depo., County's Appendix, Exhibit E at 198:7-17 (100:7-17.) Therefore, a change in the module at the Facility would not necessitate an update to the SWPPP. Peterson Depo., County's Appendix, Exhibit E at 199:12-23 (105:12-23). |
| 43. The 2019 SWPPP was implemented between September 30, 2019, and February 3, 2021. 2019 SWPPP, ex. 4 at 121 (BUTTE02947), 2021 SWPPP, ex. 5 at 167 (C0L009304). | **Disputed.** The evidence does not support all of that statement. 2019 SWPPP, ex. 4 at 121 (BUTTE02947), 2021 SWPPP, ex. 5 at 167 (C0L009304). |
| 44. During that period, the Facility changed the active phases at least twice. Excerpt of Second Quarter 2020 Monitoring Report, ex. 17 at 699; Excerpt of First Quarter 2021 Monitoring Report, ex. 18 at 702. | **Disputed.** The evidence does not support all of that statement. Excerpt of First Quarter 2021 Monitoring Report, ex. 18 at 702. |
| 45. In the second quarter of 2020, the Facility added Phase B of Module 5, and on January 14, 2021, the Facility added Phase C of Module 5. Excerpt of Second | **Admit.** |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Quarter 2020 Monitoring Report, ex. 17 at 699; Excerpt of First Quarter 2021 Monitoring Report, ex. 18 at 702. | |
| 46. The 2019 SWPPP was never revised or amended to reflect these changes. Cissell Depo., ex. 10 at 319:3-6 (22:3-6). | **Objection.** The term "these changes" is vague and ambiguous. **Disputed.** All areas of industrial activity is sufficiently identified in the 2019 SWPPP. "The SWPPP is designed to cover all operational modes for the facility and includes the operation of any of the modules that may be currently active. It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase. Because the location where waste is dumped each day (The 'working face') moves daily, and is not specific to any region, it would not be practical, nor is it required to amend the SWPPP each time this location changes. Rebuttal Expert Report Of Travis Peterson, pp. 6, 7, 8, 9, attached as Exhibit 3 to Peterson Depo., County's Appendix, Exhibit E at 216, 217, 218, 219. "[T]he requirement of [the] general permit is to identify all areas of industrial activity and that is sufficiently |

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | identified" in the SWPPPs at issue here. Peterson Depo., County's Appendix, Exhibit E at 199:24-199a:2 (105:24-106:2).  Identifying the areas of industrial activity on a SWPPP must not be so specific that it becomes outdated and inaccurate immediately.  Peterson Depo., County's Appendix, Exhibit E at 198:7-17 (100:7-17.)  Therefore, a change in the module at the Facility would not necessitate an update to the SWPPP. Peterson Depo., County's Appendix, Exhibit E at 199:12-23 (105:12-23). |
| 47.     The 2019 SWPPP site map was never revised or amended to reflect these changes. Cissel Depo., ex. 10 at 326:21-24 (61:21-241. 320:20-22 (28:20-22). | **Objection.**  The term "these changes" is vague and ambiguous.<br>**Disputed.**<br>All areas of industrial activity is sufficiently identified in the 2019 SWPPP site map.  "The SWPPP is designed to cover all operational modes for the facility and includes the operation of any of the modules that may be currently active.  It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase.  Because the location where waste is dumped each day (The 'working face') |

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | moves daily, and is not specific to any region, it would not be practical, nor is it required to amend the SWPPP each time this location changes. Rebuttal Expert Report Of Travis Peterson, pp. 6, 7, 8, 9, attached as Exhibit 3 to Peterson Depo., County's Appendix, Exhibit E at 216, 217, 218, 219. "[T]he requirement of [the] general permit is to identify all areas of industrial activity and that is sufficiently identified" in the SWPPPs at issue here. Peterson Depo., County's Appendix, Exhibit E at 199:24-199a:2 (105:24-106:2). Identifying the areas of industrial activity on a SWPPP must not be so specific that it becomes outdated and inaccurate immediately. Peterson Depo., County's Appendix, Exhibit E at 198:7-17 (100:7-17.) Therefore, a change in the module at the Facility would not necessitate an update to the SWPPP. Peterson Depo., County's Appendix, Exhibit E at 199:12-23 (105:12-23). |
| 48.    The 2021 SWPPP is the current SWPPP being implemented at the Facility, since February 4, 2021. Miller Depo., ex. 2 at 86:7-21 (27:7-21). | **Objection.** The evidence states that the 2021 SWPPP is the operative SWPPP at the Facility in terms of BMPs. Miller Depo., ex. 2 at 86:7-21 (27:7-21). |

-28-

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 49.    So far, the Facility has changed the active phases at least twice during this period. Excerpt of Second Quarter 2021 Monitoring Report, ex. 19 at 705; Excerpt of Third Quarter 2021 Monitoring Report, ex. 20 at 708. | **Disputed.**  The evidence does not support all of that statement.  Excerpt of Second Quarter 2021 Monitoring Report, ex. 19 at 705; Excerpt of Third Quarter 2021 Monitoring Report, ex. 20 at 708. |
| 50.    In the second quarter of 2021, the Facility only placed waste in Module 5, Phase C. Excerpt of Second Quarter 2021 Monitoring Report, ex. 19 at 705. | **Disputed.**  The evidence does not support all of that statement.  Excerpt of Second Quarter 2021 Monitoring Report, ex. 19 at 705. |
| 51.    In the third quarter of 2021, the Facility added back Phase B of Module 5. Excerpt of Third Quarter 2021 Monitoring Report, ex. 20 at 708. | **Disputed.**  The evidence does not support all of that statement.  Excerpt of Third Quarter 2021 Monitoring Report, ex. 20 at 708. |
| 52.    The 2021 SWPPP has not been revised or amended to reflect these changes. Miller Depo., ex. 2 at 86:5-6 (27:5-6). | **Objection.**  The term "these changes" is vague and ambiguous.<br>**Disputed.**<br>All areas of industrial activity is sufficiently identified in the 2021 SWPPP.   "The SWPPP is designed to cover all operational modes for the facility and includes the operation of any of the modules that may be currently active.  It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase. Because the location where waste is dumped each day (The 'working face') moves daily, and is not specific to any |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | region, it would not be practical, nor is it required to amend the SWPPP each time this location changes. Rebuttal Expert Report Of Travis Peterson, pp. 6, 7, 8, 9, attached as Exhibit 3 to Peterson Depo., County's Appendix, Exhibit E at 216, 217, 218, 219. "[T]he requirement of [the] general permit is to identify all areas of industrial activity and that is sufficiently identified" in the SWPPPs at issue here. Peterson Depo., County's Appendix, Exhibit E at 199:24-199a:2 (105:24-106:2).  Identifying the areas of industrial activity on a SWPPP must not be so specific that it becomes outdated and inaccurate immediately.  Peterson Depo., County's Appendix, Exhibit E at 198:7-17 (100:7-17.)  Therefore, a change in the module at the Facility would not necessitate an update to the SWPPP. Peterson Depo., County's Appendix, Exhibit E at 199:12-23 (105:12-23). |
| 53.    The 2021 SWPPP site map has not been revised or amended to reflect these changes. Miller Depo., ex. 2 at 87:21-23 (28:21-23). | **Objection.**  The term "these changes" is vague and ambiguous. **Disputed.** All areas of industrial activity is sufficiently identified in the 2021 SWPPP site map. |

-30-

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | "The SWPPP is designed to cover all operational modes for the facility and includes the operation of any of the modules that may be currently active.  It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase. Because the location where waste is dumped each day (The 'working face') moves daily, and is not specific to any region, it would not be practical, nor is it required to amend the SWPPP each time this location changes. Rebuttal Expert Report Of Travis Peterson, pp. 6, 7, 8, 9, attached as Exhibit 3 to Peterson Depo., County's Appendix, Exhibit E at 216, 217, 218, 219. "[T]he requirement of [the] general permit is to identify all areas of industrial activity and that is sufficiently identified" in the SWPPPs at issue here. Peterson Depo., County's Appendix, Exhibit E at 199:24-199a:2 (105:24-106:2).  Identifying the areas of industrial activity on a SWPPP must not be so specific that it becomes outdated and inaccurate immediately.  Peterson Depo., |

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | County's Appendix, Exhibit E at 198:7-17 (100:7-17.)  Therefore, a change in the module at the Facility would not necessitate an update to the SWPPP. Peterson Depo., County's Appendix, Exhibit E at 199:12-23 (105:12-23). |
| 54.    There is no dispute that areas at the Facility where Posi-Shell® has been applied are impervious. Peterson Depo., ex. 9 at 311:3-312:9 (117:3-118:9). | **Disputed.** Posi-Shell® is a little more semi-permanent, so it kind of crosses over a little bit between full concrete and pavement versus a more temporary impervious solution such as a tarp. Peterson Depo., County's Appendix, Exhibit E at 201:3-7 (117:3-7). |
| 55.    There is also no dispute that areas where Posi-Shell® has been applied at the Facility should be identified as impervious surfaces on the SWPPP's site maps, but were not. Peterson Depo., ex. 9 at 311:3-312:9 (117:3-118:9). | **Disputed.** Posi-Shell® is a little more semi-permanent, so it kind of crosses over a little bit between full concrete and pavement versus a more temporary impervious solution such as a tarp. Peterson Depo., County's Appendix, Exhibit E at 201:3-7 (117:3-7). While it may be appropriate to include Posi-Shell® as an area of imperviousness in the SWPPP if intended to be permanent, here it was only temporary.  Posi-Shell® is only "semi-permanent" and here it was only "temporary." |
| 56.    Posi-Shell® was applied to Module 4, Phases D and F in the fourth quarter of | **Admit.** |

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 2019. State Water Resources Control Board Notice of Violation, August 19, 2021, ex. 22 at 713-722. | |
| 57. The 2019 SWPPP was not revised or amended to reflect the application of Posi-Shell. Cissel Depo., ex. 10 at 322:12-14 (31:12-14), 323:3-5, 12-14 (34:3-5, 12-14). | **Disputed.** The evidence does not support the statement. Cissel Depo., ex. 10 at 322:12-14 (31:12-14), 323:3-5, 12-14 (34:3-5, 12-14). |
| 58.     The 2021 SWPPP fails to identify any areas with Posi-Shell. Miller Depo 1, ex. 2 at 93:25-94:2 (54:25-55:2), 96:2-4 (61:2-4), 97:4-6 (62:4-6). | **Disputed.** The evidence presented states that Drawing no. 2, Drawing no. 3 of the 2021 SWPPP does not identify area of  Posi-Shell®.  Miller Depo 1, ex. 2 at 93:25-94:2 (54:25-55:2), 96:2-4 (61:2-4), 97:4-6 (62:4-6). |
| 59.     In April of 2022, the parties to this action resolved a conservation easement enforcement action brought by California Open Lands in Butte County Superior Court. Mutual Settlement Agreement and Release, April 25, 2022, ex. 23 at 724-797. | **Admit.** |
| 60.     As part of that settlement, Defendant Butte County Department of Public Works agreed to install certain advanced BMPs at the Facility. Mutual Settlement Agreement and Release, April 25, 2022, ex. 23 at 724-797. | **Admit.** |
| 61.     The advanced BMPs included installing a series of manually-operated flow control weir boxes to direct the flow of storm water, and installing a secondary | **Disputed.** The evidence presented describes "a mechanical gate" and not any "manually-operated flow control weir boxes." Mutual Settlement Agreement |

-33-

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| containment system to contain leachate spill from trucks when they are filled. Mutual Settlement Agreement and Release. April 25. 2022, ex. 23 at 727-728. | and Release. April 25. 2022, ex. 23 at 727-728. |
| 62.    The County confirmed on July 13, 2022 that the flow control weirs were successfully installed. Letter from Gregory Einhorn dated July 13, 2022, ex. 24 at 799-809. | **Admit.** |
| 63.    The secondary containment system was confirmed to have been installed on June 16, 2023. Letter from Gregory Einhorn dated June 30, 2023, ex. 25 at 811-813. | **Admit.** |
| 64.    The weirs' primary function is to divert storm water, and thus they are advanced BMPs. Mutual Settlement Agreement and Release, April 25, 2022, ex. 23 at 727. | **Disputed.**  The evidence presented describes "a mechanical gate" and not a "weir." |
| 65.    The 2021 SWPPP, and its site map, was not revised or amended to identify either the flow control weir boxes or the secondary containment system. Cissell Depo., ex. 10 at 329:9-11 (114:9-11). | **Objection.**  The evidence does not support that statement.  Cissell Depo., ex. 10 at 329:9-11 (114:9- 11). |
| 66.    Construction and demolition debris and green waste are separate types of industrial materials that are stored in separate locations at the Facility, yet the 2021 SWPPP lumps them together and | **Disputed.** The evidence presented does not support the statement.  Miller Depo., ex. 2, 95:10-96:3; 2021 SWPPP, ex. 5, C0L009318. |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| describes their locations as "Varies and See Drawing 1." Miller Depo., ex. 2, 95:10-96:3; 2021 SWPPP, ex. 5, C0L009318. | |
| 67.    Defendants admit that these are different materials that should be identified separately in the SWPPP. Miller Depo., ex. 2 at 103a:10-103b:3 (95:10-96:3). | **Disputed.** The evidence presented by COL from the Deposition of Eric Miller is that it merely would be "more appropriate" or "helpful" to separate out the different materials, which is not an admission that they "should" be identified separately in the SWPPP or that the County is legally required to do so.  Indeed, that is an expert opinion, which objection was properly raised in the Miller Deposition. Miller Depo., ex. 2 at 103a:10-103b:3 (95:10-96:3) |
| 68.    Defendants also admit that these materials are not identified on the 2021 SWPPP site map. Miller Depo., ex. 2 at 103c:4-7 (97:4-7). | **Objection.**  The terms "these materials " are vague and ambiguous. **Disputed.**  The evidence cited states that "Drawing 1 does not identify "inert C&D" or "green waste." |
| 69.    The 2021 SWPPP identifies leachate as an industrial material, but only describes its location as the "Class II Surface Impoundment — See Drawing 2." 2021 SWPPP, ex. 5 at 181 (C0L009318). | **Disputed.** The 2021 SWPPP does not only describe the location of leachate as "Class II Surface Impoundment – See Drawing 2." The location of leachate is labeled and identified in Drawing 3, which is sufficient. 2021 SWPPP, ex. 5 at 212 (C0L009349). |
| 70.    The leachate collection and removal system is the primary mechanism | **Disputed.** Drawing no. 2 of the 2021 SWPPP shows |

-35-

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| by which leachate is transported from the waste modules to the leachate impoundments, yet it is not identified as being a location where leachate is "stored, received, shipped, and handled" in the 2021 SWPPP. Cissell Depo., ex. 10 at 324:12-325:13 (54:12-55:13); 2021 SWPPP, ex. 5 at 181 (C0L009318). | the leachate conveyance pipes. 2021 SWPPP, ex. 5 at 209 (C0L009347). |
| 71.    A March 17, 2022 Technical Memorandum describes a significant change to the Facility — the installation and repair of approximately five acres of rain fly over Module 4. Technical Memorandum: "Summary of NRRWF's Module 4 Rainfly Installation Project, 2022" dated March 17, 2022, ex. 26 at 815-833. | **Admit.** |
| 72.    This project was fully implemented by March 22, 2022, but the 2021 SWPPP was never revised to reflect the new conditions at Module 4. Miller Depo., ex. 2 at 104:2-10 (129:2-10). | **Admit.** |
| 73.    The 2021 SWPPP identifies a feature, the covered aerated static pile ("GASP"), that never came to be. Miller Depo., ex. 2 at 88:19-22 (31:19-22). | **Admit.** |
| 74.    The proposed CASP project was wholly abandoned, with no prospect of it being implemented at the Facility, due to financial limitations. Miller Depo., ex. 2 at 88:23-89:9 (31:23-32:9). | **Admit.** |

-36-

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 75.    Yet the 2021 SWPPP and site map, which reflect the Facility's proposal to install the CASP, were never revised to reflect this change, and Defendants concede that the site map is therefore inaccurate insofar as it depicts a proposed industrial activity that does not exist, and will never exist, at the Facility. Miller Depo., ex. 2 at 98:2-6 (63:2-6). | **Disputed.**  The evidence does not state that the CASP will never exist.  Also, there is no requirement that the 2021 SWPP must be revised if the proposed CASP project has not yet been installed.  The Industrial General Permit (COL's Request For Judicial Notice, Exhibit 1, p. 28) provides:

B. SWPPP Implementation and Revisions

All Dischargers are required to implement their SWPPP by July 1, 2015 or upon commencement of industrial activity. The Discharger shall:

1. Revise their on-site SWPPP whenever necessary;

2. Certify and submit via SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revision(s); and,

3. With the exception of significant revisions, the Discharger is not required to certify and submit via SMARTS their SWPPP revisions more than once every three (3) months in the reporting year.

Those provisions of the IGP do not require a revision of the 2021 SWPPP for the CASP project. |
| 76.    In 2017, Defendants uploaded to SMARTS a document entitled "SWPPP Amendment No. 1." Storm Water Pollution | **Disputed.** There is no evidence that the "SWPPP Amendment No.1," dated January 17, |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Prevention Plan Amendment, January 17, 2017, ex. 27 at 835-836 (BUTTE04652-4653). | 2017, Ex. 27 at 835-836 (BUTTE04652-4653), was uploaded to SMARTS. Declaration of Travis Peterson In Opposition To Motion For Partial Summary Judgment, ¶4, County's Appendix, Exhibit J. |
| 77.     The document identifies a series of amendments that were purportedly made to the SWPPP including (1) revising the title age to identify the correct legally responsible person; (2) updating the legally responsible person's information in the certification of the SWPPP; (3) updating the amendment log; (4) updating the members of the pollution prevention team; (5) adding information about the hydrologic setting of the Facility; (6) updating the pollutant source assessment; and, (7) updating sampling procedures. Storm Water Pollution Prevention Plan Amendment, January 17, 2017, ex. 27 at 835-836 (BUTTE04652-4653). | **Disputed.** Because the SWPPP Amendment No. 1 was never uploaded to SMARTS, and the SWPPP was not revised to incorporate the "series of amendments,"   SUF 78, therefore the "series of amendments" were merely aspirational.  Storm Water Pollution Prevention Plan Amendment, January 17, 2017, ex. 27 at 835-836 (BUTTE04652-4653). |
| 78.     However, Defendants admit that the SWPPP was never revised to incorporate these amendments, and no new SWPPP was certified and submitted via SMARTS that reflected these amendments. Miller Depo., ex. 2 at 110:13-19 (171:13-19). | **Admit.** |

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| **ISSUE NO. 3: Defendants have failed to develop and implement an adequate monitoring implementation plan for the Facility.** | |
| 79.   Leachate is a potential source of pollutants at the Facility.  (Miller Depo., ex. 2 at 99:25-100:15 (72:25-73:15). | **Disputed.**  The testimony is that "if it were to rain," a leachate seep that leaves the lined area would be a "potential pollutant that could be discharged via stormwater." (Miller Depo., ex. 2 at 99:25-100:15 (72:25-73:15). |
| 80.   Yet none of the parameters identified in the Monitoring Implementation Plans in the SWPPP require the analysis of parameters that are indicators of leachate. Peterson Depo., ex. 9 at 313 (122:15-22). | **Disputed.** "Sample parameters required by the Facility primary and secondary Standard Industrial Code5 (SIC) numbers 4953, Landfills and Land Application Facilities, and 5093, Scrap and Waste Materials, which take into account relevant industry considerations based on the operation of such facilities, including the presence of leachate, are: <br>•      pH <br>•      TSS <br>•      0 G <br>•      COD <br>•      Fe (Total) <br>•      Al (Total) <br>•      Pb (Total) <br>•      Zn (Total) <br>Subchapter N contains requirements for landfills (Part 445). However, the NRRWF is not subject to Subchapter N requirements as demonstrated in the Facility SWPPP. |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Therefore: The monitoring implementation plan for the FACILITY does not require storm water collected at the Facility to be analyzed for biological oxygen demand, and the GENERAL PERMIT does not require storm water collected at the Facility to be analyzed for biological oxygen demand, ammonia (as nitrogen), a-Terpineol, Benzoic acid, p-Cresol, or Phenol."  Rebuttal Expert Report, dated August 15, 2023, p. 10, 11, 12 attached as Exhibit 3 to Deposition of Travis Peterson, County's Appendix, Exhibit E at 220, 221, 222, Peterson Depo., County's Appendix, Exhibit E at 188:19-189:4, 203:7-204:17 (18:19-19:4, 119:7-120:17); Excerpt of Butte County's Second Amended Responses to Requests for Admission, ex. 29 at 844-847 (Nos 31 33 35 37 39 and 41). |
| 81.    The Facility is a Class III Municipal Solid Waste Landfill. Excerpt of Waste Discharge Requirements Order R5-2022-0009, ex. 28 at 839. | **Admit.** |
| 82.    There is no dispute that the Facility has discharged landfill wastewater in the form of contaminated storm water. Miller Depo., ex. 2 at 105:12-106:5 (140:12-141:5), 107:9-25 (142:9-25). | **Disputed.** While the evidence cited by COL states that storm water flowed out of the Preserve over the concrete spillway and offsite from the Facility, that evidence does not state that such storm water was "contaminated" with leachate.  Miller |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Depo., ex. 2 at 105:12-106:5 (140:12-141:5), 107:9-25 (142:9-25). Contrary to COL's statement, the Investigative Final Report, prepared by Compliance SFO, Inc. & Formation Environmental, LLC, dated December 14, 2022, p. vii, County's Appendix, Exhibit F, 245, states: "[T]he storm water data indicates that there were **no** leachate discharges that flowed off-site or into the tributary to Hamlin Slough."  (Bold added.) That expert conclusion is support by the expert opinions that   "[t]here were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the unnamed tributary to Hamlin Slough in 2019 that exceeded ESLs or background concentrations," and "[t]here were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the tributary to Hamlin Slough that exceeded human health SLs or background concentrations."  Deposition of Sean Covington, County's Appendix, Exhibit G at 316:11-22, 317:7-20, 318:16-22, 319:25-320:4, 334, 338, 340, 341 (19:11-22, 20:7-20, 31-16-22, 68:25-69:4; Ex. 3, pp. 7n 11, 13, 14). |
| 83.     Moreover, there is no dispute that Defendants' Monitoring Implementation Plan does not require analysis of the | **Disputed.** "Sample parameters required by the Facility primary and secondary Standard |

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Regulated Parameters. Excerpt of Butte County's Second Amended Responses to Requests for Admission, ex. 29 at 844-847 (Nos 31 33 35 37 39 and 41). | Industrial Code5 (SIC) numbers 4953, Landfills and Land Application Facilities, and 5093, Scrap and Waste Materials, which take into account relevant industry considerations based on the operation of such facilities, including the presence of leachate, are:<br><br>• pH<br>• TSS<br>• 0 G<br>• COD<br>• Fe (Total)<br>• Al (Total)<br>• Pb (Total)<br>• Zn (Total)<br><br>Subchapter N contains requirements for landfills (Part 445). However, the NRRWF is not subject to Subchapter N requirements as demonstrated in the Facility SWPPP. Therefore:<br>The monitoring implementation plan for the FACILITY does not require storm water collected at the Facility to be analyzed for biological oxygen demand, and the GENERAL PERMIT does not require storm water collected at the Facility to be analyzed for biological oxygen demand, ammonia (as nitrogen), a-Terpineol, Benzoic acid, p-Cresol, or Phenol."  Rebuttal Expert Report, dated August 15, 2023, p. 10, 11, 12 (attached |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | as Ex. 3 to Deposition of Travis Peterson); County's Appendix Exhibit E at 220, 221, 222; Peterson Depo., 18:19-19:4, 119:7-120:17, County's Appendix, Exhibit E at 188:19-189:4, 203:7 – 204:17; Excerpt of Butte County's Second Amended Responses to Requests for Admission, ex. 29 at 844-847 (Nos 31 33 35 37 39 and 41). |
| 84.    When Defendants discharged contaminated storm water in February of 2019, and collected samples on February 14, 2019 and February 26, 2019, they did not have those samples analyzed for all of the Regulated Parameters. SOS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 15-81 (BUTTE01701-1767). | Disputed. While the evidence cited by COL states that storm water flowed out of the Preserve and offsite from the Facility, that evidence does not state that such storm water was "contaminated" with leachate. SOS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 15-81 (BUTTE01701-1767). Contrary to COL's statement, the Investigative Final Report, prepared by Compliance SFO, Inc. & Formation Environmental, LLC, dated December 14, 2022, p. vii, County's Appendix, Exhibit F, 245, states: "[T]he storm water data indicates that there were **no** leachate discharges that flowed off-site or into the tributary to Hamlin Slough."  (Bold added.) That expert conclusion is support by the expert opinions that   "[t]here were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the unnamed tributary to Hamlin |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Slough in 2019 that exceeded ESLs or background concentrations," and "[t]here were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the tributary to Hamlin Slough that exceeded human health SLs or background concentrations."  Deposition of Sean Covington, County's Appendix, Exhibit G at 316:11-22, 317:7-20, 318:16-22, 319:25-320:4, 334, 338, 340, 341 (19:11-22, 20:7-20, 31-16-22, 68:25-69:4; Ex. 3, pp. 7n 11, 13, 14). Also, there is a genuine issue of material fact as to whether the handwriting and colored markings on the SOS Engineers Module 4 Seep Notification dated March 13, 2019 (Exhibit 1`at 10 (BUTTE01696) was on the original document, or was added after the fact by an unknown person. Furthermore, "[s]ample parameters required by the Facility primary and secondary Standard Industrial Code5 (SIC) numbers 4953, Landfills and Land Application Facilities, and 5093, Scrap and Waste Materials, which take into account relevant industry considerations based on the operation of such facilities, including the presence of leachate, are: <br>• pH<br>• TSS |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | • 0 G |
| | • COD |
| | • Fe (Total) |
| | • Al (Total) |
| | • Pb (Total) |
| | • Zn (Total) |
| | Subchapter N contains requirements for landfills (Part 445). However, the NRRWF is not subject to Subchapter N requirements as demonstrated in the Facility SWPPP. Therefore: The monitoring implementation plan for the FACILITY does not require storm water collected at the Facility to be analyzed for biological oxygen demand, and the GENERAL PERMIT does not require storm water collected at the Facility to be analyzed for biological oxygen demand, ammonia (as nitrogen), a-Terpineol, Benzoic acid, p-Cresol, or Phenol."  Rebuttal Expert Report, dated August 15, 2023, p. 10, 11,12 (attached as Ex. 3 to Deposition of Travis Peterson); Peterson Depo., 18:19-19:4, 119:7-120:17, County's Appendix, Exhibit E at 188:19-189:4, 203:7-204:17. Excerpt of Butte County's Second Amended Responses to Requests for Admission, ex. 29 at 844-847 (Nos 31 33 35 37 39 and 41). |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 85.    Specifically, they did not analyze the samples of contaminated storm water for biochemical oxygen demand, ammonia (as nitrogen), a-Terpineol, benzoic acid, or p-Cresol. SOS Engineers Module 4 Seep Notification dated March 13, 2019, ex. 1 at 15-81 (BUTTE01701-1767). | **Admit.** |
| 86.    To the extent that the Facility discharges contaminated storm water in the future, the Monitoring Implementation Plan would not require the analysis of the Regulated Parameters. Peterson Depo., ex. 9 at 313:10-22 (122:10-22). | **Disputed.** The evidence cited does not support the statement.  Peterson Depo., ex. 9 at 313:10-22 (122:10-22). |
| **ISSUE NO. 4: COL has standing.** | |
| 87.    Among Plaintiff's rights and duties set forth in the Easement are the rights to preserve and protect the water quality in the Preserve, and to prevent any activity on or use of the Preserve that harms the Preserve. Nielsen Decl., ¶4; Perpetual Conservation Easement Grant No. 2007-0051757, November 2, 2007, ex. 8 at 249-250. | **Disputed.**  The Perpetual Conservation Easement Grant No. 2007-0051757, November 2, 2007, ex. 8 at 249-250 ("Conservation Easement"), does not support that statement.  Also, the Conservation Easement states:  "Acts Beyond Parties' Control.  Nothing contained in this Easement shall be construed to entitle any party to bring any action against Grantor [Butte County Department of Public Works] or Grantee [COL] for any injury to or change in the |

-46-

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Preserve resulting from causes beyond their control, including, without limitation, fire, drought, flood, storm, and earth movement."  Ex. 8 at 254-255.  In this case, those events occurred.  Expert Report of Eric Miller, Exhibit 3 to Miller Depo., County's Appendix Exhibit C at p. 156. |
| 88.    Plaintiff has an affirmative duty to require the restoration of any areas or features of the Preserve that may be damaged by any impermissible or harmful activity or use. Nielsen Decl., ¶4; Perpetual Conservation Easement Grant No. 2007-0051757, November 2, 2007, ex. 8 at 249-250. | **Disputed**, to the extent the statement implies that "impermissible or harmful activity or use" occurred in this case.  The Conservation Easement states: "Acts Beyond Parties' Control.  Nothing contained in this Easement shall be construed to entitle any party to bring any action against Grantor [Butte County Department of Public Works] or Grantee [COL] for any injury to or change in the Preserve resulting from causes beyond their control, including, without limitation, fire, drought, flood, storm, and earth movement."  Ex. 8 at 254-255.  In this case, those events occurred.  Expert Report of Eric Miller, Exhibit 3 to Miller Depo., County's Appendix Exhibit C at p. 156. |
| 89.    The discharge of leachate-contaminated water into the Preserve harms and threatens to harm the water quality, wildlife, and other conservation | **Disputed.** "Leachate-contaminated water" that flows into the Preserve does not necessarily harm or threaten water quality, wildlife, or |

DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| values of the Preserve. In addition, the failure to allow adequate flow volumes to the Preserve threatens the integrity of the entire wetland itself, including the plants within it, that provide habitat for wildlife in the Preserve. Nielsen Decl., ¶5. | other conservation values of the Preserve.  In fact, after the events of February 2019 at the Facility, the expert analysis was that "[p]otential ecological risks to on-site terrestrial receptors due to soil exposure are considered *de minimis*"; and "[p]otential human health risk due to on-site soil exposure is considered *de minimis*."   Expert Opinions of Sean Covington, Exhibit 3, p. 14 to Deposition of Sean Covington, County's Appendix, Exhibit G at 337, 338, 341. |
| 90.    Plaintiff has been directly harmed, and continues to be under the threat of future direct harms, by Defendants' discharges in violation of the Clean Water Act, which harm the water quality, wildlife, and other conservation values of the Preserve. Nielsen Decl., ¶6. | **Disputed.**   There is no evidence of any threat of future harms.  Also, "Leachate-contaminated water" that flows into the Preserve does not necessarily harm or threaten water quality, wildlife, or other conservation values of the Preserve.  In fact, after the events of February 2019 at the Facility, the expert analysis was that "[p]otential ecological risks to on-site terrestrial receptors due to soil exposure are considered de minimis"; and "[p]otential human health risk due to on-site soil exposure is considered de minimis."   Expert Opinions of Sean Covington, Exhibit 3, p. 14 to Deposition of Sean Covington, County's Appendix, Exhibit G at 337, 338, 341. |
| 91.    Plaintiff has been directly harmed, and continues to be under the threat of future direct harms, by Defendants' failure | **Disputed.**   There is no evidence cited of any threat of future harms, of any failure by Defendants to maintain adequate |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| to maintain an adequate Storm Water Pollution Prevention Plan and failure to otherwise follow the reporting requirements of the CWA. This information would assist the Regional Water Quality Control Board in monitoring the County's compliance with the CWA and the General Industrial Permit More importantly it would greatly assist Plaintiff in managing its obligations to protect the Preserve. The County's failure to follow these reporting requirements has harmed Plaintiff by preventing it from better understanding threats to the Preserve and hampering its obligations under the Easement. Nielsen Decl., ¶7. | SWPPP, or of any failure to otherwise follow reporting requirements of the CWA. Also, "Leachate-contaminated water" that flows into the Preserve does not necessarily harm or threaten water quality, wildlife, or other conservation values of the Preserve.  In fact, after the events of February 2019 at the Facility, the expert analysis was that "[p]otential ecological risks to on-site terrestrial receptors due to soil exposure are considered de minimis"; and "[p]otential human health risk due to on-site soil exposure is considered de minimis." Expert Opinions of Sean Covington, Exhibit 3, p. 14 to Deposition of Sean Covington, County's Appendix, Exhibit G at 337, 338, 341. |
| 92.    Since Plaintiff has a duty to protect the conservation values of the Preserve, Plaintiff has been harmed by the actual and threatened discharges of contaminated water into the Preserve, and by Defendants' failure to comply with the reporting requirements of the CWA. Plaintiff has been required to spend in excess of $50,000 and over 800 hours of staff time seeking to remedy these violations of the CWA and the harm caused by them in the course of the past four and a half years. These costs include experts in hydrology and wetlands, | **Disputed.**   There is no evidence cited of any failure to comply with reporting requirements of the CWA. Also, "Leachate-contaminated water" that flows into the Preserve does not necessarily harm or threaten water quality, wildlife, or other conservation values of the Preserve.  In fact, after the events of February 2019 at the Facility, the expert analysis was that "[p]otential ecological risks to on-site terrestrial receptors due to soil exposure are considered de minimis"; and "[p]otential human health risk due to on-site soil |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

| UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| retained to study the wetland in the Preserve, including damage caused by the County's leachate contaminated discharges; lab sampling and analysis: and investigative fees and costs. Staff time involved extensive communications with the County, State and Regional water boards, and the Army Corps of Engineers, together with California Public Records Act requests, and Freedom of Information Act request to obtain information from these agencies. Nielsen Decl.,¶8, exs. 1, 2. | exposure is considered de minimis." Expert Opinions of Sean Covington, Exhibit 3, p. 14 to Deposition of Sean Covington, County's Appendix Exhibit G at 337, 338, 341. |

Dated:  February 1, 2024          ABBOTT & KINDERMANN, INC.


By:   /s/ Glen C. Hansen
GLEN C. HANSEN
DIANE G. KINDERMANN
Attorneys for Defendants
BUTTE COUNTY DEPARTMENT OF
PUBLIC WORKS, DENNIS SCHMIDT,
ERIC MILLER

**DEFENDANTS' RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**