Diane G. Kindermann (SBN 144426)
dkindermann@aklandlaw.com
Glen C. Hansen (SBN 166923)
ghansen@aklandlaw.com
ABBOTT & KINDERMANN, INC.
2100 21st Street
Sacramento, California 95818
Telephone:   (916) 456-9595
Facsimile:    (916) 456-9599

Attorneys for Defendants
BUTTE COUNTY DEPARTMENT OF
PUBLIC WORKS, DENNIS SCHMIDT,
ERIC MILLER

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA OPEN LANDS, a non-profit land trust organization,<br><br>Plaintiff,<br><br>v.<br><br>BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS, a political subdivision of the State of California, DENNIS SCHMIDT, an individual, and ERIC MILLER, an individual,<br><br>Defendants. | No.  2:20-CV-00123-KJM-DMC<br><br>**DEFENDANTS' APPENDIX OF EXHIBITS IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>(FRCP 56; Eastern District Civil L.R. 260)<br><br>Hearing:   February 29, 2024<br>Time:       1:30 p.m.<br>Location:  Courtroom: 10<br>Judge:      Hon. Daniel J. Calabretta<br><br>Trial Date: June 24, 2024 |

-1-

1

**DEFENDANTS' APPENDIX OF EXHIBITS**

2

Defendants BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS, DENNIS

3

SCHMIDT, and ERIC MILLER hereby submit the following Appendix of Exhibits in

4

opposition to Plaintiff's Motion for Partial Summary Judgment.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

| Exhibit | Page # | Document |
|---------|--------|----------|
| A | | Resolution No. 19-029 passed and adopted on March 5, 2019, by the Butte County Board of Supervisors. |
| B | | Complaint for Declaratory and Injunctive Relief filed on June 22, 2020, by California Open Lands, in the Superior Court of the County of Butte, Case No. 20CV01220, which I received attached to an email from William N. Carlon, counsel for Plaintiff California Open Lands, on June 24, 2020. |
| C | | Select pages of the transcript and exhibits of the Deposition of expert witness Eric Miller taken in this case on October 11, 2023. |
| D | | Select pages of Plaintiff's Responses to Defendant's Interrogatories (Set Two) served in this case on November 4, 2022. |
| E | | Select pages of the transcript and exhibits to the Deposition of the expert witness Travis Peterson taken in this case on October 10, 2023. |
| F | | Investigative Final Report, prepared by Compliance SFO, Inc. & Formation Environmental, LLC, dated December 14, 2022. |

27

28

**DEFENDANTS' APPENDIX OF EXHIBITS IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

| G | | Select pages of the transcript and exhibits to the Deposition of the expert witness Sean Covington that was taken in this case on October 25, 2023. |
| H | | Select pages of Plaintiff's Responses To Defendant's Interrogatories (Set One), which responses were served in this case on November 4, 2022. |
| I | | An email from William N. Carlon, counsel for Plaintiff, on August 16, 2023.  A portion of the email was redacted as it concerns settlement discussions. |
| J | | Printout from the Water Boards Stormwater Multiple Application & Reports Tracking System showing attachments related to the Notice of Intent. |
| K | | Industrial Activities Stormwater Pollution Prevention Plan for Neal Road Recycling & Waste Facility dated June 24, 2015, that I downloaded from the SMARTS system on January 1, 2024. |

Dated:  February 1, 2024                ABBOTT & KINDERMANN, INC.


                                        By:   /s/ Glen C. Hansen
                                            GLEN C. HANSEN
                                            DIANE G. KINDERMANN
                                            Attorneys for Defendants
                                            BUTTE COUNTY DEPARTMENT OF
                                            PUBLIC WORKS, DENNIS SCHMIDT,
                                            ERIC MILLER

**DEFENDANTS' APPENDIX OF EXHIBITS IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT A

**To Defendants' Appendix of Exhibits
in Opposition to Plaintiff's Motion for Partial Summary Judgment**



**BOARD OF SUPERVISORS**
COUNTY OF BUTTE, STATE OF CALIFORNIA

Resolution No. 19-029

### RESOLUTION RATIFYING THE PROCLAMATION OF A LOCAL EMERGENCY FOR THE 2019 FEBRUARY STORMS AND REQUESTING THE GOVERNOR PROCLAIM THE COUNTY OF BUTTE TO BE IN A STATE OF EMERGENCY AND REQUESTING THAT THE GOVERNOR OF THE STATE OF CALIFORNIA PURSUE A PRESIDENTIAL EMERGENCY DECLARATION OF DISASTER

**WHEREAS**, Section 8-5 of the Butte County Code empowers the Chief Administrative Officer of the County of Butte to proclaim the existence, or threatened existence of a local emergency when the county is affected, or likely to be affected, by a local emergency and the Board of Supervisors is not in session; and

**WHEREAS**, the conditions of extreme peril to the safety of persons and property did warrant and necessitate the proclamation of the existence of a local emergency; and

**WHEREAS**, at the commencement of the local emergency the Board of Supervisors was not in session (and could not immediately be called into session); and

**WHEREAS**, the Chief Administrative Officer of the County of Butte proclaimed the existence of a local emergency within the County of Butte on the 28th day of February, 2019; and

**WHEREAS**, it is hereby found that local resources are unable to cope with the effects of said emergency and the County of Butte requests California Disaster Assistance Act (CDAA) funding and any other available funding be made available.

**NOW, THEREFORE, BE IT RESOLVED AND ORDERED** that the Proclamation of Existence of a Local Emergency with respect to the 2019 February Storms and the request to the Governor to declare a State of Emergency are hereby ratified and confirmed by the Board of Supervisors of the County of Butte; and

**IT IS FURTHER RESOLVED AND ORDERED** that the County of Butte requests the State of California to waive regulations that may hinder response, mitigation and recovery efforts including but not limited to Federal Fish and Wildlife regulations, State Fish and Wildlife regulations and the California Environmental Quality Act (CEQA), and to expedite access to federal resources and any other appropriate federal disaster relief programs (e.g. SBA funding, etc.); and

**IT IS FURTHER REQUESTED** that the Governor of the State of California pursue a Presidential Declaration of Disaster for Butte County for the 2019 February Storms; and

**IT IS FURTHER RESOLVED AND ORDERED** that a copy of this resolution be forwarded to the Director of the Governor's Office of Emergency Services; and

**IT IS FURTHER RESOLVED AND ORDERED** that Cindi Dunsmoor, Emergency Services Officer of the County of Butte, is hereby designated as the authorized representative of the County of Butte for the purpose of receipt,

processing, and coordination of all inquiries and requirements necessary to obtain available state and federal disaster assistance.

**PASSED AND ADOPTED** by the Butte County Board of Supervisors this 5th day of March, 2019, by the following vote:

**AYES:** Supervisors Connelly, Lucero, Ritter, Teeter, and Chair Lambert
**NOES:** None
**ABSENT:** None
**NOT VOTING:** None

**Steve Lambert, Chair**
Butte County Board of Supervisors

**ATTEST:**
**Shari McCracken,** Chief Administrative Officer
and Clerk of the Board of Supervisors

By: _____
Deputy

THE FOREGOING INSTRUMENT IS A CORRECT COPY OF
THE ORIGINAL ON FILE AND OF RECORD IN THIS OFFICE
ATTEST            DATE 1/30/24
                  Clerk of the Board of Supervisors
                  in and for the County Of Butte
                  State of California
By _____ DEPUTY

-6-

# EXHIBIT B

**To Defendants' Appendix of Exhibits**
**in Opposition to Plaintiff's Motion for Partial Summary Judgment**

ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
LAW OFFICES OF ANDREW L. PACKARD
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA OPEN LANDS

F I L E D

Superior Court of California
County of Butte

6/22/2020

Kimberly Flener, Clerk

By _____ Deputy
Electronically FILED

F I L E D

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF BUTTE

CALIFORNIA OPEN LANDS, a non-profit
land trust organization,

        Plaintiff,

   v.

BUTTE COUNTY DEPARTMENT OF
PUBLIC WORKS, a political subdivision of the
State of California,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 20CV01220

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

**(Civil Code § 815 *et seq*; Breach of Contract)**

### INTRODUCTION

1.      By this action, Plaintiff CALIFORNIA OPEN LANDS ("COL") challenges Defendant's

actions in committing a series of significant and blatant violations of a conservation easement contract

("Easement") that COL holds over a six-acre parcel of land ("Preserve") at the landfill Defendant

operates located at 1023 Neal Road, Paradise, California ("Landfill") in Butte County.  Defendant's

unlawful actions include discharging untreated landfill leachate and storm water contaminated by

untreated landfill leachate into the Preserve, excavating soils and destroying natural vegetation in the

Preserve, and depriving the Preserve of the water necessary to protect and to sustain the biological

resources therein.  The Easement expressly prohibits all of these activities and authorizes and directs

COL to enforce its prohibitions.

//

//

**PARTIES**

2.     CALIFORNIA OPEN LANDS is a non-profit land trust corporation organized under the laws of California, with its main office in Chico, California.  COL is dedicated to the preservation and management of open space, the exchange of scientific information, public education, and responsible conservation of the natural resources of the Sacramento River Watershed.

3.     Based on the records of the Butte County Recorder's Office, as reported in a publicly available database, COL is informed and believes that Defendant is a political subdivision organized under the laws of the State of California and the owner of fee title to the Preserve, which is a portion of Assessor's Parcel No. 040-600-082 in Butte County, California.

**JURISDICTION AND VENUE**

4.     Venue is proper in this Court under Code of Civil Procedure section 392 because the property at issue in this action is located in Butte County.

5.     COL has performed all conditions precedent to the filing of the instant action.

6.     As holder and beneficiary of the Easement, COL has a direct and beneficial interest in Defendant's compliance with the Easement.  That interest is directly and adversely affected by Defendant's past and threatened future activities in and near the Preserve.

7.     The Easement expressly grants to COL "the ability to ensure enforcement of the rules and regulations regarding the Preserve."  Easement § 3.B.  The Easement also expressly authorizes COL to

> bring an action at law or in equity in a court of competent jurisdiction to enforce the terms of [the] Easement, to enjoin the violation, ex parte as necessary, by temporary or permanent injunction, to recover any damages to which it may be entitled for violation of terms of [the] Easement or injury to the Conservation Values protected by [the] Easement, including damages for the loss of aesthetic ecological educational, historical, recreation or scientific values and to require the restoration of the Preserve pursuant to the Plan to the condition that existed prior to any such injury.

Easement § 7.A.  Section 815.7 of the Civil Code likewise authorizes a party holding a conservation easement to bring a civil action to enforce its terms.

8.     COL has no plain, speedy, or adequate remedy in the course of ordinary law.  Easement § 7.A.  Unless this Court grants the equitable relief requested herein, Defendant will continue to violate the terms of the Easement and the policies of the conservation easement statute, Civil Code section 815

through 816.

## FACTUAL BACKGROUND

### The Conservation Easement

9.     In 2003, the County sought and obtained a permit from the Army Corps of Engineers which allowed the County to destroy 5.01 acres of waters of the United States in order to expand operations at the Neal Road Landfill ("Landfill").  To mitigate the use and loss of the jurisdictional waters, the Army Corps of Engineers required the County to purchase 2.01 acres of seasonal wetland habitat credits from an approved wetland mitigation bank, and to establish and maintain a preserve containing 3.00 acres of created, avoided, and preserved waters of the United States.  As part of the permit, Defendant was required to record a permanent conservation easement and deed restriction maintaining all mitigation, preservation, and avoidance areas as wetland preserve and wildlife habitat in perpetuity, and to designate an appropriate conservation-oriented third party to function as preserve manager and to hold the required conservation easement.

10.     On November 2, 2007, Defendant recorded the Easement, entitled "Perpetual Conservation Easement Grant," with the Butte County Recorder's Office.   A true and correct copy of the Easement is attached hereto as **Exhibit A**.  The Easement was created pursuant to the Army Corps of Engineers Permit No. 200300113 ("Army Corps Permit"), which is attached as Exhibit D to the Easement, and pursuant to section 815 *et seq.* of the Civil Code.

11.     The Easement protects approximately six acres of land, as delineated by the legal description attached to the Easement as Exhibit A.  A true and correct copy of that legal description platted on a satellite image of the Landfill is attached hereto as **Exhibit B.**  Three of the six acres comprise the wetlands required by the Army Corps Permit.  The remaining acreage of the Preserve is a buffer, created pursuant to Special Condition 4 of the Army Corps Permit.  The buffer creates, at minimum, a 25-foot area of native upland vegetation to minimize external disturbance of the preserved waters.  The Preserve, when healthy, provides potential and existing habitat for numerous native plant and animal species, and terrestrial communities, including the following: Conservancy fairy shrimp, *Branchinecta conservatio*; California fairy shrimp, *Linderiella occidentalis*; Vernal pool fairy shrimp, B*ranchinecta lynchi*; foothill yellow-legged frog, *Rana boylii*; western spadefoot, *Spea*

*hammondii*; bald eagle, *Haliaeetus leucocephalus*; American peregrine falcon, *Falco peregrinus anatum*; greater sandhill crane, *Antigone canadensis tabida*; osprey, *Pandion haliaetus*; burrowing owl, *Athene cunicularia*; vernal tadpole shrimp, *Lepidurus packardi*; North American porcupine, *Erethizon dorsatum*; western pond turtle, *Emys marmorata*; coast horned lizard, *Phrynosoma blainvillii*; California thrasher, *Toxostoma redivivum*; common yellowthroat, *Geothlypis trichas*; oak titmouse, *Baeolophus inornatus*; Lewis's woodpecker, *Melanerpes lewis*; Nuttal's woodpecker, *Picoides nuttallii*; Great Valley Cottonwood Riparian Forest; and, Northern Hardpan Vernal Pool.

12.     The Easement is made in favor of COL, and among the affirmative rights given to COL is the right to prevent any activity on or use of the Preserve that is inconsistent with the purpose of the Easement and to require the restoration of any area or features of the Preserve that may be damaged by any such inconsistent activity or use.  Easement § 2.D.

13.     The purpose of the Easement is to "ensure that the Preserve will be retained forever in an open space condition and to prevent any use of the Preserve that will impair or interfere with the Conservation Values of the Preserve."  Easement § 1.

14.     The Conservation Values of the Preserve are defined as the "natural resources with significant ecological values that benefit endangered, threatened, and other rare species" that the Preserve possesses.  Easement Recital E.  These Conservation Values include "Waters of the U.S., including wetlands, the adjacent upland, along with associated native vegetation and wildlife."  *Id.*

15.     The Easement expressly prohibits Defendant from, among other things, the discharge of any waste materials within the Preserve, the excavation of soils and removal of vegetation within the Preserve, the altering of the topography of the Preserve, operation of motorized vehicles on any portion of the Preserve with limited exceptions not applicable here, storing or placing materials and debris within the Preserve, and any and all other uses which may adversely affect the purposes of the Easement.  Easement § 4.

<u>**Defendant's Unlawful Actions on the Property**</u>

16.      In February of 2019, Defendant experienced a period of heavy rainfall at the Landfill. On February 14, 2019, Landfill staff observed leachate emerging from the surface of the side of Module 4, one of the Landfill's solid waste storage cells.  The leachate seeped from Module 4 and flowed down

the face of the slope of Module 4 and into Sediment Basin #4, a storm water collection basin located downhill of Module 4.  The liquid that collected in Sediment Basin #4 was then pumped into a drainage ditch which gravity-flowed to the Preserve.  The Landfill staff member who observed the leachate seeps informed Landfill management of the issue and turned off the pump that was moving the leachate into the ditch leading to the Preserve.  The staff member estimated that approximately 316,800 gallons of leachate-contaminated storm water were discharged into the Preserve between approximately 9:00 a.m. and 1:40 p.m. when the pump was eventually turned off.

17.    On February 26 and 27, 2019, Landfill staff again observed leachate seeps from Module 4 flowing into Sediment Basin #4.  On February 27, 2019 liquid was again being pumped from Sediment Basin #4 into the Preserve via the drainage ditch.  Landfill staff estimated that approximately 594,000 gallons of leachate-contaminated storm water were discharged into the Preserve during this event.

18.    On March 6, 2019, Landfill staff again observed leachate seeps from Module 4 flowing into Sediment Basin #4.  Landfill staff estimated that that leachate was flowing into Sediment Basin #4 at approximately 90 gallons per hour.  Similar leachate seeps from Module 4 were also documented in April and May of 2019.

19.    In response to the leachate seeps from Module 4, Defendant began diverting storm water flows that originated from Module 4 away from the Preserve and into either the adjacent Class II leachate impoundment (also referred to as the "lined leachate pond"), or into a storm water sediment basin located north of the Preserve.

20.    On June 26, 2019, Central Valley Regional Water Quality Control Board ("Regional Board") staff performed a site inspection at the Landfill and observed sediment deposits in the Preserve which originated from the large soil stockpile located to the north of the Preserve.  While this stockpile is billed as a "native soils" stockpile, information available to COL indicates that some of this soil was delivered to the Landfill in January 2019 from PG&E's cleanup efforts following the Paradise Camp Fire.  On January 24, 2019, Landfill staff recommended that PG&E's soils be rejected because they were not adequately screened for semi-volatile organic compounds.  However, on January 25, 2019, the soil was accepted and deposited into the soil stockpile north of the Preserve.  During the July 18, 2019

visit to the Preserve, COL documented a thin layer of sediment in the Preserve that had the characteristic red color of PG&E's cleanup soil.  *See* **Exhibit E**.

21.     On July 31, 2019, Landfill staff reported to the Regional Board that a water truck transporting leachate spilled at least 150 gallons of leachate in an area uphill of the Preserve.  Landfill staff also reported that the leachate flowed off the paved roadway and into unlined ditches, some of which drain to the Preserve.

22.     On August 21, 2019, the Regional Board issued a Notice of Violation for the events described in the paragraphs above.  A true and correct copy of this document is attached hereto as **Exhibit C**.  These violations prompted subsequent investigation by the State Water Resources Control Board Office of Enforcement, which issued its own Notice of Violation on June 11, 2020 describing additional violations arising from Defendant's unauthorized leachate discharges.  A true and correct copy of the June 11, 2020 Notice of Violation is attached hereto as **Exhibit D**.

23.     On October 17, 2019, Landfill staff reported to the Regional Board that a plastic leachate conveyance pipe had failed and caused leachate to spill into the Preserve.  Regional Board staff inspected the Landfill on October 18, 2019 and issued an inspection report on October 28, 2019 documenting the staff member's observations.  Sometime during the night between October 16, 2019 and October 17, 2019, a weld failed on a leachate conveyance pipe running from the Module 4 leachate sump to the lined leachate pond.  The resulting leachate spill flowed from the broken pipe, across a dirt road, and into the southeastern corner of the Preserve.  In response to this spill, Landfill staff began excavating soil that had been contaminated by the leachate, including within the Preserve itself.  Regional Board staff documented the stockpiling of excavated soil within the Preserve.  Defendant, between October 17, 2019 and January 8, 2020, reported excavating at least 218 cubic yards of soil from the Preserve and the spill area.

24.     However, this was not the first time Defendant had conducted excavation activities within the Preserve.  On July 18, 2019, COL staff documented a grove of cottonwood trees located near a reference gauge in the southeast corner of the basin.  A true and correct copy of a photograph taken by COL staff on July 18, 2019 is attached hereto as **Exhibit E**.  COL staff returned to the Preserve on September 11, 2019, and found that the grove had been demolished, the trees left dead and desiccated,

and that significant earth-moving activities had occurred, and were occurring, in the Preserve.  A true and correct copy of a photograph taken by COL staff showing a bulldozer in the Preserve is attached hereto as **Exhibit F**.  By February 2020, Defendant had conducted significantly more excavation and removed several additional cottonwood trees along the northeast corner of the Preserve.  Defendant had also built a new ramp in the northeast corner of the Preserve, which it used to access the Preserve with its heavy equipment.

25.     In light of the Easement's restrictions, and the separate property rights in the Preserve owned, respectively, by COL and Defendant, Defendant's actions are as egregiously unjustified as if they had discharged untreated landfill leachate into Butte Creek directly, or had dug up its bed and banks and destroyed established vegetation, trees, and habitat.  Defendant's actions are all the more disturbing because it was allowed to expand its operations only after it created the Preserve.

### COL's Efforts to Resolve the Dispute

26.     In May 2019, COL staff conducted its annual review of the Preserve, pursuant to its obligations under the Easement, and observed water in the Preserve that appeared to be contaminated. After a short period of investigation, COL staff contacted Defendant on July 15, 2019 via email to gather more information about the contamination in the Preserve.  Defendant replied on August 5, 2019, but failed to address COL's concerns raised in the July 15th email.  A true and correct copy of the July 15, 2019 and August 5, 2019 correspondence is attached hereto as **Exhibit G.**

27.     On September 3, 2019, COL staff wrote a letter notifying Defendant of four violations of the Easement, and providing Defendant an opportunity to explain the events that caused the discharge of contaminated water into the Preserve.  A true and correct copy of this letter is attached hereto as **Exhibit H**.  The letter alleges that Defendant had violated the Easement by allowing unauthorized motorized vehicles to access the Preserve, by failing to install and maintain proper signage around the Preserve, by causing chemical pollution to contaminate the soils of the Preserve, and by depositing in the Preserve, or allowing to be deposited, three to four feet of gravel sediments.

28.     In its September 10, 2019 response to COL, Defendant largely dismissed COL's concerns and rejected COL's proposal to resolve the dispute.  A true and correct copy of this letter is attached hereto as **Exhibit I**.  With respect to the concerns about chemical contamination, Defendant brushed

them off completely – despite having pumped at least 1.1 million gallons of leachate-contaminated storm water into the Preserve only months earlier.  Defendant did agree to install signs, but did so without input from COL.

29.     After conducting additional investigation, COL again wrote to Defendant on December 13, 2019 and provided Defendant with additional notice of violations of the Easement.  A true and correct copy of this letter is attached hereto as **Exhibit J**.  The letter identifies eight specific violations of the Easement and remedies that would address each violation.

30.     On February 6, 2020, Defendant responded to the proposed remedies provided in COL's December 13, 2019 notice of violations, but did not address the allegations of violations.  A true and correct copy of this letter is attached hereto as **Exhibit K**.  Again, Defendant's responses to COL's concerns were largely dismissive and Defendant rejected, or described as moot, all but COL's proposal to include additional signage near the Preserve, which it agreed to remedy pursuant to COL's direction.

31.     After obtaining Defendant's February 6, 2020 response, and after obtaining records from Butte County in response to a Public Records Act request, it became clear to COL that Defendant's understanding of the geographical and proscriptive scope of the Easement differed from COL's.  In an email to Defendant's counsel on March 31, 2020, a copy of which is attached hereto as **Exhibit L**, COL explained, and provided its legal justification for, its understanding of the boundaries of the Preserve.

32.     Defendant responded on April 10, 2020 and simultaneously agreed with COL's understanding that the Preserve consisted of six acres, of which three acres are protected wetland, and rejected COL's allegations that the excavation activities described in paragraphs 23 and 24 above were conducted in the Preserve.

33.     On April 13, 2020, COL responded to Defendant and highlighted the apparent contradiction in Defendant's position, stating "[I]n your email you confirm that the County acknowledges that there is a 3-acre wetland area ("we agree that the Easement consists of 6 acres total – 3 acres of which are protected wetlands"), but can only point to two acres the County believes are wetlands. The area the County contends is the wetland is too small."  A copy of Defendant's April 10, 2020 email and COL's April 13, 2020 response are attached hereto as **Exhibit M**.

34.     Defendant has not responded to COL's April 13, 2020 email, and the parties have not

1    made any additional progress in resolving the violations raised by COL.

2        35.    Section 7.A of the Easement requires a party who determines that there is a violation of

3    the terms of the Easement to "give written notice to the other parties of such violation and demand

4    corrective action sufficient to cure the violation and, where the violation involves injury to the Preserve

5    resulting from any use or activity inconsistent with the purpose of this Easement, to restore in

6    accordance with the Plan, the portion of the Preserve so injured."  The Easement also provides that "[i]f

7    a party fails to cure a violation within thirty (30) days after receipt of written notice thereof from the

8    other party . . . the aggrieved party may bring an action at law or in equity in a court of competent

9    jurisdiction to enforce the terms of this Easement."  *Id*.  COL provided notice on September 3, 2019, and

10   again on December 13, 2019.  Rather than run to the courthouse 30 days later, COL entered into good-

11   faith discussions with Defendant in an attempt to resolve the alleged violations.  Unfortunately, those

12   discussions have been unsuccessful, and the Parties have reached an apparent impasse.

13       36.    COL has not only the right, but also the duty under the Easement and the California Civil

14   Code to monitor and enforce compliance with the Easement.  COL's efforts to cooperatively resolve its

15   dispute with Defendant have not succeeded.  COL is therefore compelled to file this lawsuit seeking

16   declaratory and injunctive relief, damage, and restitution for Defendant's violations of the Easement.

17   Without the intervention of the Court, COL cannot protect the Property over which it holds the

18   Easement from further and ongoing harm.

19       37.    Defendant's conduct makes a mockery not only of the Easement's language and

20   purposes, but also of the conservation easement statute itself.  That statute is designed to ensure "the

21   preservation of land in its natural, scenic, agricultural, historical, forested, or open-space condition,"

22   which the Legislature has declared to be "among the most important environmental assets of

23   California."  Civ. Code § 815.  COL requests that this Court put an end to Defendant's unlawful

24   conduct.

25                    **FIRST CAUSE OF ACTION**

26           **(Violation of Conservation Easement (Civ. Code § 815.7))**

27       38.    COL incorporates the allegations contained in the above paragraphs as though fully set

28   forth herein.

Complaint for Declaratory and Injunctive Relief        -16-                                    Case No.

39.     The Easement is a "conservation easement" that runs with the Preserve, created under the authority of section 815 to 816 of the Civil Code.

40.     Section 815.7(b) of the Civil Code provides that a court may enjoin "[a]ctual or threatened injury to or impairment of a conservation easement or actual or threatened violation of its terms" in a suit brought by the holder of the easement.

41.     Section 815.7(c) of the Civil Code provides that the holder of a conservation easement "shall be entitled to recover money damages for any injury to such easement or to the interest being protected thereby or for the violation of the terms of such easement."

42.     The Easement is intended to "ensure that the Preserve will be retained forever in an open space condition and to prevent any use of the Preserve that will impair or interfere with the Conservation Values of the Preserve."  Easement § 1.

43.     Defendant's past and imminent future actions violate the Easement in numerous ways, including the following:

    a.   The discharge of leachate, a waste material, into the Preserve violates the Easement's prohibition on the discharge of any waste materials within the Preserve.  Easement § 4.E.  The same activities also violate the Easement by harming the Conservation Values of the Preserve, which include the wetlands – as well as the surface and ground water required to protect and sustain the wetlands – and water quality, because landfill leachate is a highly polluted liquid.  Easement Recital E and § 2.E.

    b.   The discharge of leachate into the Preserve violates the Easement's prohibition on "[a]ny and all other uses which may adversely affect the purposes of this Easement."  Easement § 4.R.

    c.   Defendant's diversion of storm water away from the Preserve violates the Easement by depriving the wetlands of the necessary water and therefore harming the Conservation Values of the Preserve.  Easement Recital E.

    d.   Disposal and storage of soil within the Preserve violates the Easement's prohibition on "stor[ing] or plac[ing] (whether temporarily or permanently)" any "material or debris" within the Preserve.  Easement § 4.C and 4.E.  Defendant has violated the same sections of the Easement by storing pipes and other equipment within the buffer area of the Preserve.

    e.   The excavation and removal of soil from the Preserve violates the Easement's prohibition

on "[e]xcavating, dredging, or removing loam, gravel, soil, rock, sand, or other material" from the Preserve.  Easement § 4.F.

      f.   The operation of motorized vehicles within the Preserve violates the Easement's prohibition on riding, bringing, using or permitting such vehicles "on any portion of the Preserve, except as provided for in the Plan or with prior written approval by the Corps."  Easement § 4.K.  No exceptions to this prohibition apply, nor did Defendant obtain any prior written approval by the Army Corps of Engineers.

      g.   The destruction of cottonwoods and other trees and vegetation by heavy equipment, and by the discharge of leachate, in the Preserve violates the Easement's prohibition on the "destruction or removal of any natural tree, shrub or other vegetation, that exists upon the Preserve."  Easement § 4.J.

      h.   The open venting of methane near the Preserve harms the Conservation Values of the Preserve - and therefore violates the Easement - which include, among other things, the air rights necessary "to protect and sustain the biological resources of the Preserve."  Easement § 2.E.

      i.   The foregoing activities are inconsistent with the purposes of the Easement as set forth in section 1 of the Easement.

      j.   The foregoing activities have impaired and will continue to impair the natural habitat, scenic, and open space values of the Property.

44. As a direct and proximate result of Defendant's prior and threatened future violations of the Easement, COL has incurred and will incur substantial damages and harm, as well as costs, expenses, and attorneys' fees in seeking to enforce the Easement.

45. Because there is no adequate remedy at law for Defendant's violations of the Easement, COL is entitled to an injunction prohibiting Defendant and its agents, servants, employees, officers, and representatives, and others acting in concert with it or on its behalf from further discharges of leachate and from further excavation, grading, or vegetation-removal activities within the Preserve; or engaging in any revegetation measures without COL's prior written approval.  COL is entitled to a mandatory injunction compelling Defendant to restore "such Area or features of the Preserve that may be damaged by any inconsistent activity or use," and to restore the Preserve "to the condition that existed prior to any such injury."  Easement §§ 2.D, 7.A; Civ. Code § 815.7(b).

46. COL is also entitled to damages, in an amount to be proved at trial, for Defendant's discharges of leachate to the Preserve, and extensive excavation, grading, and disposal activities in violation of the Easement.  Such damages include compensation for the harm caused by Defendant to the aesthetic, ecological, educational, historical, recreational or scientific values of the Property.  Civ. Code § 815.7(c); Easement § 7.A

47. COL is also entitled to be reimbursed, in an amount to be proved at or after trial, for all reasonable costs incurred enforcing the Easement "including, without limitation, costs of suit and attorneys' fees."  Easement § 7.B.

48. An actual controversy exists between COL and Defendant as to whether the actions of Defendant alleged in this Complaint violate the Easement, and a judicial resolution of that controversy is now required.

49. COL requests a declaration from this Court that the actions alleged in this Complaint violate the Easement.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

50. COL hereby incorporates the allegations contained in the above paragraphs as though fully set forth herein.

51. The Easement is a binding and enforceable contract.

52. As owners of fee title to the Preserve, Defendant is bound by the Easement, which runs with the Preserve.  Easement Recital A; Civ. Code § 815.7(a).

53. The actions alleged above constitute actual or threatened violations of the Easement and as such are actionable as breaches of contract.

54. Because there is no adequate remedy at law for Defendant's breaches of its obligations under the Easement, and because the Easement expressly provides that its terms shall be enforceable by injunction, COL is entitled to an injunction prohibiting Defendant and its agents, servants, employees, officers, and representatives and others acting in concert with it or on its behalf from further discharges of leachate and from further excavation, grading, or vegetation-removal activities within the Preserve; or engaging in any revegetation measures without COL's prior written approval.

55. COL is also entitled to damages, in an amount to be proved at trial, for Defendant's discharges of leachate to the Preserve, and extensive excavation, grading, and disposal activities in violation of the Easement.  Such damages include compensation for the harm caused by Defendant to the aesthetic, ecological, educational, historical, recreational or scientific values of the Property. Easement § 7.A

56. COL is also entitled to be reimbursed, in an amount to be proved at or after trial, for all reasonable costs incurred enforcing the Easement "including, without limitation, costs of suit and attorneys' fees."  Easement § 7.B.

57. An actual controversy exists between COL and Defendant as to whether the actions of Defendant alleged in this Complaint violate the Easement, and a judicial resolution of that controversy is now required.

58. COL requests a declaration from this Court that the actions alleged in this Complaint constitute breaches of the Easement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For the following declarations, pursuant to Code of Civil Procedure section 1060:

 a. That discharges of leachate into the Preserve are violations and breaches of the Easement;

 b. That excavation and removal of soils from within the Preserve are violations and breaches of the Easement;

 c. That the destruction and removal of vegetation in the Preserve are violations and breaches of the Easement;

 d. That uses of motorized equipment to excavate or grade soil in the Preserve are violations and breaches of the Easement; and,

 e. That discharges of methane and untreated landfill gases into the air of the Preserve are violations and breaches of the Easement;

2. For preliminary and permanent injunctions restraining Defendant, its agents, servants, employees, officers, and representatives, and others acting in concert with them or on their behalf, from engaging in excavation, grading, or vegetation-removal activities within the

1   Preserve without COL's prior written approval, or otherwise acting in contravention of the

2   Easement;

3   3.   For a permanent mandatory injunction compelling Defendant to:

4       a.   Replant and restore the vegetation and trees removed from the Preserve in connection

5           with the Easement violations described herein; and,

6       b.   Undertake any additional work necessary to ensure that the Property is fully "restored to

7           the condition that existed prior" to its violations and to "continue to diligently cure such

8           violations until finally cured," as required by section 7 of the Easement;

9   4.   For damages in an amount to be proved at trial;

10  5.   For costs of suit;

11  6.   For costs of review of Defendant's restoration proposals and related costs of enforcement

12      (including attorneys' fees, consultant fees, and staff time) as authorized by Section 7 of the

13      Easement, Civil Code section 815.7(d), Code of Civil Procedure sections 1021.5 and

14      1033.5(a)(1), and other provisions of law; and,

15  7.   For such other relief as the Court deems just and proper.

16  Dated: June 19, 2020              Respectfully Submitted,

17                                    LAW OFFICES OF ANDREW L. PACKARD

18                                    By: /s/ William N. Carlon
                                      William N. Carlon
19                                    Attorney for Plaintiff
                                      CALIFORNIA OPEN LANDS
20

21

22

23

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief        -21-                              Case No.

# EXHIBIT A



**COMPLETE THIS INFORMATION:**

Recording Requested by:

_Butte Co. Public Works_

```
Recorded         | REC FEE      181.00
Official Records | TAX            2.75
County of        |
Butte            |
CANDACE J. GRUBBS|
County Clerk-Recorder|
                 | MP
01:06PM 02-Nov-2007 | Page 1 of 59
```

**AND WHEN RECORDED MAIL TO:**

_California Open Lands_
_Attn: Jody Galloway_
_115 Meyer St., Suite 120_
_Chico, CA  95928_

THIS SPACE FOR RECORDERS USE ONLY

59
M

_PERPETUAL CONSERVATION EASEMENT GRANT_
**Document Title**

**DOCUMENTARY TRANSFER TAX: $ 2.75**

☑ **Computed on the consideration of property conveyed; OR**

____ **Computed on the consideration or value less liens or encumbrances**

☑ **Unincorporated area**

____ **Town or City of** _____

_William Bedywell_

**Signature of Declarant or Agent Determining Tax-Firm Name**

**MAIL TAX STATEMENTS TO:**

THIS PAGE ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION
(Additional Recording Fee Applies)

RECORDING REQUESTED BY:


WHEN RECORDED RETURN TO:

     California Open Lands
     Attention: Jody Gallaway
     115 Meyer St., Suite 120
     Chico, California 95928


<u>THIS SPACE FOR RECORDER'S USE ONLY</u>

## PERPETUAL CONSERVATION EASEMENT GRANT

THIS PERPETUAL CONSERVATION EASEMENT GRANT (hereinafter "**Easement**") is made this _14_ day of ___SEPTEMBER__, 200_7_, by <u>Butte County Department of Public Works</u> ("**Grantor**") a municipal corporation, in favor of <u>California Open Lands</u>, a recognized California 501(c)(3) Non-profit Corporation ("**Grantee**").

### RECITALS

A.     Grantor is a municipal corporation and is the sole owner in fee simple of certain real property located in the County of Butte, State of California.  Grantor intends to expand an existing landfill on a portion of this property.  The remainder of this property, specifically the storm-water detention basin, with natural resource values is intended to be preserved in its natural state.  This is the area covered by the Easement, and shall be referred to as the "**Preserve**", which is described in **Exhibit A** and depicted upon the map **Exhibit B**, both of which are attached hereto and incorporated herein by this reference.

B.     Grantee is a private non-profit 501(c)(3) corporation under the laws of the State of California, and is authorized to hold conservation easements under California Civil Code §815 et seq.

C.     **"Corps"** is the United States Army Corps of Engineers within the United States Department of the Army, which is authorized by Federal law to administer the Federal Clean Water Act, Section 404, and other laws and regulations; and

D.     This Easement provides conservation measures and mitigation for certain impacts located in an unincorporated portion of the County of Butte, south of the City of Chico, State of California, described in that certain U.S. Army Corps of Engineers (Corps) Permit Number 200300113, dated December 9, 2003., for the Neal Road Landfill, and is being conveyed in order to enable Grantor to undertake the fill of waters of the United States as necessary to complete the landfill expansion

project.

E.   The Preserve possesses natural resources with significant ecological values that benefit endangered, threatened, and other rare species (collectively, "**Conservation Values**").  These natural resources are of aesthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people.  These values include Waters of the U.S., including wetlands, the adjacent upland, along with associated native vegetation and wildlife.  These natural resources are of great importance to both Grantor and Grantee.

F.   The Preserve includes the water in wetlands and drainage features, including water resulting from direct precipitation onto the Preserve and/or flows through the drainage features from natural storm events which partially or completely fill depressions on the surface of the Preserve.  The Preserve will contain actively managed areas and passively managed areas.  The storm-water detention basin will be actively managed, and the wetland area will be passively managed.

G.   The Preserve, consisting of approximately 3.00 acres, has been identified as being potential habitat for species of native plants and wildlife which Grantor and Grantee desire to restore and enhance pursuant to an Open Space Management Plan ("**Plan**") dated January 2006, by Gallaway Consulting, Inc., of which is attached to this Easement as **Exhibit C** and incorporated herein by this reference.

H.   Grantor intends to convey to Grantee the right to inspect and monitor the management of the Conservation Values of the Preserve.

I.   Grantee agrees by accepting this Easement to honor the intentions of Grantor stated herein and to inspect and monitor in perpetuity, the Conservation Values of the Preserve in accordance with the terms of this Easement and the Open Space Management Plan.

J.   The following terms, when used herein, shall have the meanings set forth below:

"**Grantee**" Means California Open Lands or any successor, assignee, or transferee appointed in accordance with Section 8.

"**Grantor**" or "**Preserve Manager**" means Butte County Department of Public Works or any successor, assignee, or transferee appointed in accordance with Section 8.

"**Preserve**" shall mean the approximately 3.00 acre area appearing on **Exhibit B** containing both created and natural wetland features and buffer zones which shall be maintained as a Preserve in accordance with the provisions of Section 3.

"**Plan**" means the *Neal Road Landfill Open Space Preserve Management Plan*, by Gallaway Consulting, Inc., dated January 2006, a copy of which is attached hereto as **Exhibit C**.

"**Waters of the U.S.**" means that Area defined in 40 CFR 122.2 as a feature under the regulation of the Federal Clean Water Act.

"**Wetland**" means that Area that is inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.

"**Uplands**" means those habitats that are not riparian or wetlands, including valley oak woodland, grassland/meadow, blue oak woodland, and blue oak savannah.

## COVENANTS, TERMS, CONDITIONS, AND RESTRICTIONS

In consideration of the above and the mutual covenants, terms, conditions, and restrictions contained herein, and pursuant to the laws of California and California Civil Code §815 et seq., Grantor hereby voluntarily grants and conveys to Grantee a Perpetual Conservation Easement over the Preserve of the nature and character and to the extent hereinafter set forth.

1.   **PURPOSE**

It is the purpose of this Easement to ensure that the Preserve will be retained forever in an open space condition and to prevent any use of the Preserve that will impair or interfere with the Conservation Values of the Preserve.  Grantor intends that this Easement (i) will assure that the Preserve will be used for such activities as are consistent with the purpose of this Easement and (ii) shall be implemented consistently with the Plan.

2.   **RIGHTS OF GRANTEE**

A.  To accomplish the purpose of this Easement, the following rights are conveyed to Grantee by this Easement:

B.  To preserve and protect, restore and/or enhance the Conservation Values of the Preserve in a manner consistent with the Open Space Management Plan;

C.  To enter upon and traverse all portion of the Preserve at all times in order to have access to the Preserve and to monitor Grantor's compliance with and otherwise enforce the terms of this Easement and to fulfill duties detailed in the Open Space Management Plan and the Mitigation and Monitoring Plan, provided that such entry shall not unreasonably impair or interfere with

Grantor's use and quiet enjoyment of the Preserve or unreasonably disturb natural resources in the Preserve;

D.  Subject to the exceptions contained herein, to prevent any activity on or use of the Preserve that is inconsistent with the purpose of this Easement and to require the restoration of such Area or features of the Preserve that may be damaged by any inconsistent activity or use; and

E.  To conserve and protect all mineral, air, water and groundwater rights required to protect and to sustain the biological resources of the Preserve.

3. **PRESERVATION, MAINTENANCE, AND MANAGEMENT OF PRESERVE**

A.  Nature of the Preserve, Generally.  The Preserve serves for the protection of wildlife corridors, water quality and drainage detention, and contains an actively managed detention basin which flows into the seasonal wetland. Grantor intends that the Preserve be utilized and maintained in such a manner as to preserve and protect the natural features and resources of the area. The Preserve is delineated on **Exhibit B**. The Preserve shall be an area encumbered by an Easement in favor of the Preserve Manager for the purposes of access to and protection, conserving and preserving in perpetuity the Preserve.

B.  Conservation Easement.  Grantor, with recordation of this Easement is granting to California Open Lands ("Grantee") the ability to ensure enforcement of the rules and regulations regarding the Preserve.

C.  Open Space Management Plan.  The Preserve shall have controlled access and the storm-water detention basin will be actively managed by Butte County Department of Public Works, as outlined in the Plan.

D.  Preserve Manager.  The Preserve Manager shall perform such preservation and the maintenance of the Preserve as set forth in the Plan.

E.  Monitoring Biologist  The Grantee shall retain a competent biologist (the **"Monitoring Biologist"**), professionally trained in matters related to the conservation and preservation of natural resource values, to undertake an annual field review and prepare an annual report, as set forth in Section 3.F, with respect to the Status of the Preserve.  Any appointment of a Monitoring Biologist shall be made only after review of the professional background and qualifications of the proposed Monitoring Biologist by, and with the express written consent of, the Preserve Manager.

F.  Monitoring and Reporting Activities
The Monitoring Biologist shall twice yearly conduct a biological inspection for the duration of 5 years; if the project is successful then the biological inspections will be reduced to once yearly and a report will be kept on file, as

outlined in the Plan. The Preserve Manager shall twice yearly conduct a general inspection for the duration of 5 years; if the project is successful then the biological inspections will be reduced to once yearly and a report will be kept on file, as outlined in the Plan.

H. <u>Annual Report</u>. By December 31st each year, the Monitoring Biologist shall deliver to the Corps, a report regarding the status of the Preserve. This report shall contain:

1.   A map showing the project location;

2.   Photographs documenting the status of the Preserve;

3.   A narrative summarizing the general condition of the Preserve;

4.   A description of actions for which Corps approval or notification was not needed.

5.   Any recommendations regarding remedial actions or management activities.

I. <u>Maintenance and Repair.</u>  Maintenance and repair of existing and proposed structures and improvements shall be the responsibility of Butte County Department of Public Works, according to the Plan.

## 4.   PROHIBITED ACTIVITIES

The following activities are prohibited as outlined in federal Section 404 permit No. 200300113 (herein called "**Permit**") (**Exhibit D**) or as outlined in the Plan. No person shall engage in any of the following restricted activities in the Preserve unless that activity is in the future approved by the Corps:

A. Planting, landscaping, plowing, or cultivation of the Preserve or any portion of such area, shall be done or permitted except for the purpose of enhancing the Preserve through the planting of local native plant species. The irrigation of these plantings will be done in a manner that does not adversely affect the hydrology of any wetlands within the Preserve;

B. Planting, introduction, or dispersal of non-native or exotic plant species or animal species;

C. No materials or debris shall be stored or placed (whether temporarily or permanently) within the Preserve or any portion of such area;

D. Portions of the Preserve serve as a settling basin, an area of calmer water designed to allow sediments suspended in moving water to settle into an area that can be easily managed with dredging activities. However, no discharge

of any dredge or fill material shall be done or permitted within the wetland portion of the Preserve;

E.  No discharge, dumping, disposal, storage or placement of any soil, ashes, trash, refuse, fuel, rubbish, grass clippings, cuttings, bio-solids, or other waste materials shall be done or permitted within the Preserve or any portion of such area;

F.  Excavating, dredging, or removing loam, gravel, soil, rock, sand, or other material;

G.  Leveling or grading or otherwise altering the general topography of the Preserve or any portion of such area unless required to assure success of wetland establishment;

H.  No pesticides, rodenticides, or other chemicals shall be used within the Preserve;

I.  No mowing, grazing, or discing within the Preserve;

J.  Destruction or removal of any natural tree, shrub or other vegetation, that exists upon the Preserve shall be done or permitted except as provided in the Plan;

K.  No motorized vehicles shall be ridden, brought, used or permitted on any portion of the Preserve, except as provided for in the Plan or with prior written approval by the Corps;

L.  Roads, utility lines, firebreaks, trails, benches, equipment storage, buildings, billboards, signs, or other structures or activities.

M.  Granting use of the land to any third party for off-road vehicle use;

N.  Legally subdividing the Preserve, recording of a subdivision plan, partition, or any other division of the Preserve into two or more parcels;

O.  Paving or otherwise covering of the conservation Property with concrete, asphalt, or any other impervious paving material.  With the exception of maintenance to existing paved areas;

P.  Transferring any appurtenant water right required to maintain and restore the biological resources of the Preserve;

Q.  Granting surface entry for the exploration or extraction of minerals without approval by the Corps;

R.  Any and all other uses which may adversely affect the purposes of this Easement.

5.  **GRANTOR'S DUTIES**

Grantor shall undertake all reasonable actions to prevent the unlawful entry and trespass by persons whose activities may degrade or harm the Conservation Values of the Preserve.  In addition, Grantor shall undertake all necessary actions to perfect Grantee's rights under Section 2 of this Easement.

6.  **RESERVED RIGHTS**

Grantor reserves to itself and to its personal representatives, heirs, successors, assigns, agents, and present and potential future lessees, all rights accruing from its ownership of the Preserve including, but not limited to: (i) the right to engage in or invite others to engage in activity on or use of the Preserve for the purpose of construction of the Project in accordance the terms and conditions of U.S. Army Corps of Engineers Permit No. 200300113, including, without limitation, active management of the upstream detention pond; (ii) the right to engage or invite others to engage in activity on or use of the Preserve for the purpose of complying with the requirements of any governmental permits or authorizations including, but not limited to, those granted pursuant to the Federal Endangered Species Act, the California Endangered Species Act, Section 404 of the Clean Water Act or Section 1603 of the California Fish and Game Code; (iii) the right to engage in or invite others to engage in all uses of the Preserve that are not expressly prohibited herein and are not inconsistent with the conservation purposes of the Easement, such as the right to conduct maintenance activities in stormwater facilities located in the Preserve.

7.  **REMEDIES**

A.  Enforcement Rights.  If Grantee or Grantor determines that there is a violation of the terms of this Easement or that a violation is threatened, such party shall give written notice to the other parties of such violation and demand corrective action sufficient to cure the violation and, where the violation involves injury to the Preserve resulting from any use or activity inconsistent with the purpose of this Easement, to restore in accordance with the Plan, the portion of the Preserve so injured.  If a party fails to cure a violation within thirty (30) days after receipt of written notice thereof from the other party, or under circumstances where the violation cannot reasonably be cured within a thirty (30) day period, or fails to continue diligently to cure such violation until finally cured, the aggrieved party may bring an action at law or in equity in a court of competent jurisdiction to enforce the terms of this Easement, to enjoin the violation, ex parte as necessary, by temporary or permanent injunction, to recover any damages to which it may be entitled for violation of terms of this Easement or injury to the Conservation Values protected by this Easement, including damages for the loss of aesthetic ecological educational,

historical, recreation or scientific values and to require the restoration of the Preserve pursuant to the Plan to the condition that existed prior to any such injury. If a party, in its good faith and reasonable discretion, determines that circumstances require immediate action to prevent or mitigate significant damage to the Conservation Values of the Preserve, such party may pursue its remedies under this paragraph without prior notice to the other party or without waiting for the period provided for the cure to expire. Each party's rights under this paragraph apply equally in the event of either actual or threatened violations of the terms of this Easement, and each party agrees that the other party's remedies at law for any violation of the terms of this Easement are inadequate and that such party shall be entitled to the injunctive relieve described in this paragraph, both prohibitive and mandatory, in addition to such other relief to which such party may be entitled, including specific performance of the terms of this Easement, without the necessity of proving actual damages or the inadequacy of otherwise available legal remedies. Each party's remedies described in this paragraph shall be cumulative and shall be in addition to all remedies now or hereafter existing at law or in equity. Furthermore, the provisions of California Civil Code section 815 *et. seq.* are incorporated herein by this reference and this Easement is made subject to all of the rights and remedies set forth therein. If at any time in the future Grantor or Grantee or any subsequent transferee or assignee uses or threatens to use the Preserve for purposes not in conformance with the provisions of this Easement, or releases or abandons this Easement in whole or in part, notwithstanding California Civil Code section 815 *et. seq.*, the California Attorney General, or any entity organized for conservation purposes shall have standing as interested parties, and as third party beneficiaries in any proceeding affecting this Easement.

B. <u>Cost of Enforcement</u>. Reasonable costs incurred by any party enforcing the terms of this Easement, including without limitation, costs of suit and attorneys' fees, and any costs of restoration necessitated by a violation of the terms of this Easement shall be borne by the breaching party. If a party prevails in any action to enforce the terms of this Easement, such party's costs of suit including, without limitation, attorneys' fees, shall be borne by the other party.

C. <u>Parties Discretion</u>. Enforcement of the terms of this Easement shall be at the discretion of the respective parties, and any forbearance by Grantor or Grantee to exercise their rights under this Easement shall not be deemed or construed as a waiver by Grantor or Grantee of such term or of any subsequent breach of the same or any other term of this Easement or of any of their rights under this Easement. No delay or omission by Grantor or Grantee in the exercise of right or remedy upon any breach by Grantor or Grantee shall impair such right or remedy or be construed as a waiver.

D. <u>Acts Beyond Parties' Control</u>. Nothing contained in this Easement shall be construed to entitle any party to bring any action against Grantor or Grantee

for any injury to or change in the Preserve resulting from causes beyond their control, including, without limitation, fire, drought, flood, storm, and earth movement.

**8.   ACCESS**

Grantee, its successors, assigns, agents, invitees and licensees shall have the right to access the Preserve during the landfill hours of operation unless other arrangements are made.

**9.   COSTS AND LIABILITIES**

Except as set forth in this Easement, or as otherwise agreed in writing between the parties hereto, Grantor retains all responsibilities related to the ownership of the Preserve.  Preserve Manager (also the Grantor) assumes all responsibilities related to the operation, upkeep, and maintenance of the Preserve outlined in the Plan.

A.  <u>Taxes</u>: Grantor shall pay before delinquency all taxes, assessments, fees, and charges of whatever description levied on or assessed against the Preserve by competent authority, including any taxes imposed upon, or incurred as a result of, this Easement, and shall furnish Grantee with satisfactory evidence of payment upon request.

B.  <u>Hold Harmless</u>:  Grantor or its successors shall hold harmless, indemnify, and defend Grantee and its members, directors, officers, employees, agents and contractors and the heirs, personal representatives, successors, and assigns of each of them (collectively "**Grantee Indemnified Parties**") from and against all liabilities, penalties, costs, losses, damages, expense, causes of action, claims, demands, or judgments, including without limitation, reasonable attorney's fees, arising from or in any way connected with: (1) injury to or the death of any person, or physical damages to any property, resulting from any act, omission, condition or other matter occurring on the Preserve, unless caused by the acts or omissions of any of the Grantee Indemnified Parties; and (2) the existence or administration of this Easement, unless caused by the acts or omissions of any of the Grantee Indemnified Parties.

Grantee or its successor shall hold harmless, indemnify, and defend Grantor and its members, directors, officers, employees, agents and contractors and their heirs, personal representatives, successors, and assigns of each of the Grantor Indemnified Parties from and against all liabilities, penalties, costs, losses, damages, expense, cause of action, claims, demands, or judgments, including without limitation, reasonable attorneys' fees, arising from or in any way connected with the administration of this Easement, unless caused by the acts or omission of any of the Grantor Indemnified Parties.

## 10.   ASSIGNMENT

This Easement is transferable, but Grantee shall give Grantor and the Corps at least 30 days' prior written notice of the transfer.  Grantee may assign its rights and obligations under this Easement only to an organization that is 1) approved by the Grantor and the Corps; and, 2) a public agency or a qualified organization at the time of transfer under Section 170(h) of the Internal Revenue Code of 1986, as amended (or any successor provision then applicable), and the applicable regulations promulgated there under; and 3) authorized to acquire and hold Conservation Easements under California Civil Code §815 et seq. (or any successor provision then applicable).  As a condition of such assignment or transfer, the Assignee or Transferee shall agree in writing that the conservation purposes that this Easement is intended to advance shall continue to be fulfilled and that the Plan will be followed.  In the event of the termination of Grantee's existence, the rights and obligations of Grantee hereunder shall, by that fact itself, and without any further action on the part of any entity, be deemed assigned to an entity approved by the Corps.

## 11.   SUBSEQUENT TRANSFERS

Grantor agrees to incorporate the terms of this Easement in any deed or other legal instrument by which Grantor divests itself of any interest in all or a portion of the Preserve, including without limitation, a leasehold interest.  Grantor further agrees to give written notice to the Grantee and the Corps at least fifteen (15) days prior to the date of any Preserve transfer.  The failure of Grantor to perform any act required by this paragraph shall not impair the validity of this Easement or limit its enforceability in any way.

## 12.   CONDEMNATION

The habitat conservation purposes are presumed to be the best and most necessary public use as defined at California Code of Civil Procedure section 1240.680 notwithstanding California Code of Civil Procedure section 1240.609 and 1240.700.

## 13.   ESTOPPEL CERTIFICATES

Upon request by Grantor, Grantee shall within 15 days execute and deliver to Grantor any document, including an estoppel certificate, which certifies Grantor's compliance with any obligation of Grantor contained in this Easement and otherwise evidences the status of this Easement, as may be requested by Grantor.

## 14.   NOTICES

Any notice, demand, request, consent, approval, or communication that the parties desire or is required to give to the others shall be in writing and either

serviced personally or sent by first class mail, postage prepaid, address as follows:

To Grantor:         Butte County Department of Public Works
                          7 County Center Drive
                          Oroville, CA 95965
                          Attn: Mr. Mike Crump

To Grantee:         California Open Lands
                          117 Meyers St, Suite 120
                          Chico CA, 95928
                          Attn: Erin Gaustad

To the United States Army Corps of Engineers:

                          United States Army Corps of Engineers
                          Sacramento Regulatory Branch
                          1325 J Street, 14th Floor
                          Sacramento, California 95814-2922

                          Attn: Chief, Sacramento Valley Office

or to such other address or the attention of such other officer as from time to time shall be designated by written notice to the other.

## 15.  FUNDING

Grantor has provided an escrow fund for the purposes of fulfilling all of Grantor's obligations. The Grantor will be responsible for the long-term operations, and maintenance of the Easement under the Open Space Management Plan. Funding shall be transferred to the appropriate transferee or assignee if the Easement is assigned or transferred.

## 16.  RECORDATION

Grantee shall promptly record this instrument in the official records of Butte County, California and may re-record it at any time as may be required to preserve its rights in this Easement.

## 17.  ADDITIONAL EASEMENTS

Grantor shall not grant any additional Easements, rights-of-way, or other interests in the Preserve, other than a fee or leasehold interest, undivided interest or security interest (mortgage or deed of trust), or grant or otherwise transfer to

any other person or entity or to other lands or otherwise abandon or relinquish any Waters associated with the Preserve without the prior written authorization of Grantee given through the Corps. Such authorization will be given unless the Corps, among other things, determines that the proposed interest will adversely impact the functions and values of waters of the U.S. within the Preserve. This paragraph shall not prohibit the transfer of a fee title or leasehold interest in the Preserve that is subject to the terms of this Easement. This paragraph shall also not prohibit the granting of future compatible utility Easements, as authorized by the Corps.

18.   **AMENDMENT**

This Easement may be amended by Grantor and Grantee only by mutual written agreement and with written approval of the Corps. Any such amendment shall be consistent with the purposes of this Easement and shall not affect its perpetual duration.

19.   **GENERAL PROVISIONS**

A.   Controlling Law. The interpretation and performance of this Easement shall be governed by the laws of the State of California, the Federal Clean Water Act, Federal Endangered Species Act, and other applicable Federal laws.

B.   Construction. Any general rule of construction to the contrary notwithstanding, this Easement shall be construed in favor of the grant to effect the Conservation Purpose of this Easement and the policy and purpose of California Civil Code §815 et seq. If any provision in this instrument is found to be ambiguous, an interpretation consistent with the purposes of this Easement that would render the provisions valid shall be favored over any interpretation that render it invalid.

C.   Severability. If any provision of this Easement, or the application thereof to any person or circumstances, is found to be invalid, the remainder of the provisions of this Easement, or the application of such provision to persons or circumstances other than those as to which it is found to be invalid, as the case may be, shall not be affected thereby.

D.   Entire Agreement. This instrument sets forth the entire agreement of the parties with respect to the Preserve, and supersedes all prior discussions, negotiations, understandings, or agreements related to this Preserve.

E.   No Forfeiture. Nothing contained herein will result in a forfeiture or reversion of Grantor's title in any respect.

F.   Successors. The covenants, terms, conditions, and restrictions of this Easement shall be binding upon, and inure to the benefit of, the parties

hereto and their respective personal representatives, heirs, successors, and assigns shall continue as servitude running in perpetuity with the Preserve.

G. <u>Captions</u>. The captions in this instrument have been inserted solely for convenience of reference and are not a part of this instrument and shall have no effect upon construction or interpretation.

H. <u>Counterparts</u>. The parties may execute this instrument in two or more counterparts, which shall, in the aggregate, be signed by both parties; each counterpart shall be deemed an original instrument as against any party who has signed it. In the event of any disparity between the counterparts produced, the recorded counterpart shall be controlling.

I. <u>Third-Party Beneficiary</u>: Grantor and Grantee acknowledge that the Corps is a third party beneficiary of this Easement with the right of access to the Easement property and the right to enforce all of the provisions of this Easement.

## 20.  **NO MERGER**

In the event the Preserve and the Easement are ever owned by the same entity, there shall be no express or implied merger by operation of law or otherwise. If any party should claim such a merger, the parties agree that any and all terms and conditions of this Easement shall be deemed covenants and restrictions upon the Preserve, which, shall run with the land according to California and/or other applicable law and otherwise exist in perpetuity.

IN WITNESS WHEREOF, Grantor grants, and Grantee accepts, this Easement the day and year first above written.

**GRANTOR:**                                      **GRANTEE:**

Butte County Department of Public Works           California Open Lands,
                                                  a California Non-Profit Corporation

By: _____                      By: _____
    MIKE CRUMP                                        ERIN LAUSTAD
    PUBLIC WORKS DIRECTOR                              EXECUTIVE DIRECTOR

**STATE OF CALIFORNIA**

County of Butte

On ___July 27 2007___, before me, __Betty Hunt Notary Public__,
        Date                         Name and Title of Officer (e.g., "Jane Doe, Notary Public")

Personally appeared ___Erin Gaustad_____,
                              Name(s) of Signer(s)

                        ✓  personally known to me
                        __ proved to me on the basis of satisfactory evidence to be
                           the person(s) whose name(s) is/are subscribed to the
                           within instrument and acknowledged to me that
                           he/she/they executed the same in his/her/their authorized
                           capacity(ies), and that by his/her/their signature(s) on the
                           instrument the person(s), or the entity upon behalf of
                           which the person(s) acted, executed the instrument.

                           WITNESS my hand and official seal.

                           _____
Place Notary Seal Above             Signature of Notary Public



BETTY HUNT
Commission # 1666306
Notary Public - California
Butte County
My Comm. Expires Jun 10, 2010

---

Neal Road Landfill                    14                    August 2006
Conservation Easement

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**

State of California

County of _Butte_ } ss.

On _September 26, 2007_ before me, _Jennifer G. Goff, Notary Public_
Date                 Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _Mike Crump_
                       Name(s) of Signer(s)

☑ personally known to me
☐ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Jennifer G. Goff_
Signature of Notary Public

JENNIFER G. GOFF
Commission # 1587589
Notary Public - California
Butte County
My Comm. Expires Jun 14, 2009

──────── **OPTIONAL** ────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _Perpetual Conservation Easement Grant_

Document Date: _September 24, 2007_      Number of Pages: _14_

Signer(s) Other Than Named Above: _Erin Gaustad_

**Capacity(ies) Claimed by Signer**

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

© 1999 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org    Prod. No. 5907    Reorder: Call Toll-Free 1-800-876-6827

EXHIBIT A – LEGAL DESCRIPTION OF "PRESERVE"

EXHIBIT "A"

APN 040-600-082

**CONSERVATION EASEMENT**

All that certain real property situate in the County of Butte, State of California, being a portion of Parcel 2 as shown on that certain map entitled "Parcel Map, a Division of Parcel 3 of Parcel Map B", as filed in Book 136 of Maps at pages 14 through 16, in the Office of the County Recorder of the County of Butte, State of California, and also being portion of the real property conveyed by Grant Deed from Nance Canyon Partners, L.P. to County of Butte as recorded September 30, 1996 under Serial No. 96-036116 in the Office of the Recorder, County of Butte, State of California, described as follows:

**COMMENCING** at the most northerly corner of Parcel 1 as shown on said parcel map entitled "Parcel Map, a Division of Parcel 3 of Parcel Map B", said corner laying on the westerly right-of-way line of Nance Canyon Drive, said point also lying on the easterly line of a 100' wide electrical easement as recorded in the Office of the County Recorder of the County of Butte, State of California in Book 322 of Official Records at page 145;

THENCE leaving said westerly right-of-way of Nance Canyon Drive South 41°19'22" East, along the easterly line of Parcel 1 a distance of 974.75 feet;

THENCE leaving said easterly line of Parcel 1, North 48°40'38" East a distance of 20.87 feet to the **TRUE POINT OF BEGINNING**;

THENCE, North 40° 20'14" West, a distance of 253.29 feet, to the beginning of a tangent curve to the right having a radius of 110.00 feet;

THENCE, northerly along said curve, through a central angle of 92°25' 27", for an arc distance of 177.44 feet;

THENCE, North 52°05'13" East, a distance of 397.04 feet, to the beginning of a tangent curve to the right having a radius of 60.00 feet;

THENCE, easterly along said curve, through a central angle of 82°16' 47", for an arc distance of 86.16 feet;

THENCE, South 45° 38'00" East, a distance of 354.77 feet, to the beginning of a tangent curve to the right having a radius of 80.00 feet;

THENCE, southerly along said curve through a central angle of 106°12' 40", for an arc distance of 148.30 feet;

THENCE, South 60° 34'40" West, a distance of 466.28 feet, to the beginning of a tangent curve to the right having a radius of 60.00 feet;

EXHIBIT "A"
Page 1 of 2

THENCE, westerly along said curve, through a central angle of 79°05'07", for an arc distance of 82.82 feet to the **TRUE POINT OF BEGINNING**. Containing 6.08 Acres, more or less

The bearing of South 41°19'22" East along said easterly line of Parcel 1, as shown on said parcel map, filed in Book 136 of Maps at pages 14 through 16 was taken as the basis of bearings for this description.

**END OF DESCRIPTION.**

Approved:

Michael Mays
Deputy County Surveyor
County of Butte, California

LICENSED LAND SURVEYOR
MICHAEL L. MAYS
No. 6967
EXP. 09/30/07
STATE OF CALIFORNIA

Date: 6-5-2006

EXHIBIT "A"
Page 2 of 2



LEGEND

FOUND MONUMENTS AS NOTED
FENCE
CONSERVATION EASEMENT
TRANSMISSION LINES
PROPERTY LINE
DIRT ROAD
TOP OF BANK

PORTION OF
APN 040-600-082
136 M 14
PARCEL 2
1996-036118

5/8 REBAR
R.C.E.28998

NANCE CANYON DR

COUNTY OF BUTTE PUBLIC WORKS

R= 110.00'
D=92°25'27"
L=177.44'

25.00'

S52°05'13"W   397.04'

R= 60.00'
D=82°16'47"
L=86.16'

2881.76'   S40°20'14"E   974.75'

S41°19'22"E   253.29'

APN 040-600-063
136 M 14
PARCEL 1

20.87'
N48°40'38"E

TPOB
R= 60.00'
D=79°05'07"
L=82.82'

SEDIMENTATION
BASIN

EASEMENT AREA 6.08 ACRES

N45°38'00"W   354.72'

TOP OF BANK

N60°34'40"E   466.28'

R= 80.00'
D=106°12'40"
L=148.30'

100.00'
322 O.R.145

5/8 REBAR R.C.E.28998

NEAL ROAD

P:\5485\DWG\5485bdry-new.dwg

DEPARTMENT OF BUTTE COUNTY PUBLIC WORKS

| DRAWN BY: A.C. | DATE: 5/29/06 |
| CHECKED BY: MM | SCALE: 1" = 100' |
| APPROVED: | |
| DIRECTOR OF PUBLIC WORKS | |

NEAL ROAD LANDFILL
CONSERVATION EASEMENT

APN: 040-600-082

EXHIBIT
"B"

SHEET 1 OF 1

42

## EXHIBIT B – MAP OF "PRESERVE"



Exhibit B.

**EXHIBIT C – NEAL ROAD LANDFILL OPEN SPACE PRESERVE MANAGEMENT PLAN FOR
"PRESERVE"**

# OPEN SPACE PRESERVE MANAGEMENT PLAN
## NEAL ROAD LANDFILL PRESERVE
### BUTTE COUNTY, CALIFORNIA

MAY 2006



PREPARED FOR

BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS
7 COUNTY CENTER DRIVE
OROVILLE, CALIFORNIA  95965

PREPARED BY



GALLAWAY
CONSULTING, INC.
115 Meyers Street, Suite 120, Chico, CA 95928
Phone(530)343-8327   Fax(530)342-1882

# OPEN SPACE PRESERVE
# MANAGEMENT PLAN

## NEAL ROAD LANDFILL PRESERVE
### BUTTE COUNTY, CALIFORNIA

MAY 2006

PREPARED FOR:

**BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS**
**7 COUNTY CENTER DRIVE**
**OROVILLE, CALIFORNIA 95965**

PREPARED BY:



GALLAWAY
CONSULTING, INC.
115 Meyers Street, Suite 120, Chico, CA 95928
Phone(530)343-8327   Fax(530)342-1882

# OPEN SPACE PRESERVE MANAGEMENT PLAN
# NEAL ROAD LANDFILL PRESERVE
# BUTTE COUNTY, CALIFORNIA

## Table of Contents

1.0 INTRODUCTION ........................................................ 1

    1.1 Setting.......................................................... 1
    1.2 Topography and Soils ................................. 5
    1.3 Biological Resources.................................. 5
    1.4 Native and Non-Native (Exotic) Plant Species ...................... 6
    1.5 Plan Goal ..................................................... 6

2.0 PRESERVE PERSONNEL ....................................... 7

    2.1 Preserve Manager..................................... 7
    2.2 Use of Qualified Personnel/Monitoring Biologist ................... 7
    2.3 Changes in Personnel................................. 8

3.0. RECREATION, EDUCATION, AND HABITAT RESTORATION .... 8

    3.1 Recreation.................................................. 8
    3.2 Habitat Restoration/Enhancement ........................ 8

4.0 CORPS NOTIFICATION ........................................... 9

    4.1 No Notification Required ............................. 9
    4.2 Notification ................................................. 9
    4.3 Review and Approval ................................. 9
    4.4 Activities Requiring a Permit ...................... 9
    4.5 Emergency Situations ................................ 10

5.0 LONG TERM MANAGEMENT OF THE PRESERVE ..................... 11

    5.1 Adaptive Management ............................... 11
    5.2 Preserve Management During Project Construction
        Or Adjacent Construction............................ 11
    5.3 Preserve Management Activities and Guidelines................. 12

6.0 LONG TERM MAINTENANCE OF STRUCTURES AND
    IMPROVEMENTS........................................................ 14

6.1  Signage .............................................................. 15
6.2  Maintenance Vehicle Access Roads ..................................... 15
6.3  Storm-water Detention Basin ............................................. 15
6.4  Firebreaks  ............................................................... 15

7.0  PROHIBITED ACTIVITIES WITHIN THE PRESERVE ................... 15

7.1  Access to the Preserve .......................................... 16
7.2  Vegetation Removal ............................................... 16
7.3  Burning and Dumping ............................................. 16
7.4  Disking .................................................................... 16
7.5  Additional Roads, Trails, Benches, and Utility Lines ............. 16
7.6  Equipment or Fuel Storage ...................................... 16
7.7  Topography ............................................................ 16
7.8  Pesticides and Chemical Agents ............................ 17
7.9  Motor Vehicle Use ................................................ 17
7.10  Construction ........................................................ 17
7.11  Non-Native Plants ............................................... 17

8.0  REMEDIATION/RESTORATION ACTIVITIES ............................. 17

8.1  Post Construction Remediation/Restoration ....................... 17
8.2  Restoration of Conservation Easement/Vandalism ............... 17
8.3  Timing/Process for Corrective Action ................................ 17

9.0  PRESERVE INSPECTIONS AND REPORTING ........................... 18

9.1  Schedule ............................................................ 18
9.2  General Inspections ............................................. 19
9.3  Biological Inspections .......................................... 20
9.4  Agency Monitoring/Inspections ............................. 21
9.5  Annual Reporting Requirements ........................... 21

10.0  PRESERVE OWNERSHIP AND FUNDING MECHANISM ........ 21

10.1  Preserve Owner ................................................. 21
10.2  Funding Mechanism ........................................... 21

11.0  REFERENCES ......................................................... 22

**Attachment A** U.S. Army Corps of Engineers Individual Permit

**Attachment B** Conservation Easement

**List of Tables and Figures**

**Tables**

1 Mitigation Guidelines for Construction ............................................... 18

**Figures**

1 Location Map .................................................................................... 2
2 Preserve Map.................................................................................... 4

## 1.0 INTRODUCTION

## 1.1 Setting

The Neal Road Landfill Open Space Preserve (Preserve) is located in an unincorporated portion of Butte County south of the City of Chico, California. The Preserve is approximately 3.00 acres in size. It is located within Section 15, T21N R2E, of the Hamlin Canyon California 7.5 minute quadrangle U. S. Department of the Interior, Geological Survey (USGS) (**Figure 1**).

### 1.1.1 Project History

The Butte County Department of Public Works (BCDPW) has proposed to expand the existing Neal Road Landfill. The purpose of the project is to provide additional landfill capacity for an anticipated increase in solid waste generation by the service areas of the landfill, which includes the unincorporated areas of Butte County, the Cities of Biggs, Chico, Gridley and Oroville, and the Town of Paradise. It is estimated that the capacity within the existing landfill would be reached in 2018. The BCDPW has completed the CEQA process, including an alternatives analysis, and the Neal Road Landfill Expansion Project Final EIR was recorded in January 2002 (SCH No. 2001062067).

The Neal Road Landfill expansion project would result in a vertical and horizontal expansion of the existing landfill. The landfill currently has a permitted disposal area of 101 acres. The proposed project would expand the current landfill operations to include a vertical expansion from a maximum elevation of 495 feet to approximately 500 feet and a lateral expansion of approximately 74 acres. At buildout, the landfill refuse footprint would be approximately 140 acres.

Within the expansion area a large wetland (4.94 acres) and 1,794 feet of ephemeral drainages (0.07 acres) have been delineated and verified by the U.S. Army Corps of Engineers (Corps). All of the features, which total 5.01 acres will be impacted by the proposed expansion project. The lateral expansion of the landfill will not result in the fill of these features. However, a storm-water detention basin, leachate pond, and green-waste compost facility are proposed in the area where jurisdictional features occur. These proposed projects will result in indirectly impacting or the direct fill of 5.01 acres of jurisdictional Waters of the United States. Indirect impacts will be caused by redirecting or intercepting drainage water that currently provides wetland hydrology.

The BCDPW has requested a permit from both the Regional Water Quality Control Board and the Corps to fill Waters of the United States that occur on-site. The BCDPW has requested an Individual permit and consideration for authorization through the Letter of Permission process. The permit was received from the Corps on December 9, 2003, permit number 200300113. Special Conditions of the permit included developing a mitigation and monitoring plan for the preserve, purchase off-site mitigation credits, creating 3.00 acres of wetland on-site, establishment of a



Figure 1.

buffer of native vegetation around the wetland, create a detailed preserve management plan, scheduled preserve inspections to insure proper function, and submit monitoring reports. The on-site and off-site mitigation elements result in a no-net-loss of wetlands and no loss of wetland functions on-site.

### 1.1.2  Surrounding Land Use

The study site consists of approximately 75 acres. The parcel is currently a landfill. The study site is located south of the City of Chico, north of Neal Road in an unincorporated portion of the County.

### 1.1.3  Regulatory Background

An individual permit authorization (Permit) for the Neal Road Landfill Project was obtained from the U.S. Army Corps of Engineers, dated, December 9, 2003 (Regulatory Branch #200300113) for the impacts to waters of the United States (including wetlands) anticipated as part of the project (**Attachment A**). A special condition of the Permit was the establishment of a long-term management plan for the portions of the project that contain preserved or mitigation wetlands or are to be restored, and the recordation of a Conservation Easement (**Attachment B**) over these areas protecting them from further development and establishing them as wildlife habitat in perpetuity. This document, the Neal Road Landfill Operations and Management Plan (Plan), fulfills that requirement.

### 1.1.4  General Preserve Description

The Preserve consists of a small portion of the overall landfill area, located in the southwest corner of the property (**Figure 2**). The total acreage of the Preserve is 3.00 acres of wetland area, with an additional 25 foot buffer.

- Wetland Compensation Area (3.00 acres): This area is where the Corps required 3.00 acres of seasonal emergent marsh habitat to be constructed. The constructed wetlands will be integrated with the actively managed in this area and overall management is the same as that for the Passive Open Space Areas.

Throughout this Plan, all restrictions, uses, monitoring, and management guidelines are assumed to apply to all of these units unless explicitly stated otherwise.

Figure 2

## 1.2 Topography and Soils

The wetland occurs within the Wafap-Hamslough complex. The Wafap component of this complex occurs on bars on low stream terraces, whereas the Hamslough component occurs within low stream areas where clays are deposited.  The parent material for the Hamslough component is clayey alluvium derived from volcanic rock over gravelly alluvium.  The existing wetland area occurs within the clay deposits on the alluvium terrace at the base of a historic drainage.  The landfill currently occupies the historic drainage that originally deposited parent clay material and supplied hydrology. A duripan typically exists within the Hamslough complex at 20-40 inches, which creates an impermeable layer. The run-off potential for this soil type is high and the soil is poorly drained.  (Soil and water table information provided by the Chico Natural Resource Conservation Service office).

## 1.3 Biological Resources

### 1.3.1 Created Habitats

The existing wetland, a seasonally wet clay-flat wetland, totaling 4.94 acres will be impacted.  Proposed mitigation measures include the creation of on-site seasonal wetland habitats totaling 3.0 acres.  The on-site wetland will occur within the same soil types and has been designed to provide additional wetland functions. Utilizing a combination of on and off-site mitigation the BCDPW mitigation goals are to mitigate the loss of seasonal wetlands at a ration of 1:1 that result in a no-net-loss of wetlands and no loss of wetland functions on-site.

The created wetland will provide more storage and attainment than the existing wetland.  A quantitative description of storage rates is not possible but a comparison of the topography of the existing wetland in relation to the design for the created wetland clearly indicate the created wetland has more capacity to store water.  Due to it's design and capacity the created wetland will intercept surface run-off, filter sediments, remove or retain inorganic compounds and thus will contribute to water quality improvement.  The created seasonal wetland will pond water during the winter and a portion of the growing season, which will provide habitat to resident and migrating wildlife. For additional information regarding the functions of the existing wetlands and expected functions of the mitigation wetlands see Appendix A, *Functional Assessment of Existing and Proposed On-site Mitigation Wetlands at the Neal Road Landfill, Butte County, CA. June 24, 2003.*

### 1.3.2 Special-Status Species

No species of concern, threatened, or endangered species were located within the project area during on-site surveys.

## 1.4 Native And Non-Native (Exotic) Plant Species

In several locations throughout this Plan, native and non-native plant species are mentioned. The following definitions of these terms have been included to assist the Preserve Manager in determining the status of plant species found in the Preserve.

### 1.4.1 Native Plants

For the purposes of this Plan, plants native to the Preserve will be defined as those plants believed by the scientific community to have been present in Butte County prior to the settlement of Europeans. The Jepson Manual can be a reference for determining if a plant is native or non-native. The Preserve Manager can consult with the Monitoring Biologist, local botanists, or the local chapter of the California Native Plant Society (CNPS) to determine if a plant should be considered native to the Preserve.

### 1.4.2 Non-Native (Exotic) Plants

Based on the above definition of plants considered to be native to the Preserve, there are several ways to view what a non-native plant is: there are plants that are not locally native (native to Butte County), plants that are not regionally native (native to Northern California), and then plants that are not native to California or the U.S.

### 1.4.3 Exotic Pest Plants

Exotic pest plants are plants that are not native, and additionally are invasive, replacing native vegetation or native habitats. The Monitoring Biologist and the Preserve Manager can refer to the species found on the California Exotic Pest Control Council (CalEPPC) List A, List B, and Red Alert List to assist them in determining if a plant is an exotic plant species of concern. The list can be found at http://www.caleppc.org/.

## 1.5 Plan Goal

The goal of this Plan is to ensure that the preserved and created wetland and upland habitats within the Preserve are maintained in good condition such that they will continue to support the flora and fauna that the Preserve were established to protect (Conservation Values), in perpetuity, and to define the specific methods necessary to meet this goal. Conservation Values are defined as the physical, biological, and environmental processes needed to maintain the Preserve. Specific management strategies designed to maintain the Conservation Values are discussed in Section 5.0.

In order to realize the Plan Goal, the following biological goals are established:

- Preserve the abundance and diversity of the native plant and animal species within the wetland, riparian, and oak woodland habitats.

- Protect the Preserve from the effects of adjacent land uses that may adversely impact the Preserve.
- Repair or restore any adverse condition within the Preserve that may affect or potentially affect the Preserve.

It should be noted that while it is the intent of this Operation and Management Plan to comply with the project's existing federal permits, if any discrepancies between this Plan and the federal permits exist, the federal permits override the Plan stipulations unless approved by the Corps where the jurisdiction is the Corps', or the Service where the jurisdiction is the Service's.

## 2.0 PRESERVE PERSONNEL

The Preserve Manager and qualified personel/monitoring biologist are primary personnel that will oversee, monitor and coordinate the maintenance of the Preserve. They are intended to work together as a team to accomplish the management of the Preserve by exchanging information, problem solving and generally having a proactive relationship.

### 2.1 Preserve Manager

The Preserve will be managed by BCDPW pursuant to the Conservation Easement (**Attachment B**), and this Plan. The BCDPW will manage and maintain the Preserve as outlined in this Plan and will designate a Preserve Manager. Funding for the perpetual management and care of the Preserve will be provided for by BCDPW as described under Section 10.0.

#### 2.1.1 Preserve Manager Responsibilities

The Preserve Manager's responsibilities and duties shall include but not be limited to:

- Maintaining signage.
- Coordinating trash removal.
- Conducting thatch/exotic plant management when necessary with qualified personnel.
- Reviewing monitoring data, and recommend and coordinate with the Corps for any remedial action.
- Maintain a Log for the Preserve. This Log will contain a record of all activities, correspondence and determinations regarding the Preserve.
- General Inspections of the Preserve as required by this Plan.
- Coordinating an annual Biological Inspection by a qualified biologist.
- Arrange for any corrective action necessary to ensure the performance of the habitat at the Preserve, as required by this Plan.

### 2.2 Use of Qualified Personnel/Monitoring Biologist

The Preserve Manager shall retain professional biologists, botanists or other types of specialists (the Qualified Personnel, including the Monitoring Biologist) to conduct

specialized tasks. The Monitoring Biologist, from California Open Lands, shall be familiar with California flora and fauna, and shall have knowledge regarding wetland species and their ecology.

### 2.2.1 Qualified Personnel/Monitoring Biologist Potential Responsibilities

Overall, duties of the Qualified Personnel may include but are not limited to:

- Wetland function and erosion monitoring tasks.
- Evaluating the accumulation of dead vegetative matter and recommending removal if needed.
- Evaluate the presence of newly introduced non-native (exotic) plant species and recommend management, if needed.
- Conducting the Biological Inspection, collecting data on the Preserve and preparing reports required by this Plan.
- Evaluating site conditions and recommending remedial action to the Preserve Manager.
- Assist in reviewing or planning restoration activities, use of the Preserve for education or other tasks such as grant proposals.
- Supervising and monitoring construction activities as set forth in Section 5.2, below.
- Monitor, inspect and report on the Preserve as set forth in Sections 9.1, 9.2, 9.3 and 9.5 below in order to facilitate Preserve management which complies with the requirements of this Plan.

## 2.3 Changes in Personnel

If the Preserve Manager or the Qualified Personnel are changed, the outgoing and incoming personnel will tour the Preserve together, and the former will advise the latter of trends, problem areas, and any administrative difficulties.

## 3.0 RECREATION AND HABITAT RESTORATION

## 3.1 Recreation

There will be no public access of any kind, to the preserve.

## 3.2 Habitat Restoration/Enhancement

In the future the Preserve Manager may want to conduct additional habitat restoration or enhancement within the Preserve. This could include the removal of non-native (exotic) plant species (see Section 5.3.3), planting native plants (see Section 1.4.1), or other restoration activities. Restoration activities that involve work in wetlands or waters of the U.S., may require a permit under Section 404 of the Clean Water Act, and/or a Streambed Alteration Agreement from the California Department of Fish and Game (CDFG). The Preserve Manager will not need to notify the Corps if restoration activities do not require a permit from the Corps; however, these activities will be

reviewed by the monitoring Biologist and will be described in the Annual Report. If there is a question regarding whether a restoration activity will require a Corps permit, the Preserve Manager should seek guidance from the Corps.

## 4.0 CORPS NOTIFICATION

The Corps has expressed a desire to be notified when certain management and maintenance activities are undertaken within the Preserve. It is also recognized that the Preserve Manager needs be able to carry out management and maintenance activities in a timely and responsive manner. Therefore the following notification requirements have been defined:

### 4.1 No Notification Required

If an activity in this Plan does not have a specific requirement for notification, is not a Prohibited Activity (see Section 7.0), review and approval or a permit is not required, then no notification is required. If an activity was not anticipated by this Plan, and therefore is not mentioned, Corps review and approval is required.

### 4.2 Notification

For those activities noted in this Plan as requiring Corps notification, the following action will be taken. All efforts will be made to outline the activities for the coming year in the annual letter report, which is submitted by December 31st of each calendar year. If this is not possible, then the Preserve Manager will submit a separate letter to the Corps. Either will include a written description of the activity, including when the activity will take place and what methodology will be used, as well as a map showing what areas will be targeted.The Corps will have 30 days to contact the Preserve Manager to discuss the activity if the Corps does not approve. If the Preserve Manager is not contacted within 30 days, then the activity will be considered approved. Notification will be made either by fax, email, registered mail, or overnight transmittal.

### 4.3 Review and Approval

For those activities noted in this Plan as requiring Corps notification, the following action will be taken. All efforts will be made to outline the activities for the coming year in the annual letter report, which is submitted by December 31st of each calendar year. If this is not possible, then the Preserve Manager will submit a separate letter to the Corps. Either will include a written description of the activity, including when the activity will take place and what methodology will be used, as well as a map showing what areas will be targeted.The Corps will have 60 days to review, discuss, and approve the activity. For these activities, the approval from the Corps must be written. Submittal of activities for review and approval as well as written approval back from the Corps will be made either by fax, email, registered mail, or overnight transmittal.

### 4.4 Activities Requiring a Permit

Some of the activities mentioned in this plan have the potential to "impact" wetlands or waters of the U.S.  The term "loss of waters of the U.S.", which is the closest term defined in the Federal Register to "impact", is defined on page 2094 of the Federal Register, Volume 67, No. 10 / Tuesday, January 15, 2002 / Notices, as follows:

> Waters of the U.S. that include the filled area and other waters that are permanently adversely affected by flooding, excavation, or drainage because of the regulated activity.  Permanent adverse effects include permanent above-grade, at-grade, or below-grade fills that change an aquatic area to dry land, increase the bottom elevation of a waterbody, or change the use of a waterbody.  The acreage of loss of waters of the U.S. is the threshold measurement of the impact to the existing waters for determining whether a project may qualify for a NWP; it is not a net threshold calculated after considering compensatory mitigation that may be used to offset losses of aquatic functions and values.  The loss of stream bed includes the linear feet of stream bed that is filled or excavated.  Waters of the U.S. temporarily filled, flooded, excavated, or drained, but restored to preconstruction contours or elevations after construction, are not included in the acreage or linear foot measurements of loss of waters of the U.S. or loss of stream bed, for the purposes of determining compliance with the threshold limits of the NWPs.

The purpose of this section is to clarify, that while this Plan may call out the maintenance activities as allowed in the Preserve, this does not mean that the activity does not require a separate authorization (permit) under Section 404 of the Clean Water Act.  Also, if a project will not result in the permanent loss of wetlands or waters of the U.S., only temporary loss or "impact", a permit is still required.  Specific maintenance activities may also qualify for the Clean Water Act Section 404(f) exemption for maintenance.  If there is a question regarding whether a maintenance activity will require a Corps permit, the Preserve Manager should seek guidance from the Corps.

Some of these activities may also need a Streambed Alteration Agreement from the CDFG.  Pursuant to Section 1600- of the California Fish and Game Code, the CDFG requires entities obtain a Streambed Alteration Agreement for activities affecting the bed, bank, or channel of a lake, river, stream, or drainage, as defined by CDFG.

## 4.5 Emergency Situations

Should an emergency situation arise that requires immediate action in an upland area, and would normally require that the Corps be notified or have review and approval authority, the Corps will be notified verbally within forty-eight (48) hours, with written confirmation of the actions taken within one (1) week.  In these situations, "emergency" is a situation which would result in an unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship.

Should an emergency situation arise that requires immediate action in a wetland or waters of the U.S., but would normally require that a permit be obtained from the

Corps, the following applies as stated in the Code of Federal Regulations, Title 33, Chapter II, Part 325, Section 325.2 - Processing of Applications:

> Emergency procedures - Division engineers are authorized to approve special processing procedures in emergency situations. An "emergency" is a situation which would result in an unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship if corrective action requiring a permit is not undertaken within a time period less than the normal time needed to process the application under standard procedures.

California Fish and Game Code Section 1600- also has emergency procedures stipulations that may apply.

## 5.0  LONG TERM MANAGEMENT OF THE PRESERVE

### 5.1  Adaptive Management

In preparing a management plan for habitat to be preserved in perpetuity, it must be acknowledged that there will undoubtedly be future developments in habitat and species management that may affect how the Plan Goal is met. This management plan can only provide guidance for adopting new technologies or practices as they are developed. Ultimately, the Preserve Manager in coordination with the Monitoring Biologist, and the Corps, must determine the appropriate management decision for a given situation. The following management strategies, approved uses, and restrictions are intended to provide a framework for the long-term management and operation of the Preserve. Before considering any management action, the Preserve Manager must consider the Plan Goal, which is to ensure that the protected wetland and upland habitats within the Preserve are maintained in good condition such that it will continue to support the flora and fauna of the uplands and wetlands, in perpetuity. Furthermore, this Plan cannot anticipate all possible site conditions. Therefore, if a condition arises which is not specifically addressed by this plan, the Preserve Manager may upon review and approval by the Corps, adopt techniques not described here.

### 5.2  Preserve Management During Project Construction or Adjacent Construction

In general, when there is any construction within a portion of the Preserve or adjacent to the Preserve, the following protection measures will be implemented:

- The minimum necessary construction area will be used.
- The Monitoring Biologist will set construction limits that do not encroach on any preserved wetlands.
- The limits of the construction area will be delineated using high visibility construction fencing.
- If appropriate, a Storm-water Pollution Prevention Plan (SWPPP) will be prepared and best management practices will be adopted to control sediment and erosion

during construction.

- The Monitoring Biologist will attend pre-construction meetings and brief contractors on the location of wetland features or other sensitive habitats.
- The Monitoring Biologist will also conduct a post-construction inspection to determine if those conducting the construction need to do any post-construction remediation.

## 5.3  Preserve Management Activities and Guidelines

The following outlines management and maintenance activities that are allowed within the Preserve.

### 5.3.1  Authorized Access

The intent of the Preserve is to maintain the habitats of these areas in perpetuity. Limited off-trail access to the Preserve by the Preserve Manager will further this goal.  Off-trail pedestrian access to the Preserve should be discouraged through signage, and outreach activities.  Access to the Preserve for maintenance activities is allowed, but should be restricted to the immediate area where maintenance is occurring.  Access to the Preserve in emergency or law enforcement situations, by medical, fire or law enforcement personnel or vehicles is allowed.

### 5.3.2  Non-native Plant Species Management

It is unreasonable to require or expect eradication of established exotic species at the site.  The required management of non-native plants will therefore be limited to the management of newly introduced exotic pest plants and controlling the spread of existing exotic pest plant populations that are a threat to the Conservation Values. The Monitoring Biologist and the Preserve Manager can refer to the species found on the California Exotic Pest Control Council (CalEPCC) List A, List B, and Red Alert List to assist them in determining if a plant is an exotic plant species of concern, and which species should be given priority for management.  Beyond management activities, if the Preserve Manager would like to pursue more extensive removal of non-native species through volunteer efforts or grant funding, that is encouraged.

In addition to the Preserve Manager looking for these four target species and others during the General Inspections, the Monitoring Biologist will also assess the presence of any newly introduced exotic pest plant species during the Biological Inspections and recommend removal as needed.  Three methods of removing or controlling these species are outlined below:

#### 5.3.2.1  Hand/Mechanical Removal

Hand removal or use of small hand powered or handheld equipment (such as a Weed Wrench or a chainsaw) should always be the preferred method of removing exotic pest plant species from the Preserve.  If hand removal methods are tried and found to be ineffective, or the problem is too widespread for hand

removal to be practical, then mechanical methods (use of larger equipment with motors such as mowers) or biological controls as described below can be implemented. The Preserve Manager does not need to notify the Corps if removal will be done by hand, hand held equipment, or with a mower. The Corps will be notified if large equipment other than a mower is used.

### 5.3.2.2   Biological Controls

There are several natural enemies of yellow star thistle that have been introduced from Europe to act as biological controls against this invasive species. The insects develop within the seed head of the flower and develop there, feeding on the seeds. County Agricultural Commissioner would be the point of contact for use of these biological controls within the Preserve. The Agricultural Department currently (2002) does have a limited program for providing the hairy weevil for biological control, and should be contacted if it is determined that star thistle control is needed.

Currently, there are studies taking place on the effectiveness of the milfoil weevil in controlling populations of Eurasian milfoil. Care should be taken in identifying milfoil if it becomes problematic, as there are several species of milfoil native to California.

There are no biological controls currently available for Himalayan blackberry or tree of heaven.

If biological control methods are tried and found to be ineffective or if biological control methods are not available for the target species, then herbicides can be used, but only as outlined below. The Corps will be notified if biological controls will be used in the Preserve.

### 5.3.2.3   Use of Herbicides for Non-Native/Exotic Pest Plant Management

Herbicides can be used only for the management of Yellow star thistle, Himalayan blackberry, tree of heaven, Eurasian watermilfoil. List chemical to be used. They must be applied according to the label. This approval does not obviate the need for the Preserve Manager to obtain any other applicable approvals for the use of these chemicals. **None of these chemicals can be used within 25 feet of wetland habitat.** Unless the herbicides used to control these species varies from that described in this section, the Preserve Manager will not need to notify the Corps. However, any actions taken will be described in the Annual Report. If the Preserve Manager believes that the use of a new herbicide, or use one of the herbicides listed above on a new species is warranted, Corps approval must be obtained.

### 5.3.3   Altered Hydrology

In order to the maintain hydrology of the Preserve, the Preserve Manager will take steps to prevent the property owner or adjacent developments adjoining the Preserve from directing the natural flow of drainage, landscaping, and storm-water runoff from their property onto the Preserve unless it was an original design feature of this project. This is especially true in smaller, urban preserves (Clark and others 1998). See **Figure 2** – Drainage Restriction Area for the edges of the Preserve that should not receive any additional drainage from off-site. This does not preclude the use of irrigation for the establishment period for the native plantings.

### 5.3.4 Mosquitoes

If mosquito control is necessary, the local Mosquito Vector Control District will be consulted to select control mechanisms that are the least damaging to the Preserve's habitats. A plan outlining those mechanisms will be submitted to the Corps for review and approval.

### 5.3.5 Beaver Management

The Preserve Manager will be responsible for assessing the beaver population within the Preserve. If beaver dams become established, the Preserve Manager should consult with the Monitoring Biologist to determine if it is best to leave the beavers alone as they are a natural part of the ecosystem, install beaver baffling devices and allow the beavers to remain, breach the beaver dam, or if removal of the beavers is appropriate. The use of beaver baffling devices is allowed. If the Preserve Manager determines removal is appropriate, the Preserve Manager will work with the local California Department of Fish and Game to trap and relocate or hunt the beaver population. The Corps will be notified regarding beaver management.

### 5.3.6 Trash Removal

The Preserve Manager will remove accumulations of trash and other unwanted debris from the Preserve periodically.

## 6.0 LONG TERM MAINTENANCE OF STRUCTURES AND IMPROVEMENTS

(Structures in preserve areas are discouraged. In the instances where they have been authorized, include descriptive text outlining their placement and maintenance. The following section outlines some example text for when structures must be placed in the preserve.) The following paragraphs outline the allowed maintenance of structures and improvements present within the Preserve. Vegetation removal type maintenance (e.g., mowing vegetation along underground sewer line alignments) associated with these structures is not allowed unless explicitly stated below. **If maintenance or replacement activities associated with these structures will impact preserved wetlands or waters of the U.S., the Corps will be notified and any appropriate permits will be obtained (see Section 4.4).** If wetlands or waters of the U.S. will not be impacted by maintenance or replacement of any of these structures or improvements, then the Preserve Manager will review the plans for the activity to be

sure that as little disturbance to the Preserve occurs as possible, but the Corps will not have to be notified. These activities will be described in the annual letter report to the Corps. In addition, disturbed areas will be restored (see Section 8.0).

## 6.1 Signage

Signage will be installed at Preserve to inform the public of the presence of the Preserve. The Preserve manager will be responsible for the maintenance and replacement of the signage.

## 6.5 Maintenance Vehicle Access Roads

There are two maintenance vehicle access roads that are 10 feet wide decomposed granite. These allow access to the overhead transmission line towers. Routine maintenance activities such as adding more decomposed granite and mowing two feet on either side of the maintenance vehicle access roads are allowed. Chemicals will not be used on the maintenance vehicle access roads.

## 6.6 Storm-water Detention Basin

As part of the project development, it is anticipated that a storm-water detention basin will be created within the Preserve (**Figure 2**). The basin will only be constructed such that it doesn't affect any jurisdictional waters of the U.S. The storm-water detention basin will be designed to catch flow and flow over the berm into the wetland during times of high water. This will act to dissipate flows, minimize erosion, and to allow some passive treatment of water before it enters the preserved wetlands/waters of the U.S. Maintenance or repair activities for drainage may occur as needed but must not alter the surrounding open space. If maintenance or replacement activities will impact preserved wetlands or waters of the U.S., the Corps will be notified and any appropriate permits will be obtained.

## 6.7   Fire Breaks

The berm surrounding the outside of the wetland and storm-water detention basin will act as a fire break. The berm at its thinnest point is approximately 20 feet wide. The Corps requires that a survey for ground nesting birds be conducted if firebreaks are to be cut before July 1st to eliminate impacts to these species. Therefore, the Preserve Manager will be responsible for arranging for a ground nesting bird survey to be conducted each year prior to the mowing of firebreaks. Firebreaks may be mowed (not disked) such that vegetation is 2 inches high or less. Appendix A, number 6, states that firebreaks are to be avoided. The approval of this document by the Corps supersedes the actual permit.

## 7.0 PROHIBITED ACTIVITIES WITHIN THE PRESERVE

This section outlines the restrictions on activities that can take place in the Preserve. It is understood that the following activities are prohibited, except as needed to accomplish the above-mentioned management and maintenance activities or as

described below.  Additionally, if any of these activities must be undertaken due to special circumstances, they may be reviewed and approved by the Corps on a case-by-case basis.

## 7.1  Access to the Preserve

The intent of the Preserve is to maintain the habitats of the Preserve in perpetuity. Limited access to the Preserve will further this goal.  Pedestrian access to the Preserve should be discouraged through signage.  See Section 5.3.1 for a description of authorized access.  All other off-trail access to the Preserve is not allowed.

## 7.2  Vegetation Removal

No killing, removal, or alteration of any existing native vegetation will be allowed in the Preserve except as described in this Plan.

## 7.3  Burning and Dumping

No burning or dumping of rubbish, garbage or any other wastes or fill materials will be allowed in the Preserve.  The foregoing prohibition shall not be interpreted to prohibit controlled burning as a method of thatch management.

## 7.4  Discing

No discing can occur in the Preserve.

## 7.5  Additional Roads, Trails, Benches and Utility Lines

Roads, trails, benches and utility lines not called out in this Plan will not be allowed in the Preserve without approval from the Corps.

## 7.6  Equipment or Fuel Storage

There will be no equipment or fuel storage within the Preserve.

## 7.7  Topography

(Disturbance of the topography within in the Preserve for toes of slope, etc. is discouraged.  In instances where the preserve is wide enough to accommodate these activities and approval is obtained, revegetation is necessary.)

Once adjacent development is complete and areas within the Preserve that have been disturbed (as authorized by the Corps) have been revegetated (see Section 8.1), no alteration may be made to the existing topography of the Preserve.  This includes leveling or grading.  No exploration, development, or extraction of oil, gas or minerals may be made from the Preserve.

## 7.8 Pesticides and Chemical Agents

Except as needed for management of the habitat as outlined in this Plan or as approved by the Corps, there shall be no use of any pesticides, fungicides, insecticides or any other chemical agents used to kill or suppress plants, animals, or fungi in the Preserve.

## 7.9 Motor Vehicle Use

No motorized vehicles shall be ridden, brought, used, or permitted on any portion of the Preserve with the exception of the following.  Motorized vehicular use will be restricted to that required for Preserve maintenance purposes such as authorized mosquito abatement, bike trail repair or replacement, and for emergency or law enforcement situations requiring access by medical, fire or law enforcement vehicles.

## 7.10 Construction

Once the preserve is complete and the structures and improvements called out in this Plan are in place, no construction shall be allowed in the Preserve with the exception of the activities mentioned in this Plan.

## 7.11 Non-native Plants

No non-native plants will be planted in the Preserve.

## 8.0 REMEDIATION/RESTORATION ACTIVITIES

## 8.1 Post-Construction Remediation/Restoration

The replacement of the previously mentioned structures or improvements in the Preserve may require post-construction restoration.  These structures or improvements were originally permitted as part of the project through the Corps and CDFG.  For these cases, post-construction remediation/restoration means, for example, hydroseeding areas of the Preserve that were disturbed by equipment, restoring the original grade where the intent was not to alter it, cleaning up construction debris, and generally reverting the area back to pre-construction conditions (**Table 1**).

## 8.2 Restoration of Conservation Easement Violations/Vandalism

It is difficult to anticipate and provide a mitigation measure for all potential violations of the Preserve Conservation Easement; however, the following table outlines some potential violations and mitigation guidelines.  If a particular situation is not listed here, that does not mean that restoration is not required.  In these cases, determining an appropriate mitigation measure will be at the discretion of the Preserve Manager in coordination with the Monitoring Biologist.

## 8.3 Timing/Process for Corrective Actions

Minor corrective measures not requiring notification or approval of the Corps (e.g., prevention of unexpected runoff, prevention of unauthorized access to the area by placing locks on gates, etc.) will be carried out by the Preserve Manager within sixty (60) days, unless site conditions warrant delay (i.e., if soil is saturated and equipment

**Table 1. Mitigation Guidelines for Construction at the Neal Road Landfill Preserve, Butte County, California.**

| Type of Disturbance | Mitigation Guideline |
|---|---|
| Disturbance of Grassy Upland Areas | Restoration of grassy upland areas due to disturbance resulting in bare ground should include seeding the area with native grass seed and implementing the proper erosion control measures until bare ground becomes vegetated again. |
| Removal of Native Tree or Shrub Habitat | Restoration for the removal native trees or shrubs should result in the replacement of the habitat. This could be in the form of planting tree/shrub seeds or seedlings in an amount sufficient to ultimately result in the survival to maturity of the same number of trees or shrubs that were removed. Monitoring of the replacement plants should be done for at least one season. |
| Wetlands/Waters of the U.S. | Restoration for fill/loss of waters of the U.S. should result in the removal of fill from the feature, potentially the minor re-grading and revegetation of the feature (if appropriate) and monitoring for at least two seasons to gauge the feature's recovery. The Preserve Manager will contact the Corps if fill/loss of wetlands or waters of the U.S. has occurred and submit for review and approval what remediation/restoration is proposed (see Section 4.0). While the normal time period for the Corps to review and approve an action is 60 days, the Corps will make every effort to respond in a timely manner to requests regarding wetlands/waters of the U.S. so that restoration can be implemented at the appropriate time of year (e.g. before the rainy season). |
| Structures, Landscaping, Other Improvements, etc. | Any unauthorized structure, landscaping, or other improvement should be removed from the Preserve. If any of the above habitats was disturbed, mitigation will be required using the above mitigation measures as guidelines. |

would damage the upland habitat in the Preserve, it may be necessary to delay work until conditions improve). All other corrective actions will take place when conditions are best suited for restoration to occur, and after the Corps has been notified or the Preserve Manager has received approval.

## 9.0 PRESERVE INSPECTIONS AND REPORTING

### 9.1 Schedule

The monitoring/inspections described below are long-term activities to be carried out in perpetuity. Initially, success monitoring will be taking place at the site to monitor the created habitats to be sure that they are functioning properly. Once these created habitats have met the established success criteria set forth in the Mitigation and Monitoring Plan (Gallaway Consulting, Inc., January 2006) (the Mitigation and Monitoring Plan document is separate from this Open Space Preserve Management Plan)

and have been monitored twice yearly for five years, as required by the Corps, and have met their success criteria, this success monitoring will end. Once success monitoring ends inspections of the preserve will occur once a year. During this monitoring period for the created habitats, the success monitoring visits and success monitoring report can fulfill the obligation for the Biological Inspections and Annual Report required by this Plan. If there are years during the success monitoring period that no success monitoring takes place, then the Biological Inspections and Annual Report will be required. The General Inspections are required during the success monitoring period.

When required during the success monitoring period, and then in perpetuity, the schedule of inspections for the Preserve is as follows:

- The Monitoring Biologist shall conduct two Biological Inspections each year, one in April or May and one in September or October. Once project success is achieved monitoring will be reduced to once yearly.
- The Preserve Manager shall conduct (at minimum) two General Inspections each year, one in January and one in July. Once project success is achieved monitoring will be reduced to once yearly.

## 9.2  General Inspections

The Preserve Manager shall arrange for General Inspections conducted by the Monitoring Biologist in accord with Section 9.1 above, to ensure the integrity of the Preserve. Inspections will concentrate on an evaluation of the following factors: erosion, fire hazard reduction, condition of signage, trash accumulation, and evidence of unauthorized use by motor vehicles. The entire perimeter of the Preserve should be covered, as well as meandering transects through its interior. An Inspection Sheet will be utilized in order to evaluate the above criteria during each field visit. Previous inspection sheets should be reviewed before each visit in order to determine that a possible or recurring problem area is not missed. If any problems are identified, more frequent inspections will be done in order to closely track any problems as well as to ensure that remedial actions are effective. Evaluation and corrective actions for each factor are described below:

### 9.2.1  Erosion

If it is determined during the inspection that adjacent sheet-flow drainage is causing any erosion or other adverse effects upon the Preserve, immediate standard erosion control measures (such as the installation waddles) will be implemented. If any significant erosion problems occur, the Corps will also be notified and a qualified erosion control specialist will be consulted.

### 9.2.2  Fire Hazard Reduction

If at any time conditions at the Preserve become a fire hazard, the Preserve Manager will work with Corps and the local fire authorities to decide on the best method to reduce the fire risk at the Preserve.

### 9.2.3  Signage

The condition of the signage at the Preserve should be checked during the General Inspection.  The Preserve Manager will be responsible for maintaining the signage at the Preserve.

### 9.2.4  Trash Accumulation

The Preserve Manager will arrange for the removal of trash from the Preserve.

### 9.2.5  Unauthorized Motor Vehicle Use

The perimeter of the Preserve will be inspected for evidence of unauthorized motor vehicle use/access.  If necessary, corrective actions such as repairing locks and gates will be taken.

## 9.3  Biological Inspections

In order to  help ensure the long-term integrity of the wetland and upland habitats of the Preserve, measures must be taken to ensure that the existing conditions are maintained over the long term, including but not limited to inspections by a qualified biologist..

Biological Inspections of the Preserve shall be conducted by the Monitoring Biologist pursuant to Section 9.1 above, in order to monitor wetland function, thatch accumulation, newly introduced exotic species, and overall Preserve function.  The entire perimeter of the Preserve should be covered, as well as meandering transects through its interior.  The goal of these surveys is to ensure that the various habitat types are maintained in perpetuity.  The first inspection is intended to assess the various wetland habitats during the floristic season.  The second will be focused on upland habitats, problem areas, and assessing the success of restoration efforts or remediation activities. Although each of these surveys has a focus, all aspects of the Preserve will be reviewed during each visit.

### 9.3.1  Habitat Function

The purpose of assessing habitat function is to ensure that the created/preserved wetland and upland habitats are continuing have the appropriate hydrologic regime for that habitat type, monitor anthropogenic influences on the different habitats, and to informally document (make a species list as meandering transects are walked) the plant species that are present and animal species that are using the Preserve.

### 9.3.2  Newly Introduced Non-Native Plant Species

The biologist will assess the presence of any newly introduced or increasing populations of non-native plant species and recommend corrective actions as

needed.  Special attention will be paid to exotic pest plants.

### 9.3.3  Preserve Function

The overall Preserve function should be assessed, taking into account the above factors and the purpose of the Preserve, which is to support the flora and fauna of the wetlands and uplands in perpetuity.

## 9.4  Agency Monitoring/Inspection

The Corps (if applicable the U.S. Fish and Wildlife Service and the California Department of Fish and Game) may inspect and monitor the condition of the Preserve at any time.

## 9.5  Annual Reporting Requirements

The Monitoring Biologist shall prepare an Annual Report in conjunction with the Preserve Manager, that will be submitted to the Corps by December 31 of each year.  That letter report shall include at minimum, a map of the Preserve, photos documenting the status of the Preserve, a description of proposed activities and maintenance or management actions as required by this Plan, a description of actions for which Corps notification or approval was not needed, but were carried out during the year, observations from the Biological Inspections, and recommendations for altered management practices as needed.  The report will refer to the Corps regulatory branch number for the project, which is 200300113.

## 10.0  PRESERVE OWNERSHIP AND FUNDING MECHANISM

## 10.1  Preserve Owner

The entire Preserve will be owned by the Butte County Public Works Department.

## 10.2  Funding Mechanism

### 10.2.1  Conservation Easement Endowment

The annual cost of carrying out the tasks of the Preserve Manager have been determined through consultation with the BCDPW.   The amount needed yearly was determined by a maintenance cost analysis, with contingency costs of 10%.  The analysis lists a number of activities, structures, and overhead costs associated with the preserve management and allows the user to choose the tasks that apply.  These costs are then tabulated and can be printed out for budgeting purposes.  The total yearly maintenance cost is $33,753.00.  This budget was established based on estimated cost on the preliminary designs.

The cost of purchasing 2.01 acres of seasonal wetland habitat at the Sheridan Mitigation Bank was $90,450.00.

## 11.0 REFERENCES

Gallaway Consulting, Inc.  On-site Wetland Mitigation and Monitoring Plan Neal Road Landfill, Butte County, CA. November 2004.

Natural Resource Conservation Service.  Chico, CA.

# Appendix A

U.S. Army Corps of Engineers Permit

This Page Was Intentionally Left Blank



## Appendix B
Conservation Easement

This Page Was Intentionally
Left Blank

**EXHIBIT D – SECTION 404 PERMIT # 200300113**



**DEPARTMENT OF THE ARMY**
**U.S. ARMY ENGINEER DISTRICT, SACRAMENTO**
**CORPS OF ENGINEERS**
**1325 J STREET**
**SACRAMENTO, CALIFORNIA  95814-2922**

REPLY TO
ATTENTION OF

December 9, 2003

Regulatory Branch (200300113)

Mike Crump
Butte County Public Works Department
7 County Center Drive
Oroville, California  95965

Dear Mr. Crump:

This letter of permission authorizes your proposed discharge of dredged or fill material into approximately 5 acres of waters of the United States, including wetlands, to expand Neal Road Landfill, as shown on the attached drawings. The project is located in Township 21 North, Range 2 East, MDB&M, near Hamlin Canyon, in Butte County, California.

The term "you" and its derivatives, as used in this permit, means the permittee or any future transferee. The term "this office" refers to the appropriate district or division office of the Corps of Engineers having jurisdiction over the permitted activity or the appropriate official of that office acting under the authority of the commanding officer. **Work in waters of the United States must be in accordance with the following conditions of authorization:**

Special Conditions:

1.     You shall develop a final comprehensive mitigation and monitoring plan, which must be approved by the Army Corps of Engineers prior to initiation of construction activities. The plan shall include mitigation location and design drawings, vegetation plans, including target species to be planted, and final success criteria, presented in the format of the Sacramento District's <u>Habitat Mitigation and Monitoring Proposal Guidelines</u>, dated October 25, 1996. The purpose of this requirement is to insure replacement of functions and values of the aquatic environment that would be lost through project implementation.

-2-

    2.    To mitigate for a portion of the loss of 4.94 acres of waters of the United States and indirect effects to 0.07 acres of waters of the United States, you shall purchase 2.01 credits of seasonal wetlands at a Corps approved wetland mitigation bank. The selected mitigation bank shall include the area of the permitted project within its service area. Evidence of this purchase shall be provided to this office prior to proceeding with any activity otherwise authorized by this permit. A list of approved mitigation banks has been included for your reference.

    3.    To mitigate for a portion of the loss of 4.94 acres of waters of the United States and indirect effects to 0.07 acres of waters of the United States, you shall establish and maintain a preserve containing 3.00 acres of created, avoided, and preserved waters of the United States, as depicted on the exhibit entitled On-site Wetland Mitigation and Monitoring Plan Neal Road Landfill, Butte County, California, dated August 2003, in perpetuity. The purpose of this preserve is to insure that functions and values of the aquatic environment are protected.

    4.    To minimize external disturbance to preserved waters of the United States, you shall establish a buffer, consisting of native upland vegetation of at least 25 feet in width from the outer limit of jurisdiction of the entire perimeter of all created, preserved, and avoided waters of the United States, including wetlands within the proposed preserve.

    5.    To insure that the preserve is properly managed, you shall develop a specific and detailed preserve management plan for the on-site and off-site mitigation, preservation, and avoidance areas. This plan shall be submitted to and specifically approved, in writing, by the Corps of Engineers prior to engaging in any work authorized by this permit. This plan shall describe in detail any activities that are proposed within the preserve area(s) and the long term funding and maintenance of each of the preserve areas.

    6.    To protect the integrity of the preserve and avoid unanticipated future impacts, no roads, utility lines, trails, benches, equipment or fuel storage, grading, firebreaks, mowing, grazing, planting, discing, pesticide use, burning, or other structures or activities shall be constructed or occur within the on-site and off-site mitigation, preservation, and avoidance areas without specific, advance written approval from the Corps of Engineers.

    7.    To assure success of the preserved and created waters of the United States, you shall monitor compensatory mitigation, avoidance, and preservation areas for five years or until the success criteria described in the approved mitigation plan are met, whichever is greater. This period shall commence upon completion of the construction of the mitigation wetlands. Additionally, continued success of the mitigation wetlands, without human intervention, must be demonstrated for three consecutive years, once the success criteria have been met. The mitigation plan will not be deemed successful until this criterion has been met.

-3-

8.    You shall submit monitoring reports to this office for each year of the five-year monitoring period, and for each additional year, if remediation is required, by October 1 of each year.  You shall submit an additional monitoring report at the end of the three-year period demonstrating continued success of the mitigation program without human intervention.

9.    To document pre and post-project construction conditions, you shall submit pre-construction photos of the project site prior to project implementation and post-construction photos of the project site within 30 days after project completion.

10.    Prior to initiating any activity authorized by this permit, you shall, to insure long-term viability of mitigation, preservation, and avoidance areas:

a.    Establish a fully-funded endowment to provide for maintenance and monitoring of on-site and off-site mitigation, preservation, and avoidance areas.

b.    Designate an appropriate conservation-oriented third part entity to function as preserve manager and to hold the required conservation easements.

c.    Record permanent conservation easements and deed restrictions maintaining all mitigation, preservation, and avoidance areas as wetland preserve and wildlife habitat in perpetuity.  Copies of the proposed deed restriction and conservation easement language shall be provided to the Corps of Engineers for approval prior to recordation.

General Conditions:

1.    The time limit for completing the work authorized ends on December 31, 2008. If you find that you need more time to complete the authorized activity, submit a request for a time extension to this office for consideration at least one month before the above date is reached.

2.    You must maintain the activity authorized by this permit in good condition and in conformance with the terms and conditions of this permit.  You are not relieved of these requirements if you abandon the permitted activity.  This permit may be transferred upon request provided the work complies with the terms and conditions of this authorization.  When the structures or work authorized by this permit are still in existence at the time the property is transferred, the terms and conditions of this permit will continue to be binding on the new owner(s) of the property. Should you wish to cease to maintain the authorized activity or abandon it without a good faith transfer, you must obtain a permit modification from this office.

-4-

3.    If you discover any previously unknown historic or archeological remains while accomplishing the activity authorized by this permit, you must immediately notify this office of what you have found.  We will initiate the Federal and state coordination required to determine if the remains warrant a recovery effort or if the site is eligible for listing in the National Register of Historic Places.

4.    You must insure that the work complies with the conditions of October 2, 2003, Section 401 water quality certification for this project.

5.    You must allow representatives from this office to inspect the authorized activity at any time deemed necessary to ensure that it is being or has been accomplished in accordance with the terms and conditions of your permit.

Further Information:

1.    Congressional Authorities:  You have been authorized to undertake the activity described above pursuant to:

( )    Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 403).

(X)    Section 404 of the Clean Water Act (33 U.S.C. 1344).

( )    Section 103 of the Marine Protection, Research and Sanctuaries Act of 1972 (33 U.S.C. 1413).

2.    Limits of this authorization.

a.    This permit does not obviate the need to obtain other Federal, state, or local authorizations required by law.

b.    This permit does not grant any property rights or exclusive privileges.

c.    This permit does not authorize any injury to the property or rights of others.

d.    This permit does not authorize interference with any existing or proposed Federal projects.

3.    Limits of Federal Liability.  In issuing this permit, the Federal Government does not assume any liability for the following:

a.    Damages to the permitted project or uses thereof as a result of other permitted or unpermitted activities or from natural causes.

-5-

    b.    Damages to the permitted project or uses thereof as a result of current or future activities undertaken by or on behalf of the United States in the public interest.

    c.    Damages to persons, property, or to other permitted or unpermitted activities or structures caused by the activity authorized by this permit.

    d.    Design or construction deficiencies associated with the permitted work.

    e.    Damage claims associated with any future modification, suspension, or revocation of this permit.

4.    The determination of this office that issuance of this permit is not contrary to the public interest was made in reliance on the information you provided.

5.    This office may reevaluate its decision on this permit at any time the circumstances warrant.  Circumstances that could require a reevaluation include, but are not limited to, the following:

    a.    You fail to comply with the terms and conditions of this permit.

    b.    The information provided by you in support of your permit application proves to have been false, incomplete, or inaccurate (see 4 above).

    c.    Significant new information surfaces which this office did not consider in reaching the original public interest decision.

Such a reevaluation may result in a determination that it is appropriate to use the suspension, modification, and revocation procedures contained in 33 CFR 325.7 or enforcement procedures such as those contained in 33 CFR 326.4 and 326.5.

6.    Extensions.  General Condition 1 establishes a time limit for the completion of the activity authorized by this permit.  Unless there are circumstances requiring either a prompt completion of the authorized activity or a reevaluation of the public interest decision, the Corps will normally give favorable consideration to a request for an extension of this time limit.

-6-

    This letter of permission becomes effective when the Federal official, designated to act for the Secretary of the Army, has signed below. A notice of appeal options is enclosed. Please refer to number 200300113 in any correspondence concerning this permit. If you have any questions, please write to Ms. Laura Whitney, Room 1480 at the letterhead address, or telephone 916-557-7455.

For and on behalf of Lieutenant Colonel Mark W. Connelly, Acting District Engineer.

ORIGINAL SIGNED

Thomas Cavanaugh
Acting Chief, Central
  California/Nevada Section

Attachments (2 drawings)

Copies Furnished: w/ attachments

Jim Deweese, Butte County Public Works Department, 7 County Center Drive, Oroville, California 95965

Jody Gallaway, Gallaway Consulting, Incorporated, 7 Sierra Nevada Court, Chico, California 95928

Stephen R. Finn, Nance Canyon Partners, L.P., Spear Street Tower, One Market, San Francisco, California 94105

Jan Knight, U.S. Fish and Wildlife Service, Endangered Species Branch, 2800 Cottage Way, Suite W2605, Sacramento, California 95825-3901

Mr. Tim Vendlinkski, U.S. Environmental Protection Agency, Region IX, Wetlands Regulatory Office (WTR-8), 75 Hawthorne Street, San Francisco, California, 94105-3901

Bob Williams, California Department of Fish and Game Region 1, 601 Locust Street, Redding, California 96001-2781

Rodney R. McInnis, Acting Regional Administrator, National Marine Fisheries Service, 650 Capitol Mall, Suite 8-300, Sacramento, California 95814-4706

# EXHIBIT B



NEAL ROAD LANDFILL



1"=200'±



LIMITS OF NEAL ROAD LANDFILL CONSERVATION
EASEMENT FROM DOCUMENT DATED 5-29-06

S:\CIVIL 3D 2018 PROJECTS\Swartz Master File 2018\Swartz Master File 2018.dwg 03/11/20 3:58:48 PM

# EXHIBIT C





**Central Valley Regional Water Quality Control Board**

21 August 2019

Eric Miller
Waste Management Division
Butte County Public Works
#7 County Center Drive
Oroville, CA 95965

**CERTIFIED MAIL:**
**7017 3040 0001 0265 2617**

**NOTICE OF VIOLATION, WASTE DISCHARGE REQUIREMENTS ORDER R5-2011-0049, NEAL ROAD CLASS III MUNICIPAL SOLID WASTE LANDFILL, 1023 NEAL ROAD, CHICO, BUTTE COUNTY**

This Notice of Violation (NOV) is issued to Butte County Department of Public Works, Waste Management Division (Discharger) regarding its documented noncompliance with Waste Discharge Requirements Order R5-2011-0049 (WDRs Order) for Neal Road Class III Municipal Solid Waste Landfill (Neal Road Landfill or Facility).

## Background

On 6 March 2019, the Discharger called the Central Valley Regional Water Quality Control Board (Central Valley Water Board) to notify staff of leachate seeps from Module 4 waste management unit (WMU), which began on 26 February 2019. Based on the call, Central Valley Water Board staff understood that leachate from the seep was flowing into an adjacent storm water retention pond and that the leachate was being pumped into the onsite lined septage pond.

On 13 March 2019, the Discharger submitted the *Module 4 Seep Notification, Neal Road Recycling and Waste Facility, Butte County, California* (*Notification Report*). The 13 March 2019 *Notification Report* indicated that:

- At 0744 on 14 February seepage from Module 4 was observed to be flowing into the Module 4 storm water basin #4.

KARL E. LONGLEY ScD, P.E., CHAIR | PATRICK PULUPA, ESQ., EXECUTIVE OFFICER

364 Knollcrest Drive, Suite 205, Redding, CA 96002 | www.waterboards.ca.gov/centralvalley

 RECYCLED PAPER

Notice of Violation
Neal Road Landfill
Butte County Dept. of Public Works,
Waste Mgmt. Division

-2-                                                                          21 August 2019

- At 1340 on 14 February it was observed that the co-mingled leachate and storm water was being pumped into a ditch which gravity flows into the primary sedimentation basin. The pump was immediately shut down.

- Between 15 and 22 February, crews worked to correct leachate seeps on Module 4.

- At 0800 on 26 February, the weekly inspection identified new leachate seeps from Module 4 that were flowing to Module 4 storm water basin #4.

- At 0741 on 27 February, a technician observed that co-mingled leachate and storm water was being pumped into a ditch which gravity flows into the primary sedimentation basin. The pump was immediately shut down.

During a 15 March 2019 compliance inspection, Central Valley Water Board staff observed that the Module 4 leachate seep had stopped flowing, that leachate in the Module 4 storm water basin #4 was being pumped to the lined septage pond, and that the interim cover of Module 4 showed signs of erosion, with rills and depressions visible from a distance. The rainfly protective covering over inactive areas of Module 4 showed significant signs of weathering with large holes observable.

In a 28 March 2019 letter, Central Valley Water Board staff directed the Discharger to submit a technical memorandum proposing erosion control measures and cover repair no later than 30 April 2019.

On 23 April 2019, the Discharger verbally notified Central Valley Water Board staff of leachate seeps from Modules 4 and 5A which began shortly after an intense rain event on Saturday, 20 April 2019. The Discharger submitted written notification regarding the seep on 30 April 2019. The notification indicated that:

- The leachate seeps were noted from Modules 4 and 5 shortly after an intense rain event that produced almost two inches of rain in less than an hour.

- On 24 April, the Discharger directed SCS Field Services to collect a sample from storm water basin #4 and a seep that occurred from Module 5A that drained onto the floor of proposed Module 5B.

- The Discharger reconnected a portable pump to transfer all liquid from storm water basin #4 to the onsite septage pond, and as of 29 April 2019, approximately 90 percent of the liquid had been transferred to the septage pond.

On 25 June 2019, staff received a third-party complaint reporting "tons of Paradise fill washing into the protected WUS area of the onsite Preserve." The wetland preserve is adjacent to and hydraulically downgradient of the Neal Road Landfill's primary sedimentation basin.

**Notice of Violation**                                                          - 3 -                                              21 August 2019
Neal Road Landfill
Butte County Dept. of Public Works,
Waste Mgmt. Division

On 26 June 2019, staff performed a site inspection to assess the condition of the primary sedimentation pond and wetland preserve. Site conditions indicated that the accreted sediment originated from a large stockpile of native soil directly to the north of the primary sedimentation basin.

On 23 July 2019, staff received a third-party complaint stating that an "illegal discharge" had occurred into the primary sedimentation basin.

### Documented Violations

Central Valley Water Board staff's case review (including review of data in the Discharger's First Quarter 2019 Monitoring Report dated 30 April 2019) has resulted in findings for the following violations.

1. **Failures to Immediately Notify Central Valley Water Board regarding Leachate Seepages on 14 February, 26 February and 20 April 2019.**

Section K.5 (Reporting Requirements) of the WDRs Order requires the Discharger to immediately notify the Central Valley Water Board upon the Discharger's detection of a leachate seep. However, the 13 March 2019 *Notification Report* indicates that an earlier leachate seep was observed on 14 February 2019, yet this seepage event remained unreported for nearly a month. Moreover, an additional two leachate seeps were not immediately reported to the Central Valley Water Board: Tuesday, 26 February 2019 (eight days between observation and reporting); and Saturday, 20 April 2019 (three days between observation and reporting). Each of these three documented instances constitutes a *separate* violation of Section K.5 of the WDRs Order.

2. **Unauthorized Discharges of Leachate**

According to the 13 March 2019 *Notification Report*, leachate was temporarily discharged into the primary sedimentation basin on 14 February, 26 February, and 27 February 2019. The *Notification Report* included a figure showing the flow path of comingled leachate and storm water pumped from the Module 4 storm water retention basin #4. (See Attachment 1.)

Storm water samples collected from sampling station SW-1 (where water discharges from the wetland preserve) on 14 February and 26 February indicated concentrations of inorganics and volatile organic compounds (VOCs), indicative of leachate-influenced stormwater. (See Attachment 2.)

The discharges of comingled leachate on 14 February, 26 February and 27 February, as described above, constitute separate violations of the following provisions in the

WDRs Order and the Standard Provisions and Reporting Requirements[1] (SPRRs) incorporated therein:

> **Section A.1 (Discharge Prohibitions)**—Discharge of designated waste is prohibited except for the discharge of leachate to designated Class II surface impoundments;

> **Section A.2 (Discharge Prohibitions)**—Discharge of wastes outside of a unit specifically designed for their containment is prohibited;

> **Section A.5 (Discharge Prohibitions)**—Discharge of liquid waste or leachate to surface waters or surface water drainage courses is prohibited;

> **Section C.2 (Facility Specifications)**—Failure to immediately notify Central Valley Water Board staff of unpermitted discharge of waste offsite;

> **Section K.1 (Reporting Requirements)**—Failure to notify Central Valley Water Board staff of non-compliance with any prohibition of the order as soon as is discovered;

> **SPRRs section A.1 (Response to Release)**—Immediately notify Central Valley Water Board staff of indications of a measurably significant release; and

> **SPRRs section D (General Prohibitions)**—Units shall not degrade a wetland or produce adverse modification of a critical habitat.

### 3.      Failure to Implement Proper Best Management Practices regarding Precipitation and Drainage

During a compliance inspection on 15 March 2019, Central Valley Water Board staff observed that the interim cover of Module 4 showed signs of erosion and that the rainfly protective covering over inactive areas of Module 4 was in poor condition. During an inspection on 26 June 2019, staff observed that best management practices (BMPs) deployed around a native soil stockpile had failed and allowed a significant quantity of sediment to flow into the primary sedimentation basin and wetland preserve. Between February and April 2019, high intensity storm events produced numerous leachate seeps and overwhelmed site BMPs. These conditions constitute violations of the following SPRRs provisions (incorporated as part of the WDRs Order):

> **SPRRs section F (Storm Water Provisions)**—Precipitation which is not diverted by covers or drainage control systems shall be collected and managed

---

[1] Standard Provisions and Reporting Requirements, April 2000 edition.

**Notice of Violation**
Neal Road Landfill
Butte County Dept. of Public Works,
Waste Mgmt. Division

- 5 -

21 August 2019

through the leachate collection and removal system, which shall be designed and constructed to accommodate the precipitation conditions for each class unit; and

**SPRRs section C (Facility Specifications)**—Interim cover over wastes discharged shall be designed and constructed to minimize percolation of liquids through the waste.

Additionally, California Code of Regulations, title 27 (Title 27), section 20820, subdivision (a)(3) requires that a facility's drainage system be designed and maintained to prevent exposure to waste.[2]

## Closing

Please be aware that the Central Valley Water Board will be issuing an order to submit technical reports pursuant to California Water Code, section 13267 to ensure that appropriate corrective measures are implemented to address these violations.

---

[2] Although Title 27, section 20820 was promulgated by the California Integrated Waste Mgmt. Bd. (CIWMB), "[w]here necessary to protect water quality, the RWQCB can cite the standards promulgated by the CIWMB ... as evidence of a violation of standards promulgated by the SWRCB or of Waste Discharge Requirements (WDRs) in any ensuing enforcement proceeding, provided that the violation does not duplicate or conflict with any action by the EA and that such enforcement proceeding is based upon the authority of the RWQCB under Division 7 of the Water Code." (Title 27, § 20012, subd. (b).)

**Notice of Violation**                                                    - 6 -                                         21 August 2019
Neal Road Landfill
Butte County Dept. of Public Works,
Waste Mgmt. Division

Should you have any questions, please contact Patrick DeCarvalho at (530) 224-4786
or Patrick.Decarvalho@waterboards.ca.gov.

Kate Burger, P.G.
Senior Engineering Geologist
Chief, Groundwater Unit

PD: ch

Enclosures:  Attachments 1 and 2

cc via email:  Eric Kiruja, CalRecycle, Sacramento
w/ encl.        Nance Canyon Partners LP, Rancho Palos Verdes
                Kim Haas, Butte County Environmental Health Department, Oroville
                Todd Storti, Butte County Public Works, Oroville
                Holly Nielsen, California Open Lands, Chico
                Laura Shively, U.S. Army Corps of Engineers, Sacramento
                Greg Gholson, U.S. Environmental Protection Agency, San Francisco
                Nicholas Moore, Butte County District Attorney, Oroville

**Notice of Violation**                                                          21 August 2019
Neal Road Landfill
Butte County Dept. of Public Works,
Waste Mgmt. Division

## Attachment 1





**Notice of Violation**
Neal Road Landfill
Butte County Dept. of Public Works,
Waste Mgmt. Division

- 8 -                                                                21 August 2019

# Attachment 2

**Storm Water Discharge Water Quality Data, Neal Road Landfill**

| Compound | Units | Storm Water Discharge Location SW-1 02/14/2019 | Storm Water Discharge Location SW-1 02/26/2019 |
|---|---|---|---|
| Benzene | ug/L | <0.09 | <0.09 |
| Chlorobenzene | ug/L | <0.08 | <0.08 |
| Chloroethane | ug/L | <0.24 | <0.24 |
| Chloroform | ug/L | <0.50 | <0.12 |
| 1,4-Dichlorobenzene | ug/L | <0.08 | <0.08 |
| 1,1-Dichloroethane | ug/L | <0.12 | <0.12 |
| 1,2-Dichloroethane | ug/L | <0.15 | <0.15 |
| trans 1,2-Dichloroethene | ug/L | <0.14 | <0.14 |
| 1,2-Dichloropropane | ug/L | <0.10 | <0.10 |
| Ethylbenzene | ug/L | <0.08 | <0.08 |
| Methylene chloride | ug/L | <0.50 | <0.50 |
| Methyl-t-butyl ether | ug/L | <0.10 | <0.10 |
| Naphthalene | ug/L | <0.31 | <0.31 |
| Tetrachloroethylene | ug/L | <0.10 | <0.10 |
| Toluene | ug/L | <0.08 | <0.08 |
| Trichloroethene | ug/L | <0.12 | <0.12 |
| Trichlorofluoromethane | ug/L | <0.21 | <0.21 |
| Vinyl chloride | ug/L | <0.12 | <0.12 |
| Total Xylenes | ug/L | <0.15 | <0.15 |
| Acetone | ug/L | 4.15 | 138 |
| t-butyl alcohol | ug/L | <6.12 | <6.12 |
| Carbon disulfide | ug/L | <0.38 | <0.38 |
| Ethanol | ug/L | 483 | 395 |
| 2-Hexanone | ug/L | <0.63 | 0.74 |
| Methyl ethyl ketone | ug/L | <0.51 | 143 |
| Methyl isobutyl ketone | ug/L | <0.27 | 0.32 |
| m,p-xylenes | ug/L | <0.15 | <0.15 |
| o-xylene | ug/L | <0.08 | <0.08 |
| Calcium (diss.) | mg/L | NA | 31.7 |
| Calcium (total) | mg/L | 29.2 | NA |
| Magnesium (diss.) | mg/L | NA | 11.3 |
| Magnesium (total) | mg/L | 11.2 | NA |
| Sodium (diss.) | mg/L | NA | 11.3 |
| Sodium (total) | mg/L | 9.8 | NA |
| Potassium (diss.) | mg/L | NA | 5.2 |
| Potassium (total) | mg/L | 4.1J | NA |
| Bicarbonate | mg/L | 116 | 138 |
| Chloride | mg/L | 7.50 | 10 |
| Sulfate | mg/L | 19.6 | 22.0 |
| Total dissolved solids | mg/L | 163 | 196 |

*VOCs detected in at least one sample are listed.*
mg/L - milligrams per liter
ug/L - micrograms per liter

# EXHIBIT D




GAVIN NEWSOM
GOVERNOR

JARED BLUMENFELD
SECRETARY FOR
ENVIRONMENTAL PROTECTION

# State Water Resources Control Board

June 11, 2020

*(Via email and Certified Mail)*
**CERTIFIED MAIL
NO. 7018 0680 0000 1010 6882**

Mr. Dennis Schmidt, Director
Butte County Department of Public Works
7 County Center Drive
Oroville, California 95965
dschmidt@buttecounty.net

**SUBJECT:   NOTICE OF VIOLATION, WASTE DISCHARGE REQUIREMENTS ORDER
R5-2011-0049, INDUSTRIAL STORM WATER GENERAL PERMIT, AND
CLEAN WATER ACT SECTION 301, NEAL ROAD RECYCLING AND
WASTE FACILITY, 1023 NEAL ROAD, CHICO, BUTTE COUNTY**

Dear Mr. Schmidt:

The State Water Resources Control Board (State Water Board) and the nine Regional
Water Quality Control Boards are the public agencies responsible for protecting the surface
and ground water quality for all beneficial uses across the state.  The Central Valley
Regional Water Quality Control Board (Central Valley Water Board) and the State Water
Board regulate wastewater and storm water discharges and other practices that could
degrade water quality.

This Notice of Violation (NOV) is issued by the State Water Board to Butte County
Department of Public Works, Waste Management Division (Discharger) for violations of
Waste Discharge Requirements (WDR) Order R5-2011-0049 issued by the Central Valley
Water Board, the State Water Board's *National Pollutant Discharge Elimination System
(NPDES) General Permit for Storm Water Discharges Associated with Industrial Activities
Order 2014-0057-DWQ, NPDES CAS000001* (Industrial General Permit) Waste
Identification Number 5R04I000249, and the federal Water Pollution Control Act
section 301 (33 U.S.C. 1311).

On July 23, 2019, Central Valley Water Board staff received a complaint stating that illegal
discharges into the primary sedimentation basin occurred at the Neal Road Recycling and
Waste Facility (Site) in February 2019.  On August 21, 2019, Central Valley Water Board
staff issued a NOV which identified violations of Waste Discharge Requirements Order
R5-2011-0049, including the unauthorized discharges of leachate that was pumped out of
the Module 4 storm water retention basin 4 (Basin 4) into an unlined ditch that discharged
into the unlined primary sedimentation basin on February 14, 26, and 27.

The State Water Board Office of Enforcement further investigated the unauthorized
leachate discharges to the primary sedimentation basin and found that the primary
sedimentation basin is also a wetland preserve protected by the *Perpetual Conservation*

Mr. Dennis Schmidt                                  - 2 -                          June 11, 2020

*Easement Grant* dated September 24, 2007.  The easement is held by the non-profit land-trust organization California Open Lands.  As such, the primary sedimentation basin will be referred to as the wetland preserve in this NOV.

Office of Enforcement staff estimate that the Discharger pumped 1.1 million gallons of leachate-impacted storm water from Basin 4 to an unlined ditch that flowed to the wetland preserve between February 14 and February 27, 2019.[1]  The leachate-impacted storm water then discharged from the wetland preserve into an unnamed tributary on the adjacent property which drains to Hamlin Slough.

Office of Enforcement staff reviewed the lab analysis results provided in the April 30, 2019 Monitoring Report and found substantially elevated inorganic constituent levels and the presence of volatile organic compounds and semi-volatile organic compounds in SW-1 compared to SW-2.  SW-2 represents the quality of surface water that has not been affected by the landfill operations (also known as background conditions) and SW-1 is the surface water point of compliance at the outfall of the wetland preserve where storm water leaves the property.

Similar inorganic constituents and volatile and semi-volatile organic compounds were also found in samples collected from the Module 4 leachate seep area, the unlined ditch from Basin 4 to the wetland preserve, and within Basin 4 on February 14 and 26, 2019.  The similar but elevated levels of inorganic constituents and the presence of volatile organic compounds verifies that a measurably significant unauthorized release of leachate to the wetland preserve and adjacent unnamed tributary offsite had occurred.  These results are consistent with the leachate having discharged to the wetland preserve and offsite.

The Office of Enforcement has determined that in addition to the violations stated in the Central Valley Water Board's August 21, 2019 Notice of Violation, the unauthorized leachate discharges to the wetland preserve violate the following:

- Industrial General Permit Section III.  Discharge Prohibitions, Provision B – Discharges of liquids or materials other than storm water, either directly or indirectly to waters of the United States, are prohibited unless authorized by another NPDES permit.  Unauthorized non-storm water discharges must be either eliminated or authorized by a separate NPDES permit.

- Industrial General Permit Section III.  Discharge Prohibitions, Provision C – Industrial storm water discharges and authorized non-storm water discharges that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of the Water Code, are prohibited.

- Federal Clean Water Act Section 301 (33 U.S.C §1311) – Discharge of any pollutant into navigable waters by any person from a point source, unless it is compliant with a NPDES permit, is prohibited.

- The discharges of leachate-impacted storm water from the wetland preserve to offsite into waters of the state and United States is prohibited by the Industrial General Permit.  The Discharger does not have any other NPDES permit coverage

---

[1] More information regarding this estimate is provided in the Discharge Calculations memorandum dated January 23, 2020.

Mr. Dennis Schmidt                                   - 3 -                            June 11, 2020

that would authorize these discharges.  Therefore, these discharges violate Clean Water Act section 301.

Industrial General Permit non-discharge requirements were also violated as follows:

- Industrial General Permit Section V.  Effluent Limitations, Provision B requires that industrial storm water discharges from facilities shall not exceed storm water effluent limit guidelines (ELG).[2]  Zinc concentrations on February 14, 2019, exceeded the ELG.

- Industrial General Permit Section XI.  Monitoring, Provision D., subsection 1.a. requires dischargers subject to storm water ELGs[3] to collect and analyze samples from the qualifying storm events for each regulated pollutant specified.  The Discharger is required to collect and analyze the leachate-laden storm water discharges for biological oxygen demand (BOD), total suspended solids (TSS), Ammonia (as nitrogen), α-Terpineol, Benzoic acid, ρ-Cresol, Phenol, Zinc, and pH,[4] and to compare the results to the ELGs.  Office of Enforcement staff reviewed the April 30, 2019 Monitoring Report and submittals in the Stormwater Multiple Application and Report Tracking System (SMARTS) and concluded that only zinc was analyzed on February 14 and 26, 2019, and none of the other pollutants. Failing to collect and analyze the required pollutants violates this provision.  See Attachment A for a list of surface water monitoring results from February 14 and 26, 2019.

The Discharger also violated non-discharge requirements specified in its WDRs.  As described in the Central Valley Water Board's August 21, 2019 Notice of Violation, the Discharger violated WDR Standard Provisions and Reporting Requirements section A.1, 2, and 5.[5]  WDRs Provision L.6 requires the Discharger to take all reasonable steps to minimize any adverse impact to the waters of the state resulting from noncompliance with the WDR.  Such steps shall include accelerated or additional monitoring as necessary to determine the nature, extent, and impact of non-compliance. Although the April 30, 2019 Monitoring Report provided information regarding detections of volatile organic compounds in SW-1, it did not propose nor provide whether the Discharger took any reasonable steps such as investigating the nature and extent of these detections.  Therefore, the Discharger violated WDR, Provision L.6.

Please be aware that the State Water Board will be issuing an order to the Discharger to submit technical reports pursuant to California Water Code section 13267 to ensure that appropriate actions are implemented to address these violations. Both the Central Valley

---

[2] The ELGs for industrial storm water discharges subject to Code of Federal Regulations (40 CFR), title 40, chapter 1, subchapter N, are in Industrial General Permit Attachment F.
[3] Subchapter N, chapter I, 40 CFR.  The Site is a non-hazardous landfill as defined in the WDRs; as such, this requirement applies to discharges of wastewater from a landfill unit.
[4] Since the landfill discharges wastewater as defined in 40 CFR, chapter I, subchapter N, part 445.2(f), the landfill is subject to the ELGs for each of the additional regulated pollutants specified for landfills in subchapter N, part 445, subpart B, 445.21.
[5] Additional Standard Provisions and Reporting Requirements violations were described in the August 21, 2019 Notice of Violation.

Mr. Dennis Schmidt                              - 4 -                                    June 11, 2020

Regional and State Water Boards reserve their right to take any enforcement action
authorized by law.

Should you have any questions, please contact Stephanie Young at (916) 327-8043 or at
shephanie.young@waterboards.ca.gov, or Laura Drabandt at (916) 341-5180 or
laura.drabandt@waterboards.ca.gov.

Sincerely,

Yvonne M. West   Digitally signed by Yvonne M. West
Date: 2020.06.11 15:06:45 -07'00'

Yvonne West
Director
**Office of Enforcement**

Enclosures:    Attachment A

cc:  See next page.

Mr. Dennis Schmidt                                   - 5 -                                    June 11, 2020

cc:      *(via email only)*

Ms. Kristine Karlson
Criminal Investigation Division
U.S. Environmental Protection Agency
kristine.karlson@epa.gov

Ms. Holly Nielsen
Executive Director
California Open Lands
hollylane75@hotmail.com

Ms. Kim Haas
Butte County Public Health Department
khaas@buttecounty.net

Mr. Eric Miller, Manager
Butte County Public Works
emiller@buttecounty.net

Mr. Nicholas Moore, Investigator
Butte County District Attorney Office
nmoore@buttecounty.net

Mr. Patrick Lucey
Butte County Air Quality District
plucey@bcaqmd.org

Mr. Donald E. Swartz
Nance Canyon Partners LP
donswartz@cox.net

Mr. Matthew Victoria
Department of Toxic Substances Control
matthew.victoria@dtsc.ca.gov

Mr. Eric Kiruja
Environmental Scientist
CalRecycle
eric.kiruja@calrecycle.ca.gov

Ms. Laura Drabandt
Attorney III
Office of Enforcement
laura.drabandt@waterboards.ca.gov

Ms. Stephanie Young
Senior WRCE Specialist
Office of Enforcement
stephanie.young@waterboards.ca.gov

ATTACHMENT A

**TABLE 1. SURFACE WATER MONITORING RESULTS FROM FEBRUARY 14, 2019**

| CONSTITUENT | UNITS | SW-2 (background) | SW-1 (compliance point) | PERCENT INCREASE |
|---|---|---|---|---|
| TURBIDITY | NTU | 3.9 | 98.7 | 2,431% |
| CALCIUM | mg/L | 11.1 | 29.2 | 163% |
| MAGNESIUM | mg/L | 7 | 11.2 | 60% |
| SODIUM | mg/L | 2.7 | 9.8 | 263% |
| POTASSIUM | mg/L | ND | 4.1 | NA |
| BICARBONATE ALKALINITY | mg/L | 70 | 116 | 66% |
| CHLORIDE | mg/L | 0.18 | 7.5 | 4,067% |
| SULFATE | mg/L | 0.44 | 19.6 | 4,355% |
| TOTAL DISSOLVED SOLIDS | mg/L | 86 | 163 | 90% |
| TOTAL ORGANIC CARBON | ug/L | 5.3 | 26 | 391% |
| MANGANESE | ug/L | 0.00227 | 0.182 | 7,918% |
| ACETONE* | ug/L | 4.15 | 57 | 1,273% |
| MEK* | ug/L | ND | 37.9 | NA |
| ETHANOL* | ug/L | ND | 483 | NA |
| TETRAHYDRAFURAN* | ug/L | ND | 2.67 | NA |
| ANTHRACENE* | ug/L | 1.2 | ND | NA |
| BIS (2-ETHYLHEXYL) PHTHALATE* | ug/L | 0.24 | ND | NA |
| DI-N-BUTYL PHTHALATE* | ug/L | 0.075 | 0.51 | 580% |
| DIETHYL PHTHALATE* | ug/L | ND | 0.33 | NA |
| DIMETHYL PHTHALATE* | ug/L | ND | 2.7 | NA |
| PHENOL* | ug/L | 0.04 | 1.0 | 2,400% |

* volatile or semi-volatile organic compound

NTU  =  Nephelometric Turbidity Unit
mg/L  =  milligrams per liter
ug/L  =  micrograms per liter
ND  =  not detected
NA  =  cannot be quantified

**TABLE 2. SURFACE WATER MONITORING RESULTS FROM FEBRUARY 26, 2019**

| CONSTITUENT | UNITS | SW-2 (background) | SW-1 (compliance point) | PERCENT INCREASE |
|---|---|---|---|---|
| TURBIDITY | NTU | 8.5 | 72.7 | 755% |
| CALCIUM | mg/L | 7.3 | 31.7 | 334% |
| MAGNESIUM | mg/L | 4.3 | 11.3 | 163% |
| SODIUM | mg/L | 1.7 | 11.3 | 565% |
| POTASSIUM | mg/L | 1.1 | 5.2 | 373% |
| BICARBONATE ALKALINITY | mg/L | 45 | 138 | 207% |
| CHLORIDE | mg/L | ND | ND | NA |
| SULFATE | mg/L | 0.27 | 22 | 8,048% |
| TOTAL DISSOLVED SOLIDS | mg/L | 65 | 196 | 202% |
| ACETONE* | ug/L | 3.07 | 138 | 4,395% |
| MEK* | ug/L | ND | 143 | NA |
| TETRAHYDRAFURAN* | ug/L | ND | 3.18 | NA |

* volatile or semi-volatile organic compound

NTU  =  Nephelometric Turbidity Unit
mg/L  =  milligrams per liter
ug/L  =  micrograms per liter
ND  =  not detected
NA  =  cannot be quantified

# EXHIBIT E



# EXHIBIT F



# EXHIBIT G

**From:** "Storti, Todd" <tstorti@buttecounty.net>
**Date:** August 6, 2019 at 10:06:54 AM PDT
**To:** hollylane nielsen <hollylane75@hotmail.com>
**Cc:** "Schmidt, Dennis" <DSchmidt@buttecounty.net>, Jody Gallaway <jody@gallawayenterprises.com>,
"Pearce, Wayne" <Wpearce@scsengineers.com>, "Miller, Eric" <emiller@buttecounty.net>, 'Curt Fujii'
<fujiiciveng@icloud.com>
**Subject: RE: Neal Road Preserve**

Dear Ms. Nielsen,
Please find the attached letter in response to your query below.
Respectfully,
Todd Storti


-----Original Message-----
From: hollylane nielsen <hollylane75@hotmail.com>
Sent: Monday, August 5, 2019 3:28 PM
To: Storti, Todd <tstorti@buttecounty.net>; Miller, Eric <emiller@buttecounty.net>
Cc: PublicWorksDept <PublicWorksDept@buttecounty.net>; Schmidt, Dennis
<DSchmidt@buttecounty.net>
Subject: Re: Neal Road Preserve

Mr. Storti and Mr. Miller,

Will you please respond to my question from this email, dated July 15, below?

Again: Are you aware of any instances at the Neal Rd facility where leachate-contaminated stormwater
entered the Preserve managed by California Open Lands and protected under conservation easement by
pumping? By passive drainage?

Thank you,
Holly Nielsen

Executive Director—California Open Lands



Sent from my iPhone


On Jul 15, 2019, at 11:38 AM, hollylane nielsen <hollylane75@hotmail.com> wrote:

Dear Mr. Storti and Mr. Miller:

A special condition of the U.S. Army Corps of Engineers permit issued to the Butte County Department
of Public Works on Dec 9, 2003 (#200300113) was the recordation of a Conservation Easement and the
establishment of a Long-Term Management Plan. This Conservation Easement and Plan are attached
here as a reference.

As Preserve Manager, California Open Lands is required to monitor and report on the conditions of the Preserve yearly as well as any activities on or off-site that may have affected the ecological integrity of the Preserve. In order to facilitate and enable this process, Butte Co Public Works is required to disclose any potential violations of the Conservation Easement.

Specifically, the Plan states in section 5.3.3 that the Preserve should not receive any drainage from off-site apart from its original design features. Have there been any instances where drainage water or leachate from off-site of the Preserve area entered or was actively pumped into the Preserve?

California Open Lands also understands that there was infill of the wetland area due to sedimentation resulting from significant storm events. It is our understanding that California Open Lands and the USACOE will pursue remediation and/ or mitigation in the event of a loss of overall wetland area.

California Open Lands is committed to working with all parties to achieve a solution in which the ecological functioning of the Preserve and the watershed is protected and mediated, as necessary.

Thank you for your prompt response,

Holly Nielsen


Holly Nielsen

Executive Director-California Open Lands

P.O. Box 4440

Chico, CA 95927

P (530) 872-7281

holly@californiaopenlands.org
<neal road_signed and recorded_reduced.pdf>
        <Cal Open Land Ltr 0819.pdf>

# EXHIBIT H



**CALIFORNIA OPEN LANDS**

PO Box 4440 · Chico, CA 95927 · Phone/Fax: (530) 872-7281

http://www.californiaopenlands.org

9/3/2019

Todd Storti
Butte County--Department of Public Works
7 County Center Dr.
Oroville, CA 95927

Dear Mr. Storti,

Under the terms of the Conservation Easement deed for the Neal Road Preserve, California Open Lands is mandated to exercise our right to enforce the Deed's identified Conservation Values as well as the terms of the OMP and Easement. At this point, COL has determined that the following Easement violations have occurred:

1) Unauthorized access: Vehicle trespass was documented to have occurred without notification or review of activities that were conducted.
2) The required signage was never installed at the Preserve.
3) The soils of the Preserve and Sedimentation Basin are coated in an unknown chemical residue, as documented.
4) There is an area about 15' in diameter at the stormwater inlet that is covered in gravel sediments 3-4' thick.

The corrective action that COL demands to address these violations is as follows:

1) A statement to COL describing when the vehicular trespasses occurred and for what reason. Communicate to County staff that this area is off-limits to vehicles.
2) Contact Magoon Signs in Chico for COL's sign template to be printed on a durable material, such as aluminum, and mount a sign along each side of the Preserve.
3) Contract a third-party consulting firm, approved by and at the direction of COL, to collect soil samples and conduct soil testing for the contaminated soils throughout the Preserve and Sedimentation Basin in order to determine what remedial action may be necessary.
4) A map delineating the area within 15' of the stormwater inlet that shows the area of gravel deposition prior to conducting maintenance activities to remove it. Limit your activities in the Preserve to this area.

Please remedy these violations within 30 days, as is required in the Conservation Easement deed.

Furthermore, COL is conducting an ongoing review of submitted documentation and is further researching the pumping of leachate-contaminated stormwater into the drainage ditch that flows to the Sedimentation Basin and Preserve and into the Waters of the U.S. beyond which represent high quality vernal pool habitat.



## CALIFORNIA OPEN LANDS

PO Box 4440 • Chico, CA 95927 • Phone/Fax: (530) 872-7281

http://www.californiaopenlands.org

What my research and PRARs have uncovered at this point are a number of inconsistencies, contradictions, and omissions within reports, letters, staff observations and notes, and internal and external communications between the RWQCB, Butte County Public Works, and the involved consulting agencies. I would like to extend an opportunity at this time for these involved agencies, consulting firms, and individual staff members to provide COL with any amendments, clarifications, or final reports that might better describe the actual events involved in this investigation and their required documentation and reporting, especially regarding the etiology of these occurrences.

Additionally, I am requesting further Public Records Act records encompassing the Neal Road Waste Facility site supervisor's daily inspections which involve the events of leachate-contaminated stormwater pumping into the drainage ditch leading into the Preserve and/or into the Waters of the U.S. downstream. Finally, please submit any records for stormwater pumping that may have occurred in November of 2018.

Sincerely,

Holly Nielsen
Executive Director—California Open Lands

# EXHIBIT I



**Department of Public Works**

7 County Center Drive       T: 530.538.7681       buttecounty.net/publicworks
Oroville, California 95965   F: 530.538.7171

Ms. Holly Nielsen                                              August 5, 2019
Executive Director
California Open Lands
PO Box 4440
Chico, CA 95927

RE:        Neal Road Preserve

Dear Ms. Nielsen:

Thank you for your email dated July 15, 2019 regarding the Neal Road Preserve. As you are probably aware, this has been a difficult year for the Neal Road Recycling and Solid Waste Facility - first almost our entire facility was burned over during the Camp Fire, destroying millions of dollars' worth of storm drainage pipes and improvements, methane gas collection systems, closed cell liners, and other critical landfill infrastructure.

In addition, this winter was the wettest since 2010/2011, and our entire site was severely impacted by high intensity storms. Within about 3 weeks of the Camp Fire the landfill was hit with a record breaking multi-hour thunderstorm, that flooded much of the landfill, closed Highway 9II, closed the Midway in Durham and many other local roadways. Many properties within the Durham and south Chico area suffered damage from this first very strong (and record breaking) storm event.

Later in the spring, our facility was again hit with a record breaking thunderstorm/rain event. Again, this was some of the heaviest rain ever experienced by staff at the Landfill, with predictable results - overtopping of many area drainage facilities and roadways. Our Engineering monitoring firm, SCS, has been on site throughout the year for sampling, analysis, and reporting of all storm water and leachate systems including discharges and has handled all reporting to respective agencies.

Please know that staff have been working nearly non-stop since the Camp Fire, to repair our critical infrastructure, including drainage systems and the methane collection system. Additionally, to assist the community with rebuilding, we have added an entirely separate tipping face and two new temporary scales, and we now are processing solid waste tonnage on a daily basis what we used to process in an entire week.

We take your concerns seriously, and have secured the services of Jody Gallaway with Galloway Enterprises, Inc., to assist us with working with yourself, the Army Corps of Engineers and other regulatory agencies, to determine the best path forward from this point.

Respectfully,

Todd Storti
Deputy Director Solid Waste

Cc:  Jody Gallaway
     Dennis Schmidt
     Wayne Pierce

# EXHIBIT J



## CALIFORNIA OPEN LANDS

PO Box 4440 · Chico, CA 95927 · Phone/Fax: (530) 872-7281

http://www.californiaopenlands.org

December 13, 2019

Via E-Mail
Mr. Dennis Schmidt
Director of Public Works
Butte County Public Works
7 County Center Drive
Oroville, CA 95965

Dear Mr. Schmidt,

California Open Lands ("COL") holds a conservation easement ("Easement") over a portion of Butte County's Neal Road Recycling and Waste Facility ("Landfill") located at 1023 Neal Road, Paradise, CA 95969.[1] The easement area described in the Easement is an approximately 3-acre wetland located on the southwest portion of the Landfill ("Preserve"). This Easement protects natural resources, restricts development and limits allowed uses of the property. This Easement also gives COL the right to monitor and enforce those restrictions.

**Issue Summary**

COL has determined that certain uses of the property, described below, are not consistent with the terms of the Easement. This letter provides further clarification of my letter of September 3, 2019 to Todd Storti, Deputy Director of Waste Management Division of Butte County Public Works, describes new violations of the Easement occurring since then, and outlines COL's proposals for resolving these violations.

**Discharges of Landfill Leachate to the Preserve**

On February 14, 2019, the Landfill experienced a large storm event and Landfill staff observed leachate seeps coming from the side of Module 4. These seeps were observed flowing into Sediment Basin #4 below the face of the slope from which the seeps emerged. Leachate-contaminated storm water from Sediment Basin #4 was then pumped into a drainage ditch which gravity-flowed to the Preserve. Landfill staff informed Landfill management of the issue, and estimated the flow of leachate into the storm water basin, and thus the Preserve, to be approximately 475 gallons per hour. Landfill staff turned the pump off at 1:40 p.m., but it had

---

[1] A copy of the Perpetual Conservation Easement Grant to California Open Lands (Butte County Record document 2007-0051757) is attached hereto as **Exhibit A**. The Preserve is a portion of Assessor's Parcel Number 040-600-082.

Mr. Dennis Schmidt
December 13, 2019
Page 2

been in operation since about 9:00 a.m. that morning. Landfill staff estimated that approximately 316,800 gallons of leachate-contaminated storm water were discharged into the Preserve.

On February 27, 2019, Landfill staff again observed leachate seeps from Module 4 flowing into Sediment Basin #4 and being pumped into the Preserve through the drainage ditch. The leachate seeps and pumping of leachate-contaminated storm water was observed at 6:41 a.m., though it is likely that the pump began running the prior evening when the rain event began. Landfill staff estimated that approximately 594,000 gallons of leachate-contaminated storm water were discharged into the Preserve during this event.

On March 6, 2019, Landfill staff again observed leachate seeps from Module 4 flowing into Sediment Basin #4 at an estimated rate of 90 gallons per hour. Ongoing leachate seeps were also documented in April and May of 2019.

## Discharges of Storm Water that Violate the General Permit to the Preserve

As described in COL's Clean Water Act Notice of Violation dated November 15, 2019, COL is informed, and believes, that the Landfill is discharging storm water associated with industrial activity in violation of the General Permit. These unlawful discharges cause pollutants to enter the Preserve, and degrade and harm the Conservation Values described in the Easement.

## Diversion of Storm Water Away from the Preserve

In response to these troubling discharges of leachate-contaminated and polluted storm water, the Landfill's response has been to divert water away from the Preserve, and into lined septage ponds. While this may temporarily address the spread of leachate contamination, it creates a new problem by starving the Preserve of water and threatening the Conservation Values associated with the wetlands.

## Disposal/Storage of Soil and Unauthorized Materials in the Preserve

In addition to the storm water and leachate seepage issues, COL was informed by Landfill staff that the Landfill is accepting soil that was excavated from the Camp Fire cleanup efforts. COL is informed, and believes, that soil is contaminated by fire damage is being improperly disposed of at the Landfill and unlawfully used as daily cover. On July 18, 2019, I visited the Preserve and photographed reddish soil deposits in the Preserve. In addition to the disposal and storage of soil in the Preserve, COL has documented the Landfill's improper use of the 25-foot buffer zone (see Easement, Recital J)to stage various pipes and equipment.

## Excavation of Soil in the Preserve

After Landfill staff and the Regional Water Quality Control Board were alerted to the disposal of soil in the Preserve, COL is informed that the Landfill removed an unknown quantity of soil from the Preserve. While this may initially seem consistent with COL's priorities, the removal of material from the Preserve without a plan or authorization is contrary to the goals of

Mr. Dennis Schmidt

Mr. Dennis Schmidt
December 13, 2019
Page 3

the Easement. COL is concerned that, in addition to the foreign soil, the County also disturbed and removed native soil, and in so doing, harmed the Preserve. On October 23, 2019, I visited the Preserve and documented an excavated channel on the southeast slope of the Preserve that had been cut on October 18, 2019 in response to a broken leachate pipe leaking landfill leachate into the Preserve.

## Unauthorized Motorized Vehicle Use in the Preserve

In my September 3, 2019 letter, I informed Mr. Storti that COL had determined that vehicle trespass had been documented at the Preserve. Mr. Storti responded, in his September 10, 2019 letter, that in fact on June 26, 2019, a contractor entered the Preserve with an excavator to "access a sump pump used to supply a water truck for dust mitigation." Mr Storti defended this activity on the basis that Section 5.3.1 of the Open Space Preserve Management Plan ("OSPMP") permitted such access. However, Section 5.3.1 does not address the prohibition on motorized vehicles in the Preserve, except to the extent that it allows access to motorized vehicles "in emergency or law enforcement situations." The relevant section is Section 7.9, which states that "[n]o motorized vehicles shall be ridden, brought, used, or permitted on any portion of the Preserve with the exception of the following…." and goes on to identify a few Preserve maintenance activities that are not applicable here (mosquito abatement activities, bike trail repair or replacement, and for emergency or law enforcement situations). Accessing a sump pump is not a Preserve maintenance activity contemplated by the OSPMP, nor does it fall under any of the allowable exceptions to the prohibition against motorized vehicles in the preserve. Furthermore, Mr. Storti's letter raises concerns about the existence of a sump pump in the Preserve, and why it is being used to drain the Preserve's protected waters.

## Damages to Vegetation in the Preserve

At least once a year, pursuant to Section 3.E of the Easement, I perform a field review of the Preserve in order to monitor the status of the Preserve. During this field review, I inspect the vegetation in the Preserve, and make notes and collect photographs documenting my observations. In addition, I document my observations of fish and wildlife, if any, that I observe during the field reviews. For instance, in April of 2018, I documented clear water with abundant vegetation in the Preserve. And in April of 2017, I documented similarly clear water with numerous tadpoles present, in addition to healthy vegetation. However, during my inspections in 2019, beginning with my first inspection in May, I have documented a significant reduction in vegetation, brown turbid water, and evidence of chemical residue left after water had evaporated from the Preserve.

## Venting of Methane

On November 1, 2019, Landfill staff used GEM5000 and GEM2000 gas monitors and recorded methane discharging in excess of 10%, and up to 16%, from recently installed wet-wells (36" diameter standpipes) buried into the bottom of the landfill. These wet wells have been venting methane into the open atmosphere near the Preserve since at least October 2019.

Mr. Dennis Schmidt
December 13, 2019
Page 4

**Notice of Violations**. This letter constitutes written notice required by Section 7 of the Easement, informing the Landfill that the activities described above are inconsistent with the purposes of, and violate the terms of, the Easement. Specifically:

1. Recital F of the Easement states that "[t]he Preserve includes the water in wetlands and drainage features." The Easement prohibits the discharge of any waste materials within the Preserve. (Easement, Section 4.E). The leachate from Module 4 is a waste material, and therefore the Landfill violated the terms of the Easement each time the Landfill discharged leachate-contaminated storm water to the Preserve, including on February 14, 2019 and February 27, 2019. In addition, the Landfill's discharges of leachate violated the Easement by harming the Conservation Values of the Preserve, which include the wetlands – as well as the surface and ground water required to protect and sustain the wetlands – and water quality. (Easement, Recital E and Section 2.E).

2. Section 4.R of the Easement prohibits "[a]ny and all other uses which may adversely affect the purposes of this Easement." Among the purposes of the Easement are protection of water quality and conservation of existing wetlands. The unlawful discharge of storm water associated with industrial activities pollutes the Preserve's water and adversely affects the Preserve's wetlands. The Landfill's discharges of storm water in violation of the General Permit therefore violate the Easement. In addition, the operation of a sump pump in the Preserve which removes water from the Preserve's wetlands violates the Easement.

3. The Easement defines the Conservation Values of the Preserve to include the wetlands. (Easement, Recital E). By depriving the Preserve of water, the Landfill has harmed the Conservation Values of the Preserve and violated the Easement.

4. The Easement prohibits the disposal or storage of any soil within the Preserve. (Easement, Section 4.E). The disposal and/or storage of soil from the Camp Fire cleanup efforts within the Preserve violates the Easement. The Easement includes the 25-foot buffer as part of the Preserve. (Easement, Recital J). The Landfill has violated the Easement at all times during which it uses the 25-foot buffer area to stage pipes and equipment.

5. The Easement prohibits the excavation or removal of soil from the Preserve. (Easement, Section 4.F). The excavation and removal of soil from the Preserve that was documented by COL on October 23, 2019 is a violation of the Easement.

6. Section 4.K of the Easement prohibits motorized vehicles from being "ridden, brought, used or permitted on any portion of the Preserve, except as provided for in the Plan or with prior written approval by the Corps." The Landfill violated the Easement on June 26, 2019 when it permitted a contractor to operate an excavator in the Preserve.

7. Section 4.J of the Easement prohibits the "destruction or removal of any natural tree, shrub or other vegetation, that exists upon the Preserve." The Landfill's discharges of

leachate-contaminated storm water have caused the destruction of existing vegetation and have therefore violated the Easement. Furthermore, COL has documented heavy equipment destroying trees and vegetation within the Preserve.

8. Section 2.E of the Easement states that it is COL's right "[t]o conserve and protect all mineral, **air**, water and groundwater rights required to protect and to sustain the biological resources of the Preserve. The Landfill's discharges of methane into the atmosphere around the Preserve harms the Preserve's air quality and thus the biological resources and Conservation Values of the Preserve.

**Remedies and Timeline.** To address the damage caused by the violations above, COL proposes the following remedies. While COL is willing to discuss each of the following items, COL believes that each measure below – or a functional equivalent – is necessary to restore the Preserve to its pre-violation condition, and to prevent future violations of a similar nature. The issues identified above are ongoing and continue to threaten the Conservation Values of the Preserve. Therefore, time is of the essence, and the remedies identified below reflect that urgency.

1. Immediate cessation of any discharges of landfill leachate into the Preserve and into storm water conveyance systems that have the potential to discharge into the Preserve. A detailed report should be provided to COL describing what measures have been taken, and when, to prevent future discharges of landfill leachate into the Preserve.

2. Bring the Landfill into compliance with the General Permit. Develop and implement an "end-of-pipe" storm water treatment system at the point where the Landfill's storm water system discharges into the Preserve such that the Landfill will no longer discharge polluted industrial storm water into the Preserve's wetlands. This treatment system should be implemented as soon as possible, and in any case, no later than October 1, 2020.

3. Immediately restore flows of unpolluted storm water to the Preserve to the pre-diversion levels.

4. Develop a plan, in conjunction with COL's expert, to characterize all foreign soils that have been stockpiled or discarded in the Preserve. The plan shall include detailed steps to remove soil in a way that minimizes further disturbance of the Preserve, and that creates a plan to restore areas of the Preserve that were damaged by the storage/disposal, removal, and excavation of soils in the Preserve. A plan should be developed to permanently remove all foreign soils and restore the vegetation of the Preserve. The removal of all foreign soils and completion of the restoration of the Preserve shall be completed as soon as possible, and in any case, no later than October 1, 2020.

5. Within 30 days of this letter, install and maintain additional signage alerting to the presence of the Preserve. On an annual basis, provide adequate training for employees as

Case 2:20-cv-00123-DJC-DMC   Document 93-8   Filed 02/01/24   Page 119 of 362

to what the management requirements are for Easement – including training on prohibited activities in the Preserve. Within 30 days, the Landfill shall revise its documents to include the Preserve in the Landfill's reports, operations plan, and management documents to increase awareness about the Preserve and to prevent future unauthorized access to the Preserve.

**Costs.** Pursuant to Section 7.B of the Easement, COL is entitled to its reasonable costs incurred in enforcing the terms of the Easement, including without limitation, costs of suit and attorneys' fees, and any costs of restoration necessitated by a violation of the terms of the Easement, to be borne by the Landfill.

COL has retained legal counsel in this matter. Please direct all communications herein to both me and my counsel, at:

Andrew L. Packard
William N. Carlon
Law Offices Of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Telephone: (707) 782-4060
Fax: (707) 782-4062
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

Thank you for responding quickly to these issues and working with us to resolve them.

Sincerely,

Holly Nielsen
Executive Director
California Open Lands

# EXHIBIT K



**COUNTY COUNSEL**
BRUCE S. ALPERT

**ASSISTANT COUNTY COUNSEL**
BRAD J. STEPHENS

**CHIEF DEPUTY COUNTY COUNSEL**
FELIX WANNENMACHER
KATHLEEN KEHOE GREESON
ROGER S. WILSON

**DEPUTY COUNTY COUNSEL**
BRUNELLA WOOD

OFFICE OF THE COUNTY COUNSEL
COUNTY OF BUTTE
25 COUNTY CENTER DRIVE, SUITE 210
OROVILLE, CALIFORNIA  95965
PHONE: (530) 552-4070 FAX: (530) 538-6891

February 6, 2020

Law Office of Andrew Packard
Attn: Andrew Packard & William Carlon
245 Kentucky Street, Suite B3
Petaluma, CA 94952
*Sent via email only* andrew@packardlawoffices.com; wncarlon@packardlawoffices.com

California Open Lands
Attn: Holly Nielsen
P.O. Box 4440
Chico, CA 95927
*Sent via email only* hollylane75@hotmail.com, holly@californiaopenlands.org

 RE:  **California Open Lands v. Butte County Dept. of Public Works, et al.**
      **Case No.: 2:20-CV-00123-KJM-DMC**

Dear Mr. Packard, Mr. Carlon, and Ms. Nielsen,

We are in receipt of your correspondence dated December 13, 2019 relating to California Open Lands' ("COL") Notice of Violation pertaining to various alleged activities at Butte County's Neal Road Recycling and Waste Facility ("NRRWF"). While NRRWF contests many of the allegations raised in that correspondence, the County of Butte ("County") would like to first address the five remedies identified in your correspondence as well as the additional remedy identified in Mr. Carlon's email dated January 14, 2020. A comprehensive response to the allegations raised in COL's December 13, 2019 correspondence at pages 1-4 is forthcoming in a separate response from this office by the end of February.

***Remedial Action No. 1:  Immediate Cessation of Leachate Discharges into the Preserve***

Your correspondence proposes the "[i]mmediate cessation of discharges of landfill leachate into the Preserve and into storm water conveyance systems that have the potential to discharge into the Preserve." As you know, on August 28, 2019, the Central Valley Regional Water Quality Control Board ("Regional Board") issued a 13267 Order to NRRWF ("Order"), which outlined various measures to be implemented by NRRWF to address and prevent future unauthorized discharges of

1 | P a g e

leachate into the Primary Sedimentation Basin ("PSB"), or the Preserve. In response to that Order, NRRWF has implemented various corrective measures. Please see Attachments 1 thru 15, which shows the measures that have been taken by NRRWF to prevent future discharges of landfill leachate into the Preserve. One of those measures includes the Operations Plan for Managing Stormwater and Leachate, which the Regional Board found satisfied the requirements set forth within the 13267 Order. See Attachment 12. To date, NRRWF remains in compliance with the 13267 Order, which includes the cessation and prevention of future leachate discharges into the Preserve. Based on such ongoing compliance, NRRWF asserts this proposed remedial action is moot.

### Remedial Action No. 2: Bring Landfill into Compliance with the General Permit

COL proposes that NRRWF "[b]ring the Landfill into compliance with the General Permit." Beyond the alleged discharge of leachate during February 2019, the County maintains there are no ongoing violations of the substantive and procedural requirements of the Industrial Storm Water General Permit (NPDES General Permit No. CAS000001, Order 2014-0057-DWQ, as amended). As such, NRRWF is currently in compliance with the General Permit and this proposed remedial action is also moot.

### Remedial Action No. 2: Develop and Implement an "End-of-Pipe" Storm Water Treatment System

COL has proposed the following: "Develop and implement an 'end-of-pipe' storm water treatment at the point where the Landfill's storm water system discharges into the Preserve such that the *Landfill will no longer discharge polluted industrial storm water into the Preserve's wetlands.* This treatment system should be implemented as soon as possible, and in any case, no later than October 1, 2020." (emphasis added).

To begin, NRRWF maintains there are currently no ongoing discharges of polluted industrial storm water into the Preserve. The alleged discharges during February 2019 have been addressed with various additional measures that prevent discharges of polluted storm water into the Preserve. See Remedial Action No. 1. That said, NRRWF stands willing to discuss the "end-of-pipe" water treatment system envisioned by COL, the method, its feasibility, environmental impact, capital cost, operation and maintenance requirements, and its necessity or effectiveness in light of the corrective action already implemented by NRRWF to prevent future discharges of landfill leachate into the Preserve. To that end, NRRWF seeks clarification as to the type of "end-of-pipe" water treatment system sought by COL. For instance, does COL mean a wastewater treatment system or a system of sediment control using chemical treatment or a gloried leach field above the Preserve, or some other physical structure or system? We look forward to engaging with COL as to the proposed system so the County can then engage its technical experts to conduct a feasibility study.

### Remedial Action No. 3: Immediately Restore Flows of Unpolluted Storm Water to the Preserve to Pre-Diversion Levels

COL demands that NRRWF "[i]mmediately restore flows of unpolluted storm water to the Preserve to the pre-diversion levels." Paragraph 7 of COL's correspondence provides further detail relating to this proposed action. That section alleges NRRWF has been diverting water away from the Preserve and into lined septage ponds in response to the discharges of leachate/polluted storm water into the Preserve, which has resulted in "starving the Preserve of water." Indeed, when weather

2 | P a g e

conditions permitted for the re-routing of storm water from basin #4, NRRWF has taken proactive measures to re-route this water into the primary septage pond, a lined liquid waste impoundment, to eliminate potential contamination of waterways. However, over the course of the 2018-2019 Water Year, running from October 1, 2018 to September 30, 2019, NRRWF received 37.06 inches of direct rainfall, which also resulted in direct precipitation onto the Preserve. The numbers show that, for NRRWF/the Preserve, we had above-average precipitation for the 12-month cycle and the wettest season since 2010-11, so NRRWF contests the allegation that the Preserve has been "starved of water." As a comparison, rainfall data from prior years are summarized as follow:

| Water Year | Precipitation, inches |
|---|---|
| 2010-11 | 32.27 |
| 2011-12 | 18.97 |
| 2012-13 | 21.87 |
| 2013-14 | 13.92 |
| 2014-15 | 16.87 |
| 2015-16 | 20.88 |
| 2016-17 | 32.18 |
| 2017-18 | 17.22 |
| 2018-19 | 37.06 |

NRRWF maintains it actively managed its storm water during the extraordinary 2018-19 wet season under duress conditions (i.e. after taking a direct hit from the Camp Fire which destroyed BMPs in November 2018). Additionally, according to NRRWF's records, there were no discharges of storm water from NRRWF to any offsite drainage areas during several years prior to 2018. The Perpetual Conservation Easement Grant ("Grant") or Open Space Preserve Management Plan ("Plan") make no reference requiring the Department of Public Works, or Preserve Manager, to make commitments of non-polluted water deliveries to the Preserve, including during low rainfall years when discharge from sedimentation ponds are not occurring, or to maintain a certain level of hydrology of the Preserve. Indeed, we could not do that as it would essentially constitute a modification to the Plan, something which is not within our authority to approve. Therefore, NRRWF asserts that maintaining hydrology of the Preserve is not a management strategy specified in the Grant or Plan. So, at this time, NRRWF cannot commit to the delivery or restoration of unpolluted storm water to the Preserve to pre-diversion levels, especially when those levels have not been specified or quantified.

***Remedial Action No. 4: Develop a Plan to characterize all foreign soils that have been stockpiled or discarded in the Preserve***

Remedial action no. 4 proposes the following:

> "Develop a plan, in conjunction with COL's experts, to characterize all foreign soil that have been stockpiled or discarded in the Preserve. The plan shall include detailed steps to remove soil in a way that minimizes further disturbance of the Preserve, and that creates a plan to restore areas of the Preserve that were damaged by the storage/disposal, removal, and excavation of soils in the Preserve. A plan should be developed to permanently remove all foreign soils and restore the vegetation of the Preserve. The removal of all foreign soils and completion of the restoration of the Preserve shall be completed as soon as possible, and in any case, no later than October 1, 2020."

3 | P a g e

Paragraph 8 of COL's correspondence provides additional detail relating to the alleged disposal of soil in the Preserve. That section states that "COL was informed by Landfill staff that the Landfill is accepting soil that was excavated from the Camp Fire cleanup efforts. COL is informed, and believes, that soil is contaminated by fire damage is being improperly disposed of at the Landfill and unlawfully used as daily cover. On July 18, 2019, [Holly Nielsen] visited the Preserve and photographed reddish soil deposits in the Preserve."

Indeed, NRRWF accepted Camp Fire soil at its facility. However, prior to the receipt of any such soil, NRRWF worked with the Regional Board and CalRecycle to amend existing permits to accommodate for soil acceptance and disposal. All fire debris loads, whether through the Alternative Program (i.e. private contractors) or via the Government Program (i.e. Cal OES program) were characterized as non-hazardous and acceptable by the agencies prior to delivery to NRRWF. The agencies approved receipt of the soil from the Camp Fire prior to delivery to NRRWF. Further, in conjunction with the Butte County Department of Public Health Division of Environmental Health, NRRWF's Local Enforcement Agency, CalRecycle inspected NRRWF on a weekly basis once the receipt of fire debris commenced and the site operated in accordance with CalRecycle's operational protocol.

As noted above, paragraph 8 states that "[o]n July 18, 2019, [Holly Nielsen] visited the Preserve and photographed reddish soil deposits in the Preserve," so it appears COL contends the reddish soil deposits constitute Camp Fire soil that NRRWF disposed onto the Preserve. However, NRRWF denies such allegation, as no foreign soils from the Camp Fire were ever stockpiled nor discarded in the Preserve. Instead, NRRWF contends the reddish soil originated from a post-Camp Fire storm, which pummeled the site with 3 inches of rainfall between November 28, 2018 and November 30, 2018, with approximately 2.18 inches of rainfall falling on NRRWF on November 30, 2018. Reddish soil was observed in run-on flows from an adjacent property located south of NRRWF. Such run-on was photographed as it eroded the south slope of Module 5B, flowed into the primary septage pond, and flowed directly into NRRWF's storm water system above sediment basin #3, upstream of sediment basin #1, and the Preserve.

NRRWF would be happy to provide the photographs taken during this November 2018 event and, at the same time, requests copies of the photographs taken by Ms. Nielson on July 18, 2019. If COL persists in its allegation, the County requests documentation from COL regarding Ms. Nielsen's qualifications to determine the origin of soil, composition of soil, and/or whether the reddish deposits observed in the Preserve on July 18, 2019 did, in fact, constitute soil. For instance, it is possible that the reddish deposits are not soil at all, rather remnants of algal matting, which is common in the bottom of wetlands that pond for a long duration.

As NRRWF has not stocked piled or discarded any foreign soil in the Preserve, the County respectfully declines accepting this remedial action.

### *Remedial Action No. 5: Installation of Additional Signage*

COL demands NRRWF "install and maintain *additional* signage alerting to the presence of the Preserve." (emphasis added). As mentioned in our telephone call on December 19, 2019 and in an email dated January 14, 2020, NRRWF received correspondence from Holly Nielsen dated September 3, 2019 indicating that the "required signage was never installed at the Preserve." NRRWF responded by correspondence dated September 10, 2019, noting that the Grant and Plan

did not specify that the County was responsible for supplying and installing signage, and referred Ms. Nielsen to Section 6.1 of the Grant which states, "Signage will be installed at Preserve to inform the public of the presence of the Preserve. *The Preserve Manager [i.e. Public Works/NRRWF] will be responsible for the maintenance and replacement of the signage."* (emphasis added). However, to demonstrate cooperation, NRRWF mentioned in its responsive letter that it agreed to purchase and install the signage, and, in fact, did so. See Exhibit A. Note, Section 6.1 makes no reference as to what wording must be used on that sign, the number of signs, and how/where to install those signs. However, based on our telephone call on December 19, 2019, we understand COL found the installed signs insufficient, so NRRWF agreed to install the additional signage. Since then you have informed me that Magoon Signs in Chico has a template with the requested language/graphics to be printed on the four (4) signs (durable material such as aluminum), and have provided instructions as to the signs placement. We have contacted Magoon Signs to order the signs and will install the signs, as instructed, upon receipt. Again, NRRWF accepts the undertaking of this remedial action and will keep you informed as to its progress.

***Remedial Action No. 5: Training and Revisions to NRRWF Documents***

Remedial action no. 5 also demands NRRWF to "[o]n an annual basis, provide adequate training for employees to what management requirements are for Easement – including training on prohibited activities in the Preserve." To date, NRRWF management has already incorporated into its monthly on-site crew training information regarding the purpose, role, and authorizations concerning the Preserve access. Currently, NRRWF management and County Counsel are working together to create a comprehensive training package for NRRWF staff that details the management and prohibited activities of the Preserve – we would be happy to provide you a copy of that presentation, upon completion, for your review and approval as to its adequacy.

Finally, remedial action no. 5 also demands NRRWF "revise its documents to include the Preserve in the Landfill's reports, operations plan, and management documents to increase awareness about the Preserve and to prevent future unauthorized access to the Preserve." So as to avoid another comparable issue as we encountered with the signs, please clarify what information about the Preserve COL would like included in NRRWF's documents (and specify the exact documents requiring revision). Upon receipt of this additional information, NRRWF will determine whether compliance with this remedial action is feasible.

***Remedial Action No. 6: Immediately Cease and Prevent any Future, Open Venting of Methane and other Landfill Gases from Module 4***

On January 14, 2020, Mr. Carlon added the following remedial action for the County's consideration: "Immediately cease, and prevent any further, open venting of methane and other landfill gases from Module 4, especially from the 6 'wet-wells' installed at the toe of Module 4."

The installation of six (6) wet wells at the toe of Module 4 was part of a corrective measure implemented by NRRWF in response to the Regional Board's Order No. 13267, so as to enable visual observation of leachate migration. NRRWF has worked cooperatively to inform California Air Resources Board ("CARB") and the Butte County Air Quality Management District ("AQMD") regarding the reconnection of landfill gas extraction wells, located on the south slope of Module 4, that were temporarily taken off-line to accommodate the receipt of Camp Fire debris. Since November 2019, NRRWF has actively reconnected landfill gas extraction wells and is currently

5 | Page

designing for the installation of up to five (5) new vertical landfill gas extraction wells on top of Module 4, a project slated for late Spring/early Summer 2020. The recent reconnections of landfill gas extraction wells has shown a reduction in methane venting as landfill gas is sent to the Ameresco power plant under vacuum. Further, NRRWF anticipates that methane venting will become a non-issue as additional wells are either reconnected or as new wells are installed. Additionally, NRRWF conducts monitoring of the wet wells at the toe of Module 4 for not only methane but also for any liquid (leachate) accumulations. No liquid has been observed in these wet wells which indicates that leachate has been successfully redirected to the Module 4 liner system.

At this time, NRRWF seeks clarification as to what is meant by "open venting." If that term means NRRWF has open vents actively spewing methane, then, in that context, NRRWF asserts it does not currently have any such open venting, as NRRWF crews installed lids on top of the wet wells to cover them. However, to the extent that "open venting" is interpreted to mean as the passive migration of landfill gas through cover soils into the atmosphere, then NRRWF maintains that it will comply with the requirements for methane emissions as outlined in the Landfill Methane Rule, Title 17 of the California Code of Regulations and Code of Federal Regulations 40 CFR 60, which regulate Municipal Solid Waste Landfills. Those rules require that landfill emissions do not exceed 500 parts per million in air for instantaneous emissions (40 CFR 60 and Title 17) and that integrated monitoring of the landfill may not exceed 25 parts per million in any 50,000 square foot area on the landfill surface. In sum, NRRWF has ceased the active open venting of methane and continues its efforts to reduce, minimize, and eliminate the passive methane venting from Module 4. See also Exhibit B (AQMD correspondence to S. Jackson dated 01/15/2020).

To conclude, the County/NRRWF remains committed to working with COL to preserve and maintain the Preserve as set forth in the Grant and Plan. Please contact me if you have questions or if you would like to further discuss the above items.

Sincerely,
BRUCE S. ALPERT
Butte County Counsel

By _____
    Brunella M. Wood
    Deputy County Counsel

Cc: Dennis Schmidt & Eric Miller, Department of Public Works

6 | P a g e

# EXHIBIT A

NRRWF/Preserve Area
Evidence of Signage Posting – No Entry (1-16-20)



Photo 1.  Signage installed in SE corner, Sept 2019 (5" capital letters, black on white on aluminum base)



Photo 2. Signage installed in SW corner, Sept 2019 (added "No Vehicles" since this appears to be an access road to spillway)

1

NRRWF/Preserve Area
Evidence of Signage Posting – No Entry (1-16-20)



Photo 3.  Signage installed in NE corner, Sept 2019 (added "No Vehicles" as it appears to be an access road to maintenance area)



Photo 4.  Signage installed in NW corner, Jan 2020.  Only accessible by foot.

2

# EXHIBIT B



*629 Entler Avenue, Suite 15*
*Chico, CA 95928*

*(530) 332 9400*
*(530) 332-9417 Fax*

**W. JAMES WAGONER**
*Air Pollution Control Officer*

**STEPHEN ERTLE**
*Assistant Air Pollution Control Officer*

January 15, 2020

Stephen Jackson
Engineering Technician Assistant
Butte County Public Works
7 County Center Drive
Oroville, CA 95965

RE:     Permit/Authority to Construct Issue regarding Leachate Wet Wells

Dear Mr. Jackson,

Thank you for reaching out to the Butte County Air Quality Management District (District) regarding your concerns about the installation of leachate wet wells at the Neal Road Recycling and Waste Facility (NRRWF) located at 1023 Neal Road, Paradise, CA. We understand from your email and phone call that the landfill installed six (6) vertically-placed culverts along the south face of Module 4. Your observations with measuring instrumentation indicate the wet wells have methane present. You have raised concerns of excess landfill gas emissions from the wells and if an Authority to Construct was needed for the installation. You also expressed concerns about potential violations of the Title V permit.

Our staff conducted a site investigation of the landfill on November 13, 2019 to inspect the wells and obtain a status update on Module 4. From our conversation with landfill management, we understand the wet wells were installed to be able to observe leachate migration and installation was coordinated with the Regional Water Quality Control Board and their engineering consultants. We understand leachate from Module 4 seeped into the rain water run-off this past spring and these wells allow visual observation of leachate along the cell boundary. We were told the leachate pump for Module 4 was malfunctioning which likely contributed to the incident this past spring. At the time of our site investigation, the landfill staff had temporarily "capped" the six wet wells with a black plastic material and did not appear to be under pressure. The landfill gas wells in Module 4 were not connected to the collection system at the time of our visit; however, landfill management indicated the wells were expected to be connected in the next few days.

We have reviewed our permitting practices and have determined that an Authority to Construct would not have been required for the installation of the leachate wet wells. The District has not included leachate collection, piping, wells, equipment or monitoring in past permitting actions. We confirmed with several other air districts in the Sacramento Valley that they also would not have required a permit modification for this type activity.

In related background, in accordance with District Rules and Regulations, NRRWF petitioned the Butte County AQMD Hearing Board in November 2018 for a variance from permit conditions

related to the portions of the landfill that were damaged by the Camp Fire, including most of the piping for the landfill gas collection system. The Hearing Board granted the variance through November 14, 2019. Since the collection system was damaged, we would not expect gas collection in that area and believe the variance would include any excess emissions until the piping could be re-installed. In addition, our understanding of State and federal regulations would not require gas collection on a module until the module is completed.

Since the concern relates to methane releases, the District contacted the California Air Resources Board (CARB) and asked staff to review their AB32 Greenhouse Gas Control Measure for Landfills (Measure) for applicability in this situation. District staff has been in contact with CARB since the gas system was destroyed by the Camp Fire. CARB staff reported back that they believed the regulation did not address activities such as leachate observation wells and believed it would be considered as part of the alternative compliance measures enacted for the fire repairs. CARB staff recommended the landfill include these points in the surface monitoring plan once Module 4 was connected to ensure the wells were in compliance with surface concentration limits in the Measure.

Since the District inspection in November, NRRWF has reported that Module 4 has been connected to the landfill gas collection system. Two of the wells were not functional and were being replaced or repaired. The Authority to Construct issued in 2014 permitted the installation of the gas collection wells.

If you have additional concerns or questions about our review of your concern, please contact me at sertle@bcaqmd.org or (530) 332-9400.

Sincerely,

Stephen Ertle
Assistant Air Pollution Control Officer

cc:     Todd Storti, Butte County NRRWF
        Bruce Alpert, Butte County Counsel

# EXHIBIT L

ANDREW L. PACKARD
319 PLEASANT STREET, PETALUMA, CALIFORNIA 94952
PHONE (707) 763-7227  FAX (707) 763-9227
INFO@PACKARDLAWOFFICES.COM

**Will Carlon <wncarlon@packardlawoffices.com>**

# Public Records Request dated March 3, 2020

**Will Carlon** <wncarlon@packardlawoffices.com>                    Tue, Mar 31, 2020 at 10:02 AM
To: "Wood, Brunella" <BWood@buttecounty.net>
Cc: holly@californiaopenlands.org, hollylane nielsen <hollylane75@hotmail.com>, Andrew Packard
<andrew@packardlawoffices.com>
Bcc: Mark Habib <mhabib@peterslawchico.com>

    Brunella,

    Thank you for providing those documents.  Based on these records, and other documents received from the Army Corps, it appears that Butte County has an inaccurate understanding of what land is actually protected under the Conservation Easement at issue in this matter.  For your reference, I have attached the legal description that is Exhibit A to the Easement and a map of that legal description platted over a Google Earth satellite image.  As you can see from those documents, the Easement area includes the entire basin.  Documents that the County has recently provided to the Corps and Regional Board label areas within the Preserve as a "Maintenance Area" or a "Sediment Basin," apparently disregarding the land's actual status as protected wetlands.  The County's identification of this land as anything other than wetlands protected by the Easement, especially to agencies with a regulatory interest in the land, is misleading and indicative of a lack of good faith interest in resolving the issues raised by COL.

    The Easement consists of an area of 6 acres, 3 acres of which are protected wetlands.  The County's excavation activities are occurring within the 3-acre wetland area and the activities are destroying the conservation values of those wetlands.  These excavation activities must stop immediately and the land must be restored to wetland.  Had the County consulted with COL prior to conducting the excavation, perhaps the County could have avoided the inevitable costs associated with remediating the damage to the Preserve.

    If the County has a different understanding of the boundaries and scope of the Easement, please provide the specifics and support for any such position.  COL believes this issue to be integral to the resolution of its allegations against the County and hopes that we can reach a shared understanding.

    Thank you,

    William N. Carlon
    Attorney at Law

    The Law Offices of Andrew L. Packard
    245 Kentucky Street, Suite B3
    Petaluma, CA  94952

    Tel. (707) 782-4060 ext 2
    Fax: (707) 782-4062
    Email:  wncarlon@packardlawoffices.com

The communication contained in this message is considered privileged and confidential.  It is protected by attorney client privilege and the attorney work product doctrine. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in  error, please provide notification to the sender immediately by replying to the message and deleting it from your computer. This Email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged.

[Quoted text hidden]

---

**4 attachments**

 **1-Legal Description of Easement.pdf**
284K

 **2-Map platting legal description.pdf**
492K



**4-Map from County to RWQCB.pdf**
167K

**3-Map from County to Corps.pdf**
1117K

# EXHIBIT M

Will Carlon <wncarlon@packardlawoffices.com>

## Public Records Request dated March 3, 2020

**Will Carlon** <wncarlon@packardlawoffices.com>                Mon, Apr 13, 2020 at 10:07 AM
To: "Wood, Brunella" <BWood@buttecounty.net>
Cc: holly@californiaopenlands.org, hollylane nielsen <hollylane75@hotmail.com>, Andrew Packard
<andrew@packardlawoffices.com>

Brunella,

Thank you for your response.  The County's understanding of the scope of the Preserve cannot be correct because there simply isn't enough real estate available.  The map that you provided, on page 3 of the pdf - the Gallaway Enterprises map entitled "Neal Road Recycling and Waste Facility Infrastructure and Facilities Location Map" - identifies two features within the Preserve area.  One feature is a portion of the wetland which is identified by green cross hatching and labelled "Wetland".  This area, as marked on the County's map, measures only 2 acres.  The area in which the County performed the excavation activities is identified as "Sediment Basin" and measures 1 acre.  In your email you confirm that the County acknowledges that there is a 3-acre wetland area ("we agree that the Easement consists of 6 acres total - 3 acres of which are protected wetlands"), but can only point to two acres the County believes are wetlands.  The area the County contends is the wetland is too small.

Furthermore, on the issue of the 25-foot buffer. COL contends that the permit requires a **minimum** of a 25-foot buffer, and that what was actually created was larger.  ("To minimize external disturbance to preserved waters of the United States, you shall establish a buffer, consisting of native upland vegetation of **at least** 25 feet in width from the outer limit of jurisdiction of the entire perimeter of all created, preserved, and avoided waters of the United States, including wetlands within the proposed preserve."  (Permit No. 200300113, Special Condition 4, emphasis added.))  The distance from the toe of the levee surrounding the wetland area of the Preserve to the perimeter as described in the legal description is the buffer, and no prohibited activities may occur within that buffer space.  Therefore, the excavation activities that occurred within the protected wetland area of the Preserve and within the buffer area were unauthorized and prohibited activities under the Easement.

COL's position is that the County's discharge of leachate damaged the conservation values of the Preserve (and thus violated the Easement) and that the County's haphazard excavation activities, without a plan for restoring the wetlands, further exacerbated the damage.

William N. Carlon
Attorney at Law

The Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA  94952

Tel. (707) 782-4060 ext 2
Fax: (707) 782-4062
Email:  wncarlon@packardlawoffices.com

The communication contained in this message is considered privileged and confidential.  It is protected by attorney client privilege and the attorney work product doctrine. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in  error, please provide notification to the sender immediately by replying to the message and deleting it from your computer. This Email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged.

On Fri, Apr 10, 2020 at 4:56 PM Wood, Brunella <ushare@buttecounty.net> wrote:

Will,

The County understands that the area covered and protected by the Conservation Easement (referred to as the "Preserve") includes all that land described in Exhibit A to the Easement, but thank you for attaching that exhibit and map for our reference. Additionally, the County understands that the Preserve,

Case 2:20-cv-00123-DJC-DMC   Document 88-3   Filed 02/01/24   Page 138 of 362

as defined in Section 3 of page 2 of the Easement, includes and means the "approximately 3.00 acre area appearing on Exhibit B containing both created and natural wetland features and buffer zones which shall be maintained as a Preserve in accordance with the provisions of Section 3." (emphasis added). In other words, the County understands that the 3.0 acres of the Preserve (containing wetland features) plus the 25 foot buffer of the Preserve area constitute the entire Preserve. Within the Preserve, the County also understands that a storm-water detention basin (which I understand if often referred to as the "Maintenance Area" or "Sediment Basin") was created (see Figure 2, page 4 of the Plan), which was "designed to catch flow and flow over the berm into the wetland during times of high water ... and allow[s] some passive treatment of water before it enters the preserved wetlands/waters of the U.S." (emphasis added). The County understands the Public Works Department may engage in maintenance or repair activities in the storm-water detention basin so long as it does not impact preserved wetlands or waters of the U.S. Based on the County's interpretation of the definition of "Preserve" and the purpose of the storm-water detention basin, the County maintains that the 25 foot buffer zone and the storm-water detention basin do not contain wetland features, so any alleged identification of this buffer zone/maintenance area as not containing wetlands is not misleading or indicative of a lack of good faith. If COL asserts otherwise - that is, that the buffer zone and/or storm-water detention basin contain wetlands - please let me know.

That said, we agree that the Easement consists of 6 acres total - 3 acres of which are protected wetlands. However, the County maintains that the excavation activities stemming from the remediation measures that took place following the 10/17/2019 LCRS broken pipe leak have occurred in the 25 foot buffer zone and/or the storm-water detention basin, not within the 3 acre wetland area (see attached map). If COL disagrees, please provide a map/photos depicting the alleged excavation activities in the wetland area.

As far as consulting with COL, NRRWF did not consult with COL prior to conducting the remedial excavation activities at the southeastern embankment of the sedimentation basin/buffer zone, as the Easement did not require NRRWF to do so. See page 6, Paragraph 4 of Easement ("No person shall engage in any of the following restricted activities in the Preserve unless that activity is in the future approved by the Corps: … (f) Excavating, dredging, or removing loam, gravel, soil, rock, sand, or other material"). If COL maintains NRRWF was required to consult with and/or obtain COL's approval prior to engaging the subject excavation activities (in addition to the Corps), please provide the relevant section in the Easement requiring such.

At this point, as I understand it from NRRWF management, excavation/soil sampling activities resulting from the 10/17/19 incident have stopped. Further, as I understand it, NRRWF is currently working with the Corps to restore/reshape the southeastern embankment of the primary sedimentation basin (i.e. backfilling with clean soil) and this activity does not involve habitat restoration nor will it impact preserved wetlands or waters of the U.S. If COL maintains NRRWF must consult with and/or obtain approval from COL prior to reshaping/backfilling the subject area with clean soil, please reference us to the relevant section in the Easement/Plan. Finally, your email below mentions "damage to the Preserve"; as I understand it, the subject excavation activities following the 10/17/19 LCRS broken pipe leak were done as a remedial measure to remove contaminated soil/conduct soil sampling in order to preserve the values of the Easement. As such, please specify the damage or injury COL claims the Preserve sustained as a result of NRRWF's excavation in the southeast corner of the Preserve.

In sum, the County has the same understanding as COL in regard to the boundaries of the Easement. However, it appears the County and COL have a misunderstanding as to the location in which the remedial excavation activities took place as a result of the 10/17/19 incident, whether that area contains wetland features, and NRRWF's duty to consult/notify COL prior to engaging in maintenance or repair activities within the buffer zone/maintenance area. To resolve this misunderstanding, the County has and continues to remain open to working with COL to resolve those issues.

Finally, attached please find a Revised Roadside Leachate Spill Soil Remediation Report, which NRRWF sent to the Regional Board on 04/09/2020 (also uploaded in Geotracker).

Brunella M. Wood
Deputy County Counsel
Butte County Counsel
25 County Center Drive, Suite 210
Oroville, CA 95965-3380
Phone (530) 552-4071
Fax (530) 538-6891

Confidentiality Notice: This e-mail transmission, and any documents or messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering this e-mail to the intended recipient, then you are (1) notified that any disclosure, copying, distribution, saving, reading or use of this information is strictly prohibited, (2) requested to discard and delete this e-mail and any attachments, and (3) requested to immediately notify us by e-mail that you mistakenly received this message (sthornton@buttecounty.net), fax (530) 538-6891 or telephone (530) 552-4061. Thank you.

From: Will Carlon
Sent: Tuesday, April 7, 2020 1:05 PM
To: Wood, Brunella
Cc: holly@californiaopenlands.org; hollylane nielsen; Andrew Packard
Subject: Re: Public Records Request dated March 3, 2020

. ATTENTION: This message originated from outside Butte County. Please exercise judgment before opening attachments, clicking on links, or replying. .
Thank you, Brunella.

William N. Carlon
Attorney at Law

The Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952

Tel. (707) 782-4060 ext 2
Fax: (707) 782-4062
Email: wncarlon@packardlawoffices.com

The communication contained in this message is considered privileged and confidential. It is protected by attorney client privilege and the attorney work product doctrine. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please provide notification to the sender immediately by replying to the message and deleting it from your computer. This Email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged.

On Tue, Apr 7, 2020 at 12:56 PM Wood, Brunella wrote:
Hello Will,

I am currently out of the office on maternity leave. I or another attorney from our office will respond to your email by the end of this week.

# EXHIBIT C

**To Defendants' Appendix of Exhibits**
**in Opposition to Plaintiff's Motion for Partial Summary Judgment**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNLIMITED JURISDICTION

CALIFORNIA OPEN LANDS, a          )
non-profit land trust             )
organization,                     ) CASE NO.
                                  ) 2:20-cv-00123-
     Plaintiff,                   ) KJM-DMC
                                  )
V.                                )
                                  )
BUTTE COUNTY DEPARTMENT OF PUBLIC )
WORKS, et al,                     )
                                  )
     Defendants.                  )
- - - - - - - - - - - - - - - - - )

**CERTIFIED TRANSCRIPT**

REMOTE DEPOSITION OF

ERIC A. MILLER, MBA

VOLUME 1

Wednesday, October 11, 2023

Reported by:  Shaaron M. Shigio

             CSR No. 12286

Job No:  73771



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNLIMITED JURISDICTION


CALIFORNIA OPEN LANDS, a          )
non-profit land trust             )
organization,                     ) CASE NO.
                                  ) 2:20-cv-00123-
      Plaintiff,                  ) KJM-DMC
                                  )
V.                                )
                                  )
BUTTE COUNTY DEPARTMENT OF PUBLIC )
WORKS, et al,                     )
                                  )
      Defendants.                 )
- - - - - - - - - - - - - - - - - )


REMOTE DEPOSITION OF

ERIC A. MILLER, MBA

VOLUME 1


Wednesday, October 11, 2023


Reported by:  Shaaron M. Shigio

            CSR No. 12286

Job No:  73771

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF CALIFORNIA

 3     - - - - - - - - - - - - - - - - - )
 4     CALIFORNIA OPEN LANDS, a          )
       non-profit land trust            )
 5     organization,                    ) CASE NO.
                                        ) 2:20-cv-00123-
 6          Plaintiff,                  ) KJM-DMC
                                        )
 7     V.                               )
                                        )
 8     BUTTE COUNTY DEPARTMENT OF PUBLIC )
       WORKS, et al,                    )
 9                                      )
            Defendants.                 )
10     - - - - - - - - - - - - - - - - - )

11

12

13          Deposition of ERIC A. MILLER, MBA, taken on

14    behalf of Plaintiff, witness appearing via Zoom

15    Videoconference, commencing at 12:34 P.M., Wednesday,

16    October 11, 2023, before Shaaron M. Shigio, Certified

17    Shorthand Reporter No. 12286, pursuant to Notice of

18    Deposition.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF CALIFORNIA OPEN LANDS, a non-profit land

 3   trust organization:

 4          Andrew L. Packard

 5          BY: WILLIAM N. CARLON, ATTORNEY AT LAW

 6                (via videoconference)

 7          245 Kentucky Street

 8          Suite B3

 9          Petaluma, California 94952

10          Wncarlon@packarlawoffices.com

11          Telephone:  707-782-4060

12

13   FOR DEFENDANTS BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS,

14   et al:

15          Abbott & Kindermann

16          BY:  GLEN C. HANSEN, ATTORNEY AT LAW

17                (via videoconference)

18          2100 21st Street

19          Sacramento, California 95818

20          Ghansen@aklandlaw.com

21          Telephone:  916-456-9595

22

23

24

25
```

*Carol Nygard & Associates, Inc.*                    *1-877-438-7787*

```
 1                     I N D E X

 2  Examinations                               Page

 3     EXAMINATION BY MR. HANSEN                 6

 4

 5                   E X H I B I T S

 6  Exhibit No.          Description           Page

 7     Exhibit 1  Notice of Deposition of      10

 8                Miller_230922

 9     Exhibit 2  Miller CV                     16

10     Exhibit 3  Miller Expert Report          23

11     Exhibit 4  thoughts re Dennis meeting with   86

12                BOS on 1210

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       VIDEOCONFERENCE

 2                 Wednesday, October 11, 2023

 3                   ERIC A. MILLER, MBA,

 4       having been first duly sworn by the reporter, was

 5               examined and testified as follows:

 6                        EXAMINATION

 7   BY MR. HANSEN:

 8       Q.   Thank you.  It's good to see you again

 9   Mr. Miller.

10       A.   Thank you.

11       Q.   I understand --

12       A.   I'm turning up your volume too.  Okay.

13       Q.   Okay.  Can you hear me okay?

14       A.   Yeah.  Yes.

15       Q.   I can turn up my microphone.

16       A.   That would be helpful, actually.

17       Q.   How's that?

18       A.   Okay.  Let's give that a try.

19            MR. CARLON:  Is this better?

20            MR. HANSEN:  Yes.

21            MR. CARLON:  Or am I blowing your ears out

22   here?

23            MR. HANSEN:  No, that's good.

24            MR. CARLON:  Okay.

25
```

```
 1              THE REPORTER:  Mass?

 2              THE WITNESS:  The rainfall intensity and the

 3   accumulated effects of successive storms saturated the

 4   conditions.  Several of these storms were quite strong

 5   and very damaging to not only our facility, but other

 6   infrastructure within our county.  Had those events not

 7   occurred, we would have not had trouble or nearly as

 8   many challenges.  Let's put it that way.

 9              MR. CARLON:  Okay.  I don't think you answered

10   my question.

11              And, Madam Court Reporter, I think he said

12   "mass," m-a-s-s.

13   BY MR. CARLON:

14       Q.   Is that correct, Mr. Miller?

15       A.   Yes, waste mass.

16       Q.   So I just asked you -- you used the term

17   "leachate discharges" in your opinion and my question

18   was just what do you mean by "leachate discharges"?

19       A.   A seep.

20       Q.   So what do you mean?  Okay.  So the -- and to

21   be clear, we're talking about the leachate discharges

22   so these are specific events.  Could you be more

23   specific, please, when you say "seep"?

24       A.   A leachate seep that occurred on Module 4.

25       Q.   And that would be in February of 2019?
```

 1  their waste go every day.

 2      Q.   And you felt like you were being reactive

 3  rather than proactive maybe; is that a fair way of

 4  describing it?

 5      A.   Who, me being proactive?

 6      Q.   Well, the landfill, the solid waste

 7  management, what you're describing in this?

 8      A.   We needed to be more proactive.

 9      Q.   And at that point your concern was that you --

10  that the County was not being proactive?

11      A.   That's correct.

12      Q.   And since that time has the -- has your

13  opinion changed?

14      A.   Yes, it's changed.  It's improved.

15      Q.   And when did your opinion change?

16      A.   We started a master planning process a couple

17  of years ago which helped shed some light on the

18  importance of having a reliable solid waste

19  infrastructure in Butte County.

20      Q.   And that would have happened in 2021?

21      A.   I'm trying to think.  When we went into

22  contract.  It may have been 2021.

23      Q.   And then with number two you're talking about

24  operations and how you need to invest in

25  infrastructure.

 1   have for Mr. Miller today.

 2           THE WITNESS:  Okay.

 3           MR. HANSEN:  All right.  I'll just go -- take

 4   the normal copy.  Why don't we take it by electronic

 5   version first.  If we want written, we'll ask later.

 6   Okay.

 7

 8           (Whereupon, at the hour of 3:22 p.m. the

 9   matter was adjourned.)

10

11                      ---o0o---

12

13           I declare under penalty of perjury that the

14   foregoing is true and correct.  Subscribed at

15   _____, California, this_____day of

16   _____, 2023.

17

18

19                       _____

20                       ERIC A. MILLER, MBA

21

22

23

24

25

```
 1
 2                    CERTIFICATE OF REPORTER
 3
 4        I, SHAARON M. SHIGIO, a Certified Shorthand
 5   Reporter of the State of California, duly authorized to
 6   administer oaths, do hereby certify:  That I am a
 7   disinterested person herein; that the witness, ERIC A.
 8   MILLER, MBA, named in the foregoing deposition was by
 9   me duly sworn to testify the truth, the whole truth,
10   and nothing but the truth; that said deposition was
11   reported in shorthand by me, SHAARON M. SHIGIO, a
12   Certified Shorthand Reporter of the State of
13   California, and thereafter reduced to typewriting, by
14   computer.
15
16   Dated: October 25th, 2023
17
18
19                        Shaaron M. Shigio
20                        CSR # 12286
21
22
23
24
25
```

# Eric A. Miller, MBA

Chico, California  95973
eric@etcguy.com                                                          (530) 514-7729

## QUALIFICATIONS SUMMARY

Results-oriented **Management professional** with proven expertise in managing teams to complete complex, multi-faceted, multimillion-dollar projects in the solid waste and water resources industries. Exceptional interpersonal communication skills and technical expertise in environmental compliance, strategic planning, staff development, with a strong sense of project ownership and urgency.

## PROFESSIONAL EXPERIENCE

**Solid Waste Division Manager**                                        **2016-Present**
*Neal Road Recycling and Waste Facility (Butte County Public Works, Oroville, CA)*
Manage a 700 ton per day Class III sanitary landfill, crew of 25, and budget of $10+ million.  Serve as environmental compliance manager for a 200-acre facility permitted by Cal EPA agencies governing air quality, water quality, and solid waste operations.  Administer contract for a 2MW on-site power plant.  Oversaw capital facility improvement construction, including:

- Development of new septage transfer station (2018);
- Rebuilding of fire damaged landfill gas collection system (35 wells, two miles of pipe), leachate collection and removal system, one mile of facility's storm water management system (2018, 2019);
- Decommissioned two septage waste impoundments including the dewatering of more than 5 million gallons of liquid (2017-2019);
- Built four new RCRA Subtitle D solid waste cells (2017, 2018, 2020, 2022).
- Co-coordinated the acceptance of Camp Fire (Paradise, California) Debris Waste and receipt of approximately 6,000+ structures which increased daily input to 12,000 tons and consumed over 800,000 CY of air space, increased gross annual revenue and increased traffic throughput from 100,000 vehicles to over 175,000 vehicles (2019-20);
- Expanded landfill gas collection system and the installation of new extraction wells (2019, 2020, 2021):
- Developed and executed emergency landfill operations contracts for Camp Fire Debris Program (2019-2020) and  landfill crew (COVID) quarantine (2020);
- Provided technical support for County's legal team regarding Federal and State lawsuits related to leachate contaminated storm water discharge (2019-ongoing);
- Oversaw rebuilding of landfill flare and leachate control instrumentation units (2019-20);
- Continued development of integrated waste management plan, strategic plan, capital improvement plan, and budget;
- Managed cross-functional project teams involving consulting engineers, financial planners, environmental scientists, water resource planners, and public relations experts;

**Project Consultant/Freelance Writer/University Lecturer**            **2014 to 2016**
*Self-employed (and California State University, Chico, CA)*

- Lectured upper division undergraduate courses in the Department of Recreation, Hospitality and Parks Management and the Department of Finance and Marketing.
- Researched, assembled, and authored the preliminary draft of "*The History of the Browns Valley Irrigation District, California.*"



EXHIBIT
10/11/23 Miller
2

Page 1

**Interim Program Delivery Supervisor**                                    **2013 to 2014**
*Ecology Action | Pacific Gas & Electric Subcontractor (Santa Cruz, CA)*
- Managed a $400,000 marketing and public relations campaign to promote Energy Upgrade California and State energy efficiency goals within Butte, Kern, and Placer Counties.

**Senior Project Manager | Interim Management Services**          **2006 - 2013**
*MPM Engineering (Chico, CA)*
- Developed, managed, and executed projects involving water planning and delivery, groundwater management, irrigation studies, capital improvement planning, environmental compliance, and technical reporting for public and private sector clients.
- Served as interim general manager for a local irrigation district to implement its 2012 crop idling water transfer project with the California Department of Water Resources (DWR).

## ADDITIONAL PROFESSIONAL EXPERIENCE

**Assistant Manager,** *(Yuba County Water Agency, Marysville, CA)*
**Program Manager,** *(Butte County Department of Water & Resource Conservation, Oroville, CA)*
**Solid Waste Manager** (*Butte County Public Works Department, Oroville, CA*)
**Waste Reduction/Recycling Coordinator** (*Yolo County Public Works Department, Woodland, CA*)
**Lab Technician/Chemist** (*Las Virgenes Municipal Water District, Calabasas, CA*)

## EDUCATION

UNIVERSITY OF CALIFORNIA, DAVIS, CA
**Master of Business Administration (MBA)**

COLORADO STATE UNIVERSITY, FORT COLLINS, CO
**Bachelor of Science, Watershed Science and Hydrology**

## CERTIFICATIONS & TRAINING

Manager of Compost Operations, Solid Waste Association of North America (SWANA), October 2019
Hazardous Waste Site Operations & Emergency Response (8-Hour Refresher), January 2018
Certificate of Completion - Load Checking Workshop, CalRecycle, June 2017
Certified Manager of Landfill Operations (MOLO), SWANA, March 2017

## ADDITIONAL SKILLS AND TRAINING

Proficient in MS Office Suite, social media (Facebook, Twitter), and WordPress

## AFFILIATIONS

*Solid Waste Association of North America (SWANA), Member,* 2017-present
*SWANA Landfill Rebranding Committee, 2019 - present*
*Chico Urban Water Conservation Group,* Public Member, 2007-2016
*Butte County Library Literary Services,* Volunteer Fundraiser Emcee, 2014-present
*Butte County Groundwater Technical Advisory Committee,* Public Member, 2014-2016

# Presentations and Publications

## Presentations

*When Landfills (and Solid Waste Facilities) Save the Day – The Camp Fire, SWANA* WasteCon, San Diego, California 2022, and SWANA webinar August 2023

*The Effects of Wildfire on a California Municipal Landfill and the Unintended Consequences,* SWANA, Monterey, California, (2020 cancelled due to COVID).  Webinar postponed to Feb 2021

*Temperature Measurement – Mercury's Rise or Fall is Fundamental for Water Resources Management,* Measurement Science Technical Program, Anaheim, California, 2016

## Publications

Selected titles of published environmental and sustainability articles appear below.

**Central Valley Business Times, Stockton, California**
*Bugs and Floodplains May Be Part of California's Water Equation,* October 2018
*Product Stewardship Awakens in the Mattress Industry*, February 2017
*Reconciliation Ecology Could End California's Water Wars,* October 2016
*Entrepreneur's Air Force Patrols Landfill*, March 2016
*Entrepreneur Believes in California Olive Oil*, February 2016
*It's Time for New "Water" Year Resolutions*, October 2015
*Mercury's Rise Creates Competition for California Water*, July 2015
*Drought Heightens Awareness for Water Reuse and Recycling*, June 2015
*It's All Ears When Water Commissioners Speak*, April 2015
*How Baseball Trades are Like Water Transfers*, March 2015
*Water Managers State to Cope with State's New Groundwater Law*, February 2015
*Drought Worries Deepen for Groundwater Users*, November 2014
*North State Entrepreneurs Innovate for Efficient Water Use*, September 2014

**Chico News and Review, Chico, California**
*Fluid Innovators,* November 2014
*The Fresh Test – Local Lab Making the Grade for Olive Oil Industry*, February 2016

## EXPERT REPORT OF ERIC MILLER

**California Open Lands v. Butte County Department of Public Works,
etal.
Case No. 2:20-cv-00123-DJC-DMC,
U.S. District Court, Eastern
District of California**

**Introduction**:

Since 2016, I have been the Solid Waste Division Manager for the Butte County Department of Public Works ("County"). Among my responsibilities to support Department leadership, I manage personnel, budget development, contracts, capital project development, environmental compliance, and recycling and landfill disposal operations at the Neal Road Recycling and Waste Facility, located at 1023 Neal Road, in Paradise, which is also referred as the "NRRWF" or "Facility".

A detailed resume is attached.

I have not testified or provided expert witness services for any other case in the past four years.

A selected list of publications that I have authored within the past ten years are listed in my resume, attached.

The compensation that I am to be paid as an expert witness in this case is $55.85 per hour.

**Purpose and Objective:**

I was requested to provide expert witness testimony regarding the Facility's compliance with the federal Clean Water Act (CWA), the National Pollution Discharge Elimination System ("NPDES"), and the permit requirements for the CWA, the California Industrial General Permit ("IGP") and the Waste Discharge Requirements ("WDRs"). My opinions are based on my personal experience in implementing the County's compliance with the NPDES, the permit requirements for the CWA and the IGP, and the WDRs; my review of all of the documents relevant to the County's compliance with the permit requirements for the CWA and the IGP since 2016; my ongoing communications with consultants hired by the County to comply with the permit requirements for the CWA and the IGP, and the WDRs; my review of reports by consultants hired by the County to comply with the permit requirements for the CWA and the IGP, and the WDRs; my participation in and review of ongoing communications with State agencies regarding the County's compliance with the permit requirements for the CWA and the IGP, and the WDRs; California Open Lands v. Butte County Department of Public Works, signed by Wesley P. Greenwood of Compliance SFO, Inc., dated July 2, 2020; my review of the Investigative Final Report, dated December 14, 2022, prepared for the Facility by Compliance SFO, Inc. and Formation Environmental, LLC; my review of Local Enforcement Agency



EXHIBIT

10/11/23 Miller

3

1

inspection records prior to and after the Camp Fire; my personal involvement in remedying seeps and spills at the Facility; and my review of laboratory reports of analysis of samples related to storm water and site operations at the Facility.

**Opinions And Support**:

1) In my opinion, prior to the Camp Fire, which initiated November 8, 2018 and burned the Facility as evidenced in photographic documentation and by personal observation, the NRRWF complied with the Best Management Practices (BMPs) and with the requirements and regulations for storm water management in the CWA, the IGP and the WDRs. Prior to the Camp Fire and during my tenure dating back to 2016, no storm water discharges of any kind occurred at the NRRWF either onto or off the site.

The NRRWF has been developed in a northeast-to-southwest-trending canyon that historically eroded into a gently sloping plateau. The NRRWF comprises 229 acres. The solid waste facility permit lists the permitted area at 190 acres of which 140 acres is permitted for waste disposal. The NRRWF consists of five Class III operation modules identified as Waste Management Units (WMUs) 1, 2, 3, 4, and 5. Other significant features at the NRRWF include a Class II surface impoundment for landfill leachate and landfill gas condensate, storm water basins, a Primary Sedimentation Basin (PSB), and a soil cover stockpile. Site facilities consist of two scale houses, four scales, a maintenance building, a main office building, a landfill gas-to-energy plant and flare system, a septage transfer station, and one groundwater supply well.

2) In my opinion, the leachate discharges were the direct result of a series of natural disasters which can be classified as *ACTS OF GOD.*

Leachate discharges from the southwest toe of Waste Module Unit 4 of NRRWF (WMU-4 to Storm Water Basin 4 (SWB-4) and the Primary Sedimentation Basin (PSB), also known as the Conservation Easement, occurred at the NRRWF on February 14, 2019, February 26, 2019, and March 6, 2019. A series of manmade and natural events beginning November 8, 2018, with the onset of the Camp Fire caused severe damage to the Facility. The Camp Fire destroyed the infrastructure required to operate the Facility under state and federal regulatory requirements, including the CWA, the IGP and the WDRs. Storm water Best Management Practices (BMPs) associated with WMUs 1, 2, 3 and 4, WMUs poly covers, soil grass covers, and other infrastructure required to meet local, state, and federal regulations were destroyed.

The infrastructure destroyed by the Camp Fire was being repaired by NRRWF personnel, under my direction in support of NRRWF management at the time, when a series of severe local storm events caused by atmospheric rivers impacted the NRRWF beginning in late November 2018 which produced over three inches of rain in three days in a pattern of high intensity storms. From October 2018 through December 2018 the Facility received nearly eight inches of precipitation. The site received more than five inches of rain in January 2019 with wetter weather continuing into early February 2019. NRRWF received nearly thirteen inches of rain in February 2019. BMPs that had been in place to mitigate the potential impacts of storm water sheet flows were partially repaired by NRRWF personnel, or were in the process of repair, when these series of atmospheric rivers and subsequent rainfall overwhelmed the damaged BMPs resulting in leachate seep events. Prior to the

2

leachate seep events, the NRRWF BMPs, even though damaged and partially repaired, had effectively controlled the discharge of leachate from all the WMUs. The intense precipitation associated with these severe local storm events overwhelmed NRRWF site infrastructure. Leachate discharged from the southwest toe of WMU-4 and entered storm water contained in SWB-4.

On February 14, 2019, an intense storm water event produced 2.75 inches of precipitation caused numerous seeps along the toe and mid-slope of the southern side of Module 4. Liquid was observed flowing into the temporary storm water basin #4 at an estimated rate of 475 gallons per hour. The storm water and leachate in SWB-4 was discharged by a pump that had either inadvertently been turned on or left in automatic mode, resulting with a discharge into a drainage ditch that feeds the PSB. The seep areas on the Module 4 slope were managed as best as possible by landfill staff. Pumps were manually shut off.

Another atmospheric storm even occurred on February 26, 2019, and additional seeps were observed from the toe of Module 4 which flowed into storm water basin #4. The storm water and leachate in SWB-4 was discharged by a pump that was inadvertently turned on or left in automatic mode, into the drainage ditch that feeds the PSB. Pumps were manually shut off. NRRWF personnel attempted to mitigate the discharge of leachate to storm water but were unable to complete this work as saturated surface soil conditions from the severe storm events prevented the use of heavy equipment, and the use of electrically powered equipment to install pipes necessary to discharge the leachate to a suitable impoundment.

In response to the discharge, NRRWF personnel, at my direction, promptly and properly collected storm water discharge samples from the PSB storm water sampling site identified as SW-1 during the February 14, 2019, and February 26, 2019, leachate seep events. Background storm water run-on samples representing storm water quality generated from sites outside the boundary limits of the NRRWF were also collected for analysis during the February 14, 2019, and February 26, 2019, leachate seep events. The storm water run-on sample sites are identified as SW-2 located on the east-central NRRWF boundary, and SW-8 located on the southwest boundary of the NRRWF. Storm water samples collected by NRRWF personnel were analyzed at a State Water Resources Control Board ("Water Board") certified Environmental Laboratory Accreditation Program (ELAP) water testing laboratory for leachate constituent parameters that would have been present in the leachate seeps. In my opinion, the response of NRRWF personnel was swift, accurate and thorough.

No storm water contained in SWB-4 was removed by pumping to the PSB between February 27, 2019, and March 13, 2019. Improving weather conditions allowed NRRWF to construct a High-Density Polyethylene (HDPE) pipeline from SWB-4 to the lined primary septage pond (SP) located southeast of SWB-4 in the southwest portion of the NRRWF. Storm water in SWB-4 containing the March 6, 2019, leachate seep discharges was then pumped into the SP and managed as wastewater. No discharge or run-on samples were required to be collected by NRRWF personnel related to the March 6, 2019, leachate seep event as no pump generated discharges occurred from SWB-4.

On April 20, 2019, NRRWF experienced another intense 45-minute rain event that produced nearly two inches of rainfall on-site. NRRWF staff observed four main rills out of the based of the south side of Module 4 and draining into storm water basin #4 at approximately four to five gallons per

3

hour. Liquid was pumped from SWB-4 into the lined primary septage pond and managed as wastewater.

Remediation of the soils in SWB-4 was completed and a remediation report dated September 11, 2019, was submitted to the Water Board. The Water Board approved the remediation of SWB-4.

The Water Board issued Investigative Order WQ 2020-0036-EXEC ("Investigative Order") dated November 18, 2020. The Investigative Order responded to the leachate discharges to storm water conveyances that occurred at the NRRWF during February 2019 and March 2019. The Investigative Order required County to develop and submit technical reports consisting of a leachate discharges Investigative Work Plan (IWP), and a leachate discharges Investigative Final Report (IFR). The County submitted the IWP and the IFR to the Water Board. The Water Board approved Investigative Work Plan (IWP) elements and the County proceeded with the field investigative elements of the IWP. On May 1, 2023, the Water Board issued an "Investigative Final Report, Neal Road Recycling And Waste Facility, Butte County," which stated, in relevant part: "Butte County investigated whether there were any impacts from the leachate discharges and did not find any significant impacts to the environment. Based on the investigation's data results, State Water Board staff concludes that the leachate discharges from February 2019 to March 2019 did not have a significant impact to human and ecological health. As such, the Final Investigation Report is approved. No further action regarding the Investigative Order WQ-2020-0036-EXEC is required. State Water Board staff have consulted with staff from the Regional Water Quality Control Board, Central Valley Region, who agree with these conclusions."

Dated:  .   August 22, 2023

Eric Miller

4

# EXHIBIT D

**To Defendants' Appendix of Exhibits**
**in Opposition to Plaintiff's Motion for Partial Summary Judgment**

ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
E-mail: andrew@packardlawoffices.com
         wncarlon@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA OPEN LANDS

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA OPEN LANDS, a non-profit land trust organization,<br><br>             Plaintiff,<br><br>      vs.<br><br>BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS, et al,<br><br>             Defendants. | Case No. 2:20-cv-00123-KJM-DMC<br><br>**PLAINTIFF'S RESPONSES TO DEFENDANT'S INTERROGATORIES (SET TWO)** |

PROPOUNDING PARTY:   Defendant BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS

RESPONDING PARTY:    Plaintiff CALIFORNIA OPEN LANDS

SET NUMBER:          Two

　　　　Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff CALIFORNIA OPEN LANDS ("COL") makes the following responses to Defendant BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS's ("County") Special Interrogatories, Set Two.

## GENERAL OBJECTIONS

　　　　COL generally objects to the County's interrogatories as follows:

　　　　(1) COL has not yet completed discovery or trial preparation in this action and in responding to these interrogatories, COL provides only that information which is presently available to it and its agents and attorneys, with the express understanding that discovery and trial preparation are continuing.

1   Accordingly, these responses include and reflect information available to COL at this time, which may

2   be supplemented prior to the time of trial, after further discovery and trial preparation.  These responses

3   and objections are made without prejudice to, and are not a waiver of, COL's right to rely on other facts

4   or documents at trial.

5       (2) No response to any portion of the interrogatory shall be deemed a waiver of any objection not

6   set forth herein, which could be made to any such portion of the interrogatory concerning its relevancy,

7   and/or the information set forth on the document and/or any other matter affecting the potential

8   admissibility of such information at the trial of this action.  Further, COL makes the responses and

9   objections herein without in any way implying that it considers the interrogatories, and responses to the

10  interrogatories, to be relevant or material to the subject matter of this action.

11      (3) COL objects to each interrogatory to the extent that it could be interpreted as calling for the

12  production of documents subject to the attorney-client privilege or work-product immunity, on the

13  grounds that such production would or might constitute disclosure of material prepared for litigation by

14  or at the direction of counsel for respondent and/or disclosure of attorney work product generated by, or

15  at the direction of, counsel for COL.  For purposes of each response below, the reference to "non-

16  privileged documents" shall apply to documents subject to the attorney-client privilege and work product

17  immunity.

18      (4) COL expressly reserves the right to supplement, clarify, revise, or correct any and all of the

19  responses and objections herein, and to assert additional objections or privileges, in one or more

20  subsequent supplemental response(s).

21      (5) COL objects to each instruction, definition, document request, and interrogatory to the extent

22  that it purports to impose any requirement or discovery obligation greater than or different from those

23  under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

### **INTERROGATORIES**

25  **SPECIAL INTERROGATORY NO. 26:**

26  State all facts upon which you base the allegation in paragraph 81 of the Complaint that there has been

27  "use of contaminated soil from the Camp Fire cleanup efforts as daily cover at the Landfill."

28  **RESPONSE TO SPECIAL INTERROGATORY NO. 26:**

1    State all facts upon which you base the allegation in paragraph 82 of the Complaint that

2    "Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the

3    General Permit …."

4    **RESPONSE TO SPECIAL INTERROGATORY NO. 27:**

5    Plaintiff objects to this Interrogatory on the basis that seeking "all facts" is unduly broad and

6    burdensome.  Providing each and every fact would require laborious, time-consuming analysis, search,

7    and description of incidental, secondary, and perhaps irrelevant and trivial details.  *IBP, Inc. v.*

8    *Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. KS. 1998).  Moreover, such facts are available in

9    publicly-available documents and/or within the custody and control of Defendants; thus, Defendants

10    have similar access or more access to the facts responsive to this Interrogatory.

11    Plaintiff objects to this Interrogatory because it seeks the premature disclosure of expert analysis and

12    opinion.

13    Plaintiff objects to the extent responding to this Interrogatory would require the disclosure of

14    attorney work product or attorney-client communications.

15    Finally, this Interrogatory may call for the compilation of information that can be obtained

16    from documents, therefore, Plaintiff reserves its right to produce the documents from which the

17    requested compilation of information can be obtained.

18    Subject to and without waiving these objections, Plaintiff responds as follows: Plaintiff

19    expressly incorporates all facts asserted in the Complaint and the Notice of Violations and Intent to

20    File Suit under the Clean Water Act, dated November 15, 2019 sent by William Carlon on behalf of

21    Plaintiff to Defendants ("Notice Letter") into this Response.  Plaintiff further incorporates the facts

22    included within the documents produced by Plaintiff in its Initial Disclosures and/or in response to

23    Defendants' Request for Production of Documents, Set One evidencing Defendants' ongoing

24    violations of the Industrial General Permit and Clean Water Act.  Further, Plaintiff summarizes the

25    following facts:

26    • On November 2, 2007, Defendant Butte County Department of Public Works ("County")

27    established the Permanent Conservation Easement Grant ("Easement") in favor of Plaintiff,

28    establishing and maintaining a wetland preserve ("Preserve") at the Facility.  The Preserve,

pursuant to Army Corps of Engineers Permit No. 200300113 ("Permit") contains 3.00 acres of created, avoided, and preserved waters of the United States, as depicted on the On-site Wetland Mitigation and Monitoring Plan Neal Road Landfill. The purpose of the Preserve is to ensure that functions and values of the aquatic environment are protected.

- To minimize disturbance to the preserved waters of the United States, the County was required to establish a buffer, consisting of native upland vegetation of at least 25 feet in width from the out limit of jurisdiction of the entire perimeter of all created, preserved, and avoided waters of the United States, including wetlands within the Preserve.

- On September 6, 2011, the Army Corps of Engineers, based on a June 14, 2010 monitoring report and a site visit on June 28, 2010, determined that the mitigation project required by the Permit was successful.  The inspection report indicated that the "proposed preserve is exhibiting the three wetland perimeters [sic]; therefore, the permittee has met the required success criteria. . . ."

- Between December 20, 2014 and June 24, 2015 the Facility operated under a SWPPP dated August 1, 1995, last revised August 2014 ("1995 SWPPP").  This response incorporates the 1995 SWPPP, which was produced by Defendants at BUTTE 7337-7442.

- The 1995 SWPPP, which includes a site map, makes no mention of the Preserve and does not describe the Easement or its prohibitions (either directly, or by reference).  The 1995 SWPPP does not identify the created waters of the United States in the Preserve that were confirmed to be present as early as June 28, 2010 by the Army Corps of Engineers.  The 1995 SWPPP identifies the discharge point for storm water associated with industrial activity from the Facility to be from the Preserve, which it identifies as the Primary Sedimentation Basin. Defendants discharged storm water associated with industrial activities to the created waters of the United States without sampling or identifying that discharge in the 1995 SWPPP from at least June 28, 2010 to June 24, 2015.

- The site map associated with the 1995 SWPPP does not identify the areas of soil erosion or impervious areas at the Facility.  The 1995 SWPPP site map does not identify all areas of industrial activity.

1  • The 1995 SWPPP identifies leachate as a potential pollutant in storm water discharges.  The
2    1995 SWPPP sampling plan only requires storm water samples to be analyzed for total
3    suspended solids, pH, specific conductance, oil and grease, iron, turbidity, temperature, nitrate
4    + nitrite nitrogen, copper, cadmium, lead, nickel and mercury.
5  • Between June 24, 2015 and September 29, 2019 the Facility operated under a SWPPP dated
6    June 24, 2015 ("2015 SWPPP").  This response incorporates the 2015 SWPPP, which was
7    produced by Defendants at BUTTE 3208-3458.  The 2015 SWPPP does not identify the
8    location of the Preserve.  The 2015 SWPPP does not identify the created waters of the United
9    States in the Preserve that were confirmed to be present as early as June 28, 2010 by the Army
10   Corps of Engineers.  The 2015 SWPPP identifies the discharge point for storm water
11   associated with industrial activity from the Facility to be from the Preserve, which it identifies
12   as the Primary Sedimentation Basin.  Defendants discharged storm water associated with
13   industrial activities to the created waters of the United States without sampling or identifying
14   that discharge in the 2015 SWPPP from at least June 25, 2015 to September 29, 2019.
15 • The 1995 SWPPP was superseded by the 2015 SWPPP effective June 24, 2015.
16 • The 2015 SWPPP was uploaded to SMARTS on August 10, 2015.
17 • The 2015 SWPPP identifies potential pollutants in leachate, and identifies leachate as a
18   potential pollutant that could be present in storm water at the Facility.  However, only pH, oil
19   and grease, total suspended solids, and iron are identified as constituents for sampling and
20   analysis to comply with the General Permit requirements.
21 • Along with the 2015 SWPPP, a site map dated June 3, 2015 ("June 3, 2015 Site Map") was
22   uploaded to SMARTS on August 10, 2015.
23 • The June 3, 2015 Site Map does not identify areas of soil erosion or impervious areas at the
24   Facility.  The June 3, 2015 Site Map does not identify all areas of industrial activity.
25 • The June 3, 2015 Site Map does not identify the Preserve, does not identify the wetlands within
26   the Preserve, and does not identify any waters of the United States within the Preserve.  The
27   June 3, 2015 Site Map does not identify the discharge point where industrial storm water
28   discharges to the waters of the United States within the Preserve.

1   • On October 1, 2015 an updated site map was uploaded to SMARTS ("October 1, 2015 Site
2     Map").
3   • The October 1, 2015 Site Map does not identify areas of soil erosion or impervious areas at the
4     Facility.  The October 1, 2015 Site Map does not identify all areas of industrial activity.
5   • The October 1, 2015 Site Map does not identify the Preserve, does not identify the wetlands
6     within the Preserve, and does not identify any waters of the United States within the Preserve.
7     The October 1, 2015 Site Map does not identify the discharge point where industrial storm
8     water discharges to the waters of the United States within the Preserve.
9   • On December 30, 2015 an updated site map was uploaded to SMARTS ("December 30, 2015
10    Site Map").
11  • The December 30, 2015 Site Map does not identify areas of soil erosion or impervious areas at
12    the Facility.  The December 30, 2015 Site Map does not identify all areas of industrial activity.
13  • The December 30, 2015 Site Map does not identify the Preserve, does not identify the wetlands
14    within the Preserve, and does not identify any waters of the United States within the Preserve.
15    The December 30, 2015 Site Map does not identify the discharge point where industrial storm
16    water discharges to the waters of the United States within the Preserve.
17  • On March 31, 2016 an updated site map was uploaded to SMARTS ("March 31, 2016 Site
18    Map").
19  • The March 31, 2016 Site Map does not identify areas of soil erosion or impervious areas at the
20    Facility.  The March 31, 2016 Site Map does not identify all areas of industrial activity.
21  • The March 31, 2016 Site Map does not identify the Preserve, does not identify the wetlands
22    within the Preserve, and does not identify any waters of the United States within the Preserve.
23    The March 31, 2016 Site Map does not identify the discharge point where industrial storm
24    water discharges to the waters of the United States within the Preserve.
25  • On January 10, 2017 an updated site map was uploaded to SMARTS ("January 10, 2017 Site
26    Map").
27  • The January 10, 2017 Site Map does not identify areas of soil erosion or impervious areas at
28    the Facility.  The January 10, 2017 Site Map does not identify all areas of industrial activity.

1     • The January 10, 2017 Site Map does not identify the Preserve, does not identify the wetlands
2       within the Preserve, and does not identify any waters of the United States within the Preserve.
3       The January 10, 2017 Site Map does not identify the discharge point where industrial storm
4       water discharges to the waters of the United States within the Preserve.

5     • On or about February 14, 2019, landfill leachate seeped out of Module 4 and into Sediment
6       Basin 4, where it was commingled with storm water and pumped to a storm water conveyance
7       ditch, which discharged into the wetland protected by the Easement.

8     • On February 26 and 27, 2019, landfill leachate seeped out of Module 4 and into Sediment
9       Basin 4, where it was commingled with storm water and pumped to a storm water conveyance
10      ditch, which discharged into the wetland protected by the Easement.

11    • On May 13, 2019 an updated site map was uploaded to SMARTS ("May 13, 2019 Site Map").

12    • The May 13, 2019 Site Map does not identify areas of soil erosion or impervious areas at the
13      Facility.  The May 13, 2019 Site Map does not identify all areas of industrial activity, or the
14      locations where identified spills or leaks have occurred (including the February 2019 leachate
15      leaks).

16    • The May 13, 2019 Site Map does not identify the Preserve, does not identify the wetlands
17      within the Preserve, and does not identify any waters of the United States within the Preserve.
18      The May 13, 2019 Site Map does not identify the discharge point where industrial storm water
19      discharges to the waters of the United States within the Preserve.

20    • On July 31, 2019, a truck hauling leachate spilled approximately 150 gallons of leachate onto a
21      roadway adjacent to the Preserve.  The 2015 SWPPP was not revised to identify the location of
22      this spill.

23    • Other than the updated site maps, no revisions were made to the 2015 SWPPP between June
24      24, 2015 and September 29, 2019.

25    • Between September 30, 2019 and February 3, 2021, the Facility operated under a SWPPP
26      dated September 30, 2019 ("2019 SWPPP").  This response incorporates the 2019 SWPPP,
27      which Defendants produced at BUTTE 2947-3206.  The 2019 SWPPP identifies the Preserve
28      as only a "part of an environmental mitigation program," but does not identify that it is a

wetland preserve.  The 2019 SWPPP does not identify the created waters of the United States in the Preserve that were confirmed to be present as early as June 28, 2010 by the Army Corps of Engineers.  The 2019 SWPPP identifies the discharge point for storm water associated with industrial activity from the Facility to be from the Preserve, which it identifies as the Primary Sedimentation Basin.  Defendants discharged storm water associated with industrial activities to the created waters of the United States without sampling or identifying that discharge in the 2019 SWPPP from at least September 30, 2019 to February 3, 2021.  The 2019 SWPPP did not identify the July 31, 2019 leachate spill.  The 2019 SWPPP does not identify the adjacent facility which discharges storm water associated with industrial activity into the Facility's boundary.

- The 2019 SWPPP incorporates by reference laboratory results from analysis associated with leachate seeps from modules 4 and 5 in February 2019.  These laboratory results identify the presence of volatile organic compounds including benzene, chloroform, 1,1-dichloroethane, 1,2-dichloroethane, ethylbenzene, methylene chloride, methyl t-butyl ether, styrene, tetrachloroethene, toluene, 1,1,1-trichloroethane, trichloroethene, trichlorofluoromethane, p- & m-xylenes, o-xylene, acetone, t-butyl alcohol, carbon disulfide, ethanol, ethyl methacrylate, 2-hexanone, isobutanol, and methyl ethyl ketone.  The results also identify the presence of base neutral and acid extractable organics, including benzoic acid, benzyl alcohol, diethyl phthalate, dimethyl phthalate, 3- & 4-methylphenol, and phenol.  The laboratory results also identify the presence of calcium, magnesium, sodium, potassium, bicarbonate, chloride, nitrate as N, sulfate, total dissolved solids, cyanide, and non-volatile organic carbon.  The laboratory results also identify the presence of aluminum, antimony, barium, chromium, cobalt, copper, iron, manganese, mercury, nickel, silver, tin, thallium, vanadium, and zinc.

- The 2019 SWPPP identifies the following pollutants that could be present in storm water discharges from the Facility: metals, organics, litter, petroleum products such as diesel, gasoline, oil, and lubricants, leachate, hazardous wastes, and dust.

- The 2019 SWPPP acknowledges that the watershed into which it discharges is impaired for diuron, mercury, and pH, but only identifies pH as being present at the Facility, despite having

1    reported mercury being present in storm water samples in 2019.

2    •   The 2019 SWPPP states that storm water samples will be collected and analyzed for only the

3        following parameters at the Facility: total suspended solids, oil and grease, pH, iron, lead,

4        aluminum, zinc, and chemical oxygen demand.

5    •   On or about October 17, 2019 a leachate conveyance pipe broke, causing an unknown amount

6        of leachate to spill.  Landfill staff estimated the total volume of the spill to be between 2,000

7        and 6,000 gallons.  The leachate spilled into the Preserve, including the three-acre area

8        identified by the Army Corps of Engineers as waters of the United States, in June 28, 2010.

9    •   No revisions were made to the 2019 SWPPP between September 30, 2019 and February 3,

10       2021.

11   •   Between February 4, 2021 and the present, the Facility has operated under a SWPPP dated

12       February 4, 2021 ("2021 SWPPP"). This response incorporates the 2021 SWPPP.  The 2021

13       SWPPP identifies the Preserve as only a "part of an environmental mitigation program," but

14       does not identify that it is a wetland preserve.  The 2021 SWPPP does not identify the created

15       waters of the United States in the Preserve that were confirmed to be present as early as June

16       28, 2010 by the Army Corps of Engineers.  The 2021 SWPPP identifies the discharge point for

17       storm water associated with industrial activity from the Facility to be from the Preserve, which

18       it identifies as the Primary Sedimentation Basin.  Defendants discharged storm water

19       associated with industrial activities to the created waters of the United States without sampling

20       or identifying that discharge in the 2021 SWPPP from at least September 30, 2019 to February

21       3, 2021.

22   •   The 2021 SWPPP site map does not identify storm water drainage areas within the Facility

23       boundary, portions of any drainage area impacted by discharges from surrounding areas, areas

24       of soil erosion, and the location of all nearby water bodies, including the waters of the United

25       States within the Preserve.  The 2021 SWPPP site map does not identify as a discharge point

26       the point where storm water associated with industrial activities and materials enters the

27       Preserve.  The 2021 SWPPP site map fails to identify all impervious areas of the Facility.  The

28       2021 SWPPP fails to identify the neighboring operation which discharges storm water

1    associated with industrial materials to the Facility.

2    • The 2021 SWPPP was not developed, implemented, or revised to be consistent with the Permit

3    or the Easement.

4    • The 2021 SWPPP incorporates by reference laboratory results from analysis associated with

5    leachate seeps from modules 4 and 5 in February 2019.  These laboratory results identify the

6    presence of volatile organic compounds including benzene, chloroform, 1,1-dichloroethane,

7    1,2-dichloroethane, ethylbenzene, methylene chloride, methyl t-butyl ether, styrene,

8    tetrachloroethene, toluene, 1,1,1-trichloroethane, trichloroethene, trichlorofluoromethane, p- &

9    m-xylenes, o-xylene, acetone, t-butyl alcohol, carbon disulfide, ethanol, ethyl methacrylate, 2-

10   hexanone, isobutanol, and methyl ethyl ketone.  The results also identify the presence of base

11   neutral and acid extractable organics, including benzoic acid, benzyl alcohol, diethyl phthalate,

12   dimethyl phthalate, 3- & 4-methylphenol, and phenol.  The laboratory results also identify the

13   presence of calcium, magnesium, sodium, potassium, bicarbonate, chloride, nitrate as N,

14   sulfate, total dissolved solids, cyanide, and non-volatile organic carbon.  The laboratory results

15   also identify the presence of aluminum, antimony, barium, chromium, cobalt, copper, iron,

16   manganese, mercury, nickel, silver, tin, thallium, vanadium, and zinc.

17   • The 2021 SWPPP identifies the following pollutants that could be present in storm water

18   discharges from the Facility: metals, organics, litter, petroleum products such as diesel,

19   gasoline, oil, and lubricants, leachate, hazardous wastes, dust, nitrate & nitrite nitrogen,

20   phosphorus.

21   • The 2021 SWPPP acknowledges that the watershed into which it discharges is impaired for

22   diuron, mercury, and pH, but only identifies pH as being present at the Facility, despite having

23   reported mercury being present in storm water samples in 2019.

24   • The 2021 SWPPP states that storm water samples will be collected and analyzed for only the

25   following parameters at the Facility: total suspended solids, oil and grease, pH, iron, lead,

26   aluminum, zinc, chemical oxygen demand, and once the CASP facility is operational, nitrate &

27   nitrite nitrogen and phosphorus.

28   • No revisions were made to the 2021 SWPPP between February 4, 2021 and the present.

1   • On or about November 8, 2018, the Camp Fire destroyed several miles of storm drainage
2     pipes, improvements and conveyance systems, at least thirty-five landfill gas extraction wells,
3     several miles of landfill gas collection system infrastructure, portions of the landfill's base liner
4     system, thousands of lineal feet of the site's leachate collection and removal system, and other
5     critical landfill infrastructure, including downed power and phone lines and internet
6     infrastructure, that affected the performance of pumps, instrumentation, and communications.
7   • Due to the nature of the landfill's industrial operations and activity, in particular the operation
8     of active working faces of the landfill, conditions at the landfill change daily, and certainly
9     monthly.  Stockpiling and processing of industrial materials occurs in locations that change
10    frequently.
11  • The Facility stockpiles various industrial materials including, waste tires, white goods, and
12    green waste in outdoor areas without cover such that the materials are exposed to storm water.
13  • Trash from the active faces of the landfill is windblown into areas at the Facility that are
14    exposed to storm water, including, but not limited to, the Preserve.
15  • Adequate best management practices are not implemented at the Facility to prevent or limit
16    pollutants from entering the Preserve.
17  • Inadequate best management practices allow the discharge of soil and suspended solids from
18    the Native Soils Stockpile to the Preserve each time a significant rain event occurs.
19  • Defendants incorrectly identify the discharge point at the Facility to be west of the Preserve.
20    Defendants use the Preserve as an ordinary storm water management sedimentation basin, and
21    implement minimal, if any, BMPs prior to discharging to the Preserve.
22  • During periods of intense rainfall, the Facility's landfill modules have failed and caused
23    leachate to seep into the Facility's storm water conveyance systems.  These failures have been
24    addressed only on an ad hoc basis, and the Facility continues to be vulnerable to similar
25    failures throughout the operational and non-operational areas of the Facility.
26  • Samples of storm water discharging from the Facility reported exceedances of EPA benchmark
27    values for total suspended solids, nitrates, iron, aluminum, copper, chemical oxygen demand,
28    oil and grease, and magnesium.

1    • Storm water discharged from the Facility was analyzed for the presence of pollutants

2    associated with leachate, including volatile organic compounds, and was found in those

3    samples, indicating that storm water associated with leachate had discharged into the Preserve

4    and from the Facility.

5    • On October 23, 2018, Stephen Jackson was tasked by Eric Miller to screen soil from the

6    PG&E Table Mountain cleanup project for acceptance and disposal at the Facility.  PG&E did

7    not conduct the required lab testing as required by the Landfill's protocol.  Mr. Jackson

8    recommended that the soil be rejected because, as a Class III waste facility, the Facility is not

9    authorized to accept hazardous waste, and all proposed waste streams must be screened for

10   hazardous wastes.

11   • On January 23, 2019, Stephen Jackson was again tasked by Eric Miller to screen soil from the

12   PG&E Table Mountain cleanup project for acceptance and disposal at the Facility.  Again,

13   PG&E failed to conduct the required lab testing pursuant to Landfill protocols.  Mr. Jackson

14   recommended that the soil be rejected. However, Mr. Miller, Mr. Jackson's supervisor,

15   accepted the soil – approximately 150-250 tons of it – without the required SVOC testing.

16   • The soil accepted from the PG&E cleanup was stored in the soils stockpile, and during rain

17   events, storm water coming into contact with that stockpile discharges into the Preserve. The

18   soil is also transported via storm water into the Preserve.

19   • In the aftermath of the Camp Fire, beginning on or about June 4, 2018, Franklin Construction

20   set up a materials processing facility adjacent to the Landfill.  They accepted demolition debris,

21   including concrete, which they stored in stockpiles, from Camp Fire cleanup efforts, and

22   processed the materials into reusable aggregate.

23   • Franklin Construction's facility is located immediately adjacent to, and uphill from, the

24   southeast boundary of the Facility.  Storm water associated with Franklin Construction's

25   operation discharges northwest to the Facility and enters Defendants' Facility.  This storm

26   water enters storm water conveyance ditches at the Facility and discharges into the Preserve.

27   • Despite numerous spills and leaks of landfill leachate into the Facility's storm water

28   infrastructure, the Facility's sampling and analysis plans in the 2021 SWPPP, 2019 SWPPP,

1   and 2015 SWPPP do not include parameters associated with landfill leachate.  All the

2   Facility's monitoring and reporting plans fail to monitor for the presence of landfill leachate

3   within storm water discharges.

4   **SPECIAL INTERROGATORY NO. 28:**

5   State all facts upon which you base the allegation in paragraph 87 of the Complaint that

6   Defendants failed "to collect the required number of samples during each reporting period."

7   **RESPONSE TO INTERROGATORY NO. 28:**

8   Plaintiff objects to this Interrogatory on the basis that seeking "all facts" is unduly broad and

9   burdensome.  Providing each and every fact would require laborious, time-consuming analysis, search,

10   and description of incidental, secondary, and perhaps irrelevant and trivial details.  *IBP, Inc. v.*

11   *Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. KS. 1998).  Moreover, such facts are available in

12   publicly-available documents and/or within the custody and control of Defendants; thus, Defendants

13   have similar access or more access to the facts responsive to this Interrogatory.

14   Plaintiff objects to this Interrogatory because it seeks the premature disclosure of expert

15   analysis and opinion.

16   Plaintiff objects to the extent responding to this Interrogatory would require the disclosure of

17   attorney work product or attorney-client communications.

18   Finally, this Interrogatory may call for the compilation of information that can be obtained

19   from documents, therefore, Plaintiff reserves its right to produce the documents from which the

20   requested compilation of information can be obtained.

21   Subject to and without waiving these objections, Plaintiff responds as follows: Plaintiff

22   expressly incorporates all facts asserted in the Complaint and the Notice of Violations and Intent to

23   File Suit under the Clean Water Act, dated November 15, 2019 sent by William Carlon on behalf of

24   Plaintiff to Defendants ("Notice Letter") into this Response.  Plaintiff further incorporates the facts

25   included within the documents produced by Plaintiff in its Initial Disclosures and/or in response to

26   Defendants' Request for Production of Documents, Set One evidencing Defendants' ongoing

27   violations of the Industrial General Permit and Clean Water Act.  Further, Plaintiff summarizes the

28   following facts:

- On November 2, 2007, Defendant Butte County Department of Public Works ("County") established the Permanent Conservation Easement Grant ("Easement") in favor of Plaintiff, establishing and maintaining a wetland preserve ("Preserve") at the Facility.  The Preserve, pursuant to Army Corps of Engineers Permit No. 200300113 ("Permit") contains 3.00 acres of created, avoided, and preserved waters of the United States, as depicted on the On-site Wetland Mitigation and Monitoring Plan Neal Road Landfill. The purpose of the Preserve is to ensure that functions and values of the aquatic environment are protected.

- To minimize disturbance to the preserved waters of the United States, the County was required to establish a buffer, consisting of native upland vegetation of at least 25 feet in width from the out limit of jurisdiction of the entire perimeter of all created, preserved, and avoided waters of the United States, including wetlands within the Preserve.

- On September 6, 2011, the Army Corps of Engineers, based on a June 14, 2010 monitoring report and a site visit on June 28, 2010, determined that the mitigation project required by the Permit was successful.  The inspection report indicated that the "proposed preserve is exhibiting the three wetland perimeters [sic]; therefore, the permittee has met the required success criteria. . . ."

- Between December 20, 2014 and June 24, 2015 the Facility operated under a SWPPP dated August 1, 1995, last revised August 2014 ("1995 SWPPP").  This response incorporates the 1995 SWPPP, which was produced by Defendants at BUTTE 7337-7442.

- The 1995 SWPPP, which includes a site map, makes no mention of the Preserve and does not describe the Easement or its prohibitions (either directly, or by reference).  The 1995 SWPPP does not identify the created waters of the United States in the Preserve that were confirmed to be present as early as June 28, 2010 by the Army Corps of Engineers.  The 1995 SWPPP identifies the discharge point for storm water associated with industrial activity from the Facility to be from the Preserve, which it identifies as the Primary Sedimentation Basin. Defendants discharged storm water associated with industrial activities to the created waters of the United States without sampling or identifying that discharge in the 1995 SWPPP from at least June 28, 2010 to June 24, 2015.

- The site map associated with the 1995 SWPPP does not identify the areas of soil erosion or impervious areas at the Facility.  The 1995 SWPPP site map does not identify all areas of industrial activity.

- The 1995 SWPPP identifies leachate as a potential pollutant in storm water discharges.  The 1995 SWPPP sampling plan only requires storm water samples to be analyzed for total suspended solids, pH, specific conductance, oil and grease, iron, turbidity, temperature, nitrate + nitrite nitrogen, copper, cadmium, lead, nickel and mercury.

- Between June 24, 2015 and September 29, 2019 the Facility operated under a SWPPP dated June 24, 2015 ("2015 SWPPP").  This response incorporates the 2015 SWPPP, which was produced by Defendants at BUTTE 3208-3458.  The 2015 SWPPP does not identify the location of the Preserve.  The 2015 SWPPP does not identify the created waters of the United States in the Preserve that were confirmed to be present as early as June 28, 2010 by the Army Corps of Engineers.  The 2015 SWPPP identifies the discharge point for storm water associated with industrial activity from the Facility to be from the Preserve, which it identifies as the Primary Sedimentation Basin.  Defendants discharged storm water associated with industrial activities to the created waters of the United States without sampling or identifying that discharge in the 2015 SWPPP from at least June 25, 2015 to September 29, 2019.

- The 1995 SWPPP was superseded by the 2015 SWPPP effective June 24, 2015.

- The 2015 SWPPP was uploaded to SMARTS on August 10, 2015.

- The 2015 SWPPP identifies potential pollutants in leachate, and identifies leachate as a potential pollutant that could be present in storm water at the Facility.  However, only pH, oil and grease, total suspended solids, and iron are identified as constituents for sampling and analysis to comply with the General Permit requirements.

- Along with the 2015 SWPPP, a site map dated June 3, 2015 ("June 3, 2015 Site Map") was uploaded to SMARTS on August 10, 2015.

- The June 3, 2015 Site Map does not identify areas of soil erosion or impervious areas at the Facility.  The June 3, 2015 Site Map does not identify all areas of industrial activity.

- The June 3, 2015 Site Map does not identify the Preserve, does not identify the wetlands within

the Preserve, and does not identify any waters of the United States within the Preserve.  The June 3, 2015 Site Map does not identify the discharge point where industrial storm water discharges to the waters of the United States within the Preserve.

- On October 1, 2015 an updated site map was uploaded to SMARTS ("October 1, 2015 Site Map").

- The October 1, 2015 Site Map does not identify areas of soil erosion or impervious areas at the Facility.  The October 1, 2015 Site Map does not identify all areas of industrial activity.

- The October 1, 2015 Site Map does not identify the Preserve, does not identify the wetlands within the Preserve, and does not identify any waters of the United States within the Preserve. The October 1, 2015 Site Map does not identify the discharge point where industrial storm water discharges to the waters of the United States within the Preserve.

- On December 30, 2015 an updated site map was uploaded to SMARTS ("December 30, 2015 Site Map").

- The December 30, 2015 Site Map does not identify areas of soil erosion or impervious areas at the Facility.  The December 30, 2015 Site Map does not identify all areas of industrial activity.

- The December 30, 2015 Site Map does not identify the Preserve, does not identify the wetlands within the Preserve, and does not identify any waters of the United States within the Preserve. The December 30, 2015 Site Map does not identify the discharge point where industrial storm water discharges to the waters of the United States within the Preserve.

- On March 31, 2016 an updated site map was uploaded to SMARTS ("March 31, 2016 Site Map").

- The March 31, 2016 Site Map does not identify areas of soil erosion or impervious areas at the Facility.  The March 31, 2016 Site Map does not identify all areas of industrial activity.

- The March 31, 2016 Site Map does not identify the Preserve, does not identify the wetlands within the Preserve, and does not identify any waters of the United States within the Preserve. The March 31, 2016 Site Map does not identify the discharge point where industrial storm water discharges to the waters of the United States within the Preserve.

- On January 10, 2017 an updated site map was uploaded to SMARTS ("January 10, 2017 Site

1   Map").

2   • The January 10, 2017 Site Map does not identify areas of soil erosion or impervious areas at

3   the Facility.  The January 10, 2017 Site Map does not identify all areas of industrial activity.

4   • The January 10, 2017 Site Map does not identify the Preserve, does not identify the wetlands

5   within the Preserve, and does not identify any waters of the United States within the Preserve.

6   The January 10, 2017 Site Map does not identify the discharge point where industrial storm

7   water discharges to the waters of the United States within the Preserve.

8   • On or about February 14, 2019, landfill leachate seeped out of Module 4 and into Sediment

9   Basin 4, where it was commingled with storm water and pumped to a storm water conveyance

10   ditch, which discharged into the wetland protected by the Easement.

11   • On February 26 and 27, 2019, landfill leachate seeped out of Module 4 and into Sediment

12   Basin 4, where it was commingled with storm water and pumped to a storm water conveyance

13   ditch, which discharged into the wetland protected by the Easement.

14   • On May 13, 2019 an updated site map was uploaded to SMARTS ("May 13, 2019 Site Map").

15   • The May 13, 2019 Site Map does not identify areas of soil erosion or impervious areas at the

16   Facility.  The May 13, 2019 Site Map does not identify all areas of industrial activity, or the

17   locations where identified spills or leaks have occurred (including the February 2019 leachate

18   leaks).

19   • The May 13, 2019 Site Map does not identify the Preserve, does not identify the wetlands

20   within the Preserve, and does not identify any waters of the United States within the Preserve.

21   The May 13, 2019 Site Map does not identify the discharge point where industrial storm water

22   discharges to the waters of the United States within the Preserve.

23   • On July 31, 2019, a truck hauling leachate spilled approximately 150 gallons of leachate onto a

24   roadway adjacent to the Preserve.  The 2015 SWPPP was not revised to identify the location of

25   this spill.

26   • Other than the updated site maps, no revisions were made to the 2015 SWPPP between June

27   24, 2015 and September 29, 2019.

28   • Between September 30, 2019 and February 3, 2021, the Facility operated under a SWPPP

water enters storm water conveyance ditches at the Facility and discharges into the Preserve.

- Despite numerous spills and leaks of landfill leachate into the Facility's storm water infrastructure, the Facility's sampling and analysis plans in the 2021 SWPPP, 2019 SWPPP, and 2015 SWPPP do not include parameters associated with landfill leachate. All the Facility's monitoring and reporting plans fail to monitor for the presence of landfill leachate within storm water discharges.

**SPECIAL INTERROGATORY NO. 29:**

State all facts upon which you base the allegation in paragraph 87 of the Complaint that "Defendants have been sampling storm water from the wrong location (i.e., after the water has passed through the Conservation Easement wetland, and not before."

**RESPONSE TO INTERROGATORY NO. 29:**

Plaintiff objects to this Interrogatory on the basis that seeking "all facts" is unduly broad and burdensome. Providing each and every fact would require laborious, time-consuming analysis, search, and description of incidental, secondary, and perhaps irrelevant and trivial details. *IBP, Inc. v. Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. KS. 1998). Moreover, such facts are available in publicly-available documents and/or within the custody and control of Defendants; thus, Defendants have similar access or more access to the facts responsive to this Interrogatory.

Plaintiff objects to this Interrogatory because it seeks the premature disclosure of expert analysis and opinion.

Plaintiff objects to the extent responding to this Interrogatory would require the disclosure of attorney work product or attorney-client communications.

Finally, this Interrogatory may call for the compilation of information that can be obtained from documents, therefore, Plaintiff reserves its right to produce the documents from which the requested compilation of information can be obtained.

Subject to and without waiving these objections, Plaintiff responds as follows: Plaintiff expressly incorporates all facts asserted in the Complaint and the Notice of Violations and Intent to File Suit under the Clean Water Act, dated November 15, 2019 sent by William Carlon on behalf of Plaintiff to Defendants ("Notice Letter") into this Response. Plaintiff further incorporates the facts

1   included within the documents produced by Plaintiff in its Initial Disclosures and/or in response to

2   Defendants' Request for Production of Documents, Set One evidencing Defendants' ongoing

3   violations of the Industrial General Permit and Clean Water Act.  Further, Plaintiff summarizes the

4   following facts:

5   - On November 2, 2007, Defendant Butte County Department of Public Works ("County")

6   established the Permanent Conservation Easement Grant ("Easement") in favor of Plaintiff,

7   establishing and maintaining a wetland preserve ("Preserve") at the Facility.  The Preserve,

8   pursuant to Army Corps of Engineers Permit No. 200300113 ("Permit") contains 3.00 acres of

9   created, avoided, and preserved waters of the United States, as depicted on the On-site Wetland

10  Mitigation and Monitoring Plan Neal Road Landfill. The purpose of the Preserve is to ensure

11  that functions and values of the aquatic environment are protected.

12  - To minimize disturbance to the preserved waters of the United States, the County was required

13  to establish a buffer, consisting of native upland vegetation of at least 25 feet in width from the

14  out limit of jurisdiction of the entire perimeter of all created, preserved, and avoided waters of

15  the United States, including wetlands within the Preserve.

16  - On September 6, 2011, the Army Corps of Engineers, based on a June 14, 2010 monitoring

17  report and a site visit on June 28, 2010, determined that the mitigation project required by the

18  Permit was successful.  The inspection report indicated that the "proposed preserve is

19  exhibiting the three wetland perimeters [sic]; therefore, the permittee has met the required

20  success criteria. . . ."

21  - Between December 20, 2014 and June 24, 2015 the Facility operated under a SWPPP dated

22  August 1, 1995, last revised August 2014 ("1995 SWPPP").  This response incorporates the

23  1995 SWPPP, which was produced by Defendants at BUTTE 7337-7442.

24  - The 1995 SWPPP, which includes a site map, makes no mention of the Preserve and does not

25  describe the Easement or its prohibitions (either directly, or by reference).  The 1995 SWPPP

26  does not identify the created waters of the United States in the Preserve that were confirmed to

27  be present as early as June 28, 2010 by the Army Corps of Engineers.  The 1995 SWPPP

28  identifies the discharge point for storm water associated with industrial activity from the

Facility to be from the Preserve, which it identifies as the Primary Sedimentation Basin. Defendants discharged storm water associated with industrial activities to the created waters of the United States without sampling or identifying that discharge in the 1995 SWPPP from at least June 28, 2010 to June 24, 2015.

- The site map associated with the 1995 SWPPP does not identify the areas of soil erosion or impervious areas at the Facility. The 1995 SWPPP site map does not identify all areas of industrial activity.

- The 1995 SWPPP identifies leachate as a potential pollutant in storm water discharges. The 1995 SWPPP sampling plan only requires storm water samples to be analyzed for total suspended solids, pH, specific conductance, oil and grease, iron, turbidity, temperature, nitrate + nitrite nitrogen, copper, cadmium, lead, nickel and mercury.

- Between June 24, 2015 and September 29, 2019 the Facility operated under a SWPPP dated June 24, 2015 ("2015 SWPPP"). This response incorporates the 2015 SWPPP, which was produced by Defendants at BUTTE 3208-3458. The 2015 SWPPP does not identify the location of the Preserve. The 2015 SWPPP does not identify the created waters of the United States in the Preserve that were confirmed to be present as early as June 28, 2010 by the Army Corps of Engineers. The 2015 SWPPP identifies the discharge point for storm water associated with industrial activity from the Facility to be from the Preserve, which it identifies as the Primary Sedimentation Basin. Defendants discharged storm water associated with industrial activities to the created waters of the United States without sampling or identifying that discharge in the 2015 SWPPP from at least June 25, 2015 to September 29, 2019.

- The 1995 SWPPP was superseded by the 2015 SWPPP effective June 24, 2015.

- The 2015 SWPPP was uploaded to SMARTS on August 10, 2015.

- The 2015 SWPPP identifies potential pollutants in leachate, and identifies leachate as a potential pollutant that could be present in storm water at the Facility. However, only pH, oil and grease, total suspended solids, and iron are identified as constituents for sampling and analysis to comply with the General Permit requirements.

- Along with the 2015 SWPPP, a site map dated June 3, 2015 ("June 3, 2015 Site Map") was

1   Dated:  November 4, 2022                    LAW OFFICES OF ANDREW L. PACKARD

2

3                                              William N. Carlon

4                                              Attorneys for Plaintiff
                                               California Open Lands
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I, William N. Carlon, declare as follows:

I am a resident of the State of California, and employed in Petaluma, California.  I am over the age of 18 years and am not a party to the above-entitled action.  My business address is 245 Kentucky Street, Suite B3, Petaluma, California, 94952.

On November 4, 2022, I served the following document(s):

**PLAINTIFF'S RESPONSES TO INTERROGATORIES, SET TWO**

by emailing a true and correct copy, pursuant to written agreement of counsel, to:

Diane G. Kindermann Henderson
Abbott & Kindermann, Inc.
2100 21st Street
Sacramento, CA 95818
DKindermann@aklandlaw.com

I certify and declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 4, 2022 at Napa, California.

_____
William N. Carlon

# EXHIBIT E

**To Defendants' Appendix of Exhibits**
**in Opposition to Plaintiff's Motion for Partial Summary Judgment**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CALIFORNIA OPEN LANDS, a          )    Case No.
non-profit land trust             )    2:20-cv-00123-DJC-DMC
organization,                     )
                 Plaintiff,     )
vs.                               )
BUTTE COUNTY DEPARTMENT OF        )
PUBLIC WORKS, a political         )
subdivision of the State of       )
California, DENNIS SCHMIDT,        )
an individual, and ERIC           )
MILLER, an individual,            )
                 Defendants.    )
_____ )

**CERTIFIED TRANSCRIPT**

Deposition of

TRAVIS PETERSON

Tuesday, October 10, 2023

Reported by:  Erin Worley, CSR #13139





CHICO | SACRAMENTO | SAN FRANCISCO | WALNUT CREEK | YUBA CITY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


CALIFORNIA OPEN LANDS, a          )    Case No.

non-profit land trust            )    2:20-cv-00123-DJC-DMC

organization,                    )

           Plaintiff,    )

vs.                              )

BUTTE COUNTY DEPARTMENT OF       )

PUBLIC WORKS, a political        )

subdivision of the State of      )

California, DENNIS SCHMIDT,       )

an individual, and ERIC          )

MILLER, an individual,           )

          Defendants.    )

_____ )

**CERTIFIED TRANSCRIPT**


Deposition of

TRAVIS PETERSON

Tuesday, October 10, 2023


Reported by:  Erin Worley, CSR #13139

1                    APPEARANCES

2

3    Counsel for Plaintiff:

4          WILLIAM N. CARLON, ESQ. (Zoom videoconference)

5          Law Offices of Andrew L. Packard

6          245 Kentucky Street, Suite B3

7          Petaluma, California 94952

8          Telephone: (707) 782-4060

9

10   Counsel for Defendants:

11         GLEN C. HANSEN, ESQ. (Zoom videoconference)

12         DIANE G. KINDERMANN, ESQ. (Zoom videoconference)

13         Abbott & Kindermann, Inc.

14         2100 21st Street

15         Sacramento, California 95818

16         Telephone: (916)

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   EXAMINATION BY:                            PAGE

 3   Mr. Carlon                                 5

 4

 5

 6

 7

 8                      --o0o--

 9

10

11

12

13                    INDEX OF EXHIBITS

14   EXHIBIT NUMBER                             PAGE

15   Exhibit 1 - Amended Notice of Deposition   8

16   Exhibit 2 - Travis Peterson resume         9

17   Exhibit 3 - Rebuttal Expert Report of      18

18              Travis Peterson

19

20

21

22

23                      --o0o--

24

25
```

```
 1                         --o0o--

 2          BE IT REMEMBERED that, on Tuesday, the 10th day

 3  of October, 2023, at the hour 10:10 a.m. of said day,

 4  the deposition of TRAVIS PETERSON, via Zoom

 5  videoconference, was taken before me, ERIN WORLEY, a

 6  Certified Shorthand Reporter.

 7                         --o0o--

 8  BY MR. CARLON:

 9     Q.  Okay.  So, Mr. Peterson, could you please state

10  and spell your full name for the record.

11     A.  Travis, T-r-a-v-i-s, Matthew, M-a-t-t-h-e-w,

12  Peterson, P-e-t-e-r-s-o-n.

13     Q.  Have you ever had your deposition taken before?

14     A.  No.

15     Q.  Okay.  So, I am going to go through some of the

16  rules of the road.  The first is that even though we are

17  not in a courtroom, you are under oath and the force and

18  effect of that oath is the same as if you were

19  testifying in court.  Do you understand?

20     A.  Yes.

21          MR. HANSEN:  One second.  I don't want to

22  throw you off, Will, but we do have a quick question

23  here, if we can go off the record for just one second.

24          MR. CARLON:  Okay.

25          (A discussion was held off the record.)
```

1       A.   No.

2       Q.   What about botany?  Would you consider yourself

3   an expert in botany?

4       A.   No.

5       Q.   What about wetland hydrology?

6       A.   No.

7       Q.   And you're not an engineer, correct?

8       A.   Correct.

9       Q.   And you didn't go to law school, right?

10      A.   Correct.

11      Q.   And you're not licensed to practice law in

12  California?

13      A.   No, I'm not.

14      Q.   Okay.  Okay.  Let's mark this as Exhibit 3.

15           (Exhibit 3 marked for identification.)

16  BY MR. CARLON:

17      Q.   Do you recognize this document?

18      A.   I believe so.

19      Q.   Actually, I'm sorry, I have the wrong document.

20  Bear with me for one second, please.  Okay.  Let's mark

21  this one as Exhibit 3 instead.  Do you recognize this

22  document?

23      A.   Yes.

24      Q.   And what is it?

25      A.   So, that's the document I produced for the

1    rebuttal to the expert report from Matthew Hagemann.

2        Q.  And I've got 15 pages here.  Does this look like

3    a true and correct copy of the report that you provided?

4        A.  Yes.

5        Q.  Great.  So, you haven't testified or provided

6    expert witness services for any other cases, is that

7    correct?

8        A.  Correct.

9        Q.  And you're charging $360 an hour for this work?

10       A.  Correct.

11       Q.  What were you asked to do?

12       A.  So, I was asked to evaluate the expert opinions

13   of Matthew Hagemann and provide a rebuttal response to

14   those -- to those opinions.

15       Q.  And are all of the opinions that you intend to

16   testify to at the trial of this matter contained within

17   this report, Exhibit 3?

18       A.  Yes.

19       Q.  Okay.  You're not working on any additional

20   opinions right now?

21       A.  No.

22       Q.  Do you have any other additional opinions that

23   you formulated that you intend to offer at trial on this

24   matter?

25       A.  No.

```
 1    Do you see the sentence that I have highlighted?  Can
 2    you read that?
 3        A.  Yes.  "The leachate discharges were the direct
 4    result of a series of natural disasters which can be
 5    classified as ACTS OF GOD (Force Majeure)."
 6        Q.  Is that your opinion?
 7        A.  Yes.
 8        Q.  What do you mean by direct result here?
 9        A.  Had it not been for the acts of god that occurred
10    directly prior to these events, those leachate
11    discharges would not have happened.
12        Q.  Again, meaning the seeps coming out of Module 4
13    wouldn't have happened?
14        A.  That's likely correct, yes.
15        Q.  And the natural disasters here I understand to
16    include the Camp Fire that occurred and the series of
17    rainfall storm events that you describe a little bit
18    lower down, is that correct?
19        A.  Yes.
20        Q.  Is there anything else that you include in the
21    natural disasters?
22        A.  No.
23        Q.  And so how much rainfall turned a normal storm
24    into a natural disaster?
25        A.  Well, to put it in context, during that time
```

191 of 362

1  frame both -- the State of California declared emergency

2  disasters for the rain, specifically.  The County of

3  Butte had declared an emergency disaster for the flood

4  and the rain events, as well.  They were clearly not the

5  norm.  If we look at the rain data for the time frames

6  leading up, there were series of rain events that

7  occurred at such a frequency that the system and the

8  state, essentially, and the area was overwhelmed.  Any

9  one of those storms, right, can be kind of classified as

10  a probability of occurring within a 24-hour time period,

11  for example.  So the landfill, by Title 27, is required

12  to be designed for a 24-hour storm event that occurs

13  from probability of once every 100 years.  In this case,

14  in this area that's about 6.7 inches or so, somewhere

15  around there.  Again, by definition, that's once every

16  100 years.  When the area experiences multiple rain

17  events in a short amount of time that may not be each

18  individually at that level but over and over again,

19  maybe it's a five-year probability storm event or even a

20  two-year probability storm event, but by definition they

21  are not supposed to happen all the same year, right.

22  The probability of all of those occurring in the same

23  year in sequence is exceptionally low probability of

24  that occurring.  That's the type of event that I would

25  classify as an act of god.  Butte County with a

```
 1   declaration of emergency and the State of California

 2   with a declaration of emergency would tend to agree with

 3   that.

 4       Q.  And what do you mean by act of god?  Those words

 5   are capitalized.  Does that have a specific definition

 6   that you're using?

 7       A.  It's, we can say, a naturally-occurring event

 8   that's out of the reasonable control of any human.

 9       Q.  And is there a reason that these words are

10   capitalized here?

11       A.  No, not specifically.

12       Q.  Why did you choose these words instead of the

13   words that you provided in the definition?

14       A.  I'm sorry, can you restate that or --

15       Q.  Yeah.  Acts of god is a legal phrase, right?

16             MR. HANSEN:  Object.  You're assuming that

17   he would know legal terms, but you can answer if you

18   can.

19             THE WITNESS:  Yeah, I don't know the

20   specific legal definition of that term.

21   BY MR. CARLON:

22       Q.  And you include in parenthesis after act of god

23   "force majeure."  What do you understand force majeure

24   to mean?

25       A.  It's, I guess, just reiterating the force beyond
```

1    November 2018 to March 2019, right?

2       A.  Yes.

3       Q.  I think we did it.  Thank you.  Your next opinion

4    here is:  "Furthermore, reducing the amount of leachate

5    contained within Module 4 would not serve to prevent the

6    seeps from occurring."  Is this your opinion?

7       A.  Yes.

8       Q.  And what is the basis of this opinion?

9       A.  Again, it's kind of directly speaking to the

10   claim in Mr. Hagemann's opinion that the facility did

11   not reduce the amount of leachate within Module 4 so as

12   to prevent the seeps from occurring.  Simply reducing

13   the amount of leachate within Module 4 would not have

14   prevented the seeps from occurring.

15      Q.  Okay.  You've restated your opinion, and you've

16   told me why you made the opinion, but you haven't given

17   me the basis for the opinion.  That's my question.

18      A.  Right.  Thank you.  The acts of god, specifically

19   the Camp Fire and the rain events, led to the saturation

20   of the soils in the area, led to the saturation and

21   introduction of leachate into that waste module, and

22   simply reducing then the amount of leachate would not

23   have prevented the seeps from occurring.  The seeps

24   would have occurred due to the acts of god that

25   introduced excess amounts of precipitation into that

1    module.

2        Q.  So, are you saying that there was no amount of

3    pumping of leachate from Module 4 that would have

4    prevented a seep from occurring?

5                    MR. HANSEN:  Object.  Vague.  The pumping of

6    leachate is not defined as to where or how.  I will just

7    lodge the objection.

8    BY MR. CARLON:

9        Q.  Do you understand my question, Mr. Peterson?

10       A.  I think so.

11       Q.  Do you have an answer?

12       A.  If you're kind of stating a hypothetical,

13   implying that removing all introduced leachate out of

14   Module 4 before it caused a seep to occur, that

15   hypothetical, I have no way of knowing if that could

16   have been addressed or not.  It certainly wasn't

17   practical or executable under emergency conditions.

18       Q.  Your opinion is that reducing the amount of

19   leachate would not have served to prevent the seeps from

20   occurring, but you don't know whether or not pumping

21   more leachate out of Module 4 during that time period

22   would have prevented the seeps from occurring?

23       A.  Again, I am kind of speaking directly to Mr.

24   Hagemann's opinion above that -- where he implies, if

25   not states, that the facility reducing the amount of

 1    leachate within Module 4 would have prevented the seeps

 2    from occurring.  I'm saying that is not my opinion.  I

 3    believe that is not the case, that simply reducing the

 4    amount of leachate in Module 4 would not have alone all

 5    by itself prevented the leachate -- or the seeps from

 6    occurring.  The seeps occurred because of the acts of

 7    god that overloaded the system.

 8       Q.  But you're not saying reducing leachate all by

 9    itself would have prevented it; you're saying it would

10    not have even served to prevent the seeps from

11    occurring, which seems like it wouldn't contribute to

12    preventing the leachate seeps?

13       A.  And I think I'd like to maintain the context of

14    the question and -- or the statement in the rebuttal,

15    and that's what I keep pointing out is that it's

16    directly in reference to Mr. Hagemann's implication that

17    the facility not acting caused or created something, and

18    I am saying that's not the case.

19       Q.  And what's the basis for that opinion?

20       A.  That the amount -- the volume of precipitation

21    introduced to the system, to the facility, to Module 4

22    was not in the control of the facility itself.  It was

23    too much for the design of the system.  Cumulatively,

24    the system received much more precipitation than any

25    100-year designed storm event and therefore the seeps

1    occurred.

2        Q.  When you say cumulatively, what are you -- as I

3    understood you to explain a 100-year storm event

4    earlier, that's over a 24-hour period.  And so you're

5    saying --

6        A.  Yeah, the --

7        Q.  Sorry, if I can just finish my question here.

8        A.  Go ahead.

9        Q.  You're saying more than 24 hours of rainfall has

10   equaled greater than a 24-hour storm event for 100

11   years.  So, I guess my question is:  How many hours are

12   you including in your cumulative analysis?

13       A.  Well, as you -- as you state, right, the designed

14   storm is based on the -- the probability of a 100-year

15   storm event occurring over a 24-hour period of a certain

16   amount of rain.  Those design storms are -- are valid

17   because of the infrequency and low probability that it

18   will occur.  The probability that a variety of large

19   storms would impact a specific area one after the other

20   is exceptionally low probability that that will occur.

21   But it can not be taken out of context.  You can't take

22   one specific storm all by itself and -- without

23   accounting for the impacts of immediately preceding

24   storms.  So the entire area was overwhelmed.  The

25   facility itself was overwhelmed.  The soils were

 1   saturated.  The ponds were full.  Declarations of
 2   emergency were in the process of being declared, if not
 3   already declared.  So if we look at any one of those
 4   storm events all by itself, it's not going to explain
 5   what happened.  What explains what happened are the
 6   exceptionally low probability of a bunch of storms of a
 7   great magnitude happening one after the other, and it
 8   actually occurred this time, and it creates a situation
 9   where it's -- where the system -- or the facility is not
10   designed to hold or withstand that amount of water.
11   Now, if a 100-year, 24-hour storm event actually
12   occurred anytime in that sequence, I don't know, but it
13   doesn't matter in the -- in those -- the acts of god
14   that we've discussed led to the overwhelming of the
15   design of the system.
16       Q.  Okay.  And so why don't you think that reducing
17   the amount of leachate contained within Module 4 in
18   February of 2019 would have served to prevent the seeps
19   from occurring?
20           MR. HANSEN:  Object.  Vague.
21   BY MR. CARLON:
22       Q.  Do you understand my question?
23       A.  Yes.  And again, I am directly rebutting the
24   implication above that the facility not acting led to
25   the seeps occurring.  I'm saying that is not the case.

1   Q.  Is it your understanding that the active phase

2   can be operational for months at a time?

3   A.  The active phase, I believe, is a subpart of a

4   module.  So while the daily -- or the working face moves

5   more frequently, you can perform that task within an

6   active phase.

7   Q.  So your opinion here is it's not required by the

8   permit to amend the SWPPP to document the change of

9   location for the specific active phase, is that correct?

10   A.  That's correct.

11   Q.  And what is the basis for that opinion?

12   A.  That's in preparing SWPPP documents for various

13   facilities over the years and understanding and knowing

14   and practicing the strategy of identifying the areas of

15   industrial activity but not necessarily being so

16   specific that it becomes outdated and inaccurate

17   immediately.  So, for example, on a -- you know, on a

18   manufacturing area we can identify a parking lot as a

19   storage facility but I do not need to specify where the

20   individual pallets are on a daily basis and therefore

21   changing my SWPPP.  Similar here where you may identify

22   an area of industrial activity and operate within that

23   area sufficiently without changing your SWPPP

24   accordingly.

25   Q.  So you're saying that as long as you identify the

 1   treats the 2015 SWPPP the same as the 2014 SWPPP insofar

 2   that he's just opining that the 2015 SWPPP does not

 3   identify changes in the active phase.  You copy and

 4   paste, it looks like, your rebuttal to that opinion, and

 5   so I guess my question to start with is:  Does

 6   everything in this rebuttal opinion -- I mean, it's word

 7   for word the same as the preceding rebuttal opinion.

 8   Does everything in this opinion mean the same thing as

 9   in the previous opinion except, I guess, applying it to

10   the 2015 SWPPP instead?

11       A.  Correct.

12       Q.  Okay.  In Hagemann's opinion he notes that in the

13   2015 SWPPP, or at least in the relevant period in which

14   the 2015 SWPPP was implemented, the facility changed

15   modules.  So they went from placing waste into Module 4,

16   just Module 4, to also placing waste in Module 5 in the

17   second quarter of 2018.  He notes that this addition of

18   Phase A in Module 5 was not reflected in any SWPPP

19   amendment.  I want to be clear about what your opinion

20   here is.  Is it your opinion that a change in the module

21   would not necessitate an amendment to the SWPPP?

22       A.  That is my opinion.  That is correct.  It would

23   not necessitate an update to the SWPPP.

24       Q.  And what's the reason for that?

25       A.  Because the requirement of general permit is to

 1   identify all areas of industrial activity and that is

 2   sufficiently identified.

 3       Q.  But I think Hagemann's opinion is that Module 5

 4   wasn't identified.  This is a new area of industrial

 5   activity that was opened up.  Module 5 didn't exist

 6   before the 2015 SWPPP.  So isn't this a new area of

 7   industrial activity that needs to be identified?  Mr.

 8   Peterson?

 9       A.  Yeah, sorry, I am just reading the -- I am

10   re-reading his opinion there to be clear.  Yeah, no, I

11   -- I think that -- I think it was -- I think the areas

12   were identified as areas of industrial activity.

13       Q.  Okay.  You're saying Module 5 Phase A was

14   identified in the 2015 SWPPP as an area of industrial

15   activity?

16       A.  I'd have to double check then.  Sorry.

17       Q.  Would the addition of a new module be something

18   that you think needs to be included in a SWPPP or -- let

19   me ask that a different way.

20           Would the addition of a new module necessitate an

21   amendment to the SWPPP, in your opinion?

22       A.  It depends on if that area is included in the

23   defined areas of industrial activity already.  If it's a

24   change in name only, then it would not necessarily.

25       Q.  Well, this isn't a change in name only.  This

```
 1   BY MR. CARLON:

 2      Q.  Okay.  So, I think we were moving on to the

 3   Rebuttal to Hagemann Opinion II, Paragraph D.  This

 4   rebuttal starts:  "All impervious areas can be

 5   appropriately identified in the next SWPPP revision, if

 6   warranted."  Can you explain what that sentence means,

 7   please.

 8      A.  Yeah, just if there's an update that's necessary

 9   in the next SWPPP revision because there are additional

10   areas of imperviousness, then it may be updated at that

11   time.

12      Q.  Okay.  Is it your opinion that areas with, for

13   example, Posi-Shell applied to the facility do need to

14   be identified in the SWPPP as areas that are impervious?

15      A.  That particular one, it may be appropriate to

16   include that as an area of imperviousness.  And it's --

17   I say that because it's a little more at least

18   semi-permanent than other types of erosion control

19   coverers and so it may be warranted to go ahead and do

20   that.

21      Q.  And you're saying it may be.  Under what

22   conditions, I guess, would it not be warranted?

23      A.  It's more of a temporary type of thing.  For

24   example, you know, if you tarp something and tarps are

25   identified as a way to -- to make an area impervious
```

 1   temporarily, then that -- that's sufficient to be listed

 2   as a BMP but you don't necessarily need to mark it off

 3   as a specifically impervious area.  Posi-Shell is a

 4   little more semi-permanent, right, so it kind of crosses

 5   over a little bit between, you know, full concrete and

 6   pavement versus, you know, a more temporary impervious

 7   solution such as a tarp.  So if it -- you know, so

 8   that's what I mean by it may be.

 9       Q.  Okay.  So here you're saying it should have been

10   identified as an impermeable surface because it's a

11   little more permanent than like a tarp?

12       A.  Yeah, that's -- that's fair.

13       Q.  Okay.  Let's see if you can help me understand

14   this sentence.  You're saying, "It is highly impermeable

15   but it is not listed as an impervious material along

16   with concrete or asphalt."  Is that just an observation

17   that it wasn't included in the SWPPP, or what are you

18   trying to say there?

19       A.  Right, right.  Exactly.  No, I think that's

20   correct.

21       Q.  Okay.  Okay.  Then it sounds like you're not

22   really taking issue with Hagemann's opinion here, is

23   that right?  I mean, what are you rebutting in

24   Hagemann's opinion I guess is another way to ask this?

25       A.  I am just going to review his -- I'm not adopting

1    his verbatim, but, yeah, I believe it is -- you know,

2    Posi-Shell, if it's impermeable and has an impact, then

3    it should be identified.

4        Q.  And just to be clear, because we are not talking

5    about the abstract, we are talking about Posi-Shell that

6    was applied to the facility here and that was fairly

7    permanent.  It was impermeable.  It should have been put

8    on a SWPPP, correct?

9        A.  Yeah, that's correct.

10       Q.  And then I think we sort of interjected before

11   you had a chance to answer my other question about what

12   exactly are you rebutting in Mr. Hagemann's opinion

13   here?

14       A.  Well, for one, I am saying that it can and would

15   be appropriate to update a SWPPP in an iterative

16   fashion, and any lack of identification of Posi-Shell or

17   any particular impervious area does not make the entire

18   SWPPP invalid in its whole.

19       Q.  On your Rebuttal to Hagemann Opinion III,

20   Paragraph 1, you're saying:  "The monitoring

21   implementation plan for the FACILITY does not require

22   storm water collected at the Facility to be analyzed for

23   biological oxygen demand."  Let's take that first part

24   first.  Why is the first instance of facility

25   capitalized, fully in all caps, whereas the second

1    instance is only capitalized the first letter?

2        A.  It's administrative.  It's not meaningful.

3        Q.  Okay.  So those don't mean two different

4    facilities?  We're still talking about the same

5    facility?

6        A.  Correct.

7        Q.  Okay.  Good.  Okay.  And then you go on to say:

8    "And the general permit does not require storm water

9    collected at the Facility to be analyzed for biological

10   oxygen demand, ammonia (as nitrogen), a-Terpineol,

11   Benzoic acid, p-Cresol, or Phenol."  Is that your

12   opinion?

13       A.  Yes.  And the general permit specifically is

14   referring to the industrial general storm water permit.

15       Q.  Thank you.  And what is the basis for that

16   opinion?

17       A.  Well, the industrial general permit requires

18   certain parameters to be analyzed for all facilities,

19   and in addition, it has additional requirements for

20   analysis based on the SIC code, and in this case the SIC

21   code identified above indicates the COD, chemical oxygen

22   demand, the iron, aluminum, lead, and zinc as the

23   appropriate analytes for this facility.

24       Q.  So you're saying based on the SIC code and the

25   specific pollutants identified that are associated with

```
 1   that SIC code, no other parameters need to be sampled

 2   and analyzed for in the facility's storm water sampling?

 3      A.  Right.  No other parameters are required by the

 4   permit.

 5      Q.  Just because the SIC code specifies a set of

 6   parameters for landfills, correct?

 7      A.  The -- right.  The general permit defines the

 8   method of selection of pollutants for monitoring as the

 9   basic ones, which are pH, TSS, and oil, and grease, and

10   then the specific required parameters based on the SIC

11   code and then it describes the process of the pollution

12   assessment that the SWPPP authors will do.  They have

13   the option of adding parameters by that process, and

14   then there are parameters that may be added as 303(d)

15   listed waters of concern or TMDLs.  All of those are to

16   be considered when selecting the parameters to analyze

17   for in a monitoring implementation plan.

18      Q.  And so if the pollutant source assessment

19   identified leachate as a potential source of pollutants

20   at the facility, is it your opinion that the facility

21   should monitor storm water for pollutants that are

22   indicators of leachate?

23      A.  Sorry, can you read that back.

24          MR. CARLON:  Can you read back the question,

25   please.
```

```
 1            CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

 2

 3            I, the undersigned, a Certified Shorthand

 4   Reporter of the State of California, do hereby certify:

 5            That the foregoing proceedings were taken before

 6   me at the time and place herein set forth; that any

 7   witnesses in the foregoing proceedings, prior to

 8   testifying, were placed under oath; that a verbatim

 9   record of the proceedings was made by me using machine

10   shorthand which was thereafter transcribed under my

11   direction; further, that the foregoing is an accurate

12   transcript thereof.

13            I further certify that I am neither financially

14   interested in the action nor a relative or employee of

15   any attorney of any of the parties.

16            IN WITNESS WHEREOF, I have this date subscribed

17   my name.

18

19   Dated: October 24th, 2023

20

21

22            _____

23            Erin Worley, CSR No. 13139

24

25
```

1              CAROL NYGARD & ASSOCIATES

2           2295 Gateway Oaks Dr., Suite 170

3             Sacramento, California 95833

4         Telephone:  916-928-8999    Fax: 916-928-9989

5   October 24th, 2023

6   Travis Peterson
   C/O Abbott & Kindermann
7   Glen Hansen
   2100 21st Street
8   Sacramento, CA 95818

9   RE: California Open Lands v. Butte County Department of
   Public Works
10   Case No.: 2:20-cv-00123-DJC-DMC

11   Dear Travis Peterson:

12       Your deposition transcript in the above-entitled
   matter is now available at any of our offices for your
13   review at your convenience.

14       Since the original deposition may not be released
   from our custody, if you wish to read it or make any changes
15   you deem necessary and sign it, you must first call for an
   appointment within the next 30 days on any weekday between
16   the hours of 8:00 a.m. and 5:00 p.m.; we will set an appointment
   time for your review. Review of the deposition via Zoom video
17   conference is also available upon request.

18       It is necessary that you bring this letter with you.

19       In the alternative, you may wish to read your attorneys'
   copy of the deposition transcript and notify this office by
20   letter of any changes you wish to make to your transcript.

21    Sincerely,

22

   Eddie Gomez
23   Production Assistant
   Carol Nygard & Associates, Inc.
24
   cc: All Counsel
25

## TRAVIS PETERSON

● 139 Old Vine Way, Napa, CA 94558
● 707-738-8788
● travis.peterson.solutions@gmail.com

---

**EXPERIENCE &
OBJECTIVE**

Experienced environmental scientist with over 25 years of practice specializing in California regulatory strategy for water, soil, and air quality protection for facilities including industrial, commercial, manufacturing, and utility operations. Travis has significant program management experience in water resources at industrial operations, municipal and private utilities, where he developed expertise and knowledge of operations and infrastructure projects for wastewater, recycled water, drinking water, and storm water programs in many industrial and commercial applications. He is well-versed at creating and implementing environmental compliance programs aimed at reducing operational risk and liability for a variety of industry operations and public and private water and environmental utilities.

**EDUCATION**

**Master of Science, Chemistry,** San Francisco State University
**Bachelor of Science, Chemistry**, Mathematics Minor, University of Miami

**CERTIFICATIONS**

California Storm Water QISP
Water Treatment Certification Grade 2
Water Distribution Certification Grade 2

**EMPLOYMENT
AND BUSINESS
EXPERIENCE**

**Peterson Environmental Solutions LLC**, Napa, CA
**PRINCIPAL ENVIRONMENTAL COMPLIANCE STRATEGY CONSULTANT**
● Independent consultant specializing in California environmental compliance strategy;
● Industrial, MS4, and construction stormwater projects; Special enforcement cases;
● Water, wastewater permitting and compliance programs;
● Hazardous materials management, remediation, and waste characterization.

**ERM West, Inc.** Walnut Creek, CA
**PRINCIPAL ENVIRONMENTAL COMPLIANCE CONSULTANT**
● SME for the West Coast for environmental compliance strategy and water resources;
● Serving global clients in the Ag, Chemical, Tech, Energy, and manufacturing industries;
● Lead complex programmatic facility and organizational audits;
● Permitting, compliance, and enforcement case management.

**Broadbent & Associates, Inc.**, Vacaville, CA
**SENIOR SCIENTIST/BUSINESS MANAGER**
● Environmental consulting Senior Scientist and Bay Area business leader for start-up office of 5 FTEs; Tripled revenue over 2-years of growth;
● Responsible for project management, business development, & office operations expanding client base & market sector reach to water/wastewater, storm water, oil & gas, air quality; municipal & local agencies;
● California Marketing lead; Proposal manager for state operations; contract manager.

**California American Water**, Sacramento, CA; Pacific Grove, CA
**WATER QUALITY & ENVIRONMENTAL COMPLIANCE MANAGER**
● Responsible for utility water quality program for water and wastewater systems, including monitoring, reporting, and compliance strategy for 20 California public water systems, 10 wastewater systems, and 4 recycled water systems;
● Responsible for utility environmental compliance performance, including water, land, and air protection programs;
● Act as company liaison to regulatory agencies on district and statewide issues; build effective, professional relationships based on trust and common goals of protecting public health and the environment;
● Regularly Collaborate with operations & CIP engineering functional groups to efficiently accomplish district goals & improve operational & environmental processes;
● Assess new regulations for impact to business and operations; create, train, and implement compliance programs;
● Assess district practices to minimize environmental impact and incorporate environmental stewardship principles into current and future projects;
● Responsible for providing a good customer experience related to water quality,



**EXHIBIT**
10/10/23 Peterson
2

**EMPLOYMENT AND BUSINESS EXPERIENCE (cont.)**

environmental concerns, and general industry education;
- Responsible for waste management program including generator waste determination, management, and compliance with California and RCRA requirements;
- Direct and manage district staff (5-8 FTE) and consultants to successfully execute projects, contracts, and associated work products.

**City of Vacaville**, Vacaville, CA
**WATER QUALITY PERMITTING ADMINISTRATOR**
- Responsible for planning and implementing programs to establish, maintain, & document environmental compliance with regulatory permits & policies for the City's Utilities Department including 15 MGD wastewater operations, large public drinking water system, & stormwater program.  Regulator oversight: EPA, SWRCB, RWQCB, DDW (CDPH).
- Project Manager for City's ROWD permit development, including priority pollutant and expanded water quality monitoring and fate and transport study of receiving waters.
- Act as department liaison with regulatory agencies during the development of regulations, orders, and policies that may affect department business.
- Represent the City and Central Valley wastewater dischargers (POTW) group in stakeholder workgroups seeking collaborative solutions and providing direct input to regulators on a variety of policy, technical, economic, and social-impact issues.
- Project Manager for the City's MS4 Phase II permit stormwater management program including education and outreach, construction, enforcement, and low-impact development components.
- Direct and manage City staff from multiple departments and consultants.

**MWH Global, Inc.,** Walnut Creek, CA
**ENVIRONMENTAL PROJECT MANAGER/ SR. PROJECT CHEMIST**
- Project Manager for industrial clients; responsible for business development, budgets/costs, project execution, and regulatory reporting and compliance.
- Environmental consulting as a Project Chemist for a variety of oil & gas, industrial, and commercial clients involving site investigation, remediation, compliance, and closure involving CEQA, CWA, CWC, NPDES, CERCLA, RCRA, Brownfields requirements.
- Project chemistry program development including sampling design and methods, QAPP development, sample preservation, selection of preparation and analytical methods from USEPA and other standardized methods; laboratory compliance audits; data validation, verification, and assessment.
- Direct supervisor to environmental staff.

**REGULATORY STAKEHOLDER GROUP LEADERSHIP AND INVOLVEMENT:**

**Central Valley Clean Water Association,** Water Committee Chair
A collection of wastewater agencies with a common mission to effectively represent the interests of the industry in regulatory matters and to support the exchange of information so members can best meet their business challenges.  I served as the chair for a committee that focused on regulatory issues of discharges to state waterbodies.  Through this group, I effectively represented municipalities, seeking solutions that were technically and economically sound and politically acceptable to stakeholders including environmental regulators and NGOs.

**Central Valley Salinity Alternatives for Long-Term Sustainability**
CV-SALTS organizational focus is on a long-term, comprehensive solution for the increasing threat to the overall health of California's Central Valley and Delta from salt and nutrients in surface and groundwater.  Impacted water supplies threaten drinking water for the majority of California residents and the agriculture industry.  I served on the board of directors and technical committee, advocating for appropriate funding, regulation, technological innovation, and economic feasibility.

**Central Valley Drinking Water Policy Workgroup**
The CVDWPWG was a regulator-led effort to develop a policy that protects drinking water sources from further degradation by constituents such as organic carbon, pathogens, and nutrients.  Major represented interests included public health, environmental, and water supply agencies, and wastewater, agriculture, and stormwater industries.

**Key Projects**

**Industrial Materials Recycler Wastewater to Reuse Conversion**
Travis led a team focused on minimizing the discharged wastewater from an industrial plastics recycling plant by adopting water reuse principals and a series of treatment technologies to recapture waste flows and reuse water within the process. The discharged water requirement reduced from 125K gallons per day (GPD) to less than 10K GPD.

**Wastewater Treatment Plant Compliance & Permitting ☐ Various**
Travis has managed large wastewater and recycled water programs including 10 wastewater systems and four recycled water systems ranging from very small onsite wastewater treatment systems; passive pond systems; medium sized package wastewater treatment with recycled water production and distribution; and 15 million GPD advanced secondary and tertiary municipal treatment works.

Travis has helped restore the permitting and compliance status for Safe Drinking Water Act, Clean Water Act, Clean Air Act, Resource Conservation and Recovery Act, and Emergency Planning and Right-to-Know Act compliance through gaining operations experience, conducting audits, inspections, research, and record review for several systems throughout central and northern California. Additionally, he developed and implemented programmatic policies and procedures for sustaining environmental compliance and water quality compliance. Travis has trained staff and management to gain understanding and acceptance of water compliance programs, resulting in reduced liability and potential for harm to public health and the environment.

Travis created and implemented detailed programs to establish compliance with a newly issued NPDES permit for a 15MGD secondary treatment plant in preparation for its tertiary upgrade. He negotiated with the Regional Waterboard to establish clear operational parameters based on permit limit interpretation, establishing points of compliance, reasonable receiving water limits, and laboratory methodologies. Following this permit cycle, Travis led the Report of Waste Discharge permit renewal process, including priority pollutant studies, expanded water quality monitoring, and a fate and transport study of receiving waters.

**Water Treatment Facilities, Environmental Impact Assessment**
Implemented changes to water treatment system operations to reduce the toxicity of arsenic residual sludge from California-hazardous to non-hazardous levels, minimizing environmental impact, transportation and disposal costs, and allowing a more appropriate disposal pathway. Evaluated the waste generation process for a water tank rehabilitation, properly characterizing tank blast residue allowing it to be recycled for a permanently non-leachable industrial purpose and creating a new disposal pathway. Analyzed and modified treatment chemical usage to minimize quantity, cost, and environmental impact.

**Power Plant Industrial Discharger NPDES Renewal**
Travis managed the permitting strategy and data analysis for renewal of a major NPDES permit to discharge once-through cooling water by an electrical generator, incorporating new provisions and exemptions from the California Ocean Plan and performing the statistical evaluation of discharge data to predict compliance with water quality standards. The strategy and analysis resulted in the recommended removal of permit limitations for 5 pollutants from the future permit.

**Geothermal Power Generation Water Quality Protection**
Travis established a water quality protection closure plan for a shuttered geothermal facility and wellfield by evaluating the remaining pollutants from the chemical treatment units, cooling towers, wellfield operations, and storm water runoff and creating new strategic discharge pathways for different waters based on the environmental and regulatory constraints.

**Environmental Chemistry Support for Refineries**
Travis served as the Senior Project Chemist for major Bay Area refinery programs, providing remediation sampling, strategy, and environmental forensic services for investigations of petroleum hydrocarbon contamination. He performed studies and expert interpretation using high-resolution analytical chemistry techniques providing clients with scientific evidence of sources and relative aging of surface and

subsurface hydrocarbon releases often involving complex mixes of distillation fractions and multiple contamination release dates.

**Former Rocket Manufacturing and Propulsion Test Facility Surface Water Program**

Travis served as the lead Project Chemist for the Boeing Company□s Santa Susana Field Laboratory NPDES Program, a large, high-profile, politically-charged program. He worked closely with the clients and Los Angeles Waterboard to implement technical and regulatory aspects of the NPDES permit in compliance with the Clean Water Act and the California Water Code. Developed and negotiated the technical arguments for the compliance strategy, which was tangled in a legal debate over the application of point-source regulations to a nonpoint-source consisting of intermittent industrial storm water discharges. Travis planned and led the technical team responsible for complex, weather-driven sample collection, data generation, validation, database management, and for creating and meeting overall technical project quality assurance/quality control requirements.

**Hazardous Materials Program Management**

Travis managed the hazardous materials programs for over 140 industrial facilities, including annual audits and reporting, permitting, coordination with the local CUPAs, inspections, and management of the Hazardous Materials Business Planning (HMBP) program and compliance reporting and tracking through California CERS system. Designed and implemented policies and procedures for managing used oil and asbestos containing material for proper accumulation, tracking, and disposal.

**Bulk Oil Facility Compliance Inspections**

Travis led the compliance audit program for 30 bulk oil facilities in the Western US, incorporating newly acquired facilities into an existing operation, creating a consistent compliance program. Audits included compliance evaluation for hazardous materials storage and documentation, hazardous waste disposal, federal SPCC and state APSA regulations, and industrial storm water pollution prevention.

**Waste Characterization Protocol and Enforcement Response**

Travis led the effort to restore compliance to an operation with a history of poor or improper waste characterization by creating and documenting defensible characterization protocol.  Travis also represented the business in negotiations with the CUPA enforcement agency to correct misinterpretations of analytical data. Travis reduced the noncompliance penalty liability from $1.2M to $435K solely on regulatory interpretation and technical data arguments.



August 15, 2023

### REBUTTAL EXPERT REPORT OF TRAVIS PETERSON

### California Open Lands v. Butte County Department of Public Works, etal.
### Case No. 2:20-cv-00123-DJC-DMC,
### U.S. District Court, Eastern
### District of California

**Introduction:**
I am experienced environmental scientist Principal Environmental Consultant and a California Qualified Industrial Storm Water Practitioner (QISP) with 25 years of industry experience specializing in California environmental regulatory compliance and water quality protection. My clientele includes industrial, commercial, manufacturing, utility, and municipal operations. I have significant experience working on compliance matters for the Industrial General Permit, Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ & Order 20XX-XXXX-DWQ ("General Permit". I have served as a regulator responsible for creating storm water compliance and enforcement programs followed by others that adds valuable industry insight. I have significant program management experience in water resources at industrial operations, municipal and private utilities, where I developed expertise and knowledge of operations and infrastructure projects for wastewater, recycled water, drinking water, and storm water programs in many industrial and commercial applications. A detailed CV is attached.

I have not testified or provided expert witness services for any other cases. I have no publications within the past ten years.

Compensation to Peterson Environmental Solutions LLC for the work related to this matter is $360/hour.

**Purpose and Objective:**
I was requested to review the Expert Opinions of Matthew Hagemann
In the Matter of California Open Lands v. Butte County Department of Public Works, et al. Case No. 2:20-cv-00123-DJC-DMC, U.S. District Court, Eastern District of California dated July 14, 2023 and provide a rebuttal expert report. In providing a rebuttal expert opinion I reviewed documents that the County submitted to the State Water Resources Control Board (State Water Board), Central Valley Regional Water Quality Control Board (Regional Board), documents provided by the County

Peterson Environmental Solutions, LLC
139 Old Vine Way
Napa, California 94558



EXHIBIT
10/10/23 Peterson
3

to California Open Lands (COL), laboratory reports of analysis of samples related to storm water and site operations collected by others, transcripts of depositions, and related figures and photographs included in these sources.

**Opinions And Support**:

**Rebuttal To Hagemann Opinion I, Paragraph 1 (page 2):**

A.     Text of Hagemann Opinion:

"*In February 2019, the Facility experienced several large storms. Leachate seeps occurred on Module 4, and leachate flowed to a storm water detention basin, Basin 4. From there, leachate that was commingled with storm water was pumped to a ditch, which gravity flowed to the Neal Road Preserve. The Preserve discharged over the concrete spillway, and into the unnamed stream that flows to Hamlin Slough, Butte Creek, and the Sacramento River. Based on my review of the Facility's reporting on these leachate discharges, videos taken during that period, sampling data collected of the discharge, and my observations of the Facility itself, it is my opinion that these discharges were the result of failures by the Facility to implement Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology.*"

B.     Rebuttal:

Leachate discharges to Storm Water Basin #4 (SWB-4) and the Primary Sedimentation Basin (PSB), located on the Conservation Easement, occurred at the NRRWF on February 14, 2019, and February 26, 2019. These leachate discharges were pumped from SWB-4 to the PSB. Another leachate discharge from WMU-4 occurred on March 6, 2019. This leachate discharge was contained in SWB-4 and was not pumped to the PSB.  The leachate discharges were the direct result of a series of natural disasters which can be classified as ACTS OF GOD (Force Majeure). A series of manmade and natural events beginning November 8, 2018, caused severe damage to the Facility. The Camp Fire initiated by downed Pacific Gas and Electric (PG&E) powerlines destroyed infrastructure required to operate the Facility under state and federal regulatory requirements. Storm water Best Management Practices (BMPs), WMUs, poly covers, soil caps, grass covers, and other infrastructure required to meet local, state, and federal regulations were destroyed. The destroyed infrastructure was in the process of being repaired by NRRWF personnel when a series of severe local storm events caused by atmospheric rivers impacted the NRRWF beginning in the early part of February 2019. The intense rainfall and volume associated with these severe local storm events overwhelmed the remaining infrastructure and repairs to the NRRWF facility. Leachate discharged from the southwest toe of WMU-4 and entered storm water contained in SWB-4. The storm water and leachate in SWB-4 was discharged by a pump to the PSB.  NRRWF personnel attempted to mitigate the discharge of leachate to storm water, but were unable to complete this work due to saturated soils which prevented the use of heavy equipment to install pipes to discharge the leachate to the NRRWF leachate basin.

NRRWF personnel promptly collected storm water discharge samples from a storm water

2

sampling site identified as SW-1 during the February 14, 2019, and February 26, 2019, leachate seep events. SW-1 storm water discharges represent discharges from the PSB. Background storm water run-on samples representing storm water quality generated from sites outside the boundary of the NRRWF were also collected for analysis during the February 14, 2019, and February 26, 2019, leachate seep events. The storm water run-on storm water sample sites are identified as SW-2 located on the east-central NRRWF boundary, and SW-8 located on the southwest boundary of the NRRWF. All storm water samples collected by NRRWF personnel were analyzed at an approved water testing laboratory for constituents that would represent leachate seeps discharges. Copies of the February 14, 2019, and February 26, 2019, laboratory analytical data is contained in Attachment C, February 14, 2019, Storm Water Sampling Analytical Data.

Following the severe local storm events in February 2019 through March 2019, the Deputy Director of the Butte County Waste Management Division, Todd Storti, prepared a letter dated August 23, 2019 reported the discharge of leachate that occurred during the February 2019 through March 2019 severe local storm events. The letter was sent to Kate Burger, PG., Senior Engineering Geologist, Chief Groundwater Unit, Central Valley Regional Water Quality Control Board confirming the leachate discharges and identifying the reasons the discharges occurred.

These activities and analyses largely represented responses to Acts of God and reasonable approaches to evaluate the restoration of the site to normal operating conditions. If or how discharges occurred as a result of emergency conditions is not related to efforts by the Facility to design or implement Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology.

Best Available Technology Economically Achievable (BAT), and Best Conventional Pollutant Control Technology (BCT) have been incorporated into the June 24, 2015 and the September 30, 2019 amended SWPPP. Industrial Permit requirements for BAT and BCT include good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. Under normal operating conditions, trained Facility personnel have implemented and continue to update site-specific plans for implementation of Best Available Technology Economically Achievable (BAT) for toxic and nonconventional pollutants and Best Conventional Pollutant Control Technology (BCT) to mitigate storm water pollutants. The BAT and BCT measures were specified in the SWPPP dated June 24, 2015 and the amended SWPPP dated September 30, 2019. The amended SWPPP dated September 30, 2019 identified specific BAT and BCT measures to mitigate discharge from the Facility.

**Rebuttal To Hagemann Opinion I, Paragraph 2 (page 2):**

A.      Text of Hagemann Opinion:

"*Based on my review of the documentation of the February 2019 leachate seeps, it is my opinion that the leachate seeps occurred through negligent operation of the waste module unit. Specifically, the inability of the Facility to prevent storm water from infiltrating into Module 4 caused a rapid increase in the production of leachate within that Module during*

3

*the February 2019 storms. In addition, the Facility did not reduce the amount of leachate within Module 4 so as to prevent the seeps from occurring.*"

B.Rebuttal:

• The inability of the facility to prevent storm water from infiltrating into Module 4 was a result of a combination of the BMPs having been damaged from the Camp Fire, and the severe storm events that followed, including the saturated soils that precluded heavy equipment from installing a bypass pipe.

• There was no negligent operation of the waste module unit. Furthermore, reducing the amount of leachate contained within module 4 would not serve to prevent the seeps from occurring.

**Rebuttal To Hagemann Opinion I, Paragraph 3 (page 2):**

A.      Text of Hagemann Opinion:

"*Then, the County pumped the leachate commingled with storm water into the Neal Road Preserve, and discharged it to downstream surface waters.*"

B.      Rebuttal:

• During the response to the severe storms, pumps from stormwater basin 4 to the PSB on the conservation easement were discovered operating and were shut off immediately.

• The PSB overflowed as a result of the severe storm volume and discharged storm water commingled with trace amounts of leachate to downstream surface waters by gravity over the spillway.

**Rebuttal To Hagemann Opinion I, Paragraph 4 (pages 2-3):**

A.      Text of Hagemann Opinion:

"*The Facility has experienced subsequent leachate seeps from Module 4, and as recently as March 30, 2023 and January 12, 2023. The March 30, 2023 seep drained into Sediment Basin #5, a storm water detention basin. The County reported that they treated the liquid in Sediment Basin #5 as leachate and transferred it to the liquid waste impoundment. However, the potential for future leachate seeps that make it into the Facility's storm water conveyance systems remains, as a result of the County's failure to implement better containment practices.*"

B.      Rebuttal:

There may be future atmospheric rivers and severe storm events that exceed the design capacity of the stormwater detention system. It may also be possible that future fires could damage the BMPS and allow stormwater flow to produce seeps.  It is also possible that these

4

severe events could take place subsequently in a short time and create the same conditions. However, the "100-year storm" is the standard used for establishing the capacity for stormwater detention and was used to design the capacity of the detention system for the Landfill. Normal operational containment practices were followed as designed and to the extent practicable, given the constraints of the extreme weather and soil conditions which, for example, precluded the use of heavy equipment. Further, the Facility hired a consultant to develop an Operations Plan following the occurences, specifically to better prepare for future conditions.

**Rebuttal To Hagemann Opinion II, Paragraph "A" (page 3):**

A.    Text of Hagemann Opinion:

*"During the Relevant Period, there has been a succession of four SWPPPs in effect at the Facility. From November 15, 2014 to June 23, 2015, the operative SWPPP at the Facility was the SWPPP revised August 6, 2014 ("2014 SWPPP"). BU11E04533 — BUTTE04635. From June 24, 2015 to September 29, 2019, the operative SWPPP at the Facility was the SWPPP revised June 24, 2015 ("2015 SWPPP"). From September 30, 2019 to February 3, 2021, the operative SWPPP at the Facility was the SWPPP dated September 30, 2019 ("2019 SWPPP"). BUTTE02947-BUTTE03206. From February 4, 2021_ to the present, the operative SWPPP at the Facility is the SWPPP dated February 4, 2021 ("2021 SWPPP"). C0L009304 — C0L009775.*
*None of the SWPPPs were ever accurate, adequate or up to date, for the reasons discussed below.*

*A.    The SWPPPs fail to identify the Neal Road Preserve.*

*The General Permit requires the SWPPP to have a site map that identifies "on-facility surface water bodies" and "location(s) of nearby water bodies (such as rivers, lakes, wetlands, etc.) or municipal storm drain inlets that may receive the facility's industrial storm water discharges and authorized NSWDs." General Permit, Section X.E.3.a. The Neal Road Preserve contains wetlands, including, at times, surface water, and therefore should be identified in each SWPPP's site map(s). None of the SWPPP site maps include an identification or description of the Neal Road Preserve."*

B.    Rebuttal:

The Neal Road Preserve can be appropriately identified on the next SWPPP revision. SWPPPs are planning documents and are anticipated to be updated periodically and as needed. Section X.B of the IGP anticipates and allows updates to facility SWPPPs "…within 30 days whenever the SWPPP contains significant revision(s); and, 3. With the exception of significant revisions, the Discharger is not required to certify and submit via SMARTS their SWPPP revisions more than once every three (3) months in the reporting year."

5

**Rebuttal To Hagemann Opinion II, Paragraph B.1 (pages 3-5) Re: 2014 SWPPP:**

A.      Text of Hagemann Opinion:

"*SWPPPs inadequately describe the active waste disposal areas.  at the Facility is placed into various modules, each of which have certain design limitations. Each module is comprised of several phases, which are filled strategically to maximize the capacity to store waste, while staying within the engineering design parameters for each phase. Each phase takes months, if not years, to fill. While the County recognizes that the solid waste placed in these phases is a major source of potential pollutants at the Facility, they fail to adequately describe the actual locations at the Facility where these wastes are being placed.*

*1.      2014 SWPPP*
*The 2014 SWPPP states that the tipping pad is located within Module 4, but fails to identify which of the five phases of Module 4 the tipping pad is in. BUTTE04538. According to the monitoring reports summarized above, the active phase was Module 4, Phase D from the beginning of the Relevant Period until the second quarter of 2015, when the Facility began placing waste in Phase E of Module 4 as well. The 2014 SWPPP was not amended to reflect this change. Because the 2014 SWPPP described the active phase, where a significant source of potential pollutants were located, in only general terms, and because the 2014 SWPPP was never amended to reflect the subsequent changes in location of the active phases, it is my opinion that the 2014 SWPPP was inadequate during the entire period in which it was implemented during the Relevant Period (November 15, 2014 —June 23, 2015).*"

B.      Rebuttal

   The SWPPP is designed to cover all operational modes for the facility and includes the operation of any of the modules that may be currently active. It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase. Because the location where waste is dumped each day (The "working face") moves daily, and is not specific to any region, it would not be practical, nor is it required to amend the SWPPP each time this location changes.

**Rebuttal To Hagemann Opinion II, Paragraph B.2 (pages 5-6) Re: 2015 SWPPP:**

A.      Text of Hagemann Opinion:

"*2.      2015 SWPPP*

*The 2015 SWPPP uses the same language from the 2014 SWPPP in identifying that the tipping pad is located within Module 4, but it suffers the same defect in that it fails to identify the active phases within that module. The 2015 SWPPP adds Table 3.1, which purports to describe the location of industrial activities and materials. BUTTE03236-37. With respect to solid waste, Table 3.1 identifies the location as "WMUs, Drainage Areas A and E." As with the other description of where solid waste is disposed of and handled at the Facility, this description lacks sufficient detail.*

6

*During the implementation period of the 2015 SWPPP (June 24, 2015 through September 29, 2019), the Facility changed the active phases at least three times. In the first quarter of 2016, waste was only placed in Phase D of Module 4, a change that was not reflected in any SWPPP amendment or revision. In the third quarter of 2016, waste was once again placed in Phase E of Module 4, and continued to be placed in Phase D of Module 4. Again, this change was not reflected in any SWPPP amendment or revision. In the second quarter of 2018, the Facility began placing waste in Phase A of Module 5, as well as Phases D and E of Module 4. The addition of Phase A of Module 5 was not reflected in any SWPPP amendment or revision. Because the 2015 SWPPP described the active phase, where a significant source of potential pollutants were located, in only general terms, and because the 2015 SWPPP was never amended to reflect the subsequent changes in location of the active phases, it is my opinion that the 2015 SWPPP was inadequate during the entire period in which it was implemented."*

B.      Rebuttal:

   The SWPPP is designed to cover all operational modes for the facility and includes the operation of any of the modules that may be currently active. It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase. Because the location where waste is dumped each day (The "working face") moves daily, and is not specific to any region, it would not be practical, nor is it required to amend the SWPPP each time this location changes.

**Rebuttal To Hagemann Opinion II, Paragraph B.3 (page 6) Re: 2019 SWPPP:**

A.      Text of Hagemann Opinion:

*"3.      2019 SWPPP*

*Rather than improve on the previous iterations of the SWPPP, the 2019 SWPPP describes the location of solid waste at the Facility as "Working Face," which the County has testified to mean the location where waste is dumped each day. The "working face" moves daily, and is not specific to any region. It provides no information as to where at the Facility the waste is being handled and disposed of on any day, week, month, or year. During the implementation period of the 2019 SWPPP (September 30, 2019 — February 3, 2021), the Facility changed the active phases that received waste at least twice. In the second quarter of 2020, the Facility added Phase B of Module 5 to the already active Phases A of Module 5, and D and E of Module 4. This change was not reflected in any amendment or revision to the 2019 SWPPP. On January 14, 2021, the Facility added Phase C of Module 5, and this change was not reflected in any amendment or revision to the 2019 SWPPP. Because the 2019 SWPPP described the active phase, where a significant source of potential pollutants were located, in only general terms, and because the 2019 SWPPP was never amended to reflect the subsequent changes in location of the active phases, it is my opinion that the 2019 SWPPP was inadequate during the entire period in which it was implemented."*

7

B.      Rebuttal

   The SWPPP is designed to cover all operational modes for the facility and includes the operation of any of the modules that may be currently active. It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase. Because the location where waste is dumped each day (The "working face") moves daily, and is not specific to any region, it would not be practical, nor is it required to amend the SWPPP each time this location changes.

**Rebuttal To Hagemann Opinion II, Paragraph B.4 (pages 6-7) Re: 2021 SWPPP:**

A.      Text of Hagemann Opinion:

"4.      2021 SWPPP

*The 2021 SWPPP uses the same general descriptions as the 2019 SWPPP, and is defective for the same reasons. During the implementation period of the 2021 SWPPP (February 4, 2021 — present), the Facility changed the active phases that received waste at least twice. In the second quarter of 2021, the Facility only placed solid waste in Module 5, Phase C. This change was not reflected on any amendment or revision to the 2021 SWPPP. In the third quarter of 2021, the Facility added back Phase B of Module 5, but this change was not reflected in any amendment or revision to the 2021 SWPPP.*
*In my opinion, the Facility has never had a SWPPP that adequately describes the location of the County's main industrial activity — disposal of solid waste. Moreover, each time the Facility changed the location in which waste was placed constituted a significant change to the Facility's operations, and, in my opinion required a revision to the SWPPP to accurately reflect site-specific BMPs to address changed conditions.*

B.      Rebuttal:

   The SWPPP is designed to cover all operational modes for the facility and includes the operation of any of the modules that may be currently active. It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase. Because the location where waste is dumped each day (The "working face") moves daily, and is not specific to any region, it would not be practical, nor is it required to amend the SWPPP each time this location changes.

**Rebuttal To Hagemann Opinion II, Paragraph C (page 7):**

A.      Text of Hagemann Opinion:

"C.      *The Facility's SWPPPs do not adequately describe minimum or advanced BMPs that would be used to control pollution from storm water that contacted industrial activities and industrial materials.*

*Because the SWPPPs fail to identify the location(s) of the main industrial activity at the Facility, namely the disposal of solid waste, the SWPPPs cannot adequately describe minimum or*

8

-218-

*advanced BMPs for those specific areas."*

B.        Rebuttal:

   The SWPPP is designed to cover all operational modes for the facility and includes the operation of any of the modules that may be currently active. It is not required by the permit to amend the SWPPP to document the change of location for the specific active phase. Because the location where waste is dumped each day (The "working face") moves daily, and is not specific to any region, it would not be practical, nor is it required to amend the SWPPP each time this location changes. All BMPs identified and related to the protection of water quality for each of the active areas of industrial activity would be relevant and appropriately stated in the plan.

**Rebuttal To Hagemann Opinion II, Paragraph D (page 7):**

A.        Text of Hagemann Opinion:

*"The Facility's SWPPPs fail to identify all impervious areas of the facility. The General Permit requires the SWPPP to have a site map that identifies all impervious areas of the Facility. General Permit, Section X.E.3.d. A major BMP implemented at the Facility is the application of Posi-Shell®, a spray-applied coating that dries in the form of a thin durable stucco layer that is highly impermeable. Although this BMP can significantly change the volume, intensity, and direction of surface flows, it is not depicted in any of the SWPPP site maps."*

B.        Rebuttal:

All impervious areas can be appropriately identified in the next SWPPP revision, if warranted. SWPPPs are planning documents and are anticipated to be updated periodically and as needed. Section X.B of the IGP anticipates and allows updates to facility SWPPPs **"…**within 30 days whenever the SWPPP contains significant revision(s); and, 3. With the exception of significant revisions, the Discharger is not required to certify and submit via SMARTS their SWPPP revisions more than once every three (3) months in the reporting year." For example, Posi-Shell is a BMP and serves to prevent surface soils from washing away due to precipitation and surface stormwater runoff. It is highly impermeable, but it is not listed as an impervious material along with concrete or asphalt. It is an important BMP used to prevent seeps, improve containment, and as an alternative to hydroseeding to improve the water quality and may be appropriately identified as impervious.

**Rebuttal To Hagemann Opinion III, Paragraph 1 (page 7):**

A.        Text of Hagemann Opinion:

*"Under the General Permit, the County is required to develop a Monitoring Implementation Plan to continuously evaluate its storm water discharges for certain pollutants to determine whether Best Management Practices ("BMPs") are effective, and possibly to trigger the implementation of additional, mandatory BMPs. A key source of pollution at this Facility is leachate generated within the waste module units. During the Relevant Period, the Facility*

9

-219-

*has had several leaks, spills, and seeps of leachate — some of which have been discharged into the storm water conveyance system and discharged into nearby surface waters. In my opinion, this Facility should monitor its storm water discharges for the presence of leachate."*

B.     Rebuttal

Sample parameters required by the Facility primary and secondary Standard Industrial Code5 (SIC) numbers 4953, Landfills and Land Application Facilities, and 5093, Scrap and Waste Materials, which take into account relevant industry considerations based on the operation of such facilities, including the presence of leachate, are:
- pH
- TSS
- O & G
- COD
- Fe (Total)
- Al (Total)
- Pb (Total)
- Zn (Total)

Subchapter N contains requirements for landfills (Part 445). However, the NRRWF is not subject to Subchapter N requirements as demonstrated in the Facility SWPPP. Therefore:

The monitoring implementation plan for the FACILITY does not require storm water collected at the Facility to be analyzed for biological oxygen demand, and the GENERAL PERMIT does not require storm water collected at the Facility to be analyzed for biological oxygen demand, ammonia (as nitrogen), a-Terpineol, Benzoic acid, p-Cresol, or Phenol.

**Rebuttal To Hagemann Opinion III, Paragraph A (page 8) Re 2015 SWPPP:**

A.     Text of Hagemann Opinion:

*"A.     The County's failure to monitor for all required pollutant parameters*
*The 2015 SWPPP identifies potential pollutants found in the Facility's leachate.*
*BU11E03238. While the 2015 SWPPP requires analysis for those pollutants on some of the Facility's storm water sampling, the monitoring plan is deficient because it does not require each qualifying storm event sample to be analyzed for those pollutants. The County acknowledges that the pollutants are potentially in their storm water discharges, and that they have actually discharged those pollutants in their storm water in the past. However, they do not include them as required sampling parameters for routine QSE sampling despite the established likelihood of these pollutants to be present."*

B.     Rebuttal:

Sample parameters required by the Facility primary and secondary Standard Industrial Code5 (SIC) numbers 4953, Landfills and Land Application Facilities, and 5093, Scrap and Waste Materials, which take into account relevant industry considerations based on the operation of such facilities, including the presence of leachate, are:

10

- pH
- TSS
- O & G
- COD
- Fe (Total)
- Al (Total)
- Pb (Total)
- Zn (Total)

Subchapter N contains requirements for landfills (Part 445). However, the NRRWF is not subject to Subchapter N requirements as demonstrated in the Facility SWPPP. Therefore:

The monitoring implementation plan for the FACILITY does not require storm water collected at the Facility to be analyzed for biological oxygen demand, and the GENERAL PERMIT does not require storm water collected at the Facility to be analyzed for biological oxygen demand, ammonia (as nitrogen), a-Terpineol, Benzoic acid, p-Cresol, or Phenol.

**Rebuttal To Hagemann Opinion III, Paragraph A (pages 7-8) Re 2015 SWPPP:**

A.        Text of Hagemann Opinion:

"A.        The 2019 and 2021 SWPPPs are even more deficient than the 2015 SWPPP in that they do not identify potential pollutants found in the Facility's leachate. The County has testified that, unless they have reason to suspect storm water has leachate in it, they do not typically sample the storm water for leachate. However, even when the County suspects leachate is present in their storm water, such as when the Module 4 seeps occurred in February 2019, the County does not sample for all of the correct indicator parameters. The General Permit requires industrial storm water discharges from certain categories, including landfills, to comply with monitoring requirements for applicable technology-based Effluent Limitation Guidelines and New Source Performance Standards ("ELG"). General Permit, Section I.L. The ELGs for landfills include monitoring for biochemical oxygen demand, ammonia as N, g - terpineol, benzoic acid, p-cresol, and phenol. The County's storm water sampling from February 2019 failed to include these parameters. Furthermore, the Facility's SWPPPs fail to identify these parameters as likely to be present, and require analysis for them in all storm water discharges collected from the Facility.

The County admits that leachate is a potential source of pollutants in storm water — and in fact was an actual source of pollutants in the leachate seeps of February 2019. It is my opinion, given the Facility's industrial activities, the history of leachate seeps, and my observations of the Facility that the Facility's storm water sampling should include parameters that are chosen to indicate the presence of leachate, including the ELGs required by the General Permit."

11

B.      Rebuttal:

Sample parameters required by the Facility primary and secondary Standard Industrial Code5 (SIC) numbers 4953, Landfills and Land Application Facilities, and 5093, Scrap and Waste Materials, which take into account relevant industry considerations based on the operation of such facilities, including the presence of leachate, are:
- pH
- TSS
- O & G
- COD
- Fe (Total)
- Al (Total)
- Pb (Total)
- Zn (Total)

Subchapter N contains requirements for landfills (Part 445). However, the NRRWF is not subject to Subchapter N requirements as demonstrated in the Facility SWPPP. Therefore:

The monitoring implementation plan for the FACILITY does not require storm water collected at the Facility to be analyzed for biological oxygen demand, and the GENERAL PERMIT does not require storm water collected at the Facility to be analyzed for biological oxygen demand, ammonia (as nitrogen), a-Terpineol, Benzoic acid, p-Cresol, or Phenol.


**Rebuttal To Hagemann Opinion IV, Paragraph 1 (page 7):**

A.      Text of Hagemann Opinion:

*"The General Permit prohibits discharges of industrial storm water that contain pollutants in quantities that threaten to cause pollution or a public nuisance. Based on my review of the sampling data collected by the County on February 14, 2019 and February 26, 2019, and based on my review of videos of the seeps, and reports of the quantity and duration of the discharge of leachate-contaminated storm water from the Facility, I understand that the Facility discharged on the following 10 days: February 14, 2019, February 27, 2019, February 28, 2019, March 1, 2019, March 2, 2019, March 3, 2019, March 4, 2019, March 6, 2019, March 7, 2019, and March 8, 2019.*

*During the period from February 14, 2019 to March 6, 2019, leachate commingled with storm water was intermittently pumped to the Neal Road Preserve from Sediment Basin #4. The commingled storm water and leachate was collected in the basin that comprises the Neal Road Preserve, thus contaminating any storm water that was already in the Preserve, and any future water that was pumped into the Preserve while leachate was present. Put another way, because the leachate and storm water commingled in Sediment Basin #4 and again in the Neal Road Preserve, storm water contaminated with leachate was discharged from the Facility on each of the ten days identified above, whether or not the pump from Sediment Basin #4 was actively moving more leachate-contaminated storm water into the Preserve.*

*Based on estimates that landfill staff made of the volume of leachate-contaminated storm water that discharged from the Facility, it is my opinion that the County discharged millions of gallons of storm water contaminated with leachate to local surface waters, and that these discharges were (a) not authorized by any permit; (b) contained pollutants in quantities that threatened to cause pollution or a public nuisance. Significant impacts of the discharge of leachate into the aquatic environment include: eutrophication, acute and chronic toxic exposures to aquatic species, and spread of microorganisms, parasites, viruses and disease-causing bacteria."*

B.      Rebuttal:

The 2019 data collected immediately after the leachate event indicated no COPCs from storm water for aquatic ecological receptors that exceeded ESLs or background concentrations.

The leachate discharges did not result in COPCs being identified in PSB soils that posed a risk to ecological or human receptors.  Vegetative communities appear to be unchanged due to the leachate discharge and no special status, species or concern or T&E species were found to be present in the PSB.  In a single storm water sample collected, no toxicity was identified for two species (fish and invertebrate) and algal cell growth increased due to nutrient concentrations  Storm water data collected in 2021 and 2022 indicated that at the location receiving storm water runoff into the PSB, COPCs identified as posing a potential risk to ecological receptors and human health were not likely from a 2019 leachate discharge.

The February 2019 leachate discharges from the NRRWF to the PSB were evaluated through a series of data collection efforts and evaluation of those data to assess potential risks to ecological and human health receptors. A wetland survey was completed at the PSB in December 2020 and March 2022 which delineated a 1.35-acre seasonal wetland in the PSB.  Review of the plant species present suggests that the wetland in the NRRWF PSB is not a high-quality wetland habitat for wildlife. Vegetation surveys were completed at the PSB in 2022 and additional data from as far back as 2013 were examined to evaluate whether the leachate discharge impacted the vegetation in the PSB. Review of reports from 2013 to 2016 and 2018 detailing prior vegetation surveys in the PSB revealed that the reported data were insufficient to perform a pre-leachate assessment beyond a qualitative assessment of the species present within the Study Area. Based on the available information it appeared that the leachate event did not reduce the extent of the wetlands or other waters within the PSB.

The T&E species survey concluded there is no suitable habitat for listed species to reside or reproduce within the Study Area. There is a low potential for tricolored blackbird and Swainson's hawk to forage within the Study Area.

Compilation and evaluation of soil data collected in 2022 found that most chemical concentrations were less than their respective PQLs. Some inorganic chemical parameters were detected and screened using maximum soil concentrations compared

13

to ESLs and yielded only two parameters with concentrations greater than the ESLs (e.g., manganese and vanadium). Both of these COPCs when compared to off-site background soil concentrations were less than the maximum and mean off-site soil concentrations. Based on the screening of NRRWF on-site and off-site soil concentrations, no COPCs were identified that exceeded conservative risk-based ESLs or background concentrations.

Storm water samples from both on-site and off-site locations were compared to ESLs for aquatic ecological receptors. Laboratory analytical results were initially screened based on detection status relative to respective PQLs. Potential COPCs that were detected at concentrations greater than their respective PQLs were screened against acute ESLs for surface water using the maximum measured concentrations for each COPC. For storm water data collected in 2019, iron was identified as a potential COPC for sample location SW-1. Background data (SW-2 and SW-8) indicated the maximum concentration of iron was higher in background (12.9 mg/L) than it was in the SW-1 location (4.26 mg/L) and sulfate was not identified as a COPC at SW-1.

Storm water samples collected in 2021 and 2022 from the PSB (SW1A) upgradient of the PSB (SW-1B), and off-site background upgradient of the facility (SW-2) showed varying results for parameters that exceeded their ESLs. The following parameters were identified as COPCs.

- SW-1A - aluminum, chromium, cobalt, copper, iron, selenium, vanadium, and zinc
- SW-1B – iron
- SW-2 - No parameters identified as COPCs

Storm water samples at SW-1A were indicative of the NRRWF storm water runoff from the haul road and stockpiles and not the 2019 leachate discharge. COPCs that were screened against ESLs compared to background storm water concentrations of COPCs were several times higher than background in 2022 and 2019 and higher than the SW-1 discharge from the PSB during the leachate discharge. COPCs identified for the SW-1A storm water samples may pose a risk to ecological receptors in the PSB, but potential risks are not likely due to the leachate discharge, rather current potential risks are from storm water runoff from the soil stockpile and the haul road. Upon receipt of the laboratory results, the County installed BMPs to address these runoff issues.

Storm water biotoxicity testing was conducted on a sample from SW-1B at the NRRWF collected on March 15, 2022. This sample site is in close proximity to WMU-4 where leachate discharges had occurred in February 2019 and would represent a sample site receiving leachate discharges from WMU-4. Based on the toxicity data, no significant toxic effects were observed for fathead minnow larval survival and growth, and *Ceriodaphnia* survival and reproduction. While there was a significant difference observed between the control and site water *Selenastrum* growth results, the difference was that there was greater growth in the Site water sample versus control. Increased growth in algal Site water samples indicates the presence of nutrients that stimulate growth.

14

A risk screening assessment was performed to evaluate potential risk for human health from preliminary COPCs associated with leachate discharges to storm water conveyances, including SWB-4 and the PSB that occurred at the NRRWF in February and March 2019. Concentrations of two COPCs (cobalt and iron) in on-site soil samples exceeded conservative human health SLs; however, the mean and maximum on-site soil concentrations for these COPCs were equal to or less than the off-site background mean and maximum concentrations, thus no human health COPCs were identified for on-site soils.

Concentrations of 12 COPCs (aluminum, antimony, arsenic, cadmium, chromium, cobalt, iron, lead, manganese, nickel, vanadium, and nitrate) in on-site storm water samples exceeded conservative human health SLs. Nitrate and antimony were only identified exceeding the SLs at SW-1B. The 10 COPCs identified for SW-1A had concentrations greater than the off-site background and upgradient SW-1B location and are not the result of leachate discharge from 2019. This conclusion is drawn from the fact that the 2019 storm water samples at SW-1 resulted in two COPCs, arsenic and chromium and both those COPC concentrations were less than off-site background mean and max concentrations from 2019 when the leachate discharge occurred. Potential human health risk identified for storm waters from samples collected at SW-1A do not appear to be indicative of the 2019 leachate discharge, but rather storm water runoff from the haul road and stockpile. The County has installed BMPs to address the runoff from the haul road and soil stockpile.

Based on the Investigative Final Report dated December 15, 2022, the leachate discharges from Feb 2019 to March 2019 did not have a significant impact to human and ecological health and no further action is required.

Sincerely,

Travis Peterson
Manager, Peterson Environmental Solutions LLC

Attached:

15

# EXHIBIT F

**To Defendants' Appendix of Exhibits**
**in Opposition to Plaintiff's Motion for Partial Summary Judgment**



ABBOTT &
KINDERMANN, INC.
ATTORNEYS AT LAW

December 14, 2022

**VIA EMAIL**

Ms. Stephanie Young
Senior Water Resource Control Engineer Specialist
Office of Enforcement
801 K Street, Suite 2300
Sacramento, CA 95814
stephanie.young@waterboards.ca.gov

Re:   **BUTTE COUNTY IFR IN RESPONSE TO ORDER TO SUBMIT
      TECHNICAL REPORTS PURSUANT TO CALIFORNIA WATER CODE
      SECTION 13267, NEAL ROAD RECYCLING AND WASTE FACILITY,
      1023 NEAL ROAD, CHICO, BUTTE COUNTY**

Dear Ms. Young:

This firm represents Butte County ("**County**") in matters pertaining to the Neal Road
Recycling and Waste Facility in Chico ("**NRRWF**"). The purpose of this correspondence is to
submit to the State Water Resource Control Board ("**Water Board**"), the County's response to
the November 19, 2020 transmittal letter and the November 18, 2020 Water Board Investigative
Order WQ 2020-0036-EXEC to Submit Technical Reports ("**Investigative Order**") related to
leachate discharges to storm water conveyances that occurred at the NRRWF in 2019. The
transmittal letter and the Investigative Order are attached hereto as **Exhibit 1**. The November
19, 2020 transmittal summarized the request for "technical information pursuant to Water Code
section 13267(a) for the Site and the discharges that flowed offsite and into the tributary to
Hamlin Slough."

The County implemented the approved Investigation Workplan and completed the
December 9, 2022 Investigative Final Report ("**IFR**"). The IFR is attached hereto as **Exhibit 2**.
The IFR concluded that there were no discharges that flowed offsite and into the Hamlin Slough
and concluded that the onsite discharges caused no impacts to water, soils, and vegetative and
animal species.

Ms. Stephanie Young
December 14, 2022
Page 2 of 2

The County truly appreciates the Water Board staff working with the County team as
questions arose throughout this process and we look forward to answering any questions you
may have regarding the IFR.

Very truly yours,

Diane Kindermann

DKH/rmo
Enclosures
cc:    Clients
       Manuel Moniz
          compliancesfo@aol.com
       Sean Covington
          scovington@formationenv.com
       Ginger Fodge
          gfodge@MadroneEco.com
       Ms. Laura Drabandt
          laura.drabandt@waterboards.ca.gov
       Patrick Decarvalho
          patrick.decarvalho@waterboards.ca.gov

Ms. Stephanie Young
December 14, 2022
Page 2 of 2

**<u>EXHIBIT 1</u>**





## State Water Resources Control Board

November 19, 2020                                          *(Via email and Certified Mail)*
**CERTIFIED MAIL
NO. 7018 0680 0000 1010 7445**

Mr. Dennis Schmidt, Director
Department of Public Works
7 County Center Drive
Oroville, California 95965
dschmidt@buttecounty.net

**SUBJECT:     ORDER TO SUBMIT TECHNICAL REPORTS PURSUANT TO
CALIFORNIA WATER CODE SECTION 13267, NEAL ROAD RECYCLING
AND WASTE FACILITY, 1023 NEAL ROAD, CHICO, BUTTE COUNTY**

Dear Mr. Schmidt:

As discussed in previous communications with the State Water Resources Control Board
Office of Enforcement (Office of Enforcement) and the Central Valley Regional Water
Quality Control Board (Central Valley Water Board), the Office of Enforcement continues to
investigate the leachate discharges from the Neal Road Recycling and Waste Facility
(Site) in February and March 2019.  At the time, the Site was enrolled under and regulated
by Waste Discharge Requirements Order R5-2011-0049 and the *National Pollutant
Discharge Elimination System (NPDES) General Permit for Storm Water Discharges
Associated with Industrial Activities Order No. 2014-0057-DWQ, NPDES No. CAS000001*
(Industrial General Permit).

This letter transmits Investigative Order WQ-2020-0036-EXEC that requires you to provide
technical information pursuant to Water Code section 13267(a) for the Site and the
discharges that flowed offsite and into the tributary to Hamlin Slough.

Should you have any questions, please contact Ms. Stephanie Young at (916) 327-8043 or
stephanie.young@waterboards.ca.gov, or attorney Laura Drabandt at (916) 341-5180 or
laura.drabandt@waterboards.ca.gov.

Sincerely,


Yvonne West
Director
**Office of Enforcement**

Enclosures

cc:     See next page.

Office of Enforcement | 801 K Street, Suite 2300 | Sacramento, CA 95814 | 916.341.5272
E. JOAQUIN ESQUIVEL, CHAIR | EILEEN SOBECK, EXECUTIVE DIRECTOR

1001 I Street, Sacramento, CA 95814 | Mailing Address: P.O. Box 100, Sacramento, CA 95812-0100 | www.waterboards.ca.gov
-230-

Mr. Dennis Schmidt                            - 2 -                          November 19, 2020

cc:     *(via email only)*

     Ms. Diane Kinderman Henderson
     Abbott & Kindermann, Inc.
     dkindermann@aklandlaw.com

     Mr. Eric Miller, Manager
     Butte County Public Works
     emiller@buttecounty.net

     Ms. Laura Drabandt
     Attorney III
     Office of Enforcement
     laura.drabandt@waterboards.ca.gov

     Ms. Stephanie Young
     Senior Water Resource Control Engineer Specialist
     Office of Enforcement
     stephanie.young@waterboards.ca.gov





## State Water Resources Control Board

**State Water Resources Control Board**

**Office of Enforcement**

**Water Code Section 13267**
**Investigative Order WQ 2020-0036-EXEC**

**Directing Butte County Department of Public Works**
**To Submit Technical Reports**

**Pertaining to Discharges from the Neal Road Recycling and Waste Facility**

**Butte County**

The State Water Resources Control Board, Office of Enforcement (State Water Board) finds that:

1. Butte County Department of Public Works (Discharger) owns and operates the Neal Road Recycling and Waste Facility located at 1023 Neal Road, Chico, California in Butte County (Site).  In early 2019, the Site was comprised of five Class III waste management units (or Modules), two Class II surface impoundments (one for leachate and one for septage waste), and two permanent and three temporary unlined storm water sedimentation basins, encompassing 229 acres.[1]  The Site undergoes occasional changes in configuration resulting from changes in waste and liquid management operations; however, the size of the facility and general waste management unit configuration has remained materially similar in recent years.

2. The Site was regulated under *Waste Discharge Requirements for Butte County Neal Road Class III Municipal Solid Waste Landfill and Class II Surface Impoundments* (WDR) Order R5-2011-0049 issued by the Central Valley Regional Water Quality Control Board (Central Valley Water Board) in 2019.  The WDRs were amended on April 16, 2020.

3. The Site is regulated under the State Water Resources Control Board's *National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges Associated with Industrial Activities Order No. 2014-0057-DWQ, NPDES No. CAS000001* (Industrial General Permit) under Waste Identification Number 5R04I000249.

---

[1] This represents the Site at the time of discharge based on *First Quarter 2019 Monitoring Report* dated April 30, 2019.  The Site currently consists of five Class III modules, one Class II surface impoundment for leachate, and four storm water sedimentation basins (one lined and three unlined) based on the *First Quarter 2020 Monitoring Report* dated April 30, 2020.  The septage pond was clean closed and the final report of closure submitted to the Regional Board on October 18, 2019.

Butte County DPW                              - 2 -                        November 18, 2020

4.  Storm water from the Site discharges into a primary sedimentation basin which is also a wetland preserve protected by a *Perpetual Conservation Easement Grant* (Conservation Easement) dated September 24, 2007.  The Conservation Easement is held by California Open Lands, a non-profit land trust organization corporation, and is recorded in the Butte County's Recorder's Office as Record 2007-0051757.  For purposes of this Water Code section 13267 Investigative Order (Investigative Order), the primary sedimentation basin is referred to as the wetland preserve.

5.  Storm water is designed to overflow from the wetland preserve into an unnamed tributary to Hamlin Slough, then into Hamlin Slough, which is a tributary to Butte Creek, which is a tributary to the Sacramento River, a water of the state and United States.

6.  The *Revised Water Quality Protection Standard Report* (WQPS) dated July 25, 2017, prepared by SCS Engineers for the Discharger, describes the Site's surface water monitoring program.  The surface water monitoring network consists of points SW-1 and SW-2,[2] where SW-2 represents the quality of surface water that has not been affected by the landfill operations (also known as background conditions) and SW-1 is the point of compliance where storm water leaves the site.  SW-1 is located at the outfall of the wetland preserve.

7.  The *Industrial Activities Stormwater Pollution Prevention Plan* (SWPPP) dated June 24, 2015,[3] prepared by Holdrege & Kull for the Discharger, states that there is one discharge location (SW-1) at the outfall from the wetland preserve where storm water is discharged from the Site.  The Site also has one run-on location (SW-2) that is sampled concurrently to assess impacts to water quality from the adjacent property.

8.  On March 6, 2019, the Discharger called the Central Valley Water Board to notify staff of leachate seeping out of Module 4, followed by the *Module 4 Seep Notification* letter dated March 13, 2019.  The notification letter indicated that Butte County staff observed leachate seeps from Module 4 entering temporary storm water basin 4 (Basin 4) on February 14, February 26, and March 6, 2019.  The water in Basin 4 was pumped into an unlined ditch that drained to the wetland preserve on February 14 and February 27, 2019.

9.  On June 25 and July 23, 2019, Central Valley Water Board staff received complaints stating that illegal discharges into the wetland preserve had occurred in February 2019.  On August 21, 2019, Central Valley Water Board staff issued a *Notice of Violation* that identified violations of WDRs Order R5-2011-0049 including the

---

[2] Former monitoring locations included SW-3, SW-4, SW-5, and SW-6, which are no longer considered points of compliance because surface water drainage has been diverted onsite and towards the wetland preserve.  Note that per the First Quarter Monitoring Report dated April 30, 2019, SW-3 was added to the surface water monitoring point network in late November 2018 after a post Camp Fire storm event produced significant run-on from the land parcel immediately south of the site.

[3] The June 24, 2015 SWPPP was in place at the time of discharge.  The SWPPP was updated by Fujii Civil Engineering on September 30, 2019

unauthorized discharge of leachate into the wetland preserve on February 14, 26, and 27, 2019.

10. The *First Quarter 2019 Monitoring Report* dated April 30, 2019, (Monitoring Report) showed that Butte County representatives collected water samples from SW-1 and SW-2 on February 14 and February 26, 2019.

   a. In the SW-1 samples, acetone, methyl ethyl ketone, tetrahydrafuran, ethanol, Bis (2-ethylhexyl) phthalate, dimethyl phthalate, and phenols were detected. These volatile and semi-volatile organic compounds are not naturally occurring and were either not detected in background samples or at levels elevated above background values.

   b. Present above background levels in SW-1 on both days sodium and bicarbonate alkalinity. Also, present above background levels on February 14, 2019, were turbidity and total organic carbon.

11. The presence of these constituents that are not naturally occurring and/or above background levels indicates that storm water exiting the Site at SW-1 was contaminated with leachate.

   The Monitoring Report also included analytical results from samples collected from the Module 4 leachate seep area, the unlined ditch from Basin 4 to the wetland preserve, and from Basin 4 on February 19 and 28, 2019. Similar to the SW-1 overflow samples, acetone, methyl ethyl ketone, ethanol, dimethyl phthalate, and phenol were present in more than one sample collected from the Module 4 leachate seep area and Basin 4 on both days indicating leachate impacted the storm water.

12. The Monitoring Report described two or more qualifying volatile organic compounds that exceeded their method detection limits in the samples. Using the method in WDRs Order R5-2011-0049, Detection Monitoring Specifications H.21 and H.22, the data in the Monitoring Report verifies there was a "measurably significant" evidence that the leachate released from Module 4 discharged to the wetland preserve and adjacent unnamed tributary offsite.

13. This release of leachate waste from Module 4 violates WDRs Order R5-2011-0049. Specifically, Discharge Specifications B.2 requires that wastes shall remain within the designated disposal area at all times. Prohibition A.2 prohibits the discharge of wastes outside of a Unit or portions of a Unit specifically designed for their containment.

14. The Industrial General Permit, Section III, Discharge Prohibitions B and C prohibit the discharge of materials other than storm water or authorized non-storm water discharges either directly or indirectly to waters of the United States. Leachate is a waste and not an authorized non-storm water discharge. Since the surface water monitoring point is located at the outfall of the wetland preserve, the presence of storm water with waste constituents at SW-1 verifies that there was an unauthorized

discharge of leachate to the wetland preserve and adjacent unnamed tributary offsite.

**Legal and Regulatory Authority**

15. Water Code section 13267, subdivision (a), provides that the Regional Water Board may investigate the quality of any waters of the state within its region in connection with reviewing waste discharge requirements.  Water Code section 13267, subdivision (b), provides that the Regional Water Board, in conducting an investigation, may require a discharger to furnish, under penalty of perjury, technical or monitoring program reports.  Water Code section 13267, subdivision (f), grants the State Board the authority granted to the Regional Water Board in section 13267. To date, the nature and extent of the leachate contamination and the impacts it may have had on the plants and wildlife within the wetland preserve and offsite tributaries has not been evaluated.  As such, this Investigative Order requires the Discharger to prepare reports that investigate the nature and extent of the leachate contamination, assess the impacts that the leachate had on plants and wildlife, and propose cleanup and abatement or other actions or mitigations for the wetland preserve and off-site tributaries.  The reports required by this Order will assist both the Regional and State Water Boards in determining whether the Discharger needs to take action to cleanup and abate the waste discharged, or take other actions to protect water quality and the beneficial uses of surface waters Sacramento River watershed.  Staff estimate that the costs of providing a work plan and final report will likely fall into a range from $8,000 to $40,000 with variables including tasks completed in-house verses contracting out.[4]  The burden of compiling these reports, including the costs associated with collecting the information, bear a reasonable relationship to the benefits that will be obtained from having the necessary information for the Regional Water Board to properly regulate and monitor the Site and to protect the water quality in Hamlin Slough, Butte Creek, and the Sacramento River.

**THEREFORE, IT IS HEREBY ORDERED** that, pursuant to Water Code section 13267, the Discharger shall provide the following information:

A. **Investigation Work Plan for Determining Impacts of the Unauthorized Discharge of Leachate to Wetland Preserve and Offsite Tributaries**

   By **60 days from date this order is signed**, the Discharger shall submit an Investigation Work Plan that proposes methods and procedures for the collection and analysis of all data necessary to assess the nature, lateral and vertical extent, and potential short-term and long-term impacts of the leachate discharges on public health, animal and plant communities (including sensitive and/or endangered species), and on the overall ecosystem within the wetland preserve and offsite tributaries for the Executive Director's approval.  The Investigation Work Plan shall include, at a minimum, the following:

   1. Background section describing purpose and objectives of the investigation.

---

[4] See Memo to File dated October 23, 2020 and Excel spreadsheet dated October 26, 2020.

Butte County DPW                     - 5 -                     November 18, 2020

2. A list of constituents of concern used to define the nature and extent of the leachate discharges that includes constituents associated with evaluating potential short-term and long-term impacts to human health, vegetation, and wildlife from the leachate discharges for both a wet and a dry season. At a minimum, the constituents shall include those identified in the associated leachate seep results.

3. Soil sample collection strategy that includes locations and depths for obtaining background and soil conditions, and justification for the number of sampling locations and sampling depths, within the wetland preserve and offsite tributary towards Hamlin Slough.

4. Collection strategy for sampling liquid within the wetland preserve and offsite tributary, if present.

5. Procedures to evaluate contaminant fate and transport and risk, including contaminant properties such as mobility, toxicity, half-life, and chemical and biological degradation, and contaminant transport based on soil and surface water flow properties.

6. Statistical evaluation procedures to be used to evaluate the data (chemical, biological, vegetation).

7. A list of threatened and endangered species located within the wetland preserve and downstream to Hamlin Slough.

8. Monitoring and reporting procedures to document observations and sampling activities to assess vegetation and wildlife impacts.

9. Sampling and analysis plan that describes the sampling collection procedures and analytical methods that will be used to ensure proper collection and analysis of soil and liquid samples. This shall also include data quality objectives and quality assurance procedures.

10. Detailed summary of permits and approvals needed to implement the Investigation Work Plan including but not limited to California Open Lands approvals.

**Investigation Final Report**

Within **180 days** of approval of the Investigation Work Plan, the Discharger shall submit an Investigation Final Report summarizing the activities, analyses, and results of the investigation and contain a detailed description of the corrective action measures or options that could be taken to remediate or restore the impacted areas.

**B. Provisions**

1. **Use of Registered Professionals**:  The Discharger shall provide documentation that each technical report required by this Order was prepared under the direction of appropriately qualified professionals.  In preparing each technical report required by this Order, any engineering, or geologic evaluations and judgments must be performed by or under the direction of registered professionals pursuant to California Business and Professions Code sections 6735, 7835, and 7835.1.  A statement of qualifications and registration numbers of the responsible lead professional shall be included in the report submitted by the Discharger.  The lead professional shall sign and affix his or her registration stamp to the report.

2. **Qualified Professionals**:  The Discharger's reliance on qualified professionals promotes proper planning, implementation, and long-term cost-effectiveness of investigation, and cleanup and abatement activities.  Professionals shall be qualified, licensed where applicable, and competent and proficient in the fields pertinent to the required activities.

3. **Laboratory Qualifications**:  All analyses shall be conducted at a laboratory certified to perform such analyses by the State Water Board's Environmental Laboratory Accreditation Program (ELAP).

4. **Signatory Requirements**:  The technical reports required under this Investigative Order shall be signed and certified by either a principal executive officer, ranking elected official, or the person with overall responsibility for environmental matters for Butte County Department of Public Works.  Additional reports submitted in support of the technical report must be signed by the principal author.

5. **Certification Statement**:  Any report submitted in response to this Order shall include the following perjury statement:

   *"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

6. **Report submittal**:  All required data, documents, and reports required under this Order shall be promptly uploaded to the State Water Board's GeoTracker electronic database and you must notify the Office of Enforcement by email at stephanie.young@waterboards.ca.gov after each report upload.

Butte County DPW                      - 7 -                   November 18, 2020

### C. Notifications

1. **Enforcement Discretion**:  The Regional Water Board and the State Water Board reserve their rights to take any enforcement action authorized by law for the violations outlined in this Order and/or for violations of the terms and conditions of this Order.

2. **Enforcement Notification**:  Water Code section 13268, subdivision (a)(1), provides that any person failing or refusing to furnish technical or monitoring report information as required by Water Code section 13267(b), or falsifying any information provided therein, is guilty of a misdemeanor and may be liable civilly for an administratively imposed liability of up to $1,000 per day for each day compliance is not achieved with an order issued in accordance with subdivision 13268(b).

3. **California Environmental Quality Act Compliance**:  The issuance of this Order is categorically exempt from the provisions of the California Environmental Quality Act (CEQA) pursuant to title 14 of the California Code of Regulations, section 15306.  The submission of technical information does not constitute a project with environmental impacts.

4. **Appeal Notification**:  Any person aggrieved by this action of the Regional Water Board may petition the State Water Board to review the action in accordance with Water Code section 13320 and California Code of Regulations, title 23, sections 2050 and following.  The State Water Board must receive the petition by 5:00pm, 30 days after the date of this Order, except that if the thirtieth day following the date of this Order falls on a Saturday, Sunday, or state holiday (including mandatory furlough days), the petition must be received by the State Water Board by 5:00pm on the next business day.  Copies of the law and regulations applicable to filing petitions may be found on the Internet at: https://www.waterboards.ca.gov/public_notices/petitions/water_quality/ or will be provided upon request.

It is hereby ordered.


_____                    November 18, 2020
Eileen Sobeck                               Date
Executive Director
State Water Resources Control Board

# INVESTIGATIVE FINAL REPORT

*Prepared for*



**NEAL ROAD RECYCLING AND WASTE FACILITY**
**1023 Neal Road**
**Paradise, California 95969**
**530.879.2351**

*Prepared by*

**COMPLIANCE SFO, INC.**
**P.O. Box 2357**
**San Francisco, California**
**(415) 642-9000**

**&**

**FORMATION ENVIRONMENTAL, LLC**
**117 Riverview Road**
**Liberty Hill, Texas. 78642**
**(512) 924-8353**

**December 14, 2022**

**Copyright © 2022 Compliance SFO, Inc.**
**All Rights Reserved**

## TABLE OF CONTENTS

CERTIFICATION ..................................................................................... vi

EXECUTIVE SUMMARY ......................................................................... vii

1.0    INTRODUCTION................................................................................ 12

2.0    FACILITY DESCRIPTION .................................................................. 13

3.0    BACKGROUND.................................................................................. 13

4.0    STORM WATER AND SOILS SAMPLING ........................................ 15

    4.1    Storm Water Sample Site Locations ........................................ 15

    4.2    Soil Sample Site Locations ....................................................... 16

        4.2.1    Off-Site Soils................................................................ 16

        4.2.2    On-Site Soils................................................................ 16

    4.3    Sample Handling ...................................................................... 17

    4.4    Sample Equipment Use and Decontamination ........................ 17

    4.5    Dedicated Field Notebook ........................................................ 17

    4.6    Photo Documentation .............................................................. 17

5.0    STORM WATER TOXICITY TESTING .............................................. 18

6.0    WETLAND DELINEATION ................................................................. 18

7.0    VEGETATION SURVEY .................................................................... 19

    7.1    Survey of Special-Status Plant Species .................................. 20

    7.2    Vegetation Transects ............................................................... 20

8.0    THREATENED AND ENDANGERED SPECIES  EVALUATION ......... 21

9.0    ECOLOGICAL RISK SCREENING AND COPC  IDENTIFICATION ..... 22

    9.1    Soils.......................................................................................... 23

    9.1.1 Soil Screening Approach........................................................ 24

    9.1.2  Soil Screening Results ......................................................... 24

    9.1.3  Soil Screening Summary ...................................................... 25

    9.2    Storm Water ............................................................................. 25

        9.2.1    Storm Water Screening Approach................................ 25

        9.2.2    2021-2022 Storm Water Screening Results ................ 27

        9.2.3    2019 Storm Water Screening Results ......................... 28

        9.2.4    Storm Water Screening Summary................................ 29

10.0    HUMAN HEALTH RISK SCREENING AND COPC IDENTIFICAITON ......... 29

    10.1    Human Health Risk Screening Methodology .......................... 30

        10.1.1 Identification of Preliminary COPCs ............................ 30

        10.1.2 Human Health Conceptual Pathways Model (CPM) ........ 31

        10.1.3  Human Health Screening Levels And Comparison Approach........ 33

        10.1.4  Comparison of On-Site Chemicals with Background .......... 34

10.2   Human Health Screening Results ...................................................................34

10.3   2019 Results Compared to 2021/2022 Results ..........................................35

10.4 Human Health Risk Screening Summary ...................................................36

11.0   CONCLUSIONS ............................................................................................36

12.0   LIMITATIONS................................................................................................38

## FIGURES

FIGURE 2-1    VICINITY MAP

FIGURE 2-2    SITE PLAN

FIGURE 4-3    STORM WATER AND SOILS SAMPLING SITES

FIGURE 9-1    ECOLOGICAL CONCEPTUAL SITE MODEL

FIGURE 10-1   CONCEPTUAL PATHWAYS MODEL

## TABLES

9-1     Comparison of Detected Chemical Concentrations in On-Site Soil to Terrestrial Ecological Screening Levels

9-2     Comparison of Detected Chemical Concentrations in Off-Site Soil to Terrestrial Ecological Screening Levels

9-3     Comparison of On-Site Soil Concentrations to Off-Site Soil Concentrations for Chemicals Detected at Concentrations Greater than Terrestrial Ecological Screening Levels

9-4     Storm Water Sample Locations and Sample Dates

9-5     Comparison of Detected Chemical Concentrations in On-Site Storm Waters (SW-1A) to Aquatic Ecological Screening Levels (2021 and 2022)

9-6     Comparison of Detected Chemical Concentrations in On-Site Storm Waters (SW-1B) to Aquatic Ecological Screening Levels (2021 and 2022)

9-7     Comparison of Detected Chemical Concentrations in Off-Site Storm Waters (SW-2) to Aquatic Ecological Screening Levels (2021 and 2022)

9-8     Comparison of Detected Chemical Concentrations in Off-Site Storm Waters (SW-2A and SW-8) to Aquatic Ecological Screening Levels (2019)

9-9     Comparison of Detected Chemical Concentrations in Off-Site Storm Waters (SW-1) to Aquatic Ecological Screening Levels (2019)

9-10    Comparison of Detected COPCs in On-Site Storm Waters that Exceeded Aquatic ESLs (2021 and 2022) to Off-Site Storm Waters (2019 to 2022)

10-1    Human Health Screening Levels for Soil

10-2    Human Health Screening Levels for Storm water

10-3    Comparison of Detected Chemical Concentrations in On-Site Soil to Human Health Screening Levels

10-4    Comparison of Detected Chemical Concentrations in On-Site Storm water to Human Health Screening Levels

10-5    Summary of Detected Chemical Concentrations in On-Site Soil that Exceed Human Health Screening Levels

10-6    Summary of Detected Chemical Concentrations in On-Site Storm water at Location SW-1A that Exceed Human Health Screening Levels

10-7    Comparison of Detected Chemical Concentrations in On-Site Storm water in 2019 to Human Health Screening Levels

10-8    Comparison of Detected Chemical Concentrations in Storm water in 2019 and 2021/2022

## ATTACHMENTS

ATTACHMENT A        Investigative Order and Time Extension Requests

ATTACHMENT B        PowerPoint Presentation

ATTACHMENT C        February 2019 Storm Water Sampling Analytical Data

ATTACHMENT D        Storm Water Basin Number 4 (SBW-4) Remediation Report

ATTACHMENT E        2021 – 2022 Storm Water Sampling Laboratory Analytical Data

ATTACHMENT F        Water Board Soil Sampling Inspection Reports

ATTACHMENT G        Soil Borings Analytical Reports

ATTACHMENT H        Dedicated Field Notebook

ATTACHMENT I        Storm Water and Soil Sampling Photos

ATTACHMENT J        Biotoxicity Analytical Data

ATTACHMENT K        Wetland Delineation Map

ATTACHMENT L        Vegetation Survey Report

ATTACHMENT M        Threatened and Endangered Species Evaluation Report

ATTACHMENT N        Access Database for Storm Water and Soil Data (Electronic)

ATTACHMENT O        Soil and Storm Water Non-Detect Data From Ecological Screening

ATTACHMENT P        Soil and Storm Water Non-Detect Data From Human Health Screening

# CERTIFICATION

This *Investigative Final Report* has been prepared at the request of State Water Resources Control Board personnel to provide investigative information and data completed to date as required by a State Water Resources Control Board, Office of Enforcement, Water Code Section 13267, Investigative Order WQ 2020-0036-EXEC. The *Investigative Final Report* has been prepared by a California Registered Professional Geologist, pursuant to Section 7850 of the *Business and Professional Code*.

*"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

Prepared By:

Wesley P. Greenwood, P.G., QISP
Senior Geologist, COMPLIANCE SFO, INC

Sean Covington
Senior Toxicologist, Formation Environmental, LLC

Ginger Fodge
Madrone Ecological Consulting

Reviewed By:

Joshua Pack, P.E.
Director
Butte County Public Works Department

# EXECUTIVE SUMMARY

INTRODUCTION

The State Water Resources Control Board (Water Board) issued Investigative Order WQ 2020-0036-EXEC (Investigative Order) dated November 18, 2020, related to leachate discharges to storm water conveyances that occurred at the Neal Road Recycling and Waste Facility (NRRWF) in 2019. The Investigative Order requires the Butte County Department of Public Works (County) to develop and submit technical reports consisting of a leachate discharges Investigative Work Plan (IWP), and a leachate discharges Investigative Final Report (IFR). The transmittal letter from the Water Board sending the directive for the IWP and IFR states that the Investigative Order requires technical information "for the Site and the discharges that flowed offsite and in the tributary to Hamlin Slough."

SUMMARY FINDINGS

As detailed in this IFR, the storm water data indicates that there were no leachate discharges that flowed off-site or into the tributary to Hamlin Slough and no COPCs were detected at concentrations in soils from the conservation easement (PSB) that exceeded conservative risk-based screening levels or background soil concentrations for ecological or human receptors. No species of concern, threatened or endangered species or their habitats were found within the conservation easement. Further, there was no impact to or reduction in wetland vegetative species. Some inorganic COPCs in storm water were found at concentrations exceeding ecological screening levels (ESLs) and human health screening levels (SLs); however, COPCs in the storm water sample from SW-1A are not the result of the leachate discharge but originate from the soil stockpile and the haul road. Upon receiving the laboratory results on COPCs, the County implemented BMPs to address the runoff issue.

BACKGROUND FACTS

Leachate discharges from the southwest toe of Waste Module Unit 4 (WMU-4 to Storm Water Basin 4 (SWB-4) and the Primary Sedimentation Basin (PSB), also known as the Conservation Easement, occurred at the NRRWF on February 14, 2019, February 26, 2019, and March 6, 2019. The leachate discharges were the direct result of a series of natural disasters which can be classified as *ACTS OF GOD*. A series of manmade and natural events beginning November 8, 2018, with the onset of the Camp Fire caused severe damage to the Facility.  The Camp Fire destroyed the infrastructure required to operate the Facility under state and federal regulatory requirements. Storm water Best Management Practices (BMPs), WMUs poly covers, and other infrastructure required to meet local, state, and federal regulations were destroyed. The destroyed infrastructure was being repaired by NRRWF personnel when a series of severe local storm events caused by atmospheric rivers impacted the NRRWF beginning in the early part of February 2019. The intense precipitation associated with these severe local storm events overwhelmed the repairs of the NRRWF infrastructure. Leachate discharged from the southwest toe of WMU-4 and entered storm water contained in SWB-4. The storm water and leachate in SWB-4 was discharged by a pump to the PSB. NRRWF personnel attempted to mitigate the discharge of leachate to storm water but were unable to complete this work due to saturated soils from the severe storm events prevented the use of heavy equipment to install pipes necessary to discharge the leachate to the NRRWF leachate basin.

In response to the discharge, NRRWF personnel promptly and properly collected storm water discharge samples from the PSB storm water sampling site identified as SW-1 during the February 14, 2019, and February 26, 2019, leachate seep events. Background storm water runon samples representing storm water quality generated from sites outside the boundary limits of the NRRWF were also collected for analysis during the February 14, 2019, and February 26, 2019, leachate seep events. The storm water runon sample sites are identified as SW-2 located on the east-central NRRWF boundary, and SW-8 located on the southwest boundary of the NRRWF. All storm water samples collected by NRRWF personnel were analyzed at a Water Boards certified Environmental Laboratory Accreditation Program (ELAP) water testing laboratory for parameters that would represent constituents present in the leachate seeps discharges.  The response of NRRWF personnel was swift, accurate and thorough.

The IWP dated August 23, 2021, identified storm water samples sites representative of storm water runon from areas outside the boundary limits of the NRRWF, and sites withing the boundary limits of the NRRWF and the NRRWF discharge site. Storm water sample sites SW-1, and SW-1A are located along the discharge flow path of water pumped from SWB-4. Storm water sample site SW-1B is located at the inlet of SWB-4 and is representative of storm water flows generated by easterly upslope areas of the NRRWF and the south toe of WMU-4. Runon storm water flows from areas upslope and outside the boundary limits of the NRRWF are represented by SW-2 and SW-8. Due to extreme drought conditions throughout California, storm water samples were not able to be collected from all designated storm water sampling sites. Storm water samples were collected on December 13, 2021, December 22, 2021, and March 15, 2022. Storm water sample collection was attempted on April 21, 2022; however, there were no observed storm water flows at any of the designated storm water sampling sites during that time.

ECOLOGICAL ASSESSMENT OF STORM WATERS

Maximum concentrations of detected Chemicals of Potential Concern (COPCs) in storm water samples from both on-site and off-site locations were compared to Ecological Screening Levels (ESLs) for aquatic ecological receptors. Laboratory analytical data were assembled and initially culled by detection status. Non-detected data relative to their respective Practical Quantitation Limits (PQLs) were screened out from further evaluation. For storm water data collected in 2019, iron was identified as a COPC for sample location SW-1. Background storm water data (SW-2 and SW-8) indicated the maximum concentration of iron was higher in background (12.9 mg/L) than it was in the SW-1 location (4.26 mg/L) and sulfate was not identified a COPC at SW-1. The 2019 data collected immediately after the leachate event indicate no COPCs from storm water for aquatic ecological receptors. Storm water samples collected in 2021 and 2022 from the PSB (SW-1A) upgradient of the PSB (SW-1B), and off-site background upgradient of the facility (SW-2) showed varying results for parameters that exceeded their respective ESLs. At SW-1A, parameters identified as COPCs included aluminum, chromium, cobalt, copper, iron, selenium, vanadium, and zinc, while at SW-1B only iron was identified as a COPC. No parameters exceeded their respective ESLs at the off-site background location SW-2.

Storm water samples at SW-1A are not indicative of the 2019 leachate discharge, and instead originate from the soil stockpile and the haul road. Upon receiving the laboratory results on COPCs, the County implemented BMPs to address the runoff issue.  COPCs that were screened against ESLs compared to background storm water concentrations of COPCs were several times higher than background in 2022 and 2019 and higher than the SW-1 2019 discharge from the PSB during the leachate discharge. COPCs identified for the SW-1A storm water samples may

pose a risk to ecological receptors in the PSB, but these COPCs are not due to the leachate discharge.

Storm water biotoxicity testing was conducted for NRRWF samples collected on March 15, 2022. The storm water biotoxicity samples were collected at storm water sample site SW-1B. This sample site is in close proximity to WMU-4 where leachate discharges had occurred in February 2019 and would represent a sample site receiving leachate discharges from WMU-4. Based on the toxicity data, no significant toxic effects were observed for fathead minnow larval survival and growth, and *Ceriodaphnia* survival and reproduction. While there was a significant difference observed between the control and Site Water *Selenastrum* growth results, the difference was for greater growth in the Site water sample versus control.  Increased growth in algal Site water samples indicates the presence of nutrients that stimulate growth.  No toxicity was observed for any species tested in storm water runoff with only an increase in algal growth observed due to nutrient concentrations.

ECOLOGICAL ASSESSMENT OF SOILS

Soil sampling sites were identified in the IWP with the provision that the soil sample sites would be established during soil sampling field work. The soil sampling field work was completed on May 25, 2021 and May 26, 2022. Soil samples were collected from each soil boring at the surface directly below the organic horizon, 3-inches below the ground surface, and 6-inches below the ground surface except when soil auger refusal was encountered at shallower depths. The field work was observed and documented by Water Board personnel. The maximum concentrations of COPCs from all on-site soils from the PSB were compared to ESLs for terrestrial ecological receptors. The primary source of ESLs is the 2019 revision of the San Francisco Bay Regional Water Quality Control Board's Environmental Screening Levels (SFBRWQCB 2019). Terrestrial habitat ESLs are provided in that document for use as screening levels for the potential effects of COPCs to plants and soil-dwelling organisms as well as birds and mammals.

The maximum concentrations of COPCs from all on-site soils from the PSB were compared to ESLs for terrestrial ecological receptors from the San Francisco Bay Regional Water Quality Control Board's Environmental Screening Levels (SFBRWQCB 2019). Terrestrial habitat ESLs are provided in that document for use as screening levels for the potential effects of COPCs to plants and soil-dwelling organisms as well as birds and mammals. The maximum detected concentrations of only manganese and vanadium exceeded their respective ESLs in on-site soils. The maximum detected concentrations of only manganese, selenium, and vanadium exceeded their respective ESLs in off-site soils. When compared to the concentrations detected in off-site background soils, the mean and maximum concentrations detected in off-site soils were higher than those detected in NRRWF on-site soils indicating that the NRRWF on-site concentrations were representative of naturally occurring background concentrations. Based on the screening of NRRWF on-site and off-site soil concentrations, no COPCs were identified that exceeded conservative risk-based ESLs or background concentrations. Potential ecological risks due to soil exposure to terrestrial receptors is considered de-minimus.

ADDITIONAL TERRESTRIAL PLANT AND ANIMAL SURVEYS

A wetland survey was completed at the PSB on December 11, 2020, and March 23, 2022 by Madrone Ecological Consultants (Madrone). The wetland survey delineated 1.35 acres of the PSB as seasonal wetland.

Madrone completed vegetation surveys at the PSB, with a special-status plant survey conducted on March 23, 2022, and June 1, 2022. Additionally, in order to evaluate whether the leachate events of February 14, 2019, and February 26, 2019 impacted the vegetation in the PSB, comparisons to pre-leachate conditions or to reference locations were considered. Reports from 2013 to 2016 and 2018 detailing prior vegetation surveys in the PSB were reviewed; however, the reported data were insufficient to perform a pre-leachate assessment beyond a qualitative assessment of the species present within the Study Area. Comparable reference sites with similar hydrology, soils, and topography to provide a basis of comparison were unable to be identified. Despite the lack of quantitative data in monitoring reports for direct comparison of existing conditions to pre-leachate conditions, it appeared that the leachate event did not reduce the extent of the wetlands or other waters within the PSB.

Madrone completed a threatened and endangered wildlife species evaluation at the PSB with field surveys conducted August 4, 2020, December 11, 2020, March 23, 2022, and June 1, 2022. The threatened and endangered species evaluation concluded there is no suitable habitat for listed species to reside or reproduce within the Study Area. There is a low potential for tricolored blackbird and Swainson's hawk to forage within the Study Area.

No species of concern, threatened or endangered species or their habitats were found within the conservation easement. Further, there was no impact to or reduction in wetland vegetative species.


HUMAN HEALTH ASSESSMENT

A risk screening assessment was also performed to evaluate potential risk for human health from preliminary COPCs associated with leachate discharges to storm water conveyances, including SWB-4 and the PSB that occurred at the NRRWF in February and March 2019. The purpose of the human health risk screening process is to identify if preliminary COPC concentrations exceed human health screening levels. Concentrations of two COPCs (cobalt and iron) in on-site soil samples exceeded conservative human health Screening Levels (SLs). However, cobalt and iron on-site maximum and minimum soil concentrations were equal to or less than the off-site soil concentrations, therefore, these two analytes are excluded as COPCs in soils. For soils in the PSB, there were no COPCs identified at concentrations greater than human health SLs or off-site background concentrations.  Potential human health risks due to soil exposure is considered de-minimus.

Concentrations of 12 COPCs from on-site storm water samples from SW-1A and SW-1B, including aluminum, antimony, arsenic, cadmium, chromium, cobalt, iron, lead, manganese, nickel, vanadium, and nitrate exceeded conservative human health Screening Levels (SLs).  Of these only antimony and nitrate were unique to SW-1B with arsenic and manganese common between both sites. Ten COPCs were identified for the SW-1A storm water samples that enter the PSB and may pose a risk to human health in the PSB, but these COPCs are not due to the leachate discharge, but appear to originate from the soil stockpile and the haul road.  Upon receipt of the laboratory results identifying the COPCs, the County implemented BMPs to address the storm water issue.

Based on the findings of this initial screening level assessment, although some COPCs were identified in storm water samples,  they were not from the 2019 leachate discharge.

# INVESTIGATIVE FINAL REPORT

**Neal Road Recycling and Waste Facility**
**1023 Neal Road**
**Paradise, California 95969**

# 1.0  INTRODUCTION

The State Water Resources Control Board (Water Board) has issued Investigative Order WQ 2020-0036-EXEC[1] (Investigative Order) dated November 18, 2020. The Investigative Order responded to leachate discharges to storm water conveyances that occurred at the Neal Road Recycling and Waste Facility (NRRWF) during February 2019 and March 2019. The Investigative Order requires the Butte County Department of Public Works (County) to develop and submit technical reports consisting of a leachate discharges Investigative Work Plan (IWP), and a leachate discharges Investigative Final Report (IFR). Requests for time extension in letters dated March 3, 2022, and September 30, 2022 were submitted to the Water Board. The time extension requests were approved by the Water Board. The Investigative Order and the time extension requests are contained in **ATTACHMENT A, Investigative Order and Time Extension Requests**.

The Water Board approved Investigative Work Plan (IWP) elements and the County proceeded with the field investigative elements of the IWP completed beginning December 2021 and proceeding to the present. Difficulty completing field investigative IWP elements was encountered due to extreme drought conditions limiting the number of storm water samples collected, and difficulty in retaining a sub-consultant to perform the IWP elements specified in Section 11.0. Due to the specificity of the Water Board conditionally approved elements of the IWP Section 11.0, it was difficult to locate and retain a subconsultant with the experience and professional services necessary to complete Section 11.0 of the IWP. After an extensive nationwide search, Formation Environmental, LLC[2] (Formation) was retained in June 2022 as a subcontractor Compliance SFO, Inc. (Compliance) to complete the Section 11.0 of the IWP. **Note:**  The subcontractor, Environmental Management Systems was initially retained by Compliance to complete the conditionally approve IWP Section 11.0. After detailed and lengthy discussions with EMS concerning their work related to the conditionally approved Section 11.0 however, it was determined EMS would not be able to participate in the IWP or the IFR.

Formation developed a PowerPoint presentation that was presented to Water Board personnel on August 29, 2022. The PowerPoint presentation provided information on the status the NRRWF IWP elements completed to date.  The PowerPoint presentation also provided proposed elements associated with the conditionally approved sections of the IWP. Water Board personnel viewing the PowerPoint presentation concurred the presentation provided adequate elements to meet the conditionally approved sections of the IWP. The PowerPoint presentation is in **Attachment B, PowerPoint Presentation**.

A Preliminary Investigative Report (PIR) was prepared to provide data and information collected at the time the PIR was prepared. The PIR dated September 30, 2022, was submitted to the Water Board via a GeoTracker Upload. Data contained in the PIR was preliminarily evaluated and a timeline was prepared identifying November 30, 2022, as the anticipated completion date of the

---

[1] State Water Resources Control Board, Office of Enforcement, Water Code Section 13267, Investigative Order WQ 2020-0036-EXEC.
[2] Formation Environmental, LLC, 2500 55th Street, #200, Boulder, Colorado 80301.

IFR. This IFR represents the culmination of the IWP elements data reviews, analysis of published and unpublished resource materials.

# 2.0  FACILITY DESCRIPTION

The NRRWF is located at 1023 Neal Road, Paradise, Butte County, California. The map coordinates of the NWRRF are longitude 39.674930° North, latitude -121.730878° West. The location of the NRRWF is shown on **Figure 2-1, Vicinity Map**. The layout of the NRRWF is shown on **Figure 2-2, Site Plan**.

The NRRWF has been developed in a northeast-to-southwest-trending canyon that historically eroded into a gently sloping plateau. Elevations at the site range from about 410 feet mean sea level (MSL) at the east facility boundary to about 210 feet MSL at the west facility boundary.

The NRRWF comprises 229 acres. The solid waste facility permit lists the permitted area at 190 acres of which 140 acres is permitted for waste disposal. The NRRWF consists of five Class III operation modules identified as Waste Management Units (WMUs) 1, 2, 3, 4, and 5. Other significant features at the NRRWF include a Class II surface impoundment for landfill leachate and landfill gas condensate, storm water basins, a Primary Sedimentation Basin[3] (PSB), and a soil cover stockpile. Site facilities consist of two scale houses, four scales, a maintenance building, a main office building, a landfill gas-to-energy plant and flare system, a septage transfer station, and one groundwater supply well.  **Note:**  Additional parcels abutting the north, east and west NRRWF boundaries have been purchased by Butte County These areas will be utilized in the future to expand the limits of the NRRWF once required entitlements have been secured from state and federal agencies. Currently, these parcels are used for agricultural purposes to graze cattle.

# 3.0  BACKGROUND

The purpose of this IFR is to identify the field investigative elements of the IWP completed to allow an assessment to be prepared identifying any potential short and long-term impacts to public health, animal and plant communities, and the environment/ecosystem due to the leachate discharges to Storm Water Basin #4 (SWB-4) and the Primary Sedimentation Basin (PSB), also known as the Conservation Easement, that occurred at the NRRWF on February 14, 2019, and February 26, 2019. These leachate discharges were pumped from SWB-4 to the PSB.  Another leachate discharge from WMU-4 occurred on March 6, 2019. This leachate discharge was contained in SWB-4 and was not pumped to the PSB. A remediation report prepared by others for the remediation of SWB-4 is included in this IFR.

The leachate discharges were the direct result of a series of natural disasters which can be classified as *ACTS OF GOD*. A series of manmade and natural events beginning November 8, 2018, caused severe damage to the Facility. The Camp Fire initiated by downed Pacific Gas and Electric (PG&E) powerlines destroyed infrastructure required to operate the Facility under state and federal regulatory requirements. Storm water Best Management Practices (BMPs), WMUs poly covers, soil caps grass covers, and other infrastructure required to meet local, state, and federal regulations were destroyed. The destroyed infrastructure was being repaired by NRRWF

---

[3] The *Primary Sedimentation Basin* is also known as the *Wetland Preserve* and/or the *Conservation Easement Area*.

personnel when a series of severe local storm events caused by atmospheric rivers impacted the NRRWF beginning in the early part of February 2019. The intense rainfall associated with these severe local storm events overwhelmed the repairs of the NRRWF infrastructure. Leachate discharged from the southwest toe of WMU-4 and entered storm water contained in SWB-4. The storm water and leachate in SWB-4 was discharged by a pump to the PSB. NRRWF personnel attempted to mitigate the discharge of leachate to storm water but were unable to complete this work as saturated soil due to the severe storm events prevented the use of heavy equipment to install pipes necessary to discharge the leachate to the NRRWF leachate basin.

**NOTE: The Camp Fire damaged NRRWF infrastructure, including BMPs associated with WMUs 1, 2, 3, and 4. BMPs that had been in place to mitigate the potential impacts of storm water sheet flows were partially repaired by NRRWF personnel when a series of atmospheric rivers generated severe local storm events that overwhelmed the NRRWF damaged BMPs resulting in the leachate seepage events discharges. Prior to the leachate discharge seeps events, the NRRWF BMPs, even though damaged and partially repaired, had effectively controlled the discharge of leachate from all the WMUs. In fact, prior to the Camp Fire, there were no storm water discharges of any kind on the NRRWF on or off the site.**

NRRWF personnel promptly collected storm water discharge samples from a storm water sampling site identified as SW-1 during the February 14, 2019, and February 26, 2019, leachate seep events. SW-1 storm water discharges represent discharges from the PSB. Background storm water runon samples representing storm water quality generated from sites outside the boundary limits of the NRRWF were also collected for analysis during the February 14, 2019, and February 26, 2019, leachate seep events. The storm water runon storm water sample sites are identified as SW-1 located on the east-central NRRWF boundary, and SW-8 located on the southwest boundary of the NRRWF. All storm water samples collected by NRRWF personnel were analyzed at an approved water testing laboratory for constituents that would represent leachate seeps discharges. Copies of the February 14, 2019, and February 26, 2019, laboratory analytical data is contained in **Attachment C, February 14, 2019, Storm Water Sampling Analytical Data**.

A review of the February 14, 2019, and February 26, 2019 storm water analytical data will establish the following:

- Industrial General Storm Water Discharge Permit[4] Numeric Action Level (NAL) exceedances were identified for Iron (Fe), Magnesium (Mg), Aluminum (Al), Copper (Cu), Nickel (Ni), and Zinc (Zn).

- Volatile Organic Compounds (VOCs), and Semi-Volatile Organic Compounds (SVOC) were detected in concentrations that did not exceed NALs, Aquatic Life Criteria, or Human Health Criteria.

- Organophosphate Pesticides (OPP) and Organochlorine Pesticides (OCPs) were less than Reporting Limits (RLs).

No storm water contained in SWB-4 was removed by pumping to the PSB between February 27, 2019, and March 13, 2019. Improving weather conditions allowed NRRWF to construct a High-

---

[4] National Pollutant Discharge Elimination System (NPDES), General Permit for Storm Water Discharges Associated with Industrial Activities, Order NPDES No. CAS000001.

Density Polyethylene (HDPE) pipeline from SWB-4 to the Leachate Basin (LB) located on the southwest portion of the NRRWF. Storm water in SWB-4 containing the March 6, 2019, leachate seep discharges was then discharged to the LB. No discharge or runon samples were required to be collected by NRRWF personnel related to the March 6, 2019, leachate seep event as no pump generated discharges occurred from SWB-4. Remediation of the soils in SWB-4 was completed and a remediation report[5] dated September 11, 2019, was submitted to the Water Board. The Water Board approved the remediation of SWB-4. A copy of the SWB-4 remediation report containing the soil samples laboratory analytical reports is contained in **Attachment D, Storm Water Basin Number 4 Remediation Report**.

# 4.0  STORM WATER AND SOILS SAMPLING

The storm water and soil sampling locations from the IWP are identified on **Figure 4-3, Storm Water and Soil Sampling Sites**. Storm water and soil sampling site locations were documented in the field using a hand-held GPS receiver[6].

## 4.1  STORM WATER SAMPLE SITE LOCATIONS

The IWP identified on-site and off-site storm water sample sites that were confirmed during field reconnaissance to have map locations as follows:

- SW-1, Latitude 39.671644° North, -121.736773° West.

- SW-1A, Latitude 39.672209° North, -121.735700° West.

- SW-1B, Latitude 39.674228° North, -121.723056° West.

- SW-2, Latitude 39.680672° North, -121.736773° West.

- SW-8, Latitude 39.672760° North, -121.730223° West.

Storm water sample sites SW-1, and SW-1A are located along the discharge flow path of water pumped from SWB-4. Storm water sample site SW-1B is located at the inlet of SWB-4 and is representative of storm water flows generated by easterly upslope areas of the NRRWF and the south toe of WMU-4. Runon storm water flows from areas upslope and outside the boundary limits of the NRRWF are represented by SW-2 and SW-8.

Due to extreme drought conditions throughout California, storm water samples were not able to be collected from all designated storm water sampling sites. Storm water samples were able to be collected on December 13, 2021, December 22, 2021, and March 15, 2022. Storm water samples were attempted to be collected on April 21, 2022. However, there were no observed storm water flows at any of the designated storm water sampling sites on April 21, 2022.

The storm water sampling laboratory analytical data are contained in **Attachment E, 2021 – 2022 Storm Water Sampling Laboratory Analytical Data**.

---

[5] Storm Water Basin #4 Remediation Report, Neal Road Recycling and Waste Facility, Butte County, California, September 11, 2019, prepared by SCS Engineers.
[6] Garmin ETREX 32x, Serial Number 65E0370009.

## 4.2    SOIL SAMPLE SITE LOCATIONS

On-site and off-site probable soil sampling sites were identified in the IWP with the provision that the soil sample sites would be established during soil sampling field work. The soil sampling field work was completed on May 25, 2021, and May 26, 2022. Soil samples were collected from each soil boring at the surface directly below the organic horizon, 3-inches below the ground surface, and 6-inches below the ground surface except when soil auger refusal was encountered at shallower depths. The field work was observed and documented by Water Board personnel. The May 25, 2022, soil sampling was observed and documented by Erin Garner, Senior Engineering Geologist. The May 26, 2022, soil sampling was observed and documented by Stephanie Young, Senior Water Resources Control Engineer Specialist. Copies of their observations detailed in inspection reports are contained in **Attachment F, Water Board Soil Sampling Inspection Reports**.

### 4.2.1    OFF-SITE SOILS

Soil samples from off-site areas around the perimeter of the NRRWF were collected on May 25, 2022. The soil sample sites map coordinates were documented with the handheld GPS receiver identified previously. The soil sample site identifications and their respective GPS coordinates were:

- SBO-1, Latitude 39.68046° North, Longitude -121.72255° West.

- SBO-2, Latitude 39.68074° North, Longitude -121.72267° West.

- SBO-3, Latitude 39.67576° North, Longitude -121.73820° West.

- SBO-4, Latitude 39.67154° North, Longitude -121.73689° West.

- SBO-5, Latitude 39.67137° North, Longitude -121.73699° West.

- SBO-6, Latitude 39.67114° North, Longitude -121.73701° West.

Additional soils were collected from perimeter areas of the NRRWF on May 26, 2022.  The soil sample sites, and map coordinates were:

- SBO-7, Latitude 39.67023° North, Longitude -121.73543° West.

- SBO-8, Latitude 39.67273° North, Longitude -121.73018° West.

- SBO-9, Latitude 39.67275° North, Longitude -121.73012° West.

### 4.2.2    ON-SITE SOILS

Soil samples from areas within the boundary limits of the NRRWF were also collected on May 26, 2022. The soil sample sites map coordinates were documented with the handheld GPS receiver identified previously. The soil sample site identifications and their respective GPS coordinates were:

- SBF-1, Latitude 39.67257° North, Longitude -121.73561° West.

- SBF-2, Latitude 39.67234° North, Longitude -121.73540° West.

- SBF-3, Latitude 39.67199° North, Longitude -121.73524° West.

- SBF-4, Latitude 39.67183° North, Longitude -121.73549° West.

- SBF-5, Latitude 39.67230° North, Longitude -121.73600° West.

- SBF-6, Latitude 39.67192° North, Longitude -121.73589° West.

- SBF-7, Latitude 39.67177° North, Longitude -121.73614° West.

- SBF-8, Latitude 39.67196° North, Longitude -121.73637° West.

The soil samples were submitted to Fruit Growers Laboratory (FGL), 2500 Stagecoach Road, Stockton, California, on May 31, 2022. The California ELAP certification number for FGL is 1563. At the time the soil samples were submitted, an FGL employee, Debby Hagen, who received the samples advised that samples analytical results could take a considerable amount of time to complete. Ms. Hagen stated the number of samples submitted and the lack of laboratory personnel due to pandemic related issues were the reasons the soil samples analytical results would take a considerable amount of time to complete. The soil sample analytical reports were released by FGL on August 22, 2022. The soil borings sampling analytical reports are contained in **Attachment G, Soil Borings Analytical Reports**.

## 4.3   SAMPLE HANDLING

Storm water samples and soil samples were collected and handled adhering to the procedures outlined in Sections 6. 1 to 6.4, and Attachment G of the IWP.

## 4.4   SAMPLE EQUIPMENT USE AND DECONTAMINATION

Storm water and soil sampling equipment was used and maintained as recommended by the sampling equipment manufacturers. Sampling equipment decontamination before, during, and after samples were collected from a sample site adhered to the procedures in Section 6.5, and Attachment G of the IWP.

## 4.5   DEDICATED FIELD NOTEBOOK

All field activities with storm water and soil sampling, were documented in a dedicated field notebook. The dedicated field notebook pages have been included in **Attachment H, Dedicated Field Notebook**.

## 4.6   PHOTO DOCUMENTATION

Photo documentation of the storm water sample sites and the soil boring sites were completed during each sampling event. A Cannon SD 1000 Digital Elph, camera was used to photo document the sampling events with the exception of the March 15, 2022, storm water sampling event. The March 15, 2022, storm water sampling events was photo documented using a Samsung S21 Ultra phone camera. The photos of the storm water sampling events and soil borings are contained in **Attachment I, Storm Water and Soil Sampling Photos**.

**Note:**  The Cannon SD 1000 Digital Elph camera malfunctioned and did not record a photo for soil sample site SBO-9. However, the Water Board May 26, 2022, Facility Inspection report contains a photo of soil sample site SBO-9.

# 5.0  STORM WATER TOXICITY TESTING

Storm water biotoxicity testing was conducted at the NRRWF on March 15, 2022 with samples collected at storm water sample site SW-1B. This sample site is in close proximity to WMU-4 where leachate discharges had occurred in February 2019 and would represent a sample site receiving leachate discharges from WMU-4. The storm water biotoxicity samples were submitted to FGL on March 15, 2022.  FGL subcontracted with Aquatic Bioassay and Consulting Laboratories, Inc.[7] (ABC Laboratory). The ABC Laboratory California ELAP certification number is 1907. ABC Laboratory conducted the laboratory analysis under guidelines prescribed in *Short-Term Methods for Estimating the Chronic Toxicity of Effluents and Receiving Water to Freshwater Organisms, EPA-821-R-02-013*. The following toxicity tests were conducted by ABC. The associated test results were also provided by ABC Laboratory.

- Chronic *Pimphales promelas* (Fathead minnow) larvae Survival and Growth Bioassay (7-Day)

    - NOEC Survival = 100% Site Water
    - NOEC Growth = 100% Site Water

- Chronic *Ceriodaphnia dubia* (water flea) Survival and Reproduction Bioassay (7-Day)

    - NOEC Survival = 100% Site Water
    - NOEC Reproduction = 100% Site Water

- Chronic *Selenastrum capricornutum* (green algae) Growth Bioassay (4-Day)

    - NOEC = 10% Site Water

The laboratory analytical data is contained in **Attachment J, Biotoxicity Analytical Data**.

Based on the toxicity data, no significant toxic effects were observed for fathead minnow larval survival and growth, and *Ceriodaphnia* survival and reproduction. While there was a significant difference observed between the control and Site Water *Selenastrum* growth results, the difference was for greater growth in the Site water sample versus control. Increased growth in algal Site water samples indicates the presence of nutrients that stimulate growth.

# 6.0  WETLAND DELINEATION

A wetland survey was completed at the PSB on December 11, 2020, and March 23, 2022, by personnel from Madrone Ecological Consulting[8] (Madrone). The delineation was performed in accordance with the *United States Army Corps of Engineers Wetlands Delineation Manual*

---

[7] Aquatic Bioassay and Consulting Laboratories, Inc.[7] (ABC), 29 North Olive Street, Ventura, California 93001.
[8] Madrone Ecological Consulting, LLC, 8421 Auburn Boulevard, Suite 248, Citrus Heights, California 95610

(Environmental Laboratory 1987)[9], the *Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Arid West Region (Version 2.0;* USACE 2008a)[10], and *A Field Guide to the Identification of the Ordinary High-Water Mark (OHWM) in the Arid West Region of the Western United States* (USACE 2008b)[11]. U.S. Army Corps of Engineers (USACE) regulations (33 CFR 328) were used to determine the presence of Waters of the U.S. other than wetlands. The most recent *National Wetland Plant List* (Lichvar et al. 2020)[12] was used to determine the wetland indicator status of plants observed in the Project Area.

The USACE method of delineating jurisdictional wetlands requires the presence of three parameters: 1) a dominance of hydrophytic vegetation, 2) indicators of hydric soil, and 3) the presence of wetland hydrology. An area considered to have a dominance of hydrophytic vegetation has more than 50 percent of the most abundant plant species classified as Facultative (FAC), Facultative Wetland (FACW), or Obligate wetland (OBL). Hydric soils form when conditions are saturated, flooded, or ponded long enough to develop anaerobic conditions in the upper soil column. They are poorly drained and support the growth and reproduction of wetland vegetation during the growing season under natural conditions. Wetland hydrology is defined as the presence of soil saturation within 12 inches of the soil surface for 14 or more consecutive days during the growing season for at least 5 in 10 years.

Madrone delineated 1.35 acres of the PSB as seasonal wetland, indicating that the triple-parameter conditions were met for a portion of the PSB (see section 7.2 for characterization of the vegetation). The wetland delineation map has been included in **Attachment K, Wetland Delineation Map**.

While the conditions to define the area as a seasonal wetland may have been met, the PSB did not appear to be a typical wetland with a high, persistent water table. Of the 24 plant species identified in the PSB, 21 were technically upland species, which require well-drained soils. Two of the species were FAC, indicating they are characterized 50% of the time in either upland or wetland conditions, and one species was FACW, which shows it can be found up to 34% of the time in upland conditions. The vegetation community composition in the NRRWF PSB indicates that this area is not considered high quality wetland habitat for wildlife, leading to a more transient presence. This area's lack of suitability for a wetland explains in part the reduction in acreage from the original wetland acreage created in that location in 2003.

# 7.0  VEGETATION SURVEY

Vegetation in the PSB was assessed for two conditions: 1) The potential presence of special-status plants, and 2) The potential impact of the leachate events of February 14, 2019, and February 26, 2019, on the vegetation in the PSB. These will be addressed in sections 7.1 and 7.2, respectively.

---

[9] Environmental Laboratory. 1987. Corps of Engineers Wetlands Delineation Manual. Technical Report Y-87-1, U.S. Army Engineer Waterways Experiment Station. Vicksburg, Miss.

[10] U.S. Army Corps of Engineers (USACE). 2008a. Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Arid West Region (Version 2.0), ed. J. S. Wakeley, R. W. Lichvar, and C. V. Noble. ERDC/EL TR-08-28. Vicksburg, MS: U.S. Army Engineer Research and Development Center.

[11] U.S. Army Corps of Engineers (USACE). 2008b. A Field Guide to the Identification of the Ordinary High Water Mark (OHWM) in the Arid West Region of the Western United States. A Delineation Manual. Prepared by R. W. Lichvar and S. M. McColley. ERDC/CRREL TR-08-12. Cold Regions Research and Engineering Laboratory.

[12] Lichvar, R.W., D.L. Banks, W.N. Kirchner, and N.C. Melvin (2020). The National Wetland Plant List: 2018 wetland ratings. Published May 18, 2020. Retrieved from: http://wetland-plants.usace.army.mil/[accessed 22 June 2022].

## 7.1   SURVEY OF SPECIAL-STATUS PLANT SPECIES

Madrone conducted a special-status plant survey in the PSB on March 23, 2022, and June 1, 2022, in accordance with the U.S. Fish and Wildlife Service's *Guidelines for Conducting and Reporting Botanical Inventories for Federally Listed, Proposed and Candidate Plants* (USFWS 1996)[13], California Department of Fish and Wildlife's *Protocols for Surveying and Evaluating Impacts to Special Status Native Plant Populations and Natural Communities* (CDFW 2018)[14], and the *CNPS Botanical Survey Guidelines* (CNPS 2001)[15]. These evaluations were assessed against a list of special-status plant species with potential to occur within the Study Area developed by reviewing the following literature and refined based on habitat present within NRRWF:

- California Native Plant Society Rare and Endangered Plant Inventory (CNPS 2022)[16] Lists 1A, 1B, 2A, 2B, and 3 within the "Hamlin Canyon, California" Topographic Quadrangle (USGS 2021)[17] and eight surrounding quadrangles.

- California Natural Diversity Database occurrences of special-status plant species within 5 miles of the Study Area (CNDDB 2022)[18].

To assess the presence of special-status plants, Madrone performed meandering surveys of the Study Area and identified the entire plant community present. This approach was deemed appropriate to meet the objective of identifying the presence of special-status plants; no special-status plant species were observed during the 2022 protocol-level special-status plant surveys conducted at the PSB as presented in Table 7-1. The survey results presented species identification only, an estimated percent cover from this dataset was not reported. A copy of the Madrone Special-Status Plant Survey Report is contained in **Attachment L, Special-Status Plant Survey Report**.

Based on the 2022 special status plant species survey, it is likely that no special status plant species were impacted by the 2019 leachate discharge.

## 7.2   VEGETATION TRANSECTS

In order to evaluate whether the leachate events of February 14, 2019, and February 26, 2019, impacted the vegetation in the PSB, comparisons to pre-leachate conditions or to reference locations were examined and the methodology was approved by the Water Board. Madrone

---

[13] U.S. Department of the Interior, Fish and Wildlife Service (USFWS). 1996. *Guidelines for Conducting and Reporting Botanical Inventories for Federally Listed, Proposed and Candidate Plants*. Sacramento, CA.
[14] California Department of Fish and Wildlife (CDFW). 2018. Protocols for Surveying and Evaluating Impacts to Special Status Native Plant Populations and Natural Communities. State of California Natural Resource Agency Department of Fish and Wildlife. Dated March 20, 2018. Website https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=18959 [accessed January through May 2022].
[15] California Native Plant Society (CNPS). 2001. *CNPS botanical survey guidelines*. Pages 38-40 *in* California Native Plant Society's *Inventory of Rare and Endangered Vascular Plants of California* (D.P. Tibor, editor). Sixth edition. Special Publication No. 1, California Native Plant Society, Sacramento, 387 pp.
[16] California Native Plant Society (CNPS). 2022. *Inventory of Rare and Endangered Plants* (online edition, v9-01 1.5). California Native Plant Society, Sacramento, CA. Website http://www.rareplants.cnps.org [accessed January through July 2022].
[17] U.S. Geological Survey (USGS). 2021. "*Hamlin Canyon*" 7.5-Minute Series Topographic Quadrangle. U.S.Geological Survey. Denver, Colorado.
[18] California Native Plant Society (CNPS). 2001. *CNPS botanical survey guidelines*. Pages 38-40 *in* California Native Plant Society's *Inventory of Rare and Endangered Vascular Plants of California* (D.P. Tibor, editor). Sixth edition. Special Publication No. 1, California Native Plant Society, Sacramento, 387 pp.

---

biologists reviewed reports from 2013 to 2016 and 2018 detailing prior vegetation surveys in the PSB and concluded that the reported data were insufficient to perform a pre-leachate assessment beyond a qualitative assessment of the species present within the Study Area. As well, they were unable to identify comparable reference sites with similar hydrology, soils, and topography to provide a basis of comparison. Therefore, a point-intercept transect was performed across the Study Area similar to the previously reported transect surveys to identify species in the PSB and to elucidate if leachate impacts could be determined through plant condition; results are presented in Table 7-2. An evaluation was performed on this data set relative to Attachment J of the NRRWF IWP, wherein it was proposed that re-vegetation success would be met when 50% of the Study Area was covered and dominated by hydrophytic vegetation.

The survey revealed that vegetation covered 87% of the Study Area, and based on a Prevalence Index score of 2.7, wetland species dominated the vegetation community. The Prevalence Index was a weighted-average indicator of all plant species in the sampling area, where each indicator status category was given a numeric code (OBL = 1, FACW = 2, FAC = 3, FACU = 4, and UPL = 5) and weighted by abundance. A score of 3 or lower indicated prevalence of hydrophytic vegetation. Of the 24 species that were identified in the Study Area, 23 were annual grasses and herbs.

Madrone concluded that vegetation communities dominated by annual grasses and herbs will be driven by climatic conditions and site characteristics that mask potential impacts of leachate uptake. Although, evaluating change in the plant community of the PSB may not quantitatively reveal the potential leachate impact on vegetation community composition or health, it can provide reliable qualitative results.

The area within the PSB was considered to have met criteria identified in the IWP as re-vegetation success. Therefore, Madrone was able to conclude that despite the lack of quantitative data in monitoring reports for direct comparison of existing conditions to pre-leachate conditions, they found that the leachate events did not reduce the extent of the wetlands or other waters within the PSB.

A copy of the Madrone vegetation survey is contained in **Attachment M, Vegetation Survey Report**.

# 8.0   THREATENED AND ENDANGERED SPECIES EVALUATION

A threatened and endangered wildlife species evaluation was completed by Madrone at the PSB. Field surveys of the NRRWF PSB were completed by Madrone personnel on August 4, 2020, December 11, 2020, March 23, 2022, and June 1, 2022. Literature reviews were completed by Madrone personnel of wildlife species listed as threatened, endangered, or as candidates for listing under the Federal Endangered Species Act (ESA) by the U.S. Fish and Wildlife Service (USFWS), National Marine Fisheries Service (NMFS) or listed as threatened, endangered, or is a candidate for listing under the California Endangered Species Act (CESA) by California Department of Fish and Wildlife (CDFW). Madrone also completed database queries of the following:

- California Natural Diversity Database (CNDDB) (CDFW 2022)[19] query of all species within a 5-mile radius of the Study Area.

- USFWS Information for Planning and Conservation (IPaC) (USFWS 2022)[20] query for the Study Area.

- The Cornell Lab of Ornithology eBird database for the vicinity of the Study Area (eBird 2022)[21].

In addition, any species that are known to occur in the region, but that were not identified in any of the above database searches were also evaluated for their potential to occur within the NRRWF PSB.

Madrone personnel performed meandering surveys to assess the suitability of habitats at the PSB. These field surveys were completed on August 4, 2020, December 11, 2020, March 23, 2022, and June 1, 2022, including evaluations of listed wildlife species, vegetation community mapping, and aquatic resources delineation as summarized in Table 8-1. The Madrone *Threatened and Endangered Wildlife Species Evaluation* report provided the following summary regarding the presence of threatened and endangered species as the NRRWF PSB:

*There is no suitable habitat for listed species to reside or reproduce within the Study Area. There is a low potential for tricolored blackbird and Swainson's hawk to forage within the Study Area. This conclusion is consistent with Section 1.3.2 of the Neal Road Preserve's Open Space Preserve Management Plan which states: No species of concern, threatened, or endangered species were located within the project area during on-site surveys (Galloway 2006)[22].*

A copy of the Madrone *Threatened and Endangered Wildlife Species Evaluation* report is contained in **Attachment L, Threatened and Endangered Species Evaluation Report**.

# 9.0  ECOLOGICAL RISK SCREENING AND COPC IDENTIFICATION

An ecological risk assessment (ERA) screening was performed to evaluate the potential risk to ecological receptors from COPCs associated with leachate discharges to storm water conveyances, including SWB-4 and the PSB that occurred at the NRRWF in February and March 2019 (See Section 3). The purpose of the ERA screening process is to identify if preliminary COPC concentrations exceed Ecological Screening Levels (ESLs). Preceding sections describe sample collection for storm water and soils. In order to screen the analytical data from each media, the laboratory Electronic Data Deliverables (EDDs) and/or pdf laboratory reports were converted

---

[19] California Department of Fish and Wildlife (CDFW). California Natural Diversity Database (CNDDB). 2022. *RareFind 5* [Internet]. Accessed January through July 2022.
[20] U.S. Department of the Interior, Fish and Wildlife Service (USFWS). 2022. *IPaC Trust Resource Report for the Study Area.* Generated from http://ecos.fws.gov/ipac/ in July 2022.
[21] eBird online database. 2022. The Cornell Lab of Ornithology. Website https://ebird.org/home [accessed July 2022].
[22] Galloway Consulting, Inc.. 2006. *Open Space Preserve Management Plan, Neal Road Landfill Preserve, Butte County, California.* Prepared for Butte County Department of Public Works. Dated May 2006.

into an Access database and are contained in Attachment **N, Access Database for Storm water and Soil Data (Electronic)**.

A screening ecological conceptual site model (CSM) (Figure 9-1) was developed to illustrate the potential pathways and exposure routes for COPCs to potential ecological receptors that may utilize the PSB as habitat. For this ERA screening, maximum concentrations of parameters in soil and storm water were compared to conservative risk-based ESLs. This ERA screening was prepared to meet two primary objectives, (1) identify if potential COPCs are present based on detection above analytical Practical Quantitation Limits (PQLs), and (2) Identify potential COPCs that exceed conservative risk-based ESLs.

Based on storm water and soil sampling in 2019, some COPCs and toxicity values were identified (Attachment E, Table E-1 of the IWP) and a preliminary list of COPCs was identified. These preliminary COPCs were then analyzed in storm water samples collected from two on-site locations (SW-1A and SW-1B) in December 2021 and March 2022 and 19 soil samples from 8 on-site soil locations (SBF samples) collected in May 2022, as discussed in Section 4. Off-site storm water samples were also collected in December 2021 from SW-2 while 20 off-site soil samples were collected from 9 locations in May 2022 (SBO samples). All analytical laboratory reports are presented in Attachments D and F.

## 9.1 SOILS

Section 4 identified locations for on-site (SBF) and off-site (SBO) soil sample and Figure 4-3 shows the sample locations. Collection methods are summarized in Section 4 and briefly described herein. Soils were collected from the surface directly below the organic horizon, 3-inches below the ground surface, and 6-inches below the ground surface except when soil auger refusal was encountered at shallower depths.



**Figure 9-1 Ecological Conceptual Site Model**

### 9.1.1 SOIL SCREENING APPROACH

The maximum concentrations of COPCs from all on-site soils from the PSB were compared to ESLs for terrestrial ecological receptors. The primary source of ESLs is the 2019 revision of the San Francisco Bay Regional Water Quality Control Board's Environmental Screening Levels (SFBRWQCB 2019). Terrestrial habitat ESLs are provided in that document for use as screening levels for the potential effects of COPCs to plants and soil-dwelling organisms as well as birds and mammals.

The ESLs are based on the degree of vegetative cover at the Site with ESLs for significantly and minimally vegetated areas. While the SFBRWQCB 2019[23] guidance indicates that the ESLs for minimally vegetated areas are derived for use in industrial and commercial settings, such as those found at the NRRWF, the more conservative ESLs for significantly vegetated areas were selected for use in screening the on-site NRRWF soils for potential risk to terrestrial ecological receptors.

For some detected COPCs, SFBRWQCB ESLs were not available and the USEPA's Ecological Soil Screening Levels (EcoSSLs; USEPA 2005[24]) were used to screen soil concentrations. EcoSSLs are calculated in USEPA 2005 for the same set of receptors as the primary ESL source (plants, soil dwelling invertebrates, birds, and mammals) and are closely comparable to the SFBRWQCB (2019) ESLs. For those COPCs where EcoSSLs were used for screening, the lowest value of the four receptor EcoSSLs was selected as the ESL to remain consistent with the SFBRWQCB ESLs.

### 9.1.2 SOIL SCREENING RESULTS

For the COPCs detected in on-site soils, the maximum detected concentrations were compared to their respective ESLs in Table 9-1. Those COPCs that were never detected in soils are provided along with the minimum, maximum, and mean detection limits as wells as their respective ESLs in **Attachment N, Table N-1**. Of the COPCs detected in on-site soils, no ESLs were available for sulfate, calcium, potassium, and sodium. These COPCs are, however, generally considered to be essential nutrients and are not expected to be source of unacceptable risk to terrestrial ecological receptors (USEPA 2018)[25]. As indicated in Table 9-1, the maximum detected concentrations of only manganese and vanadium exceeded their respective ESLs in on-site soils.

For the COPCs detected in off-site soils, the maximum detected concentrations were compared to their respective ESLs in Table 9-2. Those COPCs that were never detected in soils are provided along with the minimum, maximum, and mean detection limits as wells as their respective ESLs in **Attachment N, Table N-2.** As indicated in Table 9-2, the maximum detected concentrations of only manganese, selenium, and vanadium exceeded their respective ESLs in off-site soils.

The NRRWF on-site concentrations of those detected and exceeding ESL COPCs are compared to the concentrations detected in off-site background soils in Table 9-3. In all cases, the mean and maximum concentrations detected in off-site soils are higher than those detected in NRRWF on-site soils indicating that the NRRWF on-site concentrations are representative of naturally occurring background concentrations.

---

[23] San Francisco Bay Regional Water Quality Control Board. 2019. Users Guide: Derivation and Application of Environmental Screening Levels (ESLs). Interim Final 2019 (Revision 1).
[24] U.S. Environmental Protection Agency. 2005. Guidance for Developing Ecological Soil Screening Levels. OSWER Directive 9285.7-55. Office of Solid Waste and Emergency Response. February, 2005
[25] U.S. Environmental Protection Agency. 2018. Region 4 Ecological Risk Assessment Supplemental Guidance. March 2018.

### 9.1.3 SOIL SCREENING SUMMARY

The maximum detected concentrations of only manganese and vanadium exceeded their respective ESLs in on-site soils. The maximum detected concentrations of only manganese, selenium, and vanadium exceeded their respective ESLs in off-site soils. When compared to the concentrations detected in off-site background soils, the mean and maximum concentrations detected in off-site soils are higher than those detected in NRRWF on-site soils indicating that the NRRWF on-site concentrations are representative of naturally occurring background concentrations. Based on the screening of NRRWF on-site and off-site soil concentrations, no COPCs are identified. Potential ecological risks due to soil exposure to terrestrial receptors is considered de-minimus.

## 9.2   STORM WATER

Storm water samples were collected at NRRWF on-site locations and off-site locations near the NRRWF as shown on Figure 4-3 and described in Section 4.0. Table 9-4 shows the locations for storm water collection and dates when samples were collected.

Samples collected during 2019 represent conditions during the leachate discharge and background storm water conditions at that time.  Samples collected in 2021 and 2022 represent storm water runoff conditions and the current operational management for storm water.

### 9.2.1 STORM WATER SCREENING APPROACH

Maximum concentrations of detected COPCs in storm water samples from both on-site and off-site locations were compared to ESLs for aquatic ecological receptors. Laboratory analytical data were assembled and initially culled by detection status. Non-detected data relative to their respective PQLs were screened out from further evaluation.

The primary source of ESLs is the 2019 revision of the San Francisco Bay Regional Water Quality Control Board's Environmental Screening Levels (SFBRWQCB 2019) for aquatic habitat.  The compilation of surface water ESLs provided in SFBRWQCB (2019) included both acute and chronic values from the following sources:

- California Toxics Rule (USEPA 2000b)[26];

- A Compilation of Water Quality Goals (State Water Board 2016)[27];

- USEPA Ecotox Thresholds (USEPA 1996a)[28];

- USEPA National Recommended Water Quality Criteria (USEPA 2002a)[29];

---

[26] USEPA. 2000b. Water Quality Standards; Establishment of Numerical Criteria for Priority Toxic Pollutants for the State of California; Rule. Federal Register, 40 CFR Part 131, Thursday, May 18, 2000.
[27] State Water Board. 2016. A Compilation of Water Quality Goals (17th Edition). California Environmental Protection Agency, State Water Board. January.
[28] USEPA. 1996a. Eco Update Volume 3, Number 2 - Ecotox Thresholds. Office of Solid Waste and Emergency Response, EPA 540/F-95/038. January.
[29] USEPA. 2002a. National Recommended Water Quality Criteria- 2002. Office of Water, EPA-822-R-02-047.

- U.S. Department of Energy (USDOE) Preliminary Remediation Goals for Ecological Endpoints (USDOE 1997)[30]; and,

- Ontario Ministry of Environment and Energy (MOEE) Rationale for the Development and Application of Generic Soil, Groundwater and Sediment Criteria (MOEE 1996)[31].

Michigan Department of Environmental Quality's (MDEQ 2022) Rule 57[32] Tier 1 and 2 values were used as a secondary source to supplement the SFBRWQCB (2019) ESL values when no values were available.  For hardness-based metals, equations from National Criteria and /or Michigan's Rule 57 values for hardness-based metals were derived in place of static values (e.g., hardness -based metals derived for a specific hardness such as 100 mg/L CaCO$_3$).  Aluminum has a revised criterion (USEPA 2018)[33] document where the derivation process includes Dissolved Organic Carbon (DOC), pH, and hardness.  Since DOC was not measured for these storm water samples, it was conservatively estimated for each sample group as 1 mg/L.  Ambient pH was used for the aluminum criterion calculations.  Where hardness was included for deriving a metal ESL, the ambient maximum hardness was used unless that value was greater than 400 mg/L (as CaCO$_3$), then hardness of 400 mg/L (as CaCO$_3$) was used as the upper limit hardness value.  The upper limit hardness was used because these are storm water samples which are the result of short-term episodic events where hardness is expected to be high due to mobilization of the components of total hardness.  Thresholds for ammonia were not derived because the threshold calculation requires water temperature data which were not available.  Most general chemistry and nutrient samples were not screened due to the lack of ESLs, although the data are presented to show the range of concentrations observed.

Parameters were identified as COPCs if the maximum concentration for a parameter was greater than the ESL. More specifically, COPCs for storm water were identified if the acute ESL was exceeded. Acute ESLs represent short term high concentration exposure, such as would occur in storm water runoff where limited exposure potential occurs (e.g., limited duration of the water for exposure due to limited short term flashy events), and limited potential for an aquatic community exists in a semi-arid, mostly dry habitat. If no acute ESL was available for a specific parameter, then the chronic ESL was used to determine if a parameter is a COPC. General chemistry and nutrient samples were not screened as most of these do not have screening levels and are not considered to be toxic.

Preliminary screening was for done for the 2019 storm water data previously collected as part of the Investigative Work Plan (IWP). Maximum concentrations for those parameters that were detected are screened herein against their respective ESLs.

---

[30] USDOE [US Department of Energy]. 1997. Preliminary Remediation Goals for Ecological Endpoints. U.S. Department of Energy, Office of Environmental Management (prepared by R.A. Efroymson, G.W. Suter II, B.E. Sample and D.S. Jones), ES/ER/TM-162/R2. August.
[31] MOEE [Ontario Ministry of Environment and Energy]. 1996. Rationale for the Development and Application of Generic Soil, Groundwater and Sediment Criteria for Use at Contaminated Sites in Ontario. Standards Development Branch. December.
[32] Michigan DEQ. 2022.  Rule 57 Water Quality Values.  Michigan Department of Environmental Quality. https://www.michigan.gov/egle/-/media/Project/Websites/egle/Documents/Programs/WRD/SWAS/rule-57-values.xlsx?rev=91582d6bfa554b5aaac0bf9d0667a75d&hash=8F8F76C57635BE8DD82D0C0F6D01EF8F
[33] USEPA. 2018. Final Aquatic Life Ambient Water Quality Criteria for Aluminum – 2018.  EPA-822-R-18-001. https://www.epa.gov/wqc/aquatic-life-criteria-and-methods-toxics

### 9.2.2 2021-2022 STORM WATER SCREENING RESULTS

#### 9.2.2.1 SAMPLE LOCATION SW-1A

Storm water samples were collected twice at SW-1A (Table 9-4) from runoff that would enter the PSB. Field notes indicate that the December 2022 sample had a large amount of sediment in the sample (e.g., turbidity and total suspended solids were high with maximum concentrations of 9340 ntu and 12500 mg/L, respectively) due to runoff from the soil stockpile and haul road. COPCs that were detected at concentrations greater than the PQL are shown in Table 9-5. Those COPCs that were never detected in storm water at location SW-1A are provided along with the minimum, maximum, and mean detection limits as wells as their respective ESLs in **Attachment O, Table O-3**

At location SW-1A in the PSB, 41 inorganic parameters were detected together with one volatile organic compound (VOC) parameter. Twenty-one inorganic parameters were detected and screened against ESLs (Table 9-5). Aluminum, barium, cadmium, chromium, cobalt, copper, iron, lead, manganese, nickel, selenium, and vanadium exceeded their respective chronic ESLs, while only aluminum, chromium, cobalt, copper, and vanadium exceeded their respective acute ESLs. Iron and selenium only have chronic ESLs.

Based on COPC maximum concentrations compared to their respective acute ESLs, aluminum, chromium, cobalt, copper, and vanadium are identified at COPCs at sample location SW-1A. Because there is no acute ESL for selenium, it was carried forward as COPC. While reported as not detected, the maximum zinc concentration was significantly greater than the PQL. Due to this uncertainty, zinc may be considered a COPC at SW-1A.

All Semi-Volatile Organic Compounds (SVOCs) were less than detection at the PQL. Acetone was the only Volatile Organic Compounds (VOCs) detected, and the maximum concentration was less than its respective ESLs. There are no SVOCs, or VOCs identified as COPCs for sample location SW-1A

#### 9.2.2.2 SAMPLE LOCATION SW-1B

Storm water samples were collected three times from SW-1B (Table 9-4). Parameters that were detected at concentrations greater than the PQL are shown in Table 9-6. Those COPCs that were never detected in storm water at location SW-1B are provided along with the minimum, maximum, and mean detection limits as wells as their respective ESLs in **Attachment O, Table O-4**.

At location SW-1B, 45 inorganic parameters were detected together with three VOC parameters. Twenty-three inorganic parameters were detected and screened against ESLs (Table 9-5). Aluminum and iron exceeded their respective chronic ESLs. Iron only has a chronic ESL, and aluminum did not exceed its respective acute ESL. No SVOCs were detected. Acetone, 2-butanone, and tert-butyl alcohol were the only VOCs detected and their maximum concentrations were less than their respective ESLs.

Based on COPC maximum concentrations compared to their respective acute ESLs, no inorganic, VOC or SVOC parameters were identified for samples from location SW-1B.

#### 9.2.2.3 SAMPLE LOCATION SW-2

At location SW-2 off-site and upgradient of the NRRWF, storm water samples were collected twice from SW-2 in 2021 and 2022 (Table 9-4). COPCs that were detected at concentrations

greater than the PQL are shown in Table 9-7. Those COPCs that were never detected in storm water at location SW-2 are provided along with the minimum, maximum, and mean detection limits as wells as their respective ESLs in **Attachment O, Table O-5**.

At location SW-2B, 38 inorganic parameters were detected. Nineteen inorganic parameters were detected and screened against ESLs (Table 9-7). Only aluminum exceeded its chronic ESL but did not exceed the acute ESL.  No VOCs or SVOCs were detected above the PQL.

Based on COPC maximum concentrations compared to their respective acute ESLs, no inorganic, VOC or SVOC parameters were identified for samples from location SW-2.

### 9.2.3  2019 STORM WATER SCREENING RESULTS

For the aluminum criteria, pH, DOC, and hardness are required to derive the acute and chronic values.  pH and DOC were not measured in these samples, therefore a pH of 8 S.U. and 1.0 mg/L DOC were assumed for derivation of the aluminum criterion values. Most of the parameter concentrations reported for the 2019 storm water data were in the dissolved form.  ESLs were most often reported were for the total form of each parameter. Dissolved COPC concentrations reported were assumed to be 100 percent of the total and compared to the total ESL values.

#### 9.2.3.1  SAMPLE LOCATIONS SW-2 AND SW-8

Storm water samples were collected twice in February 2019 at SW-2 and SW-8 (Table 9-4).  For screening purposes, since SW-2 and SW-8 were considered background locations and were collected at the same time in 2019, these data were grouped and the maximum concentrations for detected parameters were screened against ESLs (Table 9-4). COPCs that were detected at concentrations greater than the PQL are shown in Table 9-8. Those COPCs that were never detected in storm water at location SW-2 are provided along with the minimum, maximum, and mean detection limits as wells as their respective ESLs in **Attachment O, Table O-6**.

At the SW-2 and SW-8 locations, there were 32 inorganic parameters detected at concentrations greater than the PQL together with six VOCs or SVOCs. Eighteen inorganic parameters were detected and screened against ESLs (Table 9-8). Only sulfate and iron exceeded their respective chronic ESLs but did not exceed the acute ESL. Detected SVOCs and VOCs included bis(2-ethylhexyl) phthalate, diethyl phthalate, di-n-butyl phthalate, phenol, 2-butanone, and acetone. None of these detected SVOCs and VOCs exceeded their respective ESLs.

Based on COPC maximum concentrations compared to their respective acute ESLs, no inorganic, VOC or SVOC parameters were identified for samples from location SW-2 or SW-8.

#### 9.2.3.2  SAMPLE LOCATION SW-1

COPCs that were detected at concentrations greater than the PQL are shown in Table 9-9. Those COPCs that were never detected in storm water at location SW-1 are provided along with the minimum, maximum, and mean detection limits as wells as their respective ESLs in **Attachment O, Table O-7**.

Storm water samples were collected twice in February 2019 at SW-1 (Table 9-4). At SW-1 there were 32 inorganic parameters detected at concentrations greater than the PQL together with nine VOCs or SVOCs. Eighteen inorganic parameters were detected and screened against ESLs (Table 9-9).

At the SW-1 location, there were several inorganic parameters detected, however, none exceeded their respective ESLs except iron (Table 9-9) which exceeded the chronic ESL. The following SVOCs and VOCs were detected and screened against ESLs: bis (2-ethyl hexyl) phthalate, diethyl phthalate, phenol, 2-butanone, 2-hexanone, 4-methyl-2-pentanone, acetone, ethanol, tetrahydrofuran. Of these, no ESLs were found for 2-hexanone and ethanol. None of the VOCs and SVOCs for which ESLs were available exceeded their respective ESLs.

Based on COPC maximum concentrations compared to their respective acute ESLs, iron is identified as a COPC during the leachate discharge. No VOC or SVOC parameters were identified as COPCs for samples from location SW-1.

### 9.2.4 STORM WATER SCREENING SUMMARY

Samples collected in 2021 and 2022 from the PSB (SW-1A) upgradient of the PSB (SW-1B), and off-site background upgradient of the facility (SW-2) showed varying results for parameters that exceeded their ESLs. The following parameters were identified as COPCs.

- SW-1A – aluminum, chromium, cobalt, copper, iron, selenium, vanadium, and zinc

- SW-1B – iron

- SW-2 – No parameters identified as COPCs

From the storm water data collected in 2019, iron was identified as a COPC for sample location SW-1. Background data (SW-2 and SW-8) indicated the maximum concentration of iron was higher in background (12.9 mg/L) than it was in the SW-1 location (4.26 mg/L) and sulfate was not identified as a COPC at SW-1. The 2019 data collected immediately after the leachate event indicate no COPCs from storm water for aquatic ecological receptors.

Storm water samples at SW-1A are indicative of the NRRWF storm water runoff and facility management of those storm waters and not the 2019 leachate discharge. COPCs that were screened against ESLs compared to background storm water concentrations of COPCs were several times higher than background in 2019 and 2022 and higher than the SW-1 discharge from the PSB during the leachate discharge (Table 9-10). COPCs identified for the SW-1A storm water samples may pose a risk to ecological receptors in the PSB, but it is not due to the leachate discharge, rather it is due to storm water flow paths and management under current operating conditions. The storm water runoff COPCs for SW-1A are not a result of runoff or leachate discharges from the upgradient module 4 storm water basins, rather they are the result of runoff from the soil stockpile and the haul road. Upon receiving the laboratory results on COPCs, the County implemented BMPs to address these issues.

# 10.0 HUMAN HEALTH RISK SCREENING AND COPC IDENTIFICAITON

A risk screening assessment was performed to evaluate potential risk for human health from preliminary COPCs associated with leachate discharges to storm water conveyances, including SWB-4 and the PSB; also known as the Conservation Easement, that occurred at the NRRWF in February and March 2019 (Section 2). The purpose of the human health risk screening process

is to identify if preliminary COPC concentrations exceed human health screening levels and to determine whether additional analysis would be needed to support risk management decisions for the facility. This screening-level risk analysis was performed according to guidance on screening-level human health risk assessments (HHRAs) provided by the California Department of Toxic Substance Control (DTSC) Human and Ecological Risk Office (HERO) Human Health Risk Assessment (HHRA) Note #4 (DTSC 2022a)[34], DTSC Note #3 (DTSC 2022b)[35], and DTSC's Preliminary Endangerment Assessment (PEA) Guidance Manual (DTSC 2015)[36].

This section consists of the following:

- Identification of preliminary COPCs and conceptual pathways model (CPM), which describes potentially exposed persons and exposure pathways;

- Presentation of the human health screening levels and screening methodology; and,

- Summary of human health risk screening assessment results.

## 10.1 HUMAN HEALTH RISK SCREENING METHODOLOGY

This section provides a summary of the human health risk screening components and methodology, consistent with DTSC guidance (DTSC 2015, 2022a, 2022b). The primary goal of the human health screening assessment is to evaluate risk from chemicals detected in exposure media at concentrations greater than laboratory detection limits (DTSC 2015, 2022a). Detected analytes are the focus of the quantitative screening process described in the sections below.

### 10.1.1 IDENTIFICATION OF PRELIMINARY COPCs

Based on storm water and soils sampling in 2019, some COPCs and toxicity values were identified (Attachment E, Table E-1 of the Investigative Work Plan [IWP]) and a preliminary list of COPCs was identified. These preliminary COPCs were then analyzed in storm water samples collected from two on-site locations (SW-1A and SW-1B) in December 2021 and March 2022 and 19 soil samples from 8 on-site soil locations collected in May 2022, as discussed in Section 4. Analytical results from on-site sampling in 2021/2022 are summarized with human health screening levels (SLs) in Tables 10-1 through 10-6. Off-site storm water and soil samples were also collected. All analytical lab reports are presented in Attachments D and F and compiled in an electronic Access database (Attachment M).

Preliminary COPCs detected in on-site soil samples at the NRRWF are metals and sulfate (Section 4, Table 10-3). Preliminary COPCs detected at storm water location SW-1A (located along the discharge flow of water pumped from SWB-4) in metals, nutrients, and acetone (Section 4, Table 10-4). At location SW-1B (located at the inlet of SWB-4 and representative of storm water flows generated by easterly upslope areas of the NRRWF and the south toe of WMU-4), preliminary COPCs are metals, oil and grease, nutrients, 2-butanone, acetone, and tert-Butyl

---

[34] California Department of Toxic Substance Control (DTSC). 2022a. Human and Ecological Risk Office (HERO) Human Health Risk Assessment (HHRA) Note Number 4, Guidance for Screening Level Human Health Risk Assessments, Issue Date: March 29, 2022. Available at https://dtsc.ca.gov/wp-content/uploads/sites/31/2022/02/HHRA-Note-Number-4-March-2022-A2.pdf.
[35] California Department of Toxic Substance Control (DTSC). 2022b. Human and Ecological Risk Office (HERO) Human Health Risk Assessment (HHRA) Note Number 3, DTSC-modified Screening Levels (DTSC-SLs), Release Date: June 2020 – Revised May 2022. Available at https://dtsc.ca.gov/wp-content/uploads/sites/31/2022/02/HHRA-Note-3-June2020-Revised-May2022A.pdf.
[36] California Department of Toxic Substance Control (DTSC). 2015. Preliminary Endangerment Assessment (PEA) Guidance Manual. State of California, Environmental Protection Agency, Department of Toxic Substances Control. January 1994 (Revised October 2015).

alcohol (Section 4, Table 10-4). It should be noted that acetone and 2-butanone are known to be common laboratory contaminants (USEPA 1992)[37]. Storm water samples from both locations also had measurable concentrations of general chemistry and physical parameters.

For completeness, concentrations of non-detected analytes, ranges of laboratory detection levels (i.e., method detection limits [MDLs] and practical quantitation limits [PQLs]), and human health SLs are provided in **Attachment P, Tables P-1 and P-2**. If the detection limits of non-detected analytes are higher than the corresponding SLs, then there is the possibility of undetected risk. This is a source of uncertainty in this evaluation. However, the available evidence from evaluation of 220 analytes in soil and 212 analytes in storm water suggests that there is not widespread, undetected risk from VOCs and SVOCs at the facility. The majority of VOCs and SVOCs are rarely detected in soil or storm water; the organic chemicals that were detected in storm water, were not detected in soil; and the detected organic compounds had low concentrations. These non-detected analytes are not discussed further in this section.

### 10.1.2 HUMAN HEALTH CONCEPTUAL PATHWAYS MODEL (CPM)

A Conceptual Pathways Model (CPM) identifies how humans may be exposed to site contaminants. It outlines contaminant sources, mechanisms of chemical release from source areas, routes of exposure, and exposure scenarios for potentially exposed populations. The identified preliminary human health exposure pathways in a Conceptual Pathways Model (Attachment H of the IWP), which is presented here in Figure 10-1.

The CPM identifies three potential receptors – area residents, site workers, and site visitors. Area residents live in the vicinity of the Site; no residents currently live on-site at NRRWF. Given the source and transport mechanisms, the relevant pathways that were considered in this human health screening evaluation include:

- Soil to plant uptake – dermal contact (for site workers and site visitors)

- Soil to air dispersions – inhalation (for area residents, site workers, and site visitors)

- Soil to air dispersions – dermal contact (for site workers and site visitors)

- Surface water – dermal contact (for site workers and site visitors)

The CPM also identifies a potential ingestion exposure route from soil to groundwater for ingestion by area residents. The IWP did not include investigation of exposure pathways through groundwater, because groundwater will be monitored separately in accordance with the Regional Water Board's Waste Discharge Requirements. Therefore, the soil-to-groundwater ingestion pathway is not evaluated in this screening-level risk assessment.

---

[37] U.S. Environmental Protection Agency (USEPA). 1992. Guidance for Data Useability in Risk Assessment (Part A). OSWER Directive 9285.7-09A, Final report. Office of Emergency and Remedial Response. April 1992.



**Figure 10-1 Human Exposure Conceptual Pathways Model**

In general, HERO (DTSC 2022a) recommends that a residential scenario be assumed for site screening at all facilities because HERO assumes that reuse of hazardous waste sites could result in a change of ownership and land use, including potential residential reuse of the property. For active facilities, HERO considers the residential scenario evaluation to be a health-conservative approach. Sites with acceptable risk under the hypothetical future residential land use scenario will likely have acceptable risk to the other potentially exposed current receptor populations identified in the CPM (Figure 10-1). It is assumed that a hypothetical future residential population would be more exposed than other receptors because the exposure scenarios include children, longer durations of exposure, and a variety of exposure routes.

Residential SLs are calculated by assuming reasonable maximum exposure (RME) to soil via pathways most frequently encountered by adults and children in a long-term residential setting. The exposure pathways included in the calculation of USEPA RSLs for soil are: incidental ingestion of soil, dermal absorption of nonvolatile chemicals in soil, and inhalation of airborne dust and volatile chemicals in ambient air. These pathways are inclusive of the potentially complete dermal and inhalation air dispersion pathways identified in the NRRWF CPM (Figure 10-1). The RSLs do not incorporate exposure by the site worker and visitor via dermal contact of plants and so this screening-level risk evaluation does not explicitly consider risk from that specific pathway. However, it is assumed that dermal contact to plants by site workers and visitors would be less exposure than RSL exposure scenarios.

Residential tap water SLs are calculated by assuming long-term residential exposure of adults and children to tap water via the following pathways: ingestion from drinking, dermal exposure, and inhalation of volatile chemicals generated during household use (e.g., showering, dish washing). Using these water SLs is a conservative approach to evaluating potential risk to current Site receptors because the only potentially complete storm water exposure pathway identified in the NRRWF CPM (Figure 10-1) is dermal contact by site workers and visitors with storm water. It

is expected that these SLs overestimate potential risk to current site visitors and workers that may have shorter exposures to dermal contact with intermittent storm water.

### 10.1.3 HUMAN HEALTH SCREENING LEVELS AND COMPARISON APPROACH

A basic risk screening approach is used to calculate the estimated risk or hazard posed by the maximum concentration of a constituent detected in sampled soils and storm water using an established human health-risk-based residential screening level as a comparator. DTSC HERO Note 3 (DTSC 2022b) lists the recommended DTSC-modified SLs for residential uses of soil and tap water. DTSC-SLs are the primary source of SLs for conducting a screening level risk assessment of environmental media at California sites, and USEPA Regional Screening Levels[38] (RSLs) (USEPA 2022) are used for contaminants for which a DTSC SL is not available (DTSC 2022a). Maximum contaminant levels (MCLs) were not used in this a screening risk evaluation because they are not risk-based levels (DTSC 2015; 2022a), and evaluation of regulatory thresholds for protection of a drinking water resource is outside the scope of this risk screening process. Further, ingestion of surface water (storm water) as a drinking water source is not identified as a potentially complete exposure pathway at this Facility (Figure 10-1).

DTSC SLs and USEPA RSLs are derived at a target risk level of $1\times10^{-6}$ (one in one million) and a target hazard quotient value of 1. When DTSC-SLs or USEPA RSLs are not available, ESLs developed by the SFBRWQCB[39] to be protective of human health in a residential setting are provided (SFBRWQCB 2019). Tables 10-1 and 10-2 provide a listing of the risk-based human health SLs used for evaluating soils and storm water, respectively.

An EPC is the concentration of a preliminary COPC in a medium at the location where a receptor is assumed to make contact. Based on DTSC 2022a, the maximum detected concentrations of preliminary COPCs are used as EPCs in this screening level risk evaluation. The basic screening risk equations for the sampled soil and storm water analytes are as follows:

- For a carcinogenic chemical: The screening concentration is based on a target cancer risk of one-in-a-million ($10^{-6}$) where:

  *Cancer Risk = Maximum COPC concentration x $10^{-6}$/ Screening Concentration*

- For a non-carcinogenic chemical: The screening concentration is based on a target Hazard Quotient (HQ) of one where:

  *Hazard Quotient = Maximum COPC concentration/Screening Concentration*

In this screening evaluation, cancer risk estimates and non-cancer hazard quotients are calculated for all detected chemicals with human health SLs (Tables 10-3 and 10-4). These estimates present risk and hazard associated with exposure to all detected chemicals, consistent with HERO guidance (DTSC 2022a). If cancer risks are greater than $1 \times 10^{-6}$ and/or noncancer hazards are greater than 1, then further investigation and/or a more site-specific, quantitative, baseline risk assessment may be necessary.

---

[38] U.S. Environmental Protection Agency (USEPA). 2022. Regional Screening Levels, Tables as of May 2022. Available at https://www.epa.gov/risk/regional-screening-levels-rsls.

[39] San Francisco Bay Regional Water Quality Control Board (SFBRWQCB). 2019. Environmental Screening Level (ESL) Microsoft Excel Workbook, 2019 (Rev. 2). January 2019.

Detected chemicals in both soil and storm water can be occurring at concentrations that are consistent with background. Per DTSC (2022a), risk and hazard associated with exposure to all detected chemicals should be evaluated prior to elimination of any inorganic chemicals that have concentrations consistent with site-specific background concentrations. All detected inorganics are included in this screening evaluation (Tables 10-3 and 10-4), and background concentrations are not subtracted from concentrations of the chemicals observed at the facility.

### 10.1.4 COMPARISON OF ON-SITE CHEMICALS WITH BACKGROUND

A comparison of on-site concentrations with background concentrations can be useful for identifying the non-site-related chemicals that are found at or near the site and metals present at levels equivalent to background can be eliminated as COPCs (DTSC 2015). The comparison process is as follows: If the maximum site metal concentration is less than the maximum background, the metal can be excluded as a COPC. Or, if the mean site metal concentration is equal to or less than the mean local background metal concentration, the metal can be excluded as a COPC.

As summarized in Section 4, there were 20 soil samples collected in May 2022 from nine locations in off-site areas around the perimeter of the NRRWF. The results are provided in Attachment F. In this screening assessment, concentrations of metals in on-site soils that exceed human health screening levels were then compared to off-site background results to assess overlap of the site and background data sets and whether metals can be excluded as COPCs.

In addition, two storm water samples were collected from location SW-2 in December 2021 (Section 4). Location SW-2 is in an area upslope and outside the boundary limits of the NRRWF with run-on storm water flows. The on-site concentrations from location SW-1A are qualitatively compared to concentrations in SW-2 samples to identify chemicals that are potentially occurring at ambient levels.

## 10.2 HUMAN HEALTH SCREENING RESULTS

Summary statistics for preliminary COPCs (count, detection frequency, range of detection limits, minimum and maximum detected concentrations, and overall mean) and comparison of the maximum detected concentrations to human health SLs are presented in Tables 10-3 and 10-4 for on-site soil and storm water, respectively.

For the on-site soil screening assessment, 15 preliminary COPCs with detected concentrations were compared to human health residential SLs to evaluate potential cancer risks and non-cancer hazards (Table 10-3). Comparison of maximum detected soil concentrations to applicable SLs did not yield any COPCs with respect to cancer risk for receptors at the NRRWF (Table 10-3). Two inorganic COPCs (cobalt and iron) were identified for further analysis based on exceedance of non-cancer SLs. These analytes are presented on Table 10-5. As shown, cobalt and iron on-site maximum and minimum concentrations are equal to or less than the off-site soil concentrations. Based on overall low concentrations, low hazard indices, and concentrations equivalent to background, these two analytes are excluded as COPCs in soils (Table 10-5). Industrial soil SLs are also provided on Table 10-5 for qualitative comparison; concentrations of Cobalt and Iron in soils at NRRWF are lower than SLs protective of industrial receptors. As discussed in Section 10.1.2, residential SLs were used in this evaluation because they offer a significant degree of protection for future hypothetical residents in addition to current industrial use of the facility and area residents. Comparing values to industrial scenario SLs provides additional qualitative screening information that may be used to evaluate receptors under current industrial use scenarios and to support risk management decisions.

For the on-site storm water screening assessment, 42 preliminary COPCs detected at location SW-1A and 48 preliminary COPCs detected at location SW-1B were compared to human health residential SLs to evaluate potential cancer risks and non-cancer hazards (Table 10-4). Evaluation of organic VOCs and SVOCs in on-site storm water using comparison to screening SLs did not yield COPCs. Comparison of maximum detected storm water concentrations to applicable cancer risk SLs at location SW-1A identified arsenic, chromium, lead, and nickel for further analysis (Table 10-6). Aluminum, arsenic, cadmium, cobalt, iron, lead, manganese, nickel, and vanadium were identified as potential human health COPCs based on exceedance of non-cancer SLs at location SW-1A (Table 10-6). At location SW-1B, arsenic, chromium, and nickel exceeded cancer risk screening levels and antimony, arsenic, manganese, and nitrate exceeded non-cancer hazard SLs (Table 10-4).

All 10 COPCs at on-site location SW-1A have higher maximum detected concentrations than occurred at off-site location SW-2 and also at upgradient background location SW-1B. To provide additional context, USEPA RSLs for the dermal component of residential exposure are presented on Table 10-6. Aluminum, cadmium, cobalt, iron, nickel, and vanadium have detected concentrations lower than the cancer or non-cancer dermal-specific RSLs. Comparing storm water concentrations at location SW-1A to residential dermal SLs provides additional qualitative screening information that may be used to evaluate receptors under current exposure scenarios and to support risk management decisions.

In summary, concentrations of two COPCs (cobalt and iron) in on-site soil samples and concentrations of 12 COPCs (aluminum, antimony, arsenic, cadmium, chromium, cobalt, iron, lead, manganese, nickel, vanadium, and nitrate) in on-site storm water samples exceeded conservative human health SLs. Comparison of on-site soil sample data for cobalt and iron to off-site background data indicates on-site cobalt and iron are indicative of background concentrations, therefore are not considered as COPCs in soils of the PSB. For on-site storm water samples, nitrate and antimony were only identified exceeding the SLs at SW-1B. The 10 COPCs identified for SW-1A had concentrations greater than the off-site background and upgradient SW-1B location are not from the leachate discharges from 2019, but are likely linked to runoff from the haul road and soil stockpile. Upon receipt of the laboratory results, the County implemented BMPs to address these COPCs.

In a screening-level risk evaluation, identifying chemicals with concentrations greater than SLs does not mean that these conditions represent unacceptable risk to human health or that remedial action will be required.

## 10.3  2019 RESULTS COMPARED TO 2021/2022 RESULTS

The results from storm water samples collected at location SW-1 in February 2019 were qualitatively compared to the recent results obtained in 2021 and 2022 to assess how conditions have changed. Table 10-7 provides summary statistics (count, detection frequency, range of detection limits, minimum and maximum detected concentrations, and overall mean) for chemicals detected at location SW-1 in 2019. The table also provides comparison of the maximum detected concentrations at SW-1 to human health SLs. Two metals (dissolved arsenic and dissolved chromium) in storm water collected from SW-1 in 2019 exceeded human health SLs. As summarized in Section 10.2, 10 metals from location SW-1A (including arsenic and chromium) exceeded human health SLs.

Table 10-8 provides a summary of 2019 results from SW-1 to corresponding results from storm water samples at SW-1A in 2021/2022 and off-site storm water samples from locations SW-2 and SW-8 collected in 2019. The VOCs and SVOCs that were detected at SW-1 in 2019 were not detected at SW-1A in 2021/2022. However, metals concentrations in recent samples collected from SW-1A were generally higher than in the 2019 samples from SW-1. It should be noted that the metals results were for the dissolved fraction in 2019 and for the total fraction in 2021/2022. Further, storm water samples from 2021/2022 had much higher levels of Total Suspended Solids (TSS) and turbidity indicative of surficial runoff and is not related to the leachate discharge.

## 10.4 HUMAN HEALTH RISK SCREENING SUMMARY

Concentrations of two COPCs (cobalt and iron) in on-site soil samples exceeded conservative human health risk Screening Levels (SLs). However, cobalt and iron on-site maximum and minimum soil concentrations were equal to or less than the off-site soil concentrations, therefore, these two analytes are excluded as COPCs in soils. For soils in the PSB, there were no COPCs identified at concentrations greater than human health SLs or off-site background concentrations. Potential human health risks due to soil exposure is considered de-minimus.

Concentrations of 12 COPCs from on-site storm water samples from SW-1A and SW-1B, including aluminum, antimony, arsenic, cadmium, chromium, cobalt, iron, lead, manganese, nickel, vanadium, and nitrate exceeded conservative human health Screening Levels (SLs). Of these only antimony and nitrate were unique to SW-1B with arsenic and manganese common between both sites. Ten COPCs were identified for the SW-1A storm water samples that enter the PSB and may pose a risk to human health in the PSB, but these COPCs are not due to the leachate discharge, but appear to originate from the soil stockpile and the haul road and the County has addressed those COPCs by installing BMPs at the soil stockpile and haul road.

# 11.0 CONCLUSIONS

The February 2019 leachate discharges from the NRRWF to the PSB were evaluated through a series of data collection efforts and evaluation of those data to assess potential risks to ecological and human health receptors. A wetland survey was completed at the PSB in December 2020 and March 2022 which delineated a 1.35-acre seasonal wetland in the PSB. Review of the plant species present suggests that the wetland in the NRRWF PSB is not a high-quality wetland habitat for wildlife. Vegetation surveys were completed at the PSB in 2022 and additional data from as far back as 2013 were examined to evaluate whether the leachate discharge impacted the vegetation in the PSB. Review of reports from 2013 to 2016 and 2018 detailing prior vegetation surveys in the PSB revealed that the reported data were insufficient to perform a pre-leachate assessment beyond a qualitative assessment of the species present within the Study Area. Based on the available information it appeared that the leachate event did not reduce the extent of the wetlands or other waters within the PSB.

The T&E species survey concluded there is no suitable habitat for listed species to reside or reproduce within the Study Area. There is a low potential for tricolored blackbird and Swainson's hawk to forage within the Study Area.

Compilation and evaluation of soil data collected in 2022 found that most chemical concentrations were less than their respective PQLs. Some inorganic chemical parameters were detected and screened using maximum soil concentrations compared to ESLs and yielded only two parameters

with concentrations greater than the ESLs (e.g., manganese and vanadium). Both of these COPCs when compared to off-site background soil concentrations were less than the maximum and mean off-site soil concentrations. Based on the screening of NRRWF on-site and off-site soil concentrations, no COPCs were identified that exceeded conservative risk-based ESLs or background concentrations.

Storm water samples from both on-site and off-site locations were compared to ESLs for aquatic ecological receptors. Laboratory analytical results were initially screened based on detection status relative to respective PQLs. Potential COPCs that were detected at concentrations greater than their respective PQLs were screened against acute ESLs for surface water using the maximum measured concentrations for each COPC. For storm water data collected in 2019, iron was identified as a potential COPC for sample location SW-1. Background data (SW-2 and SW-8) indicated the maximum concentration of iron was higher in background (12.9 mg/L) than it was in the SW-1 location (4.26 mg/L) and sulfate was not identified a COPC at SW-1. The 2019 data collected immediately after the leachate event indicated no COPCs from storm water for aquatic ecological receptors that exceeded ESLs or background concentrations.

Storm water samples collected in 2021 and 2022 from the PSB (SW1A) upgradient of the PSB (SW-1B), and off-site background upgradient of the facility (SW-2) showed varying results for parameters that exceeded their ESLs. The following parameters were identified as COPCs.

- SW-1A - aluminum, chromium, cobalt, copper, iron, selenium, vanadium, and zinc

- SW-1B – iron

- SW-2 - No parameters identified as COPCs

Storm water samples at SW-1A were indicative of the NRRWF storm water runoff from the haul road and stock piles and not the 2019 leachate discharge. COPCs that were screened against ESLs compared to background storm water concentrations of COPCs were several times higher than background in 2022 and 2019 and higher than the SW-1 discharge from the PSB during the leachate discharge. COPCs identified for the SW-1A storm water samples may pose a risk to ecological receptors in the PSB, but potential risks are not likely due to the leachate discharge, rather current potential risks are from storm water runoff from the soil stockpile and the haul road. Upon receipt of the laboratory results, the County installed BMPs to address these runoff issues.

Storm water biotoxicity testing was conducted on a sample from SW-1B at the NRRWF collected on March 15, 2022. This sample site is in close proximity to WMU-4 where leachate discharges had occurred in February 2019 and would represent a sample site receiving leachate discharges from WMU-4. Based on the toxicity data, no significant toxic effects were observed for fathead minnow larval survival and growth, and *Ceriodaphnia* survival and reproduction. While there was a significant difference observed between the control and site water *Selenastrum* growth results, the difference was for greater growth in the Site water sample versus control. Increased growth in algal Site water samples indicates the presence of nutrients that stimulate growth

A risk screening assessment was performed to evaluate potential risk for human health from preliminary COPCs associated with leachate discharges to storm water conveyances, including SWB-4 and the PSB that occurred at the NRRWF in February and March 2019. Concentrations of two COPCs (cobalt and iron) in on-site soil samples exceeded conservative human health SLs; however, the mean and maximum on-site soil concentrations for these COPCs were equal to or

less than the off-site background mean and maximum concentrations, thus no human health COPCs were identified for on-site soils.

Concentrations of 12 COPCs (aluminum, antimony, arsenic, cadmium, chromium, cobalt, iron, lead, manganese, nickel, vanadium, and nitrate) in on-site storm water samples exceeded conservative human health SLs. Nitrate and antimony were only identified exceeding the SLs at SW-1B. The 10 COPCs identified for SW-1A had concentrations greater than the off-site background and upgradient SW-1B location and are not the result of leachate discharge from 2019.This conclusion is drawn from the fact that the 2019 storm water samples at SW-1 resulted in two COPCs, arsenic and chromium and both those COPC concentrations were less than off-site background mean and max concentrations from 2019 when the leachate discharge occurred. Potential human health risk identified for storm waters from samples collected at SW-1A do not appear to be indicative of the 2019 leachate discharge, but rather  storm water runoff from the haul road and stockpile. The County has installed BMPs to address the runoff from the haul road and soil stockpile.

The leachate discharges did not result in COPCs being identified in PSB soils that posed a risk to ecological or human receptors.  Vegetative communities appear to be unchanged due to the leachate discharge and no special status, species or concern or T&E species were found to be present in the PSB.  In a single storm water sample collected, no toxicity was identified for two species (fish and invertebrate) and algal cell growth increased due to nutrient concentrations. There were no leachate discharges that flowed off-site or into the tributary to Hamlin Slough. Storm water data collected in 2021 and 2022 indicated that at the location receiving storm water runoff into the PSB, COPCs identified as posing a potential risk to ecological receptors and human health were indicative of runoff from the haul road and stock piles and not the 2019 leachate discharge.

# 12.0  LIMITATIONS

This Investigative Final Report was written in general conformance with the State Water Resources Control Board, Office of Enforcement, Water Code Section 13267, Investigative Order WQ 2020-0036-EXEC. This Investigative Final Report is based on visual observations made during site reconnaissance and information submitted by the Butte County Public Works Department. A review of the Facility compliance with state and local zoning, building, and electrical codes was not included as a scope of work.  The Butte County Public Works Department is solely responsible for the continued compliance with State and Federal permits applicable to the Neal Road Recycling and Waste Facility. Compliance SFO, Inc., and Formation Environmental, LLC, do not guarantee, assure, or warrant that regulatory non-compliance issues will not occur at the Neal Road Recycling and Waste Facility in the future.

**FIGURES**

TABLES

**Tables 7-1, 7-2, and 8-1**

Tables 9-1 to 9-10

**Tables 10-1 to 10-8**

**ATTACHMENT A**

Investigative Order and Time Extension Requests

**Water Code Section 13267**
**Investigative Order WQ 2020-0036-EXEC**

**Time Extension Request Letter**
**March 3, 2022**

**Time Extension Request Letter**
**September 30, 2022**

ATTACHMENT B

PowerPoint Presentation

**ATTACHMENT C**

**February 2019 Storm Water Sampling Analytical Data**

**February 14, 2019 Storm Water Sampling Analytical Report**

**February 26, 2019 Storm Water Sampling Analytical Report**

# ATTACHMENT D

## Storm Water Basin Number 4 Remediation Report

**ATTACHMENT E**

**2021 – 2022 Storm Water Sampling Laboratory Analytical Data**

**Storm Water Samples Analytical Data**
**(December 13, 2021)**

**Storm Water Samples Analytical Data**
**(December 22, 2021)**

**Storm Water Samples Analytical Data**
**(March 15, 2022)**

**ATTACHMENT F**

Water Board Soil Sampling Inspection Reports

**Visual Inspection Report**
**May 25, 2022**

**Visual Inspection Report**
**May 26, 2022**

**ATTACHMENT G**

**Soil Borings Analytical Reports**

**Off-Site Soils Laboratory Analytical Report**

**On-Site Soils Laboratory Analytical Report**

**ATTACHMENT H**

**Dedicated Field Notebook**

ATTACHMENT I

Storm Water and Soil Sampling Photos

**ATTACHMENT J**

**Biotoxicity Analytical Data**

ATTACHMENT K

Wetland Delineation  Map

**ATTACHMENT L**

**Vegetation Survey Report**

ATTACHMENT M

Threatened and Endangered Species Evaluation Report

**ATTACHMENT N**

Access Database for Storm Water and Soil Data (Electronic)

**ATTACHMENT O**

**Soil and Storm Water Non-Detect Data From Ecological Screening**

**ATTACHMENT P**

Soil and Storm Water Non-Detect Data From Human Health Screening

# CERTIFICATION

This *Investigative Final Report* has been prepared at the request of State Water Resources Control Board personnel to provide investigative information and data completed to date as required by a State Water Resources Control Board, Office of Enforcement, Water Code Section 13267, Investigative Order WQ 2020-0036-EXEC. The *Investigative Final Report* has been prepared by a California Registered Professional Geologist, pursuant to Section 7850 of the Business and Professional Code.

*"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

Prepared By:

*Wesley P. Greenwood*
Wesley P. Greenwood, P.G., QISP
Senior Geologist, COMPLIANCE SFO, INC.

PROFESSIONAL GEOLOGIST
WESLEY P. GREENWOOD
No.8669
Exp. 08/31/23
STATE OF CALIFORNIA

_____
Sean Covington
Senior Toxicologist, Formation Environmental, LLC

_____
Ginger Fodge
Madrone Ecological Consulting

Reviewed By:

_____
Joshua Pack, P.E.
Director
Butte County Public Works Department

# EXHIBIT G

**To Defendants' Appendix of Exhibits**
**in Opposition to Plaintiff's Motion for Partial Summary Judgment**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

CALIFORNIA OPEN LANDS, a non- )
profit land trust organization)

        Plaintiff,    )

     vs.           )  No. 2:20-cv-00123-DJC-DMC

BUTTE COUNTY DEPARTMENT OF   )

PUBLIC WORKS, a political    )

subdivision of the State of  )

California, DENNIS SCHMIDT,   )

an individual, and ERIC     )

MILLER, an individual,      )

        Defendants.   )

_____)

**CERTIFIED TRANSCRIPT**

Deposition of

EXPERT WITNESS

SEAN COVINGTON

Wednesday, October 25, 2023

Reported by:  SHERYL DIRKS, CSR #3513 (VIA ZOOM)





UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--


CALIFORNIA OPEN LANDS, a non- )

profit land trust organization)

        Plaintiff,    )

      vs.             )  No. 2:20-cv-00123-DJC-DMC

BUTTE COUNTY DEPARTMENT OF   )

PUBLIC WORKS, a political     )

subdivision of the State of   )

California, DENNIS SCHMIDT,   )

an individual, and ERIC      )

MILLER, an individual,       )

        Defendants.   )

  _____)

**CERTIFIED TRANSCRIPT**


Deposition of

EXPERT WITNESS

SEAN COVINGTON

Wednesday, October 25, 2023


Reported by:  SHERYL DIRKS, CSR #3513 (VIA ZOOM)

```
 1                    A P P E A R A N C E S  (VIA ZOOM)

 2                              --oOo--

 3    FOR THE PLAINTIFF:

 4          LAW OFFICES OF ANDREW L. PACKARD

 5          BY:  WILLIAM N. CARLON, Attorney at Law

 6          245 Kentucky Street, Suite B3

 7          Petaluma, California 94952

 8          707.782.4060

 9          wncarlon@packardlawoffices.com

10

11    FOR THE DEFENDANTS:

12          ABBOTT & KINDERMANN, INC.

13          BY: GLEN C. HANSEN, Attorney at Law

14          BY:  DIANE G. KINDERMANN, Attorney at Law

15          2100 21st Street

16          Sacramento, California 95818

17          916.201.5701

18          ghansen@aklandlaw.com

19

20

21

22

23

24

25                              --oOo--
```

1        I N D E X   O F   E X A M I N A T I O N

2

3                                                          PAGE

4     BY MR. CARLON ..................................... 4

5

6

7              I N D E X   O F   E X H I B I T S

8

   Consecutively Numbered        Description              Page
9

10   Exhibit 1     Plaintiff's Amended Notice of Deposition  88
                   of Sean Covington
11
   Exhibit 2     Sean M. Covington resume                  88
12
   Exhibit 3     Expert Opinions of Sean Covington         88
13
   Exhibit 4     Executive Summary                         88
14
   Exhibit 5     Table 1 - Comparison of Detected          88
15                Chemical Concentrations in Off-Site
                  Storm Waters
16

17

18

19

20

21

22

23

24

25                    --oOo--

```
 1   A.        Correct.
 2   Q.        And you have a Bachelor of Science in Biology you
 3   got in 1988; is that correct?
 4   A.        Correct.
 5   Q.        Do you have any experience with the Industrial
 6   General Permit for California storm water discharges?
 7   A.        I do not.
 8   Q.        And do you have any expertise around storm water
 9   management in general?
10   A.        I don't do storm water management.
11   Q.        I'm dropping another document into the chat.
12   Marking this as Exhibit 3.
13   A.        Okay.
14   Q.        Please let me know when you're able to open it.
15   A.        Okay.  I got it open.
16   Q.        Do you recognize this document?
17   A.        I do.
18   Q.        What is it?
19   A.        It's my expert report.
20   Q.        And does this look like a true and correct copy of
21   your expert report?
22   A.        It does.
23   Q.        Are all of the opinions that you intend to testify
24   to at trial in this matter contained within this report?
25   A.        Yes.
```

```
 1   Q.        And you don't have any other opinions that you're
 2   formulating right now that you intend to offer at trial?
 3   A.        No.
 4   Q.        And you're charging $350 an hour to provide this
 5   testimony; is that correct?
 6   A.        Yes.
 7   Q.        So the Purpose and Objectives section of this report
 8   you describe this regulatory process where the State Water
 9   Resources Control Board required the County to develop and
10   submit an Investigative Work Plan and Investigative Final
11   Report.  Do you see that?
12   A.        I do.
13   Q.        And is that -- that's your recollection of the
14   events that occurred?
15   A.        Yes.
16   Q.        Is that why you were brought on board to this case?
17   A.        I was brought on board to help with the final
18   assessment.  I had no involvement in the initial Work Plan.
19   Q.        The Final Report?
20   A.        The Final Report.
21   Q.        And so the Work Plan was developed and then you were
22   brought on to do some work for the Final Report?
23   A.        Yeah.
24   Q.        The last paragraph of that section says that you
25   were retained to serve as an expert witness relative to
```

1  A.       Many of those chemicals are attracted to carbon and

2  they bind with carbon.  Many of them also are attracted to

3  different components of the soil and they bind with those

4  materials.

5  Q.       Is there a test or some sort of analysis that you

6  can do to determine whether SVOCs are present from binding

7  to that carbon or is there a way to determine whether

8  they've been bound up?

9  A.       You can look at the chemical composition of the soil

10 and also the carbon content and estimate relationships of

11 the two, but the most common practice is simply to sample

12 the soil, measure the chemical composition and rely on the

13 results of the output from the analytical method.

14 Q.       A couple of acronyms that will probably come up here

15 are chemicals of potential concerns, COPC.  And ecological

16 screening levels, ESLS.  And in Opinion Number 1 you use

17 both.  Your opinion is that there were no leachate discharge

18 concentrations of COPCs and storm water that flowed outside

19 or into the unnamed tributary to Hamlin Slough in 2019 that

20 exceeded ESLs or background concentrations; is that correct?

21 A.       Correct.

22 Q.       That is your opinion?

23 A.       That is my opinion.

24 Q.       And what is the basis for that opinion?

25 A.       Um, there were storm water samples from 2019 that

1    it was May 2022.  Yeah.

2    Q.       Did you look at any soil samples from 2019?

3    A.       I don't believe we had soil samples from 2019 in the

4    PSB.

5    Q.       But there were soil samples from somewhere else?

6    A.       I think in the Storm Water Basin 4 is where the soil

7    samples were.

8    Q.       And so when you say "on-site terrestrial receptors"

9    you're talking about specifically within the PSB?

10   A.       Correct.

11   Q.       So this opinion is wholly limited to the PSB.  It's

12   not -- well, let me just end the question there.

13   A.       Yeah.  It's specific to the PSB.

14   Q.       Okay.  And then Opinion 5 goes to the human health

15   risks due to on-site soil exposure, and it's your opinion

16   that's considered de minimus; is that correct?

17   A.       Correct.

18   Q.       And the basis for that opinion is the same as

19   Opinion 4; is that correct?

20   A.       Correct.

21   Q.       And, again, when you're talking about on-site soil

22   exposure, you're only talking about soil within the PSB.

23   Correct?

24   A.       Correct.

25   Q.       Okay.  And then Opinion 6 sounds awfully familiar

```
 1   because it closely mirrors Opinion Number 1.  Correct?
 2   Except the distinction here you're talking about human
 3   health screening levels?
 4   A.      Correct.
 5   Q.      And, again, we don't know specifically which
 6   screening levels were chosen based on the information in
 7   this report.  Correct?
 8   A.      Um, specifically which ones, no.  It's either in the
 9   final report or it's in earlier drafts.  So the specific
10   leachate, you know, human health screening levels, you know,
11   where they came from whether it was DTSC or EPA, is not
12   identified in this expert report.
13   Q.      In your report you referenced Table 11.  That's
14   Table 11 of the Final Report?
15   A.      Table 11 of the expert report.  Did you find it?
16   Q.      Yeah.  I have it here.
17   A.      Actually this screening table does include the
18   source for every, particularly for the non-cancer.  And it
19   looks like for the cancer screening levels we included the
20   source in those tables.  So you can see in Table 11, I don't
21   know, arsenic, for example, it says it looks like it was the
22   DTSC screening level.
23   Q.      These were sent separate from your report.  So
24   that's why they weren't included in the first, I guess,
25   Exhibit Number 3.  I'm going to mark the table as Exhibit 5
```

 1              I, SHERYL DIRKS, a Certified Shorthand Reporter,

 2     licensed by the State of California, being empowered to

 3     administer oaths and affirmations pursuant to Section

 4     2093(b) of the Code of Civil Procedure, do hereby certify:

 5              That the witness named in the foregoing deposition

 6     was present at the time and place specified, and was by me

 7     sworn to testify as to the truth, the whole truth, and

 8     nothing but the truth;

 9              That the said proceeding was taken before me, in

10     shorthand writing, and was thereafter transcribed, under my

11     direction, by computer-assisted transcription;

12              That the foregoing transcript constitutes a full,

13     true and correct report of the proceedings which then and

14     there took place; that I am a disinterested person to the

15     said action.

16     _____   Reading and signing was requested.

17     _____   Reading and signing was waived.

18     __X_____   Reading and signing was not requested.

19              IN WITNESS WHEREOF, I have hereunto subscribed my

20     signature on this 6th day of November, 2023.

21

22     _____

23     SHERYL DIRKS, CSR
       Certified Shorthand Reporter
       California License #3513

24

25



## Sean M. Covington, M.S.
Senior Aquatic Biologist

### Experience Summary

Mr. Covington has 30 years of experience in environmental research and consulting with particular expertise focusing on aquatic ecosystems and water and sediment quality evaluations. His career has focused on aquatic ecological monitoring to assess chemical, physical, and biological integrity of aquatic ecosystems, site-specific standards development, aquatic ecological risk assessment (ERA), aquatic toxicology, and overall water quality assessment. Recent and on-going projects include development of monitoring plans for high elevation wetlands in Chile, evaluation of leachate from a large landfill in Northern California, site-specific criteria development for selenium in southeast Idaho, continued aquatic ecological monitoring for streams around several southest Idaho mines, and aquatic ecological risk evaluation for aquatic storage and retrieval ground water injection wells for Kissimmee River in South Florida.

### Project Experience

#### Recent work

**Maricunga Wetlands, Chile.** Develop a monitoring plan for water quality and biota to evaluate long term recovery of high altitude wetlands in Chile impacted from mining where water use and withdraw has impacted wetlands. Cessation of water withdraw and other mitigation approaches are now being implemented to restore wetland structure and function.

**South Florida Water Management District, Florida.** Assisting in development and planning for aquatic ecological risk assessment of aquatic storage and retrieval of Kissimmee River water. Long term storage of water during heavy water years is being planned as an augmentation for water during drought periods, therefore, water stored in underground aquifers released to the environment must be adequately protective of Lake Okeechobee ecosystem which is fed by the Kissimmee River.

**Sage Creek, Idaho.** Project lead in developing a site-specific selenium criterion for Sage Creek tributaries. Studies involved those similar to studies described below.

**Northern California Landfill.** Assess ecological and human health risks due to a leachate spill from excessive storm water runoff.

**Snake River, Oregon.** Develop and implement a study to assess flow and temperature for a warm water discharge from a facility into a cold water system. Conduct long-term monitoring to assess size, duration, and magnitude of the effluent plume and potential effects on trout.

**Salton Sea, California.** Developed a thorough summary of years of Salton Sea ecological data to evaluate potential for irrigation operations and water management to contribute to potential selenium effects for aquatic and avian receptors.

#### Expert Witness

**Confidential Client, Texas.** Retained as an expert for evaluating the potential effects of residual chlorine in potable water related to a downstream fish kill and ensuing enforcement action by the TCEQ.

**Lake Conroe, Texas.** Retained to review expert testimony and provide expert witness for a proposed deep water discharge of treated effluent and the potential effects of additional nutrient loading to a eutrophic reservoir.

**Lockhart Ponds, Texas.** Retained as a sediment quality expert to assess a diesel fuel spill into adjacent farm ponds on private property.



EXHIBIT
10/25/23 Covington
2

1

*Sean M. Covington*

### Criteria, Standards, Risk –Based Thresholds, and UAA Development

**South Florida Water Management District, Florida.**  Collaborated with Formation ecologists to develop Sediment Quality Benchmarks for screening District soils/sediments. Assisted in the C9/C11 selenium bioaccumulation studies to evaluate *Lumbriculous* bioaccumulation in site-specific soils under flooded conditions.

**Sage Creek, Idaho**. Project lead in developing a site-specific selenium criterion to modify the State of Idaho's selenium criterion for Sage Creek and tributaries. Studies conducted are included in EPA's 2016 National selenium criterion document. Studies included site-specific assessments of chemical quality in biotic and abiotic media, toxicity testing, biological community quality and physical habitat quality. Reproductive studies for wild captured adult brown trout and Yellowstone cutthroat trout were conducted to assess maternal transfer effects of bioaccumulated selenium on trout fry survival and deformities. The criterion has been adopted by IDEQ and approved by EPA.

**Humboldt River, Nevada.**  Aquatic criteria expert for developing risk-based thresholds for molybdenum, boron, fluoride, ammonia, dissolved solids, and pH to support alternative protective beneficial use values in Nevada's existing criteria for protecting designated uses.

**Northern California**. Researched the toxicological properties of magnesium chloride to assess the potential effects of a spill into a northern California headwater creek. Risk thresholds were evaluated to aid site managers in making decisions about potential cleanup actions.

**White Pine, Michigan.**  Managed several toxicological studies designed to provide additional toxicity test data for recalculation of the State's strontium, lithium, and manganese Tier II standards. Managed a water effects ratio study for copper to increase the discharger's copper limit. The WER study was submitted to the State and accepted for amending the facility's discharge permit.

**Iowa Gulch, Leadville, Colorado.**  Provided technical assistance in development of an alternative stream classification to the State of Colorado's proposed actions for the lower segment of Iowa Gulch, a tributary to the Upper Arkansas River in Colorado. The proposal was accepted by the State and provides a three- year period during which water quality data will be collected to support a use designation for the stream segment.

**Boise River, Boise, Idaho.**  Assessed fluoride effluent limits and permit limit development for a southern Idaho industrial discharger by deriving wasteload allocations for the City's wastewater treatment plant discharges that received the industrial discharge. Developed a bibliography of fluoride reference documents on the effects of fluoride to aquatic life in preparation for assessing alternative criteria development.

**Rio de Flag, Flagstaff, Arizona.**  Implemented a series of studies to develop a site-specific copper standard for a small effluent dominated stream in Flagstaff. Studies included developing a screening-level copper translator; characterizing copper to track it through the City's distribution system, including potable water wells and lakes, wastewater treatment plant (WWTP) influent, and WWTP effluent;  training City staff for collecting metals samples using clean techniques and collecting river flow data; conducting an assessment of the aquatic community; evaluating potential habitat for a threatened and endangered (T&E) bird species; assessing laboratory toxicity data for the development of a water-effects ratio; and performing a screening level ecological risk assessment to evaluate potential risks of copper to the aquatic community. The final document compiled the weight of evidence for the site-specific standard which was accepted by the State and Region 9.

**Animas River, Silverton, Colorado.**  Conducted field studies to evaluate the Colorado WQCD's proposed changes in designated uses for several segments on the upper Animas River. Fish populations, habitat, ambient water quality, metal precipitates, and benthic macroinvertebrate density and diversity were sampled and evaluated.

**South Platte River, Denver, Colorado.**  Managed field studies designed to provide data on the abundance, composition, and tolerances of fish in an effluent dominated river to low dissolved oxygen (DO) to develop site-specific DO standards. Over a two-year period, adult, juvenile, and fry fish species in about 30 miles of the South Platte River were sampled along with DO and physical habitat. Study included intensive DO monitoring using continuous and discreet measurement methods, habitat assessment, as well as ambient toxicity testing. Biological, physical, and toxicity testing data were formulated into a series of documents that provided the weight of evidence for a

2

*Sean M. Covington*

proposed site-specific DO standard.

### *Ecological Risk Assessment/Ecological Toxicology*

**Animas River, Colorado.**  Aquatic risk assessment lead for conducting biological and physical assessments of about 2 miles of the upper Animas River to evaluate historic mining influences on the aquatic community. Investigations also included acute surface water toxicity testing and 10-day amphipod sediment toxicity testing. The data were compiled to evaluate current and future ecological risks in the Upper Animas River.

**Las Brisas Energy Center, Texas.**  Project manager for the conduct of a prospective ERA for the proposed Las Brisas Energy Center on the Corpus Christi Ship Chanel. Risks of COCs from the proposed petroleum coke burning power facility were estimated by modeling concentrations in environmental media from aerial deposition rates. T&E species were evaluated for potential risks posed by metals over a 30 square kilometer area.

**Central Texas Power Plant ERAs, Texas.**  Project manager for conducting ERAs for historical and active power generation facilities operated by the Lower Colorado River Authority in La Grange and New Braunfels, Texas.

**Southeast Idaho Ecological Risk Assessments.** Developed the aquatic ERAs for select streams in the Salt and Upper Blackfoot River Basins for CERCLA compliance actions where selenium was the primary risk driver at two mine sites.

**Rio Grande River, New Mexico.**  Collaborated with Tetra Tech to develop an ERA for Rio Grande Silvery Minnow in the middle Rio Grande. The ERA evaluated water quality, sediment quality, and fish tissue residue data to assess potential chemical contaminant risks from USFWS and USGS data.

**Las Vegas Wash, Nevada.**  Conducted a screening level ERA for Las Vegas Wash relative to its potential impacts on Las Vegas bay arm of Lake Mead and the endangered razorback suckers. In a separate task, assisted in examining the potential ecological risks associated with the Selenium Watershed Management Plan that developed different flow scenarios for Las Vegas Wash water management.

**Mad River Slough and Arcata Bay, California.**  Co-authored the off-site ERA for dioxins and furans in sediments of Mad River Slough and Arcata Bay. Developed the sampling and analysis plan for a sediment investigation of Pentachlorophenol in sediments near an active sawmill facility.

**Magnet Cove, Arkansas.**  Aquatic ERA lead for evaluating multiple metals and low pH in streams surrounding a deep mine pit lake. Sampling was conducted for benthos, fish, periphyton, and habitat characteristics.

**East St. Louis, Illinois**.  Developed the sample and analysis plan for sampling historic waste deposits from an aluminum smelting facility. Sediment, waste bauxite, surface waters, wetland, and terrestrial soils were sampled for use in the ERA. Conducted the aquatic ecological risk assessment for this Site.

**Kirby, Texas.**  Conducted an expedited stream evaluation and risk screening under Texas' Ecological Risk Guidance to assess the potential for effects of a diesel pipeline leak in an industrial area to off-site receptors. PAHs, BTEX, and TPH were evaluated in sediments and habitats were considered to assess whether exposure pathways were complete.

**Cactus, Texas.**  Prepared a screening level risk assessment on sediments affected by a sewer overflow from the City's Wastewater treatment plant effluent that contained high concentrations of chromium from industrial discharges.  The assessment focused on geochemistry of chromium, its affects on bioavailability, and using toxicological properties of the different chromium species to evaluate ecological receptor's responses.

**Bonham and Ridgeway, Texas.**  Project manager for screening level risk assessments for water, soils and sediments of agrichemical processing, distribution, and land application sites affected by pesticides, including MSMA, DDT, dieldrin, and chlordane, among others. These assessments were conducted according to the State's Risk Guidance to assess appropriate decisions for property closure and/or remedial activities.

**Atlanta, Idaho.**  Prepared the aquatic baseline ERA to assess risks of tailings and metals from a mine tailings dam failure in southern Idaho to aquatic, terrestrial, and wetland communities. Performed the screening level ecological risk assessment for the terrestrial and wetland communities found at the site.

### *Natural Resource Damage Assessment*

3

**Willamette River, Oregon.** Worked with a team of scientists to assess potential risks of PCBs and PAHs to salmonids and their food supply in the Port area of the Willamette River. Assessment included evaluations and modeling of available fish habitat relative to concentrations of contaminants in sediments and estimates of injuries and damages due to contaminated sediments.

**NRDA in Two Texas Bays, Texas.** Aquatic resources lead to assess natural resource damages from historical contaminant influences and anthropogenic activities. Evaluated historic and current trends in Nueces bay productivity relative to Trustee damage claims. In the J.D. Murphree wildlife management area (WMA), conducted habitat equivalency analysis for mitigation of a 42-inch LNG pipeline corridor through the WMA.

**Arkansas River, Colorado.** Developed the surface water quality, ground water quality, sediment, and habitat characterizations based on existing data for an 11-mile stretch of the Arkansas River below the historic mining district at Leadville, CO. Reviewed historical as well as more current data to assist in the development of a large multi-parameter database. The resource characterization was part of a multidisciplinary team effort for multiple federal, state, and private parties to assess potential natural resource damages due to historical mining influences.

**Coeur d'Alene River, Idaho.** Member of consulting group for the mining companies in the CDARB natural resource damage assessment. Conducted literature reviews, examined trustee's claims for fishery and habitat injuries, and aided in developing of counter damages assessments.

**North Texas Municipality, Texas.** Retained as an expert to assess potential effects of a potable water spill into drainage ways where a local fish kill occurred.

### *Threatened and Endangered Species*

**Willamette River, Oregon.** Together with a regional fisheries biologist, NewFields developed the Biological Assessment (BA) to assess impacts to fish and terrestrial T&E species from implementation of a dredge and fill project at a marine ship terminal.

**EPA Region 10, Seattle, Washington.** Project manager for conducting the biological assessment of potential impacts of a proposed rail removal and trail development action over a 70-mile long railroad corridor to threatened and endangered species as part of a Section 7 consultation with the USFWS.

**Greybull River, Greybull, Wyoming.** Conducted the biological assessment (BA) and environmental impact assessment for a project that evaluated potential impacts of an off-channel reservoir to a northwestern Wyoming stream. For the EIS, assessed potential impacts of (1) altered hydrologic regimes and potential sedimentation on habitat availability for a native cutthroat trout and mountain whitefish populations, and (2) fluctuating water levels on productivity of a popular sport fishing reservoir. Also conducted the BA for the sturgeon chub, a T&E species.

### *Monitoring and Characterization*

**Upper Blackfoot River Basin, Idaho.** Developed a comprehensive characterization of the aquatic resources, habitat composition, and selenium concentrations from multiple agency and private firm datasets.

**Willamette River, Oregon.** Developed the 404(b)(1) assessment for a sediment dredge and fill project in a marine ship terminal. Potential impacts to both terrestrial and aquatic species were evaluated, along with alternatives which minimize the effects of dredge and fill material discharge.

**Sam Rayburn Reservoir, Texas.** Completed an intensive review and assessment of water quality data for the State's largest reservoir for TCEQ. The review focused on dissolved oxygen, nutrients, dioxin, and metals. Spatial and temporal trends were evaluated over a 10-year period.

**Houston Ship Channel, Texas.** Field team supervisor for a pre-dredge channel characterization of a portion of navigable channel leading off the Houston Ship Channel. Developed and implemented the SAP/QAPP for the field activities, which included deep sediment cores in navigable and ecological management units. Data were used to manage dredge disposal options and assess ecological and human health risks of sediments in non-dredging areas.

**Brazos River Basin, Texas.** Project manager for TMDL data collection efforts on three Central Texas River segments. Responsible for SAP development and adherence of field teams to methods and QA requirements. Worked with

4

Tetra Tech team members to develop QAPP and historical data assessment. Conducted final review of the UAA on Rocky Creek to assess proper use designation and/or alternative use classifications.

**Lavaca Bay, Texas.** Conducted surface water monitoring to characterize mercury and carbon tetrachloride in surface waters to assess the capture efficiency of a pump and treat groundwater recovery system. Ultra clean sampling techniques were used to conduct the sampling.

**Bateman Creek, Napa Valley, California.** Prepared the post monitoring evaluation report for ambient chemistry results to evaluate if discharge from a former mercury mine was significantly affecting downgradient surface water resources.

**Willow Creek, Creede, Colorado.** Conducted the preliminary site characterization for the Willow Creek watershed, a tributary to the Rio Grande. Prepared a report for the Willow Creek Reclamation Committee that reviewed and assessed existing data on chemical, physical, and biological quality of the system as well as historical mining activities that have impacted the watershed. Worked with the Committee to develop its 319 proposal for funding future efforts. Using funds from the 319 process, completed the first phase of water and biological quality sampling at about 70 sites within the watershed during low flows.

**Milltown Reservoir State Superfund Site, Missoula, Montana.** Collected water and sediment quality data in the reservoir, Clark Fork, and Blackfoot Rivers. Deep sediment cores were collected to look at vertical sediment strata and metals concentrations within those strata.

**Santa Margarita River, Temecula, California.** Served as the field coordinator for EPA Region 9 in a study that examined the diel dissolved oxygen dynamics of the Santa Margarita River in coastal southern California. The purpose of the study was to improve the scientific understanding of the nutrient assimilative capacities of the river to evaluate maximum potential loadings to the system.

**Pinto Creek and Queen Creek, Miami, Arizona.** Provided technical expertise for an Arizona copper mining and smelting company at three of the company's facilities. Services provided include: Serving as the Company representative in a multi-agency resource damage assessment; Conducting hazardous waste toxicity screenings; Conducting a study to derive metal translators; and Developing and conducting the company's annual bioassessment plans required in their NPDES permits. Authored a document justifying an increased risk level for arsenic human-health based standards for the discharge receiving water.

**Salt River, Phoenix, Arizona.** Prepared and implemented a monitoring study of the diel dissolved oxygen dynamics in the Salt River between two of the City's treatment facilities. In the Salt River, monitoring was conducted to determine if ambient dissolved oxygen in the effluent dominated reach of the river would meet the State's proposed DO standard.

**PSE&G, Newark, New Jersey.** Provided technical expertise for a large power generating company in the Northeast. Compiled and evaluated water quality monitoring data as part of the year-long effluent characterization studies required under their NPDES permits for three of the company's power generation facilities. Chemical data were evaluated relative to applicable discharge limits, aquatic life and human health criteria, and TMDL limits for freshwater and saltwater systems.

**University of North Texas, Denton, Texas.** Field sampling and analysis for biological and chemical studies of the Trinity River below a large Ft. Worth WWTP to evaluate the effects of effluent dechlorination on water quality and the aquatic community. Also participated in a water quality and biological sampling study to assess post-impoundment quality on newly formed reservoir.

### *Protocol and Methods Development*

**North American Metals Council (NAMC).** Coauthored *Approach for Conducting Site-specific Assessments of Selenium Bioaccumulation in Aquatic Systems*. Developed the field methods monitoring portion of this manuscript. This is part of a three-part strategy to managing selenium in the environment.

**Water Environment Research Foundation (WERF).** Contributing author on a document for WERF that developed methods for aquatic ecological risk assessment. Conducted the screening level risk assessments for case studies and organized acute and chronic data from EPA AWQC documents for software development.

5

**Department of Energy (DOE), Oakridge, Tennessee.** Co-authored a document for DOE for assessing and prioritizing risks to ecological communities at DOE installations. Provided technical guidance on the proper methods to collect data for evaluating physical habitat, chemicals, toxicological effects, and biological receptors to assess risks in aquatic systems.

### Professional Affiliations

Society of Environmental Toxicology and Chemistry

### Selected Peer-Reviewed Publications

1. **Covington, S.M.**, R.R. Naddy, A.L. Prouty, S.A. Werner, and M. Dunn Lewis. 2018. Effects of in situ selenium exposure and maternal transfer on the survival and deformities of brown trout (Salmo trutta) fry. Environmental Toxicology and Chemistry, 2018 May 37(5):1936-1408.

2. Ohlendorf, H.M., **S.M. Covington**, E.R. Byron, and C.A. Arenal. 2011. Conducting site-specific assessments of selenium bioaccumulation in aquatic systems. Integrated Environmental Assessment and Management. 7(3):314-24. Erratum in: Integr Environ Assess Manag. 2012 8(1):210.

3. Marcus, M.D., B. Liu, **S.M. Covington**, and N.R. Smith. 2010. Use of existing water, sediment, and tissue data to screen ecological risks to the endangered Rio Grande silvery minnow. Science of the Total Environment, Vol 409, No. 1.

4. Parkhurst, B.R., W. Warren-Hicks, R.D. Cardwell, J. Volison, T. Etchison, J.B. Butcher, and **S.M. Covington**. 1996. Aquatic ecological Risk Assessment: A multi-tiered approach. Report 90 – AER-1, Water Environment Research Foundation, Alexandria, VA.

5. Butcher, J.B. and **S.M. Covington**. 1995. Dissolved Oxygen Analysis with Temperature Dependence. Journal of Environmental Engineering, Vol. 121, No 10.

6. Abukhalaf, I.K., E.G. Zimmerman, K.L. Dickson, R.A. Masaracchia, M.J. Donahue, and **S.M. Covington**. 1994. Purification of the 70-kDa heat-shock protein from catfish liver: Immunological comparison of the protein in different fish species and its potential use as a stress indicator. Environmental Toxicology and Chemistry, Volume 13, Issue 8, pages 1251–1257.

### Education and Training

M.S., Aquatic Toxicology and Biology – University of North Texas, 1992
B.S., Biology – University of Texas at San Antonio, 1988

Predicting the Toxicity of Metals to Aquatic Organisms: An Intro to the Biotic Ligand Model, SETAC Shortcourse, 2001
Application of Population, Community, and Landscape Ecology to ERA, SETAC Shortcourse, 1998
Integrating Ecological Risk Assessment and NRD Assessment Processes, SETAC Shortcourse, 1997
40-Hour Hazardous Waste Site Health and Safety Training and Recertification
8-Hour Hazardous Waste Site Supervisor Health and Safety Training
MSHA Site Training and Annual Certification

### Work History

| | |
|---|---|
| 2009 – Present | Senior Aquatic Biologist, Formation Environmental, LLC, Boulder, CO |
| 2004 – 2009 | Senior Aquatic Biologist, NewFields, Boulder, CO |
| 2000 – 2004 | Senior Scientist, TetraTech MFG, Boulder, CO |
| 1996 – 2000 | Project Scientist, MFG, Inc., Boulder, CO |
| 1992 – 1996 | Associate, The Cadmus Group, Laramie, WY |
| 1989 – 1992 | Research Associate/Research Assistant, University of North Texas, Denton, TX |

6

117 River View Rd.
Liberty Hill, Texas 78642

Sean Covington
(512) 924-8353
scovington@formationenv.com

**Expert Opinions of Sean Covington**

**In the Matter of**

**California Open Lands v. Butte County Department of Public Works, et al.**

**Case No. 2:20-cv-00123-DJC-DMC, U.S. District Court, Eastern District of California**

**August 22, 2023**

# 1.0   INTRODUCTION

I am an aquatic biologist and toxicologist with 31 years of experience in environmental consulting, most of which has been work related to contaminants in the environment and ecological risk assessment. I represent the Texas office of Formation Environmental, LLC, where I have been for 14 years as a senior scientist. Prior to that I was with NewFields environmental consulting, and Tetra Tech environmental consulting. Through my tenure as a consultant, I have been involved with or managed numerous investigations at operating and shuttered industrial complexes, active and abandoned mines, and municipal waste-water facilities at both the federal level under CERCLA and the state level for voluntary cleanup programs. My CV, including my testimony experience is included as Attachment A.  Formation is being compensated for my work on this report at a rate of $350/hour.

Purpose and Objectives

The State Water Resources Control Board (Water Board) issued Investigative Order WQ 2020-0036-EXEC (Investigative Order) dated November 18, 2020, related to leachate discharges to storm water conveyances that occurred at the Neal Road Recycling and Waste Facility (NRRWF) in February and March 2019. The Investigative Order required the Butte County Department of Public Works (County) to develop and submit technical reports consisting of a leachate discharges Investigative Work Plan (IWP), and an Investigative Final Report (IFR) (Attachment B to this report). The objective of the IWP was to determine the impacts to water quality that could affect public and wildlife health from the unauthorized leachate discharge to the onsite wetland

EXHIBIT
10/25/23 Covington
3

**FORMATION**
ENVIRONMENTAL

preserve and offsite tributaries during February and March 2019. On September 30, 2021, the State Water Board approved the IWP prepared by Compliance SFO, Inc. and Environmental Management Systems, Inc. dated August 23, 2021. Formation was retained to evaluate potential risks of environmental contaminants that may have been present in the leachate discharge. Compliance SFO, Inc. and Formation Environmental, LLC delivered the IFR to the State Water Board on December 15, 2022.

The IFR was approved in a letter from the State Water Resources Control Board to Mr. Craig Cissell of Butte County Public Works dated May 1, 2023. The Board concluded that the IFR investigated whether there were any impacts from the leachate discharges and did not find any significant impacts to the environment. Based on the investigation's data results, State Water Board staff concluded that the leachate discharges from February 2019 to March 2019 did not have a significant impact to human and ecological health. State Water Board staff consulted with staff from the Regional Water Quality Control Board and the Central Valley Region, who agree with the conclusion that no further action regarding the Investigative Order is required.

I was retained to serve as an expert witness relative to Formation's participation in developing the IFR, specifically related to pertinent portions of the Executive Summary and Conclusions of the IFR that draw from Section 5, 9, and 10 of that report and were developed by Formation. I was asked to provide my opinions and the bases for those opinions based on the contents of the IFR sections developed by Formation. I have not been to the NRRWF nor did I or Formation conduct any on site investigations at the NRRWF. All opinions offered in this report are based on the data from the IFR that was collected by Compliance SFO, NRRWF staff or their consultants.

# 2.0   FACILITY DESCRIPTION

The NRRWF is located at 1023 Neal Road, Paradise, Butte County, California approximately 8 miles south of the City of Chico California (**Figure 1**). The site layout of the NRRWF is shown in **Figure 2**. The NRRWF has been developed in a northeast-to-southwest-trending canyon that historically eroded into a gently sloping plateau. Elevations at the site range from about 410 feet mean sea level (MSL) at the east facility boundary to about 210 feet MSL at the west facility boundary. The NRRWF comprises 229 acres. The solid waste facility permit lists the permitted area at 190 acres of which 140 acres is permitted for waste disposal. The NRRWF consists of five Class III operation modules identified as Waste Management Units (WMUs) 1, 2, 3, 4, and 5. Other significant features at the NRRWF include a Class II surface impoundment for landfill

2





Figure 1.  NRRWF Location



Figure 2.  NRRWF Site Plan

3

**FORMATION**
ENVIRONMENTAL

leachate and landfill gas condensate, storm water basins, a Primary Sedimentation Basin (PSB)[1], and a soil cover stockpile. Site facilities consist of two scale houses, four scales, a maintenance building, a main office building, a landfill gas-to-energy plant and flare system, a septage transfer station, and one groundwater supply well[2].

# 3.0   BACKGROUND

Leachate discharges from the southwest toe of Waste Module Unit 4 (WMU-4 to Storm Water Basin 4 (SWB-4) and the PSB, also known as the Conservation Easement, occurred at the NRRWF on February 14, 2019, February 26, 2019, and March 6, 2019. The leachate discharges were the direct result of a series of natural disasters which can be classified as *ACTS OF GOD*. A series of manmade and natural events beginning November 8, 2018, with the onset of the Camp Fire caused severe damage to the Facility. The Camp Fire destroyed the infrastructure required to operate the Facility under state and federal regulatory requirements. Storm water Best Management Practices (BMPs), WMU poly covers, and other infrastructure required to meet local, state, and federal regulations were destroyed in the fire. The destroyed infrastructure was being repaired by NRRWF personnel when a series of severe local storm events caused by atmospheric rivers impacted the NRRWF beginning in the early part of February 2019. The intense precipitation associated with these severe local storm events overwhelmed the repairs of the NRRWF infrastructure. Leachate discharged from the southwest toe of WMU-4 and entered storm water contained in SWB-4 (**Figure 2**). The storm water and leachate in SWB-4 was discharged by a pump to the PSB. NRRWF personnel attempted to mitigate the discharge of leachate to storm water but were unable to complete this work as surface soil conditions due to saturated soils from the severe storm events prevented the use of heavy equipment to install pipes necessary to discharge the leachate to the NRRWF leachate basin.

In response to the discharge, NRRWF personnel promptly and properly collected storm water discharge samples from the PSB storm water sampling site identified as SW-1 during the February 14, 2019, and February 26, 2019, leachate discharge events (**Figure 3**). Background storm water samples representing storm water quality generated from sites outside the boundary limits of the NRRWF were also collected for analysis during the February 14, 2019, and February 26, 2019, leachate discharge events. The storm water sample sites are identified as SW-2 located on the east-central NRRWF boundary, and SW-8 located on the southwest boundary of the NRRWF. All storm water samples collected by NRRWF personnel were analyzed at a Water Boards certified Environmental Laboratory Accreditation Program (ELAP) water testing laboratory for parameters that would represent constituents present in the leachate seeps discharges. The response of NRRWF personnel was swift, accurate and thorough.

---

[1] The *PSB* is also known as the *Wetland Preserve* and/or the *Conservation Easement Area*.

[2] Additional parcels abutting the north, east and west NRRWF boundaries have been purchased by Butte County These areas will be utilized in the future to expand the limits of the NRRWF once required entitlements have been secured from state and federal agencies. Currently, these parcels are used for agricultural purposes to graze cattle.

4





Figure 3.  Soil and Storm Water Sampling Locations

The IWP dated August 23, 2021, identified storm water samples sites representative of storm water from areas outside the boundary limits of the NRRWF, and sites within the boundary limits of the NRRWF and the NRRWF discharge site. Storm water sample sites SW-1, and SW-1A are located along the discharge flow path of water pumped from SWB-4. Storm water sample site SW-1B is located at the inlet of SWB-4 and is representative of storm water flows generated by easterly upslope areas of the NRRWF and the south toe of WMU-4. Storm water flows from areas upslope and outside the boundary limits of the NRRWF are represented by SW-2 and SW-8. Due to extreme drought conditions throughout California, storm water samples were not able to be collected from all designated storm water sampling sites. Storm water samples were collected on December 13, 2021, December 22, 2021, and March 15, 2022. Storm water sample collection was attempted on April 21, 2022; however, there were no observed storm water flows at any of the designated storm water sampling sites during that time.

On-site and off-site probable soil sampling sites were identified in the IWP with the provision that the final soil sample sites would be established during soil sampling field work. The soil sampling field work was completed on May 25, 2022, and May 26, 2022. Soil samples were collected from each soil boring at the surface 3-inches below the ground surface, and 6-inches below the ground surface except when soil auger refusal was encountered at shallower depths. The field work was

5

FORMATION
ENVIRONMENTAL

observed and documented by Water Board personnel. The May 25, 2022, soil sampling was observed and documented by Erin Garner, Senior Engineering Geologist. The May 26, 2022, soil sampling was observed and documented by Stephanie Young, Senior Water Resources Control Engineer Specialist. Copies of their observations detailed in inspection reports are contained in Attachment F of the IFR, Water Board Soil Sampling Inspection Reports. Soil samples from off-site areas around the perimeter of the NRRWF were also collected on May 25 and 26, 2022. The locations where soil samples were collected are shown on Figure 3. Nine locations for off-site soils (SBO-1 to SBO-9) were sampled, while eight locations for on-site soils (SBF-1 to SBF-8) were sampled at locations as shown in Figure 3.

The soil samples were submitted to Fruit Growers Laboratory (FGL) on May 31, 2022. At the time the soil samples were submitted, an FGL employee, Debby Hagen, who received the samples advised that samples analytical results could take a considerable amount of time to complete due to short staffing and the number of samples submitted. The soil sample analytical reports were released by FGL on August 22, 2022. The soil borings sampling analytical reports are contained in Attachment G of the IFR, Soil Borings Analytical Reports.

Screening level ecological risk assessment (ERA) and human health risk assessments were performed to evaluate the potential risk to ecological and human receptors from Chemicals of Potential Concern (COPCs) associated with leachate discharges to storm water conveyances that occurred at the NRRWF in February and March 2019. Data evaluated included storm water data from the leachate event in 2019 and additional soi and stormwater data collected in 2021 and 2022. The purpose of the screening assessments was to identify if concentrations of COPCs were present.  For these screening assessments, concentrations of parameters in soil and water were preliminarily assessed based on detection above analytical Practical Quantitation Limits (PQLs). Laboratory analytical data were assembled and initially culled by detection status. Non-detected data relative to their respective PQLs were screened out from further evaluation. Maximum concentrations of detected parameters in soil and storm water were compared to conservative risk-based ecological screening levels (ESLs) and human health screening levels (SLs). COPCs were identified as those parameters exceeding the conservative ESLs or SLs.  A final comparison was done to compare COPCs that exceeded ESLs or SLs by comparing the maximum parameter concentrations to background maximum and mean concentrations.  Final COPCs were identified as those parameters that exceeded ESLs or SLs and were found to be greater than background concentrations.

# 4.0   OPINIONS AND BASES

Based on my review of the available data and report, my knowledge and experience in environmental risk assessment, the characterization of COPC concentrations and locations, the following opinions are summarized and provided below.

6

## 4.1    Opinion 1

There were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the unnamed tributary to Hamlin Slough in 2019 that exceeded ESLs or background concentrations.

Bases

Maximum concentrations of detected COPCs in storm water samples from location SW-1 were compared to acute ESLs for aquatic ecological receptors (**Table 1**). Acute ESLs represent short-term, high concentration exposure, such as would occur in storm water runoff where limited exposure potential occurs (e.g., limited duration of the water for exposure due to limited short-term flashy events), and limited potential for an aquatic community exists in a semi-arid, mostly dry habitat. If no acute ESL was available for a specific parameter, then chronic ESLs were used to determine if a parameter is a COPC. General chemistry and nutrient samples were not screened as most of these do not have screening levels and are not considered to be toxic.

At SW-1 there were 32 inorganic parameters detected at concentrations greater than the PQL together with nine volatile organic compounds (VOCs) or semi-volatile organic compounds (SVOCs). Eighteen of the inorganic parameters detected were screened against ESLs (**Table 1**) with the remainder of the parameters being general chemistry or nutrient parameters considered to be non-toxic. For storm water data collected in 2019, iron was the only COPC identified for sample location SW-1 exceeding an ESL.

The following SVOCs and VOCs were detected and screened against ESLs: bis (2-ethyl hexyl) phthalate, diethyl phthalate, phenol, 2-butanone, 2-hexanone, 4-methyl-2-pentanone, acetone, ethanol, and tetrahydrofuran. Of these, no ESLs were found for 2-hexanone and ethanol. None of the VOCs and SVOCs for which ESLs were available exceeded their respective ESLs.

Background storm water data from locations SW-2 and SW-8 collected in 2019 had a maximum concentration of iron (12.9 mg/L) that was higher than it was in the SW-1 location (4.26 mg/L) therefore iron was not identified as a COPC at SW-1. The 2019 storm water data collected during the leachate event indicates no COPCs from storm water exceeded ESLs for aquatic ecological receptors or background concentrations.

## 4.2    Opinion 2

No potential toxicity in storm water runoff from the NRRWF WMU-4 area was observed from samples collected downgradient at SW-1B in March 2022.

7

FORMATION
ENVIRONMENTAL

Bases

Storm water biotoxicity testing was conducted for NRRWF samples collected on March 15, 2022. The storm water biotoxicity samples were collected at storm water sample site SW-1B. This sample site is in close proximity to WMU-4 where leachate discharges occurred in February 2019 and would represent a sample site receiving leachate discharges from WMU-4.

The storm water biotoxicity samples were submitted to FGL on March 15, 2022. FGL subcontracted with Aquatic Bioassay and Consulting Laboratories, Inc. (ABC Laboratory). ABC Laboratory conducted the laboratory analysis under guidelines prescribed in *Short-Term Methods for Estimating the Chronic Toxicity of Effluents and Receiving Water to Freshwater Organisms, EPA-821-R-02-013.* Laboratory analytical data are included in Attachment J of the IFR, Biotoxicity Analytical Data.

The following toxicity tests and results were observed from the March 2022 samples.

- Chronic *Pimphales promelas* (Fathead minnow) larvae Survival and Growth Bioassay (7-Day)
  - NOEC Survival = 100% Site Water
  - NOEC Growth = 100% Site Water

- Chronic *Ceriodaphnia dubia* (water flea) Survival and Reproduction Bioassay (7-Day)
  - NOEC Survival = 100% Site Water
  - NOEC Reproduction = 100% Site Water

- Chronic *Selenastrum capricornutum* (green algae) Growth Bioassay (4-Day)
  - NOEC = 10% Site Water

The associated test results were also provided by ABC Laboratory. Based on the toxicity data, no significant toxic effects were observed for fathead minnow larval survival and growth, and *Ceriodaphnia* survival and reproduction. While there was a significant difference observed between the control and Site water for *Selenastrum* growth results, the difference was for greater growth in the Site water sample versus control. Increased growth in algal Site water samples indicates the presence of nutrients that stimulate growth. No toxicity was observed for any species tested in storm water runoff with only an increase in algal growth observed due to nutrient concentrations.

## 4.3   Opinion 3

Storm water samples at SW-1A are not indicative of the 2019 leachate discharge, and instead are representative of runoff from the soil stockpile and the haul road.

8

FORMATION
ENVIRONMENTAL

Bases

Storm water samples collected in 2021 and 2022 from the PSB (SW- 1A), upgradient of the PSB (SW-1B), and off-site background upgradient of the facility (SW-2), showed varying results for parameters that exceeded their respective ESLs (**Tables 2 to 4**). At SW-1A, parameters identified as COPCs exceeding ESLs included aluminum, chromium, cobalt, copper, iron, selenium, vanadium, and zinc[3] (**Table 2**). All SVOCs were less than detection at the PQL. Acetone was the only VOC detected, and the maximum concentration was less than its respective ESLs. There are no SVOCs or VOCs identified as COPCs for sample location SW-1A.

At location SW-1B, twenty-three inorganic parameters were detected and screened against ESLs (**Table 3**). Aluminum, copper, and iron exceeded their respective chronic ESLs. Aluminum and copper did not, however, exceed acute ESL[4]. No SVOCs were detected, and the only VOCs detected were acetone, 2-butanone, and tert-butyl alcohol which had maximum concentrations less than their respective ESLs. Based on COPC maximum concentrations compared to their respective acute ESLs, no inorganic, VOC or SVOC parameters were identified for samples from location SW-1B.

No detected parameters exceeded their respective acute ESLs at the off-site background location SW-2 (**Table 4**) in samples collected during 2021 and 2022.Similarly, no detected parameters exceeded their respective ESLs at the off-site background location SW-2 and SW-8 (**Table 5**) in samples collected during the 2019 sampling event, except for iron which had a maximum concentration of 13 mg/L.

COPCs for SW-1A that were screened against ESLs compared to background storm water concentrations of COPCs were several times higher than background in 2022 (**Table 4**) and 2019 (**Table 5**) and higher than the 2019 SW-1 discharge from the PSB during the leachate discharge (**Table 6**). Field notes indicate that the December 2022 SW-1A sample had a large amount of sediment in the sample (i.e., turbidity and total suspended solids were high with maximum concentrations of 9340 NTU[5] and 12500 mg/L, respectively) due to runoff from the soil stockpile and the haul road.

Further evidence that storm water from SW-1A was not representative of the 2019 leachate spill comes from data at location SW-1B, which is upgradient and represents discharge that would have been derived from the same location as leachate from 2019 that flowed into the PSB. At SW-1B, only iron was detected and identified exceeding chronic ESL. As noted above, the multiple COPCs identified for SW-1A should at least be similar to those identified for SW-1B, however, aluminum, barium, cobalt, copper, selenium, vanadium, zinc, and iron are many times greater in the SW-1A sample than the SW-1B sample. These inorganic parameters would likely

---

[3] Zinc was included as a COPC because the value reported was significantly higher than the PQL, but shown as non detect.
[4] Iron only has a chronic ESL.
[5] Nephelometric Turbidity Units (NTU)

9

**FORMATION**
**ENVIRONMENTAL**

be mobilized with suspended sediments during a storm event and should be similar at these closely aligned locations.

COPCs identified for the 2022 SW-1A storm water samples may pose a risk to ecological receptors in the PSB, but these COPCs are not due to the leachate discharge, rather they appear to be related to runoff from the soil stockpile and the haul road. Upon receiving the laboratory results on COPCs, the County implemented BMPs to address the runoff issue.

## 4.4   Opinion 4

Potential ecological risks to on-site terrestrial receptors due to soil exposure are considered *de minimis.*

<u>Bases</u>

No COPCs were detected at concentrations in soils from the conservation easement (PSB) that exceeded conservative risk-based ESLs or background soil concentrations. The maximum concentrations of COPCs from all on-site soils from the PSB were compared to ESLs for terrestrial ecological receptors. The primary source of ESLs is the 2019 revision of the San Francisco Bay Regional Water Quality Control Board's Environmental Screening Levels (SFBRWQCB 2019). Terrestrial habitat ESLs are provided in that document for use as screening levels for the potential effects of COPCs to plants and soil-dwelling organisms as well as birds and mammals. No ESL for manganese was available from the primary source and USEPA's Ecological Soil Screening Levels (EcoSSL) were used as the ESL. No ESLs were available for calcium, potassium, and sodium, however, since those are not considered to be toxic heavy metals in soils, they were not included in the screen.

The maximum detected concentrations of only manganese and vanadium exceeded their respective ESLs in on-site soils (**Table 7**). In off-site background soils, the maximum detected concentrations of only manganese, selenium, and vanadium exceeded their respective ESLs (**Table 8**). When compared to the concentrations detected in off-site background soils, the mean and maximum concentrations detected in off-site soils were higher than those detected in NRRWF on-site soils indicating that the NRRWF on-site concentrations were representative of naturally occurring background concentrations (**Table 8**). Based on the screening of NRRWF on-site and off-site soil concentrations, no COPCs were identified that exceeded conservative risk-based ESLs or background concentrations.

10

**FORMATION**
ENVIRONMENTAL

## 4.5    Opinion 5

Potential human health risk due to on-site soil exposure is considered *de minimis*.

Bases

For the on-site soil screening assessment, 15 detected parameters were compared to human health residential SLs to evaluate potential cancer risks and non-cancer risks (**Table 9**). Comparison of maximum detected soil concentrations did not exceed the applicable SLs for any detected parameter with respect to cancer risk for receptors at the NRRWF (**Table 9**). Maximum concentrations of two inorganic COPCs (cobalt and iron) exceeded their SLs for non-cancer effects. As shown in **Table 10**, cobalt and iron on-site maximum and minimum concentrations are equal to or less than the off-site background soil concentrations. **Table 10** notes also compare maximum detected soil concentrations for cobalt and iron to industrial soil SLs.  No exceedances were observed.

Based on overall low concentrations, low hazard quotients[6], and concentrations equivalent to background, these two analytes are excluded as COPCs in soils (**Table 10**). Residential SLs were used in this evaluation because they offer a significant degree of protection for future hypothetical residents in addition to current industrial use of the facility and area residents. Comparing values to industrial scenario SLs provides additional screening information that may be used to evaluate receptors under current industrial use scenarios.

## 4.6    Opinion 6

There were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the tributary to Hamlin Slough in 2019 that exceeded human health SLs or background concentrations.

Bases

Two metals (dissolved arsenic and dissolved chromium) detected in storm water collected from SW-1 in 2019 exceeded human health cancer SLs, while only dissolved arsenic exceeded the non-cancer SL. No SVOCs or VOCs exceeded the human health SLs (**Table 11**). The dissolved arsenic concentration was 0.0008 mg/L while the dissolved chromium concentration was 0.0018 mg/L. Corresponding storm water samples from SW-2/SW-8 in 2019 representing upgradient background had higher concentrations of both parameters (**Table 12**).  Maximum dissolved concentrations in background were equal to 0.0015 mg/L and 0.0375 mg/L for arsenic and

---

[6] For the human health assessment, hazard quotients (HQs) were determined per recommended guidance.  The HQ is the parameter concentration used for screening divided by the SL value.

11

**FORMATION**
**ENVIRONMENTAL**

chromium respectively. Therefore, stormwater samples at SW-1 are representative of background concentrations.

## 4.7    Opinion 7

Several inorganic COPCs, in on-site storm water from 2021 and 2022 may pose a risk to human health, based on conservative residential SLs, but these COPCs are not indicative of the 2019 leachate spill and are linked to runoff from the soil stockpile and haul road.

<u>Bases</u>

For the on-site storm water screening assessment, detected parameters at location SW-1A and SW-1B were compared to human health residential SLs to evaluate potential cancer risks and non-cancer hazards (**Table 13**). Maximum detected concentrations of organic VOCs and SVOCs were all less than their respective screening SLs. Maximum detected concentrations of arsenic, chromium, lead, and nickel in storm water exceeded their cancer risk SLs at location SW-1A (**Table 13**). Aluminum, arsenic, cadmium, cobalt, iron, lead, manganese, nickel, and vanadium were identified as potential human health COPCs based on exceedance of noncancer SLs at location SW-1A (**Table 13**). At location SW-1B, maximum detected concentrations of arsenic, chromium, and nickel exceeded cancer risk SLs and antimony, arsenic, manganese, and nitrate exceeded non-cancer hazard SLs (**Table 13**).

Ten COPCs identified for the SW-1A storm water samples that enter the PSB had concentrations several times greater than the off-site background and upgradient SW-1B location (**Table 14**), including aluminum, cadmium, chromium, cobalt, iron, lead, manganese, nickel, and vanadium. Recall as identified in Opinion 6, for the 2019 stormwater samples collected at SW-1, only two metals (dissolved arsenic and dissolved chromium) exceeded human health SLs, and both were found to be less than upgradient background concentrations.  Field notes indicate that the December 2022 sample had a large amount of sediment in the sample (e.g., turbidity and total suspended solids were high with maximum concentrations of 9,340 NTU and 12,500 mg/L, respectively). During the leachate discharge event, turbidity at SW-1 was 98.7 NTU with suspended solids of 59.2 mg/L (**Table 12**). Likewise, at SW-1B, turbidity was 28.9 NTU with suspended solids of 46.5 mg/L The elevated turbidity and suspended solids at SW-1A, as well as elevated metals concentrations above those from SW-1B upgradient (**Table 13**) and SW-1 downgradient during the leachate discharge suggest an alternative source. Concentrations of these COPCs are not due to the leachate discharge but appear to originate from the soil stockpile and the haul road. Upon receipt of the laboratory results identifying these elevated concentrations of COPCs, the County implemented BMPs to address the on-site storm water issue.

12

**FORMATION**
ENVIRONMENTAL

## 4.8    Opinion 8

Residential human health SLs overestimate potential risk to current site visitors and workers that likely would have shorter exposures to dermal contact with intermittent storm water.

<u>Bases</u>

Opinion 7 indicates that COPCs exceed conservative human health ingestion SLs.  It is expected that these SLs overestimate potential risk to current site visitors and workers as they likely have shorter exposures through dermal contact not ingestion, and presence of storm water is intermittent. Parameters defined as COPCs at SW-1A are those that exceed the residential tap water (e.g., drinking water) exposure SLs.  Stormwater is clearly not drinking water, therefore not ingested and the more likely scenario is to compare parameter concentrations to dermal (i.e., contact) exposure. **Table 14** shows the dermal contact screening levels for the 10 COPCs identified for onsite stormwater at SW-1A. When compared to dermal contact cancer and non-cancer SLs, potential risks due to skin contact become much lower. The SLs for dermal contact are also conservative because they represent tap water that would be used for longer-term contact such as bathing.  It is not expected that a site visitor or site worker would have long term dermal contact with stormwater runoff.  Because of the conservatism of the screening level assessment, predicted potential risk of stormwater at SW-1A to human receptors is likely overestimated.

## 5.0    Summary Findings

The IFR investigated whether there were any impacts from the leachate discharges and did not find any significant impacts to the environment. Based on the investigation's data results, State Water Board staff consulted with staff from the Regional Water Quality Control Board and the Central Valley Region, who agree with the conclusion that no further action regarding the Investigative Order WQ-2020-0036-EXEC is required. My opinions and the bases for those opinions based on the contents of the IFR sections developed by Formation are summarized below.

Opinion 1 - There were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the unnamed tributary to Hamlin Slough in 2019 that exceeded ESLs or background concentrations.

Opinion 2 - No potential toxicity in storm water runoff from the NRRWF WMU-4 area was observed from samples collected downgradient at SW-1B in March 2022.

13

Opinion 3 – Storm water samples at SW-1A are not indicative of the 2019 leachate discharge, and instead are representative of runoff from the soil stockpile and the haul road.

Opinion 4 - Potential ecological risks to on-site terrestrial receptors due to soil exposure are considered *de minimis*.

Opinion 5 – Potential human health risk due to on-site soil exposure is considered *de minimis*.

Opinion 6 - There were no leachate discharge concentrations of COPCs in storm water that flowed off-site or into the tributary to Hamlin Slough in 2019 that exceeded human health SLs or background concentrations.

Opinion 7 - Several inorganic COPCs, in on-site storm water from 2021 and 2022 may pose a risk to human health, based on conservative residential SLs, but these COPCs are not indicative of the 2019 leachate spill and are linked to runoff from the soil stockpile and haul road.

Opinion 8 - Residential human health SLs overestimate potential risk to current site visitors and workers that likely would have shorter exposures to dermal contact with intermittent storm water.

Sean Covington
Senior Aquatic Biologist/Toxicologist
FORMATION ENVIRONMENTAL, LLC

117 Riverview Rd.
Liberty Hill, Tx. 78642
Cell: 512-924-8353
Email: scovington@formationenv.com

14

# EXHIBIT H

**To Defendants' Appendix of Exhibits**
**in Opposition to Plaintiff's Motion for Partial Summary Judgment**

ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
E-mail: andrew@packardlawoffices.com
        wncarlon@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA OPEN LANDS

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA OPEN LANDS, a non-profit land trust organization, | Case No. 2:20-cv-00123-KJM-DMC |
| Plaintiff, | |
| vs. | **PLAINTIFF'S RESPONSES TO DEFENDANT'S INTERROGATORIES (SET ONE)** |
| BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS, et al, | |
| Defendants. | |

PROPOUNDING PARTY:   Defendant BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS

RESPONDING PARTY:     Plaintiff CALIFORNIA OPEN LANDS

SET NUMBER:            One

        Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff CALIFORNIA OPEN LANDS ("COL") makes the following responses to Defendant BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS's ("County") Special Interrogatories, Set One.

<u>**GENERAL OBJECTIONS**</u>

        COL generally objects to the County's interrogatories as follows:

        (1) COL has not yet completed discovery or trial preparation in this action and in responding to these interrogatories, COL provides only that information which is presently available to it and its agents and attorneys, with the express understanding that discovery and trial preparation are continuing.

1  Accordingly, these responses include and reflect information available to COL at this time, which may

2  be supplemented prior to the time of trial, after further discovery and trial preparation.

3       (2) No response to any portion of the interrogatory shall be deemed a waiver of any objection not

4  set forth herein, which could be made to any such portion of the interrogatory concerning its relevancy,

5  and/or the information set forth on the document and/or any other matter affecting the potential

6  admissibility of such information at the trial of this action.

7       (3) COL objects to each interrogatory to the extent that it could be interpreted as calling for the

8  production of documents subject to the attorney-client privilege or work-product immunity, on the

9  grounds that such production would or might constitute disclosure of material prepared for litigation by

10  or at the direction of counsel for respondent and/or disclosure of attorney work product generated by, or

11  at the direction of, counsel for COL.  For purposes of each response below, the reference to "non-

12  privileged documents" shall apply to documents subject to the attorney-client privilege and work product

13  immunity.

14  **INTERROGATORIES**

15  **SPECIAL INTERROGATORY NO. 1:**

16       State all facts upon which you base the allegation in paragraph 74 of the Complaint that

17  "Defendants have failed to develop and implement an adequate SWPPP for the Facility."

18  **RESPONSE TO SPECIAL INTERROGATORY NO. 1:**

19       Plaintiff objects to this Interrogatory on the basis that seeking "all facts" is unduly broad and

20  burdensome.  Providing each and every fact would require laborious, time-consuming analysis, search,

21  and description of incidental, secondary, and perhaps irrelevant and trivial details.  *IBP, Inc. v.*

22  *Mercantile Bank of Topeka*, 179 F.R.D. 316, 321 (D. KS. 1998).  Moreover, such facts are available in

23  publicly-available documents and/or within the custody and control of Defendants; thus, Defendants

24  have similar access or more access to the facts responsive to this Interrogatory.

25       Plaintiff objects to this Interrogatory because it seeks the premature disclosure of expert

26  analysis and opinion.

27       Plaintiff objects to the extent responding to this Interrogatory would require the disclosure of

28  attorney work product or attorney-client communications.

1    Finally, this Interrogatory may call for the compilation of information that can be obtained

2  from documents, therefore, Plaintiff reserves its right to produce the documents from which the

3  requested compilation of information can be obtained.

4    Subject to and without waiving these objections, Plaintiff responds as follows: Plaintiff

5  expressly incorporates all facts asserted in the Complaint and the Notice of Violations and Intent to

6  File Suit under the Clean Water Act, dated November 15, 2019 sent by William Carlon on behalf of

7  Plaintiff to Defendants ("Notice Letter") into this Response.  Plaintiff further incorporates the facts

8  included within the documents produced by Plaintiff in its Initial Disclosures and/or in response to

9  Defendants' Request for Production of Documents, Set One evidencing Defendants' ongoing

10  violations of the Industrial General Permit and Clean Water Act.  Further, Plaintiff summarizes the

11  following facts:

12    • On November 2, 2007, Defendant Butte County Department of Public Works

13      ("County") established the Permanent Conservation Easement Grant ("Easement") in

14      favor of Plaintiff, establishing and maintaining a wetland preserve ("Preserve") at the

15      Facility.  The Preserve, pursuant to Army Corps of Engineers Permit No. 200300113

16      ("Permit") contains 3.00 acres of created, avoided, and preserved waters of the United

17      States, as depicted on the On-site Wetland Mitigation and Monitoring Plan Neal Road

18      Landfill. The purpose of the Preserve is to ensure that functions and values of the

19      aquatic environment are protected.

20    • To minimize disturbance to the preserved waters of the United States, the County was

21      required to establish a buffer, consisting of native upland vegetation of at least 25 feet

22      in width from the out limit of jurisdiction of the entire perimeter of all created,

23      preserved, and avoided waters of the United States, including wetlands within the

24      Preserve.

25    • On September 6, 2011, the Army Corps of Engineers, based on a June 14, 2010

26      monitoring report and a site visit on June 28, 2010, determined that the mitigation

27      project required by the Permit was successful.  The inspection report indicated that the

28      "proposed preserve is exhibiting the three wetland perimeters [sic]; therefore, the

1    permittee has met the required success criteria. . . ."

2    • Between December 20, 2014 and June 24, 2015 the Facility operated under a SWPPP

3       dated August 1, 1995, last revised August 2014 ("1995 SWPPP").  This response

4       incorporates the 1995 SWPPP, which was produced by Defendants at BUTTE 7337-

5       7442.

6    • The 1995 SWPPP, which includes a site map, makes no mention of the Preserve and

7       does not describe the Easement or its prohibitions (either directly, or by reference).

8       The 1995 SWPPP does not identify the created waters of the United States in the

9       Preserve that were confirmed to be present as early as June 28, 2010 by the Army

10      Corps of Engineers.  The 1995 SWPPP identifies the discharge point for storm water

11      associated with industrial activity from the Facility to be from the Preserve, which it

12      identifies as the Primary Sedimentation Basin.  Defendants discharged storm water

13      associated with industrial activities to the created waters of the United States without

14      sampling or identifying that discharge in the 1995 SWPPP from at least June 28, 2010

15      to June 24, 2015.

16   • The site map associated with the 1995 SWPPP does not identify the areas of soil

17      erosion or impervious areas at the Facility.  The 1995 SWPPP site map does not

18      identify all areas of industrial activity.

19   • The 1995 SWPPP identifies leachate as a potential pollutant in storm water discharges.

20      The 1995 SWPPP sampling plan only requires storm water samples to be analyzed for

21      total suspended solids, pH, specific conductance, oil and grease, iron, turbidity,

22      temperature, nitrate + nitrite nitrogen, copper, cadmium, lead, nickel and mercury.

23   • Between June 24, 2015 and September 29, 2019 the Facility operated under a SWPPP

24      dated June 24, 2015 ("2015 SWPPP").  This response incorporates the 2015 SWPPP,

25      which was produced by Defendants at BUTTE 3208-3458.  The 2015 SWPPP does

26      not identify the location of the Preserve.  The 2015 SWPPP does not identify the

27      created waters of the United States in the Preserve that were confirmed to be present as

28      early as June 28, 2010 by the Army Corps of Engineers.  The 2015 SWPPP identifies

1   the discharge point for storm water associated with industrial activity from the Facility

2   to be from the Preserve, which it identifies as the Primary Sedimentation Basin.

3   Defendants discharged storm water associated with industrial activities to the created

4   waters of the United States without sampling or identifying that discharge in the 2015

5   SWPPP from at least June 25, 2015 to September 29, 2019.

6   • The 1995 SWPPP was superseded by the 2015 SWPPP effective June 24, 2015.

7   • The 2015 SWPPP was uploaded to SMARTS on August 10, 2015.

8   • The 2015 SWPPP identifies potential pollutants in leachate, and identifies leachate as a

9   potential pollutant that could be present in storm water at the Facility.  However, only

10   pH, oil and grease, total suspended solids, and iron are identified as constituents for

11   sampling and analysis to comply with the General Permit requirements.

12   • Along with the 2015 SWPPP, a site map dated June 3, 2015 ("June 3, 2015 Site Map")

13   was uploaded to SMARTS on August 10, 2015.

14   • The June 3, 2015 Site Map does not identify areas of soil erosion or impervious areas

15   at the Facility.  The June 3, 2015 Site Map does not identify all areas of industrial

16   activity.

17   • The June 3, 2015 Site Map does not identify the Preserve and it does not identify the

18   wetlands within the Preserve, and it does not identify any waters of the United States

19   within the Preserve.  The June 3, 2015 Site Map does not identify the discharge point

20   where industrial storm water discharges to the waters of the United States within the

21   Preserve.

22   • On October 1, 2015 an updated site map was uploaded to SMARTS ("October 1, 2015

23   Site Map").

24   • The October 1, 2015 Site Map does not identify areas of soil erosion or impervious

25   areas at the Facility.  The October 1, 2015 Site Map does not identify all areas of

26   industrial activity.

27   • The October 1, 2015 Site Map does not identify the Preserve and it does not identify

28   the wetlands within the Preserve, and it does not identify any waters of the United

States within the Preserve.  The October 1, 2015 Site Map does not identify the discharge point where industrial storm water discharges to the waters of the United States within the Preserve.

- On December 30, 2015 an updated site map was uploaded to SMARTS ("December 30, 2015 Site Map").

- The December 30, 2015 Site Map does not identify areas of soil erosion or impervious areas at the Facility.  The December 30, 2015 Site Map does not identify all areas of industrial activity.

- The December 30, 2015 Site Map does not identify the Preserve and it does not identify the wetlands within the Preserve, and it does not identify any waters of the United States within the Preserve.  The December 30, 2015 Site Map does not identify the discharge point where industrial storm water discharges to the waters of the United States within the Preserve.

- On March 31, 2016 an updated site map was uploaded to SMARTS ("March 31, 2016 Site Map").

- The March 31, 2016 Site Map does not identify areas of soil erosion or impervious areas at the Facility.  The March 31, 2016 Site Map does not identify all areas of industrial activity.

- The March 31, 2016 Site Map does not identify the Preserve and it does not identify the wetlands within the Preserve, and it does not identify any waters of the United States within the Preserve.  The March 31, 2016 Site Map does not identify the discharge point where industrial storm water discharges to the waters of the United States within the Preserve.

- On January 10, 2017 an updated site map was uploaded to SMARTS ("January 10, 2017 Site Map").

- The January 10, 2017 Site Map does not identify areas of soil erosion or impervious areas at the Facility.  The January 10, 2017 Site Map does not identify all areas of industrial activity.

- The January 10, 2017 Site Map does not identify the Preserve and it does not identify the wetlands within the Preserve, and it does not identify any waters of the United States within the Preserve.  The January 10, 2017 Site Map does not identify the discharge point where industrial storm water discharges to the waters of the United States within the Preserve.

- On or about February 14, 2019, landfill leachate seeped out of Module 4 and into Sediment Basin 4, where it was commingled with storm water and pumped to a storm water conveyance ditch, which discharged into the wetland protected by the Easement.

- On February 26 and 27, 2019, landfill leachate seeped out of Module 4 and into Sediment Basin 4, where it was commingled with storm water and pumped to a storm water conveyance ditch, which discharged into the wetland protected by the Easement.

- On May 13, 2019 an updated site map was uploaded to SMARTS ("May 13, 2019 Site Map").

- The May 13, 2019 Site Map does not identify areas of soil erosion or impervious areas at the Facility.  The May 13, 2019 Site Map does not identify all areas of industrial activity, or the locations where identified spills or leaks have occurred (including the February 2019 leachate leaks).

- The May 13, 2019 Site Map does not identify the Preserve and it does not identify the wetlands within the Preserve, and it does not identify any waters of the United States within the Preserve.  The May 13, 2019 Site Map does not identify the discharge point where industrial storm water discharges to the waters of the United States within the Preserve.

- On July 31, 2019, a truck hauling leachate spilled approximately 150 gallons of leachate onto a roadway adjacent to the Preserve.  The 2015 SWPPP was not revised to identify the location of this spill.

- Other than the updated site maps, no revisions were made to the 2015 SWPPP between June 24, 2015 and September 29, 2019.

- Between September 30, 2019 and February 3, 2021, the Facility operated under a

SWPPP dated September 30, 2019 ("2019 SWPPP").  This response incorporates the 2019 SWPPP, which Defendants produced at BUTTE 2947-3206.  The 2019 SWPPP identifies the Preserve as only a "part of an environmental mitigation program," but does not identify that it is a wetland preserve.  The 2019 SWPPP does not identify the created waters of the United States in the Preserve that were confirmed to be present as early as June 28, 2010 by the Army Corps of Engineers.  The 2019 SWPPP identifies the discharge point for storm water associated with industrial activity from the Facility to be from the Preserve, which it identifies as the Primary Sedimentation Basin.  Defendants discharged storm water associated with industrial activities to the created waters of the United States without sampling or identifying that discharge in the 2019 SWPPP from at least September 30, 2019 to February 3, 2021.  The 2019 SWPPP did not identify the July 31, 2019 leachate spill.  The 2019 SWPPP does not identify the adjacent facility which discharges storm water associated with industrial activity into the Facility's boundary.

- The 2019 SWPPP incorporates by reference laboratory results from analysis associated with leachate seeps from modules 4 and 5 in February 2019.  These laboratory results identify the presence of volatile organic compounds including benzene, chloroform, 1,1-dichloroethane, 1,2-dichloroethane, ethylbenzene, methylene chloride, methyl t-butyl ether, styrene, tetrachloroethene, toluene, 1,1,1-trichloroethane, trichloroethene, trichlorofluoromethane, p- & m-xylenes, o-xylene, acetone, t-butyl alcohol, carbon disulfide, ethanol, ethyl methacrylate, 2-hexanone, isobutanol, and methyl ethyl ketone.  The results also identify the presence of base neutral and acid extractable organics including benzoic acid, benzyl alcohol, diethyl phthalate, dimethyl phthalate, 3- & 4-methylphenol, and phenol.  The laboratory results also identify the presence of calcium, magnesium, sodium, potassium, bicarbonate, chloride, nitrate as N, sulfate, total dissolved solids, cyanide, and non-volatile organic carbon.  The laboratory results also identify the presence of aluminum, antimony, barium, chromium, cobalt, copper, iron, manganese, mercury, nickel, silver, tin, thallium, vanadium, and zinc.

- The 2019 SWPPP identifies the following pollutants that could be present in storm water discharges from the Facility: metals, organics, litter, petroleum products such as diesel, gasoline, oil, and lubricants, leachate, hazardous wastes, and dust.

- The 2019 SWPPP acknowledges that the watershed into which it discharges is impaired for diuron, mercury, and pH, but only identifies pH as being present at the Facility, despite having reported mercury being present in storm water samples in 2019.

- The 2019 SWPPP states that storm water samples will be collected and analyzed for only the following parameters at the Facility: total suspended solids, oil and grease, pH, iron, lead, aluminum, zinc, and chemical oxygen demand.

- On or about October 17, 2019 a leachate conveyance pipe broke, causing an unknown amount of leachate to spill.  Landfill staff estimated the total volume of the spill to be between 2000 and 6000 gallons.  The leachate spilled into the Preserve, including the three-acre area identified by the Army Corps of Engineers as waters of the United States in 2010.

- No revisions were made to the 2019 SWPPP between September 30, 2019 and February 3, 2021.

- Between February 4, 2021 and the present, the Facility has operated under a SWPPP dated February 4, 2021 ("2021 SWPPP"). This response incorporates the 2021 SWPPP.  The 2021 SWPPP identifies the Preserve as only a "part of an environmental mitigation program," but does not identify that it is a wetland preserve.  The 2021 SWPPP does not identify the created waters of the United States in the Preserve that were confirmed to be present as early as June 28, 2010 by the Army Corps of Engineers.  The 2021 SWPPP identifies the discharge point for storm water associated with industrial activity from the Facility to be from the Preserve, which it identifies as the Primary Sedimentation Basin.  Defendants discharged storm water associated with industrial activities to the created waters of the United States without sampling or identifying that discharge in the 2021 SWPPP from at least September 30, 2019 to

February 3, 2021.

- The 2021 SWPPP site map does not identify storm water drainage areas within the Facility boundary, portions of any drainage area impacted by discharges from surrounding areas, areas of soil erosion, and the location of all nearby water bodies, including the waters of the United States within the Preserve.  The 20221 SWPPP site map does not identify as a discharge point the point where storm water associated with industrial activities and materials enters the Preserve. The 2021 SWPPP site map fails to identify all impervious areas of the Facility. The 2021 SWPPP fails to identify the neighboring operation which discharges storm water associated with industrial materials to the Facility.

- The 2021 SWPPP was not developed, implemented, or revised to be consistent with the Permit or the Easement.

- The 2021 SWPPP incorporates by reference laboratory results from analysis associated with leachate seeps from modules 4 and 5 in February 2019.  These laboratory results identify the presence of volatile organic compounds including benzene, chloroform, 1,1-dichloroethane, 1,2-dichloroethane, ethylbenzene, methylene chloride, methyl t-butyl ether, styrene, tetrachloroethene, toluene, 1,1,1-trichloroethane, trichloroethene, trichlorofluoromethane, p- & m-xylenes, o-xylene, acetone, t-butyl alcohol, carbon disulfide, ethanol, ethyl methacrylate, 2-hexanone, isobutanol, and methyl ethyl ketone.  The results also identify the presence of base neutral and acid extractable organics including benzoic acid, benzyl alcohol, diethyl phthalate, dimethyl phthalate, 3- & 4-methylphenol, and phenol.  The laboratory results also identify the presence of calcium, magnesium, sodium, potassium, bicarbonate, chloride, nitrate as N, sulfate, total dissolved solids, cyanide, and non-volatile organic carbon.  The laboratory results also identify the presence of aluminum, antimony, barium, chromium, cobalt, copper, iron, manganese, mercury, nickel, silver, tin, thallium, vanadium, and zinc.

- The 2021 SWPPP identifies the following pollutants that could be present in storm water discharges from the Facility: metals, organics, litter, petroleum products such as

diesel, gasoline, oil, and lubricants, leachate, hazardous wastes, dust, nitrate & nitrite nitrogen, phosphorus.

- The 2021 SWPPP acknowledges that the watershed into which it discharges is impaired for diuron, mercury, and pH, but only identifies pH as being present at the Facility, despite having reported mercury being present in storm water samples in 2019.

- The 2021 SWPPP states that storm water samples will be collected and analyzed for only the following parameters at the Facility: total suspended solids, oil and grease, pH, iron, lead, aluminum, zinc, chemical oxygen demand, and once the CASP facility is operational, nitrate & nitrite nitrogen and phosphorus.

- No revisions were made to the 2021 SWPPP between February 4, 2021 and the present.

- On or about November 8, 2018, the Camp Fire destroyed several miles of storm drainage pipes, improvements and conveyance systems, at least thirty-five landfill gas extraction wells, several miles of landfill gas collection system infrastructure, portions of the landfill's base liner system, thousands of lineal feet of the site's leachate collection and removal system, and other critical landfill infrastructure, including downed power and phone lines and internet infrastructure, that affected the performance of pumps, instrumentation, and communications.

- Due to the nature of the landfill's industrial operations and activity, in particular the operation of active working faces of the landfill, conditions at the landfill change daily, and certainly monthly.  Stockpiling and processing of industrial materials occurs in locations that change frequently.

**SPECIAL INTERROGATORY NO. 2:**

State all facts upon which you base the allegation in paragraph 74 of the Complaint that "Defendants' outdoor storage of industrial materials" is "without appropriate best management practices."

**RESPONSE TO SPECIAL INTERROGATORY NO. 2:**

1    processed the materials into reusable aggregate.

2    •   Franklin Construction's facility is located immediately adjacent to, and uphill from, the

3        southeast boundary of the Facility.  Storm water associated with Franklin Construction's

4        operation discharges northwest to the Facility and enters Defendants' Facility.  This storm

5        water enters storm water conveyance ditches at the Facility and discharges into the Preserve.

6    •   Despite numerous spills and leaks of landfill leachate into the Facility's storm water

7        infrastructure, the Facility's sampling and analysis plans in the 2021 SWPPP, 2019 SWPPP,

8        and 2015 SWPPP do not include parameters associated with landfill leachate.  All the

9        Facility's monitoring and reporting plans fail to monitor for the presence of landfill leachate

10       within storm water discharges.

12   Dated: November 4, 2022                    LAW OFFICES OF ANDREW L. PACKARD

                                                _____
                                                William N. Carlon
                                                Attorneys for Plaintiff
                                                California Open Lands

**PROOF OF SERVICE**

I, William N. Carlon, declare as follows:

I am a resident of the State of California, and employed in Petaluma, California.  I am over the age of 18 years and am not a party to the above-entitled action.  My business address is 245 Kentucky Street, Suite B3, Petaluma, California, 94952.

On November 4, 2022, I served the following document(s):

**PLAINTIFF'S RESPONSES TO INTERROGATORIES, SET ONE**

by emailing a true and correct copy, pursuant to written agreement between counsel, to:

Diane G. Kindermann Henderson
Abbott & Kindermann, Inc.
2100 21st Street
Sacramento, CA 95818
DKindermann@aklandlaw.com

I certify and declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 4, 2022 at Napa, California.

William N. Carlon

# EXHIBIT I

**To Defendants' Appendix of Exhibits**
**in Opposition to Plaintiff's Motion for Partial Summary Judgment**

**Glen Hansen**

| | |
|---|---|
| **From:** | William Carlon <wncarlon@packardlawoffices.com> |
| **Sent:** | Wednesday, August 16, 2023 2:53 PM |
| **To:** | Glen Hansen; Diane Kindermann Henderson; Lisa Haddix; Andrew Packard |
| **Subject:** | COL v. Butte Co., et al; Motions for Summary Judgment |

Hi Glen,

I write pursuant to the Court's standing order, Section I.D., which requires the parties to meet and confer at least 28 days prior to the deadline to file dispositive motions to determine whether the parties intend to file cross motions for summary judgment. COL intends to file a motion for summary judgment, does the County?

Section I.C. of the Court's standing order also requires a moving party to meet and confer regarding the substance of a contemplated motion and any potential resolution. In short, we intend to move for summary judgment based on admissions made by the County in its written discovery and during deposition testimony, and based on undisputed facts, produced, in large part, by the County itself. Specifically, we will move for summary judgment on our first claim for relief, that Defendants failed to develop and implement an adequate SWPPP for the facility; our second claim for relief, that Defendants failed to develop and implement BAT/BCT at the facility; our third claim for relief, that Defendants failed to develop and implement an adequate monitoring implementation plan for the facility; and, our fourth claim for relief, that discharges of contaminated storm water from the facility violated the General Permit and the Clean Water Act.

Given the dispositive nature of this proposed motion, I'm not sure what potential resolutions exist, other than a court order finding Defendants' liable for the alleged violations.

William N. Carlon

The Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952

Tel. (707) 782-4060 ext 2
Email: wncarlon@packardlawoffices.com

The communication contained in this message is considered privileged and confidential. It is protected by attorney client privilege and the attorney work product doctrine. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please provide notification to the sender immediately by replying to the message and deleting it from your computer. This email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged.

1

# EXHIBIT J

**To Defendants' Appendix of Exhibits**
**in Opposition to Plaintiff's Motion for Partial Summary Judgment**

*Water Boards* *Storm water Multiple Application & Report Tracking System*

## Notice Of Intents - View Attachments

The following are the attachments related to the NOI. Click on the link "Attachment Id" to view them.

Display ( 40 ⊜ ) per page

1 2 (1 of 2)    1 2

| Attachment ID | Attachment For | File Type | File Title | File Description | File Size (Bytes) | Part No. | Date Attached |
|---|---|---|---|---|---|---|---|
| 217353 | Annual Report | Binary Large Object | NealRoadLandfill.pdf | Sampling Narrative explaining high TSS and Turbidity for Neal Road Landfill 5R04I000249 | 14039 | 1/1 | 06/29/2007 |
| 1055662 | Annual Report | Supporting Documentation | Reporting Benchmark Exceedance | | 58926 | 1/1 | 07/14/2011 |
| 1063135 | Annual Report | Supporting Documentation | Form 1 (Stormwater Sampling) | | 219129 | 1/1 | 08/18/2011 |
| 1063157 | Annual Report | Laboratory Results | Lab Sheets | | 2623240 | 1/1 | 08/18/2011 |
| 1063175 | Annual Report | Supporting Documentation | Form 3 (Quarterly NSWD monitoring) | | 193865 | 1/1 | 08/18/2011 |
| 1063188 | Annual Report | Supporting Documentation | Form 4(Monthly Wet Season Monitoring) | | 685467 | 1/1 | 08/18/2011 |
| 1100539 | NOI/NEC | Cover/Explanation Letter | Correction to Report of Storm Water Discharge | | 44925 | 1/1 | 03/29/2012 |
| 1296926 | Annual Report | Submitted Report PDF | Submitted report pdf | | 239282 | / | 08/06/2014 |
| 1296927 | Annual Report | Report COR | COR zip | | 205583 | / | 08/06/2014 |
| 1403518 | NOI/NEC | Application COR Zip | COR zip | | 112348 | / | 05/21/2015 |
| 1417260 | NOI/NEC | Other | Reminder & Recertification Letter 5.29.2015 | | 200224 | 1/1 | 06/15/2015 |
| 1458193 | Annual Report | Submitted Report PDF | Submitted report pdf | | 239521 | / | 07/16/2015 |
| 1458194 | Annual Report | Report COR | COR zip | | 205892 | / | 07/16/2015 |
| 1458195 | NOI/NEC | Other | Annual Report 14/15 | | 2201135 | 1/1 | 07/16/2015 |
| 1487954 | NOI/NEC | SWPPP | SWPPP | | 15788416 | 1/1 | 08/10/2015 |
| 1487955 | NOI/NEC | Facility/Site Map | SWPPP Map | | 480118 | 1/1 | 08/10/2015 |

CA Storm water Multiple Applications and Report Tracking System - Ver 2015.11 Bid: 10.28.2015.8.40

| ID | Type | Category | Title/File | Description | Number | Copies | Date |
|---|---|---|---|---|---|---|---|
| 1531663 | NOI/NEC | Facility/Site Map | SWPPP Map - Update 10012015 | updated SWPPP map | 486702 | 1/1 | 10/01/2015 |
| 1568894 | NOI/NEC | Facility/Site Map | StormWater_4Q15 Map | udated SWPPP map Q4 2015 | 517988 | 1/1 | 12/30/2015 |
| 1618072 | NOI/NEC | Facility/Site Map | Stormwater_1Q16 Map | updated SWPPP map QI 2016 | 513235 | 1/1 | 03/31/2016 |
| 1682141 | Annual Report | Supporting Documentation | IGP Attachment F Effluent Limitations | 40 CFR Subpart B | 66499 | 1/1 | 07/07/2016 |
| 1696612 | Annual Report | E-mail Correspondence | SWPPP Annual Rpt - Question for Water Board | Requested clarification for inclusion of Duron as a COC for the NRRWF. | 135158 | 1/1 | 07/15/2016 |
| 1700548 | Annual Report | Report COR | COR.zip | | 980388 | / | 07/18/2016 |
| 1700547 | Annual Report | Submitted Report PDF | Submitted report pdf | | 933387 | / | 07/18/2016 |
| 1831094 | NOI/NEC | Facility/Site Map | Stormwater_4Q16 Map | updated SWPPP map | 499368 | 1/1 | 01/10/2017 |
| 1957512 | Annual Report | Report COR | COR.zip | | 793840 | / | 07/05/2017 |
| 1957511 | Annual Report | Submitted Report PDF | Submitted report pdf | | 932998 | / | 07/05/2017 |
| 2193070 | Annual Report | Supporting Documentation | App F Effluent Limitations Part 445 | | 66680 | 1/1 | 07/06/2018 |
| 2210085 | Annual Report | Submitted Report PDF | Submitted report pdf | | 10822 | / | 07/16/2018 |
| 2210086 | Annual Report | Report COR | COR.zip | | 60202 | / | 07/16/2018 |
| 2399267 | Ad Hoc Report | Laboratory Results | 2/26/19 lab report | | 6030154 | 1/1 | 05/13/2019 |
| 2399270 | Ad Hoc Report | Facility/Site Map | Sample Location Map | | 497876 | 1/1 | 05/13/2019 |
| 2399285 | Ad Hoc Report | Laboratory Results | 2/14/19 QSE event lab report | | 24637946 | 1/1 | 05/13/2019 |
| 2399286 | Ad Hoc Report | Facility/Site Map | Sample Location Map | | 497876 | 1/1 | 05/14/2019 |
| 2400169 | Reports | Submitted Report PDF | Submitted report pdf | | 111740 | / | 05/14/2019 |
| 2400170 | Reports | Report COR | AdHoc_20190514_COR.zip | | 4923536 | 1/1 | 05/14/2019 |
| 2400171 | Reports | Submitted Report PDF | Submitted report pdf | | 113927 | / | 05/14/2019 |
| 2400172 | Reports | Report COR | AdHoc_20190514_COR.zip | | 17558002 | 1/1 | 05/14/2019 |
| 2445598 | Reports | Submitted Report PDF | Submitted report pdf | | 1023644 | / | 07/11/2019 |
| 2445599 | Reports | Report COR | 2018-2019_AR_COR.zip | | 853857 | / | 07/11/2019 |
| 2518368 | NOI/NEC | Supporting Documentation | NRRWF WDID 5R04I0000249 SWPPP 09-30-19 | Updated SWPPP | 29846356 | 1/1 | 09/30/2019 |

1  2   (1 of 2)   Display [40] per page

© 2022 State of California. Conditions of Use   Privacy Policy

https://smarts.waterboards.ca.gov/smarts/faces/Public/DataAccess/PublicNoiSearchResults.xhtml

1/31/24, 12:07 PM

CA Storm water Multiple Applications and Report Tracking System – Ver 2015.11 Bld: 10.28.2015.8.40

https://smarts.waterboards.ca.gov/smarts/faces/PublicDataAccess/PublicNoiSearchResults.xhtml