ANDREW L. PACKARD (State Bar No. 168690)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
E-mail: andrew@packardlawoffices.com

[Additional counsel listed on p. 2]

Attorneys for Plaintiff
CALIFORNIA OPEN LANDS

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA OPEN LANDS,<br><br>Plaintiff,<br><br>    v.<br><br>BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS, ERIC MILLER, and DENNIS SCHMIDT,<br><br>Defendants. | Case No: 2:20-cv-00123-DJC-DMC<br><br>PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>(FRCP 56; Eastern District Civil L.R. 260)<br><br>Hearing Date: February 29, 2024<br>Hearing Time: 1:30 p.m.<br>Courtroom: 10, Hon. Daniel J. Calabretta<br>Trial Date: June 24, 2024 |

Brian D. Acree (State Bar No. 202505)
Law Office of Brian Acree
95 3rd Street, Second Floor
San Francisco, CA 94103-3103
Tel: (510) 517-5196
E-mail: brian@brianacree.com

William N. Carlon (State Bar No. 305739)
Law Office of William Carlon
437 Post Street
Napa, CA 94559
Tel: (530) 514-4115
E-mail: william@carlonlaw.com

Attorneys for Plaintiff
CALIFORNIA OPEN LANDS

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 6

II. THERE IS NO GENUINE DISPUTE THAT DEFENDANTS DISCHARGED POLLUTANTS WITHOUT A PERMIT TO NAVIGABLE WATERS ............................... 6

    A. Defendants Do Not Dispute that Landfill Leachate Is a Pollutant Under the Clean Water Act, that the Discharges Reached Waters of the United States, or that the Discharges Were from a Point Source ............................................. 6

    B. There Is No Genuine Dispute of Fact as to Whether Leachate Discharged from the Preserve ........................................................................................ 7

    C. Defendants' Sole Piece of Evidence Does Not Actually Raise a Genuine Dispute of Material Fact ............................................................................. 9

III. THERE IS NO GENUINE DISPUTE AS TO THE NUMBER OF DAYS THAT DEFENDANTS DISCHARGED CONTAMINATED STORM WATER FROM THE PRESERVE ........................................................................................................ 12

IV. DEFENDANTS' FAIL TO IDENTIFY AN APPLICABLE PERMIT THAT AUTHORIZES THE DISCHARGES OF LEACHATE ........................................... 13

V. NO GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER DEFENDANTS' SWPPPS CONTAINED ALL REQUIRED INFORMATION ................ 14

    A. Plaintiff Was Not Required to Amend Its 60-Day Notice Letter or Issue a New 60-Day Notice Letter to Address the Deficiencies of the 2021 SWPPP or Violations Occurring After the Notice Letter Was Sent. .......................... 14

    B. Defendants' Expert Is Not Qualified to Provide a Legal Opinion About What the General Permit Requires ....................................................................... 17

    C. There Is No Genuine Dispute that Defendants Failed to Identify All Wetlands and Impervious Areas on Their Site Maps ................................... 18

VI. NO GENUINE DISPUTE OF MATERIAL FACT EXISTS AS TO WHETHER DEFENDANTS ADEQUATELY DEVELOPED AND IMPLEMENTED A MONITORING PLAN ................................................................................................................ 19

    A. Whether Defendants Are Required to Sample Their Discharges of Landfill Wastewater for Regulated Parameters Is Not a Question of Fact, but a Question of Law ....................................................................................... 19

VII. PLAINTIFF MET ITS MEET AND CONFER OBLIGATIONS ............................. 19

VIII. CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*B.C. by & Through Powers v. Plumas Unified Sch. Dist.*,
  192 F.3d 1260 (9th Cir. 1999) .................................................................................. 20

*Brooks v. E.I. Du Pont De Nemours and Co., Inc.*,
  944 F.Supp. 448 (E.D. N.C. 1996) ................................................................. 8, 12, 14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................. 7

*First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253 (1968) ................................................. 8

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ............................................................................................ 15, 17

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
  484 U.S. 49 (1987) .............................................................................................. 15, 17

*Hallstrom v. Tillamook County*, 493 U.S. 20 (1989) ...................................................... 15

*Jean v. Dugan*, 814 F. Supp. 1401 (N.D. Ind. 1993) ........................................... 8, 12, 14

*LD v. United Behavioral Health*,
  2023 U.S. Dist. LEXIS 62462 (N.D. Cal. 2023) .................................................. 18, 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................ 7, 8, 9

*Natural Resources Defense Council v. Southwest Marine, Inc.*,
  236 F.3d 985 (9th Cir. 2000) .............................................................................. 14, 15

*Radobenko v. Automated Equipment Corp.*, 520 F.2d 540 (9th Cir. 1975) ......... 8, 12, 14

*S.F. Baykeeper v. City of Sunnyvale*, 627 F. Supp. 3d 1102 (N.D. Cal. 2022) ................ 7

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) .................................... 15, 17

*Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730 (9th Cir. 1979) .............................. 7, 11

*WaterKeepers N. Cal. v. Ag. Indus. Mfg.*, 375 F.3d 913 (9th Cir. 2004) .................. 14, 16

*Waterkeepers N. Cal. v. Ag. Indus. Mfg.*,
  00-cv-1967-MCE-PAN, 2005 U.S. Dist. LEXIS 43006 (E.D. Cal. Aug. 19, 2005) ...... 12

**Statutes**

33 U.S.C. § 1365(b) .................................................................................................. 15, 16

**Rules**

Federal Rule of Civil Procedure 56(c) ............................................................................... 7

Federal Rule of Civil Procedure 56(e) ............................................................................... 8

**Regulations**

40 C.F.R. § 445 ............................................................................................................... 19

40 C.F.R. § 445.2(b) ....................................................................................................... 12

Plaintiff's Reply in Support of Mot.                4          Case No.: 2:20-cv-00123-DJC-DMC
for Partial Sum. Judg. and P&A

40 C.F.R. § 445.2(f) ............................................................................................................. 12

40 C.F.R. § 445.21 ............................................................................................................... 19

## I. INTRODUCTION

Defendants begin their defense to Plaintiff's Motion for Partial Summary Judgment ("Motion"), ECF No. 91, with a regurgitation of various statements about the impacts of the Camp Fire to the Facility. Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment ("Opposition"), ECF No. 93 at 6:1-8:11. There is no dispute that the Camp Fire was a terrible tragedy that caused significant impacts to many parts of Butte County, including the Facility. However, Defendants do not make any legal or factual arguments that amount to a defense to Plaintiff's claims, but merely invoke the Camp Fire in a naked attempt to prey on the Court's sympathies. When pressed to explain exactly how the Camp Fire caused or contributed to the leachate seeps at issue in this case, Defendants have thus far been unable to do so – and they make no effort to do so in their Opposition. Defendant Eric Miller[1] testified in his deposition that he could not think of any damage from the Camp Fire that caused the leachate seeps in February 2019. Plaintiff's Supplemental Appendix of Evidence, ex. 30 at 853:19-23. Though Mr. Miller's expert report states that the "leachate discharges were the direct result of natural disasters" he clarified in his deposition that what he really believed caused the leachate discharges was not damage to the Facility's infrastructure, but rather just the rain that fell on the Facility. *Id.* at 854:14-22. In short, it was not the Camp Fire that caused these unlawful discharges – it was Defendants' poor storm water management.

## II. THERE IS NO GENUINE DISPUTE THAT DEFENDANTS DISCHARGED POLLUTANTS WITHOUT A PERMIT TO NAVIGABLE WATERS

### A. Defendants Do Not Dispute that Landfill Leachate Is a Pollutant Under the Clean Water Act, that the Discharges Reached Waters of the United States, or that the Discharges Were from a Point Source

Defendants challenge: 1) whether the pollutant at issue in this case, landfill

---

[1] Mr. Miller is not just a Defendant in this case, but he was also designated as both Defendant Butte County Department of Public Works' person most knowledgeable to testify on its behalf under Federal Rule of Civil Procedure 30(b)(6), and by all Defendants, as one of their four experts.

Plaintiff's Reply in Support of Mot. for Partial Sum. Judg. and P&A     6     Case No.: 2:20-cv-00123-DJC-DMC

1 leachate, actually left the Facility, Opposition at 10:16-12-20; 2) the number of days that
2 discharges occurred, *id.* at 12:21-13:8; and 3) whether Defendants have a permit that
3 authorized such discharges, *id.* at 13:9-14:17.  Defendants however do not dispute that
4 landfill leachate is a pollutant, Motion at 17:9-13, that the waters into which the
5 discharges are alleged to have reached are waters of the United States, *id.* at 17:14-27,
6 or that the discharges were made from point sources at the Facility, id. at 18:1-28.  As
7 set forth below, Defendant's challenges are without merit.

  **B. There Is No Genuine Dispute of Fact as to Whether Leachate Discharged from the Preserve**

10   On a motion for summary judgment, the moving party has the initial burden of
11 citing to materials in the record, including portions of the pleadings, discovery and
12 disclosures on file, and affidavits, that demonstrate the absence of a genuine issue of
13 material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once that burden
14 has been met, the burden shifts to the non-moving party to set forth specific facts
15 showing a genuine issue of material fact.  See Celotex, 477 U.S. at 324; Matsushita
16 Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  If the non-moving
17 party does not produce evidence to show a genuine dispute as to a material fact, the
18 moving party is entitled to summary judgment. See Celotex, 477 U.S. at 323.
19   The court must draw all reasonable inferences in favor of the party against whom
20 summary judgment is sought. Matsushita Elec. Indus. Co., 475 U.S. at 587.  However,
21 the mere suggestion that facts are in controversy, as well as conclusory or speculative
22 testimony in affidavits and moving papers, is not sufficient to defeat summary judgment.
23 *Id.* ("When the moving party has carried its burden under Rule 56(c), its opponent must
24 do more than simply show that there is some metaphysical doubt as to the material
25 facts"); Thornhill Publ'g Co. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).  Instead,
26 the non-moving party must come forward with admissible evidence to satisfy the
27 burden.  Fed. R. Civ. P. 56(c).  S.F. Baykeeper v. City of Sunnyvale, 627 F. Supp. 3d
28 1102, 1110 (N.D. Cal. 2022).  The nonmoving party must come forward with 'specific

1 facts showing that there is a genuine issue for trial.' Fed. Rule Civ. Proc. 56(e). *See also* Advisory Committee Note to 1963 Amendment of Fed. Rule Civ. Proc. 56(e), 28 U.S. C. App., p. 626 (purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial"). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

Moreover, and particularly relevant here, a genuine dispute of material fact cannot be created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct. *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir. 1975); *see also Brooks v. E.I. Du Pont De Nemours and Co., Inc.*, 944 F.Supp. 448, 450 (E.D. N.C. 1996) (holding that affidavit from party's expert that contradicted the expert's pervious sworn testimony regarding contaminated well water was not sufficient to create triable issue of fact); *Jean v. Dugan*, 814 F. Supp. 1401, 1405 (N.D. Ind. 1993) (holding that a statement made under oath that contradicted a prior unsworn statement made in a letter did not create a dispute of fact because the letter was unsworn testimony).

Defendants attempt to generate a dispute of material fact in their opposition by pointing to apparently conflicting evidence generated by *their own witnesses*. They now dispute whether any leachate-contaminated storm water discharged from the Preserve. Defendants rely on a single, conclusory statement that was directly contradicted by one of the authors of the very report in which the sentence was found, and by Defendants' own admissions. No rational trier of fact could agree with Defendants' assertion that no leachate-contaminated storm water was discharged from Defendants' landfill facility to downstream surface waters. *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

Defendants admit that leachate left the confines of Waste Module 4 and flowed into Sediment Basin Number 4, where it commingled with storm water. SUF 1, 2, 5, 6.

Defendants concede that the contaminated storm water within Sediment Basin Number 4 was pumped to a drainage ditch which flowed to the Preserve. SUF 3, 7. Defendants concede that the storm water in the Preserve was then discharged from the concrete weir and into downstream surface waters. Response to SUF 4, 8. However, Defendants now claim that a dispute exists as to whether the storm water that discharged from the Preserve was contaminated with leachate. *Id.*

**C. Defendants' Sole Piece of Evidence Does Not Actually Raise a Genuine Dispute of Material Fact**

Defendants' sole piece of evidence in support of their contention is a conclusory statement made in the Investigative Final Report. Opposition at 11:16-17:2. However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The fact on which Defendants' entire defense to this claim rests does not actually create a dispute of material fact. In addition, Defendants' interpretation of the Investigative Final Report contradicts the deposition testimony of Defendants' own expert who was an author of the report.

The line that Defendants argue creates a dispute of material fact says "the storm water data indicates that there were no leachate discharges that flowed off-site or into the tributary to Hamlin Slough." Opposition at 11:21. First, this statement does not stand for the proposition that no leachate discharges did, in fact, flow off-site. It only states that the storm water data, in the authors' opinion, was not sufficient to establish that there was a leachate discharge off-site. That is, there may be other pieces of information and evidence that support a conclusion that leachate discharges flowed off-site or into the tributary to Hamlin Slough, but in the authors' opinion the storm water data does not support that conclusion. As discussed below, there is no actual dispute that the leachate-contaminated storm water left the Facility.

Defendants' expert, Sean Covington, testified that he believed the discharges from the Preserve were a mixture of storm water and leachate. Plaintiff's Supplemental

Appendix of Evidence, ex. 31 at 861:9-22 (describing how the discharges of leachate-contaminated storm water flowed, initially, to the Preserve, and then from the Preserve to the downstream surface waters); *id.* at 862:10-18 (explaining that the analysis was done to evaluate discharges from the Preserve); *id.* at 860:17-23 (describing how the contaminates were being mobilized and discharged off-site at SW-1); *id.* at 859:9-16 (explaining how the "material that was collected" was leachate and storm water); *id.* at 863:5-25 (explaining how the samples analyzed were a "mixture" of leachate and storm water). Mr. Covington's expert opinion was not, as Defendants suggest, that the discharges of storm water from the Preserve did not have any leachate in them, but rather that there were no concentrations of chemicals of potential concern that exceeded Environmental Screening Levels or background levels. *Id.* at 858:17-859:8. Mr. Covington clarifies in his expert report that "[t]he objective of the [Investigative Work Plan] was to determine the impacts to water quality that could affect public and wildlife health from the unauthorized leachate discharge to the onsite wetland preserve *and offsite tributaries* during February and March 2019." ECF No. 93-8 at 329 (emphasis added). Mr. Covington understood that he was evaluating samples of storm water mixed with leachate that had flowed out of the Preserve at SW-1 for potential impacts to water quality. He was not evaluating whether leachate had left the Facility, but rather *how much* had left, and what the impacts of that were.

On the one hand, Defendants agree that the flows passing through SW-1 are representative of the contents of the Preserve[2] and that the Preserve contained leachate-contaminated storm water[3]. On the other hand, Defendants claim that there is a dispute that the contaminated contents of the Preserve ever passed through SW-1. Opposition at 12:13-15. This argument defies logic, contradicts Defendants' own experts, and as discussed below, contradicts Defendants' own admissions.

---

[2] The Investigative Final Report states that "SW-1 storm water discharges represent discharges from the PSB." Defendants' Appendix, 252.
[3] SUF 3, 7

In his first deposition as the designated person most knowledgeable to testify on behalf of Defendant Butte County Department of Public Works, Defendant Eric Miller admits that the leachate from Module 4 entered Sediment Basin 4, was pumped to the Preserve, and that the storm water within the Preserve discharged off site on February 14, 2019 and February 26, 2019.  ECF No. 91-2 at 108:12-109:5, 110:9-25.

Defendants' own notification to the Regional Board also confirms the path that leachate took during the events in question.  *Id.* at 7-14.  The map attached to the belated March 13, 2019 seep notification includes a blue line showing the path that the leachate flowed from Module 4 to the discharge weir at the Preserve, and offsite to waters of the United States.  *Id.* at 10.  Though Defendants dispute the origin of these drawings, the dispute is not genuine.  The seep notification, and map contained within, were produced by *Defendants* to Plaintiff in response to a document request under Rule 34.  ECF No. 91-7, ¶ 3.  The very same report, and map, can be accessed via the publicly-available GeoTracker website.  Plaintiff's Supplemental Appendix of Evidence, ex. 32 at 867.  The person who submitted the document is Wayne Pearce, the engineer who signed the report on behalf of the Couty, and under penalty of perjury.  *Id.*  Finally, the same map was attached to the State Board's August 2019 Notice of Violation.  Plaintiff's Supplemental Appendix of Evidence, ex. 33 at 877.  Defendants' abstract and hypothetical concerns about the authorship of the markings included in the report are not supported by any evidence that the document was edited, and Defendants – who provided the report to the Regional Board, and who presumably have the original copy – have not produced a version of the map that they contend is the true authentic version that does not have the drawings in question.  Defendants "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to manufacture a genuine dispute of fact.  *Thornhill Publ'g Co.*, 594 F.2d at 738.

Finally, Defendants cannot create a genuine dispute of material fact by impeaching their own witness.  Mr. Covington's unsworn Investigative Final Report is not enough to create a genuine dispute when compared to a) Mr. Covington's sworn

deposition testimony, b) Mr. Covington's expert report, c) Mr. Miller's sworn deposition testimony, and d) Defendants' reports to the Water Board prior to the start of this litigation.  It is not enough to defeat a motion for summary judgment to merely raise a dispute as to which version of *your own witnesses'* testimony you are asking the Court to believe.  See, Radobenko v. Automated Equipment Corp., 520 F.2d 540, 544 (9th Cir. 1975); Brooks v. E.I. Du Pont De Nemours and Co., Inc., 944 F.Supp. 448, 450 (E.D. N.C. 1996); Jean v. Dugan, 814 F. Supp. 1401, 1405 (N.D. Ind. 1993).

Defendants' reliance on Waterkeepers N. Cal. v. Ag. Indus. Mfg., 00-cv-1967-MCE-PAN, 2005 U.S. Dist. LEXIS 43006 (E.D. Cal. Aug. 19, 2005) is misplaced.  In that case, the court found that there were triable issues of material fact as to the source of the metals found in the defendant's storm water discharges.  Id. at *28-30.  Here, there is no dispute that the pollutant in question, leachate, was generated from Defendants' industrial activities and materials in Waste Module 4 on Defendants' Facility.  SUF 1, 5.  As Defendants highlight in their Opposition, the court in that case found that there was a question of fact as to whether the industrial storm water received pollutants from non-industrial sources.  Opposition at 10:9-12.  That is not the issue here, since the source of the pollutants is undisputed.  No factual assessment is necessary to conclude that the leachate came from Waste Module 4 since that fact is not in dispute.

### III. THERE IS NO GENUINE DISPUTE AS TO THE NUMBER OF DAYS THAT DEFENDANTS DISCHARGED CONTAMINATED STORM WATER FROM THE PRESERVE

Contaminated storm water includes storm water that comes into direct contact with leachate.  40 C.F.R. §§ 445.2(b), (f).  By definition, therefore, all of the storm water within Sediment Basin Number 4 became contaminated storm water when leachate from Waste Module 4 flowed into it.  Id.  By the same token, the storm water within the Preserve became contaminated storm water when the contaminated storm water from Sediment Basin Number 4 was pumped to the Preserve.  Id.  Adding uncontaminated storm water to contaminated storm water creates more contaminated storm water.  Id.

There is no dispute that contaminated storm water flowed into the Preserve on

February 14, 2019 and February 26, 2019.  SUF 3, 7.  There is no dispute that the Preserve discharged storm water on ten days between February 14, 2019 and March 8, 2019.  SUF 4, 8.  Defendants simply attempt to create a dispute of fact by impeaching their own witnesses and admissions, relying on the same evidence discussed above of an alleged "conflict" between the unsworn Final Investigative report and the testimony of its own experts. Opposition at 11:13-12-20.  For the same reasons stated above, this is not adequate to raise a genuine issue of material fact.  Moreover, Defendants present no specific evidence to rebut Plaintiff's evidence that all of the storm water within the Preserve during the period between February 14, 2019 and March 8, 2019 was contaminated storm water.  Thus, no genuine dispute exists and the Motion should be granted.

### IV. DEFENDANTS' FAIL TO IDENTIFY AN APPLICABLE PERMIT THAT AUTHORIZES THE DISCHARGES OF LEACHATE

Defendants do not actually dispute the fact that they do not have a permit that authorizes the alleged discharges of leachate.  Instead, Defendants identify *other* permits, not in effect at this facility, that could potentially authorize a discharge of leachate, but entirely fail to present any evidence that Defendants themselves are covered under such a permit.  If a permit did authorize such discharges, presumably Defendants would have readily identified the permit, and would have led their Opposition with that information.  Instead, they make vague references to Title 27 design storm standards, and other NPDES permits that have upset and bypass provisions that are not found in any of the permits that Defendants *actually* do have.

Defendants ask this Court to find that a genuine dispute of material fact exists with respect to Plaintiff's allegation that Defendants discharged contaminated storm water to waters of the United States.  Opposition at 11:13-15.  Defendants admit that leachate came into contact with storm water within the Preserve, and that storm water within the Preserve discharged to downstream waters of the United States.  However, Defendants dispute that the leachate-contaminated storm water within the Preserve was

discharged. Opposition at 12:11-15.  Implicit in this argument is the contention that the leachate-contaminated storm water from Storm Water Basin Number 4 did not commingle with the storm water in the Preserve.  Defendants do not present the Court with evidence that would allow such a determination.  The only piece of evidence that Defendants put forth is, again, the same statement found in a report prepared by Defendants' experts that Defendants attempt to use to impeach the deposition testimony of those same experts.  Opposition at 11:13-12:20; *infra* Section II.C.  As set forth above, Defendants cannot use an unsworn document to create a conflict with *their own* experts' deposition testimony to create a dispute of fact.  See, *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir. 1975); *Brooks v. E.I. Du Pont De Nemours and Co., Inc.*, 944 F.Supp. 448, 450 (E.D. N.C. 1996); *Jean v. Dugan*, 814 F. Supp. 1401, 1405 (N.D. Ind. 1993).

## V. NO GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER DEFENDANTS' SWPPPS CONTAINED ALL REQUIRED INFORMATION

The question is simply whether Defendants' SWPPPs contained each and every element that the General Permit requires.  The court does not need to wade into any type of factual analysis or weighing of evidence to determine that the SWPPPs have been, and continue to be, deficient in a number of different ways.

### A. Plaintiff Was Not Required to Amend Its 60-Day Notice Letter or Issue a New 60-Day Notice Letter to Address the Deficiencies of the 2021 SWPPP or Violations Occurring After the Notice Letter Was Sent.

Throughout their Opposition, Defendants repeat the argument that violations involving the 2021 SWPPP, and violations arising after the 60-Day Notice Letter ("Notice Letter"), "cannot be considered in this Motion or even allowed in this lawsuit."  Opposition at 16:3-4, 16:17, 17:24-25, 21:2, 21:19-20.  The Ninth Circuit has, on two occasions, considered and *rejected* precisely the argument that Defendants make.  *Natural Resources Defense Council v. Southwest Marine, Inc.*, 236 F.3d 985 (9th Cir. 2000) ("NRDC"); *WaterKeepers N. Cal. v. AG Indus. Mfg.*, 375 F.3d 913, 920 (9th Cir. 2004).

> The second and more theoretical question that Defendant's argument raises is what, if any, effect Defendant's post-notice alterations of its plans and facilities had on the adequacy of the notice letter. If a defendant receives a proper notice letter alleging that it has failed to prepare and implement an adequate plan and, in response, prepares a new plan and begins to implement it before the complaint is filed, is the otherwise proper notice letter defective for failing to identify and discuss the new plan and its implementation? In those circumstances, must a citizen-plaintiff send a new notice letter? We think not.

NRDC, 236 F.3d at 997.  The Ninth Circuit emphatically rejected the idea that a citizen-plaintiff needs to send a new notice letter each time a defendant changes its plan, comes up with a new one, or changes the implementation of its existing plans.  *Id.*  The rationale here is straightforward.  Notice is intended to provide a discharger with the information it needs to bring itself into compliance, and to provide the relevant agencies with the information they need to decide whether to bring their own enforcement action.  Hallstrom v. Tillamook County, 493 U.S. 20, 27-29 (1989) (the Court sought to further the congressional goals of allowing "government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits," as well as giving "the alleged violator an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit"); NRDC, 236 F.3d at 996 ("In practical terms, the notice must be sufficiently specific to inform the alleged violator about what it is doing wrong, so that it will know what corrective actions will avert a lawsuit," (internal citation omitted).  As the Ninth Circuit goes on to explain in *NRDC*, "[t]he defendant's later changes to its operations and plans may affect standing, *see* Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 105-106 (1998); the question of ongoing violations or remedies, *see* Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 64 (1987); or mootness, *see* Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 188 (2000) .  But such changes do not retroactively divest a district court of jurisdiction under 33 U.S.C. § 1365(b)." NRDC, 236 F.3d at 997.

In *Waterkeeper N. Cal. v. AG Indus. Mfg.*, the Ninth Circuit reaffirmed its ruling in

*NRDC*, and held that the plaintiff in that case "was not required to send a second notice letter in order to pursue specific claims regarding the inadequacies of [the defendant's] post-notice compliance efforts." 375 F.3d 913, 920 (9th Cir. 2004).

Here, Defendants argue that the Court lacks subject matter jurisdiction under 33 U.S.C. § 1365(b) because Plaintiff's claims involve the 2021 SWPPP and other violations alleged to have occurred after the Notice Letter was issued by Plaintiff. Opposition at 16:3-4, 16:17, 17:24-25, 21:2, 21:19-20.  Defendants argue that because Plaintiff never issued a new notice letter to include these claims, the court lacks the jurisdiction to adjudicate the claims.  *Id.*  This is precisely the argument that the Ninth Circuit rejected in *NRDC*, and again in *Waterkeeper N. Cal.*  Plaintiff's Notice Letter alleged that Defendants failed to develop and implement adequate SWPPPs and Monitoring Implementation Plans.  ECF No. 1 at 27-28.  Plaintiff's first and third claims for relief incorporate those allegations into the Complaint.  *Id.* at 13:20-21:18, 15:20:16:13.  Defendants' later changes to its operations and plans do not retroactively divest this Court of jurisdiction under 33 U.S.C. § 1365(b).[4]  *NRDC*, 236 F.3d at 997  Defendants complain, with no citation to legal authority, that some of the alleged violations could not have accrued until after the close of non-expert discovery, that the complaint was never amended to include them, and therefore it would be inappropriate for the Court to rule on those claims.  Opposition at 18:23-19:7.  Defendants claim to be surprised by these allegations, but the Notice Letter and Complaint identified these types of violations as claims, ECF No. 1 at 27-28, 13:20-21:18, and pursuant to *NRDC* and *Waterkeeper N. Cal.*, these violations are well within the Court's jurisdiction to adjudicate.

Furthermore, Defendants do not contend that Plaintiff's Notice Letter was improper in any other way.  Defendants do not argue that the 2021 SWPPP brought

---

[4] Defendants also claim that Plaintiff did not include these claims in its responses to Defendants' interrogatories, but Plaintiff's responses do identify the violations. Response to SAUF 126.

them into compliance such that Plaintiff's claims were barred for lack of standing, see [Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 105-106 (1998)](), or that the violations were no longer ongoing or that there were no available remedies, see [Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 64 (1987)](), or that Plaintiff's claims were moot, see [Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 188 (2000)](). Instead, Defendants hang their entire opposition to violations arising from the 2021 SWPPP, and post-notice violations, on a busted legal theory. Because the Ninth Circuit has already rejected this argument, this Court must also.

### B. Defendants' Expert Is Not Qualified to Provide a Legal Opinion About What the General Permit Requires

Defendants offer the testimony and legal opinion of Travis Peterson to support their argument that the General Permit does not require a SWPPP to identify the current location of where the primary industrial activity at the Facility are being conducted. E.g., County's Response to SUF 31. Defendants' expert conflates key terms with respect to this allegation that are worth clarifying. *Id.* The "working face" is the location at the Facility where waste is placed each day. SUF 26-28. The "working face" moves daily. *Id.* However, the "active phase" is the location at the Facility that describes a larger area – of which the "working face" is a part – where waste is placed, and where waste is going to be placed in the future. *Id.* The "active phase" is determined by permitting and engineering restrictions such as how high waste can be piled before it sloughs off. *Id.* The Facility does not change "active phases" on a daily basis, and can place waste in a given "active phase" for months at a time. SUF 29. A "Waste Module Unit" is the largest unit of waste disposal at the Facility, and is comprised of many "phases." SUF 26. "Waste Module Units" are active for years at a time. SUF 29.

Plaintiff contends that the "active phases" and the "Waste Module Units" should be accurately reflected on each site map to satisfy the General Permit's requirement that "all areas of industrial activity subject to the General Permit" are identified on the

site maps.  Motion at 20:19-22:13; see General Permit Section X.E.3.f.  Defendants argue that the SWPPP does not need to be amended to reflect changes to these "active phases" or even the bigger "Waste Module Units."  Opposition at 16:18-17:6.  This is not a factual dispute – both parties apparently agree that the site maps in question do not include the information about the "active phases" and "Waste Module Units" as alleged by Plaintiff.  This is a legal dispute and is within the authority of the Court to decide on a motion for summary judgment.  Defendants' inappropriate reliance on the legal opinion of Mr. Peterson does not convert the dispute into a factual one.  *LD v. United Behavioral Health*, 2023 U.S. Dist. LEXIS 62462 at *7 (N.D. Cal. 2023) ("Experts may not opine on 'matters of law for the court'").  A straightforward reading of Section X.E.3.f of the General Permit is enough to determine that Defendants have it wrong.

### C. There Is No Genuine Dispute that Defendants Failed to Identify All Wetlands and Impervious Areas on Their Site Maps

Defendants also contend that there is a disputed issue of material fact with respect to whether the site maps in the SWPPPs adequately identify the Preserve.  Opposition at 16:5-7.  Notably, Defendants do not dispute Plaintiff's claim that the site maps violate Section X.E.3.f, which requires the site map to identify the "location(s) of nearby water bodies (such as rivers, lakes, *wetlands*, etc.)" (emphasis added).  It is undisputed that site maps only identify the Primary Sedimentation Basin – and not any wetlands found within.  SAUF 109, 110.

Defendants dispute whether Posi-Shell is required to be identified on the site maps.  Opposition at 17:27-18:3.  They contend that Posi-Shell is only "semi-permanent" and "temporary," and therefore the General Permit does not require the impervious material to be identified by Section X.E.3.d which mandates the "identification of all impervious areas of the facility."  The General Permit does not make the same distinction that Defendants do between temporary and permanent impervious surfaces, and Defendants offer no authority for their interpretation of the General Permit.  Even Defendants' own expert, Travis Peterson, disagrees with that conclusion,

1 because he testified that he thought that Defendants should have identified areas with
2 Posi-Shell.  ECF No. 93-8 at 202:9:12.

## VI. NO GENUINE DISPUTE OF MATERIAL FACT EXISTS AS TO WHETHER DEFENDANTS ADEQUATELY DEVELOPED AND IMPLEMENTED A MONITORING PLAN

### A. Whether Defendants Are Required to Sample Their Discharges of Landfill Wastewater for Regulated Parameters Is Not a Question of Fact, but a Question of Law

Defendants again conflate a dispute of law with a dispute of fact.  They contend that they are not required to have their storm water samples analyzed for the Regulated Parameters under 40 C.F.R. § 445.21.  The sole basis for this contention is apparently the opinion of Travis Peterson, who states, in circular fashion, that "[t]he NRRWF is not subject to Subchapter N requirements as demonstrated in the Facility SWPPP." Opposition at 23:27-28.  Again, Mr. Peterson's legal opinion should be excluded.  *LD v. United Behavioral Health, 2023 U.S. Dist. LEXIS 62462 at *7 (N.D. Cal. 2023)*.  In any case, Mr. Peterson's reasoning is flawed in that he relies on the conclusions made in the SWPPP to determine what sampling parameters are required by the implementing regulations for the Clean Water Act.  This is not a dispute of fact.  There is no dispute that Defendants do not sample for the Regulated Parameters.  The only dispute is whether Defendants are *required* to sample for them in the first place.  This is a legal dispute, and well within the Court's authority to resolve.

The legal dispute is whether the requirements of 40 C.F.R. § 445 (Subchapter N) apply to Defendants.  Plaintiff contends that where there is a discharge of landfill wastewater, which is defined in the regulations to include leachate and contaminated storm water, section 445.21 applies and the discharges must be sampled for the Regulated Parameters.  Defendants disagree, but offer only the legal opinions of Mr. Peterson in support, which is not sufficient to create a triable issue of fact.  The dispute is thus a legal one, and may be resolved on summary judgment.

## VII. PLAINTIFF MET ITS MEET AND CONFER OBLIGATIONS

In anticipation of bringing this Motion, Plaintiff informed Defendants of its intent to

file a motion for summary judgment and invited Defendants to meet and confer on the substance of the Motion.  Implicit in any dispositive motion brought by Plaintiff is the question of Plaintiff's standing.  "Federal courts are required sua sponte to examine jurisdictional issues such as standing." B.C. by & Through Powers v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999).  Because standing is jurisdictional, the court must satisfy itself that Plaintiff has standing, and that therefore the Court has jurisdiction.  The Court may decide to address the issue of standing even if neither party raises the issue, and even if the parties did not meet and confer specifically about standing.  Plaintiff provided the facts that would provide sufficient basis to determine that Plaintiff has standing to prevail on its Motion.

Notably, Defendants choose to attack only Plaintiff's meet and confer efforts, and not Plaintiff's actual standing to bring this action.  During the meet and confer, Defendants raised several issues that they thought would defeat Plaintiff's proposed motion for summary judgment, but the issue of standing was not one of them.  Presumably, knowing that standing is jurisdictional and that a lack of standing would defeat any motion for summary judgment, Defendants would have identified that as a reason why Plaintiff should not have brought its motion.  However, Defendants did not challenge Plaintiff's standing then, just as they do not challenge it now.

## VIII. CONCLUSION

Defendants have failed to raise a *genuine* dispute of material fact with respect to whether the discharges at issue in this case contained leachate.  Defendants simply got the law wrong with respect to whether Plaintiff was required to submit additional notice letters for the post-notice violations alleged in this Motion.  Defendants have violated and continue to violate the General Permit and Clean Water Act in myriad ways.

Respectfully submitted,

Dated:  February 12, 2024                         LAW OFFICE OF WILLIAM CARLON

Attorney for Plaintiff                    By:     /s/ William Carlon_____
CALIFORNIA OPEN LANDS                             William Carlon

Plaintiff's Reply in Support of Mot.        20      Case No.: 2:20-cv-00123-DJC-DMC
for Partial Sum. Judg. and P&A