Diane G. Kindermann (SBN 144426)
dkindermann@aklandlaw.com
Glen C. Hansen (SBN 166923)
ghansen@aklandlaw.com
ABBOTT & KINDERMANN, INC.
2100 21st Street
Sacramento, California 95818
Telephone: (916) 456-9595
Facsimile: (916) 456-9599

Attorneys for Defendants
BUTTE COUNTY DEPARTMENT OF
PUBLIC WORKS, DENNIS SCHMIDT,
ERIC MILLER

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA OPEN LANDS, a non-profit land trust organization,<br><br>Plaintiff,<br><br>v.<br><br>BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS, a political subdivision of the State of California, DENNIS SCHMIDT, an individual, and ERIC MILLER, an individual,<br><br>Defendants. | No. 2:20-CV-00123-KJM-DMC<br><br>**DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>(FRCP 56; Eastern District Civil L.R. 260)<br><br>Judge: Hon. Daniel J. Calabretta<br>Trial Date: June 24, 2024 |

-1-

## I. INTRODUCTION

This Court stated that it "is not convinced that the alleged MIP violations are continuous or intermittent; that is, that the 2019 and 2021 MIPs do not comply with the General Permit, or that Defendants would not test contaminated storm water for the Regulated Parameters under those MIPs." Order Re Supplemental Briefing (ECF No. 99) ("Order") at 2. Accordingly, this Court ordered Plaintiff to submit supplemental briefing "demonstrating why Defendants' alleged failures to develop and implement adequate MIPs are continuous or intermittent such that the Court may grant summary judgment on Plaintiff's claim." On March 26, 2024, Plaintiff filed its Supplemental Brief ("PSB"), which fails to demonstrate that the Defendants' alleged MIP violations are continuous or intermittent. Rather, Plaintiff's arguments in the PSB:

(1)   Assert an erroneous testing requirement in order to avoid the Court's finding that "the 2019 and 2021 MIPs appear to require the Facility to test landfill wastewater for the Regulated Parameters" (ECF 99, at 3:5-11);

(2)   Rely on speculation and ignore the evidence in the record of Defendants' ongoing observation and repairing of leachate seeps; and

(3)   Present disputed issues of material facts that preclude this Court's grant of summary judgment on Plaintiff's MIP violations claim.

Accordingly, this Court should deny summary judgment of Plaintiff's MIP claim, as well as all of the other claims raised in Plaintiff's motion for partial summary judgment.

## II.   PLAINTIFF'S ARGUMENT ABOUT THE TESTING OF ALL STORM WATER AT THE FACILITY IS WRONG, AS A MATTER OF LAW.

Plaintiff initially alleged in its motion for partial summary judgment that, "[t]o the extent that the Facility discharges contaminated storm water in the future, the Monitoring Implementation Plan would not provide for the analysis of the required Regulated Parameters. SUF 86." Pl.' Notice of Motion, etc. (ECF No. 91) at 28:12-15. As this Court found in the Order, that allegation is false:

> The Court concurs with Plaintiff that the 2015 MIP, which was in

> place at the time of the alleged storm water discharges in 2019, did not require testing for the Regulated Parameters. (See Pl.'s App., Ex. 11 (ECF No. 91-3) ("2015 MIP") at 391–971 (no required testing of biochemical oxygen demand, ammonia (as nitrogen), α-Terpineol, benzoic acid, or p-Cresol).) *However, the 2019 and 2021 MIPs appear to require the Facility to test landfill wastewater for the Regulated Parameters.* (See Pl.'s App., Ex. 4 (ECF No. 91-2) ("2019 MIP") at 153–54 (stating that "if the Facility discharges landfill wastewater, as defined in Part 445.2(f), then it will be subject to the storm water EGLs" and will analyze samples for biochemical oxygen demand, ammonia (as nitrogen), α-Terpineol, benzoic acid, and p-Cresol); Pl.'s App., Ex. 5 (ECF No. 91-2) ("2021 MIP") at 202 (same).)  [Order (ECF No. 99) at 3:1-11 (emphasis added).]

In response to this Court's findings and contrary to its earlier position, Plaintiff now concedes that "subsequent amendments" to the MIPs in September 2019 and in 2021 include the requirement that Defendants analyze samples of landfill wastewater discharges for Regulated Parameters required by Subchapter N.  PSB, at 3:17-19.

To avoid the conclusiveness of that concession, however, Plaintiff appears to base its MIP claim on a different testing requirement that Plaintiff *alleges* is mandated by the General Permit.  In the first main point in the PSB, Plaintiff appears to argue that the General Permit requires that *all* storm water at the Facility must be sampled for the Regulated Parameters, not just discharges of landfill wastewater. PBS, at 3:28-4:3; 5:8-9. Those allegations are wrong, as a matter of law.  As explained by Travis Peterson, the Defendants' expert QISP, the General Permit does not require that Defendants analyze all storm water samples for Regulated Parameters required by Subchapter N:

> The monitoring implementation plan for the FACILITY does not require storm water collected at the Facility to be analyzed for biological oxygen demand, and the GENERAL PERMIT does not require storm water collected at the Facility to be analyzed for biological oxygen demand, ammonia (as nitrogen), a-Terpineol, Benzoic acid, p-Cresol, or Phenol.  [County's SAUF 132, 133; Rebuttal Expert Report, dated August 15, 2023, p. 10 (attached as Ex. 3 to Deposition of Travis Peterson); Peterson Depo., 18:19-19:4, 119:7-120:17, County's App., Ex. E, at 188:19-189:4; 203:7-204:17, 220, 222.

That analysis by Mr. Peterson is correct.

The General Permit, section XI.B.6 includes seven parts that describe the parameters a discharger is required to analyze when samples are collected, some

explicit, others not. (ECF No. 92, at 52.) Dischargers, QISPs, and SWPPP authors use these descriptions to select the appropriate analytical parameters. In this case, General Permit, section XI.B.6 parts a, b, d, e, and g were directly addressed in the 2019 MIP (i.e., the 2019 SWPPP), including two parts that are specific to the type of industrial classification and activity. Section XI.B.6.d was addressed by adding parameters based on the Facility's primary and secondary SIC codes: 4953, "Landfills and Land Application Facilities" and 5093, "Scrap and Waste Materials (not including source separated recycling)," respectively. The specific parameters associated with these industrial classifications (Fe; Pb; Al; Zn; COD) (ECF No. 92, at 55, Table 1), are included in the Facility's SWPPP. (See Pl.'s App., Ex. 4 (ECF No. 91-2) (2019 MIP, Sec. 9.3.1.7) at 151-52; (2021 MIP, Sec. 9.3.1.7) at 200-01). Section XI.B.6.g, also directly relates to landfill operations and the applicability of Subchapter N, 40 C.F.R. §445 to the facility, and was addressed in both the 2019 and 2021 SWPPPs, stating "Therefore, this Facility is not subject to the storm water EGLs in Subchapter N of 40 CFR. However, if the Facility discharges landfill wastewater, as defined in Part 445.2(f), then it will be subject to the storm water EGLs, and facility personnel will collect and analyze samples from QSEs for each of the following (additional) regulated pollutants specified for landfills in Subchapter N" (See Pl.'s App., Ex. 4 (ECF No. 91-2) (2019 MIP, Sec. 10) at 153-54; Pl.'s App., Ex. 5 (ECF No. 91-2) (2021 MIP, Sec. 10) at 202.) General Permit, Section XI.B.6. parts c and f were not needed because the parameters already selected served as indicators of the presence of identified industrial pollutants, and the parameters indicated in Subchapter N are not the only parameters that may indicate the presence of leachate (e.g. COD and O&G are organic indicators and iron, lead, aluminum, and zinc are inorganic indicators). These analytical parameters would indicate if a "…wide variety of inorganic and organic pollutants…" that are identified in the pollutant source assessment within each SWPPP for leachate management and at the working face may be present in any analytical samples (See Pl.'s App., Ex. 4 (ECF No. 91-2) (2019 MIP, Sec. 7.2.1.d and g) at 137; Pl.'s App., Ex. 5 (ECF No. 91-2) (2021 MIP, Sec. 7.2.1.d and g) at 185.)

Therefore, the analysis of Mr. Peterson is correct, and Plaintiff's first argument in its PSB is simply wrong, as a matter of law.

### III. Plaintiff's Arguments Are Based On Conjecture And Speculation, And Ignore Contrary Evidence Before This Court.

"[A] citizen plaintiff must always establish ongoing violations to prevail on a Clean Water Act claim." *L.A. Waterkeeper v. AAA Plating & Inspection, Inc.*, No. CV 18-5916 PA (GJSx), 2019 U.S. Dist. LEXIS 228240, at *8 (C.D.Ca., July 24, 2019). As this Court explained, "'a citizen plaintiff may prove ongoing violations "either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.'" Order (ECF No. 99) at 2:22-25 (quoting *Sierra Club v. Union Oil*, 853 F.2d 667, 671 (9th Cir. 1988) (internal citation omitted)).

Plaintiff provides no evidence that the alleged MIP violations (i.e., discharge of landfill wastewater from the Facility in early 2019) continued after the filing of the Complaint on January 16, 2020. Instead, Plaintiff argues that the alleged violations in early 2019 "are likely to reoccur" even after the changes in the MIPs in September 2019 and in 2021. (PSB, at 3:19-21; 5:23-25.) But that argument is based on conjecture and speculation. Without citation to any evidence, Plaintiff merely *suggests* that "some landfill wastewater *may* escape the confines of waste modules and leachate collection and removal system in ways that are not readily visible" (PSB, at 5:27-6:1)(emphasis added)]; that "[e]ach time leachate escapes the collection and removal system is an *opportunity* for leachate to enter into the storm water conveyance system and to discharge offsite" (PSB, at 4:24-26) (emphasis added); that "it is not unreasonable to expect that leachate *might* leak from places that cannot be observed" (PSB, at 6:2-4) (emphasis added); that "Defendants *might* not be aware of the presence of landfill wastewater in their storm water discharges" (PSB, at 3:22-23) (emphasis added); that "Defendants *may* not know whether they are discharging leachate-contaminated storm water" (PSB, at 6:7-8) (emphasis added); and that "it is not unreasonable to expect that [leachate] *might* be

discharged from the Facility again." (PSB, at 6:11-12) (emphasis added).

Such speculative potentialities, unsupported by any evidence, fail to constitute "adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." Order (ECF No. 99) at 2:22-25. Plaintiff's motion for partial summary judgment cannot be based on such conjecture and speculation. *See e.g., Tran v. James River Ins. Co.*, No.: 2:19-cv-05679-MWF-SK, 2020 U.S. Dist. LEXIS 197660, at *25 (C.D.Ca., March 30, 2020) ["Mere speculation as to the facts is not sufficient to sustain [plaintiff's] burden of proof" on plaintiff's motion for partial summary judgment].

Furthermore, Plaintiff's conjecture and speculation is contrary to evidence in the record that establishes that Defendants would become aware of the presence of landfill wastewater in any storm water discharges, and so would adhere to storm water EGLs and will analyze samples for the Regulated Parameters in those circumstances, as required by the September 2019 and 2020 MIPs. Section XI.A.1.a.i of the General Permit (ECF No. 92, at 50) requires monthly visual observation of each drainage area for "[t]he presence or indications of prior, current, or potential unauthorized NSWDs and their sources." Section XI.A.1.a.iii of the General Permit (ECF No. 92, at 50) requires monthly visual observation of "[o]utdoor industrial equipment and storage areas, outdoor industrial activities areas, BMPs, and all other potential source of industrial pollutants." Also, monthly visual observations are required in section 9.2.1 of the 2019 MIP (ECF No. 91-2, at 149-50) and of the 2021 MIP (ECF No. 91-2, at 198), which states: "Attachment 6 presents the form Facility personnel will use to record monthly visual observations."

Plaintiff failed to include all the Attachments to the 2019 SWPPP and 2021 SWPPP in their Appendix of Exhibits in support of the motion for partial summary judgment, even though such Attachments are explicitly listed in the Table of Contents for the SWPPPs. (ECF No. 91-2, at 124, 170.) For that reason, Defendants are now presenting to this Court the *entire* contents of both the 2019 SWPPP and the 2021 SWPPP by way of a Supplemental Appendix of Exhibits, which is filed herewith.

As discussed above, Attachment 6 to the 2019 SWPPP and the 2021 SWPPP presents the form Facility personnel will use to record monthly visual observations. (Defendants' Supplemental Appendix of Exhibits ("Def.Supp.App."), Ex. L, at 249-50; Def. Supp.App., Ex. M, at 722-23.)

Also, Defendants have specific plans and procedures in place to determine the presence of landfill wastewater through visual observations and have successfully documented doing so. Included in the 2019 SWPPP and 2021 SWPPP, Attachment 3: Leachate Seep Notifications, the Facility includes evidence of actually performing the process of detecting and evaluating leachate spills and leaks through observation, documentation, communication, performance of mitigating and corrective actions, sampling, and regulatory reporting immediately following an intense rain event on April 20, 2019.  (Def. Supp.App., Ex. L, at 165, 241-45; Def.Supp.App., Ex. M, at 433, 510-14.)

Also included in the 2019 SWPPP and 2021 SWPPP as Attachment 1 is the *September 23, 2019 Operations Plan for Managing Stormwater and Leachate, Neal Road Recycling and Waste Facility, prepared by Golder Associates, Inc.* (Def. Supp.App., Ex. L, at 49-65; Ex. M, at 317-333.)  Section 3.1.1 ("Leachate Extraction and Storage") of this document describes the location and storage of leachate at the facility.  (Def. Supp.App., Ex. L, at 59-60; Ex. M, at 327-28.)  Section 3.1.2 ("Leachate Seeps") of this document fully describes the mechanism by which leachate seeps may occur, describes the identification of small and large leachate seeps, and describes the mitigation procedures, all of which indicate the awareness, methods, and mitigation for knowing if leachate is escaping containment and has the potential to be discharged from the Facility.  (Def. Supp.App., Ex. L, at 60-61; Ex. M, at 328-29.)

Furthermore, throughout the SWPPP documents are numerous site-specific descriptions detailing how the Facility detects, observes, and manages leachate, spills, and leaks, which demonstrate not only the Defendants' "awareness" of the presence of landfill wastewater at the Facility, but Defendants' extensive experience and knowledge. Those descriptions are included in the following sections of the 2019 and 2021 SWPPPS:

- Section 8.1.2.1 lists locations that may spill or leak, including leachate at the surface impoundment and working face. (ECF No. 91-2, at 141, 190.)
- Section 8.1.2.2 explains that Facility personnel observe the working face daily and surface impoundment monthly for conditions that may result in spills or leaks. (ECF No. 91-2, at 141-42, 190-91.)
- Section 8.1.3 states: "If a spill, or leachate seep, flows into the Facility storm water system, Facility personnel will implement procedures immediately (consistent with Facility safety procedures) to contain the contaminated stormwater. Such measures could include the following actions:…" (ECF No. 91-2, at 143, 191.)
- Section 8.1.4.4 states: "At the working face, Facility personnel will construct temporary berms to divert storm water run-on from adjacent covered areas away from exposed wastes at the working face. As described in Section 5.5, Facility personnel will also construct temporary berms around the active working face if necessary to capture storm water that might become leachate by contacting exposed wastes" (ECF No. 91-2, at 144, 192-93.)
- Section 7.2.4 describes the nature of spills and leaks at the Facility and the unlikely mobilization of pollutants through storm water. The structural controls described in Section 5.3 will limit transport of pollutants from wastes, inerts, waste tires and recyclable materials. In addition, spills or leaks are most likely to occur on surfaces where they can be detected and cleaned up easily. Therefore, the degree to which pollutants may be exposed to, and mobilized by contact with storm water is minimal. (ECF No. 91-2, at 138, 186.)

In addition, Plaintiff has not provided any evidence that the Facility has ever discharged landfill wastewater since early 2019, and therefore Plaintiff cannot establish and prove that Defendants will not test as required by the 2019 and 2020 MIPs.

Thus, the evidence of Defendants' required observations and policies provided in

the 2019 and 2021 SWPPS, listed above, coupled with Plaintiff's failure to prove Defendants' lack of observation or failure to follow those policies, collectively establish that Plaintiff cannot prove that the alleged MIP violations are continuous or intermittent. *See e.g., Pawtuxet Cove Marina v. Ciuba-Geigy Corp.*, 807 F.2d 1089, 1094 (1st Cir. 1986) [in action for civil penalties under the Clean Water Act, "there was no reasonable likelihood that defendant's alleged infractions would continue, and the district court correctly determined that the action should be dismissed."]

### IV. Disputed Issues Of Material Facts Preclude This Court's Grant Of Summary Judgment On Plaintiff's MIP Violations Claim.

As explained above, the evidence before this Court regarding Defendants' observation and policies, listed above, establishes that Defendants will become aware of the presence of landfill wastewater in any storm water discharges, and so will adhere to storm water EGLs and will analyze samples for the Regulated Parameters in those circumstances, as the 2019 and 2021 MIPs require. Such evidence contradicts the suggestion underlying Plaintiff's MIP claim that "Defendants may not know whether they are discharging leachate-contaminated storm water …." PSB, at 6:7-8. For that reason, summary judgment is not permitted on Plaintiff's MIP claim. "If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party. The nonmoving party's evidence must be taken as true." (*T.W. Elec. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 632 (9th Cir. 1987).) "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge' ruling on a motion for summary judgment." *Mt. Club Owner's Ass'n v. Graybar Elec. Co.*, CIV. NO. 2:13-1835 WBS KJN, 2016 U.S. Dist. LEXIS 10383 at *4, 2016 WL 323805 (E.D.Ca. 2016), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1985).

For example, in *Cal. Sportfishing Prot. Alliance v. Cal. Ammonia Co.*, NO. CIV. S-05-0952 WBS JMF, 2007 U.S. Dist. LEXIS 8845, at *28 (E.D.Ca. 2007), the District Court

considered conflicting evidence regarding the sufficiency of defendants' monitoring and denied plaintiff's motion for partial summary judgment on plaintiff's claim that defendant failed to develop and implement an effective monitoring program.

In short, the evidence regarding the sufficiency of Defendants' observations and policies precludes summary judgment on the MIP claim.

Plaintiff argues that "there is a reasonable likelihood" that the 2019 alleged violations "will recur." PSB, at 5:20-22.) However, courts routinely hold that determinations of the "reasonable likelihood" of certain events occurring in the future are inappropriate on summary judgment. *See e.g., Wahlstrom v. Successline, Inc.*, No. 15-14113, 2017 U.S. Dist. LEXIS 82724, at *13-*15 (E.D.Mich., May 31, 2017); *Branta, LLC v. Newfield Prod. Co.*, No. 15-cv-00416-WYD-KLM, 2017 U.S. Dist. LEXIS 113632, at *19-*20 (D.Colo., June 21, 2017). This Court cannot decide "there is a reasonable likelihood" that the 2019 alleged violations "will recur," precluding summary judgment on the MIP claim.

V.   **CONCLUSION.**

Because undisputed evidence does not prove that the Defendants' alleged MIP violations are continuous or intermittent, this Court should deny summary judgment on Plaintiff's MIP claim.

Dated: April 2, 2024

ABBOTT & KINDERMANN, INC.

By: /s/ Glen Hansen
GLEN C. HANSEN
DIANE G. KINDERMANN
Attorneys for Defendants
BUTTE COUNTY DEPARTMENT OF
PUBLIC WORKS, DENNIS SCHMIDT,
ERIC MILLER