UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA OPEN LANDS, | No. 2:20-cv-00123-DJC-DMC |
| Plaintiff, | |
| v. | <u>ORDER</u> |
| BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS, DENNIS SCHMIDT, and ERIC MILLER, | |
| Defendants. | |

Pending before the Court is Plaintiff California Open Lands' Motion for Partial Summary Judgment on its first, third, and fourth claims for relief.  (ECF No. 91.)

Having considered the Parties' briefing and arguments, the Court hereby GRANTS the Motion in part, and DENIES it in part.

## FACTUAL BACKGROUND

### I.    Plaintiff's Wetland Preserve

Plaintiff is a California non-profit land trust corporation based in Chico, California.  (Nielsen Decl. (ECF No. 91-5) ¶ 1.)  In 2007, Butte County recorded a perpetual conservation easement grant ("Easement") in Plaintiff's favor that created a wetland preserve ("Preserve") on a portion of the Neal Road Recycling and Waste Facility ("Facility") located in Butte County.  (*Id.* ¶ 2.)  Plaintiff maintains the Preserve pursuant to the terms of the Easement.  (*Id.* ¶ 3.)

## II.   Defendants' Landfill Facility

The Facility, located at 1023 Neal Road in Paradise, California, is a solid waste facility owned and operated by Defendant Butte Country Department of Public Works.[1]  (Pl.'s Statement Undisputed Facts ("Pl.'s SUF") (ECF No. 93-1) ¶ 12; Compl. (ECF No. 1) ¶ 10.)  The Facility's primary industrial activity is the receiving, handling, and disposal of municipal solid waste.  (Pl.'s SUF ¶ 13.)  The Facility also manages and stores landfill leachate.[2]  (*Id.*)

The Facility is approximately 229 acres, and consists of five Class III waste management units, also known as modules.  (*Id.* ¶ 12.)  Other significant features at the Facility include a Class II surface impoundment for landfill leachate and landfill gas condensate, storm water basins, and a primary sedimentation basin.  (Defs.' Statement Undisputed Facts ("Defs.' SUF") (ECF No. 94-3) ¶ 93.)  Plaintiff's Preserve is located in the primary sedimentation basin.  (See *id.* ¶¶ 109–10.)

The Facility sits in a canyon which slopes northeast-to-southwest.  (Pl.'s SUF ¶ 15.)  Storm water is collected at the Facility in a series of conveyances and basins, and generally flows to the southwest.  (*Id.* ¶¶ 15–16.)  Before flowing off-site, storm water flows into the Preserve.  (*Id.* ¶ 16.)  Any off-site flow that occurs flows through the spillway for the Preserve.  (*Id.*)  This spillway is the only storm water sampling location at the Facility and is designated as SW-1.  (*Id.*)  Storm water runoff from the Facility ultimately flows to the Sacramento River.  (*Id.* ¶ 17.)

## III.   Leacheate Discharges

On or about November 8, 2018, a wide-spread fire, commonly known as the Camp Fire, damaged critical Facility infrastructure.  (Defs.' SUF ¶ 94.)  The infrastructure destroyed by the Camp Fire was being repaired by Facility personnel when a series of severe local storm events caused by atmospheric rivers impacted the

---

[1] Defendant Dennis Schmidt is the Director of the Facility, while Defendant Eric Miller is the Manager of the Facility.  (Compl. ¶¶ 11–12.)

[2] Leachate means a liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste.  40 C.F.R. § 258.2.

Facility beginning in late November 2018, producing over three inches of rain in three days. (*Id.* ¶ 97.) The site received over five inches of rain in January 2019, and nearly thirteen inches of rain in February 2019. (*Id.*)

On February 14, 2019, during these extreme weather conditions, Defendants became aware of landfill leachate seeping out of the southern face of the facility's module 4 ("Module 4"). (Pl.'s SUF ¶ 1.) The leachate seeped into a storm water basin located downstream of Module 4, Sediment Basin 4. (*Id.* ¶ 2.) Leachate commingled with storm water collected in Sediment Basin 4 and was discharged by a pump into a ditch that flowed to the Preserve. (*Id.* ¶ 3.) From the Preserve, storm water flowed over the concrete spillway along the west side of the Preserve basin, SW-1, and off the Facility into an unnamed creek. (*Id.* ¶ 4.) The unnamed creek flows to Hamlin Slough, which is a tributary to Butte Creek, which is in turn a tributary to the Sacramento River and the Sacramento-San Joaquin Delta. (*Id.* ¶¶ 4, 17.) The Delta and its tributaries are waters of the United States within the meaning of the Clean Water Act. (*Id.* ¶ 10.)

On February 26, 2019, leachate again seeped from Module 4 into Sediment Basin 4 where it commingled with storm water collected there. (*Id.* ¶¶ 5, 6.) Leachate-contaminated storm water was then discharged by a pump into the ditch that drained to the Preserve. (*Id.* ¶ 7.) By the following day, February 27, 2019, enough liquid had accumulated in the Preserve basin that it flowed over the concrete spillway and into the surface waters downstream. (*Id.* ¶ 8.) The Facility continued to discharge from this point for the next five days, through March 4, 2019, and again on March 6, 2019, through March 8, 2019. (*Id.*)

## LEGAL BACKGROUND

## I.    The Clean Water Act

The "objective of [the Clean Water] Act (33 U.S.C. §§ 1251 et seq.) is to restore and maintain the chemical, physical, and biological integrity of [the] Nation's waters." 33 U.S.C. § 1251(a). To achieve this objective, the Clean Water Act prohibits the discharge of any pollutant by any person unless in compliance with a permit issued

1   under the National Pollution Discharge Elimination System ("NPDES"). *Id.* §§ 1311(a),

2   1342. NPDES permits impose effluent limits and other standards onto individual

3   dischargers. *Envt'l Prot. Agency v. Cal.*, 426 U.S. 200, 205 (1976). Non-compliance

4   with an NPDES permit is a violation of the Clean Water Act. 40 C.F.R. § 122.41.

5        The Environmental Protection Agency has delegated authority to California to

6   issue NPDES permits. *See* 3 U.S.C. § 1342(b); 54 Fed. Reg. 406,64, 406,65 (Oct. 3,

7   1989); Cal. Wat. Code § 13160. In 1991, the California State Water Resources Control

8   Board ("State Board") issued a single, statewide general NPDES permit applicable to

9   all industrial storm water dischargers (the "General Permit"). Since 1991, the General

10   Permit has been renewed several times. As is relevant here, the existing General

11   Permit, Water Quality Order No. 97-03-DWQ, was amended in 2015 by Water Quality

12   Order No. 2014-0057-DWQ. The 2015 General Permit was in effect from July 1, 2015

13   to November 5, 2018. The General Permit was amended again on November 6, 2018,

14   by Water Quality Order No. 2018-0028-DWQ, and went into effect on July 1, 2020.

15   **II.   California's General Permit**

16        The General Permit has three basic requirements: (1) discharge prohibitions;

17   (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) monitoring

18   and reporting requirements, including a requirement to prepare an annual report.

19   (Pl.'s Request for Judicial Notice[3] ("Pl.'s RJN"), Ex. 1 ("General Permit") (ECF No. 92),

20   §§ III, X, XI.)

21        In order to discharge storm water lawfully in California, industrial operations

22   subject to the General Permit must comply with its terms. 33 U.S.C. § 1311(a). The

23

24   [3] Plaintiff requests the Court take judicial notice of (1) a true and correct copy of NPDES General Permit No. CAS000001, State Water Resources Control Board Water Quality Order 2014-0057-DWQ as

25   amended by Order 2015-0122-DWQ and Order 2018-0028-DWQ ("Exhibit 1"), and (2) a true and correct copy of NPDES General Permit No. CAS000001, State Water Resources Control Board Water

26   Quality Order No. 92-12-DWQ, as amended by Order Nos. 97-03-DWQ and 2014-0057-DWQ ("Exhibit 2"). (Pl.'s RJN at 4.) Courts may take judicial notice of matters of public record, including records and

27   reports of administrative bodies. *See Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986). Accordingly, the Court grants Plaintiff's request, and will take judicial notice of both

28   Exhibits 1 and 2.

General Permit prohibits the discharge of storm water to waters of the United States except as authorized by the General Permit or another NPDES permit.  (General Permit § III.A.)  The General Permit also prohibits discharges of liquids or materials other than storm water to waters of the United States unless authorized by the General Permit or another NPDES permit.  (*Id.* § III.B.)  Finally, the General Permit prohibits storm water and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  (*Id.* § III.C.)

The General Permit also mandates that permittees develop and implement a SWPPP, which is filed online with the State Board.  The SWPPP is a facility-specific plan to develop and execute state-of-the-art practices designed to prevent or reduce pollution from industrial storm water discharges.  SWPPPs must include: (1) a description and assessment of potential pollutant sources; (2) a site map; (3) a description and assessment of Best Management Practices ("BMPs"); and (4) a Monitoring Implementation Plan ("MIP").  (*Id.* § X.)  Permittees must upgrade, whenever necessary, the SWPPP and Monitoring Implementation Plan with any Best Management Practices necessary to comply with the General Permit.  (*Id.* § VI.H.)

Finally, the General Permit requires that permittees develop and implement their Monitoring Information Plan.  (*Id.* § XI.)  As part of the MIP, permittees must collect storm water samples at discharge points during specified times; analyze these samples for specific contaminants that are likely to be present at the facility and compare them to levels set forth in the General Permit; conduct monthly visual observations of sources of storm water pollution throughout the entire wet season; and maintain records of these observations.  (*Id.* §§ XI.A–B.)  The permittee must file annual reports summarizing the visual observations, results of sampling analyses, and General Permit compliance.  (*Id.*)

## PROCEDURAL BACKGROUND

Plaintiff brought this action on January 16, 2020, alleging four causes of action for violations of the Clean Water Act and the General Permit: (1) Failure to Develop

1  and Implement an Adequate SWPPP For the Facility, (2) Failure to Develop and

2  Implement the Best Available And Best Conventional Treatment Technologies at the

3  Facility, (3) Failure to Develop and Implement an Adequate MIP for the Facility, and

4  (4) Discharges of Contaminated Storm Water From The Facility.  (*See* Compl.)

5        Plaintiff subsequently brought this Motion for Partial Summary Judgment on

6  January 18, 2024, seeking judgment as to liability on counts one, three, and four.  (*See*

7  Mot. Partial Summ. J. ("Mot. PSJ") (ECF No. 91).)  The Court held a hearing on

8  February 29, 2024, with William Carlon appearing for Plaintiff, and Glen Hansen

9  appearing for Defendants.  Following the hearing, the Court ordered supplemental

10  briefing from the Parties as to count three.  (ECF No. 99.)  The Parties filed the

11  requested briefing (ECF Nos. 100, 101, 102) and the matter is now submitted.

12  **SUMMARY JUDGMENT STANDARD**

13        Summary judgment may be granted when the evidence shows that there is no

14  genuine issue as to any material fact and the moving party is entitled to a judgment as

15  a matter of law.  Fed. R. Civ. P. 56(c).  The principal purpose of summary judgment is

16  to dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477

17  U.S. 317, 325 (1986).  Therefore, the "threshold inquiry" is whether there are any

18  factual issues that could reasonably be resolved in favor of either party, or conversely,

19  whether the facts are so one-sided that one party must prevail as a matter of law.

20  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986).  However, "[o]nly

21  disputes over facts that might affect the outcome of the suit under the governing law

22  will properly preclude the entry of summary judgment."  *Id.* at 248.

23        In a summary judgment motion, the moving party must inform the court of the

24  basis for the motion and identify the portion of the record which it believes

25  demonstrates the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at

26  323.  If the moving party meets its initial burden, the burden then shifts to the

27  opposing party, which must establish that there is a genuine issue of material fact.

28  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574. 585 (1986).  To meet

6

1   their burden, parties must either cite to materials in the record supporting their

2   position or show that the materials cited do not establish the absence or presence of a

3   genuine dispute.  Fed. R. Civ. P. 56(c)(1).

4         For the opposing party to succeed and avoid summary judgment, they "must

5   do more than simply show that there is some metaphysical doubt as to the material

6   facts." *Matsushita*, 475 U.S. at 586.  Rather, the opposing party must produce enough

7   evidence such that the specific facts set forth by the nonmoving party, coupled with

8   undisputed background or facts, are such that a reasonable jury might return a verdict

9   in their favor.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631

10   (9th Cir. 1987).  In other words, for the moving party to succeed, the court must

11   conclude that no rational trier of fact could find for the opposing party.  *Matsushita*,

12   475 U.S. at 587.  However, so as not to usurp the role of the jury, "[c]redibility

13   determinations, the weighing of the evidence, and the drawing of legitimate

14   inferences from the facts are jury functions," and so the court draws all reasonable

15   inferences and views all evidence in the light most favorable to the opposing party.

16   *Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587–88.

17                              **DISCUSSION**

18   **I.   Discharges of Contaminated Storm Water From The Facility**

19        **(Fourth Claim for Relief)**

20        The Clean Water Act prohibits any person from discharging pollutants into

21   navigable waters from a point source without a permit.  33 U.S.C. §§ 1311(a), 1342.

22   Further, the General Permit prohibits the discharge of storm water or other liquids to

23   waters of the United States except as specifically authorized by the General Permit or

24   another NPDES permit.  (General Permit §§ III.A–III.B.)

25        Plaintiff alleges that, on at least ten days between February 14, 2019, and

26   March 8, 2019, Defendants discharged leachate-contaminated storm water from the

27   Facility.  (Mot. PSJ at 15–16.)  Plaintiff argues that there is no dispute (1) the discharges

28   occurred, (2) leachate is a pollutant under the Clean Water Act, (3) the waters into

1   which Defendants discharged the leachate are waters of the United States,

2   (4) Defendants discharged the leachate from a point source within the meaning of the

3   Clean Water Act, and (5) Defendants did not have a permit authorizing these

4   discharges. (*Id.* at 15–19.)  Accordingly, Plaintiff argues each of the ten days

5   Defendants discharged leachate is a violation of the Clean Water Act and the General

6   Permit, and summary judgment should be granted in their favor. (*Id.* at 16.)

7         In opposition, Defendants do not dispute that (1) landfill leachate is a pollutant,

8   (2) that the waters which the discharges are alleged to have reached are waters of the

9   United States, or (3) that the discharges were made from a point source at the Facility.

10   (Opp'n Partial Summ. J. ("Opp'n PSJ") (ECF No. 93) at 9–14.)  However, Defendants do

11   dispute (1) whether the leachate was actually discharged from the Facility, (2) the

12   number of days that discharges occurred, and (3) whether Defendants had a permit

13   that authorized such discharges. (*Id.*)

14         For the reasons set forth below, the Court denies summary judgment on

15   Plaintiff's fourth cause of action.

16         **A.   Whether Leachate was Discharged from the Facility**

17         A "discharge" under the Clean Water Act means the "discharge of a pollutant,"

18   33 U.S.C. § 1362(16), which, in turn, is defined as "any [1] addition of any [2] pollutant

19   or combination of pollutants to [3] waters of the United States from any [4] point

20   source." *Id.* § 1362(12).

21         Defendants admit that leachate-contaminated storm water was pumped from

22   Storm Water Basin 4 into a ditch which then flowed into the east side of the Preserve,

23   which is the primary sedimentation basin. (Opp'n PSJ at 10–11.)  Defendants also

24   concede that storm water from the primary sedimentation basin then flowed over an

25   earthen embankment into the wetlands situated on the west side of the Preserve. (*Id.*)

26   Finally, Defendants agree that the storm water in the wetlands then flowed over the

27   spillway on the west side of the Preserve, thereby leaving the Facility, into downstream

28   waters. (*Id.*)

1      However, Defendants maintain there is a genuine dispute as to whether the

2   storm water discharged from the Facility via the spillway was contaminated with

3   leachate.  (*Id.*)  Defendants point to a report prepared by their experts, Formation

4   Environmental, LLC ("Formation"), which found based on water samples drawn from

5   the Preserve's spillway, SW-1, that "the storm water data indicates that there were *no*

6   *leachate discharges* that flowed off-site or into the tributary to Hamlin Slough . . . ."

7   (Defs.' App., Ex. F ("Investigative Final Report") (ECF No. 93-8), at 245[4] (emphasis

8   added).)

9      This conclusion was expounded upon by Defendants' expert Sean Covington,

10   one of the authors of Formation's Investigative Final Report,[5] who opined that "[t]here

11   were no leachate discharge concentrations of [Chemicals of Potential Concern

12   ("COPCs")] in storm water that flowed off-site or into the unnamed tributary to Hamlin

13   Slough in 2019 that exceeded [environmental screening levels] or background

14   concentrations," and "[t]here were no leachate discharge concentrations of COPCs in

15   storm water that flowed off-site or into the tributary to Hamlin Slough that exceeded

16   human health [screening levels] or background concentrations."  (Defs.' App., Ex. G

17   ("Covington Dep. and Report") (ECF No. 93-8), at 334, 338.)

18      The Court finds that this presents a close, but genuine, dispute of fact as to

19   whether leachate was in fact discharged from the Facility.  This is a close dispute

20   because the Parties agree that leachate-contaminated storm water was pumped into

21   the Preserve.  (Pl.'s SUF Nos. 3, 7.)  Plaintiff argues this fact is sufficient to grant

22   summary judgment in their favor as it supports a reasonable inference that if the

23   Preserve contained contaminated storm water, the discharges from the Preserve were

24   also contaminated storm water.  In further support of this inference, Plaintiff points to

25

26   [4] Citations to all appendices refer to the page numbering of the appendix, not the page numbering of the documents themselves.

27   [5] Covington explains that he represents the Texas office of Formation, was "retained to serve as an expert witness relative to Formation's participation in developing the [Investigative Final Report]," and was "asked to provide my opinions and the bases for those opinions based on the contents of the

28   [Investigative Final Report] sections developed by Formation."  (Defs.' App., Ex. G, at 329.)

1  the testimony of Covington, who stated he was "under the impression" the discharges

2  from the Preserve were a mixture of storm water and leachate.  (Pl.'s Supp. App.[6], Ex.

3  31 (ECF No. 94-1) at 859:9-16, 861:9-22, 863:5-25.)  Plaintiff argues this testimony

4  demonstrates that Covington's opinion, as stated in his report, was not "that the

5  discharges of storm water from the Preserve did not have any leachate in them, but

6  rather that there were no concentrations of chemicals of potential concern that

7  exceeded Environmental Screening Levels or background levels."[7]  (Reply Partial

8  Summ. J. ("Reply PSJ") (ECF No. 94) at 10.)  In other words, Covington was not opining

9  on "whether leachate had left the Facility, but rather how much had left, and what the

10  impacts of that were."  (Id.)

11       However, Plaintiff has not provided definitive proof that the storm water

12  discharged from the Preserve contained leachate.  Rather, Plaintiff has provided

13  evidence that Covington believed, or assumed, the storm water he was testing

14  contained leachate.  This was a rational assumption based on the evidence before the

15  Court, which includes: (1) a report confirming the leachate seep from Module 4

16  occurred on February 14, 2019, and February 26, 2019, (Pl.'s App., Ex. 1 (ECF No. 91-

17  2) at 7–8); and (2) deposition testimony of Defendant Miller, who confirmed that

18  leachate from Module 4 entered Sediment Basin 4 and mixed with storm water, this

19  mixture was then pumped to the Preserve, and that the water within the Preserve was

20

21  [6] Defendants object to the additional exhibits submitted along with Plaintiff's Reply to the Motion for Partial Summary Judgment, arguing Plaintiff has impermissibly introduced new facts or evidence.  (Obj.

22  Reply Evid. (ECF No. 95).)  However, parties can file "rebuttal evidence to contravene arguments first raised by the non-moving party in its opposition."  *TSI Inc. v. Azbil BioVigilant Inc.*, No. CV-12-00083-PHX-DGC, 2014 WL 880408, *1 (D. Ariz. 2014).  Here, the Court agrees with Plaintiff that the evidence

23  was submitted in response to arguments raised in Defendants' Opposition, and is thus not impermissible "new" evidence, but rather permissible "rebuttal" evidence.  (*See* Resp. Obj. Reply Evid.

24  (ECF No. 96) at 3 ("Exhibit 30 provides deposition testimony that directly rebuts Defendants' opening to their Opposition.  Exhibits 31 and 32 provide additional context to Defendants' experts' statements.

25  Exhibit 33 rebuts a claim made by Defendants about the authenticity of a document submitted in support of the Motion.").)  Accordingly, the Court will consider the evidence submitted by Plaintiff as

26  part of their Reply.

27  [7] Covington clarifies in his expert report that "[t]he objective of the [Investigative Final Report] was to determine the impacts to water quality that could affect public and wildlife health from the unauthorized leachate discharge to the onsite wetland preserve and offsite tributaries during February

28  and March 2019."  (Covington Dep. and Report at 328–29.)

1  discharged off site (Pl.'s App., Ex. 2 ("Miller Dep.") (ECF No. 91-2) at 105:12–106:5,

2  107:9-25).  The inference that Covington undoubtedly drew, and that Plaintiff asks this

3  Court to draw, is that because leachate-contaminated storm water was pumped into

4  the Preserve, any water then discharged from the Preserve was also contaminated.

5  However, this is an inference that the finder of fact, not the Court, must make.  *See*

6  *Anderson*, 477 U.S. at 255 (explaining that "[c]redibility determinations, the weighing

7  of the evidence, and the drawing of legitimate inferences from the facts are jury

8  functions").

9      In order for Plaintiff to prevail, the Court must conclude that no rational trier of

10  fact could find for Defendants.  *Matsushita*, 475 U.S. at 587.  The Court cannot make

11  such a finding here.  The reports cited by Defendants undermine the assumption that

12  the storm water discharged from the Preserve was contaminated with leachate.  A

13  rational jury could view those reports as evidence that no leachate was in fact leaked

14  from the Preserve, and Plaintiff has not provided any definitive evidence to the

15  contrary.  In addition, as Defendants explained at oral argument, the primary

16  sedimentation basin is designed to allow suspended particles to settle out of water as

17  it flows through the basin.  Accordingly, some contaminants may have been removed

18  from the storm water that entered the primary sedimentation basin on the dates in

19  question before it was discharged from the Facility.  Therefore, the evidence is not so

20  one sided that Plaintiff must prevail as a matter of law.

21      The Court finds there is a genuine dispute of fact precluding summary

22  judgment as to whether leachate was discharged.

23  ////

24  ////

25  ////

26  ////

27  ////

28

## II.   Failure to Develop and Implement an Adequate SWPPP (First Claim for Relief)

Plaintiff argues there is no dispute that each of the four SWPPPs in effect during the relevant limitations period[8] fail to comply with section X of the General Permit in three main ways: (1) their site maps do not include all required information; (2) they do not accurately describe and locate all industrial materials handled at the Facility; and (3) they are missing required updates.  (Mot. PSJ at 19.)  As Plaintiff argues, each day Defendants fail to comply with the General Permit is a violation of the Clean Water Act.  33 U.S.C. §§ 1311(a), 1365(a)(1) , 1365(f).

As detailed below, the Court finds that the 2014, 2015, 2019, and 2021 SWPPPs fail to comply with the requirements of the General Permit section X in several ways.  Accordingly, the Court will grant summary judgment in Plaintiff's favor as follows.

### A.   Adequacy of the 2019 60-Day Notice

Defendants generally challenge Plaintiff's claims regarding the adequacy of the 2021 SWPPP, arguing Plaintiff's claims were never included in the 60-day notice that Plaintiff provided to Defendants on November 15, 2019 ("2019 Notice"), and were never made a part of any subsequent 60-day notice, meaning they cannot be considered as part of the Motion.  (Opp'n PSJ at 15–18, 20–21.)  However, the Court agrees with Plaintiff that under *Natural Resources Defense Council v. Southwest Marine, Inc. ("NRDC")*, 236 F.3d 985 (9th Cir. 2000) and *WaterKeepers Northern California  v. AG Industrial Manufacturing*, 375 F.3d 913 (9th Cir. 2004), Plaintiff was not required to send a second notice letter in order to pursue claims regarding the 2021 SWPPP because the 2019 Notice put Defendants on sufficient notice of the continuing violations in the SWPPPs.[9]  As the Court in *NRDC* reasoned:

---

[8] During the relevant statute of limitations period, November 15, 2014, to the present, there have been four successive SWPPPs in effect at the Facility.  (Pl.'s App., Ex. 5 (ECF No. 91-2) ("2021 SWPPP"); Pl.'s App., Ex. 4 (ECF No. 91-2) ("2019 SWPPP"); Pl.'s App., Ex. 11 (ECF No. 91-3) ("2015 SWPPP"); Pl.'s App., Ex. 12 (ECF No. 91-3) ("2014 SWPPP").)

[9] This reasoning does not apply to Plaintiff's claim Defendants failed to update the 2021 SWPPP per a 2022 state court settlement for the reasons discussed in Section II.B.4 *infra*.

> If a defendant receives a proper notice letter alleging that it has failed to prepare and implement an adequate plan and, in response, prepares a new plan and begins to implement it before the complaint is filed, is the otherwise proper notice letter defective for failing to identify and discuss the new plan and its implementation?  In those circumstances, must a citizen-plaintiff send a new notice letter?  We think not.  Subject matter jurisdiction is established by providing a notice that is adequate on the date it is given to the defendant.

*See NRDC*, 236 F.3d at 997; *see also WaterKeepers N. Cal.*, 375 F.3d 920 ("[W]e hold that WaterKeepers was not required to send a second notice letter in order to pursue specific claims regarding the inadequacies of [defendant's] post-notice compliance efforts.").

Here, the 2019 Notice advises Defendants that (1) the "Facility's SWPPP contains a site map that lacks all required information"; (2) "the Facility's pollutant source description and assessment fails to capture all potential pollutants at the Facility"; and (3) Defendants are required to "revise their SWPPP whenever necessary" and each day Defendants "failed to develop and implement an adequate SWPPP is a violation of the General Permit."  (Compl., Ex. A (ECF No. 1) at 9.)  Defendants do not argue that Plaintiff's notice letter was inadequate, or that the 2021 SWPPP brought Defendants into compliance such that Plaintiff's claims regarding the 2021 SWPPP are barred for lack of standing.  Accordingly, the Court will consider Plaintiff's claims regarding the 2021 SWPPP below.

### B.    Failure to Include Adequate Site Maps

The General Permit requires SWPPPs to contain a site map that meets certain criteria.  (General Permit § X.E.)  These criteria include, among other things, that the site map include information such as the "location(s) of nearby water bodies (such as rivers, lakes, wetlands, etc.)," (*id.* § X.E.3.a); "[a]reas of industrial activity subject to [the] General Permit, (*id.* § X.E.3.f); and "[i]dentification of all impervious areas of the facility,

1    including paved areas, buildings, covered storage areas, or other roofed structures,"

2    (*id.* § X.E.3.d).

### 1.    The Preserve and Wetlands

4        First, Plaintiff argues that the SWPPP maps fail to identify the Preserve and the

5    presence of wetlands at the Preserve, despite these being "nearby water bodies (such

6    as rivers, lakes, wetlands, etc.)" that must be identified under the General Permit.

7    (Mot. PSJ at 20.)

8        Defendants respond that the SWPPP maps identify the primary sedimentation

9    basin, which is the Preserve.  (Defs.' SUF ¶ 110.)  Further, Defendants point out that

10    the SWPPPs include information identifying the primary sedimentation basin on the

11    maps as the Preserve and wetlands.  For example, Table 4.3 in the 2015 SWPPP

12    identifies the primary sedimentation basin as the "Constructed wetland" BMP used at

13    the Facility, while the text of the 2019 SWPPP states: "The primary sedimentation basin

14    was designed to serve as both a storm water sedimentation basin and a Preserve Area

15    (the Neal Road Preserve mentioned above) as part of an environmental mitigation

16    program."  (*See* Defs.' Resp. to Pl.'s SUF ¶ 21.)

17        The Court finds there is no genuine dispute of fact that none of the SWPPP

18    maps adequately identify the location of the wetlands within the Facility, despite a

19    clear directive from the General Permit to do so.  While the maps identify the primary

20    sedimentation basin, and other portions of some SWPPPs refer to the primary

21    sedimentation basin as encompassing the Preserve and/or wetlands, the Preserve and

22    wetlands are not reflected on the maps, and the maps do not reference the

23    descriptions located elsewhere in the SWPPPs.  Readers cannot be expected to scour

24    the SWPPPs to understand the primary sedimentation basin on the map is also the

25    Preserve and wetlands.

26        Accordingly, summary judgment is appropriate as to the 2014, 2015, 2019, and

27    2021 SWPPPs' maps failure to identify all nearby bodies of water.

28

1

### 2. Locations of Industrial Activity and Material

2      Second, Plaintiff argues the SWPPPs fail to include maps identifying all "areas of

3   industrial activity subject to the General Permit" (General Permit § X.E.3.f) and list the

4   locations where each industrial "material is stored, received, shipped, and handled, as

5   well as the typical quantities and handling frequency" (*id.* § X.F).

6      The primary industrial activity at the Facility is the disposal of municipal solid

7   waste in waste module units.  (Pl.'s SUF ¶ 25.)  Waste module units are made up of

8   several phases, one or two of which may be active at any time.  (*Id.* ¶ 26.)  Waste is

9   placed in the working face of the active module.  (*Id.* ¶ 27.) The working face moves

10  daily and is closed at the end of each day with material known as daily cover.  (*Id.*

11  ¶ 28.)  Plaintiff argues that the Facility has changed the active phase where municipal

12  solid waste has been disposed at least eight times during the relevant period, and the

13  active waste module has changed at least once (so that waste was placed in Module 5

14  in addition to Module 4), but "[n]one of the SWPPPs were revised or amended to

15  reflect the changes to the locations of where the main industrial activities were

16  conducted at the Facility."  (Mot. PSJ at 21.)

17      Defendant replies that all areas of industrial activity conducted at the Facility are

18  sufficiently identified in the SWPPPs' maps.  (Opp'n PSJ at 16–17; Defs.' Response to

19  Pl.'s SUF ¶ 32 (citing 2021 SWPPP at 178–81, 208–12; 2019 SWPPP at 132–33, 158–60;

20  2015 SWPPP at 356–57, 408; 2014 SWPPP at 593, 684).)  Defendants cite their expert

21  Travis Peterson,[10] who opines that "the requirement of [the] general permit is to

22  identify all areas of industrial activity and that is sufficiently identified" in the SWPPPs at

23  issue here; Peterson further opines that the areas of industrial activity identified in a

24  SWPPP must not be so specific that it becomes outdated and inaccurate immediately,

25  and that therefore a change in the module at the Facility, for example, would not

26

27

---

28  [10] Peterson is an environmental scientist consultant and a California Qualified Industrial Storm Water
Practitioner.  (Defs.' App., Ex. E ("Peterson Dep. and Reports") (ECF 93-8) at 211.)

1    necessitate an update to the SWPPP.  (Defs.' App., Ex. E ("Peterson Dep. and Reports")

2    (ECF 93-8) at 198:7–17, 199:12–199a:2.)

3           Concerning the site maps, the Court will not grant summary judgment in

4    Plaintiff's favor.  Section X.E.3.f of the General Permit requires SWPPP maps to:

5                     Identify all industrial storage areas and storage tanks,
                      shipping and receiving areas, fueling areas, vehicle and
6                     equipment storage/maintenance areas, material handling
                      and processing areas, waste treatment and disposal areas,
7                     dust or particulate generating areas, cleaning and material
                      reuse areas, and other areas of industrial activity that may
8                     have potential pollutant sources.

9

10   The primary industrial activity takes place in the waste module units.  Plaintiff disputes

11   whether the site maps adequately identify which waste module units and phases are

12   active.  However, there is no clear requirement in the General Permit that the site

13   maps distinguish between active and non-active waste modules, and the areas of

14   industrial activity, including the waste module units, are clearly marked in the maps for

15   each SWPPP.  (*See* 2021 SWPPP at 208–12; 2019 SWPPP at 158–60; 2015 SWPPP at

16   408; 2014 SWPPP at 684.)  Accordingly, the Court cannot conclude that the SWPPPs'

17   maps fail to comply with section X.E.3.f.

18          As to Plaintiff's related claim that the SWPPPs do not comply with General

19   Permit section X.F because they do not clearly list the locations where each industrial

20   "material is stored, received, shipped, and handled," the Court will not grant summary

21   judgment as to the 2014 SWPPP, which identifies Module 4 as the active waste

22   module.  (2014 SWPPP at 588; Pl.'s SUF ¶ 33.)  The Court will also not grant summary

23   judgment as to the 2015 SWPPP, which identifies the location of the industrial activity

24   as the "WMUs" (i.e., waste module units), and "Drainage Areas A and E."  (2015

25   SWPPP at 356.)  While this is not a precise location of the solid waste, the General

26   Permit does not appear to require more specificity on its face, and the Court will not

27   impose such a requirement at this stage.

28

16

1    However, the Court will grant summary judgment as to the 2019 and 2021

2   SWPPPs.  The 2021 and 2019 SWPPPs state "[t]he major area of industrial activity at

3   the Facility is the active working face of the landfill.  The location of this area changes

4   over time as part of normal landfill operations." (2021 SWPPP at 179; 2019 SWPPP at

5   132).  They also identify the location of solid waste as the "Working Face," the location

6   of which "Varies." (2021 SWPPP at 181; 2019 SWPPP at 133.)  The Court agrees with

7   Plaintiff that the 2021 and 2019 SWPPPs fail to specify any identifiable location for

8   solid waste, instead pinpointing a vague location which is often changeable and

9   unidentifiable on the SWPPPs' maps.  Defendants do not explain why they cannot

10   identify the location of solid waste as, for example, one or more of the waste module

11   units, the location of which does not shift daily.  Instead, Defendants rely on the

12   opinion of their expert Peterson that they are not legally required to do so.   However,

13   Defendants' experts may not testify to legal conclusions. *Crow Tribe of Indians v.*

14   *Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues

15   of law.").

16    Accordingly, the Court grants summary judgment on this point as to the 2021

17   and 2019 SWPPPs only.

18                      **3.    All Impervious Areas**

19    Third, Plaintiff argues there are impervious areas at the Facility where Posi-

20   Shell[11] has been applied that should be identified on the 2019 and 2021 SWPPPs'

21   maps but are not. (Mot. PSJ at 22.)  Defendants respond that that their expert

22   Peterson identified Posi-Shell as being only "semi-permanent" and "temporary,"

23   therefore its inclusion in the maps was not necessary.  (Opp'n PSJ at 17–18; Pl.'s SUF

24   ¶ 55; Defs.' SUF ¶ 115.)

25    However, as Plaintiff points out, Peterson also opines that despite Posi-Shell

26   being temporary, it should have been identified on the SWPPPs.  (Pl.'s App., Ex. 9

27

28   [11] Posi-Shell is a spray-on product that dries in the form of a thin durable stucco.  (Mot. PSJ at 22 n.6.)

1   ("Peterson Dep.") (ECF No. 91-2) at 311:3–312:9.)  The 2021 SWPPP also explicitly

2   identifies areas with Posi-Shell as impervious areas at the Facility.  (2021 SWPPP at

3   178.)  Defendants do not otherwise explain why Posi-Shell's temporary nature excused

4   it from being identified in the SWPPP maps.  As Plaintiff's evidence supports the

5   conclusion that areas where Posi-Shell was applied were impervious and should have

6   been identified in the SWPPPs' maps, the Court finds there is no dispute of fact that

7   the 2019 and 2021 SWPPPs' maps failed to identify all impervious areas.

8               **4.     2021 SWPPP and Site Maps Failure to Identify the Advanced**

9                        **BMPs Implemented as a Result of the Parties' State Court**

10                       **Settlement Agreement**

11          Finally, Plaintiff argues the Parties entered into a settlement in Butte County

12   Superior Court in 2022 which required Defendant Butte County Department of Public

13   Works to install certain advanced BMPs at the Facility.  (Mot. PSJ at 23.)  These BMPs

14   were installed by June 2023.  (*Id.*)  Plaintiff alleges the Defendants have not revised or

15   amended the 2021 SWPPP to reflect the installation of these BMPs.  (*Id.* at 23–24.)

16   Defendants argue that this claim should not be considered because it (1) was not

17   included in the 2019 Notice provided to Defendants, (2) was never listed in Plaintiff's

18   discovery responses, (3) did not fully accrue until June 2023, after the applicable non-

19   expert discovery cutoff, and (4) was never included as a claim in the Complaint.

20   (Opp'n PSJ at 18–19.)

21          "It is axiomatic that violations not pled in the complaint cannot be considered

22   by this court at the summary judgment stage." *Feezor v. Patterson*, 896 F. Supp. 2d

23   895, 903 (E.D. Cal. 2012); *see also Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963,

24   968–69 (9th Cir. 2006) (affirming a district court's refusal to consider at the summary

25   judgment stage factual allegations not pled in the complaint).  While the Complaint

26   makes general allegations concerning the Defendants failure to include advanced

27   BMPs in the SWPPPs (*see* Compl. ¶ 44), the Court is concerned that neither the

28   Complaint nor Plaintiff's later disclosures reference the BMPs in the 2022 settlement,

1  and Plaintiff's claims concerning those BMPs only fully accrued after the close of non-

2  expert discovery.  Therefore, even if Defendants had some notice of the claim, the

3  Court is not convinced they had an adequate opportunity to address the claim in

4  discovery and prepare for defense of this Motion.  Accordingly, the Court will not

5  consider Plaintiff's claims concerning Defendants' failure to update the 2021 SWPPP in

6  light of the 2022 state court settlement agreement in this Motion.  *Cf. Wilson v. Pier 1*

7  *Imps. (US), Inc.*, 439 F. Supp. 2d 1054, 1064 (E.D. Cal. 2006) ("Where, as here, plaintiff

8  discovered new alleged violations during the discovery period that were not pled in

9  the complaint, but disclosed to defendants in sufficient time to permit defendants to

10  address them in discovery and by way of law and motion, the court concludes plaintiff

11  is not precluded from raising these allegations on a motion for summary judgment or

12  at trial.").

13      **C.**    **Failure to Accurately Describe the Locations of All Industrial**

14          **Materials**

15      Plaintiff argues that the SWPPPs are also required to include "a list of industrial

16  materials handled at the facility, and the locations where each material is stored,

17  received, shipped, and handled, as well as the typical quantities and handling

18  frequency." (General Permit § X.F.)  Plaintiff argues that, in addition to the SWPPPs'

19  failure to identify the specific locations of solid waste, as discussed in Section II.B.2

20  *supra*, the 2021 SWPPP also fails to accurately identify the locations where

21  construction and demolition debris and green waste are located, as well as the

22  location of leachate.  (Mot. PSJ at 24.)

23      Concerning the location of construction and demolition debris and green

24  waste, which the 2021 SWPPP identifies as industrial materials, the 2021 SWPPP lists

25  the location for construction and demolition debris, green waste, recyclable materials,

26  and waste tires as "Varies and See Drawing 1." (Miller Dep. at 95:10–12; 2021 SWPPP

27  at 181.)  Drawing 1 does not identify construction and demolition debris, nor does it

28  identify green waste, although it does identify tires and recyclables.  (Miller Dep. at

97:4–7; 2021 SWPPP at 208.)  Defendants argue that, while Miller testified it would have been more appropriate or helpful to separate out locations for the different materials, this is not an admission Defendants were legally required to do so.  (Opp'n PSJ at 20.)  However, this argument does not rebut the fact that the 2021 SWPPP fails to list the location where the construction and demolition debris and green waste are stored, as the purported location of these materials refers to a map which does not, in fact, identify their location.  The General Permit requires "a list of industrial materials handled at the facility, and the locations where *each* material is stored."  (General Permit § X.F (emphasis added).)  The Court finds that under the plain language of the General Permit, Defendants failed to meet this requirement, and will grant summary judgment on this point.

Further, Plaintiff argues the location of leachate is insufficiently identified as "Class II Surface Impoundment – See Drawing 2."  (Mot. PSJ at 24 (citing 2021 SWPPP at 181).)  Plaintiff also argues the leachate collection and removal system is not properly identified as a location where leachate is "stored, received, shipped, and handled" in the 2021 SWPPP.  (*Id.*)  However, the location of leachate is clearly identified in Drawing 3 of the 2021 SWPPP.  (2021 SWPPP at 212.)  Further, Drawing 2 shows the leachate conveyance pipes.  (2021 SWPPP at 209.)  Thus, the Court cannot say as a matter of law that Defendants have failed to identify the location of leachate at the Facility.  Accordingly, the Court will deny summary judgment on this point.

## D.     Failure to Revise the SWPPPs when Necessary

The General Permit requires dischargers to "[r]evise their on-site SWPPP whenever necessary," and to "[c]ertify and submit via [Stormwater Multiple Application and Tracking System ("SMARTS")] their SWPPP within 30 days whenever the SWPPP contains significant revisions."  (General Permit §§ X.B.1–2.)  SWPPPs must also "[i]dentify and describe conditions or circumstances which may require future revisions to be made to the SWPPP."  (*Id.* § X.C.2.)

1    Plaintiff identifies several ways in which Defendants have failed to update the

2    SWPPPs when necessary, including (1) failing to update the 2021 SWPPP to account

3    for the installation and repair of approximately five acres of rain fly over Module 4,

4    (2) failing to remove a covered aerated static pile ("CASP") facility from the 2021

5    SWPPP that was never implemented due to budget constraints, and (3) a failure to

6    revise the SWPPPs to incorporate amendments uploaded to SMARTS in 2017.  (*See*

7    Mot. PSJ at 25–26.)

8    Defendants do not contest that they failed to update the 2021 SWPPP to

9    account for the rain fly over Module 4.  (Pl.'s SUF ¶¶ 71–72.)  Accordingly, the Court

10   will grant summary judgment to Plaintiff on that claim.

11   Concerning the CASP facility, Plaintiff argues it must be removed from the

12   SWPPP because it "does not exist, and will never exist, at the Facility."  (*Id.* ¶ 75.)

13   Defendants argue that the evidence does not show the CASP will never exist, and the

14   2021 SWPPP need not be revised if the CASP project has simply not yet been

15   installed.  However, Miller testified that, "as of today," the SWPPP was "inaccurate"

16   because "[t]here is no proposed CASP facility."  (Miller Dep. at 98:2–6.)  While Miller's

17   testimony does not definitively foreclose the possibility of a future CASP facility, his

18   testimony also does not support the conclusion that the CASP project is still a realistic

19   possibility, and Defendants provide no evidence the CASP project is still in progress.

20   Indeed, Defendants admit that the "proposed CASP project was wholly abandoned,

21   with no prospect of it being implemented at the Facility, due to financial limitations."

22   (Pl.'s SUF ¶ 74.)  Accordingly, the Court finds there is no dispute of fact that

23   Defendants failed to update the 2021 SWPPP to remove the CASP facility.

24   Finally, Plaintiff argues that a document detailing a series of amendments

25   purportedly made to the SWPPP were uploaded to SMARTS in 2017.  (Mot. PSJ at 25.)

26   Plaintiff argues the "amendments appear to be significant and would warrant

27   certification and submission of a revised SWPPP via SMARTS within 30 days" under

28   General Permit section X.B.2.  (*Id.* at 26.)  However, Plaintiff argues these amendments

21

were never incorporated into a revised SWPPP. (*Id.*)  Defendants do not contest that a revised SWPPP was never submitted.  Rather, they point to evidence that that 2017 amendments were never uploaded to SMARTS in the first place.  (Peterson Decl. (ECF No. 93-7) ¶ 4.)  Accordingly, Defendants argue there is a genuine dispute of fact as to whether these amendments were aspirational, or whether they were concrete amendments Defendants were required to incorporate into a revised SWPPP.  (Defs.' Response to Pl.'s SUF ¶ 77.)  While Defendants were required to submit an updated SWPPP within 30 days if the SWPPP contained significant revisions (*see* General Permit § X.B.2), it is not clear to the Court whether the 2017 amendments identified here were finalized revisions to the SWPPP, or merely proposed revisions.  Plaintiff has not demonstrated that any revisions to the SWPPP were required if these amendments were merely proposed revisions.  Accordingly, the Court declines to grant summary judgment on this point.

## III.   Failure to Develop and Implement an Adequate MIP (Third Claim for Relief)

The General Permit requires dischargers to develop and implement a MIP as part of the SWPPP.  (General Permit §§ X.I, XI.)  One of the monitoring requirements is to collect representative samples of storm water discharges and have those samples analyzed for various pollutants.  (*Id.* § XI.B.6.)  Facilities are required to analyze the samples for pollutants that are typically associated with their industry; pollutants identified on a site-specific basis that are likely to be present in discharges; pollutants associated with downstream impairments; additional parameters required by the Regional Water Board; and parameters required under Subchapter N, 40 C.F.R. sections 401–471.  (*Id.* §§ XI.B.6.c–g.)  Failure to comply with the monitoring requirements of the General Permit is a violation of the Clean Water Act.  33 U.S.C. §§ 1311(a), 1365(a)(1), 1365(f).

Within Subchapter N, 40 C.F.R. section 445 governs effluent limitations for discharges of wastewater from landfill units.  Non-hazardous waste landfills such as

1   the Facility that discharge landfill wastewater must analyze samples for specific

2   regulated parameters ("Regulated Parameters"), which include biochemical oxygen

3   demand, total suspended solids, ammonia (as nitrogen), α-Terpineol, benzoic acid, p-

4   Cresol, phenol, zinc, and pH.  (General Permit § XI.B.6.g;) 40 C.F.R. §§ 445.20–445.21.

5   Landfill wastewater includes leachate and contaminated storm water.  40 C.F.R.

6   § 445.2(f).  Thus, discharges of leachate-contaminated storm water from the Facility

7   are subject to Subchapter N.

8          Plaintiff argues that, under Subchapter N, the Facility was required to analyze

9   the 2019 storm water discharges for the Regulated Parameters.  (Mot. PSJ at 27.)  Yet,

10  Plaintiff argues "there is no dispute that Defendants' Monitoring Implementation Plan

11  does not require analysis of the Regulated Parameters," and that when Defendants

12  discharged contaminated storm water in February of 2019, and collected samples on

13  February 14, 2019, and February 26, 2019, "they did not have those samples analyzed

14  for all of the Regulated Parameters," *i.e.*, " biochemical oxygen demand, ammonia (as

15  nitrogen), α-Terpineol, benzoic acid, or p-Cresol." (*Id.* at 28.)  Accordingly, Plaintiff

16  argues the Defendants have violated the General Permit and the Clean Water Act.

17         As the Court noted in its order for supplemental briefing, the 2015 MIP, which

18  was in place at the time of the alleged storm water discharges in 2019, did not require

19  testing for the Regulated Parameters.  (*See* 2015 SWPPP at 391-971 (no required

20  testing of biochemical oxygen demand, ammonia (as nitrogen), α-Terpineol, benzoic

21  acid, or p-Cresol).)  The 2019 and 2021 MIPs remedy this, however, by requiring the

22  Facility to test landfill wastewater for the Regulated Parameters.  (*See* 2019 SWPPP at

23  153–54 (stating that "if the Facility discharges landfill wastewater, as defined in Part

24  445.2(f), then it will be subject to the storm water EGLs" and will analyze samples for

25  the Regulated Parameters); 2021 SWPPP at 202 (same).)  Plaintiffs may not sue to

26  remedy "wholly past" violations of the Clean Water Act; the Act only confers

27  jurisdiction over citizen suits that allege continuous or intermittent violations.

28  *Waterkeepers N. Cal.*, 375 F.3d at 921.  Thus, the Court ordered Plaintiff to

1    demonstrate why Defendants' alleged failures to develop and implement an adequate

2    MIP are continuous or intermittent such that the Court could grant summary judgment

3    on Plaintiff's claim.  (ECF No. 99 at 3.)

4           In their supplemental briefing, Plaintiff concedes that the 2019 and 2021 MIPs

5    require Defendants to analyze for the Regulated Parameters if the Facility discharges

6    landfill wastewater.  (Supp. Br. (ECF No. 100) at 3.)  However, Plaintiff now presents an

7    entirely new basis for summary judgment,[12] arguing that the 2019 and 2021 MIPs are

8    deficient because they do not comply with a different section of the General Permit –

9    Section XI.B.6.c – that requires dischargers to "analyze all collected samples" for

10   "[a]dditional parameters identified by the Discharger on a facility-specific basis that

11   serve as indicators of the presence of all industrial pollutants identified in the pollutant

12   source assessment (Section X.G)."  (*Id.* at 4.)  Plaintiff argues that Defendants have

13   identified leachate as an industrial pollutant likely to be present in industrial storm

14   water discharges from the Facility.  (*Id.*; *see* 2019 SWPPP at 137; 2021 SWPPP at 186.)

15   Yet, Plaintiff argues the MIPs do not require testing for specific parameters that serve

16   as indicators of the presence of leachate, a fact which was confirmed by Defendants'

17   expert Peterson.  (Supp. Br. at 5.)  When Peterson was asked whether "any of the

18   monitoring implementation plans include pollutants that are indicators of leachate in

19   the storm water sampling requirements," Peterson responded "[n]o, I don't believe

20   so."  (Peterson Dep. at 316:18–22.)

21          Defendants respond that the 2019 and 2021 MIPs did not add any additional

22   testing parameters under section XI.B.6.c of the General Permit because the MIPs

23   already identified parameters under section XI.B.6 parts a, b, d, e, and g that were

24   sufficient to serve as indicators of leachate.  (Opp'n Supp. Br. (ECF No. 101) at 4.)

25   Specifically, the MIPs require storm water be sampled for total suspended solids

26

27   [12] Defendants do not argue that Plaintiffs waived this argument by not raising it in their initial briefing.
     Given that Defendants had an opportunity to respond to this argument in their opposition to the
     supplemental briefing and given that Plaintiff's third cause of action is broad enough to encompass this
28   theory of liability, the Court will decide Plaintiff's claim on the merits.

1 ("TSS"), oil and grease ("O&G"), pH, iron, lead, aluminum, zinc, and chemical oxygen

2 demand ("COD").  (2019 SWPPP at 151–52; 2021 SWPPP at 200.)  TSS, O&G, and pH

3 are parameters required for all industrial facilities, while iron, lead, aluminum, zinc,

4 and COD are pollutants associated with the Facility's Standard Industrial Classification

5 codes.  (*See* General Permit §§ XI.B.6.a, XI.B.6.b, XI.B.6.d, Table 1.)  Defendants argue

6 that COD and O&G, which are organic indicators, and iron, lead, aluminum, and zinc,

7 which are inorganic indicators, are sufficient to detect leachate because leachate leaks

8 can contain a "wide variety of inorganic and organic pollutants."  (Opp'n Supp. Br. at

9 4; 2019 SWPPP at 137; 2021 SWPPP at 185.)

10 　　　　However, Defendants do not point to evidence in the record supporting these

11 arguments.  They conclude that COD, O&G, iron, lead, aluminum, and zinc are

12 sufficient to detect leachate because they are indicators of inorganic and organic

13 pollutants, but do not point to any expert testimony or other source for why these

14 parameters are sufficient such that any further duty to identify additional parameters

15 under section XI.B.6.c of the General Permit is excused.  Unsupported conclusory

16 statements in a brief are insufficient to create an issue of fact.  *Comite de Jornaleros de*

17 *Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 950 n.9 (9th Cir. 2011) (en

18 banc), *cert. denied*, 565 U.S. 1200 (2012); *Barnes v. Indep. Auto. Dealers Ass'n Health*

19 *& Benefit Plan*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995).

20 　　　　The closest support for Defendants' arguments that the Court can find is in

21 Peterson's rebuttal report, wherein he opines that the "[s]ample parameters required

22 by the Facility," i.e., pH, TSS, O&G, COD, iron, aluminum, lead, and zinc, are based on

23 "primary and secondary Standard Industrial Code5 (SIC) numbers 4953, Landfills and

24 Land Application Facilities, and 5093, Scrap and Waste Materials" which "take into

25 account relevant industry considerations based on the operation of such facilities,

26 including the presence of leachate."  (Peterson Dep. and Reports at 220–22.)  This still

27 does not explain, however, why the Facility is not required to identify any *additional*

28 parameters that indicate the presence of leachate.

1    Support for Defendants' position is further undermined by the 2014 and 2015

2  MIPs, which do identify and require testing for specific inorganic and organic

3  constituents that indicate the presence of leachate.  (*See* 2014 SWPPP at 608, 613–14

4  (stating storm water samples shall be analyzed for constituents listed in Table 3, which

5  in turn requires testing for inorganic and organic constituents from the leachate-

6  monitoring program listed in Table 2); 2015 SWPPP at 358, 391–96 (requiring

7  sampling for potential organic and inorganic pollutants in leachate listed in Table

8  3.2).)  The 2019 and 2021 MIPs, on the other hand, do not.  This shows that

9  Defendants could, but did not, comply with section XI.B.6.c of the General Permit.

10  Accordingly, the Court finds that summary judgment is appropriate in Plaintiff's favor

11  as to the inadequacy of the 2019 and 2021 MIPs.

12    Alternatively, Plaintiff argues summary judgment is proper because it is

13  undisputed the storm water samples collected in 2019 were not tested for the

14  Regulated Parameters.  (Supp. Br. at 3.)  Plaintiff argues this failure is likely to be

15  repeated in future, even under the 2021 MIP, because the 2021 MIP only requires

16  discharges of landfill wastewater be tested for the Regulated Parameters.  (*Id.* at 5–6.)

17  Plaintiff argues it is not always obvious if discharged storm water qualifies as landfill

18  wastewater (i.e., whether the storm water is contaminated).  (*Id.*)  Thus, because the

19  2021 MIP does not require that all storm water be tested for the Regulated

20  Parameters, Defendants will likely fail to test contaminated storm water for the

21  Regulated Parameters in future.

22    The Court declines to grant summary judgment on this basis.  Plaintiff provides

23  no evidence that any failure to test contaminated storm water samples for the

24  Regulated Parameters continued after the 2019 and 2021 MIPs were implemented.

25  Rather, Plaintiff argues that any failure is "likely" to reoccur because Defendants might

26  not always be aware of leachate in their storm water discharges.  (*See id.* at 3.)  Such

27  speculation is insufficient to support Plaintiff's burden of proof at summary judgment.

28  *Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016) ("Mere allegation and speculation

1  do not create a factual dispute for purposes of summary judgment." (quoting *Nelson*

2  *v. Pima Community College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996)).)

3      Therefore, the Court grants summary judgment on Plaintiff's third cause of

4  action as to the 2019 and 2021 MIPs only.

5  **IV.    Standing**

6      Finally, Plaintiff argues they have standing to bring this action under *Lujan v.*

7  *Defenders of Wildlife*, 504 U.S. 555 (1992), because (1) Defendants' violations of the

8  Clean Water Act harm the Preserve as well as Plaintiff, (2) these injuries are fairly

9  traceable to Defendants, and (3) Plaintiff's injuries will likely be redressed by a

10  favorable decision.  (Mot. PSJ at 28–31.)

11      Defendants object to Plaintiff's standing argument on the basis it was not raised

12  at the Parties' meet and confer prior to the filing of this Motion.  (Opp'n PSJ at 24.)

13  However, Plaintiff does not seek summary judgment on the issue of standing.  Rather,

14  Plaintiff argues that implicit in any dispositive motion is the question of standing, and

15  Plaintiff simply "provided the facts that would provide sufficient basis to determine

16  that Plaintiff has standing to prevail on its Motion."  (Reply PSJ at 20.)

17      The Court finds for the purposes of this Motion that Plaintiff has satisfied the

18  Article III standing requirement.

19  ////

20  ////

21  ////

22  ////

23  ////

24  ////

25  ////

26  ////

27  ////

28  ////

1

2

**CONCLUSION**

In accordance with the above, the Court hereby GRANTS in part and DENIES in part Plaintiff's Motion for Partial Summary Judgment.  (ECF No. 91.)

Specifically, the Court denies summary judgment as to Plaintiff's fourth cause of action.  However, the Court grants summary judgment on Plaintiff's first cause of action as to the 2014, 2015, 2019, and 2021 SWPPPs.  The Court further grants summary judgment on Plaintiff's third cause of action as to the 2019 and 2021 MIPs.

IT IS SO ORDERED.

Dated:   **April 17, 2024**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC4 – CalOpenLands20cv123.PSJ

28