1  Diane G. Kindermann (SBN 144426)
   dkindermann@aklandlaw.com
2  Glen C. Hansen (SBN 166923)
   ghansen@aklandlaw.com
3  ABBOTT & KINDERMANN, INC.
   2100 21st Street
4  Sacramento, California 95818
   Telephone:   (916) 456-9595
5  Facsimile:   (916) 456-9599

6  Attorneys for Defendants
   BUTTE COUNTY DEPARTMENT OF
7  PUBLIC WORKS, DENNIS SCHMIDT,
   ERIC MILLER

8

9              **UNITED STATES DISTRICT COURT**

10             **EASTERN DISTRICT OF CALIFORNIA**

11

12  CALIFORNIA OPEN LANDS, a non-              No.  2:20-CV-00123-KJM-DMC
    profit land trust organization,
13                                             **DECLARATION OF GREGORY P.**
                   Plaintiff,                  **EINHORN IN SUPPORT OF**
14                                             **DEFENDANTS' OPPOSITION TO**
            v.                                 **PLAINTIFF'S MOTION FOR ATTORNEYS'**
15                                             **FEES AND COSTS**
    BUTTE COUNTY DEPARTMENT OF
16  PUBLIC WORKS, a political                  Hearing:    October 3, 2024
    subdivision of the State of California,    Time:       1:30 p.m.
17  DENNIS SCHMIDT, an individual,             Location:   Courtroom: 10
    and ERIC MILLER, an individual,           Judge:      Hon. Daniel J. Calabretta
18
                   Defendants.
19

20

21

22       I, Gregory P. Einhorn, declare,

23       1.    I was counsel of record for Defendant Butte County Department Of Public Works

24  in the matter of *California Open Lands v. Butte County Department of Public Works*, case no.

25  20CV01220 that was filed in the Butte County Superior Court ("State Action").  If called as a

26  witness, I could and would competently testify to the following facts of which I have personal

27  knowledge, except those matters alleged upon information and belief, and as to those, I believe

28  them to be true.

                                    -1-

1       2.    Attached as **Exhibit A** is a true and correct copy of the Complaint For Declaratory

2   And Injunctive Relief that was filed by Plaintiff California Open Lands ("COL") in the State

3   Action, without the attached exhibits.

4       3.    Attached as **Exhibit B** is a true and correct copy of the Declaration of Andrew L.

5   Packard In Support of Motion For Enforcement Costs that was filed by COL in the State Action,

6   with all of the attached exhibits.

7       I declare under penalty of perjury under the laws of the State of California and the United

8   States of America that the foregoing is true and correct, except as to those matters alleged on

9   information and belief and, as to those matters, I believe them to be true.

10      Executed on August 2, 2024, at Rio Vista, California.

11

12                      Gregory P. Einhorn

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF GREGORY P. EINHORN ISO OPPOSITION TO MOTION FOR ATTORNEYS' FEES**

# EXHIBIT A

ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
LAW OFFICES OF ANDREW L. PACKARD
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA OPEN LANDS

Superior Court of California
County of Butte

**F I L E D**

6/22/2020

Kimberly Flener, Clerk
By _____ Deputy
Electronically FILED

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF BUTTE

CALIFORNIA OPEN LANDS, a non-profit land trust organization,

      Plaintiff,

      v.

BUTTE COUNTY DEPARTMENT OF PUBLIC WORKS, a political subdivision of the State of California,

      Defendant.

Case No. 20CV01220

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**(Civil Code § 815 *et seq*; Breach of Contract)**

## INTRODUCTION

1.     By this action, Plaintiff CALIFORNIA OPEN LANDS ("COL") challenges Defendant's actions in committing a series of significant and blatant violations of a conservation easement contract ("Easement") that COL holds over a six-acre parcel of land ("Preserve") at the landfill Defendant operates located at 1023 Neal Road, Paradise, California ("Landfill") in Butte County.  Defendant's unlawful actions include discharging untreated landfill leachate and storm water contaminated by untreated landfill leachate into the Preserve, excavating soils and destroying natural vegetation in the Preserve, and depriving the Preserve of the water necessary to protect and to sustain the biological resources therein.  The Easement expressly prohibits all of these activities and authorizes and directs COL to enforce its prohibitions.

//

//

Complaint for Declaratory and Injunctive Relief      1      Case No.

1

**PARTIES**

2      2.      CALIFORNIA OPEN LANDS is a non-profit land trust corporation organized under the

3  laws of California, with its main office in Chico, California.  COL is dedicated to the preservation and

4  management of open space, the exchange of scientific information, public education, and responsible

5  conservation of the natural resources of the Sacramento River Watershed.

6      3.      Based on the records of the Butte County Recorder's Office, as reported in a publicly

7  available database, COL is informed and believes that Defendant is a political subdivision organized

8  under the laws of the State of California and the owner of fee title to the Preserve, which is a portion of

9  Assessor's Parcel No. 040-600-082 in Butte County, California.

10

**JURISDICTION AND VENUE**

11      4.      Venue is proper in this Court under Code of Civil Procedure section 392 because the

12  property at issue in this action is located in Butte County.

13      5.      COL has performed all conditions precedent to the filing of the instant action.

14      6.      As holder and beneficiary of the Easement, COL has a direct and beneficial interest in

15  Defendant's compliance with the Easement.  That interest is directly and adversely affected by

16  Defendant's past and threatened future activities in and near the Preserve.

17      7.      The Easement expressly grants to COL "the ability to ensure enforcement of the rules and

18  regulations regarding the Preserve."  Easement § 3.B.  The Easement also expressly authorizes COL to

19
20
21
22
23
> bring an action at law or in equity in a court of competent jurisdiction to
> enforce the terms of [the] Easement, to enjoin the violation, ex parte as
> necessary, by temporary or permanent injunction, to recover any damages
> to which it may be entitled for violation of terms of [the] Easement or
> injury to the Conservation Values protected by [the] Easement, including
> damages for the loss of aesthetic ecological educational, historical,
> recreation or scientific values and to require the restoration of the Preserve
> pursuant to the Plan to the condition that existed prior to any such injury.

24  Easement § 7.A.  Section 815.7 of the Civil Code likewise authorizes a party holding a conservation

25  easement to bring a civil action to enforce its terms.

26      8.      COL has no plain, speedy, or adequate remedy in the course of ordinary law.  Easement §

27  7.A.  Unless this Court grants the equitable relief requested herein, Defendant will continue to violate

28  the terms of the Easement and the policies of the conservation easement statute, Civil Code section 815

Complaint for Declaratory and Injunctive Relief           2                                    Case No.

1 │ through 816.

2 │ **FACTUAL BACKGROUND**

3 │ **The Conservation Easement**

4 │ 9.      In 2003, the County sought and obtained a permit from the Army Corps of Engineers

5 │ which allowed the County to destroy 5.01 acres of waters of the United States in order to expand

6 │ operations at the Neal Road Landfill ("Landfill").   To mitigate the use and loss of the jurisdictional

7 │ waters, the Army Corps of Engineers required the County to purchase 2.01 acres of seasonal wetland

8 │ habitat credits from an approved wetland mitigation bank, and to establish and maintain a preserve

9 │ containing 3.00 acres of created, avoided, and preserved waters of the United States.   As part of the

10 │ permit, Defendant was required to record a permanent conservation easement and deed restriction

11 │ maintaining all mitigation, preservation, and avoidance areas as wetland preserve and wildlife habitat in

12 │ perpetuity, and to designate an appropriate conservation-oriented third party to function as preserve

13 │ manager and to hold the required conservation easement.

14 │ 10.      On November 2, 2007, Defendant recorded the Easement, entitled "Perpetual

15 │ Conservation Easement Grant," with the Butte County Recorder's Office.   A true and correct copy of

16 │ the Easement is attached hereto as **Exhibit A**.   The Easement was created pursuant to the Army Corps of

17 │ Engineers Permit No. 200300113 ("Army Corps Permit"), which is attached as Exhibit D to the

18 │ Easement, and pursuant to section 815 *et seq.* of the Civil Code.

19 │ 11.      The Easement protects approximately six acres of land, as delineated by the legal

20 │ description attached to the Easement as Exhibit A.   A true and correct copy of that legal description

21 │ platted on a satellite image of the Landfill is attached hereto as **Exhibit B.**   Three of the six acres

22 │ comprise the wetlands required by the Army Corps Permit.   The remaining acreage of the Preserve is a

23 │ buffer, created pursuant to Special Condition 4 of the Army Corps Permit.   The buffer creates, at

24 │ minimum, a 25-foot area of native upland vegetation to minimize external disturbance of the preserved

25 │ waters.   The Preserve, when healthy, provides potential and existing habitat for numerous native plant

26 │ and animal species, and terrestrial communities, including the following: Conservancy fairy

27 │ shrimp, *Branchinecta conservatio*; California fairy shrimp, *Linderiella occidentalis*; Vernal pool fairy

28 │ shrimp, B*ranchinecta lynchi*; foothill yellow-legged frog, *Rana boylii*; western spadefoot, *Spea*

1   *hammondii*; bald eagle, *Haliaeetus leucocephalus*; American peregrine falcon, *Falco peregrinus*

2   *anatum*; greater sandhill crane, *Antigone canadensis tabida*; osprey, *Pandion haliaetus*; burrowing owl,

3   *Athene cunicularia*; vernal tadpole shrimp, *Lepidurus packardi*; North American porcupine, *Erethizon*

4   *dorsatum*; western pond turtle, *Emys marmorata*; coast horned lizard, *Phrynosoma blainvillii*; California

5   thrasher, *Toxostoma redivivum*; common yellowthroat, *Geothlypis trichas*; oak titmouse, *Baeolophus*

6   *inornatus*; Lewis's woodpecker, *Melanerpes lewis*; Nuttal's woodpecker, *Picoides nuttallii*; Great

7   Valley Cottonwood Riparian Forest; and, Northern Hardpan Vernal Pool.

8       12.     The Easement is made in favor of COL, and among the affirmative rights given to COL

9   is the right to prevent any activity on or use of the Preserve that is inconsistent with the purpose of the

10  Easement and to require the restoration of any area or features of the Preserve that may be damaged by

11  any such inconsistent activity or use.  Easement § 2.D.

12      13.     The purpose of the Easement is to "ensure that the Preserve will be retained forever in an

13  open space condition and to prevent any use of the Preserve that will impair or interfere with the

14  Conservation Values of the Preserve."  Easement § 1.

15      14.     The Conservation Values of the Preserve are defined as the "natural resources with

16  significant ecological values that benefit endangered, threatened, and other rare species" that the

17  Preserve possesses.  Easement Recital E.  These Conservation Values include "Waters of the U.S.,

18  including wetlands, the adjacent upland, along with associated native vegetation and wildlife."  *Id.*

19      15.     The Easement expressly prohibits Defendant from, among other things, the discharge of

20  any waste materials within the Preserve, the excavation of soils and removal of vegetation within the

21  Preserve, the altering of the topography of the Preserve, operation of motorized vehicles on any portion

22  of the Preserve with limited exceptions not applicable here, storing or placing materials and debris

23  within the Preserve, and any and all other uses which may adversely affect the purposes of the

24  Easement.  Easement § 4.

25                          **Defendant's Unlawful Actions on the Property**

26      16.     In February of 2019, Defendant experienced a period of heavy rainfall at the Landfill.

27  On February 14, 2019, Landfill staff observed leachate emerging from the surface of the side of Module

28  4, one of the Landfill's solid waste storage cells.  The leachate seeped from Module 4 and flowed down

the face of the slope of Module 4 and into Sediment Basin #4, a storm water collection basin located downhill of Module 4. The liquid that collected in Sediment Basin #4 was then pumped into a drainage ditch which gravity-flowed to the Preserve. The Landfill staff member who observed the leachate seeps informed Landfill management of the issue and turned off the pump that was moving the leachate into the ditch leading to the Preserve. The staff member estimated that approximately 316,800 gallons of leachate-contaminated storm water were discharged into the Preserve between approximately 9:00 a.m. and 1:40 p.m. when the pump was eventually turned off.

17.     On February 26 and 27, 2019, Landfill staff again observed leachate seeps from Module 4 flowing into Sediment Basin #4. On February 27, 2019 liquid was again being pumped from Sediment Basin #4 into the Preserve via the drainage ditch. Landfill staff estimated that approximately 594,000 gallons of leachate-contaminated storm water were discharged into the Preserve during this event.

18.     On March 6, 2019, Landfill staff again observed leachate seeps from Module 4 flowing into Sediment Basin #4. Landfill staff estimated that that leachate was flowing into Sediment Basin #4 at approximately 90 gallons per hour. Similar leachate seeps from Module 4 were also documented in April and May of 2019.

19.     In response to the leachate seeps from Module 4, Defendant began diverting storm water flows that originated from Module 4 away from the Preserve and into either the adjacent Class II leachate impoundment (also referred to as the "lined leachate pond"), or into a storm water sediment basin located north of the Preserve.

20.     On June 26, 2019, Central Valley Regional Water Quality Control Board ("Regional Board") staff performed a site inspection at the Landfill and observed sediment deposits in the Preserve which originated from the large soil stockpile located to the north of the Preserve. While this stockpile is billed as a "native soils" stockpile, information available to COL indicates that some of this soil was delivered to the Landfill in January 2019 from PG&E's cleanup efforts following the Paradise Camp Fire. On January 24, 2019, Landfill staff recommended that PG&E's soils be rejected because they were not adequately screened for semi-volatile organic compounds. However, on January 25, 2019, the soil was accepted and deposited into the soil stockpile north of the Preserve. During the July 18, 2019

1    visit to the Preserve, COL documented a thin layer of sediment in the Preserve that had the characteristic

2    red color of PG&E's cleanup soil. *See* **Exhibit E**.

3       21.    On July 31, 2019, Landfill staff reported to the Regional Board that a water truck

4    transporting leachate spilled at least 150 gallons of leachate in an area uphill of the Preserve. Landfill

5    staff also reported that the leachate flowed off the paved roadway and into unlined ditches, some of

6    which drain to the Preserve.

7       22.    On August 21, 2019, the Regional Board issued a Notice of Violation for the events

8    described in the paragraphs above. A true and correct copy of this document is attached hereto as

9    **Exhibit C**. These violations prompted subsequent investigation by the State Water Resources Control

10    Board Office of Enforcement, which issued its own Notice of Violation on June 11, 2020 describing

11    additional violations arising from Defendant's unauthorized leachate discharges. A true and correct

12    copy of the June 11, 2020 Notice of Violation is attached hereto as **Exhibit D**.

13       23.    On October 17, 2019, Landfill staff reported to the Regional Board that a plastic leachate

14    conveyance pipe had failed and caused leachate to spill into the Preserve. Regional Board staff

15    inspected the Landfill on October 18, 2019 and issued an inspection report on October 28, 2019

16    documenting the staff member's observations. Sometime during the night between October 16, 2019

17    and October 17, 2019, a weld failed on a leachate conveyance pipe running from the Module 4 leachate

18    sump to the lined leachate pond. The resulting leachate spill flowed from the broken pipe, across a dirt

19    road, and into the southeastern corner of the Preserve. In response to this spill, Landfill staff began

20    excavating soil that had been contaminated by the leachate, including within the Preserve itself.

21    Regional Board staff documented the stockpiling of excavated soil within the Preserve. Defendant,

22    between October 17, 2019 and January 8, 2020, reported excavating at least 218 cubic yards of soil from

23    the Preserve and the spill area.

24       24.    However, this was not the first time Defendant had conducted excavation activities

25    within the Preserve. On July 18, 2019, COL staff documented a grove of cottonwood trees located near

26    a reference gauge in the southeast corner of the basin. A true and correct copy of a photograph taken by

27    COL staff on July 18, 2019 is attached hereto as **Exhibit E.** COL staff returned to the Preserve on

28    September 11, 2019, and found that the grove had been demolished, the trees left dead and desiccated,

1  and that significant earth-moving activities had occurred, and were occurring, in the Preserve.  A true

2  and correct copy of a photograph taken by COL staff showing a bulldozer in the Preserve is attached

3  hereto as **Exhibit F**.  By February 2020, Defendant had conducted significantly more excavation and

4  removed several additional cottonwood trees along the northeast corner of the Preserve.  Defendant had

5  also built a new ramp in the northeast corner of the Preserve, which it used to access the Preserve with

6  its heavy equipment.

7     25.    In light of the Easement's restrictions, and the separate property rights in the Preserve

8  owned, respectively, by COL and Defendant, Defendant's actions are as egregiously unjustified as if

9  they had discharged untreated landfill leachate into Butte Creek directly, or had dug up its bed and banks

10  and destroyed established vegetation, trees, and habitat.  Defendant's actions are all the more disturbing

11  because it was allowed to expand its operations only after it created the Preserve.

12                      **COL's Efforts to Resolve the Dispute**

13     26.    In May 2019, COL staff conducted its annual review of the Preserve, pursuant to its

14  obligations under the Easement, and observed water in the Preserve that appeared to be contaminated.

15  After a short period of investigation, COL staff contacted Defendant on July 15, 2019 via email to

16  gather more information about the contamination in the Preserve.  Defendant replied on August 5, 2019,

17  but failed to address COL's concerns raised in the July 15th email.  A true and correct copy of the July

18  15, 2019 and August 5, 2019 correspondence is attached hereto as **Exhibit G.**

19     27.    On September 3, 2019, COL staff wrote a letter notifying Defendant of four violations of

20  the Easement, and providing Defendant an opportunity to explain the events that caused the discharge of

21  contaminated water into the Preserve.  A true and correct copy of this letter is attached hereto as **Exhibit**

22  **H**.  The letter alleges that Defendant had violated the Easement by allowing unauthorized motorized

23  vehicles to access the Preserve, by failing to install and maintain proper signage around the Preserve, by

24  causing chemical pollution to contaminate the soils of the Preserve, and by depositing in the Preserve, or

25  allowing to be deposited, three to four feet of gravel sediments.

26     28.    In its September 10, 2019 response to COL, Defendant largely dismissed COL's concerns

27  and rejected COL's proposal to resolve the dispute.  A true and correct copy of this letter is attached

28  hereto as **Exhibit I**.  With respect to the concerns about chemical contamination, Defendant brushed

1    them off completely – despite having pumped at least 1.1 million gallons of leachate-contaminated

2    storm water into the Preserve only months earlier.  Defendant did agree to install signs, but did so

3    without input from COL.

4         29.    After conducting additional investigation, COL again wrote to Defendant on December

5    13, 2019 and provided Defendant with additional notice of violations of the Easement.  A true and

6    correct copy of this letter is attached hereto as **Exhibit J**.  The letter identifies eight specific violations

7    of the Easement and remedies that would address each violation.

8         30.    On February 6, 2020, Defendant responded to the proposed remedies provided in COL's

9    December 13, 2019 notice of violations, but did not address the allegations of violations.  A true and

10   correct copy of this letter is attached hereto as **Exhibit K**.  Again, Defendant's responses to COL's

11   concerns were largely dismissive and Defendant rejected, or described as moot, all but COL's proposal

12   to include additional signage near the Preserve, which it agreed to remedy pursuant to COL's direction.

13        31.    After obtaining Defendant's February 6, 2020 response, and after obtaining records from

14   Butte County in response to a Public Records Act request, it became clear to COL that Defendant's

15   understanding of the geographical and proscriptive scope of the Easement differed from COL's.  In an

16   email to Defendant's counsel on March 31, 2020, a copy of which is attached hereto as **Exhibit L**, COL

17   explained, and provided its legal justification for, its understanding of the boundaries of the Preserve.

18        32.    Defendant responded on April 10, 2020 and simultaneously agreed with COL's

19   understanding that the Preserve consisted of six acres, of which three acres are protected wetland, and

20   rejected COL's allegations that the excavation activities described in paragraphs 23 and 24 above were

21   conducted in the Preserve.

22        33.    On April 13, 2020, COL responded to Defendant and highlighted the apparent

23   contradiction in Defendant's position, stating "[I]n your email you confirm that the County

24   acknowledges that there is a 3-acre wetland area ("we agree that the Easement consists of 6 acres total –

25   3 acres of which are protected wetlands"), but can only point to two acres the County believes are

26   wetlands. The area the County contends is the wetland is too small."  A copy of Defendant's April 10,

27   2020 email and COL's April 13, 2020 response are attached hereto as **Exhibit M**.

28        34.    Defendant has not responded to COL's April 13, 2020 email, and the parties have not

1    made any additional progress in resolving the violations raised by COL.

2        35.      Section 7.A of the Easement requires a party who determines that there is a violation of

3 the terms of the Easement to "give written notice to the other parties of such violation and demand

4 corrective action sufficient to cure the violation and, where the violation involves injury to the Preserve

5 resulting from any use or activity inconsistent with the purpose of this Easement, to restore in

6 accordance with the Plan, the portion of the Preserve so injured."  The Easement also provides that "[i]f

7 a party fails to cure a violation within thirty (30) days after receipt of written notice thereof from the

8 other party . . . the aggrieved party may bring an action at law or in equity in a court of competent

9 jurisdiction to enforce the terms of this Easement." *Id*.  COL provided notice on September 3, 2019, and

10 again on December 13, 2019.  Rather than run to the courthouse 30 days later, COL entered into good-

11 faith discussions with Defendant in an attempt to resolve the alleged violations.  Unfortunately, those

12 discussions have been unsuccessful, and the Parties have reached an apparent impasse.

13        36.      COL has not only the right, but also the duty under the Easement and the California Civil

14 Code to monitor and enforce compliance with the Easement.  COL's efforts to cooperatively resolve its

15 dispute with Defendant have not succeeded.  COL is therefore compelled to file this lawsuit seeking

16 declaratory and injunctive relief, damage, and restitution for Defendant's violations of the Easement.

17 Without the intervention of the Court, COL cannot protect the Property over which it holds the

18 Easement from further and ongoing harm.

19        37.      Defendant's conduct makes a mockery not only of the Easement's language and

20 purposes, but also of the conservation easement statute itself.  That statute is designed to ensure "the

21 preservation of land in its natural, scenic, agricultural, historical, forested, or open-space condition,"

22 which the Legislature has declared to be "among the most important environmental assets of

23 California."  Civ. Code § 815.  COL requests that this Court put an end to Defendant's unlawful

24 conduct.

25 **FIRST CAUSE OF ACTION**

26 **(Violation of Conservation Easement (Civ. Code § 815.7))**

27        38.      COL incorporates the allegations contained in the above paragraphs as though fully set

28 forth herein.

39.     The Easement is a "conservation easement" that runs with the Preserve, created under the authority of section 815 to 816 of the Civil Code.

40.     Section 815.7(b) of the Civil Code provides that a court may enjoin "[a]ctual or threatened injury to or impairment of a conservation easement or actual or threatened violation of its terms" in a suit brought by the holder of the easement.

41.     Section 815.7(c) of the Civil Code provides that the holder of a conservation easement "shall be entitled to recover money damages for any injury to such easement or to the interest being protected thereby or for the violation of the terms of such easement."

42.     The Easement is intended to "ensure that the Preserve will be retained forever in an open space condition and to prevent any use of the Preserve that will impair or interfere with the Conservation Values of the Preserve." Easement § 1.

43.     Defendant's past and imminent future actions violate the Easement in numerous ways, including the following:

a.     The discharge of leachate, a waste material, into the Preserve violates the Easement's prohibition on the discharge of any waste materials within the Preserve. Easement § 4.E. The same activities also violate the Easement by harming the Conservation Values of the Preserve, which include the wetlands – as well as the surface and ground water required to protect and sustain the wetlands – and water quality, because landfill leachate is a highly polluted liquid. Easement Recital E and § 2.E.

b.     The discharge of leachate into the Preserve violates the Easement's prohibition on "[a]ny and all other uses which may adversely affect the purposes of this Easement." Easement § 4.R.

c.     Defendant's diversion of storm water away from the Preserve violates the Easement by depriving the wetlands of the necessary water and therefore harming the Conservation Values of the Preserve. Easement Recital E.

d.     Disposal and storage of soil within the Preserve violates the Easement's prohibition on "stor[ing] or plac[ing] (whether temporarily or permanently)" any "material or debris" within the Preserve. Easement § 4.C and 4.E. Defendant has violated the same sections of the Easement by storing pipes and other equipment within the buffer area of the Preserve.

e.     The excavation and removal of soil from the Preserve violates the Easement's prohibition

1  on "[e]xcavating, dredging, or removing loam, gravel, soil, rock, sand, or other material" from the

2  Preserve.  Easement § 4.F.

3        f.   The operation of motorized vehicles within the Preserve violates the Easement's

4  prohibition on riding, bringing, using or permitting such vehicles "on any portion of the Preserve, except

5  as provided for in the Plan or with prior written approval by the Corps."  Easement § 4.K.  No

6  exceptions to this prohibition apply, nor did Defendant obtain any prior written approval by the Army

7  Corps of Engineers.

8        g.   The destruction of cottonwoods and other trees and vegetation by heavy equipment, and

9  by the discharge of leachate, in the Preserve violates the Easement's prohibition on the "destruction or

10  removal of any natural tree, shrub or other vegetation, that exists upon the Preserve."  Easement § 4.J.

11        h.   The open venting of methane near the Preserve harms the Conservation Values of the

12  Preserve - and therefore violates the Easement - which include, among other things, the air rights

13  necessary "to protect and sustain the biological resources of the Preserve."  Easement § 2.E.

14        i.   The foregoing activities are inconsistent with the purposes of the Easement as set forth in

15  section 1 of the Easement.

16        j.   The foregoing activities have impaired and will continue to impair the natural habitat,

17  scenic, and open space values of the Property.

18     44. As a direct and proximate result of Defendant's prior and threatened future violations of the

19  Easement, COL has incurred and will incur substantial damages and harm, as well as costs, expenses,

20  and attorneys' fees in seeking to enforce the Easement.

21     45. Because there is no adequate remedy at law for Defendant's violations of the Easement, COL

22  is entitled to an injunction prohibiting Defendant and its agents, servants, employees, officers, and

23  representatives, and others acting in concert with it or on its behalf from further discharges of leachate

24  and from further excavation, grading, or vegetation-removal activities within the Preserve; or engaging

25  in any revegetation measures without COL's prior written approval.  COL is entitled to a mandatory

26  injunction compelling Defendant to restore "such Area or features of the Preserve that may be damaged

27  by any inconsistent activity or use," and to restore the Preserve "to the condition that existed prior to any

28  such injury."  Easement §§ 2.D, 7.A; Civ. Code § 815.7(b).

46. COL is also entitled to damages, in an amount to be proved at trial, for Defendant's discharges of leachate to the Preserve, and extensive excavation, grading, and disposal activities in violation of the Easement.  Such damages include compensation for the harm caused by Defendant to the aesthetic, ecological, educational, historical, recreational or scientific values of the Property.  Civ. Code § 815.7(c); Easement § 7.A

47. COL is also entitled to be reimbursed, in an amount to be proved at or after trial, for all reasonable costs incurred enforcing the Easement "including, without limitation, costs of suit and attorneys' fees."  Easement § 7.B.

48. An actual controversy exists between COL and Defendant as to whether the actions of Defendant alleged in this Complaint violate the Easement, and a judicial resolution of that controversy is now required.

49. COL requests a declaration from this Court that the actions alleged in this Complaint violate the Easement.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

50. COL hereby incorporates the allegations contained in the above paragraphs as though fully set forth herein.

51. The Easement is a binding and enforceable contract.

52. As owners of fee title to the Preserve, Defendant is bound by the Easement, which runs with the Preserve.  Easement Recital A; Civ. Code § 815.7(a).

53. The actions alleged above constitute actual or threatened violations of the Easement and as such are actionable as breaches of contract.

54. Because there is no adequate remedy at law for Defendant's breaches of its obligations under the Easement, and because the Easement expressly provides that its terms shall be enforceable by injunction, COL is entitled to an injunction prohibiting Defendant and its agents, servants, employees, officers, and representatives and others acting in concert with it or on its behalf from further discharges of leachate and from further excavation, grading, or vegetation-removal activities within the Preserve; or engaging in any revegetation measures without COL's prior written approval.

55. COL is also entitled to damages, in an amount to be proved at trial, for Defendant's discharges of leachate to the Preserve, and extensive excavation, grading, and disposal activities in violation of the Easement.  Such damages include compensation for the harm caused by Defendant to the aesthetic, ecological, educational, historical, recreational or scientific values of the Property. Easement § 7.A

56. COL is also entitled to be reimbursed, in an amount to be proved at or after trial, for all reasonable costs incurred enforcing the Easement "including, without limitation, costs of suit and attorneys' fees." Easement § 7.B.

57. An actual controversy exists between COL and Defendant as to whether the actions of Defendant alleged in this Complaint violate the Easement, and a judicial resolution of that controversy is now required.

58. COL requests a declaration from this Court that the actions alleged in this Complaint constitute breaches of the Easement.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For the following declarations, pursuant to Code of Civil Procedure section 1060:

   a. That discharges of leachate into the Preserve are violations and breaches of the Easement;

   b. That excavation and removal of soils from within the Preserve are violations and breaches of the Easement;

   c. That the destruction and removal of vegetation in the Preserve are violations and breaches of the Easement;

   d. That uses of motorized equipment to excavate or grade soil in the Preserve are violations and breaches of the Easement; and,

   e. That discharges of methane and untreated landfill gases into the air of the Preserve are violations and breaches of the Easement;

2. For preliminary and permanent injunctions restraining Defendant, its agents, servants, employees, officers, and representatives, and others acting in concert with them or on their behalf, from engaging in excavation, grading, or vegetation-removal activities within the

Preserve without COL's prior written approval, or otherwise acting in contravention of the Easement;

3. For a permanent mandatory injunction compelling Defendant to:

    a.  Replant and restore the vegetation and trees removed from the Preserve in connection with the Easement violations described herein; and,

    b.  Undertake any additional work necessary to ensure that the Property is fully "restored to the condition that existed prior" to its violations and to "continue to diligently cure such violations until finally cured," as required by section 7 of the Easement;

4. For damages in an amount to be proved at trial;

5. For costs of suit;

6. For costs of review of Defendant's restoration proposals and related costs of enforcement (including attorneys' fees, consultant fees, and staff time) as authorized by Section 7 of the Easement, Civil Code section 815.7(d), Code of Civil Procedure sections 1021.5 and 1033.5(a)(1), and other provisions of law; and,

7. For such other relief as the Court deems just and proper.

Dated: June 19, 2020        Respectfully Submitted,

                      LAW OFFICES OF ANDREW L. PACKARD

                      By: /s/ William N. Carlon
                      William N. Carlon
                      Attorney for Plaintiff
                      CALIFORNIA OPEN LANDS

# EXHIBIT B

1   ANDREW L. PACKARD (State Bar No. 168690)
    WILLIAM N. CARLON (State Bar No. 305739)
2   LAW OFFICES OF ANDREW L. PACKARD
    245 Kentucky Street, Suite B3
3   Petaluma, CA 94952
    Tel: (707) 782-4060
4   Fax: (707) 782-4062
    andrew@packardlawoffices.com
5   wncarlon@packardlawoffices.com

6   BRIAN ACREE (State Bar No. 202505)
    LAW OFFICE OF BRIAN ACREE
7   331 J Street, Suite 200
    Sacramento, CA 95814
8   Tel: (510) 517-5196
    brian@brianacree.com

9   Attorneys for Plaintiff
    CALIFORNIA OPEN LANDS
10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                          COUNTY OF BUTTE

13  CALIFORNIA OPEN LANDS, a non-profit      )   Case No. 20CV01220
    land trust organization,                 )
14                                           )
                                             )
15          Plaintiff and Cross Defendant,   )   DECLARATION OF ANDREW L. PACKARD
       v.                                    )   IN SUPPORT OF MOTION FOR
16                                           )   ENFORCEMENT COSTS
    BUTTE COUNTY DEPARTMENT OF               )
17  PUBLIC WORKS, a political subdivision of the )   Date:      August 10, 2022
    State of California,                     )   Time:      9:00 a.m.
18                                           )   Dept. 6 (Hon. Stephen E. Benson)
                                             )
19          Defendant and Cross Complainant. )
                                             )
20  _____ )

21          I, ANDREW L. PACKARD, hereby declare under penalty of law that the following facts are true

22  and correct:

23          1.      I have been a member of the California Bar for 28 years.  My firm, together with the Law

24  Office of Brian Acree, has served as counsel for Plaintiff and Cross-Defendant California Open Lands

25  ("COL") in the above-captioned action since its inception.  I make this declaration in support of

26  Plaintiff's Motion for Enforcement Costs based upon my personal knowledge, unless otherwise stated,

27  and I am competent to testify to the matters set forth herein.

28  _____
    Packard Dec ISO Motion
    for Enforcement Costs                                    Case No. 20CV01220

1    2.    I am admitted to practice law in the State of California and before the United States

2    District Court of the Northern District of California, and am a member of good standing in the state bar.

3    **Background and Experience**

4    3.    I earned my Juris Doctorate from the Boston University School of Law in May 1993 and

5    have been a member of the California Bar since December 1993.  Since 1997, my firm has represented

6    dozens of local, regional and statewide environmental non-profit organizations and individuals in over

7    140 public interest cases to advance environmental, consumer protection and "right-to-know" laws.

8    These citizen enforcement actions have been brought under the Clean Water Act ("CWA"), California's

9    Safe Drinking Water and Toxic Enforcement Act ("Proposition 65"), the California Business &

10   Professions Code, California Code of Civil Procedure section 1094.5, and the Resource Conservation

11   and Recovery Act ("RCRA").  In support of these cases, my firm regularly uses the provisions of the

12   federal Freedom of Information Act, the California Public Records Act, and California's Strategic

13   Lawsuits Against Public Participation statute.

14   4.    My firm has served as lead counsel in over ninety CWA cases, and has represented eight

15   of the California chapters of the international Waterkeeper Alliance in connection with their CWA

16   enforcement program.  My firm currently represents the California Sportfishing Protection Alliance in

17   connection with its statewide development and prosecution of Clean Water Act and Proposition 65

18   "Discharge to Drinking Water" claims.  This work has resulted in several significant published opinions

19   in the United States District Courts of the Northern District of California, the Eastern District of

20   California, and the Central District of California, as well as the Court of Appeals for the Ninth Circuit,

21   and California's appellate courts.

22   5.    Over my 28 years of practicing public interest environmental law on behalf of private

23   clients, I have gained considerable experience negotiating, mediating and litigating attorney fee

24   recoveries.  In the course of this work experience, I have performed many hours of research into

25   prevailing attorney rates in various California legal markets and the case law concerning attorney fee

26   awards, including attorney fee awards by the District Court for the Northern District of California, the

27   opinions expressed by other attorney fee experts in declarations filed in fee motions, legal periodicals

28   concerning attorney rates, and discussions with other San Francisco Bay Area counsel concerning the

1   rates they charge.

2       6.      In my annual re-setting of my firm's hourly rates for cases of this type, I have relied

3   primarily on market data and fee awards in cases involving citizen suit environmental litigation across

4   California.

5   **Procedural History of This Action**

6       7.      My firm was contacted by Holly Nielsen, COL's Executive Director, in October of 2019,

7   and retained on a partly-contingent basis to investigate the Butte County Department of Public Works'

8   mismanagement of the Neal Road Landfill to assess potential violations of COL's conservation

9   easement and the County's General Industrial Storm Water Permit, a permit required for discharges

10  subject to the National Pollutant Discharge Elimination System implemented under the Clean Water

11  Act.

12      8.      After reviewing the terms of the easement and the County's storm water compliance

13  issues at Neal Road Landfill, my firm, with input and approval from COL's Board of Directors,

14  developed a strategy for moving forward on two matters: (1) enforcing the terms of COL's easement in

15  state court; and, (2) addressing the County's Clean Water Act permit violations in federal court.

16      9.      From this early stage in the case, all billing hours were meticulously assigned to either

17  the conservation easement enforcement effort, or the Clean Water Act permit enforcement effort. Any

18  time equally attributable to the furtherance of *both* matters (*e.g.*, COL early development of a settlement

19  demand settling both cases) has been split between the two actions. The fees sought in this motion are

20  for billings to the conservation easement enforcement matter *only* (the federal matter is still pending).

21      10.     To implement this strategy, COL also formally retained the advisory services of Mark

22  Habib, a local attorney with expertise in real estate law and conservation easements, in January of 2020.

23  (Mr. Habib's declaration in support of this motion is filed herewith.)

24      11.     As an initial step in the state court action, and as required under Section 7 of the

25  Easement, my firm worked with COL staff to collect evidence, confer with experts, and develop a

26  written notice of the County's violations of the Easement. COL issued this notice, together with

27  proposed remedial actions for the violations to the County on December 13, 2019. (A true and correct

28  copy of COL's December 13, 2019 letter to the County is attached hereto as **Exhibit A**.)

Packard Dec ISO Motion
for Enforcement Costs                          3                          Case No. 20CV01220

1        12.    Nearly two months later, on February 6, 2020, the County responded by letter, dismissing

2  COL's concerns, rejecting nearly all of COL's proposed remedial actions, and promising a more

3  comprehensive response to COL's letter of December 13, 2019 by the end of the month.  A true and

4  correct copy of the County's February 6, 2020 response is attached hereto as **Exhibit B**.

5        13.    After further discussions and emails, COL's counsel emailed the County on March 31,

6  2020 to explain, and provided its legal justification for, its understanding of the boundaries of the

7  Preserve.  A true and correct copy of COL's March 31, 2020 response is attached hereto as **Exhibit C**.

8        14.    On April 10, 2020, the County responded by letter, simultaneously agreeing with COL's

9  understanding that the Preserve consisted of six acres, of which three acres are protected wetland, but

10  also rejecting COL's allegations that the County had violated the terms of the Easement.  A true and

11  correct copy of the County's April 10, 2020 letter is attached hereto as **Exhibit D**.

12        15.    On April 13, 2020, COL responded by email to the County to point out the apparent

13  contradiction in Defendant's position, stating "[I]n your email you confirm that the County

14  acknowledges that there is a 3-acre wetland area ("we agree that the Easement consists of 6 acres total –

15  3 acres of which are protected wetlands"), but can only point to two acres the County believes are

16  wetlands. The area the County contends is the wetland is too small."  A true and correct copy of COL's

17  April 13, 2020 email is attached hereto as **Exhibit E**.

18        16.    Based on the unyielding positions taken by the County in the parties' discussions

19  between COL's formal notice on December 13, 2019 and continuing through June 2020, and additional

20  information obtained by COL in response to a number of Public Records Act and Freedom of

21  Information Act requests, it became clear to COL that the County misunderstood the geographical and

22  prescriptive scope of the Easement, the boundaries of the Preserve, and what measures would need to be

23  undertaken to repair the damage it had caused and prevent future leachate spills to the Preserve.

24        17.    After two months without receiving any response to its April 13, 2020 email[1],  COL filed

---

25        [1] Settlement discussions in the federal action during this time period were equally unproductive.

26  On May 27, 2020, at COL's request, the parties conducted a settlement-protected facility inspection in the federal action filed against the County on January 16, 2020.  This meeting was not productive

27  because the County failed to make available a representative who could answer COL's questions during the meeting and declined to engage in a meaningful discussion to resolve the case.   The County did ask

28  COL to prepare a written list of questions, which COL provided to the County on July 29, 2020.  The

1  this action on June 19, 2020.

2      18.    The County filed a demurrer in September of 2020, and a cross-complaint (to which COL

3  demurred) in November of 2020.  During this five-month period, settlement discussions were effectively

4  suspended while the parties engaged in motion practice and COL awaited responses to the settlement

5  questions posed in July.

6      19.    By the end January of 2021, with the procedural motions completed and the County

7  returning to the settlement discussion, COL was able to persuade the County to stipulate, in the federal

8  action, to an order setting a settlement conference with Magistrate Judge Kendall J. Newman "to explore

9  a comprehensive, early resolution" of *both* the federal and state actions.  The stipulated order provided

10 that Plaintiff was to make best efforts to provide Defendants with a written demand, including all

11 injunctive and monetary terms, as well as a draft consent decree on or before January 29, 2021, and that

12 Defendants were to make best efforts to provide a written response to Plaintiff's demand, including a

13 mark-up of the draft consent decree, on or before February 26, 2021.

14     20.    COL provided its demand for injunctive relief by letter dated January 29, 2021 and

15 supplemented this with its monetary demand the following business day, on February 2, 2021.  The

16 County responded to COL's demand belatedly, on March 4, 2021, only days before the settlement

17 conference, falsely asserting that COL's proposed relief measures had already been implemented by the

18 County, had been accepted for future implementation by the County, or were moot.  Notably, the County

19 also announced, for the first time, that it would unilaterally "seek a modification of the underlying

20 mitigation obligations in the 2003 Letter of Permission (200300113) issued by the United States Army

21 Corps of Engineers ("USACE")" resulting in "the elimination of the Conservation Easement Area and

22 will authorize offsite mitigation."  In short, the County hatched a half-baked plan to try to unilaterally

23 terminate the easement through a modification of the Army Corps of Engineers' permit modification

24 process (a theory contrary to California's law of easements).  On this basis, the County further declared

25 that it "will not concur with any settlement demands relevant to the Conservation Easement Area as they

26 will be moot."

27

28 County responded nearly four months later, on November 19, 2020 (see further discussion below).

21.     Finally, and notable in the context of this motion, the County also refused to negotiate *any* fees or costs in *either* the federal of the state case without COL first providing billing statements, which would need to be redacted to prevent the waiver of any privileges.

22.     The March 10, 2021 settlement conference with Magistrate Judge Newman was not successful, despite a follow-up conference call hosted by Magistrate Judge Newman on April 16, 2021 and conversations running through the summer to try to put the settlement process back on track.

23.     In December 2021, COL communicated to the County that it was willing to restart negotiations, but the County did not respond.

24.     As it became obvious the County was no longer interested in participating in settlement discussions after the March 2021 conference, COL started to shift its focus to discovery and factual investigation.  On April 13, 2021, COL propounded Form Interrogatories, Set One.  On June 10, 2021, COL propounded additional written discovery, including a second set of form interrogatories, requests for production of documents, and requests for admissions.  The written discovery process was made more laborious by the County's objections, responses, and repeatedly-amended responses, which required extensive efforts to resolve through meeting and conferring with County's counsel.  The County also propounded written discovery, including document requests that required significant attorney review time.

25.     As the case approached trial, counsel expended significant time preparing for expert depositions.  Also included in this category of time are efforts COL made to gather information from the Army Corps of Engineers, as well as other regulatory agencies that were making decisions related to the County's violations, and COL's enforcement, of the Easement.

26.     By the fall of 2021, eighteen months into the case, with a settlement process that had sputtered to halt and trial deadlines looming, COL elected to complete its discovery and seek summary judgment of the issues raised in its complaint and in the County's cross-complaint.  To support this work, COL also retained Brian Acree, an attorney in Sacramento with substantial experience in citizen suit enforcement and state court practice, in late 2021.

27.     The County's cross-complaint made three requests for relief.  COL believed that the cross-complaint raised purely legal questions, specifically, how the definition of the term "Preserve"

should be interpreted in the Easement, and began preparing a motion for summary judgment, or in the alternative, for summary adjudication, on the cross-complaint ("MSJ 1"). COL's motion also focused on narrowing the issues left for trial. In particular, COL moved for summary adjudication on whether the cross-complaint raised a genuine dispute as to whether the easement establishes "wetlands" within the Preserve.

28.    COL filed MSJ 1 on November 30, 2021, the County filed its opposition on January 27, 2022, and COL filed a reply on February 11, 2022.

29.    After COL filed MSJ 1, it began work on another motion for summary judgment, or in the alternative, for summary adjudication, on COL's complaint ("MSJ 2"). MSJ 2 sought adjudication of COL's claims that the County's discharge of leachate, and other activities, were prohibited by the Easement, and also sought to dispose of the County's affirmative defenses for which the County had provided no facts or evidence in support thereof.

30.    COL filed MSJ 2 on December 20, 2021, the County filed its opposition on February 22, 2022, and COL filed its reply on March 4, 2022.

31.    The Court consolidated the two motions into one hearing, held on March 9, 2022. On MSJ1 the court ruled in COL's favor that there was no genuine dispute as to whether the Easement establishes wetlands within the Preserve. In its order, the Court emphasized the importance of particular provisions of the Easement and the Permit, and these provisions became key points of focus for COL's trial preparation.

32.    On the second motion, the Court granted COL's motion for summary adjudication as to the County's first six affirmative defenses, and otherwise denied the motion. However, just as with the first motion, the Court highlighted the County's force majeure defense, and that too became a key point of focus for COL's trial preparation.

33.    Through its two motions, COL successfully narrowed the issues left for trial by disposing of one of three of the County's claims in its cross-complaint, and by disposing of six out of the County's ten affirmative defenses. Through this briefing, the parties were also able to further focus the issues for trial, as the Court emphasized in its ruling by paying particular attention to the key provisions of the permit, and the County's force majeure defense.

34.     On March 22, 2022, twenty days before trial in the present action, and the morning before the first expert deposition was set to take place, the County finally provided a settlement offer.  In its March 22nd settlement communication, the County represented to COL that it would be taking the position in its trial brief that there was no dispute between the parties because the County would be conceding each and every request for declaratory relief made by COL.  This was a sharp reversal of the County's initial position where it denied that any of the discharges of leachate, excavation activities, removal of vegetation, or operation of heavy equipment alleged in COL's complaint were violations of the Easement.

35.     Though the County's new position represented a step toward settlement, the Parties still had significant work ahead of them to reach a final resolution.  At that point, settlement was an uncertain proposition, so the expert deposition schedule for March 23rd proceeded as planned.

36.     In addition to preparing and conducting the expert deposition, COL immediately began working on a good faith response to the County's March 22nd settlement communication, which it provided the following day.  The County responded by letter on March 26th, provided a draft settlement agreement on March 28th, and an amended draft on March 29th.  On March 30th, COL responded by letter and provided a redline draft of the settlement agreement.

37.     The second expert deposition was set to take place on April 1st at 10:00 a.m. Approximately 20 minutes before, at 9:39 a.m., the County provided a responsive letter and settlement agreement.  Before the deposition began, the parties agreed to continue the deposition to avoid the expense in case a settlement could be reached.  In the event a settlement could not be reached, the parties agreed to ask the court at the April 6th trial readiness conference to send the case to a settlement conference to see if any remaining issues could be resolved.  The parties further committed to an exchange of drafts over the next two or three days.  COL provided its response that same day.

38.     The parties were not able to resolve the remaining issues and continued to exchange letters and drafts up to the trial readiness conference on April 6th.  At the conference, the court continued the trail date and ordered the parties to a settlement conference with Judge Candela on April 18th.  The parties continued to exchange letters and drafts of the agreement up until the settlement conference.

39.     At the second settlement conference with Judge Candela, on April 22nd, the parties reached an agreement in principle that was finalized and fully executed on April 25th.  As part of the settlement, the parties agreed to negotiate the resolution of attorneys' fees and costs after the substantive issues regarding declaratory and injunctive relief were addressed.  On May 2nd, counsel for COL and the County spoke and agreed that as an initial starting point, COL would provide a summary chart detailing COL's lodestar, including  and the number of hours, the rates, and years of practice for each timekeeper seeking fees.  COL provided this information on May 3, 2022.  At that time, COL's un-modified lodestar was approximately $615,000, and COL proposed settling the issue for $492,000 if the matter could be resolved promptly before the parties had another settlement conference scheduled (avoiding the costs associated with a contested fee motion).  COL informed the County that if the matter went to a fee motion, COL would seek its full lodestar, plus the added costs associated with filing the motion.

40.     The County responded by rejecting COL's offer of a fee settlement and stating its belief that "a fee motion is the appropriate method for resolving the matter."  The County also threatened to share confidential information that was shared with the County in the federal litigation under a stipulated protective order.  This threat, coupled with the County's summary rejection of COL's May 6th offer, made it clear that the County had no intention to comply with the terms of the settlement agreement that it had just signed, which required it to negotiate *in good faith*, and to seek a settlement conference if no agreement could be reached.

41.     COL answered by letter the same day, asking the County if it was willing to use the already-scheduled settlement conference to try and narrow the issues, and see any progress could be made.  The following day, the County agreed to move forward with the settlement conference, but confirmed its position that a fee motion appeared to be the appropriate method for resolving the matter.

42.     This motion is necessary because the County made it clear that it was not willing to negotiate the issue, and that it thought a motion was the "appropriate method for resolving the matter." (this despite COL's informing the County that counsel for COL had recently prevailed on a fee motion, in another case, where the court awarded approximately $72,000 in fees for work done on the fee motion alone).  That did not persuade the County, and the only recourse COL has left is to make this motion.

**Summary of Fees Sought and Method of Tracking Attorney Fees**

43.     By this motion, COL is seeking reimbursement of its reasonable attorneys' fees and costs incurred in bringing this action, as well as consulting and staff costs, and other typical litigation expenses (court filing and remote appearance fees, court reporters' fees, and expert witness fees).  This declaration contains a detailed accounting of the $630,677, for 1,047.1, hours of legal services from October 2019 through the present.

44.     Attached as **Exhibit F** to this declaration is a spreadsheet covering the time records of lead counsel and co-counsel: myself, my associate (William Carlon), and my co-counsel (Brian Acree), along with their hourly rates, by year of practice.

45.     In preparing this declaration, I have reviewed all of the over 1,000 individual time entries in this case, from the development of the case strategy and preparation of the December 13, 2019 notice of the County's violations of the Easement through the filing of this motion for attorneys' fees and costs over two and a half years later.

46.     The attorney hours for which recovery is sought in this motion are based on contemporaneous time records, to the tenth of an hour, prepared by the attorneys working on this case.  My firm maintains an electronic system for recording and managing time entries using Toggle™ and Time59™ billing programs, and for all costs incurred for individual matters.  Pursuant to the firm's regular timekeeping practices, Mr. Carlon and I recorded each task we performed and the time spent on each task on the same date that the task was performed.  I am informed by Mr. Acree that he also maintains electronic systems for contemporaneously recording and managing time and cost entries, and that he recorded each task he performed, and the time spent on each task, on the same date that the tasks were performed.

47.     I personally oversaw assignments and ensured the appropriate delegation of tasks based on seniority and billing rate.  I leveraged the time of my associate, for example, by assigning him to conduct fact research and issue Public Records Act requests.  Similarly, I tasked certain members of the attorney group with discreet parts of the case work to avoid any duplication of effort.

48.     As described more fully below, I also exercised my professional billing judgment to ensure that the attorneys' fees sought in this motion represents only those efficient legal service hours

1    reasonably expended in this litigation, further streamlining and eliminating any potential duplication of

2    efforts by different attorneys.

3        49.    My firm and my co-counsel agreed to litigate this case through trial and appeal at rates as

4    low as one fifth of market rates, knowing that if we prevailed, we would be entitled to seek a multiplier.

**Biographical Information About the Attorneys Who Worked on this Matter and Their Respective Contributions to the Case**

6        50.    I am familiar with the background and qualifications of my associate and co-counsel.  For

each of them, I have set forth below their educational background, professional experience and

contributions to the prosecution of this case.  Attached as **Exhibit G** to this declaration are each of their

declarations confirming these facts and authenticating their time entries as set forth in the spreadsheet

attached as **Exhibit F.**

12       51.    **ANDREW L. PACKARD**.  My background and experience are set forth in Paragraphs 3

– 6, above.  In this action, I was responsible for the management of all aspects of this case, including

client and expert communications, delegating assignments to my associate, and coordinating our work

with that of our co-counsel Brian Acree.

17       52.    From the beginning of this case, my associate, William Carlon, and I, led in the

development of the factual record and significantly assisted in the development of the overall legal

strategy for the case.

20       53.    My firm has performed 757.2 hours of work on this case, which represents nearly three

quarters of the total attorney hours for which compensation is sought in this motion.

22       54.    By this motion, I am seeking reimbursement for 259.7 hours of my work on this case.  I

have set my hourly billing rate for purposes of this action at $825 per hour.  In my opinion, this rate is

well within the reasonable 2022 market rate in the San Francisco Bay Attorney for an attorney with my

skill, experience and reputation.  To calculate our hourly rates, my associate, co-counsel and I performed

an extensive review of fee awards in cases involving citizen suit environmental enforcement actions in

the Northern District of California.  This rate is also informed by discussions about prevailing market

rates that I have had with other public interest environmental litigators who practice in the Northern

1 | District.

2 |     55.   **WILLIAM CARLON**.  My associate, Mr. Carlon, has practiced law in California for

3 | nearly six and half years.  He was admitted to the California bar on December 3, 2015.  In February

4 | 2016, he joined my firm and began litigating various environmental enforcement cases, including cases

5 | under the Clean Water Act and Proposition 65.  Before joining the California bar, Mr. Carlon earned a

6 | Bachelor of Arts degree in Communications from the University of California, Davis in 2010.  After

7 | working for a year and a half at the Butte County District Attorney's Office, he earned his law degree at

8 | the University of Oregon School of Law in 2015.  During law school, he worked as a summer associate

9 | at the Crag Law Center in Portland, OR, and externed at the United States Federal District Court for the

10 | District of Oregon, in Eugene, OR.

11 |     56.   Mr. Carlon has represented Californians for Alternatives to Toxics, the Mateel

12 | Environmental Justice Foundation, and the California Sportfishing Protection Alliance in a number of

13 | Clean Water Act enforcement actions against industrial facilities found to be discharging storm water in

14 | violation of their permit requirements, and a groundbreaking Proposition 65 "discharge to drinking

15 | water" case.  In 2019, he was the lead attorney in *Californians for Alternatives to Toxics v. Schneider*

16 | *Dock & Intermodal Facility, et al.*, USDC, NDCA Case No. 3:17-cv-05287-JST (Cal. N.D. Mar. 19,

17 | 2019) in which he argued and won significant portions of a summary judgment motion.  In 2021, he was

18 | a critical member of a team of attorneys who succeeded in obtaining a $2,087,750 civil penalty award in

19 | another Clean Water Act case.  See *Californians for Alternatives to Toxics v. Kernen Construction Co.,*

20 | *et al.,* USDC, NDCA Case No. 4:20-cv-01348, ECF No. 58.  In addition to discovery, motion practice,

21 | depositions and oral argument, Mr. Carlon has also gained experience in client development, settlement

22 | negotiations and appellate practice during his tenure at my firm.

23 |     57.   In this case, Mr. Carlon was tasked with developing the evidentiary record, obtaining

24 | documents through the California Public Records Act, drafting the December 13, 2019 notice of

25 | violation, propounding discovery, briefing the motions for summary judgment and trial preparation.

26 | With nearly 500 hours worked on this case, Mr. Carlon has contributed to its success more than any

27 | other attorney, billing nearly half of the total attorney hours in the case.

28 |     58.   In conjunction with Mr. Carlon, I have set his hourly billing rate for the purposes of this

1    action at $400 per hour.  In my opinion, this rate is well within the reasonable 2022 market rate in the

2    San Francisco Bay Area for an attorney with Mr. Carlon's skill, experience, and reputation.  To calculate

3    his hourly rate, I performed an extensive review of fee awards in cases involving citizen suit

4    environmental enforcement actions in the Northern District of California.  This rate is also informed by

5    discussions about prevailing market rates that I have had with other public interest environmental

6    litigators who practice in the San Francisco Bay Area.

7            59.    **BRIAN ACREE.**  Mr. Acree graduated with highest honors from Golden Gate

8    University School of Law in San Francisco and has been a member of the California State Bar for over

9    twenty-two years.  He was an editor of the Golden Gate University Law Review and earned

10   specialization certificates in environmental and public interest law.  He also worked as a student attorney

11   for the Golden Gate University School of Law Environmental Law and Justice Clinic, where he

12   represented non-profit organizations and in Clean Water Act, CERCLA, and RCRA litigation.  He also

13   worked as a law clerk for Lead Safe California where he assisted in drafting model lead hazard

14   abatement legislation.  In May 2003, he was awarded Golden Gate University School of Law's "Judith

15   G. McKelvey Award for Outstanding Achievement as an Alumnus."

16           60.    Since joining the bar, Mr. Acree has worked as a sole practitioner, and has served as

17   either lead trial counsel or co-counsel in environmental matters involving the Clean Water Act, RCRA,

18   the California Environmental Quality Act, and various government transparency statutes, including the

19   Brown Act and the California Public Records Act.  He has appeared and argued before the California

20   Court of Appeals for the Second Appellate District and has litigated cases in both federal and state

21   courts throughout California. He has also been retained numerous times as a motion practice and brief

22   writing consultant in both federal and state cases, including cases argued before the California Supreme

23   Court.  The majority of Mr. Acree's law practice takes place in the San Francisco Bay Area and the Los

24   Angeles area, where he continues to maintain an office address.  In 2018, Mr. Acree relocated his

25   residence to the Sacramento area to care for an ailing family member, and while he has an office in

26   Sacramento, his practice areas remain in San Francisco and Los Angeles area courts.

27           61.    Although Mr. Acree contributed to all aspects of the case strategy, his primary focus was

28   on the motions for summary judgment and trial preparation.   Mr. Acree has billed 289 hours to this

1  case.

2      62.    In conjunction with Mr. Acree, I have set his hourly billing rate for the purposes of this

3  action at $750 per hour.  In my opinion, this rate is well within the reasonable 2022 market rate in the

4  San Francisco Bay Area for an attorney with Mr. Acree's skill, experience, and reputation.  To calculate

5  his hourly rate, I performed extensive review of fee awards in cases involving citizen suit environmental

6  enforcement actions in the Northern District of California.  This rate is also informed by discussions

7  about prevailing market rates that I have had with other public interest environmental litigators who

8  practice in the San Francisco Bay Area.

9      **The Fee Rates Sought in This Motion Are Reasonable**

10     63.    The rates applied to the attorneys billing in this matter and included in this request are

11  reasonable in light of prevailing community standards for comparable legal work, and are the same rates

12  that would be charged to paying clients for comparable legal work.  These billing rates are based

13  primarily on years of legal experience, and are consistent with rates this courts in the San Francisco Bay

14  Area haves approved for comparable legal work.

15     64.    In setting rates in this case, my co-counsel and I have looked to other fee awards from the

16  relevant legal community involving similar claims.  There are only a handful of lawyers who provide

17  "similar services" to Plaintiff's counsel, and citizen suit enforcement of the Clean Water Act is a

18  relatively small practice area, consisting mostly of boutique smaller firms who specialize in

19  environmental law.

20     65.    Based on my review of CWA fee award cases from the Northern District in the last

21  decade, the Laffey Matrix is an appropriate starting point in determining what appropriate rates should

22  be.  *S.F. Baykeeper v. W. Bay Sanitary Dist.*, 2011 U.S. Dist. LEXIS 138093 (N.D. Cal. Dec 1, 2011);

23  *Our Children's Earth Found. v. U.S. EPA*, 2016 U.S. Dist. LEXIS 40558 (N.D. Cal. Jan. 21, 2016).  A

24  true and correct copy of the Laffey Matrix is attached hereto as **Exhibit H**.

25     66.    Upon closer analysis of the supporting declarations used in fee awards for *S.F.*

26  *Baykeeper, Our Children's Earth*, and three other fee awards in citizen suit environmental litigation in

27  the Northern District, it appears that reasonable rates have been derived using multiple sources, in

28  addition to the Laffey Matrix.  These sources include other fee awards from complex civil litigation in

1  the Northern District, and prior fee awards from other districts for the attorneys seeking fees and for

2  their supporting declarants.  A true and correct copy of the Declaration of Christopher Sproul in Support

3  of Plaintiffs' Motion for Attorneys' Fees and Costs, filed in *Our Children's Earth Found. v. U.S. EPA*,

4  Case No.: 4:13-cv-2857-JSW, ECF No. 59-1, at ¶¶ 16 -- 21 (describing Laffey rates, prior fee awards

5  and fee awards from complex civil litigation), is attached hereto as **Exhibit I**.

6    67.    Here, Plaintiff relies on the knowledge and experience of some of the same declarants the

7  other courts in the Northern District found to be persuasive – for example, Messrs. Sproul, Verick and

8  Williams.  Plaintiff further relies on the Northern District's application of the Laffey Matrix in *S.F.*

9  *Baykeeper*, and the consistency of those fee awards with those in *Our Children's Earth*.

10    68.    In light of the fee awards from citizen suit environmental litigation in the Northern

11  District, and the courts' rationales for awarding those fees, COL's requested rates here are reasonable.

12    **The Hours Expended on This Case Are Reasonable**

13    69.    Plaintiff's counsel expended a reasonable number of hours litigating this case, and the

14  contingent nature of this litigation gave Plaintiff's counsel a reason to put into this case only those hours

15  that were prudent and necessary for advancing success.

16    70.    The hours billed to this case can be divided roughly into six categories, each of which is

17  described in detail below.

18    Category 1: Early Investigation, Notice and Complaint

19    71.    This category includes Plaintiff's pre-suit investigative efforts to collect evidence of the

20  easement's violations by the County; the drafting of the notice of violation ("Notice"); drafting of

21  the Complaint and related filings; and retaining a process server to serve the Summons and Complaint.

22    72.    Category 1 also includes time spent in communications with County Counsel regarding

23  the Notice, conferencing with advisory local counsel and easement specialist Mark Habib; advising the

24  client's board of directors with regard to COL's enforcement rights and possible case strategy; issuing

25  FOIA requests to the USACE and the Regional Board; and two inspections of the land protected by the

26  Easement, one in February with the client, and one in May for a settlement-protected site meeting.

27    73.    The work in this category ends in July 2020, with the service of the complaint filed on

28  June 19, 2020.

74.     As shown on **Exhibit F**, Column E (Investigation, Notice and Complaint) required 94.3 hours of attorney time to complete.

Category 2: Demurrers and Cross-Complaint

75.     This category dominates the period from July 2020 to January 2021 and includes time spent addressing two demurrers filed by the County, and the County's cross-complaint.

76.     As shown on **Exhibit F**, Column F (Demurrers and Cross-Complaint) required 88.8 hours of attorney time to complete.

Category 3: Discovery and Continuing Investigation

77.     This category spans from July 2020 through preparation for the April 11, 2022 trial date, and includes the time spent in formal discovery, ongoing communications with the County, the USACE and the Regional Board, advanced research regarding the termination of easements, trial witness interviews and an expert deposition.

78.     As shown on **Exhibit F**, Column G (Discovery and Continuing Investigation) required 176 hours of attorney time to complete.

Category 4: First Motion for Summary Judgment (on Cross-Complaint)

79.     This category begins in the spring and summer of 2021, in the aftermath of the parties' unsuccessful settlement conference in the federal court action, dominates the efforts of counsel in the fall of 2021 (the opening brief was filed November 30, 2021) and includes the time spent on the reply brief and at the oral argument on March 9, 2022.

80.     As shown on **Exhibit F**, Column H (First Motion for Summary Judgment, Cross-Complaint) required 210.5 hours of attorney time to complete.

Category 5: Second First Motion for Summary Judgment (on COL Complaint)

81.     This smaller category of time begins in December of 2021 and includes the time spent on the reply brief and at the oral argument on March 9, 2022.

82.     As shown on **Exhibit F**, Column I (Second Motion for Summary Judgment, COL Complaint) required 159.7 hours of attorney time to complete.

Category 6: Trial Preparation

83.     This category of time dominated counsel's efforts in March and April of 2022 and

1  includes the time spent drafting the Trial Readiness Conference Statement, the Trial Memorandum,

2  subpoenas, and motions in limine, as well as attending the Trial Readiness Conference and meeting and

3  conferring with the County regarding the preparation of trial exhibits.

4     84.    As shown on **Exhibit F**, Column J (Trial Preparation) required 53.6 hours of attorney

5  time to complete.

6     Category 7: Settlement

7     85.    This category begins in December of 2020, runs through the parties' unsuccessful federal

8  court settlement conference in March of 2021 and the five months thereafter, and picks up on the eve of

9  trial and the ensuing settlement conference with Judge Candella on April 22, 2022.  This category also

10 includes time spent seeking to negotiate a settlement of the Enforcement Costs sought herein.  As part of

11 that effort, COL on May 3, 2022 made a significantly discounted demand, which the County rejected,

12 stating that "the County believes that a fee motion is the appropriate method for resolving the matter"

13 and failing to even make a counter-offer.

14    86.    As shown on **Exhibit F,** Column K (Settlement) required 148.2 hours of attorney time to

15 complete.

16    Category 8: Motion for Enforcement Costs

17    87.    This category of time spans May through July of this year and reflects all time spent in

18 the preparation of this motion.  I tasked Mr. Acree with the preparation of the outline and legal

19 arguments for the memorandum of points and authority.  I tasked Mr. Carlon with drafting portions of

20 the factual and procedural background for the memorandum, as well as the notice of motion, proposed

21 order and proofs of service.  I tasked myself with preparing the declaration of COL's Executive

22 Director, Holly Nielsen, and my own declaration.

23    88.    I reviewed all the attorney time records for accuracy and to better explain the work done

24 in each of the categories of work described above.  During this time, I also contacted several highly

25 skilled litigators with extensive knowledge of the Clean Water Act and fee motions. This work resulted

26 in the declarations of Christopher Sproul, David Williams and William Verick filed herewith.

27    89.    From my conversations with other attorneys who practice public interest environmental

28 law and defense counsel who represent defendants in environmental citizen suit cases, I have personal

1  knowledge that Messrs. Sproul, Williams and Verick enjoy a reputation for environmental citizen suit

2  expertise.  I also believe that each of these attorneys are member of the relevant legal community for

3  determining fees in this case.

4       90.     As shown on **Exhibit F**, Column L (Motion for Enforcement Costs) required

5  approximately 120 hours of attorney time to complete.

6       91.     COL has incurred expenses in bringing this action that are of the type ordinarily and

7  necessarily incurred in litigation and typically billed to clients by their counsel: the Court's filing fee to

8  initiate this case, expert witness invoices, copy costs, postage or other delivery charges, and travel

9  expenses.  These include $16,225 incurred in connection with work performed by Wood Watershed

10  Sciences (Nielsen Decl. at ¶ 26, Exhibit E) and ordinary litigation expenses (Nielsen Decl., Exhibit C).

11  The work done by Wood Watershed Sciences was necessary to the litigation because of the various

12  technical and legal arguments that arose regarding the character and quality of wetlands within the

13  Preserve.

14       92.     Attached as **Exhibit J** to this declaration is a true and correct copy of the settlement

15  agreement reached in this case.

16

17       I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 19,

18  2022.

19

20  _____

21               Andrew L. Packard

22

23

24

25

26

27

28

**EXHIBIT A**



## CALIFORNIA OPEN LANDS

PO Box 4440 · Chico, CA 95927 · Phone/Fax: (530) 872-7281

http://www.californiaopenlands.org

December 13, 2019

<u>Via E-Mail</u>
Mr. Dennis Schmidt
Director of Public Works
Butte County Public Works
7 County Center Drive
Oroville, CA 95965

Dear Mr. Schmidt,

California Open Lands ("COL") holds a conservation easement ("Easement") over a portion of Butte County's Neal Road Recycling and Waste Facility ("Landfill") located at 1023 Neal Road, Paradise, CA 95969.[1]  The easement area described in the Easement is an approximately 3-acre wetland located on the southwest portion of the Landfill ("Preserve").  This Easement protects natural resources, restricts development and limits allowed uses of the property.  This Easement also gives COL the right to monitor and enforce those restrictions.

**Issue Summary**

COL has determined that certain uses of the property, described below, are not consistent with the terms of the Easement.  This letter provides further clarification of my letter of September 3, 2019 to Todd Storti, Deputy Director of Waste Management Division of Butte County Public Works, describes new violations of the Easement occurring since then, and outlines COL's proposals for resolving these violations.

**Discharges of Landfill Leachate to the Preserve**

On February 14, 2019, the Landfill experienced a large storm event and Landfill staff observed leachate seeps coming from the side of Module 4.  These seeps were observed flowing into Sediment Basin #4 below the face of the slope from which the seeps emerged.  Leachate-contaminated storm water from Sediment Basin #4 was then pumped into a drainage ditch which gravity-flowed to the Preserve.  Landfill staff informed Landfill management of the issue, and estimated the flow of leachate into the storm water basin, and thus the Preserve, to be approximately 475 gallons per hour.  Landfill staff turned the pump off at 1:40 p.m., but it had

---

[1] A copy of the Perpetual Conservation Easement Grant to California Open Lands (Butte County Record document 2007-0051757) is attached hereto as **Exhibit A**.  The Preserve is a portion of Assessor's Parcel Number 040-600-082.

Mr. Dennis Schmidt
December 13, 2019
Page 2

been in operation since about 9:00 a.m. that morning. Landfill staff estimated that approximately 316,800 gallons of leachate-contaminated storm water were discharged into the Preserve.

On February 27, 2019, Landfill staff again observed leachate seeps from Module 4 flowing into Sediment Basin #4 and being pumped into the Preserve through the drainage ditch. The leachate seeps and pumping of leachate-contaminated storm water was observed at 6:41 a.m., though it is likely that the pump began running the prior evening when the rain event began. Landfill staff estimated that approximately 594,000 gallons of leachate-contaminated storm water were discharged into the Preserve during this event.

On March 6, 2019, Landfill staff again observed leachate seeps from Module 4 flowing into Sediment Basin #4 at an estimated rate of 90 gallons per hour. Ongoing leachate seeps were also documented in April and May of 2019.

**Discharges of Storm Water that Violate the General Permit to the Preserve**

As described in COL's Clean Water Act Notice of Violation dated November 15, 2019, COL is informed, and believes, that the Landfill is discharging storm water associated with industrial activity in violation of the General Permit. These unlawful discharges cause pollutants to enter the Preserve, and degrade and harm the Conservation Values described in the Easement.

**Diversion of Storm Water Away from the Preserve**

In response to these troubling discharges of leachate-contaminated and polluted storm water, the Landfill's response has been to divert water away from the Preserve, and into lined septage ponds. While this may temporarily address the spread of leachate contamination, it creates a new problem by starving the Preserve of water and threatening the Conservation Values associated with the wetlands.

**Disposal/Storage of Soil and Unauthorized Materials in the Preserve**

In addition to the storm water and leachate seepage issues, COL was informed by Landfill staff that the Landfill is accepting soil that was excavated from the Camp Fire cleanup efforts. COL is informed, and believes, that soil is contaminated by fire damage is being improperly disposed of at the Landfill and unlawfully used as daily cover. On July 18, 2019, I visited the Preserve and photographed reddish soil deposits in the Preserve. In addition to the disposal and storage of soil in the Preserve, COL has documented the Landfill's improper use of the 25-foot buffer zone (see Easement, Recital J) to stage various pipes and equipment.

**Excavation of Soil in the Preserve**

After Landfill staff and the Regional Water Quality Control Board were alerted to the disposal of soil in the Preserve, COL is informed that the Landfill removed an unknown quantity of soil from the Preserve. While this may initially seem consistent with COL's priorities, the removal of material from the Preserve without a plan or authorization is contrary to the goals of

Mr. Dennis Schmidt
December 13, 2019
Page 3

the Easement. COL is concerned that, in addition to the foreign soil, the County also disturbed and removed native soil, and in so doing, harmed the Preserve. On October 23, 2019, I visited the Preserve and documented an excavated channel on the southeast slope of the Preserve that had been cut on October 18, 2019 in response to a broken leachate pipe leaking landfill leachate into the Preserve.

## Unauthorized Motorized Vehicle Use in the Preserve

In my September 3, 2019 letter, I informed Mr. Storti that COL had determined that vehicle trespass had been documented at the Preserve. Mr. Storti responded, in his September 10, 2019 letter, that in fact on June 26, 2019, a contractor entered the Preserve with an excavator to "access a sump pump used to supply a water truck for dust mitigation." Mr Storti defended this activity on the basis that Section 5.3.1 of the Open Space Preserve Management Plan ("OSPMP") permitted such access. However, Section 5.3.1 does not address the prohibition on motorized vehicles in the Preserve, except to the extent that it allows access to motorized vehicles "in emergency or law enforcement situations." The relevant section is Section 7.9, which states that "[n]o motorized vehicles shall be ridden, brought, used, or permitted on any portion of the Preserve with the exception of the following…." and goes on to identify a few Preserve maintenance activities that are not applicable here (mosquito abatement activities, bike trail repair or replacement, and for emergency or law enforcement situations). Accessing a sump pump is not a Preserve maintenance activity contemplated by the OSPMP, nor does it fall under any of the allowable exceptions to the prohibition against motorized vehicles in the preserve. Furthermore, Mr. Storti's letter raises concerns about the existence of a sump pump in the Preserve, and why it is being used to drain the Preserve's protected waters.

## Damages to Vegetation in the Preserve

At least once a year, pursuant to Section 3.E of the Easement, I perform a field review of the Preserve in order to monitor the status of the Preserve. During this field review, I inspect the vegetation in the Preserve, and make notes and collect photographs documenting my observations. In addition, I document my observations of fish and wildlife, if any, that I observe during the field reviews. For instance, in April of 2018, I documented clear water with abundant vegetation in the Preserve. And in April of 2017, I documented similarly clear water with numerous tadpoles present, in addition to healthy vegetation. However, during my inspections in 2019, beginning with my first inspection in May, I have documented a significant reduction in vegetation, brown turbid water, and evidence of chemical residue left after water had evaporated from the Preserve.

## Venting of Methane

On November 1, 2019, Landfill staff used GEM5000 and GEM2000 gas monitors and recorded methane discharging in excess of 10%, and up to 16%, from recently installed wet-wells (36" diameter standpipes) buried into the bottom of the landfill. These wet wells have been venting methane into the open atmosphere near the Preserve since at least October 2019.

Mr. Dennis Schmidt
December 13, 2019
Page 4

**Notice of Violations**.  This letter constitutes written notice required by Section 7 of the Easement, informing the Landfill that the activities described above are inconsistent with the purposes of, and violate the terms of, the Easement.  Specifically:

1. Recital F of the Easement states that "[t]he Preserve includes the water in wetlands and drainage features."  The Easement prohibits the discharge of any waste materials within the Preserve.  (Easement, Section 4.E).  The leachate from Module 4 is a waste material, and therefore the Landfill violated the terms of the Easement each time the Landfill discharged leachate-contaminated storm water to the Preserve, including on February 14, 2019 and February 27, 2019.  In addition, the Landfill's discharges of leachate violated the Easement by harming the Conservation Values of the Preserve, which include the wetlands – as well as the surface and ground water required to protect and sustain the wetlands – and water quality.  (Easement, Recital E and Section 2.E).

2. Section 4.R of the Easement prohibits "[a]ny and all other uses which may adversely affect the purposes of this Easement."  Among the purposes of the Easement are protection of water quality and conservation of existing wetlands.  The unlawful discharge of storm water associated with industrial activities pollutes the Preserve's water and adversely affects the Preserve's wetlands.  The Landfill's discharges of storm water in violation of the General Permit therefore violate the Easement.  In addition, the operation of a sump pump in the Preserve which removes water from the Preserve's wetlands violates the Easement.

3. The Easement defines the Conservation Values of the Preserve to include the wetlands. (Easement, Recital E).  By depriving the Preserve of water, the Landfill has harmed the Conservation Values of the Preserve and violated the Easement.

4. The Easement prohibits the disposal or storage of any soil within the Preserve. (Easement, Section 4.E).  The disposal and/or storage of soil from the Camp Fire cleanup efforts within the Preserve violates the Easement.  The Easement includes the 25-foot buffer as part of the Preserve.  (Easement, Recital J).  The Landfill has violated the Easement at all times during which it uses the 25-foot buffer area to stage pipes and equipment.

5. The Easement prohibits the excavation or removal of soil from the Preserve.  (Easement, Section 4.F).  The excavation and removal of soil from the Preserve that was documented by COL on October 23, 2019 is a violation of the Easement.

6. Section 4.K of the Easement prohibits motorized vehicles from being "ridden, brought, used or permitted on any portion of the Preserve, except as provided for in the Plan or with prior written approval by the Corps."  The Landfill violated the Easement on June 26, 2019 when it permitted a contractor to operate an excavator in the Preserve.

7. Section 4.J of the Easement prohibits the "destruction or removal of any natural tree, shrub or other vegetation, that exists upon the Preserve."  The Landfill's discharges of

Mr. Dennis Schmidt
December 13, 2019
Page 5

leachate-contaminated storm water have caused the destruction of existing vegetation and have therefore violated the Easement. Furthermore, COL has documented heavy equipment destroying trees and vegetation within the Preserve.

8. Section 2.E of the Easement states that it is COL's right "[t]o conserve and protect all mineral, **air**, water and groundwater rights required to protect and to sustain the biological resources of the Preserve. The Landfill's discharges of methane into the atmosphere around the Preserve harms the Preserve's air quality and thus the biological resources and Conservation Values of the Preserve.

**Remedies and Timeline.** To address the damage caused by the violations above, COL proposes the following remedies. While COL is willing to discuss each of the following items, COL believes that each measure below – or a functional equivalent – is necessary to restore the Preserve to its pre-violation condition, and to prevent future violations of a similar nature. The issues identified above are ongoing and continue to threaten the Conservation Values of the Preserve. Therefore, time is of the essence, and the remedies identified below reflect that urgency.

1. Immediate cessation of any discharges of landfill leachate into the Preserve and into storm water conveyance systems that have the potential to discharge into the Preserve. A detailed report should be provided to COL describing what measures have been taken, and when, to prevent future discharges of landfill leachate into the Preserve.

2. Bring the Landfill into compliance with the General Permit. Develop and implement an "end-of-pipe" storm water treatment system at the point where the Landfill's storm water system discharges into the Preserve such that the Landfill will no longer discharge polluted industrial storm water into the Preserve's wetlands. This treatment system should be implemented as soon as possible, and in any case, no later than October 1, 2020.

3. Immediately restore flows of unpolluted storm water to the Preserve to the pre-diversion levels.

4. Develop a plan, in conjunction with COL's expert, to characterize all foreign soils that have been stockpiled or discarded in the Preserve. The plan shall include detailed steps to remove soil in a way that minimizes further disturbance of the Preserve, and that creates a plan to restore areas of the Preserve that were damaged by the storage/disposal, removal, and excavation of soils in the Preserve. A plan should be developed to permanently remove all foreign soils and restore the vegetation of the Preserve. The removal of all foreign soils and completion of the restoration of the Preserve shall be completed as soon as possible, and in any case, no later than October 1, 2020.

5. Within 30 days of this letter, install and maintain additional signage alerting to the presence of the Preserve. On an annual basis, provide adequate training for employees as

Mr. Dennis Schmidt
December 13, 2019
Page 6

to what the management requirements are for Easement – including training on prohibited activities in the Preserve.  Within 30 days, the Landfill shall revise its documents to include the Preserve in the Landfill's reports, operations plan, and management documents to increase awareness about the Preserve and to prevent future unauthorized access to the Preserve.

**Costs.**  Pursuant to Section 7.B of the Easement, COL is entitled to its reasonable costs incurred in enforcing the terms of the Easement, including without limitation, costs of suit and attorneys' fees, and any costs of restoration necessitated by a violation of the terms of the Easement, to be borne by the Landfill.

COL has retained legal counsel in this matter.  Please direct all communications herein to both me and my counsel, at:

Andrew L. Packard
William N. Carlon
Law Offices Of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Telephone: (707) 782-4060
Fax: (707) 782-4062
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

Thank you for responding quickly to these issues and working with us to resolve them.

Sincerely,

Holly Nielsen
Executive Director
California Open Lands

**EXHIBIT B**

COUNTY COUNSEL
BRUCE S. ALPERT

ASSISTANT COUNTY COUNSEL
BRAD J. STEPHENS



CHIEF DEPUTY COUNTY COUNSEL
FELIX WANNENMACHER
KATHLEEN KEHOE GREESON
ROGER S. WILSON

DEPUTY COUNTY COUNSEL
BRUNELLA WOOD

**OFFICE OF THE COUNTY COUNSEL**
**COUNTY OF BUTTE**
25 COUNTY CENTER DRIVE, SUITE 210
OROVILLE, CALIFORNIA  95965
PHONE: (530) 552-4070 FAX: (530) 538-6891

February 6, 2020

Law Office of Andrew Packard
Attn: Andrew Packard & William Carlon
245 Kentucky Street, Suite B3
Petaluma, CA 94952
*Sent via email only* *andrew@packardlawoffices.com; wncarlon@packardlawoffices.com*

California Open Lands
Attn: Holly Nielsen
P.O. Box 4440
Chico, CA 95927
*Sent via email only* *hollylane75@hotmail.com, holly@californiaopenlands.org*

RE:  **California Open Lands v. Butte County Dept. of Public Works, et al.**
      **Case No.: 2:20-CV-00123-KJM-DMC**

Dear Mr. Packard, Mr. Carlon, and Ms. Nielsen,

We are in receipt of your correspondence dated December 13, 2019 relating to California Open Lands' ("COL") Notice of Violation pertaining to various alleged activities at Butte County's Neal Road Recycling and Waste Facility ("NRRWF"). While NRRWF contests many of the allegations raised in that correspondence, the County of Butte ("County") would like to first address the five remedies identified in your correspondence as well as the additional remedy identified in Mr. Carlon's email dated January 14, 2020. A comprehensive response to the allegations raised in COL's December 13, 2019 correspondence at pages 1-4 is forthcoming in a separate response from this office by the end of February.

*Remedial Action No. 1:  Immediate Cessation of Leachate Discharges into the Preserve*

Your correspondence proposes the "[i]mmediate cessation of discharges of landfill leachate into the Preserve and into storm water conveyance systems that have the potential to discharge into the Preserve." As you know, on August 28, 2019, the Central Valley Regional Water Quality Control Board ("Regional Board") issued a 13267 Order to NRRWF ("Order"), which outlined various measures to be implemented by NRRWF to address and prevent future unauthorized discharges of

1 | P a g e

leachate into the Primary Sedimentation Basin ("PSB"), or the Preserve. In response to that Order, NRRWF has implemented various corrective measures. Please see Attachments 1 thru 15, which shows the measures that have been taken by NRRWF to prevent future discharges of landfill leachate into the Preserve. One of those measures includes the Operations Plan for Managing Stormwater and Leachate, which the Regional Board found satisfied the requirements set forth within the 13267 Order. See Attachment 12. To date, NRRWF remains in compliance with the 13267 Order, which includes the cessation and prevention of future leachate discharges into the Preserve. Based on such ongoing compliance, NRRWF asserts this proposed remedial action is moot.

***Remedial Action No. 2: Bring Landfill into Compliance with the General Permit***

COL proposes that NRRWF "[b]ring the Landfill into compliance with the General Permit." Beyond the alleged discharge of leachate during February 2019, the County maintains there are no ongoing violations of the substantive and procedural requirements of the Industrial Storm Water General Permit (NPDES General Permit No. CAS000001, Order 2014-0057-DWQ, as amended). As such, NRRWF is currently in compliance with the General Permit and this proposed remedial action is also moot.

***Remedial Action No. 2: Develop and Implement an "End-of-Pipe" Storm Water Treatment System***

COL has proposed the following: "Develop and implement an 'end-of-pipe' storm water treatment at the point where the Landfill's storm water system discharges into the Preserve such that the *Landfill will no longer discharge polluted industrial storm water into the Preserve's wetlands*. This treatment system should be implemented as soon as possible, and in any case, no later than October 1, 2020." (emphasis added).

To begin, NRRWF maintains there are currently no ongoing discharges of polluted industrial storm water into the Preserve. The alleged discharges during February 2019 have been addressed with various additional measures that prevent discharges of polluted storm water into the Preserve. See Remedial Action No. 1. That said, NRRWF stands willing to discuss the "end-of-pipe" water treatment system envisioned by COL, the method, its feasibility, environmental impact, capital cost, operation and maintenance requirements, and its necessity or effectiveness in light of the corrective action already implemented by NRRWF to prevent future discharges of landfill leachate into the Preserve. To that end, NRRWF seeks clarification as to the type of "end-of-pipe" water treatment system sought by COL. For instance, does COL mean a wastewater treatment system or a system of sediment control using chemical treatment or a gloried leach field above the Preserve, or some other physical structure or system? We look forward to engaging with COL as to the proposed system so the County can then engage its technical experts to conduct a feasibility study.

***Remedial Action No. 3: Immediately Restore Flows of Unpolluted Storm Water to the Preserve to Pre-Diversion Levels***

COL demands that NRRWF "[i]mmediately restore flows of unpolluted storm water to the Preserve to the pre-diversion levels." Paragraph 7 of COL's correspondence provides further detail relating to this proposed action. That section alleges NRRWF has been diverting water away from the Preserve and into lined septage ponds in response to the discharges of leachate/polluted storm water into the Preserve, which has resulted in "starving the Preserve of water." Indeed, when weather

2 | P a g e

conditions permitted for the re-routing of storm water from basin #4, NRRWF has taken proactive measures to re-route this water into the primary septage pond, a lined liquid waste impoundment, to eliminate potential contamination of waterways. However, over the course of the 2018-2019 Water Year, running from October 1, 2018 to September 30, 2019, NRRWF received 37.06 inches of direct rainfall, which also resulted in direct precipitation onto the Preserve. The numbers show that, for NRRWF/the Preserve, we had above-average precipitation for the 12-month cycle and the wettest season since 2010-11, so NRRWF contests the allegation that the Preserve has been "starved of water." As a comparison, rainfall data from prior years are summarized as follow:

| Water Year | Precipitation, inches |
|------------|-----------------------|
| 2010-11 | 32.27 |
| 2011-12 | 18.97 |
| 2012-13 | 21.87 |
| 2013-14 | 13.92 |
| 2014-15 | 16.87 |
| 2015-16 | 20.88 |
| 2016-17 | 32.18 |
| 2017-18 | 17.22 |
| 2018-19 | 37.06 |

NRRWF maintains it actively managed its storm water during the extraordinary 2018-19 wet season under duress conditions (i.e. after taking a direct hit from the Camp Fire which destroyed BMPs in November 2018). Additionally, according to NRRWF's records, there were no discharges of storm water from NRRWF to any offsite drainage areas during several years prior to 2018. The Perpetual Conservation Easement Grant ("Grant") or Open Space Preserve Management Plan ("Plan") make no reference requiring the Department of Public Works, or Preserve Manager, to make commitments of non-polluted water deliveries to the Preserve, including during low rainfall years when discharge from sedimentation ponds are not occurring, or to maintain a certain level of hydrology of the Preserve. Indeed, we could not do that as it would essentially constitute a modification to the Plan, something which is not within our authority to approve. Therefore, NRRWF asserts that maintaining hydrology of the Preserve is not a management strategy specified in the Grant or Plan. So, at this time, NRRWF cannot commit to the delivery or restoration of unpolluted storm water to the Preserve to pre-diversion levels, especially when those levels have not been specified or quantified.

*Remedial Action No. 4: Develop a Plan to characterize all foreign soils that have been stockpiled or discarded in the Preserve*

Remedial action no. 4 proposes the following:

> "Develop a plan, in conjunction with COL's experts, to characterize all foreign soil that have been stockpiled or discarded in the Preserve. The plan shall include detailed steps to remove soil in a way that minimizes further disturbance of the Preserve, and that creates a plan to restore areas of the Preserve that were damaged by the storage/disposal, removal, and excavation of soils in the Preserve. A plan should be developed to permanently remove all foreign soils and restore the vegetation of the Preserve. The removal of all foreign soils and completion of the restoration of the Preserve shall be completed as soon as possible, and in any case, no later than October 1, 2020."

Paragraph 8 of COL's correspondence provides additional detail relating to the alleged disposal of soil in the Preserve. That section states that "COL was informed by Landfill staff that the Landfill is accepting soil that was excavated from the Camp Fire cleanup efforts. COL is informed, and believes, that soil is contaminated by fire damage is being improperly disposed of at the Landfill and unlawfully used as daily cover. On July 18, 2019, [Holly Nielsen] visited the Preserve and photographed reddish soil deposits in the Preserve."

Indeed, NRRWF accepted Camp Fire soil at its facility. However, prior to the receipt of any such soil, NRRWF worked with the Regional Board and CalRecycle to amend existing permits to accommodate for soil acceptance and disposal. All fire debris loads, whether through the Alternative Program (i.e. private contractors) or via the Government Program (i.e. Cal OES program) were characterized as non-hazardous and acceptable by the agencies prior to delivery to NRRWF. The agencies approved receipt of the soil from the Camp Fire prior to delivery to NRRWF. Further, in conjunction with the Butte County Department of Public Health Division of Environmental Health, NRRWF's Local Enforcement Agency, CalRecycle inspected NRRWF on a weekly basis once the receipt of fire debris commenced and the site operated in accordance with CalRecycle's operational protocol.

As noted above, paragraph 8 states that "[o]n July 18, 2019, [Holly Nielsen] visited the Preserve and photographed reddish soil deposits in the Preserve," so it appears COL contends the reddish soil deposits constitute Camp Fire soil that NRRWF disposed onto the Preserve. However, NRRWF denies such allegation, as no foreign soils from the Camp Fire were ever stockpiled nor discarded in the Preserve. Instead, NRRWF contends the reddish soil originated from a post-Camp Fire storm, which pummeled the site with 3 inches of rainfall between November 28, 2018 and November 30, 2018, with approximately 2.18 inches of rainfall falling on NRRWF on November 30, 2018. Reddish soil was observed in run-on flows from an adjacent property located south of NRRWF. Such run-on was photographed as it eroded the south slope of Module 5B, flowed into the primary septage pond, and flowed directly into NRRWF's storm water system above sediment basin #3, upstream of sediment basin #1, and the Preserve.

NRRWF would be happy to provide the photographs taken during this November 2018 event and, at the same time, requests copies of the photographs taken by Ms. Nielson on July 18, 2019. If COL persists in its allegation, the County requests documentation from COL regarding Ms. Nielsen's qualifications to determine the origin of soil, composition of soil, and/or whether the reddish deposits observed in the Preserve on July 18, 2019 did, in fact, constitute soil. For instance, it is possible that the reddish deposits are not soil at all, rather remnants of algal matting, which is common in the bottom of wetlands that pond for a long duration.

As NRRWF has not stocked piled or discarded any foreign soil in the Preserve, the County respectfully declines accepting this remedial action.

***Remedial Action No. 5: Installation of Additional Signage***

COL demands NRRWF "install and maintain *additional* signage alerting to the presence of the Preserve." (emphasis added). As mentioned in our telephone call on December 19, 2019 and in an email dated January 14, 2020, NRRWF received correspondence from Holly Nielsen dated September 3, 2019 indicating that the "required signage was never installed at the Preserve." NRRWF responded by correspondence dated September 10, 2019, noting that the Grant and Plan

did not specify that the County was responsible for supplying and installing signage, and referred Ms. Nielsen to Section 6.1 of the Grant which states, "Signage will be installed at Preserve to inform the public of the presence of the Preserve. *The Preserve Manager [i.e. Public Works/NRRWF] will be responsible for the <u>maintenance</u> and <u>replacement</u> of the signage.*" (emphasis added). However, to demonstrate cooperation, NRRWF mentioned in its responsive letter that it agreed to purchase and install the signage, and, in fact, did so. <u>See</u> Exhibit A. Note, Section 6.1 makes no reference as to what wording must be used on that sign, the number of signs, and how/where to install those signs. However, based on our telephone call on December 19, 2019, we understand COL found the installed signs insufficient, so NRRWF agreed to install the additional signage. Since then you have informed me that Magoon Signs in Chico has a template with the requested language/graphics to be printed on the four (4) signs (durable material such as aluminum), and have provided instructions as to the signs placement. We have contacted Magoon Signs to order the signs and will install the signs, as instructed, upon receipt. Again, NRRWF accepts the undertaking of this remedial action and will keep you informed as to its progress.

### Remedial Action No. 5: Training and Revisions to NRRWF Documents

Remedial action no. 5 also demands NRRWF to "[o]n an annual basis, provide adequate training for employees to what management requirements are for Easement – including training on prohibited activities in the Preserve." To date, NRRWF management has already incorporated into its monthly on-site crew training information regarding the purpose, role, and authorizations concerning the Preserve access. Currently, NRRWF management and County Counsel are working together to create a comprehensive training package for NRRWF staff that details the management and prohibited activities of the Preserve – we would be happy to provide you a copy of that presentation, upon completion, for your review and approval as to its adequacy.

Finally, remedial action no. 5 also demands NRRWF "revise its documents to include the Preserve in the Landfill's reports, operations plan, and management documents to increase awareness about the Preserve and to prevent future unauthorized access to the Preserve." So as to avoid another comparable issue as we encountered with the signs, please clarify what information about the Preserve COL would like included in NRRWF's documents (and specify the exact documents requiring revision). Upon receipt of this additional information, NRRWF will determine whether compliance with this remedial action is feasible.

### Remedial Action No. 6: Immediately Cease and Prevent any Future, Open Venting of Methane and other Landfill Gases from Module 4

On January 14, 2020, Mr. Carlon added the following remedial action for the County's consideration: "Immediately cease, and prevent any further, open venting of methane and other landfill gases from Module 4, especially from the 6 'wet-wells' installed at the toe of Module 4."

The installation of six (6) wet wells at the toe of Module 4 was part of a corrective measure implemented by NRRWF in response to the Regional Board's Order No. 13267, so as to enable visual observation of leachate migration. NRRWF has worked cooperatively to inform California Air Resources Board ("CARB") and the Butte County Air Quality Management District ("AQMD") regarding the reconnection of landfill gas extraction wells, located on the south slope of Module 4, that were temporarily taken off-line to accommodate the receipt of Camp Fire debris. Since November 2019, NRRWF has actively reconnected landfill gas extraction wells and is currently

designing for the installation of up to five (5) new vertical landfill gas extraction wells on top of Module 4, a project slated for late Spring/early Summer 2020. The recent reconnections of landfill gas extraction wells has shown a reduction in methane venting as landfill gas is sent to the Ameresco power plant under vacuum. Further, NRRWF anticipates that methane venting will become a non-issue as additional wells are either reconnected or as new wells are installed. Additionally, NRRWF conducts monitoring of the wet wells at the toe of Module 4 for not only methane but also for any liquid (leachate) accumulations. No liquid has been observed in these wet wells which indicates that leachate has been successfully redirected to the Module 4 liner system.

At this time, NRRWF seeks clarification as to what is meant by "open venting." If that term means NRRWF has open vents actively spewing methane, then, in that context, NRRWF asserts it does not currently have any such open venting, as NRRWF crews installed lids on top of the wet wells to cover them. However, to the extent that "open venting" is interpreted to mean as the passive migration of landfill gas through cover soils into the atmosphere, then NRRWF maintains that it will comply with the requirements for methane emissions as outlined in the Landfill Methane Rule, Title 17 of the California Code of Regulations and Code of Federal Regulations 40 CFR 60, which regulate Municipal Solid Waste Landfills. Those rules require that landfill emissions do not exceed 500 parts per million in air for instantaneous emissions (40 CFR 60 and Title 17) and that integrated monitoring of the landfill may not exceed 25 parts per million in any 50,000 square foot area on the landfill surface. In sum, NRRWF has ceased the active open venting of methane and continues its efforts to reduce, minimize, and eliminate the passive methane venting from Module 4. See also Exhibit B (AQMD correspondence to S. Jackson dated 01/15/2020).

To conclude, the County/NRRWF remains committed to working with COL to preserve and maintain the Preserve as set forth in the Grant and Plan. Please contact me if you have questions or if you would like to further discuss the above items.

Sincerely,
BRUCE S. ALPERT
Butte County Counsel

By _____
Brunella M. Wood
Deputy County Counsel

Cc: Dennis Schmidt & Eric Miller, Department of Public Works

**EXHIBIT C**

ANDREW L. PACKARD

**Andrew Packard <andrew@packardlawoffices.com>**

# Public Records Request dated March 3, 2020

**Will Carlon** <wncarlon@packardlawoffices.com>                                Tue, Mar 31, 2020 at 10:02 AM
To: "Wood, Brunella" <BWood@buttecounty.net>
Cc: holly@californiaopenlands.org, hollylane nielsen <hollylane75@hotmail.com>, Andrew Packard
<andrew@packardlawoffices.com>

Brunella,

Thank you for providing those documents.  Based on these records, and other documents received from the Army Corps, it appears that Butte County has an inaccurate understanding of what land is actually protected under the Conservation Easement at issue in this matter.  For your reference, I have attached the legal description that is Exhibit A to the Easement and a map of that legal description platted over a Google Earth satellite image.  As you can see from those documents, the Easement area includes the entire basin.  Documents that the County has recently provided to the Corps and Regional Board label areas within the Preserve as a "Maintenance Area" or a "Sediment Basin," apparently disregarding the land's actual status as protected wetlands.  The County's identification of this land as anything other than wetlands protected by the Easement, especially to agencies with a regulatory interest in the land, is misleading and indicative of a lack of good faith interest in resolving the issues raised by COL.

The Easement consists of an area of 6 acres, 3 acres of which are protected wetlands.  The County's excavation activities are occurring within the 3-acre wetland area and the activities are destroying the conservation values of those wetlands.  These excavation activities must stop immediately and the land must be restored to wetland.  Had the County consulted with COL prior to conducting the excavation, perhaps the County could have avoided the inevitable costs associated with remediating the damage to the Preserve.

If the County has a different understanding of the boundaries and scope of the Easement, please provide the specifics and support for any such position.  COL believes this issue to be integral to the resolution of its allegations against the County and hopes that we can reach a shared understanding.

Thank you,

William N. Carlon
Attorney at Law

The Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA  94952

Tel. (707) 782-4060 ext 2
Fax: (707) 782-4062
Email:  wncarlon@packardlawoffices.com

The communication contained in this message is considered privileged and confidential.  It is protected by attorney client privilege and the attorney work product doctrine. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in  error, please provide notification to the sender immediately by replying to the message and deleting it from your computer. This Email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged.

[Quoted text hidden]

**4 attachments**

 **1-Legal Description of Easement.pdf**
284K

 **2-Map platting legal description.pdf**
492K

 **4-Map from County to RWQCB.pdf**

167K

**3-Map from County to Corps.pdf**
1117K

**EXHIBIT D**

ANDREW L. PACKARD

Will Carlon <wncarlon@packardlawoffices.com>

## Public Records Request dated March 3, 2020

**Wood, Brunella** <ushare@buttecounty.net>                                    Fri, Apr 10, 2020 at 4:56 PM
Reply-To: BWood@buttecounty.net
To: wncarlon@packardlawoffices.com
Cc: holly@californiaopenlands.org, hollylane75@hotmail.com, andrew@packardlawoffices.com

Will,

The County understands that the area covered and protected by the Conservation Easement (referred to as
the "Preserve") includes all that land described in Exhibit A to the Easement, but thank you for attaching that
exhibit and map for our reference. Additionally, the County understands that the Preserve, as defined in
Section J of page 2 of the Easement, includes and means the "approximately 3.00 acre area appearing on
Exhibit B containing both created and natural wetland features and buffer zones which shall be maintained
as a Preserve in accordance with the provisions of Section 3." (emphasis added). In other words, the County
understands that the 3.0 acres of the Preserve (containing wetland features) plus the 25 foot buffer of the
Preserve area constitute the entire Preserve. Within the Preserve, the County also understands that a
storm-water detention basin (which I understand if often referred to as the "Maintenance Area" or "Sediment
Basin") was created (see Figure 2, page 4 of the Plan), which was "designed to catch flow and flow over the
berm into the wetland during times of high water ... and allow[s] some passive treatment of water before it
enters the preserved wetlands/waters of the U.S." (emphasis added). The County understands the Public
Works Department may engage in maintenance or repair activities in the storm-water detention basin so
long as it does not impact preserved wetlands or waters of the U.S. Based on the County's interpretation of
the definition of "Preserve" and the purpose of the storm-water detention basin, the County maintains that
the 25 foot buffer zone and the storm-water detention basin do not contain wetland features, so any alleged
identification of this buffer zone/maintenance area as not containing wetlands is not misleading or indicative
of a lack of good faith. If COL asserts otherwise - that is, that the buffer zone and/or storm-water detention
basin contain wetlands - please let me know.

That said, we agree that the Easement consists of 6 acres total - 3 acres of which are protected wetlands.
However, the County maintains that the excavation activities stemming from the remediation measures that
took place following the 10/17/2019 LCRS broken pipe leak have occurred in the 25 foot buffer zone and/or
the storm-water detention basin, not within the 3 acre wetland area (see attached map). If COL disagrees,
please provide a map/photos depicting the alleged excavation activities in the wetland area.

As far as consulting with COL, NRRWF did not consult with COL prior to conducting the remedial excavation
activities at the southeastern embankment of the sedimentation basin/buffer zone, as the Easement did not
require NRRWF to do so. See page 6, Paragraph 4 of Easement ("No person shall engage in any of the
following restricted activities in the Preserve unless that activity is in the future approved by the Corps: … (f)
Excavating, dredging, or removing loam, gravel, soil, rock, sand, or other material"). If COL maintains
NRRWF was required to consult with and/or obtain COL's approval prior to engaging the subject excavation
activities (in addition to the Corps), please provide the relevant section in the Easement requiring such.

At this point, as I understand it from NRRWF management, excavation/soil sampling activities resulting from
the 10/17/19 incident have stopped. Further, as I understand it, NRRWF is currently working with the Corps
to restore/reshape the southeastern embankment of the primary sedimentation basin (i.e. backfilling with
clean soil) and this activity does not involve habitat restoration nor will it impact preserved wetlands or
waters of the U.S. If COL maintains NRRWF must consult with and/or obtain approval from COL prior to
reshaping/backfilling the subject area with clean soil, please reference us to the relevant section in the

037

Easement/Plan. Finally, your email below mentions "damage to the Preserve"; as I understand it, the subject excavation activities following the 10/17/19 LCRS broken pipe leak were done as a remedial measure to remove contaminated soil/conduct soil sampling in order to preserve the values of the Easement. As such, please specify the damage or injury COL claims the Preserve sustained as a result of NRRWF's excavation in the southeast corner of the Preserve.

In sum, the County has the same understanding as COL in regard to the boundaries of the Easement. However, it appears the County and COL have a misunderstanding as to the location in which the remedial excavation activities took place as a result of the 10/17/19 incident, whether that area contains wetland features, and NRRWF's duty to consult/notify COL prior to engaging in maintenance or repair activities within the buffer zone/maintenance area. To resolve this misunderstanding, the County has and continues to remain open to working with COL to resolve those issues.

Finally, attached please find a Revised Roadside Leachate Spill Soil Remediation Report, which NRRWF sent to the Regional Board on 04/09/2020 (also uploaded in Geotracker).

Brunella M. Wood
Deputy County Counsel
Butte County Counsel
25 County Center Drive, Suite 210
Oroville, CA 95965-3380
Phone (530) 552-4071
Fax (530) 538-6891


Confidentiality Notice: This e-mail transmission, and any documents or messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering this e-mail to the intended recipient, then you are (1) notified that any disclosure, copying, distribution, saving, reading or use of this information is strictly prohibited, (2) requested to discard and delete this e-mail and any attachments, and (3) requested to immediately notify us by e-mail that you mistakenly received this message (sthornton@buttecounty.net), fax (530) 538-6891 or telephone (530) 552-4061. Thank you.


From: Will Carlon
Sent: Tuesday, April 7, 2020 1:05 PM
To: Wood, Brunella
Cc: holly@californiaopenlands.org; hollylane nielsen; Andrew Packard
Subject: Re: Public Records Request dated March 3, 2020

. ATTENTION: This message originated from outside Butte County. Please exercise judgment before opening attachments, clicking on links, or replying. .
Thank you, Brunella.

William N. Carlon
Attorney at Law

The Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952

Tel. (707) 782-4060 ext 2
Fax: (707) 782-4062
Email: wncarlon@packardlawoffices.com

# EXHIBIT E

ANDREW L. PACKARD

Andrew Packard <andrew@packardlawoffices.com>

## Public Records Request dated March 3, 2020

**Will Carlon** <wncarlon@packardlawoffices.com>                    Mon, Apr 13, 2020 at 10:07 AM
To: "Wood, Brunella" <BWood@buttecounty.net>
Cc: holly@californiaopenlands.org, hollylane nielsen <hollylane75@hotmail.com>, Andrew Packard
<andrew@packardlawoffices.com>

Brunella,

Thank you for your response.  The County's understanding of the scope of the Preserve cannot be correct because there simply isn't enough real estate available.  The map that you provided, on page 3 of the pdf - the Gallaway Enterprises map entitled "Neal Road Recycling and Waste Facility Infrastructure and Facilities Location Map" - identifies two features within the Preserve area.  One feature is a portion of the wetland which is identified by green cross hatching and labelled "Wetland".  This area, as marked on the County's map, measures only 2 acres.  The area in which the County performed the excavation activities is identified as "Sediment Basin" and measures 1 acre.  In your email you confirm that the County acknowledges that there is a 3-acre wetland area ("we agree that the Easement consists of 6 acres total - 3 acres of which are protected wetlands"), but can only point to two acres the County believes are wetlands.  The area the County contends is the wetland is too small.

Furthermore, on the issue of the 25-foot buffer. COL contends that the permit requires a **minimum** of a 25-foot buffer, and that what was actually created was larger.  ("To minimize external disturbance to preserved waters of the United States, you shall establish a buffer, consisting of native upland vegetation of **at least** 25 feet in width from the outer limit of jurisdiction of the entire perimeter of all created, preserved, and avoided waters of the United States, including wetlands within the proposed preserve." (Permit No. 200300113, Special Condition 4, emphasis added.))  The distance from the toe of the levee surrounding the wetland area of the Preserve to the perimeter as described in the legal description is the buffer, and no prohibited activities may occur within that buffer space.  Therefore, the excavation activities that occurred within the protected wetland area of the Preserve and within the buffer area were unauthorized and prohibited activities under the Easement.

COL's position is that the County's discharge of leachate damaged the conservation values of the Preserve (and thus violated the Easement) and that the County's haphazard excavation activities, without a plan for restoring the wetlands, further exacerbated the damage.

William N. Carlon
Attorney at Law

The Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA  94952

Tel. (707) 782-4060 ext 2
Fax: (707) 782-4062
Email:  wncarlon@packardlawoffices.com

The communication contained in this message is considered privileged and confidential.  It is protected by attorney client privilege and the attorney work product doctrine. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please provide notification to the sender immediately by replying to the message and deleting it from your computer. This Email is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is legally privileged.

[Quoted text hidden]

**EXHIBIT F**

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 10/7/2019 | TC w/ H. Nielsen re: documentation and defense of easement | 0.9 | 0.9 | | | | | | | |
| AP | 10/8/2019 | Easement research | 0.2 | 0.2 | | | | | | | |
| WC | 10/8/2019 | Research conservation easements | 1 | 1 | | | | | | | |
| WC | 10/8/2019 | Read/review OMP | 1 | 1 | | | | | | | |
| AP | 10/9/2019 | Review CE documentation | 0.3 | 0.3 | | | | | | | |
| WC | 10/9/2019 | Read/review OMP | 1.2 | 1.2 | | | | | | | |
| WC | 10/9/2019 | Discuss case w/Pam and AP re representation of CE case; | 0.4 | 0.4 | | | | | | | |
| WC | 10/16/2019 | Review CE and emails; | 0.4 | 0.4 | | | | | | | |
| WC | 10/21/2019 | Draft email to SLG re CE enforcement issues; draft email to JL re soil samples; draft email to HN re soil samples; review retainer agreements; | 1.6 | 1.6 | | | | | | | |
| AP | 10/24/2019 | Confer w/ B. Neale at SALT re: conservation easement enforcement | 0.3 | 0.3 | | | | | | | |
| AP | 10/24/2019 | Easement research | 0.7 | 0.7 | | | | | | | |
| WC | 10/24/2019 | Phone call w/Bob Neale at SALT re counsel; | 0.3 | 0.3 | | | | | | | |
| AP | 11/1/2019 | Confer w/ client and board re: case strategy and enforcement goals; | 0.4 | 0.4 | | | | | | | |
| WC | 11/5/2019 | Read sonoma land trust complaint | 0.1 | 0.1 | | | | | | | |
| AP | 11/6/2019 | Easement research | 0.5 | 0.5 | | | | | | | |
| AP | 11/6/2019 | TC w/ J. Lane re: case strategy, easement provisions; | 0.3 | 0.3 | | | | | | | |
| AP | 11/7/2019 | Draft 3-point note to JL and HN re: next steps for case | 0.2 | 0.2 | | | | | | | |
| AP | 11/7/2019 | Review ACE letter | 0.1 | 0.1 | | | | | | | |
| WC | 11/7/2019 | Review letter from SLT re complaint in oak tree case | 0.2 | 0.2 | | | | | | | |
| WC | 11/7/2019 | Draft letter to Butte Co. re issues with CE | 2.8 | 2.8 | | | | | | | |
| AP | 11/8/2019 | Conf. call w/ HN re: recent soil results, new parameters to test, Bd. input on NOV, expected timeframes for NOV and CEE litigation | 0.4 | 0.4 | | | | | | | |
| WC | 11/12/2019 | Draft demand letter; | 1.7 | 1.7 | | | | | | | |
| WC | 11/13/2019 | Review edits to demand letter; draft email to Holly re size of preserve; review mitigation plan, maps and descriptions of preserve; | 1.4 | 1.4 | | | | | | | |
| AP | 11/18/2019 | Confer w/ WC re: status of CEE review and rec'd client data | 0.4 | 0.4 | | | | | | | |
| WC | 11/20/2019 | Conf call w/Mark Habib; | 0.6 | 0.6 | | | | | | | |
| WC | 11/22/2019 | Discuss jodie harrassment and case strategy w/HN; | 0.4 | 0.4 | | | | | | | |
| WC | 11/22/2019 | Review/edit demand letter | 1.4 | 1.4 | | | | | | | |
| AP | 12/10/2019 | Confer w/ WC re: site configuration | 0.4 | 0.4 | | | | | | | |
| AP | 12/10/2019 | Review and edit demand letter | 0.6 | 0.6 | | | | | | | |
| AP | 12/10/2019 | Review client's historic documentation of site conditions | 1.3 | 1.3 | | | | | | | |
| AP | 12/11/2019 | Draft note to M. Habib re: demand letter | 0.3 | 0.3 | | | | | | | |
| AP | 12/11/2019 | TC w/ MH re: roles in case/demand letter | 0.3 | 0.3 | | | | | | | |
| WC | 12/11/2019 | Review/edit demand letter | 1.1 | 1.1 | | | | | | | |
| AP | 12/13/2019 | Confer w/ WC re: 12/13 inspection + client mtg | 0.6 | 0.6 | | | | | | | |

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 12/13/2019 | Draft scope of service agreement w/ atty M. Habib | 0.6 | 0.6 | | | | | | | |
| AP | 12/19/2019 | Prep and attend TC w/ Brunella Wood re: NOV | 0.2 | 0.2 | | | | | | | |
| AP | 12/19/2019 | Confer w/ WC, HN re: call with County, demand letter | 0.2 | 0.2 | | | | | | | |
| WC | 12/19/2019 | Conference call w/ County Counsel, Brunella Wood | 0.2 | 0.2 | | | | | | | |
| AP | 12/20/2019 | Confer w/ WC re: easement interpretation qs | 0.2 | 0.2 | | | | | | | |
| AP | 12/20/2019 | Send M. Habib draft retainer; | 0.2 | 0.2 | | | | | | | |
| WC | 12/20/2019 | Discuss scope of wetlands issue w/AP | 0.1 | 0.1 | | | | | | | |
| WC | 12/20/2019 | Draft email responding to HN's concerns about scope of wetland | 0.8 | 0.8 | | | | | | | |
| WC | 12/20/2019 | Review end of year report | 0.2 | 0.2 | | | | | | | |
| AP | 12/30/2019 | Review and resp. to MH re: retainer draft | 0.2 | 0.2 | | | | | | | |
| AP | 12/30/2019 | Confer w/ WC re: B. Wood comms, J. Gallaway and early inspection set-up | 0.2 | 0.2 | | | | | | | |
| WC | 12/30/2019 | Draft email to BW re JGalloway | 0.4 | 0.4 | | | | | | | |
| WC | 1/6/2020 | Draft email to Holly re signs; draft email to BW responding to her email re signage; prar; and site visit; | 0.3 | 0.3 | | | | | | | |
| WC | 1/7/2020 | Draft email to holly re signage | 0.1 | 0.1 | | | | | | | |
| AP | 1/8/2020 | Note to Habib re: terms of retainer; | 0.2 | 0.2 | | | | | | | |
| WC | 1/8/2020 | Draft email re signage issues to HN | 0.1 | 0.1 | | | | | | | |
| WC | 1/8/2020 | Discuss demand letter strategy w/AP re next steps | 0.1 | 0.1 | | | | | | | |
| WC | 1/9/2020 | Draft email to HN re assessment; discuss assessment options w/AP/ draft email to Laura Drabandt re same | 0.3 | 0.3 | | | | | | | |
| WC | 1/9/2020 | Draft email to HN re consultant; draft email to LD re consultant; | 0.1 | 0.1 | | | | | | | |
| WC | 1/9/2020 | Confer w/ WC re: timeframe for filling state court claim, fee recovery under terms of easment, scope of review for M. Habib to undertake | 0.3 | 0.3 | | | | | | | |
| WC | 1/13/2020 | Draft email to BW re signage; site visit; and response to demand letter | 0.2 | 0.2 | | | | | | | |
| WC | 1/14/2020 | Review demand letter; review SI's comments about air pollution; draft email to BW re same | 0.7 | 0.7 | | | | | | | |
| WC | 1/14/2020 | Conf call w/Board re status of case and next steps | 0.4 | 0.4 | | | | | | | |
| AP | 2/3/2020 | Draft note to M. Habib re: complaint, assessment and retainer agreement; | 0.2 | 0.2 | | | | | | | |
| WC | 2/3/2020 | Discuss complaint drafting issues w/ AP | 0.1 | 0.1 | | | | | | | |
| WC | 2/4/2020 | Draft email to HN re status of case | 0.2 | 0.2 | | | | | | | |
| WC | 2/4/2020 | Draft email to BW re response to letter | 0.4 | 0.4 | | | | | | | |
| WC | 2/4/2020 | Draft email to BW re excavation issues at preserve | 1 | 1 | | | | | | | |
| WC | 2/5/2020 | Discuss wetlands vs sediment basin issue w/AP | 0.1 | 0.1 | | | | | | | |
| WC | 2/5/2020 | Discuss wotus issues w/AP | 0.1 | 0.1 | | | | | | | |
| WC | 2/5/2020 | Draft email to BW re response to letter | 0.2 | 0.2 | | | | | | | |
| WC | 2/6/2020 | Review county's response to demand letter; | 0.2 | 0.2 | | | | | | | |
| WC | 2/10/2020 | Respond to HN email | 0.1 | 0.1 | | | | | | | |
| AP | 2/11/2020 | Review County response to demand | 0.4 | 0.4 | | | | | | | |
| AP | 2/11/2020 | Confer w/ WC re: County response | 0.2 | 0.2 | | | | | | | |
| AP | 2/11/2020 | Draft note to M. Habib re: County resp | 0.2 | 0.2 | | | | | | | |

043

| A.Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 2/13/2020 | Note to M. Habib re: planned 2/18 conf. call | 0.2 | 0.2 | | | | | | | |
| WC | 2/13/2020 | Review response and draft counter response | 0.4 | 0.4 | | | | | | | |
| AP | 2/14/2020 | Prep and attend conf. call w/ COL board, Holly N., WC re: specifics of demand, response to 2/6 letter from Country | 0.7 | 0.7 | | | | | | | |
| WC | 2/14/2020 | Prepare for conf call w/board | 0.5 | 0.5 | | | | | | | |
| WC | 2/14/2020 | Conf call w/Board re county's response and next steps | 0.7 | 0.7 | | | | | | | |
| AP | 2/18/2020 | Conf. call with client and J. Lane | 0.5 | 0.5 | | | | | | | |
| AP | 2/18/2020 | Conf. call w/ client + M. Habib re: CE language and case strategy | 0.7 | 0.7 | | | | | | | |
| WC | 2/18/2020 | Conf call w/AP, HN, and JL re remedies issues | 0.5 | 0.5 | | | | | | | |
| WC | 2/18/2020 | Conf call w/MH, HN, and AP re conservation easement demand | 0.7 | 0.7 | | | | | | | |
| WC | 2/21/2020 | Drive from oroville to landfill to inspect preserve (50%) | 0.2 | 0.2 | | | | | | | |
| WC | 2/21/2020 | Site visit w/HN, MH, and JL | 1.3 | 1.3 | | | | | | | |
| AP | 2/24/2020 | Confer w/ WC re: inspection w/ client | 0.2 | 0.2 | | | | | | | |
| AP | 2/24/2020 | Conf. call w/ JL, HN + WC re: next steps, ACE PRA responses | 0.6 | 0.6 | | | | | | | |
| WC | 2/24/2020 | Discuss site visit w/AP | 0.2 | 0.2 | | | | | | | |
| WC | 2/24/2020 | set up call number for meeting re ask | 0.1 | 0.1 | | | | | | | |
| WC | 2/24/2020 | Conf call w/HN and JL and AP re demand issues | 0.6 | 0.6 | | | | | | | |
| WC | 2/27/2020 | Discuss drainage of preserve w/AP re surface model; | 0.7 | 0.7 | | | | | | | |
| WC | 3/2/2020 | Discuss settlement remedies w/ AP; | 0.2 | 0.2 | | | | | | | |
| AP | 3/3/2020 | Conference call with client re scope of easement issues, PRAs and status of cty resp, next steps | 1 | 1 | | | | | | | |
| WC | 3/3/2020 | Conf call w/HN and AP re FOIA/PRA issues/Memo re scope/and settlement strategies | 1 | 1 | | | | | | | |
| WC | 3/4/2020 | Review documents from county | 0.3 | 0.3 | | | | | | | |
| WC | 3/5/2020 | Review op plan for managing stormwater and leachate | 0.4 | 0.4 | | | | | | | |
| WC | 3/6/2020 | Review documents; translate property legal description to google maps | 4.3 | 4.3 | | | | | | | |
| WC | 3/9/2020 | Draft memo re scope of conservation easement; review pertinent documents | 2.1 | 2.1 | | | | | | | |
| WC | 3/10/2020 | Research attorney fee issues; draft email re same | 2.3 | 2.3 | | | | | | | |
| AP | 3/11/2020 | Review WC research re: CCP 1717 and bilateral recovery terms of the CEE | 0.2 | 0.2 | | | | | | | |
| AP | 3/11/2020 | Confer w/ WC re: CCP research | 0.2 | 0.2 | | | | | | | |
| AP | | Prep and attend conf. call w/ Diane K. and Glen H. re: inspection issues, rep. of county, settlement of both actions, easement violations, global resolution | 0.4 | 0.4 | | | | | | | |
| WC | 3/11/2020 | Draft memo re scope of easement | 1 | 1 | | | | | | | |
| WC | 3/12/2020 | Draft memo re scope of easement; review associated documents; | 2.4 | 2.4 | | | | | | | |
| WC | 3/12/2020 | Read law review article about fixing "problem easements" | 0.1 | 0.1 | | | | | | | |

044

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 3/13/2020 | Prep and attend TC w/ Holly, Mark, WC re: easement mapping, legal issues in WC memo of 3/11 | 1.4 | 1.4 | | | | | | | |
| WC | 3/13/2020 | Conf call w/HN, MH, and AP re scope of easement | 1.4 | 1.4 | | | | | | | |
| AP | 3/16/2020 | Review comms from S.J. to APCD & confer w/ WC re: air pollution violations as potential CEE claims | 0.4 | 0.4 | | | | | | | |
| WC | 3/19/2020 | Review docs from county re response; draft letter to B.Wood re scoping issue | 1.1 | 1.1 | | | | | | | |
| WC | 3/19/2020 | Conf call w/HN and MH re list of remedies | 0.6 | 0.6 | | | | | | | |
| WC | 3/20/2020 | Draft letter to laura shively at acoe re foia request and excavation activities in preserve | 1.1 | 1.1 | | | | | | | |
| WC | 3/23/2020 | Download and review ACOE documents | 0.7 | 0.7 | | | | | | | |
| WC | 3/31/2020 | Draft email to BW re scope of preserve; review PRA docs | 0.5 | 0.5 | | | | | | | |
| WC | 3/31/2020 | Draft email to Shively re FOIA docs | 0.1 | 0.1 | | | | | | | |
| AP | 4/13/2020 | Review comms between Brunella Wood and WC | 0.2 | 0.2 | | | | | | | |
| WC | 4/13/2020 | Draft email responding to Brunella Wood re scope of Preserve | 0.9 | 0.9 | | | | | | | |
| WC | 4/17/2020 | Draft letter to rwqcb | 1.6 | 1.6 | | | | | | | |
| WC | 4/20/2020 | Draft email repsonse to Laura Drabant re terminology | 0.7 | 0.7 | | | | | | | |
| WC | 4/22/2020 | Draft email to diane re exhibits and attach correspondence with BW | 0.2 | 0.2 | | | | | | | |
| AP | 6/9/2020 | TC w/ client re: case status | 0.3 | 0.3 | | | | | | | |
| WC | 6/9/2020 | Prep for conf call | 0.7 | 0.7 | | | | | | | |
| WC | 6/9/2020 | Conf call w/ holly re update | 0.3 | 0.3 | | | | | | | |
| WC | 6/10/2020 | Draft response to HN re leakage; review monitoring reports from SJ | 0.4 | 0.4 | | | | | | | |
| WC | 6/10/2020 | Draft complaint | 1.4 | 1.4 | | | | | | | |
| WC | 6/11/2020 | Draft complaint; | 1.1 | 1.1 | | | | | | | |
| WC | 6/12/2020 | Draft complaint; | 2 | 2 | | | | | | | |
| WC | 6/15/2020 | Draft complaint; | 6.8 | 6.8 | | | | | | | |
| AP | 6/16/2020 | Review and edit CEE complaint | 1.4 | 1.4 | | | | | | | |
| WC | 6/16/2020 | Review AP's edits to complaint | 0.4 | 0.4 | | | | | | | |
| WC | 6/16/2020 | Edit complaint and send to client and MH for edits | 0.6 | 0.6 | | | | | | | |
| WC | 6/17/2020 | Review Mark's comments to complaint | 0.1 | 0.1 | | | | | | | |
| WC | 6/17/2020 | Discuss complaint w/MH | 0.4 | 0.4 | | | | | | | |
| WC | 6/17/2020 | Review docs associated with PG&E soil; draft email to HN; edit complaint; | 0.3 | 0.3 | | | | | | | |
| WC | 6/19/2020 | Edit complaint | 3.4 | 3.4 | | | | | | | |
| WC | 6/19/2020 | Finalize complaint; assemble exhibits; file | 1.4 | 1.4 | | | | | | | |
| WC | 6/22/2020 | Review rules re summons; complete and file summons | 0.5 | 0.5 | | | | | | | |
| WC | 6/22/2020 | Recreate and refile to conform w/court's filing requirements | 1.1 | 1.1 | | | | | | | |
| WC | 7/2/2020 | Discuss timeline of cmns w/AP; | 0.4 | 0.4 | | | | | | | |
| WC | 7/3/2020 | Review leachate signature memo; draft email to HN re same | 0.2 | 0.2 | | | | | | | |
| WC | 7/7/2020 | Organize filing for process server; | 0.8 | 0.8 | | | | | | | |

045

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WC | 7/15/2020 | File proof of service of summons/complaint | 0.1 | 0.1 | | | | | | | |
| WC | 7/24/2020 | Draft response to Diane re access issues | 0.5 | | | 0.5 | | | | | |
| WC | 7/24/2020 | Draft letter to diane re access | 0.9 | | | 0.9 | | | | | |
| AP | 7/28/2020 | Review and edit letter re: easement access | 0.3 | | | 0.3 | | | | | |
| WC | 7/28/2020 | Draft letter to diane re access; respond to HN re same | 1 | | | 1 | | | | | |
| WC | 7/28/2020 | Review questions for diane | 0.2 | | | 0.2 | | | | | |
| WC | 7/29/2020 | Draft email to HN re sampling procedures | 0.2 | | | 0.2 | | | | | |
| WC | 7/29/2020 | Finalize and transmit correspondence re site access and questions re settlement | 0.3 | | | 0.3 | | | | | |
| AP | 7/31/2020 | Review demurrer letter from Einhorn | 0.3 | | 0.3 | | | | | | |
| AP | 7/31/2020 | Confer w/ MH, WC re: demurrer | 1.2 | | 1.2 | | | | | | |
| AP | 7/31/2020 | Outline client memo | 0.2 | | 0.2 | | | | | | |
| WC | 7/31/2020 | Discuss demurrer issue w/AP; and MH | 1.2 | | 1.2 | | | | | | |
| WC | 7/31/2020 | Discuss strategy for dealing with Einhorn letter w/AP | 0.2 | | 0.2 | | | | | | |
| WC | 7/31/2020 | Draft email to HN re demurrer letter | 0.1 | | 0.1 | | | | | | |
| WC | 7/31/2020 | Draft memo to client re government code section 905 | 2.2 | | 2.2 | | | | | | |
| AP | 8/3/2020 | Review and confer w/ WC re: client memo | 0.3 | | 0.3 | | | | | | |
| AP | 8/3/2020 | Research on Gov. Claims Act | 0.3 | | 0.3 | | | | | | |
| WC | 8/3/2020 | Discuss demurrer issue w/AP | 0.4 | | 0.4 | | | | | | |
| WC | 8/3/2020 | Draft email to GE re letter | 0.1 | | 0.1 | | | | | | |
| AP | 8/4/2020 | Conf. call w/ client, MH, WC re: demurrer/ amendment strategy | 1 | | 1 | | | | | | |
| WC | 8/4/2020 | Conf call w/team re demurrer | 1 | | 1 | | | | | | |
| AP | 8/4/2020 | Debrief call w/AP | 0.3 | | 0.3 | | | | | | |
| WC | 8/4/2020 | Research gov. claims act | 0.7 | | 0.7 | | | | | | |
| AP | 8/4/2020 | Amend complaint; draft letter to einhorn | 0.5 | | 0.5 | | | | | | |
| WC | 8/4/2020 | Draft email to GE | 0.4 | | 0.4 | | | | | | |
| AP | 8/5/2020 | Review and proof amendments to complaint | 0.2 | | 0.2 | | | | | | |
| WC | 8/5/2020 | Draft edits to fac; research government claims act pleading requirements; file FAC | 2 | | 2 | | | | | | |
| WC | 8/5/2020 | Resize and refile FAC | 0.1 | | 0.1 | | | | | | |
| AP | 8/6/2020 | Confer w/ WC re: filing of complaint | 0.1 | | 0.1 | | | | | | |
| WC | 8/6/2020 | Serve FAC; | 0.2 | | 0.2 | | | | | | |
| WC | 8/24/2020 | Draft response to GE re demurrer; | 0.3 | | 0.3 | | | | | | |
| WC | 8/25/2020 | Draft response to GE re demurrer | 2.8 | | 2.8 | | | | | | |
| WC | 8/25/2020 | Research claims act re "series of letters" issue | 0.4 | | 0.4 | | | | | | |
| AP | 8/26/2020 | Review + edit WC letter re: Gov. Claims Act compliance | 0.4 | | 0.4 | | | | | | |
| WC | 8/26/2020 | Draft/edit letter to einhorn re demurrer | 0.4 | | 0.4 | | | | | | |
| WC | 8/26/2020 | Draft response to GE re demurrer | 0.4 | | 0.4 | | | | | | |
| AP | 9/21/2020 | Review demurrer papers filed 9/7/20 | 0.3 | | 0.3 | | | | | | |
| AP | 9/28/2020 | Review demurrer + confer w/ WC re: outline opp. to same | 0.3 | | 0.3 | | | | | | |
| AP | 9/28/2020 | Confer w/ MH re: decision to amend comp. | 0.2 | | 0.2 | | | | | | |
| WC | 9/28/2020 | Discuss amending strategy w/AP | 0.6 | | 0.6 | | | | | | |
| WC | 9/28/2020 | Discuss demurrer strategy w/HN | 0.2 | | 0.2 | | | | | | |
| WC | 9/28/2020 | Draft stip to file second amended complaint | 0.2 | | 0.2 | | | | | | |

046

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WC | 9/28/2020 | Draft stip to amend complaint and email same to GE | 0.5 | | 0.5 | | | | | | |
| WC | 9/29/2020 | Draft email re stip/proposed order to GE; | 0.1 | | 0.1 | | | | | | |
| AP | 10/22/2020 | Review and edit RFAs and confer w/ WC re: same | 0.3 | | | 0.3 | | | | | |
| AP | 10/27/2020 | Confer w/ MH, WC re: 2nd attempted demurrer by Einhorn, resp. to same | 0.5 | | 0.5 | | | | | | |
| WC | 10/27/2020 | Conf call w/MH and AP re motion to strike issue | 0.5 | | 0.5 | | | | | | |
| WC | 10/27/2020 | Draft and send letter to Einhorn re strike issue | 0.1 | | 0.1 | | | | | | |
| WC | 10/27/2020 | Draft and send courtesy copies of disco to opp counsel | 0.2 | | | 0.2 | | | | | |
| WC | 10/27/2020 | Draft and send email re updates to HN | 0.3 | | 0.3 | | | | | | |
| WC | 10/27/2020 | Research controversy issue re declaratory relief; draft letter re same to Einhorn | 1.3 | | 1.3 | | | | | | |
| WC | 10/28/2020 | Discuss motion to strike w/GE; | 0.6 | | 0.6 | | | | | | |
| WC | 10/29/2020 | Discuss controversy issue w/MH and draft letter to GE re same; | 0.6 | | 0.6 | | | | | | |
| WC | 11/3/2020 | Talk to Butte Co. Deputy DA re case; | 0.1 | | | 0.1 | | | | | |
| AP | 11/5/2020 | TC w/ Matt Carr (Butte) re: case status | 0.1 | | | 0.1 | | | | | |
| WC | 11/5/2020 | Conf call w state board re enforcement status; | 1 | | | 1 | | | | | |
| WC | 11/6/2020 | Review cross complaint; research case law re duplicative actions; | 2.3 | | 2.3 | | | | | | |
| WC | 11/9/2020 | Research cross-complaint; demurers re same; | 0.7 | | 0.7 | | | | | | |
| AP | 11/12/2020 | TC w/ BA re: state claim | 0.3 | | 0.3 | | | | | | |
| BA | 11/12/2020 | TC re case status | 0.3 | | 0.3 | | | | | | |
| WC | 11/12/2020 | Brief Brian Acree (BA), bring him up to speed on the facts of the cases; | 0.3 | | 0.3 | | | | | | |
| WC | 11/13/2020 | Draft email to HN re county's position/cross complaint; | 0.1 | | 0.1 | | | | | | |
| AP | 11/24/2020 | TC w/ BA re: case law on motion to strike, substance of m+c letter | 0.2 | | 0.2 | | | | | | |
| BA | 11/24/2020 | TC re case status | 0.6 | | 0.6 | | | | | | |
| WC | 11/24/2020 | Confer w/Holly re status of SB involvement; discuss responses to July inquiry | 0.6 | | 0.6 | | | | | | |
| WC | 11/24/2020 | Discuss motion to strike w/BA and AP | 0.2 | | 0.2 | | | | | | |
| BA | 12/1/2020 | Research Dec relief cases | 2 | | 2 | | | | | | |
| WC | 12/1/2020 | Research demurrer re existing suit; | 1.2 | | 1.2 | | | | | | |
| BA | 12/2/2020 | Draft section for MC letter re dec relief | 3.7 | | 3.7 | | | | | | |
| WC | 12/2/2020 | Research demurrer re 1061 issue; draft letter to Einhorn | 2.5 | | 2.5 | | | | | | |
| WC | 12/2/2020 | Draft email to ACOE re easement scoping issue | 0.3 | | 0.3 | | | | | | |
| WC | 12/4/2020 | Finalize and send letter to Einhorn re demurrer x-complaint; | 0.2 | | 0.2 | | | | | | |
| WC | 12/8/2020 | Draft case management conf statement; review ACOE cmns; draft email following up w/ACOE | 0.8 | | 0.8 | | | | | | |
| WC | 12/8/2020 | Review einhorn letter; draft outline demurrer | 0.8 | | 0.8 | | | | | | |
| WC | 12/8/2020 | Draft demurrer to cross complaint | 1.3 | | 1.3 | | | | | | |
| BA | 12/9/2020 | Review demurrer, draft proposed order, notice | 3.3 | | 3.3 | | | | | | |
| WC | 12/9/2020 | Draft demurrer to cross complaint | 3.1 | | 3.1 | | | | | | |

| A.Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WC | 12/9/2020 | Edit notice of demurrer and demurrer; edit proposed order; review local rules re scheduling | 0.5 | | 0.5 | | | | | | |
| AP | 12/10/2020 | Review and edit COL demurrer to cross-complaint | 1.2 | | 1.2 | | | | | | |
| WC | 12/10/2020 | Edit review/finalize demurrer and moving papers; file same | 1.7 | | 1.7 | | | | | | |
| WC | 12/10/2020 | Print and compile mailing for demurrer (50%) | 0.4 | | 0.4 | | | | | | |
| AP | 12/14/2020 | TC w/ client and army corps re: wetland designation | 0.8 | | | 0.8 | | | | | |
| WC | 12/14/2020 | Conf call w/Nancy at ACOE; followup call w/HN; | 0.8 | | | 0.8 | | | | | |
| AP | 12/17/2020 | Review and refine sett. Outline | 1.1 | | | | | | | 1.1 | |
| AP | 12/17/2020 | Confer w/ WC re: details of settlement | 0.4 | | | | | | | 0.4 | |
| BA | 12/20/2020 | Review demurrer opp, discuss WC AP | 0.8 | | 0.8 | | | | | | |
| AP | 12/20/2020 | Prep and attend CMC by Court Call | 0.7 | | 0.7 | | | | | | |
| WC | 12/23/2020 | Review pleadings re demurrer; | 1.1 | | 1.1 | | | | | | |
| AP | 1/7/2021 | Confer w/ BA, WC re: reply brief for demurrer | 0.2 | | 0.2 | | | | | | |
| AP | 1/8/2021 | Review brief opp. brief and re-assignment order | 0.2 | | 0.2 | | | | | | |
| WC | 1/8/2021 | Review opp to demurrer; draft outline for reply | 0.8 | | 0.8 | | | | | | |
| WC | 1/8/2021 | Discuss briefing strategy and merits of opp to demurrer w/AP and BA | 0.2 | | 0.2 | | | | | | |
| BA | 1/10/2021 | Draft reply brief for demurrer | 2.1 | | 2.1 | | | | | | |
| BA | 1/11/2021 | Draft reply brief for demurrer | 6.3 | | 6.3 | | | | | | |
| WC | 1/11/2021 | Review/edit reply to demurrer; | 1 | | 1 | | | | | | |
| AP | 1/12/2021 | Review + edit reply memo re: demurrer | 0.8 | | 0.8 | | | | | | |
| BA | 1/12/2021 | Edit demurrer reply brief, add final citations | 1.3 | | 1.3 | | | | | | |
| WC | 1/12/2021 | Review/finalize edits to demurrer reply | 0.9 | | 0.9 | | | | | | |
| AP | 1/19/2021 | Review tentative ruling and confer with BA re arguments for 1/20 hearing | 0.4 | | 0.4 | | | | | | |
| BA | 1/19/2021 | Review tentative ruling, TC WC AP re hearing strategy | 0.4 | | 0.4 | | | | | | |
| WC | 1/19/2021 | Review tentative order; discuss same w/AP; draft email to team | 0.2 | | 0.2 | | | | | | |
| WC | 1/19/2021 | Discuss oral arg strategy w/AP and BA | 0.3 | | 0.3 | | | | | | |
| WC | 1/19/2021 | Call GE and Court to provide notice of oral arg | 0.1 | | 0.1 | | | | | | |
| WC | 1/19/2021 | Call Court call to set up oral arg call | 0.2 | | 0.2 | | | | | | |
| WC | 1/19/2021 | Email Holly re update on demurrer | 0.1 | | 0.1 | | | | | | |
| WC | 1/19/2021 | Prepare for oral arg | 1.2 | | 1.2 | | | | | | |
| AP | 1/20/2021 | Attend hrg on demurrer | 0.4 | | 0.4 | | | | | | |
| WC | 1/20/2021 | Oral arg for demurrer on cross complaint | 0.4 | | 0.4 | | | | | | |
| WC | 1/20/2021 | Debrief hearing w/AP and discuss next steps | 0.3 | | 0.3 | | | | | | |
| WC | 1/20/2021 | Draft email to BA re answer | 0.1 | | 0.1 | | | | | | |
| WC | 1/20/2021 | Update holly re status of demurrer and cross complaint; discuss litigation and settlement strategy | 0.5 | | 0.5 | | | | | | |
| WC | 1/20/2021 | Review answer to cross complaint | 1.3 | | 1.3 | | | | | | |
| BA | 1/26/2021 | Draft Answer, research affirmative defenses, review petition and covenant terms, TC WC re answer | 2.7 | | 2.7 | | | | | | |
| WC | 1/26/2021 | Review draft answer to cross complaint | 0.4 | | 0.4 | | | | | | |
| WC | 1/28/2021 | Draft settlement demand letter; | 2.4 | | 2.4 | | | | | | |
| AP | 1/29/2021 | Review answer and ADs to state claim | 1.8 | | 1.8 | | | | | | |

048

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BA | 1/29/2021 | Review answer | 0.1 | | 0.1 | | | | | | |
| WC | 1/29/2021 | Review and edit answer to cross complaint | 1.1 | | 1.1 | | | | | | |
| WC | 1/29/2021 | Draft verification; finalize answer to cross complaint; review settlement demand letter and make final edits | 1.1 | | 1.1 | | | | | | |
| AP | 2/1/2021 | Review and edit monetary demand letter after TC w/ client | 0.6 | | | | | | | 0.6 | |
| WC | 2/12/2021 | Draft email to HN re corps wishlist; review leechate seep report and draft email to HN; | 0.9 | | | 0.9 | | | | | |
| AP | 2/18/2021 | Develop disco plan w/ WC | 0.3 | | | 0.3 | | | | | |
| AP | 2/19/2021 | TC w/ BA re: discovery plan | 0.6 | | | 0.6 | | | | | |
| BA | 2/19/2021 | Tc discovery w AP | 0.6 | | | 0.6 | | | | | |
| WC | 2/19/2021 | Discuss discovery and settlement plan w/AP and BA; ; | 0.6 | | | 0.6 | | | | | |
| AP | 2/24/2021 | Prep and attend CMC (via Court Call) | 0.7 | | 0.7 | | | | | | |
| AP | 2/24/2021 | TC to M. Habib re: CMC | 0.2 | | 0.2 | | | | | | |
| WC | 2/24/2021 | Observe CMC | 0.5 | | 0.5 | | | | | | |
| AP | 3/5/2021 | Client call re: settlement strategy | 0.3 | | | | | | | 0.3 | |
| AP | 3/5/2021 | Draft confidential SCS for client review | 1.1 | | | | | | | 1.1 | |
| AP | 3/5/2021 | TC to Drabant (sp.) at State Board | 0.3 | | | | | | | 0.3 | |
| AP | 3/5/2021 | Client call re: SCS drafting . | 0.6 | | | | | | | 0.6 | |
| BA | 3/5/2021 | Research easement termination law, review easement | 2.1 | | | 2.1 | | | | | |
| AP | 3/8/2021 | Review COL Board edits and revise confidential SCS | 0.8 | | | | | | | 0.8 | |
| AP | 3/8/2021 | COL board call | 0.3 | | | | | | | 0.3 | |
| AP | 3/8/2021 | Confer w/ experts re: mediation | 0.2 | | | | | | | 0.2 | |
| AP | 3/9/2021 | TC w/ client re: mediation expectations | 0.3 | | | | | | | 0.3 | |
| AP | 3/9/2021 | TCs w/ Mag. Newman, DK, MH re: mediation | 0.4 | | | | | | | 0.4 | |
| AP | 3/10/2021 | Prep and attend sett. conf. | 2.4 | | | | | | | 2.4 | |
| AP | 3/10/2021 | Post-conference TCs with DK, HN re: Sett Conf | 0.4 | | | | | | | 0.4 | |
| AP | 3/10/2021 | Draft note to Army Corp requesting 3/17 mtg; | 0.3 | | | 0.3 | | | | | |
| BA | 3/10/2021 | Mediation | 2.2 | | | | | | | 2.2 | |
| AP | 3/11/2021 | COL Bd call re: sett. conference summary | 0.2 | | | | | | | 0.2 | |
| AP | 3/11/2021 | TCs to HN re: ACE PRA | 0.2 | | | 0.2 | | | | | |
| AP | 3/11/2021 | Renew PRA request w/ ACE | 0.2 | | | 0.2 | | | | | |
| AP | 3/15/2021 | Prep and attend call w/ ACE | 0.4 | | | 0.4 | | | | | |
| WC | 3/15/2021 | Conf call w/ACOE; | 0.4 | | | 0.4 | | | | | |
| AP | 3/16/2021 | Review and respond to proposed stip. extending deadlines | 0.5 | | | 0.5 | | | | | |
| AP | 3/16/2021 | Review + respond to emails w/ Judge and counsel | 0.3 | | | | | | | 0.3 | |
| AP | 3/16/2021 | Confer w/ WC + HN re: PRAs re: ACE application | 0.3 | | | 0.3 | | | | | |
| WC | 3/16/2021 | Draft emails to ACOE re application to amend; | 0.5 | | | 0.5 | | | | | |
| AP | 3/17/2021 | Prep and attend conf. call w/ USACE + County | 0.6 | | | 0.6 | | | | | |
| AP | 3/17/2021 | Confer w/ WC + BA re: next steps | 0.3 | | | 0.3 | | | | | |
| WC | 3/17/2021 | Conf call w/Opp counsel and ACOE; conf call w/HN | 1.3 | | | 1.3 | | | | | |
| WC | 3/17/2021 | Discuss settlement strategy w/AP and disco next steps | 0.3 | | | 0.3 | | | | | |
| WC | 3/19/2021 | Review ACOE "no record" letter write response email re same; | 0.2 | | | 0.2 | | | | | |
| AP | 3/22/2021 | Review Madrone letter to ACE | 0.4 | | | 0.4 | | | | | |

049

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 3/22/2021 | Prep and attend COL Board call | 0.8 | | | 0.8 | | | | | |
| AP | 3/22/2021 | TC w/ client (HN) re: BD of Supervisor's outreach and press concerns | 0.4 | | | 0.4 | | | | | |
| WC | 3/22/2021 | Prepare for conf call w/Board | 0.1 | | | 0.1 | | | | | |
| WC | 3/22/2021 | Conf call w/Board re case status and next steps | 0.8 | | | 0.8 | | | | | |
| WC | 3/22/2021 | Review letter requesting modification; review CE and LOP; draft response to ACOE; discuss same w/AP | 3 | | | 3 | | | | | |
| AP | 3/23/2021 | Draft LTA letter | 2.6 | | | 2.6 | | | | | |
| AP | 3/23/2021 | Revise letter to USACE re: mod. Request | 0.4 | | | 0.4 | | | | | |
| AP | 3/23/2021 | Prep and attend call w/ BA re: MSJ outline and disco needs | 0.5 | | | 0.5 | | | | | |
| WC | 3/23/2021 | Conf call w/AP and BA re MSJ and disco strategy | 0.5 | | | 0.5 | | | | | |
| WC | 3/23/2021 | Review LTA letter; finalize and send Corps letter | 0.4 | | | 0.4 | | | | | |
| AP | 3/24/2021 | Finalize appeal letter to LTA with client edits | 2.7 | | | 2.7 | | | | | |
| AP | 3/24/2021 | Notes to LTA in follow-up | 0.3 | | | 0.3 | | | | | |
| AP | 3/24/2021 | Outline MSJ | 0.6 | | | | | 0.3 | | | |
| WC | 3/24/2021 | Review/edit letter to LTA | 0.2 | | | 0.2 | | | | | |
| WC | 3/24/2021 | Review groundwater issues raised by HN/LW | 0.6 | | | 0.6 | | | | | |
| AP | 3/30/2021 | TC from J. Dahlmeir re: COL outreach to County | 0.2 | | | 0.2 | | | | | |
| AP | 3/31/2021 | TC w/ COL Bd re: mtgs w/ County Supes and process for next steps | 0.2 | | | 0.2 | | | | | |
| AP | 3/31/2021 | Review edits to MSJ outline | 0.2 | | | | 0.2 | | | | |
| WC | 3/31/2021 | Review/edit outline to MSJ; | 0.9 | | | | 0.4 | 0.5 | | | |
| AP | 4/1/2021 | Confer w. COL Bd/HN re: next steps | 0.8 | | | 0.8 | | | | | |
| BA | 4/1/2021 | Conf call re msj | 0.9 | | | | 0.4 | 0.5 | | | |
| WC | 4/1/2021 | Discuss document production issues w/AP; research same | 1.1 | | | 1.1 | | | | | |
| AP | 4/2/2021 | Confer w/ M. Habib re: MSJ process in Butte Cty | 0.2 | | | | 0.1 | 0.1 | | | |
| AP | 4/2/2021 | Review revised memo from L. Wood | 0.4 | | | 0.4 | | | | | |
| BA | 4/4/2021 | Draft evidence matrix. Review complaint and supporting docs and cross complaint. Review CWA definition of wetlands and waters | 3.2 | | | | 1.6 | 1.6 | | | |
| AP | 4/5/2021 | TC from DK re: alt. site proposal | 0.2 | | | | | | | 0.2 | |
| AP | 4/5/2021 | Note to COL Bd re: proposed alt site/swap | 0.1 | | | | | | | 0.1 | |
| BA | 4/5/2021 | Draft evidence matrix. Review complaint and supporting docs and cross complaint. Review CWA definition of wetlands and waters | 2.6 | | | | 1.3 | 1.3 | | | |
| WC | 4/5/2021 | Review email from LTA re involvement | 0.2 | | | 0.2 | | | | | |
| WC | 4/5/2021 | Draft email to Holly re LW | 0.3 | | | 0.3 | | | | | |
| WC | 4/5/2021 | Discuss consultant issue w/AP | 0.6 | | | 0.6 | | | | | |
| WC | 4/5/2021 | Review evidence matrix for MSJ | 2.3 | | | | 1.1 | 1.2 | | | |
| AP | 4/6/2021 | Note and TC to L. Clay re: ACE response to Madrone letter | 0.2 | | | 0.2 | | | | | |
| AP | 4/6/2021 | Note to G. Einhorn re: MSJ briefing schedule | 0.2 | | | | 0.1 | 0.1 | | | |
| BA | 4/6/2021 | Research NOVs and cross complaint update evidence matrix | 3 | | | | 1.5 | 1.5 | | | |

050

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 4/7/2021 | TC w/ COL bd and HN re: County comms, settlement plan | 0.3 | | | | | | | 0.3 | |
| AP | 4/7/2021 | Rev and resp to G. Einhorn re: briefing schedule | 0.4 | | | | 0.2 | 0.2 | | | |
| AP | 4/7/2021 | Note to DK re: swap deal | 0.3 | | | | | | | 0.3 | |
| BA | 4/7/2021 | Tc WC re county defenses | 0.2 | | | | | 0.2 | | | |
| WC | 4/7/2021 | Review acoe crms and county's request to modify LOP | 0.3 | | | 0.3 | | | | | |
| WC | 4/7/2021 | Provide update to board; discuss settlement strategies and nexts steps in litigation | 0.3 | | | | | | | 0.3 | |
| WC | 4/7/2021 | Draft acoe letter responding to request to modify LOP | 0.4 | | | 0.4 | | | | | |
| AP | 4/8/2021 | Prep and attend conf. call re: motions and disco w/ G. Einhorn | 0.5 | | | 0.5 | | | | | |
| AP | 4/8/2021 | Draft prompting note to DK, Judge Newman | 0.2 | | | | | | | 0.2 | |
| AP | 4/12/2021 | Draft note to Lisa Clay re: contact info | 0.2 | | | 0.2 | | | | | |
| WC | 4/8/2021 | Conf call w/GE re scheduling | 0.5 | | | 0.5 | | | | | |
| AP | 4/9/2021 | Review DK sett. letter and draft rec. to COL Board | 0.9 | | | | | | | 0.9 | |
| AP | 4/9/2021 | Review Bd responses and incorporate edits into Joint Statement | 0.8 | | | | | | | 0.8 | |
| AP | 4/10/2021 | Review and respond in email to Bd. comments | 0.2 | | | | | | | 0.2 | |
| AP | 4/12/2021 | Confer w/ WC re: COL demand for both cases | 0.3 | | | | | | | 0.3 | |
| AP | 4/12/2021 | Respond to DK and Court re: 4/16 conference call | 0.3 | | | | | | | 0.3 | |
| AP | 4/12/2021 | TC w/ J. Dahlmeier re: status | 0.2 | | | | | | | 0.2 | |
| AP | 4/13/2021 | Review + respond to emails to and from DK | 0.3 | | | | | | | 0.3 | |
| AP | 4/13/2021 | Confer w/ WC re: state CMC statement + trial dates | 0.2 | 0.2 | | | | | | | |
| AP | 4/13/2021 | Confer w/ HN re: prospects for sett. conf #2 | 0.4 | | | | | | | 0.4 | |
| WC | 4/13/2021 | Discuss trial, briefing and disco schedule w/AP | 0.2 | | 0.2 | | | | | | |
| WC | 4/13/2021 | Draft email to GE re trial schedule | 0.1 | | 0.1 | | | | | | |
| WC | 4/13/2021 | Draft, print and mail form rogps and cmc | 0.3 | | | 0.3 | | | | | |
| WC | 4/13/2021 | Draft CMCS | 0.2 | | 0.2 | | | | | | |
| WC | 4/13/2021 | Discuss bifurcation issues w/AP; discuss disco timeline and case strategy | 0.7 | | 0.7 | | | | | | |
| WC | 4/13/2021 | File and serve CMCS | 0.2 | | 0.2 | | | | | | |
| WC | 4/13/2021 | Review crms and draft email to MC re CDAA Investigation | 0.2 | | | 0.2 | | | | | |
| WC | 4/13/2021 | Put together $ distribution chart and discuss same w/AP | 0.7 | | | | | | | 0.7 | |
| AP | 4/14/2021 | Review and respond to multiple DK emails | 0.8 | | | | | | | 0.8 | |
| AP | 4/14/2021 | Conf call w/ DK | 0.3 | | | | | | | 0.3 | |
| AP | 4/14/2021 | Draft note to Court cancelling 2nd sett. Conference | 0.4 | | | | | | | 0.4 | |
| AP | 4/14/2021 | Draft discovery letter (16) re: MQP depos | 1.2 | | | 1.2 | | | | | |
| WC | 4/14/2021 | Draft response to ACOE letter; | 3 | | | 3 | | | | | |
| WC | 4/15/2021 | Incorporate AP's edits to response letter to request to modify LOP; transmit to HN | 0.2 | | | 0.2 | | | | | |
| WC | 4/15/2021 | Finalize letter to ACOE re misreps in Butte's Request and transmit same | 0.3 | | | 0.3 | | | | | |
| AP | 4/16/2021 | Prep and attend conf. call w/ KJN | 0.2 | | | | | | | 0.2 | |
| AP | 4/16/2021 | Note to client re: same | 0.1 | | | 0.1 | | | | | |
| WC | 4/20/2021 | Review MSJ matric; add evidence to same; | 0.4 | | | | 0.2 | 0.2 | | | |

051

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WC | 4/23/2021 | Discuss stay of discovery w/GE; | 0.2 | | | 0.2 | | | | | |
| AP | 4/27/2021 | Prep and attend sett. conf. w/ Mag. Newman | 0.6 | | | | | | | 0.6 | |
| AP | 4/27/2021 | Confer w/ client re: wetland requirements | 0.3 | | | | | | | 0.3 | |
| AP | 4/27/2021 | Confer w/ BA + WC re: disco, sett. status and case mgm | 0.4 | | | 0.2 | | | | 0.2 | |
| BA | 4/27/2021 | Status update, disco plan | 0.4 | | | 0.2 | | | | 0.2 | |
| WC | 4/27/2021 | Settlement discussion w/KGN and opp counsel | 0.6 | | | | | | | 0.6 | |
| WC | 4/27/2021 | Conf call w/Lisa Clay re: request to modify | 0.5 | | | | | | | 0.5 | |
| AP | 4/28/2021 | Prep and attend CMC by phone | 0.6 | | 0.6 | | | | | | |
| AP | 4/28/2021 | Draft letter to DK/GE re: wetlands information after client auth | 0.8 | | | | | | | 0.8 | |
| WC | 4/28/2021 | Case management conference; | 0.3 | | 0.3 | | | | | | |
| AP | 5/5/2021 | TCs w/ COL Board, HN re: status of sett. Efforts | 0.5 | | | | | | | 0.5 | |
| WC | 5/5/2021 | Discuss case updates w/HN and AP; | 0.4 | | | | | | | 0.4 | |
| AP | 5/6/2021 | Review and respond to COL board emails | 0.3 | | | | | | | 0.3 | |
| AP | 5/12/2021 | Review and revise draft P.O. | 0.3 | | | 0.3 | | | | | |
| AP | 5/12/2021 | TC w/ D. Kinderman, emails to GE, re: P.O. | 0.2 | | | 0.2 | | | | | |
| AP | 5/12/2021 | Prep and attend BOD conf. call | 0.3 | | | | | | | 0.3 | |
| WC | 5/12/2021 | Call w/board re prot order and process for moving forward with decisions re replacement lands; | 0.5 | | | | | | | 0.5 | |
| WC | 5/13/2021 | TC w/ DK re: proposals to swap reserve location, finalize protective order | 0.2 | | | | | | | 0.2 | |
| AP | 5/13/2021 | Note to client re: DK comms | 0.1 | | | | | | | 0.1 | |
| WC | 5/13/2021 | Review GE's letter; draft response; | 0.8 | | 0.8 | | | | | | |
| AP | 5/17/2021 | TC and email to DK re: status | 0.1 | | | | | | | 0.1 | |
| AP | 5/18/2021 | TC and email to DK re: status | 0.2 | | | | | | | 0.2 | |
| AP | 5/18/2021 | Email to COL Board re: non-response; | 0.1 | | | | | | | 0.1 | |
| AP | 5/19/2021 | Review DK settlement response and circulate status to Holly/BD | 0.6 | | | | | | | 0.6 | |
| AP | 5/20/2021 | TC w/ COL Board | 0.4 | | | | | | | 0.4 | |
| AP | 5/20/2021 | Confer w/ WC re: MSJ strategy | 0.4 | | | | 0.2 | 0.2 | | | |
| WC | 5/20/2021 | Discuss MSJ strategy w/AP; | 0.4 | | | | 0.2 | 0.2 | | | |
| AP | 5/26/2021 | Mtg w/ BA, WC re: MSJ + related discovery | 1.1 | | | | 0.5 | 0.6 | | | |
| BA | 5/26/2021 | Call re msj tasks | 1.1 | | | | 0.5 | 0.6 | | | |
| BA | 5/28/2021 | Create template for SSUF, MSJ | 0.8 | | | | 0.4 | 0.4 | | | |
| BA | 5/28/2021 | Update MSJ table | 0.5 | | | | 0.2 | 0.3 | | | |
| BA | 5/28/2021 | Draft discovery | 1.7 | | | 1.7 | | | | | |
| BA | 5/28/2021 | Research aff defense cases for MC letter | 0.6 | | | | | 0.6 | | | |
| WC | 5/28/2021 | Draft letter to Einhorn re interrogatory response; | 2.5 | | | 2.5 | | | | | |
| BA | 5/29/2021 | Draft MSJ, SSUF, review easement | 2.2 | | | | 1.1 | 1.1 | | | |
| BA | 5/30/2021 | Draft MSJ, SSUF, RFAs | 1.6 | | | | 0.8 | 0.8 | | | |
| BA | 5/30/2021 | Draft RFAs | 1.6 | | | 1.6 | | | | | |
| BA | 5/31/2021 | Draft SSUF, upload to drive | 0.7 | | | | 0.3 | 0.4 | | | |
| WC | 6/1/2021 | Discuss response to interrogatories w/AP | 0.3 | | | 0.3 | | | | | |
| WC | 6/1/2021 | Draft letter to Einhorn re interrogatory response | 0.5 | | | 0.5 | | | | | |
| WC | 6/1/2021 | Review docs and compile maps/discharge memo for BA MSJ | 0.3 | | | | | 0.3 | | | |

052

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WC | 6/1/2021 | Draft email to BA re size of wetland | 0.1 | | | | 0.1 | | | | |
| AP | 6/2/2021 | Zoom call w/ E-Corps for vetting as potential experts, local conflicts | 0.6 | | | 0.6 | | | | | |
| BA | 6/3/2021 | Call re MSJ/Admissions/ CPRA | 0.2 | | | 0.2 | | | | | |
| WC | 6/3/2021 | Review and compile docs for MSJ | 0.9 | | | | 0.4 | 0.5 | | | |
| WC | 6/3/2021 | Discuss disco strategy and msj briefing w/BA and AP | 0.2 | | | 0.2 | | | | | |
| AP | 6/4/2021 | TC w/ COL Bd re: retaining E-CORPS as wetland experts | 0.3 | | | 0.3 | | | | | |
| WC | 6/4/2021 | Update board with details from call w/ecorp; | 0.3 | | | 0.3 | | | | | |
| WC | 6/7/2021 | Draft letter to Einhorn re interrogatory response; | 1.6 | | | 1.6 | | | | | |
| AP | 6/8/2021 | Confer w/ BA re: disco + MSJ | 0.3 | | | 0.3 | | | | | |
| BA | 6/8/2021 | Call re admissions | 0.3 | | | 0.3 | | | | | |
| WC | 6/8/2021 | Review/edit letter to DK and GE re settlement | 0.4 | | | | | | | 0.4 | |
| WC | 6/8/2021 | Review RFAs; edit same | 2.2 | | | 2.2 | | | | | |
| AP | 6/9/2021 | Finalize sett. status letter to DK | 0.2 | | | | | | | 0.2 | |
| BA | 6/9/2021 | Review RFAs and MC | 0.3 | | | 0.3 | | | | | |
| WC | 6/9/2021 | Draft discovery (rfas/rfpd/form roggs) and compile; | 2 | | | 2 | | | | | |
| BA | 6/10/2021 | Review final RFAs and MC | 0.1 | | | 0.1 | | | | | |
| WC | 6/10/2021 | Edit/draft disco | 2.1 | | | 2.1 | | | | | |
| WC | 6/10/2021 | Finalize rfas/rfpds/form roggs/letter to GE re form roggs; print and mail same; | 2 | | | 2 | | | | | |
| AP | 6/11/2021 | Confer w/ Lisa Clay @ USACE | 0.1 | | | 0.1 | | | | | |
| WC | 6/11/2021 | Discuss status update w/LC; | 0.1 | | | 0.1 | | | | | |
| WC | 6/14/2021 | Compile exhibits for RFAs; transmit same to GE | 0.1 | | | 0.1 | | | | | |
| WC | 6/14/2021 | Fix exhibits and resend to GE | 0.1 | | | 0.1 | | | | | |
| AP | 6/16/2021 | Mtg w/ BA re: briefing status | 0.6 | | | | 0.3 | 0.3 | | | |
| BA | 6/16/2021 | Call w/ AP WC re MSJ | 0.6 | | | | 0.3 | 0.3 | | | |
| WC | 6/16/2021 | Discuss disco issues w/AP | 0.1 | | | 0.1 | | | | | |
| WC | 6/16/2021 | Discuss MSJ strategy, timeline, and substance w/AP and BA | 0.6 | | | | 0.3 | 0.3 | | | |
| AP | 6/17/2021 | Draft note to Lisa Clay re: call and need for updates | 0.4 | | | 0.4 | | | | | |
| WC | 6/17/2021 | Draft email to GE re responses to first set of form roggs | 0.1 | | | 0.1 | | | | | |
| WC | 6/17/2021 | Review letter re disco responses; draft email to GE re same | 0.2 | | | 0.2 | | | | | |
| BA | 6/18/2021 | Draft MSJ | 1.1 | | | | 0.5 | 0.6 | | | |
| WC | 6/18/2021 | Discuss discovery responses w/AP | 0.4 | | | 0.4 | | | | | |
| WC | 6/18/2021 | Review disco responses; draft email response to GE re same | 0.3 | | | 0.3 | | | | | |
| BA | 6/19/2021 | Draft MSJ | 3.8 | | | | 1.9 | 1.9 | | | |
| BA | 6/21/2021 | Review Civ Code re easements | 0.8 | | | | 0.4 | 0.4 | | | |
| BA | 6/22/2021 | Draft MSJ | 2.1 | | | | 1 | 1.1 | | | |
| BA | 6/23/2021 | Draft MSJ | 1.3 | | | | 0.6 | 0.7 | | | |
| WC | 6/25/2021 | Review letter re amended disco responses from GE | 0.2 | | | 0.2 | | | | | |
| BA | 6/26/2021 | Draft MSJ, review Civ Code re easements/MSJ standards | 2.3 | | | | 1 | 1.3 | | | |
| BA | 6/27/2021 | Draft MSJ | 4.3 | | | | 2.1 | 2.2 | | | |
| BA | 6/28/2021 | Draft MSJ | 0.5 | | | | 0.2 | 0.3 | | | |

053

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 6/30/2021 | Review comms from whistleblower S. Jackson and ALJ decision | 0.4 | | | 0.4 | | | | | |
| BA | 6/30/2021 | Draft MSJ | 0.8 | | | | 0.4 | 0.4 | | | |
| BA | 7/1/2021 | Draft MSJ | 4.6 | | | | 2.3 | 2.3 | | | |
| BA | 7/2/2021 | Draft MSJ | 1.9 | | | | 0.9 | 1 | | | |
| WC | 7/2/2021 | Draft email to board re OSHA's findings | 0.2 | | | 0.2 | | | | | |
| BA | 7/5/2021 | Draft MSJ re preserve size | 1.3 | | | | 1.3 | | | | |
| BA | 7/6/2021 | Review discovery responses, draft MC email | 1.5 | | | 1.5 | | | | | |
| AP | 7/8/2021 | TC w/ BA re: MSJ briefing | 0.6 | | | | 0.3 | 0.3 | | | |
| BA | 7/8/2021 | Tc re msj w AP | 0.6 | | | | 0.3 | 0.3 | | | |
| AP | 7/9/2021 | Review and respond to DK settlement letter of 7/2 | 0.6 | | | | | | | 0.6 | |
| AP | 7/9/2021 | TC to HN re: settlement | 0.3 | | | | | | | 0.3 | |
| BA | 7/9/2021 | Draft MSJ | 0.5 | | | | 0.2 | 0.3 | | | |
| BA | 7/10/2021 | Draft MSJ | 0.7 | | | | 0.3 | 0.4 | | | |
| BA | 7/11/2021 | Draft MSJ | 0.6 | | | | 0.3 | 0.3 | | | |
| BA | 7/12/2021 | Draft MSJ | 2.3 | | | | 1.1 | 1.2 | | | |
| WC | 7/12/2021 | Review FOIA request; draft email re same to AP: calendar ping date | 0.1 | | | 0.1 | | | | | |
| BA | 7/13/2021 | Review WOCB order, incorporate into MSJ, and arguments re defenses | 2.7 | | | | | 2.7 | | | |
| WC | 7/13/2021 | Draft letter to GE re disco dispute | 2.2 | | | 2.2 | | | | | |
| WC | 7/14/2021 | Review MSJ; draft email to BA re same; finalize and transmit M&C letter re amended froggs to GE | 0.8 | | | 0.8 | | | | | |
| AP | 7/14/2021 | Confer w/ BA, WC re: MSJ and disco | 0.5 | | | 0.5 | | | | | |
| BA | 7/14/2021 | TC WC AP re RFA responses, MSJ briefing | 0.5 | | | 0.5 | | | | | |
| BA | 7/14/2021 | Research RFA objections, email AP WC re same | 1.3 | | | 1.3 | | | | | |
| WC | 7/14/2021 | Draft M&C letter to GE re responses to RFAs | 2.1 | | | 2.1 | | | | | |
| WC | 7/14/2021 | Review MSJ | 0.8 | | | | 0.4 | 0.4 | | | |
| WC | 7/14/2021 | Confer w/AP and BA re sufficiency of responses to RFAs; confer w/BA re MSJ brief | 0.5 | | | 0.5 | | | | | |
| AP | 7/15/2021 | Draft settlement letter to D. Kindermann | 0.4 | | | | | | | 0.4 | |
| AP | 7/15/2021 | Review SPD terms re: disclosure to client | 0.2 | | | | | | | 0.2 | |
| AP | 7/15/2021 | Review RB comments to investigative work plan | 0.2 | | | 0.2 | | | | | |
| WC | 7/15/2021 | Draft M&C letter to GE re responses to RFAs | 0.7 | | | 0.7 | | | | | |
| WC | 7/15/2021 | Review and edit settlement letter to opp counsel | 0.3 | | | | | | | 0.3 | |
| WC | 7/15/2021 | Finalize and send M&C re RFAs | 0.1 | | | 0.1 | | | | | |
| WC | 7/15/2022 | Review technical documents cited in state board response | 0.5 | | | 0.5 | | | | | |
| AP | 7/16/2022 | Prep and attend conf. call w/ D. Kindermann | 0.6 | | | | | | | 0.6 | |
| BA | 7/16/2021 | Review JOP leachate collection procedures | 0.3 | | | | | 0.3 | | | |
| WC | 7/16/2021 | Draft email to Corps re FOIA request | 0.1 | | | 0.1 | | | | | |
| WC | 7/16/2022 | Review technical documents cite in state board response to work plan | 1.3 | | | | | 1.3 | | | |
| WC | 7/16/2021 | Draft email to team re rainfall data/design storm issues re "big rain" defense | 0.4 | | | | | 0.4 | | | |
| WC | 7/16/2021 | Conf w/opp counsel re settlement | 0.7 | | | | | | | 0.7 | |

054

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WC | 7/16/2021 | Discuss settlement conversation with HN; provide updates on case status | 0.6 | | | | | | | 0.6 | |
| AP | 7/20/2021 | Draft note to DK confirming 7/16 TC re: sett. of both state and fed. Actions | 0.6 | | | | | | | 0.6 | |
| AP | 7/21/2021 | Review and respond to Haddix re: settlement call Friday 7/23 | 0.2 | | | | | | | 0.2 | |
| AP | 7/22/2021 | Draft note to DK/GH w/ agenda for 7/23 call | 0.2 | | | | | | | 0.2 | |
| AP | 7/23/2021 | Prep and attend sett. call w/ BA, DK, GH and GE | 0.7 | | | | | | | 0.7 | |
| AP | 7/23/2021 | Draft note to DK confirming call | 0.3 | | | | | | | 0.3 | |
| BA | 7/23/2021 | Conf call with county, review disco responses | 0.9 | | | 0.9 | | | | | |
| AP | 7/26/2021 | Review WC's discovery ltr to G.E. | 0.2 | | | 0.2 | | | | | |
| AP | 7/26/2021 | Mtg w/ BA, WC re: MSJ and related discovery, motion to compel | 0.2 | | | 0.2 | | | | | |
| WC | 7/26/2021 | Confer w/AP and BA re responses to disco (amended resps to RFAs) and GE's cmns | 0.2 | | | 0.2 | | | | | |
| WC | 7/26/2021 | Draft m&c letter re amended roggs/rfa | 0.4 | | | 0.4 | | | | | |
| WC | 7/26/2021 | Confer w/AP re disco issues | 0.1 | | | 0.1 | | | | | |
| WC | 7/26/2021 | Organize disco and responses | 0.7 | | | 0.7 | | | | | |
| WC | 7/26/2021 | Draft letter to Einhorn re disco | 1.8 | | | 1.8 | | | | | |
| WC | 7/27/2021 | Finalize and send letter to einhorn re disco | 0.6 | | | 0.6 | | | | | |
| WC | 7/27/2021 | Draft M&C letter to einhorn re rfas | 1.7 | | | 1.7 | | | | | |
| WC | 7/27/2021 | Review discovery responses and draft M&C letter re same | 2 | | | 2 | | | | | |
| AP | 7/28/2021 | Draft letter to GE re: settlement deal points | 0.2 | | | 0.2 | | | | | |
| AP | 7/28/2021 | Review County objections to Steve Jackson's favorable ruling in DOL whistleblower case | 0.1 | | | 0.1 | | | | | |
| WC | 7/28/2021 | Review discovery responses; | 0.5 | | | 0.5 | | | | | |
| WC | 7/28/2021 | Draft M&C letter to GE re responses to RFAs | 3 | | | 3 | | | | | |
| AP | 7/29/2021 | TCs w/ Holly Nielsen and WC re: fee and cost accounting for demand | 0.4 | | | | | | | 0.4 | |
| WC | 7/29/2021 | Draft letter to Einhorn and draft email to team re disco update; | 1.4 | | | 1.4 | | | | | |
| WC | 7/30/2021 | Review permitting documents; review and edit MSJ; | 1.3 | | | | 0.6 | 0.7 | | | |
| AP | 8/2/2021 | TC to Tamara Galanter re: easement mechanics | 0.2 | | | | | | | 0.2 | |
| AP | 8/5/2021 | Draft sett. letter to G. Einhorn | 1.4 | | | | | | | 1.4 | |
| WC | 8/5/2021 | Review and edit letter to einhorn re settlement; | 0.4 | | | | | | | 0.4 | |
| AP | 8/6/2021 | Review and edit Einhorn letter re: settlement | 0.4 | | | | | | | 0.4 | |
| WC | 8/6/2021 | Confer w/AP re consent decree; | 0.5 | | | | | | | 0.5 | |
| AP | 8/9/2021 | Draft settlement note prompting DK re: settlement | 0.1 | | | | | | | 0.1 | |
| AP | 8/9/2021 | Review disco letter to G. Einhorn | 0.2 | | | 0.2 | | | | | |
| AP | 8/9/2021 | Confer w/ WC re: MSJ | 0.2 | | | | 0.2 | | | | |
| WC | 8/9/2021 | Review and finalize letter re rfas to GE; | 0.4 | | | 0.4 | | | | | |
| AP | 8/10/2021 | TC and emails to DK re: Defendants failure to provide full and share-able settlement | 0.3 | | | | | | | 0.3 | |
| WC | 8/10/2021 | Review and edit MSJ; | 3 | | | | 1.5 | 1.5 | | | |

055

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 8/11/2021 | Prep and attend TC w/ COL board re: settlement status, next steps in litigation | 0.3 | | | | | | | 0.3 | |
| WC | 8/11/2021 | Review and edit MSJ; | 0.7 | | | | 0.3 | 0.4 | | | |
| AP | 8/12/2021 | TCs to DK re: letter of intent | 0.2 | | | | | | | 0.2 | |
| AP | 8/12/2021 | Revise Exh A for COL Bd members to be bound by SPO | 0.2 | | | | | | | 0.2 | |
| WC | 8/12/2021 | Confer w/AP re letter to DK re proposal and prot order issues | 0.4 | | | | | | | 0.4 | |
| WC | 8/12/2021 | Draft letter to DK/GE re settlement issues | 0.4 | | | | | | | 0.4 | |
| WC | 8/12/2021 | Review/edit MSI | 1.1 | | | | 0.5 | 0.6 | | | |
| AP | 8/13/2021 | Note to DK re: settlement and failure to articulate a proposal | 0.2 | | | | | | | 0.2 | |
| WC | 8/13/2021 | Review disco responses and draft response to GE | 2.3 | | | 2.3 | | | | | |
| WC | 8/13/2021 | Review/edit MSI | 1.5 | | | | 0.7 | 0.8 | | | |
| WC | 8/13/2021 | Confer w/BA re MSI and disco cmns | 0.3 | | | | | 0.3 | | | |
| WC | 8/16/2021 | Review/edit MSI; | 1.6 | | | | 0.8 | 0.8 | | | |
| WC | 8/17/2021 | Draft M&C letter to Einhorn re froggs, set two and RFPs, set one | 0.8 | | | 0.8 | | | | | |
| WC | 8/17/2021 | Review/edit MSI; review docs for same | 3.7 | | | | 1.8 | 1.9 | | | |
| AP | 8/18/2021 | Review USACE response to FOIA request and related docs | 0.3 | | | 0.3 | | | | | |
| AP | 8/18/2021 | Draft note to Lisa Clay clarifying non-settlement status | 0.3 | | | | | | | 0.3 | |
| WC | 8/18/2021 | Review correspondence re easement termination | 0.6 | | | | | | | 0.6 | |
| WC | 8/18/2021 | Research condemnation; prep for call w/tamara re condemnation options | 0.7 | | | | | | | 0.7 | |
| AP | 8/19/2021 | Prep and attend TC w/ T. Galanter at SMW re: condemnation of easements and mechanics | 0.7 | | | | | | | 0.7 | |
| AP | 8/19/2021 | Research condemnation cases | 0.5 | | | | | | | 0.5 | |
| WC | 8/19/2021 | Confer w/AP re call w/Tamara | 0.7 | | | | | | | 0.7 | |
| AP | 8/20/2021 | TC w/ client re: stipulated inverse condemnation, press strategy, TC to DK | 0.9 | | | | | | | 0.9 | |
| WC | 8/20/2021 | Confer w/AP and client re status of settlement discussion and prot. order; discuss basin 2 issues and review photographs re same; | 0.9 | | | | | | | 0.9 | |
| WC | 8/23/2021 | Review/edit MSI | 2 | | | | 1 | 1 | | | |
| WC | 8/24/2021 | Review/edit MSI; review docs | 3.5 | | | | 1.7 | 1.8 | | | |
| WC | 8/24/2021 | Review 2d revised workplan; draft email to team re same | 1.2 | | | 1.2 | | | | | |
| WC | 8/25/2021 | Review/edit MSI; draft msj; review docs; | 1.8 | | | | 0.9 | 0.9 | | | |
| WC | 8/26/2021 | Review/edit MSI | 1 | | | | 0.5 | 0.5 | | | |
| WC | 8/26/2021 | Draft and send M&C letter to GE re RFAs | 0.8 | | | 0.8 | | | | | |
| WC | 8/27/2021 | Review/edit MSI; draft msj; review docs; | 1.9 | | | | 0.9 | 1 | | | |
| WC | 8/30/2021 | Discuss settlement issues w/DK | 0.3 | | | | | | | 0.3 | |
| WC | 8/30/2021 | Draft email to team re land swap | 0.5 | | | | | | | 0.5 | |
| WC | 8/30/2021 | Draft emails to board/holly; phone call w/HN re land swap | 0.9 | | | | | | | 0.9 | |
| WC | 8/31/2021 | Draft email to DK re settlement map | 0.4 | | | | | | | 0.4 | |

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WC | 8/31/2021 | Review settlement proposal and draft email to COL re same | 0.5 | | | | | | | 0.5 | |
| WC | 8/31/2021 | Review/edit MSJ; review cmns from board/HN; draft email responding to same | 2.5 | | | | 1 | 1.5 | | | |
| WC | 9/1/2021 | Draft email to HN and Board re settlement | 0.3 | | | | | | | 0.3 | |
| WC | 9/1/2021 | Review/edit MSJ | 2.3 | | | | 1 | 1.3 | | | |
| WC | 9/8/2021 | Draft argument section 1 MSJ; | 2 | | | | 2 | | | | |
| AP | 9/9/2021 | Briefing mtg re: MSJ, collection of evidence | 0.6 | | | | | 0.6 | | | |
| WC | 9/9/2021 | Revise argument section of MSJ | 2.5 | | | | 2.5 | | | | |
| WC | 9/9/2021 | Confer w/AP and BA re status of MSJ and strategy, and re settlement status | 0.6 | | | | 0.3 | 0.3 | | | |
| WC | 9/10/2021 | Draft argument section 1 MSJ; | 1.8 | | | | 1.8 | | | | |
| WC | 9/13/2021 | Draft arg section 1 | 0.5 | | | | 0.5 | | | | |
| WC | 9/13/2021 | Draft arg section 1 and 2 MSJ | 2.9 | | | | 2.9 | | | | |
| WC | 9/13/2021 | Draft arg section 2 | 0.1 | | | | 0.1 | | | | |
| WC | 9/14/2021 | Draft arg sections 2 and 3 | 0.6 | | | | 0.6 | | | | |
| WC | 9/14/2021 | Draft arg section 3 | 3.1 | | | | 3.1 | | | | |
| AP | 9/15/2021 | Review 8/31 sett. proposal and draft responsive emails to HN | 0.5 | | | | | | | 0.5 | |
| AP | 9/15/2021 | Draft rejection email to DK re: exclusion of HN | 0.4 | | | | | | | 0.4 | |
| BA | 9/15/2021 | Review WC edits to brief | 0.6 | | | | 0.3 | 0.3 | | | |
| WC | 9/15/2021 | Draft arg section 3 | 0.3 | | | | 0.3 | | | | |
| WC | 9/16/2021 | Review and edit msj | 0.5 | | | | 0.2 | 0.3 | | | |
| AP | 9/16/2021 | Review draft MSJ and confer w/ WC, BA re: same | 1.3 | | | | 0.6 | 0.7 | | | |
| AP | 9/16/2021 | TC w/ client re: evaluation/rejection of parcel proposed | 0.5 | | | | | | | 0.5 | |
| BA | 9/16/2021 | TC AP WC re MSJ | 0.7 | | | | 0.3 | 0.4 | | | |
| WC | 9/16/2021 | Confer w/AP and BA re MSJ and case strategy | 0.7 | | | | 0.3 | 0.4 | | | |
| WC | 9/16/2021 | Confer w/AP and HN re settlement issues | 1 | | | | | | | 1 | |
| WC | 9/16/2021 | Draft email to SWRCB re misrepresentations at BoS meeting | 0.3 | | | 0.3 | | | | | |
| WC | 9/16/2021 | Review and organize disco responses; draft email to GE re continuation of deadline to file MTC | 0.5 | | | 0.5 | | | | | |
| AP | 9/17/2021 | Draft client letter re: settlement | 1.5 | | | | | | | 1.5 | |
| AP | 9/17/2021 | Draft note to DK re: sett. comms and agreement to be bound | 0.4 | | | 0.4 | | | | | |
| AP | 9/17/2021 | Draft note to Lisa Clay at USACE re: status of LOP determination | 0.3 | | | 0.3 | | | | | |
| BA | 9/17/2021 | Edit brief, review dec relief cases, discuss w/ WC | 1.7 | | | | 1.7 | | | | |
| WC | 9/17/2021 | Review and edit letter to DK re settlement; confer w/AP re same | 0.3 | | | | | | | 0.3 | |
| WC | 9/17/2021 | Confer w/BA re MSJ | 0.3 | | | | 0.1 | 0.2 | | | |
| WC | 9/17/2021 | Review discovery responses; draft new RFAs/email re same | 0.6 | | | 0.6 | | | | | |
| BA | 9/18/2021 | Review dec relief argument, email AP WL re theory for MSJ on cross claim, research case re MSJ and dec relief standards | 2.3 | | | | 2.3 | | | | |

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 9/20/2021 | Draft note to Diane K. re: 8/6 letter, response and Country's signatories to agreement to be bound | 0.2 | | | 0.2 | | | | | |
| AP | 9/20/2021 | Finalize board auth. to issue settlement letter and transmit | 0.2 | | | | | | | 0.2 | |
| BA | 9/20/2021 | Revise dec relief MSJ arguments and standard, case re parol evidence and easement interpretation | 1.2 | | | | 1.2 | | | | |
| BA | 9/22/2021 | Revise dec relief MSJ arguments and standard, review "actual controversy" cases | 3.6 | | | | 3.6 | | | | |
| BA | 9/24/2021 | Revise dec relief MSJ arguments, review SSMF | 1.5 | | | | 1 | | | | |
| WC | 9/24/2021 | Confer w/AP re next steps in MTC | 0.2 | | | | | 0.5 | | | |
| WC | 9/24/2021 | Draft email to client | 0.3 | 0.3 | | | | | | | |
| WC | 9/24/2021 | Confer w/BA re msj | 0.4 | | | | | 0.2 | | | |
| BA | 9/26/2021 | Revise dec relief MSJ section, and MSA facts | 3 | | | | 3 | | | | |
| WC | 9/30/2021 | Review agency's conditional approval of investigative workplan; | 0.1 | | | | 0.1 | | | | |
| WC | 10/4/2021 | Review edits to MSJ; | 0.4 | | | | 0.2 | 0.2 | | | |
| AP | 10/5/2021 | Rev. County's 9/23 sett. comm. | 0.4 | | | | | | | 0.4 | |
| AP | 10/5/2021 | Confer w/ WC re: disco and sett. Status | 0.3 | | | 0.3 | | | | | |
| AP | 10/5/2021 | Draft settlement response letter to DK | 0.7 | | | | | | | 0.7 | |
| AP | 10/5/2021 | Draft email requesting response to 9/20 counter settlement proposal | 0.2 | | | | | | | 0.2 | |
| WC | 10/5/2021 | Confer w/AP re settlement status and case updates | 0.3 | | | | | | | 0.3 | |
| WC | 10/5/2021 | Research MSJ rules re multiple motions in Butte Superior | 0.2 | | | | 0.1 | 0.1 | | | |
| WC | 10/5/2021 | Finalize and transmit letter re in-person depos | 0.1 | | | 0.1 | | | | | |
| AP | 10/6/2021 | Confer w/ BA + WC re: Strategy for first MSJ motion | 1 | | | | 0.5 | 0.5 | | | |
| AP | 10/6/2021 | Draft and revise settlement letter, copying same to client for review and approval | 0.9 | | | | | | | 0.9 | |
| AP | 10/6/2021 | Review and forward to client DK responses to emails seeking County resp. on sett. demand | 0.9 | | | | | | | 0.9 | |
| BA | 10/6/2021 | TC w/AP re briefing strategy | 1 | | | | 0.5 | 0.5 | | | |
| BA | 10/6/2021 | Split existiing MSJ into 2 separate briefs, research facts regarding vegetation removal and soil excavation | 2.2 | | | | 1.1 | 1.1 | | | |
| WC | 10/6/2021 | Confer w/AP and BA re MSJ briefing schedule and strategy | 1 | | | | 0.5 | 0.5 | | | |
| WC | 10/6/2021 | Review mmp docs to determine planting of cottonwood timing | 0.3 | | | | 0.3 | | | | |
| AP | 10/7/2021 | TC w/ client re: settlement and strategy re: response to 9/23 settlement communication | 1.1 | | | | | | | 1.1 | |
| AP | 10/13/2021 | Review and respond to client note re: USACE's status on Req. to Mod. LOP | 0.4 | | | | | | | 0.4 | |
| AP | 10/13/2021 | Review comms file re: PRA status | 0.2 | | | 0.2 | | | | | |
| BA | 10/13/2021 | Revise cross claim MSJ | 1.8 | | | | 1.8 | | | | |
| BA | 10/14/2021 | Revise cross claim MSJ | 1.6 | | | | 1.6 | | | | |
| AP | 10/18/2021 | Confer w/ WC, BA re: logistics and timing for filing MSJ | 0.3 | | | | 0.3 | | | | |
| BA | 10/23/2021 | Revise cross claim MSJ | 2.2 | | | | 2.2 | | | | |

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BA | 10/24/2021 | Revise argument re actual controversy, update brief, research cases on controversy | 4.2 | | | | 4.2 | | | | |
| AP | 10/26/2021 | Confer w/ WC, BA re: MSJ briefing | 0.5 | | | | 0.5 | | | | |
| AP | 10/26/2021 | Draft note to DK seeking sett. response | 0.2 | | | | | | | 0.2 | |
| BA | 10/26/2021 | Review brief | 0.6 | | | | 0.6 | | | | |
| BA | 10/26/2021 | TC WL,AP re briefing issues | 0.5 | | | | 0.5 | | | | |
| WC | 10/26/2021 | Confer w/AP and BA re MSJ strategy | 0.5 | | | | 0.5 | | | | |
| WC | 10/26/2021 | Review/edit MSJ MPA | 0.9 | | | | 0.9 | | | | |
| AP | 10/28/2021 | Confer with Matt Hagemann and HN | 0.1 | | | 0.1 | | | | | |
| WC | 10/29/2021 | Review arg section re cross complaint controversies and confer w/BA re same | 0.4 | | | | 0.4 | | | | |
| WC | 10/29/2021 | Review/edit legal standard section MSJ | 0.2 | | | | 0.2 | | | | |
| WC | 11/1/2021 | Review/edit MSJ; | 4.2 | | | | 4.2 | | | | |
| AP | 11/3/2021 | Review draft MSJ1 | 0.8 | | | | 0.8 | | | | |
| AP | 11/3/2021 | Confer with WC re draft MSJ1 | 0.3 | | | | 0.3 | | | | |
| WC | 11/3/2021 | Confer w/AP re status of MSJ; | 0.3 | | | | 0.3 | | | | |
| AP | 11/12/2021 | Review MSJ draft and confer w/ BA re: same | 0.7 | | | | 0.7 | | | | |
| AP | 11/15/2021 | Review and respond to GH email clarifying settlement letters | 0.6 | | | | | | | 0.6 | |
| AP | 11/15/2021 | Review MPA and confer w/ WC, BA re: briefing assignments | 0.5 | | | | 0.5 | | | | |
| AP | 11/15/2021 | Review calendar options for calendaring fillings of the MSJ | 0.2 | | | | 0.2 | | | | |
| BA | 11/15/2021 | Revise brief | 2.3 | | | | 2.3 | | | | |
| WC | 11/15/2021 | Confer w/AP and BA re MSJ | 0.5 | | | | 0.5 | | | | |
| WC | 11/15/2021 | Confer w/AP re briefing schedule re MSJ | 0.1 | | | | 0.1 | | | | |
| BA | 11/16/2021 | Finalize Brief | 2.9 | | | | 2.9 | | | | |
| WC | 11/16/2021 | Review/edit MSJ | 2.5 | | | | 2.5 | | | | |
| WC | 11/16/2021 | Review citations and work on SSUF | 1.3 | | | | 1.3 | | | | |
| WC | 11/16/2021 | Confer w/BA re MSJ strategy | 0.6 | | | | 0.6 | | | | |
| WC | 11/17/2021 | Review BA's edits to MSJ | 0.3 | | | | 0.3 | | | | |
| WC | 11/17/2021 | Draft SSUF | 0.8 | | | | 0.8 | | | | |
| WC | 11/17/2021 | Review easement language re wetland/buffer/interpretation; discuss same and MSJ strategy and briefing assignments w/BA | 2.1 | | | | 2.1 | | | | |
| AP | 11/19/2021 | Confer w/ WC re: drafts of Carion Dec, SSUF and Appendix of Evidence | 0.4 | | | | 0.4 | | | | |
| WC | 11/19/2021 | Confer w/AP re structure of appendix of evidence and ssuf citations; | 0.5 | | | | 0.5 | | | | |
| AP | 11/22/2021 | Review Def. Sett. comm and fwd to HN | 0.1 | | | | 0.1 | | | | |
| AP | 11/23/2021 | Draft Packard Dec for Appendix of Evidence | 1.1 | | | | 1.1 | | | | |
| WC | 11/23/2021 | Review and edit MSJ MPA | 2 | | | | 2 | | | | |
| WC | 11/23/2021 | Code cases and statutes, make toa/toc | 0.5 | | | | 0.5 | | | | |
| WC | 11/23/2021 | Draft SSUF | 0.8 | | | | 0.8 | | | | |
| WC | 11/23/2021 | Confer w/BA re MSJ status and final round of edits | 0.3 | | | | 0.3 | | | | |

059

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WC | 11/23/2021 | Legal research re legal descriptions and draft section re same in MSJ | 1 | | | | 1 | | | | |
| AP | 11/24/2021 | Draft and proof Appendix of Evidence | 1.3 | | | | 1.3 | | | | |
| AP | 11/24/2021 | Revise and proof AP Dec. | 0.5 | | | | 0.5 | | | | |
| AP | 11/24/2021 | Tech. check MPA | 0.3 | | | | 0.3 | | | | |
| BA | 11/24/2021 | Research contract and easement map law, finalize brief | 3.7 | | | | 3.7 | | | | |
| WC | 11/24/2021 | Draft/edits ssuf; confer w/AP re same | 2.7 | | | | 2.7 | | | | |
| WC | 11/24/2021 | Review and edit MPA and SSUF | 1.2 | | | | 1.2 | | | | |
| WC | 11/24/2021 | Draft and compile appendix of evidence | 1.8 | | | | 1.8 | | | | |
| AP | 11/24/2021 | Confer w/AP re MPA final edits | 0.2 | | | | 0.2 | | | | |
| WC | 11/24/2021 | Finalize packard decl; nom/mot; ssuf; and appendix | 1.2 | | | | 1.2 | | | | |
| AP | 11/29/2021 | Draft H. Nielsen Dec. and confer w/ her, and WC, re: same | 0.5 | | | | 0.5 | | | | |
| AP | 11/29/2021 | Note to G.E. confirming his e-service email | 0.1 | | | | 0.1 | | | | |
| WC | 11/29/2021 | Review/edit Nielsen decl | 0.7 | | | | 0.7 | | | | |
| WC | 11/29/2021 | Organize and edit appendix of evidence | 1.1 | | | | 1.1 | | | | |
| WC | 11/29/2021 | Finalize docs and prep for filing | 0.9 | | | | 0.9 | | | | |
| WC | 11/30/2021 | Confirm service rules and serve MSJ; | 0.5 | | | | 0.5 | | | | |
| AP | 12/2/2021 | Draft reviewed FOIA request/status update req, to L. Clay (USACE) | 0.3 | | | 0.3 | | | | | |
| BA | 12/2/2021 | Review MSJ | 0.8 | | | | 0.8 | | | | |
| AP | 12/3/2021 | Draft note to USACE re: urgency of FOIA request, changes; draft JSDD | 3.5 | | | 3.5 | | | | | |
| AP | 12/6/2021 | Review Def's settlement letter and fwd w/ note to client | 0.5 | | | | | | | 0.5 | |
| AP | 12/6/2021 | Confer w/ BA re: 2nd MSJ briefing assignments | 0.2 | | | | | 0.2 | | | |
| BA | 12/6/2021 | Review MSJ | 1.6 | | | | | 1.6 | | | |
| WC | 12/6/2021 | Confer w/AP and BA re 2d MSI issues; | 0.5 | | | | | 0.5 | | | |
| BA | 12/7/2021 | Review MSJ | 4 | | | | | 4 | | | |
| AP | 12/8/2021 | Draft response to County's 12/6 sett. Response | 1.8 | | | | | | | 1.8 | |
| WC | 12/8/2021 | Read and review MSI2 | 2 | | | | | 2 | | | |
| WC | 12/8/2021 | Confer w/BA re MSI2 | 0.4 | | | | | 0.4 | | | |
| AP | 12/9/2021 | Complete sett. Response | 0.3 | | | | | | | 0.3 | |
| WC | 12/13/2021 | Review edits to MSI2; | 1 | | | | | 1 | | | |
| WC | 12/14/2021 | Review and edit MSI2; | 3.3 | | | | | 3.3 | | | |
| AP | 12/15/2021 | Confer w/ expert, WC, re: testing parameters and draft update memo to COL Bd | 0.5 | | | | | | | 0.5 | |
| WC | 12/15/2021 | Draft SSUF | 4.6 | | | | | 4.6 | | | |
| WC | 12/15/2021 | Draft MPA | 0.8 | | | | | 0.8 | | | |
| BA | 12/16/2021 | Review and edit MSI on Comp, | 2 | | | | | 2 | | | |
| WC | 12/16/2021 | Draft MPA and SSUF; draft MPA and SSUF | 0.6 | | | | | 0.6 | | | |
| WC | 12/16/2021 | Confer w/BA re MPA/SSUF | 1.1 | | | | | 1.1 | | | |
| AP | 12/17/2021 | Review and edit MSI2 | 1.3 | | | | | 1.3 | | | |
| AP | 12/17/2021 | Contact HN re: declaration forthcoming/need to sign, approve motion | 0.3 | | | | | 0.3 | | | |
| WC | 12/17/2021 | Draft MPA and SSUF | 0.6 | | | | | 0.6 | | | |

060

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WC | 12/17/2021 | Review and Edit MPA/SSUF and Appendix of Ev | 1.9 | | | | | 1.9 | | | |
| WC | 12/17/2021 | Review and edit SSUF | 1.5 | | | | | 1.5 | | | |
| WC | 12/17/2021 | Draft HN and AP decs | 0.6 | | | | | 0.6 | | | |
| WC | 12/20/2021 | Finalize and file MSJ2 | 1.7 | | | | | 1.7 | | | |
| WC | 12/20/2021 | Fix appendix of evidence and refile | 1.3 | | | | | 1.3 | | | |
| AP | 12/22/2021 | Schedule counsel mtg. for 1/4/22 to cover outstanding pre-trial disco needs | 0.3 | | | | | | 0.3 | | |
| AP | 12/29/2021 | Review docs produced by USACE re-FOIA request | 1.1 | | | 1.1 | | | | | |
| AP | 12/29/2021 | Draft notes to USACE renewing PRA request | 0.2 | | | 0.2 | | | | | |
| AP | 12/29/2021 | Email doc set to HN w/ cover note | 0.3 | | | 0.3 | | | | | |
| AP | 12/29/2021 | Email Lisa Clay re: 12/2 status update on County's request | 0.3 | | | 0.3 | | | | | |
| WC | 1/3/2022 | Research pra re invoices in ongoing litigation; | 0.4 | | | 0.4 | | | | | |
| AP | 1/5/2022 | Confer w/ BA, WC re: remaining pre-trial discovery needs | 0.6 | | | 0.6 | | | | | |
| WC | 1/5/2022 | Confer w/AP and BA re disco strategy | 0.6 | | | 0.6 | | | | | |
| WC | 1/5/2022 | Review document request and inventory responsive documents | 0.5 | | | 0.5 | | | | | |
| AP | 1/6/2022 | Review and respond to Drea at USACE re: FOIA request | 0.4 | | | 0.4 | | | | | |
| WC | 1/10/2022 | Review Board of supervisors agenda and draft email to HN re same | 0.1 | | | 0.1 | | | | | |
| WC | 1/10/2022 | Conf w/HN re doc request | 0.5 | | | 0.5 | | | | | |
| WC | 1/10/2022 | Review documents and draft response to RFP | 0.9 | | | 0.9 | | | | | |
| WC | 1/11/2022 | Review documents and prepare response to rfp; | 1.1 | | | 1.1 | | | | | |
| WC | 1/12/2022 | Compile docs for production; review documents for production; | 2.3 | | | 2.3 | | | | | |
| WC | 1/13/2022 | Compile docs for production; | 1.2 | | | 1.2 | | | | | |
| WC | 1/14/2022 | Compile docs for production; | 1.8 | | | 1.8 | | | | | |
| BA | 1/20/2022 | TC Co-counsel re Neal Rd litigation | 0.3 | | | | | | 0.3 | | |
| WC | 1/26/2022 | Review trial prep practice guide and calendar dates; | 0.6 | | | | | | 0.6 | | |
| AP | 1/27/2022 | Review opposition to MSJ #1 | 0.6 | | | | 0.6 | | | | |
| WC | 1/27/2022 | Confer w/AP re trial prep; | 0.3 | | | | | | 0.3 | | |
| AP | 1/31/2022 | Review new FOIA disclosures and draft note to client re: same | 1.4 | | | 1.4 | | | | | |
| BA | 1/31/2022 | TC Co-Counsel re MSJ, discovery needs | 0.7 | | | 0.7 | | | | | |
| WC | 1/31/2022 | Prep for call w/AP and BA; call w/AP and BA re reply brief | 1.1 | | | 1.1 | | | | | |
| WC | 1/31/2022 | Review briefing and draft reply outline | 3.2 | | | | 3.2 | | | | |
| WC | 1/31/2022 | Review demand for expert ID | 0.4 | | | 0.4 | | | | | |
| AP | 2/1/2022 | TC w/ HN re: strategy for reply brief | 0.4 | | | | 0.4 | | | | |
| AP | 2/1/2022 | Confer w/ WC re: reply outline | 0.5 | | | | 0.5 | | | | |
| AP | 2/1/2022 | Draft settlement note to DK re: Army Corp Request/sharing of proposal | 0.4 | | | | | | | 0.4 | |
| WC | 2/1/2022 | Confer w/client and AP re status of MSJ and case | 0.9 | | | | 0.4 | 0.5 | | | |
| WC | 2/1/2022 | Review briefing and draft reply outline | 0.9 | | | | 0.9 | | | | |
| AP | 2/2/2022 | Review and edit reply outline for MSJ #1 | 0.4 | | | | 0.4 | | | | |

061

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 2/3/2022 | Draft note to USACE re: County's pleadings | 0.4 | | | 0.4 | | | | | |
| BA | 2/3/2022 | Review Opp to MSJ, review outline for reply | 1.1 | | | | 1.1 | | | | |
| WC | 2/3/2022 | Incorporate edits to outline to reply | 0.6 | | | | 0.6 | | | | |
| WC | 2/3/2022 | Draft reply to msj | 1.6 | | | | 1.6 | | | | |
| AP | 2/4/2022 | Review Mays, Cissel decs | 0.3 | | | | 0.3 | | | | |
| AP | 2/4/2022 | Confer w/ BA, WC re: briefing strategy and assignments | 0.8 | | | | 0.8 | | | | |
| BA | 2/4/2022 | Discuss Opp to MSJ w co counsel | 0.8 | | | | 0.8 | | | | |
| WC | 2/4/2022 | Confer w/AP and BA re reply brief | 0.8 | | | | 0.8 | | | | |
| WC | 2/4/2022 | Draft reply to msj | 1.8 | | | | 1.8 | | | | |
| BA | 2/7/2022 | Review objections, case law re failure to provide evidence in opp to MSJ | 1.2 | | | | 1.2 | | | | |
| WC | 2/7/2022 | Draft reply to msj; | 3 | | | | 3 | | | | |
| AP | 2/8/2022 | Draft objections to evidence (Cissell and Mays Decs) | 4.1 | | | | 4.1 | | | | |
| BA | 2/8/2022 | Review draft MPA | 0.8 | | | | 0.8 | | | | |
| WC | 2/8/2022 | Draft reply to msj | 4 | | | | 4 | | | | |
| WC | 2/8/2022 | Research declaratory judgment issue | 0.4 | | | | 0.4 | | | | |
| AP | 2/9/2022 | Review and edit reply brief | 0.9 | | | | 0.9 | | | | |
| AP | 2/9/2022 | Draft responses to objections | 1.2 | | | | 1.2 | | | | |
| AP | 2/9/2022 | TC w/ WC, BA re: evidence and status of briefs | 0.6 | | | | 0.6 | | | | |
| BA | 2/9/2022 | Edit MPA | 5.8 | | | | 5.8 | | | | |
| WC | 2/9/2022 | Confer w/AP re reply edits/review | 0.1 | | | | 0.1 | | | | |
| WC | 2/9/2022 | Confer w/AP and BA re reply briefing and distribution of tasks | 0.6 | | | | 0.6 | | | | |
| WC | 2/9/2022 | Review and edit objections to evidence | 0.4 | | | | 0.4 | | | | |
| AP | 2/10/2022 | Draft response to Sep statement | 2.2 | | | | 2.2 | | | | |
| AP | 2/10/2022 | Draft objections to evidence | 1.8 | | | | 1.8 | | | | |
| AP | 2/10/2022 | Confer w/ WC, BA re: briefs | 0.5 | | | | 0.5 | | | | |
| BA | 2/10/2022 | Edit MPA, edit SOF, edit objections | 7 | | | | 7 | | | | |
| WC | 2/10/2022 | Draft objections to evidence | 0.7 | | | | 0.7 | | | | |
| WC | 2/10/2022 | Draft responses to county's ssuf | 1.2 | | | | 1.2 | | | | |
| WC | 2/10/2022 | Review edits and edit Reply brief | 2.4 | | | | 2.4 | | | | |
| WC | 2/10/2022 | Review/edit resps to objections; | 0.3 | | | | 0.3 | | | | |
| AP | 2/11/2022 | Draft and finalize Objections to Evidence, P.O. re: same | 3.4 | | | | 3.4 | | | | |
| AP | 2/11/2022 | draft and finalize Responses to County objections | 2.4 | | | | 2.4 | | | | |
| BA | 2/11/2022 | Edit MPA, edit SOF, edit objections | 5.1 | | | | 5.1 | | | | |
| WC | 2/11/2022 | Review MPA re reply; edit same | 0.7 | | | | 0.7 | | | | |
| WC | 2/11/2022 | Confer w/AP and BA re reply | 0.4 | | | | 0.4 | | | | |
| WC | 2/11/2022 | Review/edit MPA and objs to evid | 0.9 | | | | 0.9 | | | | |
| WC | 2/11/2022 | Review/edit objections to evidence | 1.2 | | | | 1.2 | | | | |
| WC | 2/11/2022 | Compile final docs for filing | 0.4 | | | | 0.4 | | | | |
| WC | 2/11/2022 | Review and edit response to SSUF | 0.8 | | | | 0.8 | | | | |
| WC | 2/11/2022 | File reply and serve county | 0.2 | | | | 0.2 | | | | |
| AP | 2/14/2022 | Contact Herb Votaw re: surveying questions | 0.3 | | | 0.3 | | | | | |
| AP | 2/15/2022 | TC w/ H. Votaw re: surveying | 0.4 | | | 0.4 | | | | | |
| WC | 2/15/2022 | Confer w/BA and AP re hearing strategy for combined hearing | 0.6 | 0.6 | | | | | | | |

062

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WC | 2/15/2022 | Draft email to client re status update; conference call w/HV and AP re surveying questions | 0.5 | 0.5 | | | | | | | |
| AP | 2/18/2022 | Review and respond to USACE comms re: FOIA request | 0.4 | | | 0.4 | | | | | |
| AP | 2/22/2022 | Review County opposition briefs | 0.3 | | | | | 0.3 | | | |
| AP | 2/23/2022 | Review County Opp to MSJ #2 | 0.3 | | | | | 0.3 | | | |
| WC | 2/23/2022 | Review opposition to MSJ2 | 1.5 | | | | | 1.5 | | | |
| WC | 2/23/2022 | Legal research re affirmative defenses and conditions precedent/jurisdiction/waiver | 0.9 | | | | | 0.9 | | | |
| AP | 2/24/2022 | Prep and attend call with WC and BA re reply brief strategy | 0.6 | | | | | 0.6 | | | |
| BA | 2/24/2022 | Review opp MSI brief, discuss with co counsel | 2.7 | | | | | 2.7 | | | |
| WC | 2/24/2022 | Confer w/AP and BA re reply | 1.3 | | | | | 1.3 | | | |
| WC | 2/25/2022 | Draft outline to reply | 0.5 | | | | | 0.5 | | | |
| WC | 2/25/2022 | Research contract law re burden of proof and affirmative defense | 2.9 | | | | | 2.9 | | | |
| WC | 2/25/2022 | Confer w/AP re expert disclosures | 0.3 | | | | | 0.3 | | | |
| AP | 2/28/2022 | Review and comment on outline for reply brief | 0.5 | | | | | 0.5 | | | |
| AP | 2/28/2022 | Draft responses to objections to evidence | 0.8 | | | | | 0.8 | | | |
| BA | 2/28/2022 | Review case law re affirmative defenses, revise outline of reply | 3.2 | | | | | 3.2 | | | |
| WC | 2/28/2022 | Draft outline to reply; research contract law re burden of proof and affirmative defense | 1.1 | | | | | 1.1 | | | |
| WC | 2/28/2022 | Draft outline to reply | 1.7 | | | | | 1.7 | | | |
| WC | 2/28/2022 | Draft outline and letter to team re same; confer w/BA re outline | 0.9 | | | | | 0.9 | | | |
| WC | 2/28/2022 | Research conditions precedent | 1.4 | | | | | 1.4 | | | |
| WC | 2/28/2022 | Edit reply outline | 0.3 | | | | | 0.3 | | | |
| AP | 3/1/2022 | Review opposition decs of Mays, Wood and Greenwood | 1.5 | | | | | 1.5 | | | |
| AP | 3/1/2022 | Draft objections to evidence | 2.4 | | | | | 2.4 | | | |
| BA | 3/1/2022 | Review case law re affirmative defenses, revise outline of reply | 1.8 | | | | | 1.8 | | | |
| WC | 3/1/2022 | Confer w/AP re reply | 0.3 | | | | | 0.3 | | | |
| WC | 3/1/2022 | Draft reply brief | 4.4 | | | | | 4.4 | | | |
| WC | 3/1/2022 | Convert opp decs to useable formats | 0.2 | | | | | 0.2 | | | |
| AP | 3/2/2022 | Draft objections to declarations | 2.3 | | | | | 2.3 | | | |
| BA | 3/2/2022 | Edit brief section on affirmative defenses | 2.6 | | | | | 2.6 | | | |
| WC | 3/2/2022 | Draft reply brief; | 2.2 | | | | | 2.2 | | | |
| AP | 3/2/2022 | Conference call w/ BA, WC re: briefing strategy | 0.7 | | | | | 0.7 | | | |
| AP | 3/3/2022 | Draft P.O. re: Plaintiff's objections | 0.4 | | | | | 0.4 | | | |
| AP | 3/3/2022 | Draft objections | 0.8 | | | | | 0.8 | | | |
| BA | 3/3/2022 | TC re briefing | 0.7 | | | | | 0.7 | | | |
| BA | 3/3/2022 | Edit brief | 3 | | | | | 3 | | | |
| WC | 3/3/2022 | Edit and review reply | 1.4 | | | | | 1.4 | | | |
| WC | 3/3/2022 | Confer w/AP and BA re reply | 0.7 | | | | | 0.7 | | | |

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WC | 3/3/2022 | Edit and review reply; review/edit objections to evidence | 2.8 | | | | | 2.8 | | | |
| AP | 3/4/2022 | Proof and finalize responses to evid. objs, COL Objections, COL Resp. to SSUFacts | 3.7 | | | | | 3.7 | | | |
| BA | 3/4/2022 | Finalize brief | 4.2 | | | | | 4.2 | | | |
| WC | 3/4/2022 | Confer w/AP re separate statement | 0.2 | | | | | 0.2 | | | |
| WC | 3/4/2022 | Edit/review objs to evidence; confer w/AP and BA re status of reply brief | 2.4 | | | | | 2.4 | | | |
| WC | 3/4/2022 | Draft notice of errata and compile exh | 0.8 | | | | | 0.8 | | | |
| WC | 3/4/2022 | Review/edit reply | 1 | | | | | 1 | | | |
| WC | 3/4/2022 | Review response to county's ssuf; finalize MPA | 1 | | | | | 1 | | | |
| AP | 3/7/2022 | Confer w/BA, WC re: expert depo | 0.3 | | | 0.3 | | | | | |
| AP | 3/7/2022 | Draft note confirming dates to G. Einhorn | 0.2 | | | 0.2 | | | | | |
| BA | 3/7/2022 | TC re expert depos | 0.3 | | | 0.3 | | | | | |
| WC | 3/7/2022 | Confer w/AP and BA re expert depos | 0.3 | | | 0.3 | | | | | |
| WC | 3/7/2022 | Prepare for oral arg | 0.6 | | | | 0.3 | 0.3 | | | |
| AP | 3/8/2022 | Review tentative order on MSI and confer w/ BA, WC re: same | 1.1 | | | | 0.6 | 0.5 | | | |
| BA | 3/8/2022 | Review tentative on MSIs, tc re plan for hearing | 1.5 | | | | 0.7 | 0.8 | | | |
| WC | 3/8/2022 | Prepare for oral arg | 4 | | | | 2 | 2 | | | |
| WC | 3/8/2022 | Review tentative; confer w/AP and BA re same | 1.1 | | | | 0.5 | 0.6 | | | |
| BA | 3/8/2022 | Review ssuf and appendix | 0.4 | | | | 0.2 | 0.2 | | | |
| BA | 3/9/2022 | Travel to Chico for MSI hearing | 3.4 | | | | 1.7 | 1.7 | | | |
| BA | 3/9/2022 | Attend MSI hearing | 0.8 | | | | 0.4 | 0.4 | | | |
| BA | 3/9/2022 | Review final ruling | 0.4 | | | | 0.2 | 0.2 | | | |
| WC | 3/9/2022 | RT travel to Chico for MSI oral argument (50%) | 2.8 | | | | 1.4 | 1.4 | | | |
| AP | 3/11/2022 | Prep and attend conf. call re: outcome of MSI order, next steps (depos and trial prep) | 1.1 | | | | 0.5 | 0.6 | | | |
| BA | 3/11/2022 | TC co counsel re trial tasks | 0.9 | | | | | | 0.9 | | |
| WC | 3/13/2022 | Confer w/AP re settlement conference; | 0.2 | | | | | | | 0.2 | |
| AP | 3/14/2022 | Prep and attend witness interview of Steve Jackson w/ BA, WC | 1.8 | | | 1.8 | | | | | |
| BA | 3/14/2022 | Interview steve Jackson | 1.8 | | | 1.8 | | | | | |
| BA | 3/14/2022 | Prep for depos and interview | 1.8 | | | 1.8 | | | | | |
| WC | 3/14/2022 | Confer w/AP and BA in prep for call w/SJ; interview w/SJ; | 1.8 | | | 1.8 | | | | | |
| AP | 3/15/2022 | Arrange court reporter and draft note to GE re: same | 0.4 | | | 0.4 | | | | | |
| WC | 3/15/2022 | Investigate budget/revenue data; | 1 | | | 1 | | | | | |
| AP | 3/16/2022 | Proof and revise NOD of experts; copy Nygard on final NOD | 0.5 | | | 0.5 | | | | | |
| AP | 3/17/2022 | Review USACE doc production and draft renewed FOIA request | 0.8 | | | 0.8 | | | | | |
| AP | 3/17/2022 | Review order on MSI and confer with WC re trial prep | 0.7 | | | | 0.7 | | | | |
| WC | 3/17/2022 | Confer w/AP re FOIA request | 0.2 | | | 0.2 | | | | | |
| WC | 3/17/2022 | Prepare trial brief; confer w/AP re same | 0.7 | | | | | | 0.7 | | |

064

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 3/18/2022 | Prep and attend conf. call w/ HV (surveyor) re: Mays depo | 1 | | | 1 | | | | | |
| AP | 3/18/2022 | Draft Trial Readiness Memo | 0.9 | | | | | | 0.9 | | |
| BA | 3/18/2022 | Meet w/ Herb Votaw | 1 | | | 1 | | | | | |
| BA | 3/18/2022 | Meet w co-counsel re trial prep tasks | 0.5 | | | | | | 0.5 | | |
| WC | 3/18/2022 | Confer w/client in prep for Mays depo | 1 | | | 1 | | | | | |
| WC | 3/18/2022 | Confer w/GE and AP re doc production | 0.5 | | | 0.5 | | | | | |
| WC | 3/18/2022 | Confer w/BA re Mays depo | 0.5 | | | 0.5 | | | | | |
| BA | 3/20/2022 | Prepare depo outline for Mays | 1.2 | | | 1.2 | | | | | |
| AP | 3/21/2022 | Trial prep (motions in limine, Pre-trial Brief, Cond. statement) | 0.8 | | | | | | 0.8 | | |
| BA | 3/21/2022 | Discuss trial prep w/ co counsel | 0.3 | | | | | | 0.3 | | |
| WC | 3/21/2022 | Draft outline to trial brief | 1.9 | | | | | | 1.9 | | |
| WC | 3/21/2022 | Draft outline to trial brief; review Greenwood decl; review Mays decl and docs | 1 | | | | | | 1 | | |
| AP | 3/22/2022 | Review settlement letter from G. Einhorn | 0.6 | | | | | | | 0.6 | |
| AP | 3/22/2022 | Draft response to settlement offer with input from HN, COL Bd, WC and BA | 2.1 | | | | | | | 2.1 | |
| BA | 3/22/2022 | Prepare depo outline for Mays, review briefing and des re | 4.6 | | | 4.6 | | | | | |
| BA | 3/22/2022 | Preserve size, review surveyor professional standards | 1.2 | | | | | | 1.2 | | |
| WC | 3/22/2022 | Review settlement demand and confer w/AP and BA re same | 0.7 | | | | | | | 0.7 | |
| WC | 3/22/2022 | Confer w/client re settlement proposal | 0.6 | | | | | | | 0.6 | |
| WC | 3/23/2022 | Confer wAP and BA re depo prep and settlement strategy | 0.4 | | | | | | | 0.4 | |
| WC | 3/23/2022 | Draft trial brief | 0.5 | | | | | | 0.5 | | |
| AP | 3/23/2022 | TC w/ HN re: settlement letter | 0.8 | | | | | | | 0.8 | |
| AP | 3/23/2022 | Revise settlement letter for further board review and discussion | 1.3 | | | | | | 1.3 | | |
| AP | 3/23/2022 | Attend Mays deposition | 2.9 | | | 2.9 | | | | | |
| BA | 3/23/2022 | Review outline, login to deposition | 1 | | | 1 | | | | | |
| BA | 3/23/2022 | Take Deposition of Mays | 5.5 | | | 5.5 | | | | | |
| BA | 3/23/2022 | Review settlement offer from county and discuss response with co counsel | 0.6 | | | | | | | 0.6 | |
| WC | 3/23/2022 | Attend Mays deposition; | 4 | | | 4 | | | | | |
| AP | 3/24/2022 | Draft Pretrial Conf Statement | 2.6 | | | | | | 2.6 | | |
| AP | 3/24/2022 | Confer w/ BA, WC re: trial briefing | 0.4 | | | | | | 0.4 | | |
| AP | 3/24/2022 | Prep and attend meet and confer re: exhibits w/ G.E | 0.6 | | | | | | 0.6 | | |
| BA | 3/24/2022 | Discuss trial prep tasks w/ co counsel | 0.4 | | | | | | 0.4 | | |
| WC | 3/24/2022 | Confer w/AP re trial prep | 0.2 | | | | | | 0.2 | | |
| WC | 3/24/2022 | Draft outline to trial brief | 1.1 | | | | | | 1.1 | | |
| WC | 3/24/2022 | Confer w/AP and BA re trial prep | 0.4 | | | | | | 0.4 | | |
| WC | 3/24/2022 | Confer w/GE re doc production | 0.6 | | | 0.6 | | | | | |
| WC | 3/24/2022 | Review documents and draft email to team re witness list | 0.2 | | | | | | 0.2 | | |

065

| A.Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 3/25/2022 | Draft 6 subpoenas | 1.3 | | | | | | 1.3 | | |
| AP | 3/25/2022 | Serve Nielsen and Jackson sunpoenas | 0.5 | | | | | | 0.5 | | |
| AP | 3/25/2022 | TCs to State and Regional Water Bds. re: service of subpoenas (Drab and Knight) | 0.7 | | | | | | 0.7 | | |
| AP | 3/25/2022 | Revise appendices to PTCS | 1.2 | | | | | | 1.2 | | |
| BA | 3/25/2022 | Discuss trial prep tasks w/ co counsel | 0.4 | | | | | | 0.4 | | |
| WC | 3/25/2022 | Confer w/AP re witness subpoenas and strategy | 0.2 | | | | | | 0.2 | | |
| WC | 3/25/2022 | Prepare evidence chart | 1.9 | | | | | | 1.9 | | |
| WC | 3/25/2022 | Draft evidence chart/review docs | 0.4 | | | | | | 0.4 | | |
| WC | 3/25/2022 | Review docs | 0.6 | | | | | | 0.6 | | |
| WC | 3/25/2022 | Draft trial brief memo | 1.2 | | | | | | 1.2 | | |
| WC | 3/25/2022 | Confer w/AP re TRCS | 0.3 | | | | | | 0.3 | | |
| BA | 3/27/2022 | Prep for Greenwoode Depo, draft outline | 1.7 | | | 1.7 | | | | | |
| BA | 3/28/2022 | Review settlement offer from county and discuss and draft response with co counsel | 1.6 | | | | | | | 1.6 | |
| BA | 3/28/2022 | Prep for Greenwoode Depo, prepare exhibits, draft outline | 4 | | | 4 | | | | | |
| WC | 3/28/2022 | Confer w/BA re settlement response and strategy | 0.6 | | | | | | | 0.6 | |
| WC | 3/28/2022 | Draft response letter to GE re settlement | 1.3 | | | | | | | 1.3 | |
| WC | 3/28/2022 | Review and edit draft settlement agreement | 0.2 | | | | | | | 0.2 | |
| WC | 3/28/2022 | Call w/COL re settlement | 0.9 | | | | | | | 0.9 | |
| BA | 3/29/2022 | Finalize TRCS | 2.1 | | | | | | 2.1 | | |
| BA | 3/29/2022 | Discuss Settlement offer w/ client | 0.4 | | | | | | | 0.4 | |
| WC | 3/29/2022 | Prepare trial readiness conference statement | 1.4 | | | | | | 1.4 | | |
| WC | 3/29/2022 | Confer w/Laura Drabandt re water board witnesses | 0.3 | | | | | | 0.3 | | |
| WC | 3/29/2022 | Finalize and serve subpoenas for water board staff | 0.3 | | | | | | 0.3 | | |
| WC | 3/29/2022 | Confer w/HN and BA | 0.4 | | | | | | | 0.4 | |
| WC | 3/29/2022 | Confer w/AP re settlement response | 1 | | | | | | | 1 | |
| WC | 3/29/2022 | Edit settlement response | 0.7 | | | | | | | 0.7 | |
| WC | 3/29/2022 | Prepare exhibits for TRCS | 1.8 | | | | | | 1.8 | | |
| WC | 3/29/2022 | Draft and finalize trial readiness conference statement | 2.5 | | | | | | 2.5 | | |
| WC | 3/29/2022 | File trial readiness conference statement | 0.1 | | | | | | 0.1 | | |
| BA | 3/30/2022 | Review and send settlement letter | 0.4 | | | | | | | 0.4 | |
| BA | 3/30/2022 | Review documents provided by Greenwood | 4.8 | | | 4.8 | | | | | |
| BA | 3/31/2022 | Prep documents and depo outline | 6.5 | | | 6.5 | | | | | |
| BA | 4/1/2022 | Depo prep | 2.3 | | | 2.3 | | | | | |
| BA | 4/1/2022 | Review settlement offer, continue deposition draft response | 0.8 | | | | | | | 0.8 | |
| WC | 4/1/2022 | Review settlement and transmit to client | 0.1 | | | | | | | 0.1 | |
| WC | 4/1/2022 | Meet and confer w/opp counsel re settlement | 1.1 | | | | | | | 1.1 | |
| WC | 4/1/2022 | Review settlement and draft response | 2 | | | | | | | 2 | |
| WC | 4/1/2022 | Confer w/HN re settlement, send same to GE | 0.1 | | | | | | | 0.1 | |
| BA | 4/3/2022 | Draft trial brief | 7 | | | | | | 7 | | |
| AP | 4/4/2022 | Review and edit trial brief | 0.9 | | | | | | 0.9 | | |
| AP | 4/4/2022 | Review and respond to G. Einhorn settlement comms and issues re: notice to court | 0.9 | | | | | | 0.9 | | |

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 4/4/2022 | Reviews and edit settlement | 1.2 | | | | | | 1.2 | | |
| AP | 4/4/2022 | Confer w/ client re: settlement | 0.3 | | | | | | 0.3 | | |
| BA | 4/4/2022 | Finalize trial brief | 0.3 | | | | | | | 0.3 | |
| BA | 4/4/2022 | Draft response to settlement proposal, review SWPPP | 0.9 | | | | | | | 0.9 | |
| WC | 4/4/2022 | Review/edit Trial memo | 1.8 | | | | | | 1.8 | | |
| WC | 4/4/2022 | Confer w/AP and BA re settlement strategy | 0.9 | | | | | | | 0.9 | |
| WC | 4/4/2022 | Confer w/AP re settlement issues | 0.2 | | | | | | | 0.2 | |
| WC | 4/4/2022 | Review and edit settlement agreement | 0.7 | | | | | | | 0.7 | |
| AP | 4/5/2022 | Review final sett. draft before TRC | 0.4 | | | | | | | 0.4 | |
| AP | 4/5/2022 | Revise GE letter to court re: req. to continue TRC | 0.5 | | | | | | 0.5 | | |
| AP | 4/5/2022 | Revise opp. to MILs | 0.5 | | | | | | 0.5 | | |
| BA | 4/5/2022 | Draft Response to MILs | 1.8 | | | | | | 1.8 | | |
| BA | 4/5/2022 | TC AP, WC re trial and settlement strategy | 0.9 | | | | | | | 0.9 | |
| WC | 4/5/2022 | Schedule court call for TRC | 0.5 | | | | | | 0.5 | | |
| WC | 4/5/2022 | Confer w/BA re opp to MILs | 0.3 | | | | | | 0.3 | | |
| WC | 4/5/2022 | Finalize and file response to MIL | 0.2 | | | | | | 0.2 | | |
| AP | 4/6/2022 | Prep and attend trial readiness conf. | 2.1 | | | | | | 2.1 | | |
| AP | 4/6/2022 | Confer w/ client re: trial status | 0.4 | | | | | | 0.4 | | |
| BA | 4/6/2022 | TC AP, WL re trial readiness conference | 0.5 | | | | | | 0.5 | | |
| BA | 4/6/2022 | Attend trial readiness conference | 0.2 | | | | | | 0.2 | | |
| WC | 4/6/2022 | Confer w/AP and BA re TRC and settlement strategy; | 0.5 | | | | | | 0.5 | | |
| AP | 4/7/2022 | Review and discuss w/ WC the USACE notice of non-compliance | 0.3 | | | 0.3 | | | | | |
| AP | 4/7/2022 | Review County settlement | 0.3 | | | | | | | 0.3 | |
| WC | 4/7/2022 | Send army corps nrc to HN | 0.1 | | | 0.1 | | | | | |
| WC | 4/7/2022 | Confer w/AP re implications of ACOE letter | 0.2 | | | | | | | 0.2 | |
| WC | 4/7/2022 | Review settlement response | 0.3 | | | | | | | 0.3 | |
| AP | 4/8/2022 | Note to client re: Army Corps NOV | 0.3 | | | | | | | 0.3 | |
| AP | 4/8/2022 | Draft SCS and confer w/ BA re: same | 0.5 | | | | | | | 0.5 | |
| BA | 4/8/2022 | Draft settlement conference statement, review settlement proposals | 1.7 | | | | | | | 1.7 | |
| AP | 4/10/2022 | Review and edit SCS | 0.5 | | | | | | | 0.5 | |
| AP | 4/11/2022 | Review and edit sett. agreement + SCS | 0.9 | | | | | | | 0.9 | |
| AP | 4/11/2022 | Confer w/ WC, BA and HN re: SCS | 0.8 | | | | | | | 0.8 | |
| BA | 4/11/2022 | TC WC AP re Settlement Conference Statement | 0.5 | | | | | | | 0.5 | |
| WC | 4/11/2022 | Confer w/AP and BA re settlement conference statement | 0.5 | | | | | | | 0.5 | |
| WC | 4/11/2022 | Review/edit settlement conference statement | 1.2 | | | | | | | 1.2 | |
| WC | 4/11/2022 | Confer w/AP and BA re settlement draft | 0.4 | | | | | | | 0.4 | |
| WC | 4/11/2022 | Confer w/AP re settlement issue | 0.6 | | | | | | | 0.6 | |
| WC | 4/11/2022 | Finalize and file and serve SCS | 0.3 | | | | | | | 0.3 | |
| AP | 4/13/2022 | Review and respond to G.E. re: settlement; | 0.3 | | | | | | | 0.3 | |
| WC | 4/13/2022 | Confer w/AP re settlement conference | 0.2 | | | | | | | 0.2 | |
| AP | 4/14/2022 | Review GE comms date 4/1, 4/4, 4/7 and 4/13 and draft response to same | 2.4 | | | | | | | 2.4 | |

067

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 4/14/2022 | Tally lodester for sett. conf. and draft cover note to Court w/ SCS | 0.9 | | | | | | | 0.9 | |
| WC | 4/14/2022 | Review County's scs and draft settlement agreement | 0.4 | | | | | | | 0.4 | |
| WC | 4/14/2022 | Confer w/AP re response to settlement issues | 0.4 | | | | | | | 0.4 | |
| AP | 4/15/2022 | Review + fwd note from Judge Candela to client | 0.3 | | | | | | | 0.3 | |
| AP | 4/15/2022 | Review + fwd note from GE to client | 0.2 | | | | | | | 0.2 | |
| AP | 4/15/2022 | Prepare for mediation | 0.6 | | | | | | | 0.6 | |
| BA | 4/15/2022 | Discuss settlement posture with co counsel | 0.3 | | | | | | | 0.3 | |
| BA | 4/17/2022 | Review settlement conference statments from parties | 0.6 | | | | | | | 0.6 | |
| AP | 4/18/2022 | Prep and attend sett. conf. w/ Judge Candela | 3.9 | | | | | | | 3.9 | |
| BA | 4/18/2022 | Prep for and attend settlement conference | 3 | | | | | | | 3 | |
| BA | 4/18/2022 | Meet with client before settlement conference | 0.3 | | | | | | | 0.3 | |
| BA | 4/18/2022 | Discuss next steps with co-counsel | 0.4 | | | | | | | 0.4 | |
| WC | 4/18/2022 | Settlement conference | 3.2 | | | | | | | 3.2 | |
| WC | 4/18/2022 | Review photographs; confer w/AP and BA re settlement strategy; create graphic showing trees | 1.1 | | | | | | | 1.1 | |
| WC | 4/19/2022 | Review and edit County's 4/18 draft sett. and confer w/ WC and BA re: same | 1.1 | | | | | | | 1.1 | |
| AP | 4/19/2022 | Revise response to settlement agreement, review google earth | 1.2 | | | | | | | 1.2 | |
| BA | 4/19/2022 | Review settlement draft; confer w/AP re same | 1.1 | | | | | | | 1.1 | |
| WC | 4/19/2022 | Review photographs and prepare settlement response | 0.6 | | | | | | | 0.6 | |
| WC | 4/19/2022 | Put together exhibits and draft response to settlement letter | 2.3 | | | | | | | 2.3 | |
| AP | 4/20/2022 | Revise and proof final settlement draft | 0.3 | | | | | | | 0.3 | |
| AP | 4/20/2022 | Propose m&c dates for F&C discussion | 0.2 | | | | | | | 0.2 | |
| BA | 4/21/2022 | Discuss mediation w AP | 0.2 | | | | | | | 0.2 | |
| BA | 4/21/2022 | Review counter proposal from GE | 0.4 | | | | | | | 0.4 | |
| BA | 4/22/2022 | Discuss mediation w/ WC | 0.3 | | | | | | | 0.3 | |
| BA | 4/22/2022 | Discuss mediation w/ client | 0.2 | | | | | | | 0.2 | |
| BA | 4/22/2022 | Attend mediation, draft settlement agreement | 1.5 | | | | | | | 1.5 | |
| WC | 4/22/2022 | Review settlement agreement | 0.2 | | | | | | | 0.2 | |
| WC | 4/22/2022 | Confer w/BA re settlement strategy | 0.3 | | | | | | | 0.3 | |
| WC | 4/22/2022 | Draft response to GE and court re settlement | 0.5 | | | | | | | 0.5 | |
| WC | 4/22/2022 | Settlement conference w/ Judge Candela | 2.5 | | | | | | | 2.5 | |
| WC | 4/22/2022 | Confer w/BA and review final draft of settlement | 0.4 | | | | | | | 0.4 | |
| AP | 4/25/2022 | Confer w/ WC, BA re: state court sett. | 0.6 | | | | | | | 0.6 | |
| BA | 4/25/2022 | Discuss procedure for settling remaining issues w/co-counsel | 0.6 | | | | | | | 0.6 | |
| WC | 4/25/2022 | Confer w/AP and BA re settlement strategy; | 0.6 | | | | | | | 0.6 | |
| AP | 4/26/2022 | Prep and attend conference call w/ client re: settlement | 0.9 | | | | | | | 0.9 | |
| AP | 4/27/2022 | Review and discuss WC sett. letter w/ WC | 0.5 | | | | | | | 0.5 | |
| WC | 4/27/2022 | Review agreement for completion | 0.1 | | | | | | | 0.1 | |
| WC | 4/27/2022 | Draft correspondence to Einhorn re fees and trees | 0.5 | | | | | | | 0.5 | |
| WC | 4/27/2022 | Confer w/AP re fees and costs settlement offer | 0.5 | | | | | | | 0.5 | |

068

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WC | 4/27/2022 | Draft m&c letter re fees and trees | 1 | | | | | | | 1 | |
| WC | 4/28/2022 | Confer w/AP re settlement offer; | 0.5 | | | | | | | 0.5 | |
| AP | 5/2/2022 | Assemble fees and costs for fee demand | 0.9 | | | | | | | 0.9 | |
| AP | 5/2/2022 | Review and edit ltr to GE re trees issue | 0.2 | | | | | | | 0.2 | |
| AP | 5/2/2022 | Confer with WC, BA re fee motion and demand strategy | 0.4 | | | | | | | 0.4 | |
| AP | 5/2/2022 | Draft client note re records needed for fee motion | 0.4 | | | | | | | 0.4 | |
| WC | 5/2/2022 | Confer w/AP re settlement strategy re fees | 0.4 | | | | | | | 0.4 | |
| WC | 5/2/2022 | Draft response re trees to einhorn | 0.6 | | | | | | | 0.6 | |
| WC | 5/2/2022 | Draft letter re fees | 0.2 | | | | | | | 0.2 | |
| WC | 5/2/2022 | Confer w/GE re trees issue | 0.2 | | | | | | | 0.2 | |
| WC | 5/2/2022 | Confer w/AP re settlement issues | 0.6 | | | | | | | 0.6 | |
| WC | 5/2/2022 | Prepare fee demand | 0.6 | | | | | | | 0.6 | |
| WC | 5/2/2022 | Draft response/amended agreement | 0.5 | | | | | | | 0.5 | |
| WC | 5/2/2022 | Research attny fee case law | 1.2 | | | | | | | 1.2 | |
| WC | 5/2/2022 | Confer w/GE re trees issue | 0.3 | | | | | | | 0.3 | |
| WC | 5/2/2022 | Confer w/AP re cmts w/opp counsel | 0.1 | | | | | | | 0.1 | |
| WC | 5/2/2022 | Draft response re fees | 0.2 | | | | | | | 0.2 | |
| WC | 5/2/2022 | Confer w/AP and BA re fees letter | 0.4 | | | | | | | 0.4 | |
| WC | 5/2/2022 | Confer w/AP re settlement offer | 0.2 | | | | | | | 0.2 | |
| WC | 5/2/2022 | Draft letter re fees | 0.7 | | | | | | | 0.7 | |
| BA | 5/2/2022 | TC AP WC re costs and fees settlement | 0.4 | | | | | | | 0.4 | |
| AP | 5/3/2022 | TC with M. Habib re fee demand | 0.4 | | | | | | | | 0.4 |
| AP | 5/3/2022 | Review and edit timesheets and costs, demand letter | 0.4 | | | | | | | 0.4 | |
| AP | 5/3/2022 | Review HN time records and receipts for demand | 0.8 | | | | | | | 0.8 | |
| WC | 5/3/2022 | Prepare fee demand | 0.8 | | | | | | | 0.8 | |
| WC | 5/3/2022 | Finalize fee demand and send to client for review | 0.6 | | | | | | | 0.6 | |
| WC | 5/3/2022 | Draft emails to Einhorn and HN re trees | 0.2 | | | | | | | 0.2 | |
| AP | 5/6/2022 | Prep and attend strategy call re fee motion, sett. conference re same, and 5/10 letter to Einhorn | 0.7 | | | | | | | 0.7 | |
| WC | 5/10/2022 | Draft response to GE re M&C on fees/costs | 1.1 | | | | | | | 1.1 | |
| WC | 5/10/2022 | Review edits and transmit letter re fees to GE | 0.2 | | | | | | | 0.2 | |
| AP | 5/11/2022 | Review ltr from DK re workplan | 0.2 | | | | | | | 0.2 | |
| AP | 5/11/2022 | Draft client note re DK ltr | 0.3 | | | | | | | 0.3 | |
| AP | 5/11/2022 | Review draft fee settlement ltr to Einhorn | 0.2 | | | | | | | 0.2 | |
| AP | 5/11/2022 | Prepare exhibit to fee motion | 2.2 | | | | | | | | 2.2 |
| AP | 5/11/2022 | Draft note to Judge Candela re settlement conference | 0.2 | | | | | | | 0.2 | |
| WC | 5/11/2022 | Draft letter to einhorn re fees | 0.3 | | | | | | | 0.3 | |
| WC | 5/11/2022 | Draft email to Judge candela re settlemen conf | 0.2 | | | | | | | 0.2 | |
| WC | 5/11/2022 | Confer w/AP and revise letter to GE re fees | 0.8 | | | | | | | 0.8 | |
| BA | 5/12/2022 | Prepare fee motion exhibits, review timesheets | 1.7 | | | | | | | | 1.7 |
| WC | 5/12/2022 | Prepare exhibit for fee motion/settlement conference | 2.6 | | | | | | | 2.6 | |
| AP | 5/13/2022 | TC with BA, WC re fee mediation strategy | 0.3 | | | | | | | 0.3 | |
| AP | 5/13/2022 | TC with M. Habib re evidence of costs | 0.2 | | | | | | | | 0.2 |
| WC | 5/13/2022 | Confer w/AP and BA re fee motion and strategy | 0.3 | | | | | | | | 0.3 |
| BA | 5/13/2022 | TC AP WC re fee motion | 0.3 | | | | | | | | 0.3 |
| WC | 5/19/2022 | Conf w/BA re fee motion | 0.1 | | | | | | | | 0.1 |

069

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 5/23/2022 | Upload last 25 days of time records to master spreadsheet | 0.3 | | | | | | | | 0.3 |
| AP | 5/24/2022 | Review Habib invoices as to hours and rates | 0.4 | | | | | | | | 0.4 |
| WC | 5/25/2022 | Confer w/AP re fee motion | 0.1 | | | | | | | | 0.1 |
| AP | 5/31/2022 | Review and edit draft CMCS due 6/1 | 0.3 | | | | | | | 0.3 | |
| WC | 5/31/2022 | Draft CMCS | 0.2 | | | | | | | | 0.2 |
| AP | 6/1/2022 | Outline Nielsen dec for fee motion | 0.3 | | | | | | | | 0.3 |
| WC | 6/1/2022 | Confer w/AP re fee motion | 0.3 | | | | | | | | 0.3 |
| WC | 6/1/2022 | Confer w/AP re fee motion | 0.4 | | | | | | | | 0.4 |
| WC | 6/6/2022 | TC w/BA, WC re fee motion briefing strategy | 0.9 | | | | | | | | 0.9 |
| AP | 6/6/2022 | Prepare fee motion exhibits | 0.9 | | | | | | | | 0.9 |
| BA | 6/6/2022 | TC W/AP re fee motion briefing, decs needed, and case law | 0.9 | | | | | | | | 0.9 |
| WC | 6/6/2022 | Review evidence and prepare exhibit for fee motion | 1.7 | | | | | | | | 1.7 |
| WC | 6/6/2022 | TC w/AP and BA re fee motion briefing strategy/evidence | 0.9 | | | | | | | | 0.9 |
| WC | 6/6/2022 | Confer w/AP re exhibit to fee motion | 0.6 | | | | | | | | 0.6 |
| WC | 6/6/2022 | TC w/AP and BA re fee motion briefing strategy/evidence | 0.9 | | | | | | | | 0.9 |
| WC | 6/6/2022 | Review evidence and prepare exhibit for fee motion | 1.8 | | | | | | | | 1.8 |
| WC | 6/6/2022 | Confer w/AP re exhibit to fee motion | 0.7 | | | | | | | | 0.7 |
| AP | 6/7/2022 | Draft letter requesting supporting declarations from Verick, Williams and Sproul | 0.6 | | | | | | | | 0.6 |
| AP | 6/7/2022 | Review outline of MPA and confer with BA, WC re same | 0.7 | | | | | | | | 0.7 |
| WC | 6/7/2022 | Legal research re attny fees and rates in butte county | 0.8 | | | | | | | | 0.8 |
| WC | 6/7/2022 | Review outline and provide comments re fee motion | 0.3 | | | | | | | | 0.3 |
| WC | 6/7/2022 | Confer w/AP re fee motion outline | 0.1 | | | | | | | | 0.1 |
| WC | 6/7/2022 | Confer w/AP and BA re CMC, settlement, and fee motion | 0.5 | | | | | | | | 0.5 |
| AP | 6/8/2022 | Attend telephonic CMC | 0.5 | | | | | | 0.5 | | |
| AP | 6/8/2022 | Confer with BA, WC re fee motion assignments and outline | 0.6 | | | | | | | | 0.6 |
| AP | 6/8/2022 | Note to GE re failure to dismiss cross-complaint | 0.2 | | | | | | | | |
| AP | 6/8/2022 | TC to HN re CMC | 0.2 | | | | | | 0.2 | 0.2 | |
| AP | 6/8/2022 | Draft Nielsen declaration and cover note to HN re same | 0.6 | | | | | | | | 0.6 |
| AP | 6/8/2022 | Draft emails to Sproul and Williams re supporting declarations | 0.3 | | | | | | | | 0.3 |
| BA | 6/8/2022 | TC AP WC re fee motion and case management | 0.5 | | | | | | | | 0.5 |
| WC | 6/8/2022 | Prepare for CMC | 0.8 | | | | | | | | 0.8 |
| WC | 6/8/2022 | Attend case management conference | 0.5 | | | | | | | | 0.5 |
| WC | 6/8/2022 | Confer w/AP re fee motion | 0.2 | | | | | | | | 0.2 |
| WC | 6/8/2022 | Confer w/AP and BA re CMC and fee motion | 0.5 | | | | | | | | 0.5 |
| WC | 6/8/2022 | Confer w/AP re decis for fee motion | 0.3 | | | | | | | | 0.3 |
| AP | 6/9/2022 | Draft Sproul dec and confer w/ WC re same | 1.1 | | | | | | | | 1.1 |
| AP | 6/10/2022 | Review Habib dec from Habib and draft note to MH re same | 0.4 | | | | | | | | 0.4 |

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 6/10/2022 | TC w/ HN re fee motion dec content, status and timing | 0.2 | | | | | | | | 0.2 |
| WC | 6/10/2022 | Confer w/AP re fee motion declarations | 0.3 | | | | | | | | 0.3 |
| WC | 6/17/2022 | Review Holly decl iso fee motion | 0.3 | | | | | | | | 0.3 |
| AP | 6/24/2022 | Note to Sproul re supporting dec | 0.2 | | | | | | | | 0.2 |
| AP | 6/24/2022 | Revise Nielsen dec | 0.8 | | | | | | | | 0.8 |
| AP | 6/24/2022 | Note to HN re dec | 0.2 | | | | | | | | 0.2 |
| AP | 6/24/2022 | Review Habib dec for conformity with Nielsen dec | 0.2 | | | | | | | | 0.2 |
| WC | 6/24/2022 | Review/edit holly decl; confer w/AP re same | 0.7 | | | | | | | | 0.7 |
| WC | 6/24/2022 | Review/edit nielsen decl | 0.2 | | | | | | | | 0.2 |
| WC | 6/27/2022 | Confer w/AP re fee motion | 0.2 | | | | | | | | 0.2 |
| AP | 6/28/2022 | Tc with HN re Nielsen dec and revise dec re same | 0.8 | | | | | | | | 0.8 |
| AP | 6/28/2022 | Notes to MH, BA re Habib dec status | 0.2 | | | | | | | | 0.2 |
| WC | 6/28/2022 | Draft fee motion statement of facts | 0.3 | | | | | | | | 0.3 |
| AP | 6/30/2022 | Confer with WC, Habib re HN and MH decs | 0.2 | | | | | | | | 0.2 |
| AP | 6/30/2022 | Revise HN and MH decs with xmission note to MH | 0.2 | | | | | | | | 0.2 |
| WC | 6/30/2022 | Confer w/AP re decls | 0.2 | | | | | | | | 0.2 |
| WC | 6/30/2022 | Draft section re scope of services in MH decl | 0.2 | | | | | | | | 0.2 |
| WC | 6/30/2022 | Draft fee motion statement of facts | 0.4 | | | | | | | | 0.4 |
| WC | 6/30/2022 | Confer w/AP re fee motion | 0.5 | | | | | | | | 0.5 |
| BA | 6/30/2022 | Obtain briefing in SLT case re fee motion | 0.9 | | | | | | | | 0.9 |
| AP | 7/6/2022 | Revise Sproul Dec and complete | 0.3 | | | | | | | | 0.3 |
| AP | 7/6/2022 | Draft Williams and Verick Decs | 0.7 | | | | | | | | 0.7 |
| BA | 7/6/2022 | TC AP WC re fee motion | 0.4 | | | | | | | | 0.4 |
| AP | 7/6/2022 | Confer with WC, BA re briefing status, factors and facts for multiplier argument | 0.4 | | | | | | | | 0.4 |
| BA | 7/6/2022 | TC WC AP re fee motion tasks | 0.4 | | | | | | | | 0.4 |
| WC | 7/6/2022 | Draft fee motion statement of facts | 3 | | | | | | | | 3 |
| WC | 7/6/2022 | Confer w/AP and BA re fee motion | 0.4 | | | | | | | | 0.4 |
| WC | 7/6/2022 | Confer w/AP re fee motion | 0.3 | | | | | | | | 0.3 |
| AP | 7/7/2022 | Draft Exhibit C to Nielsen Dec (costs accounting) | 0.3 | | | | | | | | 0.3 |
| AP | 7/7/2022 | Outline Packard Dec | 0.4 | | | | | | | | 0.4 |
| WC | 7/7/2022 | Draft fee motion statement of facts | 0.7 | | | | | | | | 0.7 |
| AP | 7/8/2022 | Draft Packard Declaration re procedural history of the case from October 2019-September 2021 | 6.1 | | | | | | | | 6.1 |
| WC | 7/8/2022 | Confer w/AP re fee motion | 0.1 | | | | | | | | 0.1 |
| WC | 7/8/2022 | Draft fee motion statement of facts | 2.1 | | | | | | | | 2.1 |
| BA | 7/11/2022 | Review fee motion cases and Pearl Decs | 3.7 | | | | | | | | 3.7 |
| WC | 7/11/2022 | TC WC AP re fee motion | 0.6 | | | | | | | | 0.6 |
| WC | 7/11/2022 | Review/edit statement of facts | 0.7 | | | | | | | | 0.7 |
| WC | 7/11/2022 | Confer w/AP and BA re fee motion | 0.6 | | | | | | | | 0.6 |
| WC | 7/11/2022 | Confer w/AP re fee motion | 0.1 | | | | | | | | 0.1 |
| AP | 7/11/2022 | Complete Verick and Williams decs in support of fee motion | 0.4 | | | | | | | | 0.4 |
| AP | 7/11/2022 | Draft Packard dec sections summarizing phases of litigation, reasonableness of rates and hours | 3.2 | | | | | | | | 3.2 |
| BA | 7/11/2022 | TC AP WC re briefing | 0.8 | | | | | | | | 0.8 |

071

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AP | 7/11/2022 | Confer with WC, BA re briefing issues and strategy | 0.8 | | | | | | | | 0.8 |
| BA | 7/12/2022 | Review rate case law, review prior case decs and briefs | 3.2 | | | | | | | | 3.2 |
| WC | 7/12/2022 | Review/edit Packard declaration | 0.6 | | | | | | | | 0.6 |
| WC | 7/12/2022 | Confer w/AP re fee motion | 0.5 | | | | | | | | 0.5 |
| WC | 7/12/2022 | Prepare case management conference statement | 0.1 | | | | | | | | 0.1 |
| WC | 7/12/2022 | Review/edit Packard declaration | 0.8 | | | | | | | | 0.8 |
| AP | 7/12/2022 | Revise MPA and Nielsen dec re out-of-forum rates, unavailability of local attys, multiplier and reasonableness of case expenses | 2.2 | | | | | | | | 2.2 |
| AP | 7/12/2022 | Draft notice of motion | 0.3 | | | | | | | | 0.3 |
| BA | 7/12/2022 | Draft arguments re entitlement to fees, review fee statutes and cases | 5.1 | | | | | | | | 5.1 |
| WC | 7/13/2022 | Confer w/AP re fee motion | 0.4 | | | | | | | | 0.4 |
| WC | 7/13/2022 | Draft arg section 1.A | 1 | | | | | | | | 1 |
| WC | 7/13/2022 | Review/edit fee motion | 2.9 | | | | | | | | 2.9 |
| BA | 7/13/2022 | TC AP re fee motion | 0.2 | | | | | | | | 0.2 |
| AP | 7/13/2022 | Review and edit Packard and Nielsen decs, MPA | 3.7 | | | | | | | | 3.7 |
| WC | 7/14/2022 | Confer w/AP and BA re fee motion | 0.2 | | | | | | | | 0.2 |
| WC | 7/14/2022 | Review/edit Packard declaration | 1.1 | | | | | | | | 1.1 |
| AP | 7/14/2022 | Revise MPA and Packard dec | 1.1 | | | | | | | | 1.1 |
| AP | 7/14/2022 | Confer with BA, WC re briefing issues | 0.3 | | | | | | | | 0.3 |
| BA | 7/14/2022 | TC AP WC re briefing, revise brief, add sections on prevailing party | 3.6 | | | | | | | | 3.6 |
| BA | 7/15/2022 | Draft motion for fees, edit decs | 4.2 | | | | | | | | 4.2 |
| AP | 7/16/2022 | Review and edit MPA, Packard and Nielsen decs | 3.2 | | | | | | | | 3.2 |
| BA | 7/16/2022 | Edit MPA and decs for fee motion | 3.5 | | | | | | | | 3.5 |
| AP | 7/17/2022 | Revise and edit check MPA and Packard dec | 3.8 | | | | | | | | 3.8 |
| AP | 7/17/2022 | Draft attorney mini-decs (Exhibit G to Packard Dec) | 0.4 | | | | | | | | 0.4 |
| AP | 7/17/2022 | Update and proof master spreadsheet of time entries | 0.2 | | | | | | | | 0.2 |
| BA | 7/17/2022 | Revise brief, tables for AP dec, review BA dec | 3.7 | | | | | | | | 3.7 |
| BA | 7/18/2022 | Finalize brief, check cites, research rates cases | 4.6 | | | | | | | | 4.6 |
| AP | 7/18/2022 | Revise MPA, assemble all exhibits for Packard and Nielsen decs; note to client re final dec | 3.5 | | | | | | | | 3.5 |
| BA | 7/19/2022 | Final read through, document review, and filing | 1.4 | | | | | | | | 1.4 |
| AP | 7/19/2022 | proof and tech check moving papers, evidence | 1.2 | | | | | | | | 1.2 |

072

| A. Timekeeper | B. Date | C. Description | D. Hours | E. Early Investigation, Notice and Complaint | F. Demurrers and Cross Complaint | G. Discovery and Continuing Investigation | H. Motion for Summary Judgment, Cross-Complaint | I. Motion for Summary Judgment, Complaint | J. Trial Preparation | K. Settlement | L. Motion for Enforcement Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | TOTALS | 1047.1 | 94.3 | 88.8 | 176.0 | 210.5 | 159.7 | 53.6 | 148.2 | 116.0 |
| | | Total hours billed by each attorney: | | | | | | | | | |
| | | William Carlon | 497.5 | 74.2 | 52.2 | 86.4 | 93.9 | 79.6 | 21.2 | 59.1 | 30.9 |
| | | Brian Acree | 289.9 | 0 | 23.6 | 48.5 | 83.6 | 59.0 | 15.6 | 19.9 | 39.7 |
| | | Andrew Packard | 259.7 | 20.1 | 13 | 41.1 | 33.0 | 21.1 | 16.8 | 69.2 | 45.4 |
| | | | | | | | | | | | |
| | | Lodestar: | | | | | | | | | |
| | | William Carlon | $199,000.00 | | | | | Settlement hours up to 11/15/21 | | | |
| | | Brian Acree | $217,425.00 | | | | | William Carlon | | 14.1 | |
| | | Andrew Packard | $214,252.50 | | | | | Brian Acree | | 2.4 | |
| | | TOTAL | $630,677.50 | | | | | Andrew Packard | | 39.5 | |
| | | | | | | | | Settlement hours after 11/15/21 | | | |
| | | | | | | | | William Carlon | | 45 | |
| | | | | | | | | Brian Acree | | 17.5 | |
| | | | | | | | | Andrew Packard | | 29.7 | |

# EXHIBIT G

DECLARATION OF BRIAN ACREE

I, Brian Acree, am over the age of 18 years, not a party to this action, and make the following declaration based upon my personal knowledge; if called, I would competently testify as follows:

1.    I have reviewed the time entries bearing my initial ("BA") in Exhibit F to the Declaration of Andrew L. Packard filed in support of this motion.  These entries accurately reflect and describe the time I have spent in this matter.  I personally recorded my time records contemporaneously and reviewed them in conjunction with contemporaneous records and work product in an exercise of billing judgment.

2.    I have reviewed the statement of my background, education and professional experience as set forth in Mr. Packard's declaration and confirm and attest that it is an accurate statement of my background and experience, as well as my contributions to this case.

3.    I have conferred with the other attorneys working on this case regarding the fee rates sought in this motion, and believe them to be reasonable market rates for attorneys in the San Francisco Bay Area.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and this declaration was executed on July 18, 2022 in Sacramento, California.

/s/ Brian Acree

Brian Acree

1

CASE NO. 20CV01220

DECLARATION OF WILLIAM N. CARLON

I, William N. Carlon, am over the age of 18 years, not a party to this action, and make the following declaration based upon my personal knowledge; if called, I would competently testify as follows:

1. I have reviewed the time entries bearing my initials ("WC") in Exhibit F to the Declaration of Andrew L. Packard filed in support of this motion. These entries accurately reflect and describe the time I have spent in this matter. I personally recorded my time records contemporaneously and reviewed them in conjunction with contemporaneous records and work product in an exercise of billing judgment.

2. I have reviewed the statement of my background, education and professional experience as set forth in Mr. Packard's declaration and confirm and attest that it is an accurate statement of my background and experience, as well as my contributions to this case.

3. I have conferred with the other attorneys working on this case regarding the fee rates sought in this motion, and believe them to be reasonable market rates for attorneys in the San Francisco Bay Area.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and this declaration was executed on July 18, 2022.

/s/ William N. Carlon

William N. Carlon

1

CASE NO. 20CV01220

**EXHIBIT H**

# LAFFEY MATRIX

History

Case Law

See the Matrix

Contact us

Home

| Year | Adjustmt Factor** | Paralegal/ Law Clerk | Years Out of Law School * | | | | |
|---|---|---|---|---|---|---|---|
| | | | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
| 6/01/21- 5/31/22 | 1.006053 | $208 | $381 | $468 | $676 | $764 | $919 |
| 6/01/20- 5/31/21 | 1.015894 | $206 | $378 | $465 | $672 | $759 | $914 |
| 6/01/19- 5/31/20 | 1.0049 | $203 | $372 | $458 | $661 | $747 | $899 |
| 6/01/18- 5/31/19 | 1.0350 | $202 | $371 | $455 | $658 | $742 | $894 |
| 6/01/17- 5/31/18 | 1.0463 | $196 | $359 | $440 | $636 | $717 | $864 |
| 6/01/16- 5/31/17 | 1.0369 | $187 | $343 | $421 | $608 | $685 | $826 |
| 6/01/15- 5/31/16 | 1.0089 | $180 | $331 | $406 | $586 | $661 | $796 |
| 6/01/14- 5/31/15 | 1.0235 | $179 | $328 | $402 | $581 | $655 | $789 |
| 6/01/13- 5/31/14 | 1.0244 | $175 | $320 | $393 | $567 | $640 | $771 |
| 6/01/12- 5/31/13 | 1.0258 | $170 | $312 | $383 | $554 | $625 | $753 |
| 6/01/11- 5/31/12 | 1.0352 | $166 | $305 | $374 | $540 | $609 | $734 |
| 6/01/10- 5/31/11 | 1.0337 | $161 | $294 | $361 | $522 | $589 | $709 |
| 6/01/09- 5/31/10 | 1.0220 | $155 | $285 | $349 | $505 | $569 | $686 |
| 6/01/08- 5/31/09 | 1.0399 | $152 | $279 | $342 | $494 | $557 | $671 |
| 6/01/07-5/31/08 | 1.0516 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06-5/31/07 | 1.0256 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05-5/31/06 | 1.0427 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04-5/31/05 | 1.0455 | $130 | $239 | $293 | $423 | $476 | $574 |
| 6/1/03-6/1/04 | 1.0507 | $124 | $228 | $280 | $405 | $456 | $549 |
| 6/1/02-5/31/03 | 1.0727 | $118 | $217 | $267 | $385 | $434 | $522 |
| 6/1/01-5/31/02 | 1.0407 | $110 | $203 | $249 | $359 | $404 | $487 |
| 6/1/00-5/31/01 | 1.0529 | $106 | $195 | $239 | $345 | $388 | $468 |
| 6/1/99-5/31/00 | 1.0491 | $101 | $185 | $227 | $328 | $369 | $444 |
| 6/1/98-5/31/99 | 1.0439 | $96 | $176 | $216 | $312 | $352 | $424 |
| 6/1/97-5/31/98 | 1.0419 | $92 | $169 | $207 | $299 | $337 | $406 |
| 6/1/96-5/31/97 | 1.0396 | $88 | $162 | $198 | $287 | $323 | $389 |
| 6/1/95-5/31/96 | 1.032 | $85 | $155 | $191 | $276 | $311 | $375 |
| 6/1/94-5/31/95 | 1.0237 | $82 | $151 | $185 | $267 | $301 | $363 |

The methodology of calculation and benchmarking for this Updated Laffey Matrix has been

approved in a number of cases. See, e.g.,DL v. District of Columbia, 267 F.Supp.3d 55, 69 (D.D.C. 2017)

* "Years Out of Law School" is calculated from June 1 of each year, when most law students graduate. "1-3" includes an attorney in his 1st, 2nd and 3rd years of practice, measured from date of graduation (June 1). "4-7" applies to attorneys in their 4th, 5th, 6th and 7th years of practice. An attorney who graduated in May 1996 would be in tier "1-3" from June 1, 1996 until May 31, 1999, would move into tier "4-7" on June 1, 1999, and tier "8-10" on June 1, 2003.

** The Adjustment Factor refers to the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor.

**EXHIBIT I**

Christopher A. Sproul (Bar No. 126398)
Jodene L. Isaacs (Bar No. 226895)
Environmental Advocates
5135 Anza Street
San Francisco, California 94121
Telephone (415) 533-3376
Facsimile: (415) 358-5695
Email: csproul@enviroadvocates.com
Email: jisaacs@ enviroadvocates.com

Michael A. Costa (Bar No. 219416)
3848 Sacramento St. #2
San Francisco, CA 94118
Telephone: (415) 342-0042
Email: mike@ocefoundation.org

OUR CHILDREN 'S EARTH FOUNDATION and
ECOLOGICAL RIGHTS FOUNDATION

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OUR CHILDREN 'S EARTH FOUNDATION, non-profit corporation, and ECOLOGICAL RIGHTS FOUNDATION, a non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, BOB PERCIASEPE, Acting Administrator, JARED BLUMENTHAL, Regional Administrator U.S. Environmental Protection Agency Region 9, NATIONAL MARINE FISHERIES SERVICE, REBECCA BLANK, as Acting Secretary of Commerce, RODNEY MCINNIS, as Regional Administrator of the National Marine Fisheries Service Southwest Region, U.S. DEPARTMENT OF THE INTERIOR, KEN SALAZAR, as Secretary of the Department of the Interior, REN LOHOEFENER as Regional Administrator of the United States Fish and Wildlife Service Pacific Southwest Region,<br><br>Defendants. | Civil Case No.: 4:13-cv-2857-JSW<br><br>DECLARATION OF CHRISTOPHER SPROUL IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS FEES AND COSTS<br><br>Hearing date: April 3, 2015<br>Time: 9:00 a.m.<br>Location: Courtroom 5 |

## DECLARATION OF CHRISTOPHER SPROUL

I, Christopher Sproul, hereby declare and state under penalty of law that the following facts are true and correct:

1.      I am an attorney admitted to the bar of this Court. I am a partner in Environmental Advocates, a law partnership, and counsel for Plaintiffs Our Children's Earth Foundation ("OCE") and Ecological Rights Foundation ("ERF") in this matter. I make this Declaration in support of the Plaintiffs' Motion for Attorneys' Fees and Costs based on my personal knowledge, and I am competent to testify to the matters set forth herein.

2.      In **Part I** of this Declaration, I explain how I and my colleagues have set the hourly rates for each attorney who has worked on this case based on the experience and qualifications of each attorney and my review of relevant information on prevailing market rates for attorneys of like skill and experience in the San Francisco Bay Area. In **Part II**, I summarize the substantial history of this litigation and highlight the major litigation tasks performed by Environmental Advocates attorneys, including drafting the pleadings, gathering and reviewing the substantial factual record, litigating the major motions, and attempting to minimize litigation and pursue settlement. This section also provides a summary of each attorney's specific contributions to the case. **Part III** summarizes the attorneys' fee lodestars for Environmental Advocates attorneys calculated using San Francisco-based rates. **Part IV** provide supporting information for Plaintiffs' recovery of costs, including expert costs.

### I.      Explanation of Hourly Rates of Plaintiffs' Counsel

3.      Environmental Advocates is located in San Francisco, California. Environmental Advocates exclusively represents non-profit environmental organizations, individuals, and other entities that seek to advance environmental protection and restoration. Most of our work involves federal court litigation brought pursuant to the citizen suit provisions of the federal environmental statutes.

4.      The following attorneys working with Environmental Advocates have performed legal work in this matter for which Plaintiffs are seeking recovery of attorneys' fees: Christopher Sproul, Jodene Isaacs, Michael Costa, and Page Perry. The hourly rates charged by these attorneys, their relevant qualifications ,and justifications for their hourly rates are set forth below and in companion declarations submitted by each of these attorneys.

## A.   Justification for Hourly Rate of Christopher Sproul

### 1.   Christopher Sproul's Biographical Information

5.     I earned my Juris Doctorate from the University of California, Berkeley (Boalt Hall) in June 1986 and a Master of Arts degree in political science from the University of California, Santa Barbara in August 1982.

6.     I have been a member of the California Bar since December 1986. I have also been a member of the United States District Court for the Northern District of California since 2002.

7.     I have been a partner in Environmental Advocates for over 12 years and the managing partner of the firm for over nine years. I have exclusively represented non-profit environmental organizations and individuals seeking to advance environmental protection through judicial litigation and administrative advocacy under the major environmental laws, including the Clean Water Act ("CWA"), Endangered Species Act ("ESA"), Clean Air Act ("CAA"), Resource Conservation and Recovery Act ("RCRA"), National Environmental Policy Act ("NEPA"), the California Environmental Quality Act ("CEQA") and other state and federal laws, including the Freedom of Information Act ("FOIA") and the California Public Records Act. I have also brought actions against federal agencies under the Administrative Procedure Act (APA) challenging agency actions or inaction. Numerous of these actions have resulted in court orders or judicial consent decrees imposing far-reaching injunctive relief for environmental remediation.

8.     During my time as a partner at Environmental Advocates, I have represented environmental organization clients in several CWA, ESA and APA citizen suits against EPA and/or the National Marine Fisheries Service ("NMFS"), alleging breaches of EPA mandatory CWA duties or challenging EPA failures to act or seeking to reverse NMFS decisions. I have also represented environmental organization clients in numerous CWA citizen suits against municipalities and private companies seeking to abate water pollution violations. I have additionally represented environmental organization clients in several ESA citizen suits against the U.S. Army Corps of Engineers ("the Corps"), public water districts, and a large university seeking to remedy harms being done to aquatic species protected under the ESA.  I have also provided advice to several environmental organization clients concerning the potential for several other citizen suit enforcement actions for violations of the CWA and/or the

1  ESA. I have also presented public hearing testimony and drafted written comments to government
2  agencies concerning various CWA and ESA regulatory decisions.

3  9.      Prior to joining Environmental Advocates, I served as an Assistant Regional Counsel for the
4  United States Environmental Protection Agency ("EPA") from 1987 until 2002. At EPA, my primary
5  concentration was representing EPA in judicial and administrative enforcement actions brought under
6  the environmental statutes administered by EPA. My accomplishments include several judicial and
7  administrative settlements and judgments resulting in extensive injunctive relief and civil penalty
8  awards.

9  10.     During my 15-year tenure at EPA, I worked on several matters involving the ESA. As a staff
10  attorney at the EPA, I developed and helped prosecute numerous civil cases involving the unlawful
11  discharge of dredged and fill material to waters of the United States in violation of the federal CWA. In
12  many of these cases, the unlawful discharges at issue also adversely impacted various endangered
13  species. Proper prosecution of these cases required me to assess the extent of the potential violation of
14  the ESA. In some cases, whether the actions at issue involved an ESA violation affected the potential
15  authorization of some of the activities by certain CWA general permits issued by the Corps (a matter
16  relevant to the extent of liability). In other cases, this information was necessary to ensure proper
17  coordination between EPA and the relevant federal wildlife agencies, such as the United States Fish &
18  Wildlife Service, in prosecution of these cases. Also in my role as a staff attorney at the EPA, I was
19  assigned to providing advice concerning certain EPA and Corps actions that had the potential to affect
20  endangered species. In providing this advice, I was required to analyze the potential requirements of
21  ESA section 7 as they affected these actions.

22  11.     While at EPA, I also worked on several permitting matters, including litigation challenges to
23  EPA NPDES permit decisions; assisted in EPA reviews of state environmental programs: counseled
24  EPA staff in responding to FOIA responses; participated in work groups tasked with drafting EPA
25  regulations and proposed amendments to the CWA; and provided client counseling to numerous EPA
26  regulatory officials.

27  12.     From 1997 to 1998, through an intergovernmental personnel agreement between EPA and the
28  State of Hawaii, I worked for the Hawaii Attorney General as a staff attorney. In this role, I represented

1    the Hawaii Department of Health in several water pollution enforcement actions under the Hawaii

2    equivalent of the federal CWA, provided advice to the Department of Health concerning many

3    regulatory matters, and provided advice to the Hawaii State Legislature concerning environmental

4    legislation related to water pollution.

5    13.     From 2004 to 2010, I was an Adjunct Professor at Golden Gate University School of Law in San

6    Francisco where I taught a course on environmental litigation. I also served as a law clerk to U.S.

7    District Court Judge William J. Rea, in the U.S. District Court for the Central District of California in

8    1986 and 1987.

9    14.     Over the course of my years of practicing law in California, I have filed several motions for

10    attorneys' fees and costs and mediation briefs in fee negotiation matters. Prior to this motion, I filed my

11    most recent fee motion in September 2014.  In the course of drafting these motions and mediation briefs,

12    I have necessarily acquired expertise and extensive data concerning the prevailing hourly rates for

13    attorneys in the San Francisco Bay Area legal market.

14    15.     I have worked on this case from March 2012 until the present. For the time I worked on the case

15    through May 31, 2012, I have billed at a rate of $600 per hour. The starting point for my calculation of

16    this 2011-2012 rate was the $585 per hour rate awarded me the previous year for work done in 2010 and

17    2011 in *South Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 2012 WL 1038131 (E.D. Cal.

18    March 27, 2012) ("*SYRCL*"), *aff'd* 2014 U.S. App. LEXIS 12450 (9th Cir. July 1, 2014) and *San*

19    *Francisco Baykeeper v. West Bay Sanitary District*, No. C-09-5676 EMC (N.D. Cal. Dec. 1, 2011) (Dkt.

20    174). I increased this rate by $15 per hour, an increase commensurate with the general increase in

21    attorneys' hourly rates in the San Francisco market and well within the range of rates charged then by

22    attorneys with equivalent experience.- After that, I have billed according to my 2012-13 rates (effective

23    from June 1, 2012 to May 31, 2013), 2013-2014 rates (effective from June 1, 2013 to May 31, 2014),

24    and 2014-15 rates (effective from June 1, 2014 to May 31, 2015) as set forth below:

25                       Sproul Billing Rates

| Time Period | Rate |
|---|---|
| June 1, 2011 – May 31, 2012 | $600 |
| June 1, 2012 – May 31, 2013 | $615 |
| June 1, 2013 – May 31, 2014 | $625 |
| June 1, 2014 – May 31, 2015 | $655 |

Sproul Declaration ISO Plaintiffs'               4                  4:13-cv-2857-JSW
Motion for Attorneys Fees and Costs
085

16.     These rates are commensurate with the rates found reasonable in the attorney fee award decisions in *SYRCL* and *San Francisco Baykeeper*. As noted, in both of these cases, the courts awarded me $585 per hour as a reasonable 2010-2011 San Francisco market-based rate based on my presentation of extensive supporting market data and comparable case fee awards and my demonstration that this rate was in accord with the U.S. Department of Justice's "Laffey Matrix."[1] The Ninth Circuit has subsequently affirmed the District Court decision in *SYRCL* and thus implicitly affirmed the rates awarded me and my co-counsel in that case. A rate of $655 per hour for me as a 2014-15 rate is reasonable using these decisions as a benchmark. This $655 per hour rate represents an increase of only about 12% in my rates since 2010-2011 (or less than 3% per year) and appropriately reflects that I now have four years more experience and attorney rates in general have continued to rise over the last four years. That the latter is true is underscored, for example, by the Laffey Matrix—which has shown a steady increase in attorney rates over the past four years.[2] Legal journals have also consistently reported that attorneys' fees rates have continued to increase in recent years. *See, e.g.*, ABA Journal, "Average Hourly Billing Rate For Partners Last Year Was $727 In Largest Law Firms" (posted July 15, 2013) (published at:

---

[1] The Department of Justice's Laffey Matrix is designed to provide objective guidance in assessing appropriate hourly rates for attorneys of differing levels of experience in the Washington, D.C. area. *Kempf v. Barrett Bus. Servs., Inc.*, 2007 U.S. Dist. LEXIS 89447, at *13 (N.D. Cal. 2007). Courts in the Ninth Circuit have recognized the value of the Laffey Matrix and employed it, with modification for differences in pay scales between Washington, D.C. and local Ninth Circuit jurisdictions, in assessing the reasonableness of requested rates. *See id.*; *see also Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp.2d 1039, 1067-68 (N.D. Cal. 2010); *In re HPL Techs., Inc., Secs. Litig.* 366 F. Supp.2d 912, 921-22 (N.D. Cal. 2005); *St. Bernard v. State Collection Serv.*, 782 F. Supp.2d 823 (D. Ariz. 2010); *see also Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 708-10 (3d Cir. 2005).

[2] DOJ has increased the Laffey Matrix base rate for an attorney with 20-plus years of experience from $475 per hour in 2010-2011 to $520 in 2014-2015, an increase of nearly 10%. *See* DOJ Laffey Matrices for these years published on DOJ's internet homepage at:
http://www.justice.gov/usao/dc/divisions/Laffey_Matrix%202014.pdf and
http://www.justice.gov/usao/dc/divisions/Laffey%20Matrix_2014-2015.pdf. Notably, this increase reflects only the inflation in the legal market, as it reflects the comparative rates charged in these years by attorneys with the same years of experience. This increase does not reflect the added compensation that an attorney who had 20 years of experience in 2010-2011 would demand in 2014-2015 when the same attorney had 24 years of experience. With this in mind, the 12% increase in my hourly rate from 2010-2011 to 2014-2015 is comparatively modest, as it reflects the increase in my rate due to both my added years of experience as well as inflation in the legal market.

http://www.abajournal.com/news/article/average_hourly_billing_rate_for_partners_last_year_was_727_in_largest_law_f/).

17.     My historic rates and current rate are well within prevailing market rates in San Francisco as further evidenced by recent Northern District of California decisions. Several recent Northern District decisions have awarded significantly higher rates to attorneys whose experience is comparable to mine, and/or awarded hourly rates only marginally lower than these, to attorneys with significantly less experience than I have:

- In *Rosenfeld v. United States DOJ*, 904 F. Supp.2d 988, 1002 (N.D. Cal. 2012), the court approved hourly rates of $700 for an attorney with twenty-eight years of experience and $550 for an attorney with twenty-one years of experience as appropriate 2012 rates. The court determined that based on market data "an attorney with 28 years of experience, would likely command an hourly billed rate between $640 and $875." *Id*. Notably, I set my 2012 rates between $600 and $615 per hour, substantially less than the $700 per hour awarded in *Rosenfeld* to an attorney with twenty-eight years of experience in 2012, even though I had more years of experience during this time. Even my 2014-15 rate of $655 per hour is less than this $700 per hour rate, for an attorney with the same number years of experience set several years ago.

- In *American Civil Liberties Union v. Drug Enforcement Administration*, 2012 U.S. Dist. LEXIS 190389 (N.D. Cal., Nov. 8, 2012), the court approved hourly rates of $575 for an attorney with twelve years of experience, $595 for an attorney with fifteen years of experience, $700 for an attorney with forty-one years of experience, and $150 for law clerks as appropriate 2012 rates. Notably, the $595 per hour rate for an attorney with fifteen years of experience is only slightly less than the rate that I set for myself in 2011-2012 even though I had more than a decade of additional experience.

- In *Davis v. Prison Health Serv.*, 2012 U.S. Dist. LEXIS 138556 (N.D. Cal., Sept. 25, 2012), the court awarded fee rates of $675 and $750 to an attorney with twenty-nine, thirty-two, and thirty-three years of experience as appropriate 2012 rates. Notably, these

1    rates are substantially higher than the rate I am claiming nearly three years later--even

2    though I have comparable experience.

3       • In *Armstrong v. Brown,* 2011 U.S. Dist. LEXIS 87428 (N.D. Cal. 2011), the court found

4         a rate of $700 to be reasonable for an attorney with thirty-one years of experience. This

5         rate awarded four years ago is well above what I am presently claiming, even though I

6         have only slightly less experience.

7  18.     Moreover, recent expert declaration testimony provided in the Northern District by well-

8  recognized attorney fee expert Richard Pearl further supports the reasonableness of my hourly rates.

9  Notably, the Northern District has expressly recognized that "Mr. Pearl specializes in matters relating to

10  court-awarded attorneys' fees and has served as an expert witness, mediator, and arbitrator in fee

11  disputes and related matters. He has also written extensively on court-awarded attorneys' fees. Mr. Pearl

12  is 'frequently called upon to opine about the reasonableness of attorneys' fees.'" *Kranson v. Fed. Express*

13  *Corp.*, 2013 U.S. Dist. LEXIS 173499 (N.D. Cal. Dec. 11, 2013) (citations omitted). In a 2012

14  declaration submitted in *Frayley v. Facebook, Inc.*, Case No. 3:11-cv-01726-RS (N.D. Cal. Dec. 21,

15  2012) (a true and correct copy of this decision is attached here as Exhibit 2), Mr. Pearl attested to the

16  reasonableness of fees ranging from $675 to $750 per hour for attorneys with twenty-nine to thirty-three

17  years of experience.

18  19.     Mr. Pearl's *Frayley* Declaration supports its conclusion by reference to case law, the billing rates

19  of numerous California law firms (which run consistently higher than those requested here for similar

20  years of experience), as well as the results of the *Valeo 2012 Halftime Report*, a yearly survey of legal

21  billing rates. According to Mr. Pearl, that report indicated that the average partner and associate rates for

22  San Francisco were $750 and $495 per hour, respectively–rates substantially higher than my rate or my

23  co-counsel's rates. Exhibit 2 at 14.

24  20.     My rates are within the range and, if anything, lower than the rates awarded to attorneys with

25  comparable experience in cases discussed by Mr. Pearl's *Frayley* declaration. For example:

26       • In *Williams v. H&R Block Enterprises, Inc.*, Alameda County Superior Ct. No. 3

27         RG08366506 (November 8, 2012), the court approved a billing rate of $750 an hour for

28         an attorney with thirty-one years of experience. This rate awarded more than two years

Sproul Declaration ISO Plaintiffs'             7                4:13-cv-2857-JSW
Motion for Attorneys Fees and Costs
088

1      ago is substantially above the rate that I am presently claiming even though I have only

2      slightly less experience. Notably, market rates have generally increased since 2012,

3      underscoring that my present rate is reasonable and if anything, below-market.

4      • In *Luquetta v. The Regents of the Univ. of California, San Francisco*, Superior Ct., 23

5      No.CGC-05-443007 (October 31, 2012), the court approved a billing rate of $785 an hour

6      for an attorney with twenty-six years of experience, i.e., an attorney with less experience

7      than me. Notably, this rate awarded in 2012 to an attorney with less experience (and

8      when market rates were lower than they are presently) is higher than the rate I am seeking

9      in 2014-2015.

10      • In *Charlebois v. Angels Baseball LP,* 2012 U.S. Dist. LEXIS 91069 (C.D. Cal. 2012), the

11      court awarded $600-695 to an attorney with twenty-seven years of experience. Notably,

12      these rates are essentially equal to or even higher than the rates I am claiming for all

13      years from 2011-2012 to the present, even though I had as much or more years of

14      experience during this timeframe.

15      • In 2011, the Northern District in *Wren v. RGIS Inventory Specialists,* 2011 U.S. Dist.

16      LEXIS 38667 (N.D. Cal 2011), found $675 to be a reasonable 2010 rate (when market

17      rates were substantially lower than they are now) for an attorney with twenty-nine years

18      of experience. My rates are lower as an attorney with twenty-eight years of experience in

19      2014-2015.

20      • In *Californians for Disability Rights, Inc., et al. v. California Department of*

21      *Transportation, et al.*, 2010 U.S. Dist. LEXIS 141030 (N.D. Cal. 2010), the court

22      approved $730 and $740 for attorneys with twenty-five and twenty-six years of

23      experience as 2010 rates (when market rates were substantially lower than they are now).

24      Notably, these rate is significantly higher than the rates charged by me as an attorney

25      between 2011 and 2015 when I had twenty-six, twenty-seven and twenty-eight years of

26      experience, and years after this 2010 award.

27 21.      I have also looked at the National Law Journal's recent publication of its billing rates survey that

28 is attached as Exhibit 6. This National Law Journal survey reports billing rates for several San Francisco

Sproul Declaration ISO Plaintiffs'              8              4:13-cv-2857-JSW
Motion for Attorneys Fees and Costs
089

1  law firms. The range of rates reported in the survey are commensurate (and actually tend to be higher)

2  than either my rate or the rates charged by Plaintiffs' other attorneys in this case.

3  **B.  Justification for Hourly Rate of Jodene Isaacs**

4  22.  The companion declaration of Ms. Isaacs filed concurrently with this declaration sets forth Ms.

5  Isaacs' experience. As indicated in her declaration, Ms. Isaacs has been practicing law since 2003.

6  23.  Ms. Isaacs has worked on this case from March 2012 until the present.

7  24.  For the time she began working on the case through May 31, 2012, she billed at a $435 per hour

8  rate. For time spent after that, she has billed according to her 2012-13 rates (effective from June 1, 2012

9  to May 31, 2013), 2013-2014 rates (effective from June 1, 2013 to May 31, 2014), and 2014-15 rates

10  (effective from June 1, 2014 to May 31, 2015) which are set forth below.

11  Isaacs Billing Rates

12
13
14

| Time Period | Rate |
|---|---|
| June 1, 2011 – May 31, 2012 | $435 |
| June 1, 2012 – May 31, 2013 | $460 |
| June 1, 2013 – May 31, 2014 | $500 |
| June 1, 2014 – May 31, 2015 | $520 |

15

16  25.  In setting her hourly rate, Ms. Isaacs and I have considered market rates approved by courts in

17  the Northern District, other available market data, as well as Ms. Isaacs' Northern District approved rate

18  in *San Francisco Baykeeper v. West Bay Sanitary District*. The Northern District approved an hourly

19  rate for Ms. Isaacs at $385 for work in 2010-2011. Since that time, Ms. Isaacs has surpassed the ten year

20  mark in her practice of law, and we have increased her hourly rate step-wise in accord with each

21  additional year of experience as is customary in the San Francisco legal market.

22  26.  In setting Ms. Isaacs rate, we have considered that these rate are commensurate with the rates

23  found reasonable in the attorneys' fee award decisions in several recent Northern District cases:

24  •  In *Californians for Disability Rights, Inc., et al. v. California Department of*

25  *Transportation, et al.*, 2010 U.S. Dist. LEXIS 141030 (N.D. Cal. 2010), the court

26  approved $570 an hour for attorneys with ten years of experience as a 2010 rate. Notably,

27  this rate is significantly higher than the rates charged by Ms. Isaacs when she had ten and

28  eleven years of experience -- years after this 2010 award.

- In *American Civil Liberties Union v. Drug Enforcement Administration,* 2012 U.S. Dist. LEXIS 190389 (N.D. Cal., 2012), the court awarded hourly rates of $575 for an attorney admitted to the bar in 1999 as an appropriate 2012 rate. This case provides support that a $520 per hour rate in 2014-2015 for Ms. Isaacs, who was admitted to the bar in 2003, is a reasonable market rate, as rates are higher in 2014-15 than 2012. For example, the Laffey Matrix base rate for an eleventh to nineteenth year attorney is 3.37% higher in 2014-15 than in 2012-13. Assuming the same rate of inflation as reflected in the Laffey Matrix, an attorney with twelve years experience's compensation would increase from $575 per hour in 2012-2013 to $594 per hour presently. If $594 per hour is a reasonable 2014-15 rate for an attorney with twelve years of experience, then, $520 per hour for an attorney with eleven years of experience is easily not only a reasonable rate but actually under a market rate.

- In *Vallabhapurapu v. Burger King Corp.*, 2012 U.S. Dist. LEXIS 154867 (N.D. Cal October 29, 2012), the court awarded $450 for an attorney with eight years of experience as an appropriate 2012 rate. Notably, this rate is more than the rate Ms. Isaacs claims for the work she did in 2011-12 as an attorney with eight years of experience and is very nearly the same as the rate she claimed a year later when she had nine years of experience.

27.     Mr. Pearl's *Fraley* declaration referred to above further supports the reasonableness of Ms. Isaacs' rates. In this declaration, Mr. Pearl attested to the reasonableness of fees ranging from $460 and $550 per hour for attorneys with seven to twelve years of experience—*i.e.,*, to rates similar to the rates claimed by Ms. Isaacs whose experience falls within this range.

28.     As noted, Mr. Pearl's *Fraley* declaration recites case decisions to support its conclusions.

29.     Ms. Isaacs' rates are within the range and, if anything, lower than the rates awarded in cases discussed by Mr. Pearl's *Frayley* declaration. For example:

- In *Charlebois v. Angels Baseball LP* (C.D. Cal. 2012) 2012 U.S. Dist. LEXIS 91069 (May 30, 2012), the court awarded $460 to an attorney with seven years of experience and $450 to an attorney with six years of experience as appropriate 2012 rates. Notably,

these rates are essentially equal to or even higher than the rates Ms. Isaacs is claiming in 2011-12 and 2012-13, even though she had more experience in these years.

- In *Credit/Debit Card Tying Cases*, San Francisco County Superior Court, JCCP No. 4335 (August 23, 2010), the court found that billing rates between $535 and $600 an hour were reasonable prevailing rates for attorneys with nine years of experience. Notably, this rate is higher than the $435 per hour Ms. Isaacs claims for work done in 2011-2012 (when market rates would have increased) when she had eight years of experience.

- In another 2010 case, *Savaglio, et al. v. WalMart*, Alameda County Superior Court No. C-835687-7, Order Granting Class Counsel's Motion for Attorneys' Fees, (September 10, 2010), the court found $500 an hour to be a reasonable 2010 rate for an attorney with nine years of experience, and the court approved of increases to that rate of between $5 to $25 for associates with additional years of experience. Again, this rate is significantly higher than the $435 per hour claimed for Ms. Isaacs in 2011-2012.

- In *Williams v. H&R Block Enterprises, Inc.*, Alameda County Superior Ct. No. 3 RG08366506 (November 8, 2012), the court approved a billing rate of $500 an hour for an attorney who was admitted to the bar in 2004 and approved $470 an hour for an attorney admitted to the bar in 2005. These rates are higher than the $460 claimed for Ms. Isaacs in 2012, who was admitted to the bar in 2003.

- In *Luquetta v. The Regents of the Univ. of California, San Francisco*, Superior Ct., 23 No.CGC-05-443007 (October 31, 2012), the court approved a billing rate of $520 an hour for an attorney admitted to the bar in 2002. Notably, this rate awarded in 2012 is equivalent to the rate sought for Ms. Isaacs in 2014-2015 (who was admitted to the bar in 2003) when market rates would have increased.

- In *Holloway et al. v. Best Buy Co., Inc.* (N.D. Cal. 2011) No. 05-5056 PJH (Order dated November 9, 2011), the court approved a lodestar award which included a $490 hourly rate for an attorney with eight years of experience. By comparison, the 2011-2012 rate of $435 per hour for Ms. Isaacs is significantly less than that amount even though she had the same years of experience.

1  30.     As noted, Mr. Pearl's *Fraley* Declaration further supports its conclusions by reference to the

2  billing rates of numerous California law firms, as well as the results of the Valeo 2012 Halftime Report,

3  a yearly survey of legal billing rates. According to Mr. Pearl, that report indicated that the average

4  partner and associate rates for San Francisco were $750 and $495, respectively. This associate rate is

5  higher than Ms. Isaacs' 2011-12 and 2012-13 rates when she had more experience than typical senior

6  associates.

7  31.     Again, the hourly rates for Ms. Isaacs set forth above for 2012 to the present are modest by

8  comparison to rates found to be reasonable San Francisco market rates. Indeed, her rates are lower than

9  rates approved five years ago in some cases. Attorney rates have continued to rise in the San Francisco

10  legal market over the past few years. Ms. Isaacs has more than eleven years of experience with complex

11  environmental enforcement actions, making Ms. Isaacs' hourly rates well within the reasonable range of

12  other attorneys practicing in San Francisco.

13  **C.     Justification for Hourly Rate of Michael Costa**

14  32.     The companion declaration of Michael Costa filed concurrently with this declaration sets forth

15  Mr. Costa's experience. As set forth in his declaration, Mr. Costa has been practicing law since 2002.

16  33.     Mr. Costa primarily worked on this case between June 2012 and April 2014.  In working with

17  Mr. Costa to set his hourly rate for the time period that he worked on the case, we have considered

18  market rates approved by courts in the Northern District and other available market data. We have

19  increased his hourly rate step-wise in accord with each additional year of experience as is customary in

20  the Northern District.

21  34.     Mr. Costa's 2012-2013 rate was applied time he billed between June 1, 2012 and May 31, 2013.

22  After that, his 2013-2014 rates (effective from June 1, 2013 to May 31, 2014) were applied, and as of

23  May 31, 2014, I will apply his 2014-2015 rate for the work he contributed to this motion. Mr. Costa's

24  historic and present hourly rates are set forth as follows:

25

26

27

28

Costa Billing Rates

| Time Period | Rate |
|---|---|
| June 1, 2012 – May 31, 2013 | $495 |
| June 1, 2013 – May 31, 2014 | $505 |
| June 1, 2014 – May 31, 2015 | $525 |

35.    In setting Mr. Costa's rate, I have considered that these rate are commensurate with the rates found reasonable in the attorneys' fee award decisions in several recent Northern District cases:

- In *Californians for Disability Rights, Inc., et al. v. California Department of Transportation, et al.*, 2010 U.S. Dist. LEXIS 141030 (N.D. Cal. 2010), the court approved $570 an hour for an attorney with ten years of experience as a 2010 rate. Notably, this rate is significantly higher than the rates charged by Mr. Costa when he had ten to twelve years of experience (*i.e.*, in 2012 through 2015, when market rates would have been higher).

- In *American Civil Liberties Union v. Drug Enforcement Administration,* 2012 U.S. Dist. LEXIS 190389 (N.D. Cal., 2012), the court awarded hourly rates of $575 for an attorney admitted to the bar in 1999 as an appropriate 2012 rate. This case provides support that a $525 per hour rate in 2014-2015 for Mr. Costa who was admitted to the bar in 2002 is a reasonable market rate, as rates are higher in 2014-15 than 2012. For example, the Laffey Matrix base rate for an attorney with eleven to nineteen years of experience is 3.37% higher 2014-15 than in 2012-13. Assuming the same rate of inflation as reflected in the Laffey Matrix, an attorney with twelve years of experience's compensation would increase from $575 per hour in 2012-2013 to $594 per hour currently. Using this as a benchmark, $525 per hour for an attorney with twelve years of experience in 2014-2015 could easily be seen as being not only fair but actually under market rate.

- In *Stonebrae v. Toll Bros.*, 2011 U.S. Dist. LEXIS 39832, (N.D. Cal. 2011), the court found the 2010 rate of $550 an hour for an attorney with nine years of experience

1    reasonable, which is higher than Mr. Costa's rate when he has twelve years of experience

2    in 2014-2015.

3    36.    Mr. Pearl's *Fraley* declaration referred to above further supports the reasonableness of Mr.

4    Costa's rates. In this declaration, Mr. Pearl attested to the reasonableness of fees ranging from $460 and

5    $550 per hour for attorneys with seven to twelve years of experience—*i.e.*, to rates similar to the rates

6    claimed by Mr. Costa whose experience falls within this range.

7    37.    As noted, Mr. Pearl's *Fraley* declaration recites case decisions to support its conclusions.

8    38.    Mr. Costa's rates are within the range and, if anything, lower than the rates awarded in cases

9    discussed by Mr. Pearl's *Frayley* declaration. For example:

10   - In *Credit/Debit Card Tying Cases*, San Francisco County Superior Court, JCCP No. 4335
11     (August 23, 2010), the court found that billing rates between $535 and $600 an hour were
12     reasonable prevailing rates for attorneys with nine years of experience. Notably, this rate
13     is higher than the $495 per hour Mr. Costa claims for work done in 2011-2012 (when
14     market rates would have increased) when he had nine years of experience.

15   - In another 2010 case, *Savaglio, et al. v. WalMart*, Alameda County Superior Court No.
16     C-835687-7, Order Granting Class Counsel's Motion for Attorneys' Fees, (September 10,
17     2010), the court found $500 an hour to be a reasonable 2010 rate for an attorney with
18     nine years of experience, and the court approved of increases to that rate of between $5 to
19     $25 for associates with additional years of experience. This rate is comparable to the rates
20     claimed by Mr. Costa, but from 2011 to 2014, when rates have only increased.

21   - In *Williams v. H&R Block Enterprises, Inc.*, Alameda County Superior Ct. No. 3
22     RG08366506 (November 8, 2012), the court approved a 2012 billing rate of $500 an hour
23     for an attorney admitted to the bar in 2004. This rate is comparable to the rate charged by
24     Mr. Costa, but he was admitted to the bar in 2002 and thus would have commanded an
25     even higher rate.

26   - In *Luquetta v. The Regents of the Univ. of California, San Francisco*, Superior Ct., 23
27     No.CGC-05-443007 (October 31, 2012), the court approved a billing rate of $520 an hour
28     for an attorney admitted to the bar in 2002 and $550 an hour for an attorney admitted to

1     the bar in 2001. Notably, these rates awarded in 2012 are higher than the rate sought for

2     Mr. Costa in 2014-2015, who was admitted to the bar in 2002, when market rates have

3     increased.

4     • In *Holloway et al. v. Best Buy Co., Inc.* (N.D. Cal. 2011) No. 05-5056 PJH (Order dated

5        November 9, 2011), the court approved a lodestar award which included a $490 hourly

6        rate for an attorney with eight years of experience. By comparison, the 2011-2012 rate of

7        $495 for Mr. Costa, who had nine years of experience at that time, is only slightly more,

8        and therefore below market rate, if anything.

9  39.    As noted, Mr. Pearl's *Fraley* Declaration further supports its conclusions by reference to the

10 billing rates of numerous California law firms, as well as the results of the Valeo 2012 Halftime Report,

11 a yearly survey of legal billing rates. According to Mr. Pearl, that report indicated that the average

12 partner and associate rates for San Francisco were $750 and $495, respectively. This associate rate is

13 equivalent to Mr. Costa's 2011-12 rate when he had more experience than typical senior associates.

14 40.    Again, the hourly rates for Mr. Costa set forth above for 2012 to the present are modest by

15 comparison to rates found to be reasonable San Francisco market rates. Indeed, his rates are lower than

16 rates approved five years ago in some cases. Attorney rates have continued to rise in the San Francisco

17 legal market over the past few years, and Mr. Costa has more than twelve years of experience with

18 complex environmental enforcement actions, thus his hourly rates are well within the reasonable range

19 of other attorneys practicing in San Francisco.

20     **D.    Justification for Hourly Rate of Page Perry**

21 41.    The companion declaration of Page Perry filed concurrently with this declaration sets forth Ms.

22 Perry's experience. As set forth in her declaration, Ms. Perry has been practicing law since 2006.

23 42.    Ms. Perry has worked on this case from December 15, 2014 through the present. I have worked

24 in conjunction with Ms. Perry to set her hourly rate and set it at $450 per hour, effective from June 1,

25 2014 to May 31, 2015. In setting her hourly rate, we relied on market research and prior case decisions.

26 In *SYRCL*, the court accepted $430 as a reasonable rate for Brian Orion, who was admitted to the bar in

27 2005. Thus, a rate of $450 per hour as a 2014-2015 rate for Ms. Perry is reasonable using this decision

28 as a benchmark given that Ms. Perry has eight years of experience in 2014, as discussed in her

Sproul Declaration ISO Plaintiffs'                          15                          4:13-cv-2857-JSW
Motion for Attorneys Fees and Costs

declaration, Declaration of Page Perry in Support for Motion for Attorneys' Fees and Costs.

43.     In setting Ms. Perry's rate, we have considered that this rate is commensurate, and even lower than the rates found reasonable in the attorneys' fee award decisions in several recent Northern District cases, for example:

- In *Californians for Disability Rights, Inc., et al. v. California Department of Transportation, et al.*, 2010 U.S. Dist. LEXIS 141030 (N.D. Cal. 2010), the court approved $560 an hour for an attorney with nine years of experience, notably more than Ms. Perry's rate in 2014-2015, several years later, when she had only one less year of experience.

- In *Stonebrae v. Toll Bros.*, 2011 U.S. Dist. LEXIS 39832, (N.D. Cal. 2011) the court found the 2010 hourly rate of $550 an hour for an attorney with nine years of experience reasonable. Notably, this is substantially more than Ms. Perry's 2014-2015 rate (when market rates are now substantially higher) for an attorney with only one more year experience.

- In *Holloway et al. v. Best Buy Co.*, Inc. (N.D. Cal. 2011) No. 05-5056 PJH (Order dated November 9, 2011), the court approved an hourly rate of $490 an hour for an attorney with eight years of experience. Notably, this is substantially more than Ms. Perry's 2014-2015 rate (when market rates are now substantially higher) for an attorney with the same years of experience.

44.     Ms. Perry's rates are within the range and, if anything, lower than the rates awarded in cases discussed by Mr. Pearl's *Frayley* declaration, discussed above, in which he attested to court's awarding fees ranging from $460 and $550 per hour for attorneys with seven to twelve years of experience. *See* Exhibit 2. These rates are commensurate to what is requested here, but they were awarded several years ago. For example:

- In *Williams v. H&R Block Enterprises, Inc.*, Alameda County Superior Ct. No. 3 RG08366506 (November 8, 2012), the court years ago approved billing rates of $445-475 an hour, i.e., rates essentially equal or higher than Ms. Perry's rate, for attorneys admitted to the bar in 2006, the same year as Ms. Perry.

- In *Charlebois v. Angels Baseball LP* (C.D. Cal. 2012) 2012 U.S. Dist. LEXIS 91069 (May 30, 2012), the court awarded a 2012 hourly rate of $460 for an attorney with seven years of experience and $450 for an attorney with six years of experience. Notably, these historic rates are equal to or higher than Ms. Perry's rate even though the attorneys in *Charlebois* had less experience than Ms. Perry.

- In *Molina, et al. v. Lexmark International, et al.*, Los Angeles County Superior Court No. BC339177, Order Granting Petitioners' Motion for Attorneys' Fees and Costs filed October 28, 2011, the court years ago approved a billing rate of $475 an hour for an attorney with nine years of experience, *i.e.*, a rate higher than Ms. Perry's rate even though she has only one less year of experience.

- *Savaglio, et al. v. WalMart*, Alameda County Superior Court No. C-835687-7, Order Granting Class Counsel's Motion for Attorneys' Fees, filed September 10, 2010, the court found $500 an hour reasonable for an attorney with nine years of experience. Notably, this $500 per hour rate awarded several years ago is substantially above Ms. Perry's even though she has only one year less of experience.

45.     Pearl's *Fraley* Declaration supports its conclusions on attorneys rates not only by reference to case law, but also refers the billing rates of numerous California law firms (which run consistently higher than those requested here for similar years of experience) and the results of the Valeo 2012 Halftime Report, a yearly survey of legal billing rates. Again, the hourly rate for Ms. Perry is modest by comparison to those above given that she has equivalent or greater experience some of the attorneys' rates cited in Mr. Pearl's *Frayley* Declaration. For example, in *Credit/Debit Card Tying Cases*, San Francisco County Superior Court, JCCP No. 4335 (August 23, 2010), the court found that billing rates between $535 and $600 an hour were reasonable prevailing rates in 2010 for attorneys with nine years of experience. As those rates were approved five years ago and Ms. Perry currently has nine years of experience, with specific experience with complex environmental enforcement actions, Ms. Perry's hourly rate is well within the reasonable range of other attorneys practicing in San Francisco.

### E. Justification for Environmental Advocates Paralegal Hourly Rate

46. Some of the work performed by attorneys on this case was in the nature of task performed by a paralegal. I have billed all this time at the following paralegal rates: June 1, 2012 to May 31, 2014--$160 per hour and after June 1, 2014--$165 per hour.

47. In setting these hourly rates, I have considered the applicable fee determinations discussed in Richard Pearl's *Frayley* Declaration. According to Mr. Pearl's case citations, the average rate for paralegals in 2011-2012 was $145 per hour. I have increased this amount in subsequent years to commensurate with attorney rate increases.

## II. Explanation for Reasonableness of Total Hours in the Context of Case Development and Outcome

48. Plaintiffs' counsel worked many hours on this case. In exercise of billing judgment, counsel are only requesting an award for some of this time, a combined total of 822.62 billable hours. Attached as Exhibit 1 is a true and correct copy of time records documenting the hours I have worked on this case for which I am seeking to recover an attorney's fee award. These records reflect billing judgment reductions from the total hours I have spent on this case. Attached as Exhibit 5 is a total lodestar spreadsheet summarizing the total number of hours each attorney has billed on the case and the hourly rate claimed for the attorneys' time, including a total amount of attorneys' fees for all attorneys.

49. Devoting the hours necessary to represent the Plaintiffs in this has required me and other Plaintiffs' counsel to forgo other cases where compensation may have been more quickly recovered. At the outset, Environmental Advocates took this case with some hesitation, recognizing that due to its factual and legal complexity and the likely resistance to settlement that the Plaintiffs could reasonably expect to encounter, that the case would likely require long hours over a prolonged period without compensation from the clients, who could only afford legal representation on a contingency basis.

50. I have represented Plaintiffs OCE and ERF for over a decade in their work advocating for stronger water quality protection in California as well as enforcing environmental laws related to improving water quality and endangered species habitat. For example, I have worked with Plaintiffs to lobby State agencies to push for more stringent application of the CWA in discharge permits, and I have also represented Plaintiffs in suing dischargers to comply with the CWA, ESA, and other federal and

state environmental laws. Plaintiffs' goals in the matters I have worked with them on have been to improve water quality in California for their members and the public at large. In bringing this particular lawsuit asserting claims concerning EPA's failure to fully implement the RPMs set forth in the BiOp issued by NMFS and the USFWS, Plaintiffs' primary goal was to motivate EPA to revise California's CWA water quality standards that according to the Services are not adequately protective of threatened and endangered species throughout the State.

51.     Given the technical complexity surrounding EPA's proposal and issuance of the water quality standards in the CTR, it took Plaintiffs several months to fully understand the factual and legal implications of EPA's actions. This evidenced in part by the fact the CTR, a regulation that is constantly referred to and relied upon by state and federal agencies, regulated dischargers, and environmental organizations, has been missing complete selenium and mercury water quality standards since its passage without palpable awareness by stakeholders. In the numerous FOIA requests to EPA, NMFS, and the USFWS that Plaintiffs made throughout 2012, we were not provided any documents that suggested that state regulators or the public at large were either aware or questioning EPA's non-compliance with its duty to revise and promulgate the water quality standards as the BiOp directs. Plaintiffs thus determined that litigation was likely necessary to disrupt this ongoing bureaucratic inertia.

52.     From March 2012 to February 2013, Plaintiffs performed a variety of pre-litigation case development tasks. This included significant time spent gathering and analyzing factual information on the potential claims and remedies in the case, including extensive review of documents obtained via "FOIA requests from EPA, NMFS, and the USFWS. Because the pertinent facts relevant to Plaintiffs' claims in this case are necessarily documented in EPA's and the Services' administrative records underlying EPA's actions with respect to water quality standards for the State of California, adoption of the CTR, EPA consultation with the Services that led to the Services' issuance of the BiOp, this required Plaintiffs to review expansive sets of several agencies' documents that the agencies developed over nearly fourteen years and which included many thousands of pages. Further, due to the involvement of state regulatory agencies on the actions at issue in the Plaintiffs' claims, Plaintiffs also sent California Public Record Act Requests to the California State Water Resources Control Board, and San Francisco Regional Water Quality Control Board, which generated many additional documents to review. In

1   addition to reviewing documents to determine whether the Defendants were complying or intended to

2   comply with the CWA and ESA and spending time in discussion with the agencies to narrow the scope

3   of FOIA requests to allow the agencies to respond more efficiently, Plaintiffs also conducted

4   independent extensive factual research on scientific issues related to the water quality criteria. Plaintiffs

5   researched the continuing environmental impacts of the Defendants' actions, investigated issues

6   regarding standing, conducted legal research and developed the legal theories of the case, and

7   necessarily spent time evaluating with clients and co-counsel the merits of bring this case.  Plaintiffs

8   ultimately spent considerable time drafting the Notice of Intent to Sue for claims under the CWA and

9   ESA ("Notice Letter"), which was extensive due to the complex factual background of the case. This

10  Notice Letter was a jurisdictional requirement for bringing suit specified in both the CWA and ESA.

11  53.     In February 2013, shortly after Plaintiffs served their Notice Letter, Defendant EPA reached out

12  to Plaintiffs to discuss early settlement prior to the complaint being filed. Plaintiffs thus spent time in

13  Spring 2013 conferring with EPA regarding the Notice Letter and planning in-person meeting with EPA

14  staff to determine if early settlement was feasible. Plaintiffs were willing to settle to keep costs down, so

15  long as their ultimate goal of stricter water quality standards would be implemented. In particular,

16  Plaintiffs had several phone calls with EPA Region 9 counsel in February and March 2013, attended an

17  in-person meetings on April 24, 2013, and exchanged several written communications in April and May

18  2013. After several months, the Defendants indicated that settlement was not forthcoming, and we were

19  forced to spend considerable additional time drafting and then filing the complaint to initiate formal

20  litigation to prompt EPA to address the claims at issue.

21  54.     Plaintiffs' complaint contained six claims, all based essentially on the same facts developed

22  mostly from the agencies' administrative records involving the proposal of the CTR, the issuance of the

23  BiOp, and EPA's subsequent actions. Claim 1 asserted a breach of an EPA mandatory CWA duty when

24  EPA failed to issue final water quality standards for selenium and mercury 90 days after initially

25  proposing them. As an alternate legal theory to this same underlying cause of action, Plaintiffs' Claim

26  Six argued that the failure to act on selenium and mercury constituted "unreasonable delay" under the

27  Administrative Procedure Act § 706(a)(1). Also posing alternate legal theories, Plaintiffs' ESA Claims

28  (Claims 2-4) likewise alleged that EPA's failure to promulgate final standards for selenium and mercury

1   as well as revise the standards for cadmium, pentachlorophenol, and dissolved metals violated ESA §

2   9's prohibition on take, ESA § 7(a)(1)'s duty to implement conservation recommendations, and

3   §7(a)(2)'s duty to reinitiate consultation. As a further strategic measure, Plaintiffs' brought an ESA

4   Claim against the Services (Claim 5) for their failure to reinitiate ESA § 7 consultation with EPA

5   following EPA's failure to comply with the BiOp's RPMs and the occurrence of other events triggering a

6   mandatory duty to perform ESA § 7 consultation under the Services' regulations. Plaintiffs considered

7   the Services as indispensable parties without whose involvement the overarching claims against EPA

8   would not have been properly resolved. Indeed, Plaintiffs' addition of Claim 5 had the desired effect of

9   having all of the federal agencies present at the ADR mediation session which helped developed the core

10   timelines for water quality promulgation that are the essence of the Consent Decree.

11   55.     Filing the complaint in this action did not prompt any further immediate action from EPA or the

12   Services; settlement talks remained stalled and the agencies appeared in no hurry to move the case

13   forward to litigated resolution. To expedite the potential for settlement and narrow the claims at issue,

14   Plaintiffs prepared a Motion for Partial Summary Judgment on Claim One, including Declarations in

15   Support of Plaintiffs' Standing, in September 2013. The nature of the wrong Plaintiffs complained of

16   was prolonged EPA inaction in the face of recognized urgent threats to endangered and threatened

17   species, making Plaintiffs' early motion for summary judgment a case appropriate action in my view.

18   Plaintiffs' counsel reasonably intended this motion (1) to provide Defendants' incentive to focus on this

19   case and hopefully resume meaningful settlement dialog and (2) to keep the case moving toward prompt

20   resolution should settlement discussions remain unsuccessful. This Motion prompted the Defendants to

21   again pay attention to the issues in this case. Defendants requested that Plaintiffs' motion be stayed and

22   so they could attempt to narrow the claims with their Motion to Dismiss. *Id.* More importantly,

23   Defendants resumed substantive settlement discussions and mediation while their Motion to Dismiss

24   remained filed but effectively stayed—providing the necessary backdrop for the parties to appreciate

25   their respective litigation risks within the context of eventual litigation deadlines. Plaintiffs spent many

26   hours in advance of filing these motions completing the factual and legal research necessary to present

27   the arguments in these motions and preparing presentation of the extensive evidence submitted with

28   these motions. While working on these motions, the parties also completed work required by Federal

Sproul Declaration ISO Plaintiffs'             21                     4:13-cv-2857-JSW
Motion for Attorneys Fees and Costs

1    Rule of Civil Procedure 26(f), conducting meet-and-confer efforts, and drafting the Rule 26(f) Report,

2    which again required several hours of Plaintiffs' counsel's time-all reasonably compensable hours.

3    56.    After the Motion to Dismiss was fully briefed, the parties agreed to mediation through the

4    Northern District's ADR program, and the Court stayed the hearing pending the mediation with all the

5    Defendants. *See* Dkt. 46, [Feb. 26, 2014]. Before the mediation, Plaintiffs met separately with the

6    Services for extended discussion about the factual and legal issues raised by Plaintiffs' claims. This

7    discussion provided useful information to Plaintiffs and how to approach further settlement discussions

8    with the Defendants, and thus helped to advance and ultimately successful settlement outcome in the

9    mediation and discussions following the mediation. Participating in mediation necessitated that Plaintiffs

10   advocate for an appropriate mediator, prepare a mediation brief, inform and recommend settlement

11   strategies to Plaintiffs' decision makers, attend a full day mediation session, and carry out numerous

12   follow-up in-person and phone conferences with Defendants EPA, NMFS, and USFWS throughout the

13   spring and summer of 2014. These meetings required preparation in the form of reviewing complex

14   factual issues pertaining to the effects of the Defendants' actions on the environment as well as post-

15   meeting debriefings to develop effective advocacy for settlement terms that would best address the

16   impacts of EPA's failure to issue appropriately protective water quality criteria.

17   57.    I sought to limit the number of hours spent and number of people involved in preparing this case

18   to the extent possible to minimize the costs of litigation, while still being effective.  While I always seek

19   to do so in keeping with what I believe to be the ethical obligations of counsel to clients and the judicial

20   process, I had special motivation to do so in this case. I and all my co-counsel representing Plaintiffs are

21   working on contingency in this matter and thus our clients will not compensate us unless the Court

22   awards the Plaintiffs attorney's fees. This gave me additional financial motivation to reduce the risks to

23   my firm and my co-counsel by striving to keep the time invested in this case to that prudently necessary.

24   It is notable that two attorneys did the majority of the work on this case: myself and Jodene Isaacs. Mike

25   Costa has provided some assistance with legal research as well as contributed to case and settlement

26   strategy, and Page Perry has contributed to Plaintiffs' Motion for Attorneys' Fees. I served as senior

27   counsel, with responsibility for litigation strategy, supervision, court appearances, and other discrete

28   assignments at various times throughout the case (such as drafting specific sections of briefs,  working

---

Sproul Declaration ISO Plaintiffs'                     22                        4:13-cv-2857-JSW
Motion for Attorneys Fees and Costs

1   out FRCP 26 matters with opposing counsel, and drafting consent decrees and other settlement

2   proposals). Jodene Isaacs served as the mid-level associate on the case. With my supervision and

3   guidance, she has had primary responsibility for producing the briefs and other filings made in the case,

4   reviewing and analyzing the documents received via FOIA requests and from other sources to develop

5   the factual record in support of the claims asserted in the complaint and motions briefing, conducting

6   legal research assignments, and conferring with myself on case strategy. Page Perry is now a junior

7   associate on the case. She has had responsibility for conducting legal research at the direction of myself

8   and Jodene Isaacs, and drafting sections of this Motion for Attorneys' Fees and Costs and supporting

9   declarations.

10  **III.   Plaintiffs' Lodestar**

11  58.     As mentioned above, the attached Exhibit 5 compiles the timeslips that itemize the work

12  performed by myself, Jodene Isaacs, Michael Costa, and Page Perry in this case up through February 24,

13  2015 (additional attorney work that will inevitably be required to complete briefing on this Motion for

14  Attorneys Fees, including Plaintiffs' reply briefing, will be documented in subsequent declarations

15  submitted on reply). My own timeslips are attached to this Declaration as Exhibit 1; each individual

16  attorney's slips are exhibits to their individual Declarations. I have reviewed and approved the time and

17  charges set forth in this itemization of work.

18  59.     As set forth in Exhibit 5, the combined total number of hours expended by attorneys who

19  worked on this case is 822.62 hours. As also noted in Exhibit 5, some attorneys spent time

20  performing tasks that would be reasonably charged at a paralegal rate, 10.43 hours in total.

21  Therefore, I have applied a different billing rate to this paralegal time. The result is two sets of

22  hours: "attorney time," which includes only those hours for which the attorneys were performing

23  legal services appropriate for an attorney, and "paralegal time," which includes those hours for

24  which the attorneys were performing paralegal tasks. As described in Exhibit 5, I multiplied the total

25  "attorney time" by the attorney's hourly rate and the total "paralegal rate" by the reduced rate for

26  paralegals to arrive at the total lodestar for each attorney. As described in Section I above, these

27  lodestars are based on prevailing market rates for attorneys in the San Francisco Bay area.

28

60.     Plaintiffs total claimed lodestar through February 24, 2015 is $429,521.27. This is broken down as follows: Christopher Sproul--$176,779.10; Jodene Isaacs--$165,737.52; Michael Costa--$9,004.20, and Page Perry--$78,000.45. As noted, Plaintiffs will seek recovery for their additional time that will necessarily be spent on this motion in their reply briefing in support of this motion.

**IV.     Support for Plaintiffs' Recovery of Costs**

61.     The Plaintiffs have incurred $4,059.60 in expenses in bringing this action that are of the type ordinarily and necessarily incurred in litigation and typically billed of clients by their counsel: the Court's filing fee to initiate this case; attorney travel to attend Court hearings; electronic legal research using LEXIS-NEXIS; the costs of printing and photocopying documents filed with the Court, sent to the Defendants, or needed by the lawyers to analyze and prepare factual and legal argument in the case; postage to send documents to the Court, the Defendants, and co-counsel. Additionally, Plaintiffs incurred $3,435 in costs in compensating their consulting expert Steven Bond. Mr. Bond's advice was important and useful to the Plaintiffs in evaluating the technical issues presented in this case and developing their final settlement proposals. Mr. Bond assisted the Plaintiffs in being able to present to the Defendants their arguments in post-mediation settlement discussions as to why the EPA inaction in issue was environmentally harmful and causing injury in fact to the Plaintiffs. I have attached as Exhibit 3 a spreadsheet which itemizes these costs. Receipts for these expenses are attached as Exhibit 4.


        Executed in San Francisco, California on February 26, 2015.


        _Christopher A. Sproul_

        _____
        Christopher Sproul
        Environmental Advocates

105

**EXHIBIT J**

## MUTUAL SETTLEMENT AGREEMENT AND RELEASE

California Open Lands, Plaintiff and Cross-Defendant (COL), and the County of Butte/Butte County Public Works (County), Defendant and Cross-Complainant, together, Parties, enter into the following Mutual Settlement Agreement and Release (Agreement):

### 1.   Nature of Complaints

A.   COL filed Butte County Superior Court Case No. 20CV01220 (Action) against County.   The Action seeks declaratory and injunctive relief against the County in connection with a Conservation Easement between the Parties recorded November 2, 2007 (CE), a true and correct copy of which is attached as Exhibit A and incorporated herewith.

B.   In response to the Action, the County filed a Cross-Complaint seeking declaratory relief as to the size of the Preserve created by the CE.

### 2.   Intent of Agreement

A.   This Agreement consists of a compromise and settlement by COL of its claims against County arising from the Action and a compromise and settlement by the County of its claims against COL as set forth in the Cross-Complaint.

B.   The Parties intend that the terms of this Agreement shall be used by the Parties in connection with the CE and shall be used by the Parties in proceeding under and by the CE.

C.   This Agreement is not, and shall not be treated as, an admission of liability by any Party for any purpose.

–1–

107

### 3.      Definitions

A.      Conservation Easement:   The Conservation Easement between the Parties recorded November 2, 2007, a true and correct copy of which is attached as **Exhibit A** and incorporated herewith.

B.      Golder Map: Neal Road Recovery and Waste Facility systems map, attached hereto as **Exhibit B**.

C.      NRRWF: Neal Road Recovery and Waste Facility.

D.      Open Space Management Plan: The Neal Road Landfill Open Space Preserve Management Plan for "Preserve," attached as Exhibit C to the Conservation Easement.

E.      Preserve: the area of land as described in the Conservation Easement.

F.      Storm-Water Detention Basin: for the purposes of this Agreement only, the 'Storm Water Detention Basin' referred to in this Agreement shall refer to the area described as the "storm water detention basin" on the topographic map attached as **Exhibit C**.

### 4.      Violations of the Conservation Easement

The County agrees as follows:

1.      Discharges of leachate into the Preserve by the County of Butte are violations and breaches of the Easement.

2.      Excavation and removal of soils from within the Preserve by the County of Butte are violations and breaches of the Easement; provided, however, that the County may engage in maintenance or repair activities for drainage in the Storm-Water Detention Basin, as provided in Section 4.D. of the Conservation Easement and Section 6.6 of the Open Space Preserve Management Plan.

–2–

3.    The destruction and removal of vegetation by the County of Butte in the Preserve are violations and breaches of the Easement; provided, however, that the County may engage in maintenance or repair activities for drainage in the Storm-Water Detention Basin, as provided in Section 4.D. of the Conservation Easement and Section 6.6 of the Open Space Preserve Management Plan.

4.    Uses of motorized equipment to excavate or grade soil in the Preserve are violations and breaches of the Easement; provided, however, that the County may engage in maintenance or repair activities for drainage in the Storm-Water Detention Basin, as provided in Section 4.D. of the Conservation Easement and Section 6.6 of the Open Space Preserve Management Plan, with motorized equipment.

5.    Unpermitted discharges of methane and untreated landfill gases into the air of the Preserve by the County of Butte are violations and breaches of the Easement.

### 5.      Notice by County to COL

A.    Excepting maintenance or repair activities for drainage in the Storm-Water Detention Basin undertaken pursuant to Section 4.D. of the Conservation Easement and Section 6.6 of the Open Space Preserve Management Plan, prior to engaging in non-emergency excavation, grading, or vegetation-removal activities within the Preserve, the County of Butte, including its agents, servants, employees, officers, and representatives, and others acting in concert with them or on their behalf, will obtain COL's prior written approval, such approval shall not unreasonably be withheld.   COL's failure to respond within 15 days of notice shall be deemed as acceptance.

B.    In the event of emergency excavation, grading, or vegetation-removal activities within the Preserve, the County of Butte will provide COL as much written notice, by text or email, as is practical.

–3–

109

### 6.      Conservation Easement Projects

A.      Within 90 days of the execution of this Agreement, the County will install a mechanical gate located along the north portion of the unlined drainage ditch in the area adjacent to MD4D (U-12) in the attached Golder Map, such that the gate will cause water in the ditch to flow to the Preserve.   County personnel will monitor the water level of the Preserve, and when the level reaches the point of overflow through the Conservation Easement discharge structure, the mechanical gate will be opened, resulting in the flow of storm water discharged from the Basin 4 pump being directed to Sedimentation Basin 2.   At all other times, this gate will remain closed.

B.      Within 90 days of the execution of this Agreement, the County will develop and submit to COL for comment a plan for regrading and restoring the October 2019 remediated area of the Storm-Water Detention Basin pursuant to the Sedimentation Basin Reseeding specifications (Golder Associates, March 2004, pages 10-15) utilized in the original construction of the Storm-Water Detention Basin, including: seed mix ratio (California Brome, White Yarrow, Meadow Barley, Creeping Wildeye, Richmond Slender Wheatgrass), seeding schedule (between Sept 15th and Nov 15th), and seeding application method.   The County shall regrade and restore the October 2019 remediated area of the Storm-Water Detention Basin to address revegetation, including the replanting of vegetation and cottonwood trees, if any, removed from the Storm Water Detention Basin, so long as such regrading and restoration does not frustrate the purposes of the Storm Water Detention Basin in accordance with the Easement.   Work to be performed by the County, in consultation with the Monitoring Biologist.   Upon proof by COL as to the number of trees removed by the County, if any, the Plan will provide that an equivalent number of trees will be replanted in the Preserve.   The parties will meet and confer in good faith, with each side exchanging evidence in support of their position regarding the issue of the number of trees removed by the County, if any, within 15 days of the execution of this

–4–

Agreement.   In the event that the parties cannot agree as to the number of trees, if any, removed by the County, the parties agree to schedule a further settlement conference at the court's earliest convenience, to attempt to resolve the issue.   If, following that settlement conference, the parties remain in dispute as to the number of trees removed by the County, if any, the issue will be tried to the Court and decided upon a preponderance of the evidence standard, with the prevailing party to receive costs and fees incurred in resolving the issue.   The County will obtain relevant permits and approvals, including, but not limited to, obtaining approval from the U.S. Army Corps of Engineers.   The parties understand that work cannot proceed unless all necessary permits and approvals are obtained first.

C.      The County anticipates that it will no longer haul leachate offsite.   In the event that leachate trucks are filled with leachate at the NRRWF after December 31, 2022, secondary containment in the form of a reinforced Portland Cement Concrete slab with perimeter rollover berms will be constructed at the area where trucks are filled, such construction to be completed no later than July 1, 2023.

D.      Upon execution of this Agreement, each month, for 24 months, the County will provide to COL the weekly monitoring reports for the piezometer at the leachate impoundment south of the Preserve.

E.      Within 90 days of the execution of this Agreement, the County will encase the leachate pipe that crosses the road directly north of the leachate basin, as is depicted in the Golder Map, within a larger diameter pipe and then encase that with either compacted soil backfill or a slurry mix concrete backfill.

F.      Miscellaneous

1.      Consistent with access provided by the Conservation Easement, COL may inspect the drainages contributing storm water flows to the Preserve upon 48 hours notice to the County prior to any inspection, physical conditions permitting.

–5–

2.      The County shall provide a copy of the Investigative Final Report related to the investigative study to determine the impacts of the leachate discharges on the soil, vegetation, and biological species present in the Preserve to COL within seven days of uploading the report to the GeoTracker website.

3.      The County shall provide COL with seven days advance notice of any physical sampling or testing that requires the County to physically access the area described by the legal description attached to the Easement as Exhibit A.  COL may be present at all such physical sampling or testing, provided that COL personnel comply with all applicable safety requirements.

4.      COL, at its expense, may install and operate a video camera located within the Conservation Easement, with such camera directed to the Conservation Easement.

### 7.      Dismissal, Release and Discharge

A.      In consideration of the above, within 30 days of the Parties resolving the issue of Costs of Enforcement as set forth in Section 8 below, COL shall dismiss the Action with prejudice.

B.      In consideration of the above, the County shall dismiss the Cross-Complaint with prejudice within 10 days of the execution of this Agreement.

C.      COL hereby releases, waives and discharges County and County's predecessors, successors in interest, heirs, insurers, executors, administrators, assigns, departments, employees, supervisors, board members, agents and County's past, present and future officers, agents, insurers, managers, employees, departments, employees, supervisors, board members, agents and attorneys from and relinquish any and all past or present claims, demands, obligations or causes of action for compensatory or punitive damages, arising from any claims or disputes which arise

–6–

from the subject matter of the Second Amended Complaint, except for those related to civil action 2:20-cv-00123-KJM-DMC which is still pending before the United States District Court in the Eastern District of California.

D.     The County hereby releases, waives and discharges COL and COL's predecessors, successors in interest, heirs, insurers, executors, administrators, assigns, departments, employees, board members, agents and COL's past, present and future officers, agents, insurers, managers, employees, departments, employees, board members, agents and attorneys from and relinquish any and all past or present claims, demands, obligations or causes of action arising from any claims or disputes which arise from the subject matter of the Cross-Complaint.

## 8.     Costs of Enforcement

Within 10 days of the execution of this Agreement, the Parties agree to meet and confer in good faith to resolve the Costs of Enforcement.   If, within 30 days of the execution of this Agreement, the Parties are unable to reach agreement, the Parties agree that prior to seeking a formal determination by the Court, the Parties will request that the Court set a settlement conference on the matter to be held no later than 60 days from the execution of the Agreement. The Parties agree that the County is not entitled to any Costs of Enforcement.

## 9.     Provisions to Enforce Agreement

A.     In the event it becomes necessary for any Party to take legal action to enforce or interpret this Agreement, the prevailing party shall be entitled to recover its reasonable costs and attorneys fees.

B.     Prior to taking any such action, the Party seeking to enforce this Agreement shall provide the other Party with written notice of the basis for the enforcement action and an opportunity to cure and correct as is set forth at section 7(A) of the CE.

–7–

## 10.    Execution of Other Documents

The Parties agree to execute, file, and record Requests for Dismissal with Prejudice in Butte County Superior Court as set forth above.   The Parties further agree to execute any other documents or writings which may be necessary or appropriate to give full force and effect to the terms of this Agreement.

## 11.    Entire Agreement

This Agreement contains the entire agreement between the Parties.   All previous oral agreements and/or discussions regarding settlement are superseded by this Agreement.

## 12.    Construction of Agreement

The Parties acknowledge that this Agreement is to be construed and interpreted without regard to the identity of the party drafting this Agreement.

## 13.    Unenforceable Terms

If any terms or provisions of this Agreement, or the application thereof, to any persons or circumstances shall, to any extent, be held invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each such term or provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

–8–

114

14.    Counterparts

This Agreement may be executed in counterparts and each signed copy shall be deemed original thereof.   A faxed or electronic signature is valid as an original wet ink signature.

DATED:    4/25/2022                    *Holly Nielsen*
_____
Holly Nielsen, Executive Director
California Open Lands


DATED:    _____
_____
Andy    Pickett,    Butte    County    Chief
Administrative Officer, for the County of
Butte


Approved as to form:

DATED:    4/25/22                    *[signature]*
_____
Andrew L. Packard, Attorney for California
Open Lands


DATED:    _____
_____
Gregory P. Einhorn, Attorney for County of
Butte

–9–

115